UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| NEW LONDON TOBACCO MARKET, INC. and FIVEMILE ENERGY, LLC,<br><br>Plaintiffs<br><br>V.<br><br>KENTUCKY FUEL CORPORATION and JAMES C. JUSTICE COMPANIES, INC.,<br><br>Defendants | Civil No. 12-91-GFVT<br><br>**MEMORANDUM OPINION**<br>**&**<br>**ORDER** |

*** *** *** ***

Before the Court is Magistrate Judge Hanly A. Ingram's Report and Recommendation. [R. 259.]  The Court will now ADOPT the Magistrate's report.

**I**

Over the last four years, Defendants Kentucky Fuel Corporation and James C. Justice Companies, Inc. have inundated this Court with duplicative arguments, deliberately withheld discoverable material, and violated multiple court orders.  The Court need not waste any further time detailing the Defendants' startling history of obstruction and delay, but will incorporate by reference its previous summaries of this conduct.  [R. 189, 206, 251, 255.]  After contending with the Defendants' abusive tactics for almost two years, the Magistrate finally concluded that he could "fathom no sanction that [would] result in appropriate compliance by Defendants or sufficiently address Defendants' behavior other than entry of default judgment."  [R. 189 at 22.] In September 2014, this Court agreed with the Magistrate that the Defendants' flagrant and unapologetic history of non-compliance was, "by definition, contumacious and enough to

conclude they acted in bad faith." [R. 206 at 8.]  The Court noted that the Defendants did "not even argue that they were unable to comply with the Court's orders," compelling the conclusion "that they could have complied but elected not to do so." [*Id*.]  With this "appalling" behavior in mind, the Court found that the Defendants' conduct "justifie[d] the entry of default judgment." [*Id.* at 21.]

In September 2015, the Court directed the Magistrate to "establish a briefing schedule and hold proceedings to make appropriate findings and issue a recommendation as to how much should be awarded to Plaintiffs' counsel in compensation for attorneys' fees and reasonable expenses relating to their motions for sanctions and attempt to depose Mr. Justice." [R. 227 at 7.]  The Plaintiffs then filed three proposed calculations of their fees and expenses. [R. 208, 240, 244.]  The Defendants objected to virtually every aspect of the Plaintiffs' calculations. [R. 209, 241, 256.]  On March 16, 2016, the Magistrate filed the present Report and Recommendation ("R&R"). [R. 259.]  The Magistrate recommended sustaining the Defendants' objections to the Plaintiffs' request for fees related to "the Plaintiffs' notice of supplemental authority" and the Defendants' "motion to strike" and "motion for extension of time," reasoning that those filings were not sufficiently related to the Plaintiffs' motions for sanctions and/or attempt to depose Mr. Justice. [*Id.* at 13.]  The Magistrate overruled the Defendants' remaining objections, however, and ultimately recommended that the Court award the Plaintiffs "$109,789.75 in attorneys' fees and expenses." [*Id.* at 24.]  The Defendants now object to almost every aspect of the Magistrate's recommendation.

II

A

In any case involving a request for attorneys' fees, "'[t]he primary concern . . . is that the fee awarded be reasonable,' that is, one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). For this reason, attorneys seeking compensation must "maintain billing time records that are sufficiently detailed to enable courts to review the reasonableness of the hours expended." *Wooldridge v. Marlene Indus. Corp.,* 898 F.2d 1169, 1177 (6th Cir. 1990). The fee applicant carries "the burden of providing for the court's perusal a particularized billing record" that supports the proposed amount. *Perotti v. Seiter,* 935 F.2d 761, 764 (6th Cir. 1991). The petitioner, "of course, is not required to record in great detail how every minute of his [or her] time was expended," but should "at least . . . identify the general subject matter of [ ] time expenditures." *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983).

When evaluating these records, "[t]he trial court's initial point of departure . . . should be the determination of the fee applicant's 'lodestar,' which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate." *Adcock-Ladd*, 227 F.3d at 349. After calculating this figure, "[t]he trial judge may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Id.* Although the district court's "exercise of discretion" in calculating a reasonable amount "is entitled to substantial deference," the court must still "provide a clear and concise explanation of its reasons for the fee award." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). This review "should state with some particularity which of the claimed hours the court is rejecting, which it is accepting, and why." *Smith v. Serv. Master Corp.*, 592 F.

3

App'x 363, 366 (6th Cir. 2014) (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1193 (6th Cir. 1997). And when a counterparty "raises specific objections to a fee award, a district court should state why it is rejecting them." *Wooldridge*, 898 F.2d at 1176.

**B**

The Defendants lodge five objections to the Magistrate's recommendation. First, they argue that the Magistrate "erred in his application of the '[l]odestar' approach when reviewing the reasonableness of the number of hours charged by Plaintiffs' counsel." [R. 261 at 4.] The Defendants first make the conclusory announcement that "Plaintiffs' chief counsel" provided "26 entries where the work performed [was] not directly related to the preparation for" the motions for sanctions or deposition of Mr. Justice. [R. 261 at 11.] The Magistrate reviewed these 26 entries and found that they all directly related to the motions for sanctions and/or attempted deposition. [R. 259 at 14.] He added that he could "not grasp Defendants' theory as to why these entries are unrelated to Plaintiff's motions for sanctions or the deposition of Mr. Justice," and reminded the Defendants that "[b]aldly asserting that the entries are 'unrelated' to the sanctions motions and deposition—without more—is insufficient to raise a contested issue of fact." [*Id*.]

In their objection to the Magistrate's report, the Defendants merely copy and paste the same argument cited above. The Court has carefully reviewed each of these 26 entries and agrees with the Magistrate that they are indisputably related to the motions for sanctions and/or deposition of Mr. Justice. The "charges for 9/30/13," for example, describe hours spent "work[ing] on motion for sanctions" and a conference to "discuss [the] case and motion for sanctions." [R. 240-1 at 3.] And an entry dated "1/15/14" lists "research[ing] cases for failure to appear and entry of default," and "draft[ing] inserts for [a] memo in support of Rule 37(d)

4

sanctions." [R. 240-1.] The rest of these entries—considered in the context of the procedural posture of this case during the time period in question—also plainly relate to the numerous hearings, motions, and orders arising out of the Defendants' habitual discovery abuses, the resulting motions for sanctions, and the final imposition of default judgment. [R. 240-1 at 4-9.] The Defendants' unsupported claim that this work was "not directly related" to the motions for sanctions is, at best, a gross mischaracterization of the record.[1]

    The Defendants also recycle the claim that the record contains "no mention" of whether some "charges were related to the actual preparation of pleadings as opposed to more perfunctory tasks." [R. 261 at 10.] They apparently take issue with the fact that many of the local counsel's charges were "for receiving, reviewing and responding to email from co-counsel." [R. 240-2 at 4.] A simple review of these entries reveals that each email involved communication about the Defendants' refusal to obey discovery orders, the Plaintiffs' attempts to depose Mr. Justice, and/or the preparation for, drafting, and review of the Plaintiffs' motions for sanctions. [R. 242 at 3-10.] The entries also expressly detail the nature of the email correspondence; the entry at 8/15/14, for example, states that counsel "received and reviewed email from J. Lucas regarding prejudice from lack of financial information; performed research and response email with and regarding draft argument." [*Id.* at 8.] Counsel also appropriately limited the number of hours charged for emails, often listing only ".1" or ".2" billable hours and charging "$20.00" or "$40.00" for his services. [*Id.*]

---

[1] The Defendants also suggest that "there are multiple entries included within the statements submitted by Plaintiffs' counsel that were never addressed by the Magistrate." [R. 261 at 10.] The Magistrate rigorously itemized and addressed each and every exhibit and declaration attached by the Plaintiffs. Of course, the trial court need not explicitly address each of the hundreds of entries contained in the attorneys' exhibits in order to "provide a clear and concise explanation of its reasons for [a] fee award." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343.

5

The Court notes, too, that co-counsel will often use email as a useful and necessary method of correspondence. Nothing about this form of communication renders the work performed invalid or otherwise unworthy of compensation. As the Plaintiffs properly observe, the Defendants have made no attempt to explain "[j]ust how local counsel is supposed to discharge his duties without 'receiving, reviewing, and responding' to communications from his co-counsel." [R. 263 at 3.] The Court thus agrees with the Magistrate that the number of hours charged by Plaintiffs' counsel were reasonable under the lodestar analysis.[2]

## C

Second, the Defendants argue that "[t]he Magistrate erred in his application of the '[l]odestar' approach when reviewing the hourly rates charged by Plaintiffs' counsel." [R. 261 at 4.] They insist that Sixth Circuit precedent requires the fee "to be commensurate with that charged by counsel in the local forum." [*Id.* at 12.] It does not. In fact, the principal case cited by the Defendants, *Adcock-Ladd*, 227 F.3d 343, faulted the trial court for "erroneously conclud[ing] that the hourly rate prevailing within the venue of the court wherein the case was commenced will *always* constitute the maximum allowable reasonable hourly rate for legal work performed by a foreign counselor in a venue other than the jurisdiction wherein the case was commenced." *Id.* at 350 (emphasis in original). Because special circumstances in that case required an out-of-state attorney to depose a party in the state where the attorney practiced, the Court determined that market rates in that state, rather than those charged in the local forum, were appropriate. *Id.* at 350-51. Similarly, in *Louisville Black Police Officers Org. v. City of*

---

[2] The Defendants relatedly argue that "the simple review of a document that was prepared by a different attorney would constitute 'unnecessarily duplicating the work of co-counsel' which is to be excluded." [R. 261 at 11.] The record shows that the attorneys often reviewed each other's work, communicated with each other about that work, and performed additional research and/or writing following those conversations. This process simply describes the way that law firms operate; needless to say, the Court will not penalize attorneys for working together. Collaboration is not duplication.

*Louisville*, 700 F.2d 268 (6th Cir. 1983), the court held that "[d]istrict courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases." *Id.* at 278; *see also Knop v. Johnson*, 712 F. Supp. 571, 582-83 (W.D. Mich. 1989) (holding that, "in keeping with the discretionary nature of fee awards," the Sixth Circuit does "not require the district court to look *only* to [local] rates," and district judges remain free to adjust "a fee upward or downward to reflect the quality of representation."); *Smith v. Serv. Master Corp.*, 592 F. App'x 363, 369 (6th Cir. 2014) (citing *Louisville Black Police Officers* as evidence of "Sixth Circuit authority that [holds] the relevant market need not be local to the venue.").

Rather than *require* lower courts to apply the market rate of the local forum, the Sixth Circuit holds only that courts should "*initially assess*" that rate when "calculating the reasonable hourly rate component of the lodestar computation." *Adcock–Ladd,* 227 F.3d at 350 (internal quotations omitted). But in addition to the local rate, courts may also consider other circumstances that might support a fee award above or below the local standard. *Cf. Smith v. Serv. Master Corp.,* 592 F. App'x 363, 370 (6th Cir. 2014) (reversing lower court's fee award only because "[t]he district court did not adequately explain its reasons for departing from the local rate for associates and did not discuss the governing criteria."). Among these additional considerations are the twelve criteria announced in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), which include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

7

*Paschal v. Flagstar Bank*, 297 F.3d 431, 435 (6th Cir. 2002) (citing *Johnson,* 488 F.2d 714)). The Court may consider these factors separately from its initial assessment, although the *Johnson* factors "usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley* 461 U.S. at 434.  And finally, "[w]hen fees are sought for an out-of-town specialist," courts should also consider "(1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995).  The Court may relatedly "question the reasonableness of an out-of-town attorney's billing rate if there is reason to believe that competent counsel was readily available locally at a lower charge or rate." *Id.*

To summarize, then, a proper lodestar analysis in this case requires four broad and related considerations.  First, the Court should "initially assess" the prevailing market rate of the forum. *Adcock–Ladd,* 227 F.3d at 350.  At the same time, the Court must situate that rate alongside (2) the twelve criteria enumerated in *Johnson*, (3) the specific analysis provided in *Hadix*, and (4) any other special circumstances warranting an adjustment of the rate.  After balancing all of these considerations, the Court may exercise its substantial discretion in calculating a reasonable award.

Here, the Magistrate's R&R carefully followed the steps outlined above.  The Magistrate expressly recognized that a court should "'initially assess the prevailing market rate of the [local] community,'" and noted that "Mr. Lucas charged Plaintiffs $425 an hour, while [local counsel] charged $200 an hour." [R. 259 at 5, 15, 17.]  But the Magistrate also identified many other factors that warranted an adjustment of the rate.  Citing the *Johnson* test, he found that "this litigation has been unusually time-consuming and laborious for Plaintiffs" as result of the

8

"tactics that led to these sanctions." [R. 259 at 20.] He added that these discovery abuses required a great amount of skill to combat, and "Mr. Lucas's diligence [was] commendable." [*Id.*] He also noted that the results obtained have been substantial, as the litigation involves claims in excess of $17 million, and counsel has "already succeeded in obtaining default judgment on three counts." [*Id.*] The "declarations of fellow attorneys and Mr. Lucas's CV" also demonstrated "his outstanding experience, reputation, and ability—facts Defendants d[id] not attempt to challenge." [*Id.*] And the president of the Plaintiff corporation, Mr. Brownlow, "explained the he and his company have a relationship with Mr. Lucas going back to 1994," when Lucas represented the Plaintiff in another complex commercial case. [*Id.* at 18-19.]

Turning to the *Hadix* factors,[3] the Magistrate concluded that "hiring Mr. Lucas (as opposed to someone from the Eastern District of Kentucky) was reasonable." [*Id.* at 18.] Plaintiff's corporate counsel indicated that he was "'intimately familiar with Mr. Lucas' practice having been associated with him in the same law firm for seven (7) years." [R. 259 at 16.] Brownlow also stated that, based on his "previous relationship with Mr. Lucas," he had "made the decision that [Lucas] would be [his] first choice as litigation counsel in any future complex matters." [*Id.* at 17.] Brownlow added that, given "the business practices of the Defendants and of their president, Mr. James Justice, [he] knew that it would be essential to have highly experienced and seasoned counsel because the Defendants would be formidable adversaries and difficult to deal with." [*Id.*] This personal exposure to Mr. Lucas's exceptional skill as a complex commercial litigator—coupled with Lucas's reputation as "the most able commercial litigator in [the Knoxville] area" that had for years "been the first and top choice of commercial

---

[3] The Court notes that many of the facts relevant to the *Hadix* analysis are equally relevant to the *Johnson* criteria.

9

litigators"—led Brownlow to conclude that hiring Mr. Lucas would be a prudent and cost-effective decision.[4]  [*Id.*]

Lastly, the Magistrate determined that "it was important for [Brownlow] to have lead counsel where he lived so that he, his wife, and corporate counsel could coordinate effectively." [*Id.* at 19.]  Lucas, Brownlow, and corporate counsel all live in Knoxville, Tennessee.  [*Id.* at 17.]  Most of the Plaintiff's records "are retained at [Brownlow's] home office" in Knoxville, and he conducts company business from Knoxville.[5]  [*Id.*]  Brownlow also strongly desired "to have lead counsel from Knoxville . . . with whom [he and his] wife could interact regularly," and

---

[4] The Defendants point out that "Plaintiffs also hired a London attorney," and argue that "[t]heir apparent satisfaction with his skill and experiences creates a 'reason to believe that counsel was readily available locally at a lower charge of rate.'"  [R. 261 at 14.]  Once again, however, the Defendants are simply describing the way that law firms routinely operate.  Out-of-state firms will frequently hire local counsel to assist them.  But it does not logically follow that hiring a local attorney to assist in certain aspects of litigation—and expressing "apparent satisfaction" with that attorney's performance—somehow affirms that local counsel was "readily available" to perform all of the same work performed by lead counsel.  For the reasons explained in this order, the Court finds that Mr. Lucas was unusually well-positioned to act as lead counsel in this case.

[5] The Defendants suggest that "[t]hough the president claimed that most of his company records were in Knoxville, the filings made with the Kentucky Secretary of State indicate that New London Tobacco Market is a Kentucky corporation with its principal place of business in London," and "the Secretary of State's records indicate that the now-dissolved Fivemile Energy Resources, Inc. was at or around the time of the lawsuit headed by Mr. and Mrs. Brownlow and located at the same premises."  [R. 261 at 13.]  The Plaintiff in this case is Fivemile Energy, LLC, not Fivemile Energy Resources, Inc.  Brownlow states that the latter is a company formed in 1988 by another individual and he had "nothing to do with it."  [R. 215-2. At 3.]  He indicates that he only formed Fivemile Energy, LLC in order "to acquire certain Fivemile leases" in 2009.  [*Id.*]  The Plaintiffs explained this distinction to the Defendants in 2014, though the Defendants continue to refer to the wrong corporation.  In any case, the simple fact that the corporation owned by Brownlow is located in London does not conflict with his statement that he keeps most business records in his home office.

10

with whom his corporate counsel "could work with and coordinate regularly."[6] [*Id.*] Given (1) Brownlow's personal history with Mr. Lucas, (2) Lucas's reputation as an uncommonly skilled commercial litigator, and (3) the efficiency and convenience of retaining counsel in Knoxville, the Court finds that it was reasonable for Brownlow to hire Mr. Lucas and pay him a fee roughly similar to his standard rate.[7]

The Court will end by emphasizing that the peculiar facts of this case also warrant an adjustment of Mr. Lucas's rate. The Defendants' repeated abuse of the discovery process "began at the very outset of the case." [R. 189 at 17.] They have not only refused to produce numerous discoverable documents, but have also "obstructed the search for truth" by "selectively disclos[ing] information . . . [and] withholding information they want[ed] to keep from the fact-finder." [*Id.* at 19.] This Court has previously found that, "[a]lthough the Plaintiffs 'were resourceful and did everything they could to be prepared for depositions with the discovery they had,' they [ ] plainly suffered prejudice resulting from 'the waste of time and money [spent]

---

[6] The Defendants counter that "after reviewing over two (2) years of billing records, however, it appears that Mr. Brownlow only met with Knoxville counsel three (3) times in person and twice telephonically." [R. 261 at 14.] The Plaintiffs argue that "[t]here are so many errors in th[is] statement that one scarcely knows where to begin, and these "numbers (three meetings and two telephone conferences) appear to have been pulled out of thin air." [R. 263 at 5.] The Court agrees. The document cited by the Defendants to support this claim, R. 244-4, is an unrelated declaration signed by Mr. Brownlow that contains no mention of the number of meetings that took place between the Brownlows and Lucas. The Plaintiffs suggest that "the detailed billing records" at DE 240-1 "reflect at least four personal meetings and nine phone calls between Messrs. Brownlow and Lucas during the 15-month period (*not* 'over two (2) years') covered by the time records dealing with the sanctions issues." [R. 263 at 5.] The Court's own review of these records reveals that at least six "conferences" took place during the relevant time period. [R. 240-1 at 5, 6, 7, 8.] In any event, these records only show those specific meetings that occurred over a 15-month period to discuss the motions for sanctions, and do not include any other meetings that took place over the last four years. The Plaintiffs indicate that "Messrs. Brownlow and Lucas met personally in Knoxville on numerous other matters in addition to the sanctions issues." [R. 263 at 5.] Although these additional meetings are not relevant to the Court's calculation of the hours spent dealing with the motions for sanctions, they are relevant to the reasonableness of Brownlow's decision to hire Lucas.

[7] Although Mr. Lucas's standard hourly rate ranges from $450-475 per hour, he proposes a discounted rate of $425 in this case. [R. 259 at 16.]

11

dealing with these abuses.'" [R. 251 at 3.] To be clear, the Court does not suggest that a higher fee award is necessary to punish the Defendants for their contumacy and bad faith, or that Lucas should be compensated here for work unrelated to the motions for sanctions and/or attempted deposition of Mr. Justice. Rather, the Court simply recognizes that the Defendants' obstructive tactics—which forced counsel to redirect his attention to the sanctions motions for which he now seeks compensation—amplified the difficulty, complexity, and undesirability of an already convoluted case. Accordingly, based upon all the considerations detailed above, and in light of the Court's deep familiarity with the unusual facts of this case, the Court finds that Mr. Lucas's hourly rate was reasonable. *Cf. Adcock-Ladd*, 227 F.3d at 349 (finding "the trial court's discretion in fee award cases sweeps broadly," particularly "when the rationale for the award [is] predominantly fact-driven.").

**D**

Third, the Defendants claim that "[t]he Magistrate erred in failing to conduct an evidentiary hearing as to the facts and issues raised by Plaintiffs' application for fees and expenses." [R. 261 at 5.] An attorney's "fee application may be decided without [an evidentiary] hearing," and such a hearing "is required only where the district court cannot fairly decide disputed questions of fact on the basis of affidavits and other documentation." *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1402 (6th Cir. 1995).[8] The Defendants argue here that "there are a number of factual issues relevant to the

---

[8] The Magistrate agreed with the Defendants' suggestion that "the evidentiary burden is greater if the party [is] seeking an enhanced award beyond the '[l]odestar" amount or when excessive hours are claimed." [R. 261 at 8.] But the Magistrate also found that the amount awarded did not represent "an upward adjustment from the lodestar amount." [R. 259 at 10.] The case law shows that a fee award does not represent an upward adjustment from the lodestar amount simply because that fee exceeds the local rate. *See Hensley* 461 U.S. at 434 (noting that the *Johnson* factors "usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."). The Defendants admitted as much when they stated that "[t]he *Johnson* factors have since been subsumed within the '[l]odestar'

reasonableness of the number of hours charged by Plaintiffs' counsel." [R. 261. at 9.] They cite the Magistrate's comment that he could "not grasp Defendants' theory as to why [certain] entries [were] unrelated" to the motions for sanctions, and claim that the "Magistrate should have held an evidentiary hearing" to resolve this confusion. [*Id.* at 11-12.] But the Magistrate did not suggest that he could "not grasp the Defendants' theory" because that theory was too complex or sophisticated to comprehend through briefing alone; rather, the Magistrate's confusion resulted from the fact that the Defendants' arguments were vague, conclusory, and facially contradicted by the record. For the reasons explained above, the Court agrees with the Magistrate that the Defendants' bald assertions were "insufficient to raise a contested issue of fact." [R. 259 at 14.]

The Defendants also insist that "[o]nly through a hearing could the Magistrate accurately assess the evidence presented as to the accuracy of the averments made by Plaintiffs' counsel." [R. 261 at 9.] They fault the Magistrate for relying "instead upon affidavits made by corporate counsel and others of unknown biases." [*Id.*] But the Sixth Circuit has already held that a hearing is not required when the district court can "fairly decide disputed questions of fact on the basis of affidavits and other documentation." *Grandview Raceway*, 46 F.3d 1392 at 1402. And as the Magistrate noted, "the declarations submitted by Plaintiffs have the same force and effect as sworn statements." [R. 259 at 9] (citing 28 U.S.C. § 1746). Apart from their naked allusion to "unknown biases," the Defendants provide no support for their claim that the Court cannot fairly resolve these factual issues on the basis of the Plaintiffs' heavily detailed declarations. One party cannot simply manufacture grounds for an evidentiary hearing by raising the possibility, in the absence of any factual support, that a counterparty committed perjury.[9]

---

approach adopted by the Supreme Court." [R. 256 at 4.] But even assuming that a heightened evidentiary burden is warranted, the Court still finds that a hearing is not necessary because the Defendants have completely failed to raise a credible factual dispute.

[9] The Defendants also briefly argue that the Court should hold an evidentiary hearing because "most of

Finally, the Defendants also support their demand for an evidentiary hearing by citing to two cases—*Johnson*, 488 F.2d 714, and *Adcock-Ladd*, 227 F.3d 343—where an appellate court reversed the trial court's award of attorneys' fees. [R. 261 at 7.] But the Defendants conspicuously decline to explain *why* those courts reversed the district court's judgment. Instead, they summarily suggest that each panel reversed the trial court because "the evidentiary basis" for the fee was "inadequate" and the lower court needed "to make additional findings." [*Id.* at 6-7.] That is a flat misstatement of both courts' holdings, neither of which directly concerned the need for an evidentiary hearing. In *Johnson,* the court remanded the case only because the district court had failed "to consider the [*Johnson*] factors" listed above. *Johnson*, 488 F.2d 714 at 720. The Magistrate carefully analyzed those factors here. And as previously explained, the court in *Adcock-Ladd* reversed a fee award because "the trial court erroneously concluded that the hourly rate prevailing within the venue of the court wherein the case was commenced will *always* constitute the maximum allowable reasonable hourly rate for legal work performed by a foreign counselor in a venue other than the jurisdiction wherein the case was commenced." *Adcock-Ladd*, 227 F.3d 343 at 350 (emphasis in original). The Magistrate certainly did not commit that error here, despite the Defendants' best efforts.

By citing to these cases, the Defendants misconstrue the standard for granting an evidentiary hearing. The purpose of an evidentiary hearing is not to debate the proper legal

---

the declarations upon which the Magistrate relied were filed with Plaintiffs' reply memorandum," and the Defendants never had an opportunity to "comment" on those "opinions offered" because "the matter was by then submitted." [R. 261 at 8.] What the Defendants fail to mention is that the Magistrate allowed supplemental briefing on the issue of whether to grant an evidentiary hearing *after* the Plaintiffs had already filed their reply memorandum. [R. 254.] The Defendants then filed a 14-page brief in which they cited the Plaintiffs' reply memorandum and extensively objected to the reasonableness of the Plaintiffs' charges. [R. 256 at 6-13.] The Defendants also had an opportunity to dispute the accuracy of these declarations in their present objections to the Magistrate's R&R. In each instance, they failed to provide any credible grounds for granting a hearing.

14

standards governing a particular issue, or to question whether the court has considered all the legal criteria relevant to the disposition of a party's motion. All of those issues can be, and have been, addressed in the parties' briefing or at oral argument. Rather, the purpose of an evidentiary hearing is to help resolve a credible, existing factual dispute. As demonstrated throughout this order, the Defendants have altogether failed to establish such a dispute. At best, they now seek an evidentiary hearing for the purpose of *creating* a factual dispute, hoping that cross-examination of "corporate counsel and others of unknown biases" might breathe life into their presently underdeveloped, conclusory allegations. The Court will not further waste the time of the Plaintiffs and this Court by granting such a hearing.

### E

Fourth, the Defendants argue that "[t]he Magistrate erred by allowing Plaintiffs to recover attorneys' fees and expenses incurred after his initial [R&R]." [R. 261 at 16.] The Magistrate's initial R&R recommended that the Court impose sanctions on the Defendants for their repeated violation of court orders. [R. 189.] The Defendants objected to that recommendation, and the Plaintiffs responded to those objections. [R. 190, 198.] The Defendants apparently believe that, because the Plaintiffs filed this response after submitting their "last motion for sanctions," the Court should not award any fees for work related to that filing. But the Court did not simply direct the Magistrate to recommend compensation for work performed *on* the motions for sanctions; instead, the Court asked the Magistrate to recommend "compensation for attorneys' fees and reasonable expenses *relating to* their motions for sanctions and attempt to depose Mr. Justice." [R. 227 at 7] (emphasis added). If the Court had sustained the Defendants' objections to the R&R, no sanctions would have been imposed. The Plaintiffs' opposition to these objections thus plainly related to the motions for sanctions.

15

The Defendants also argue that compensating the Plaintiffs for this work would "improperly punish[ ] Defendants for exercising their right to seek review under 28 USC 636(b)(1) and Rule 72(b)." [R. 261 at 17.] This claim ignores the parallel right of the Plaintiffs to recover all fees and expenses relating to their motions for sanctions. As the Magistrate correctly recognized, "[i]t is Defendants' contumacious conduct that engendered this litigation over attorneys' fees," and the Plaintiffs' "right to respond to Defendants' objections to the R&R was just as strong as Defendants' right to object." [R. 259 at 10.] The Court also agrees that "[d]isallowing fees incurred in responding to the objections would create a perverse incentive to abandon a party's efforts to obtain justified sanctions." [*Id.* at 10-11.] The Plaintiffs' application for these fees was proper.

### F

Fifth and finally, the Defendants claim that "[t]he Magistrate erred in failing to impose a 3% cap on fees and expenses charged by counsel for the preparation and litigation of this claim." [R. 261 at 17.] They cite *Coulter v. State of Tenn.*, 805 F.2d 146 (6th Cir. 1986), for the proposition that "the hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case when the issue is submitted on the papers without a trial." *Id.* at 151. In *Coulter*, a law professor sought compensation for (1) fees incurred in his successful representation of a plaintiff in a civil rights suit, and (2) fees incurred in his drafting of the motion for attorneys' fees related to that representation. *Id.* at 148, 151. The court noted that the "legislative intent" behind the applicable civil rights statutes "was to encourage lawyers to bring successful civil rights cases, not successful attorney fee cases." *Id.* Any work performed on a motion for attorneys' fees, then, would have to "ride piggyback on" the earlier work performed on the "civil rights case" itself. *Id.*

The court thus held that, in order to strike "the right balance," those "hours allowed for preparing and litigating the attorney fee case should not exceed 3% of the hours in the main case." *Id.* This guideline was "necessary to insure that the compensation from the attorney fee case will not be out of proportion to the main case and encourage protracted litigation." *Id.* The court qualified, however, that "unusual circumstances" might warrant deviation from this guideline in future cases. *Id*; *see also Bunn Enterprises, Inc. v. Ohio Operating Engineers Fringe Benefit Programs,* 2016 WL 223717 at *5 (S.D. Ohio Jan. 19, 2016) (noting that "unusual circumstance[s]" can "make the *Coulter* limitation on attorney fees inapplicable," and finding the case before that court distinguishable from civil rights cases under Title VII).

If ever there were an "unusual circumstance" warranting a departure from *Coulter*'s suggested rate, this would be the case. The present facts are readily distinguishable from those in *Coulter*. The dual concerns animating the *Coulter* court—that "compensation from the attorney fee case will not be out of proportion to the main case" or "encourage protracted litigation"—strongly cut against the Defendants' claims here. This dispute does not even arise out of work performed on the main litigation of this case; instead, the Plaintiffs seek compensation for their unexpected work on Rule 37 motions for sanctions. The Plaintiffs never intended or desired to work on these motions; it was only the brazen, habitual, and unrepentant obstruction of the Defendants that necessitated this *detour* from the substantive claims raised in the main case. And the "protracted" nature of this fee dispute is entirely attributable to the Defendants' morass of conclusory objections and repeated refusal to accept responsibility for their violation of numerous court orders. Application of the 3% guideline here would not serve the principles governing *Coulter*, and would in fact punish the Plaintiffs for their admirable attempts to expedite the resolution of this case.

## III

The Defendants' objections to the Magistrate's R&R are meritless.  Accordingly, the Court **HEREBY ORDERS** as follows:

1. The Magistrate's Report and Recommendation **[R. 259]** is **ADOPTED** as and for the opinion of the Court;

2. The Plaintiffs' Supplemental Motion for Attorney Fees **[R. 240]** is **GRANTED IN PART**; and

3. The Court **HEREBY AWARDS** the Plaintiffs **$109,789.75** in fees and expenses.

This 20th day of July, 2016.

Gregory F. Van Tatenhove
United States District Judge