UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| NEW LONDON TOBACCO MARKET, INC., and FIVEMILE ENERGY, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | No. 6:12-CV-91-GFVT-HAI |
| v. | ) ) ) | REPORT & RECOMMENDATION |
| KENTUCKY FUEL CORPORATION and JAMES C. JUSTICE COMPANIES, INC., | ) ) ) | |
| Defendants. | ) ) | |

*** *** *** ***

This is a highly contentious lawsuit involving leases to mine coal. Plaintiffs are New London Tobacco Market ("NLTM") of London, Kentucky, and its agent Fivemile Energy, LLC, of Tennessee. In 2012, Plaintiffs sued Defendants for breach of contract and fraud related to an agreement to mine coal (the Fourth Amendment). On September 30, 2014, District Judge Van Tatenhove granted Plaintiffs' request for a default judgment against Defendants as to liability on Counts I, II, and V of the Amended Complaint as a sanction against Defendants under Federal Rule of Civil Procedure 37(b)(2) for their deliberate noncompliance with multiple discovery orders. D.E. 206.

Count I alleges that Defendants breached section 9 of the Fourth Amendment by (1) failing to pay required minimum royalty payments and (2) failing to pay monthly retainer fees. D.E. 40 at 10. Count II alleges that, as a result of the breach, Defendants owe lost tonnage royalties, which Plaintiffs calculated using an independent arbiter as authorized under section 7 of the Fourth Amendment. *Id.* at 11. Count V alleges that Defendants committed fraud to

induce assent to the Fourth Amendment because they "did not intend to honor their obligations or to make the payments due when they were required[.]" *Id*. at 14-16.

On October 16, 2014, Plaintiffs filed a Rule 55 motion to determine and award damages under Counts I and II. D.E. 210. Plaintiffs' position was that those damages "are breach of contract damages for liquidated amounts that are susceptible of mathematical computation and that can readily be determined from the pleadings." D.E. 210-1 at 3. In a September 15, 2015 Order, Judge Van Tatenhove indicated he would refer the motion to the undersigned, but asked that consideration of the motion be delayed until liability was determined regarding Counts III and IV. D.E. 227 at 3. The Court denied the Rule 55 motion without prejudice. *Id*. at 7-8. The Order also referred to the undersigned "as he deems necessary, [to establish] a briefing schedule, and hold[] proceedings to make appropriate findings and issue a recommendation regarding damages on Counts I, II, and V (although the Court anticipates that such recommendations will not be made until after Counts III and IV are resolved) . . . ." *Id*. at 7.

On January 4, 2016, Plaintiffs sought voluntary dismissal of Counts III and IV. D.E. 245. That motion was granted on February 2, 2016. D.E. 251. The same order directed the undersigned to "(l) hold any proceedings necessary to make appropriate findings of law and fact regarding damages as to Counts I, II, and V of the Plaintiffs' Amended Complaint and (2) issue a report and recommendation regarding these damages." *Id*. at 6. The undersigned conducted a teleconference on February 8, in which the parties were directed to file a prehearing memorandum regarding damages on Counts I, II, and V. D.E. 254.

Two rounds of briefing followed. Plaintiffs filed a prehearing memorandum on March 11, 2016. D.E. 258. In the memorandum, Plaintiffs indicated they would file a Rule 55 motion "asking the Court to recommend a damages award on all Counts without the necessity of

scheduling an evidentiary hearing." *Id*. at 1. Defendants filed a response memorandum (D.E. 262), and Plaintiffs replied (D.E. 265). Defendants moved to strike a portion of Plaintiffs' reply memorandum. D.E. 269. Plaintiffs filed a motion to determine the confidentiality of certain documents. D.E. 274. Both of these motions were followed by a response and a reply. The motion to strike was denied (D.E. 287), but the motion to determine confidentiality remains pending, and will be addressed by separate order.

On April 29, 2016, Plaintiffs filed their renewed Rule 55 motion. D.E. 270, 271. Defendants responded (D.E. 277), and Plaintiffs replied (D.E. 284). On July 22, 2016, Judge Van Tatenhove entered an order making clear that the Rule 55 motion was referred to the undersigned "for the preparation of a report and recommendation." D.E. 286.

On October 20, 2016, new counsel entered their appearance for Defendants (D.E. 289) and filed a motion for "a hearing at which counsel can argue the pending motions, including Plaintiffs' Renewed Motion Under Rule 55" (D.E. 290).[1] Plaintiffs opposed the motion (D.E. 292), and Defendants replied (D.E. 294). The Court now considers Plaintiffs' Rule 55 motion (D.E. 270, 271), along with the related prehearing memoranda.

## I.

The first issue to consider is whether an evidentiary hearing or trial is necessary on these motions. "Where damages are unliquidated a default admits only defendant's liability and the amount of damages must be proved." *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995) (quoting *Fehlhaber v. Fehlhaber,* 681 F.2d 1015, 1026 (5th Cir. 1982) (en banc)). Although Plaintiffs' damages must be proven, in this case an evidentiary hearing is not necessary to do so. "Upon default, the well-pled allegations of the complaint relating to liability are taken

---

[1] The new motion also anticipates oral argument on Plaintiffs' November 13, 2014 motion to strike at Docket Entry 215 (D.E. 290; D.E. 294 at 3), but that motion was already denied without prejudice in September 2015 (D.E. 227 at 8).

as true, but those relating to the amount of damages suffered ordinarily are not. . . . Thus, "'[d]amages must be proved unless they are liquidated or capable of calculation.'" *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012) (quoting *Merrill Lynch Mortg. Corp. v. Narayan,* 908 F.2d 246, 253 (7th Cir. 1990)). "While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974).

The Court agrees with Plaintiffs that the record is sufficiently developed and the damages are capable of mathematical calculation so as to be proven without an evidentiary hearing. Federal Rule of Civil Procedure 55, governing default judgments, provides that the court "may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2).

When "the amount of damages can be determined from the pleadings, affidavits and submissions by the parties, the Court need not hold a separate hearing on damages and may enter judgment on damages based on the record." *Great Plains Servs., Inc. v. K-VA-T Food Stores, Inc.*, No. 7:05-CV-56-ART, 2008 WL 3077873, at *1 (E.D. Ky. Aug. 4, 2008) (collecting cases to this effect). "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." *Pope v. United States*, 323 U.S. 1, 12 (1944). An evidentiary hearing is "an available tool, not a prerequisite, to the determination of a damage award." *AngioDynamics, Inc. v. Biolitec AG*, 780 F.3d 429, 436-37 (1st Cir.) (affirming an award of damages in a default judgment without an evidentiary hearing when the damages were mathematically calculable and the court was "well-

acquainted with the egregiousness of Defendants' conduct."), *cert. denied*, 136 S. Ct. 535 (2015); *Vesligaj v. Peterson*, 331 F. App'x 351, 355-56 (6th Cir. 2009) (upholding, in part, an award of damages that was determined without a hearing).

In this case, the record available at the time of the award of default contains sufficient facts for the Court to make an informed calculation of damages. These documents include the Amended Complaint, the Fourth Amendment (the operative contract between the parties), and the independent arbiter's report. It is true that subsequent affidavits and other documents have been filed in the record, but the Court's reliance on these is minimal.

Defendants' failure to engage in ***any*** timely discovery concerning Plaintiffs' claimed damages (D.E. 300 at 1; D.E. 298 at 1-2) colors their claim for an evidentiary hearing. Without engaging in written discovery or taking depositions concerning damages, an evidentiary hearing at this point would essentially be an exercise in discovery instead of an orderly presentation of proof. Of course, no party is required to engage in such discovery to pursue a claim or defense. But, given Defendants' obstructive behavior throughout this case, their failure to take discovery on Plaintiffs' damage claims sullies, in the Court's view, their motivation at this point. It is precisely this type of familiarity with a party's litigation misconduct that *Frame II* recognizes as requiring deference in this context. *See Frame II*, 6 F.3d at 311 ("After seven years of trying a case, a district court judge should be trusted when he elects not to seek more evidence on matters with which he is already familiar.").

Defendants argue that the Kentucky constitution and KRS § 411.186(2) grant them a right to a jury trial on the amount of punitive damages. D.E. 262 at 28-31. In general, there is no federal constitutional right to a jury trial following a default. *Dell, Inc. v. Elles*, No. 07-2082, 2008 WL 4613978, at *4 (6th Cir. June 10, 2008). When a Kentucky litigant seeks punitive

damages, § 411.186 mandates two decisional phases. In the first phase, the jury (or judge if jury trial is waived) assesses whether punitive damages should be awarded. In the second phase, "the trier of fact" determines the amount of punitive damages based on a five-factor test. In general, federal courts apply *federal* procedural rules. *Rupert v. Daggett*, 695 F.3d 417, 423 (6th Cir. 2012) ("Federal courts sitting in diversity generally apply federal procedural rules and the substantive law of the forum state."). Defendants have not pointed to a case in which a federal court found that KRS § 411.186 mandated that punitive damages be assessed by jury trial. Nor has the Court been able to find such a case. However, the Court did find a case in which Judge Russell of the Western District applied the five-factor test of § 411.186 and awarded $1 million in punitive damages following a hearing, but without a trial. *Jackson v. Renfrow*, No. 1:13-CV-116-TBR, 2014 WL 5366110, at *3 (W.D. Ky. Oct. 21, 2014).

This case is similar to *James v. Frame* ("*Frame II*"), 6 F.3d 307, 309-11 (5th Cir. 1993). The appellate court in *Frame II* noted that, although "[a] default judgment typically arises early in the proceedings, often when the court has received little substantive evidence," this was not true of the case at hand:

> To the contrary, plentiful evidence on the appellant's conduct has been received. The district judge, himself, has maintained a long and close familiarity with the issues in this matter. We cannot say that the evidence in this case was insufficient to allow a district court, in its measured discretion, to forego an evidentiary hearing.

*Frame II*, 6 F.3d at 310. The *Frame II* court described a Second Circuit case in which the district judge had "permissibly relied on 'detailed affidavits and documentary evidence, supplemented by the district court Judge's personal knowledge of the record, gained during four years of involvement with the litigation.'" *Id.* (quoting *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991)). Similarly, the record in this case is robust and the briefing on damages has

been extensive. The Court is painfully familiar with the conduct of Defendants. *See HMG Prop. Inv'rs, Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 919 (1st Cir. 1988) (citing the district court's "years of travail" with a default case in upholding a hearing-less damage award). Under the unusual circumstances of this case, no trial or evidentiary hearing is warranted.

Defendants' motion for a hearing (D.E. 290) requests a hearing prior to any evidentiary hearing. Because there will be no evidentiary hearing there is no need to hold a hearing to establish the parameters of an evidentiary hearing. That motion will be denied by separate order.

## II. Damages Under Count I
### (Minimum Royalty Payments and Monthly Retainer Fees)

In Count I, Plaintiffs allege that Defendants failed to pay the minimum royalty payments and monthly retainer fees required under the Fourth Amendment. D.E. 40 at 10. The monthly retainer fees pertain to the "Strong Brothers" property, and are described in section 9 of the Fourth Amendment. That section begins by noting that

> The Strong Brothers Property is one of the properties leased by Fivernile Energy. Kentucky Fuel previously requested that NLTM assist Kentucky Fuel in completing documentation of the permitting and leasing of . . . the "Strong Brothers Property". Such permitting and leasing has been partially completed to the satisfaction of Kentucky Fuel but remains ongoing. Additionally, Kentucky Fuel has requested that NLTM, from time to time, provide additional services to Kentucky Fuel in connection with multiple properties and assignments, including but not limited to the Strong Brothers Property.

D.E. 40-5 at 6-7. Against this historical backdrop, section 9 describes the retainer fee payments and how the retainer agreement can be terminated:

> In consideration of the previously performed services, and the anticipated future services to be provided by NLTM, Kentucky Fuel agrees to pay NLTM a monthly retainer fee in the amount of $10,000 paid in arrears beginning December 1, 2010, and on the first day of each month thereafter and continuing until terminated by mutual agreement of the parties; provided, however, Kentucky Fuel or NLTM shall have the right to terminate such payment upon providing thirty (30) days prior written notice and, thereafter, neither Kentucky Fuel nor NLTM shall have no [sic] further obligation to provide services to Kentucky Fuel.

*Id*. at 7. The Amended Complaint alleges that Kentucky fuel paid $50,000 in retainer fees on May 2011, but had not paid any since then. D.E. 40 at 7-8. This appears to still be the case. D.E. 258 at 3-4.

Defendants argue that any of Plaintiffs' consulting services secured by the retainer agreement ended before the suit was filed. D.E. 262 at 19-23. Mr. Brownlow, they say, had already ceased doing any meaningful consulting work since before then.[2] D.E. 277 at 11. Defendants further argue that "the filing of a lawsuit alleging not only breach but fraud, is clear and unequivocal evidence of a termination of any working relationship." D.E. 262 at 22. In other words, Defendants argue there was an implicit mutual agreement of the parties that the consulting relationship had been terminated and abandoned. In the alternative, Defendants point to contract law, under which an agreement can be terminated by abandonment as reflected by conduct inconsistent with its continued existence. *Id*. at 20. Accordingly, Defendants ask that damages for retainer fees be cut off at the date the lawsuit was filed in May 2012. *Id*. at 22. Alternatively, Defendants state in their prehearing memorandum that they "now provide clear notice that Mr. Brownlow's services were and have been terminated." *Id*.

Defendants might have a valid claim of abandonment if not for the fact that this case is controlled by the award of default. Liability is established and the facts pleaded in the Complaint must be taken as true. *United States v. Conces*, 507 F.3d 1028, 1038 (6th Cir. 2007). Count I of the Amended Complaint states:

> Justice has failed to pay the Monthly Retainer Fee and minimum royalty payments as required by Section 9 of the Fourth Amendment. Pursuant to its guaranty, Justice presently is liable to NLTM in the amount of $435,000 for the unpaid Minimum Royalty Payments and the Monthly Retainer Fees, and is *further*

---

[2] William G. Brownlow is president of NLTM. D.E. 40 at 1. He and his wife constitute the members of Fivemile. *Id*. As such, he was responsible for performing the occasional "additional services" contemplated by section 9 of the Fourth Amendment.

> *obligated to pay all such future fees that accrue from and after the filing of this Amended Complaint.*

D.E. 40 at 10 (emphasis added).

Regardless of Defendants' arguments regarding abandonment or rescission, the effect of the default awarded to Plaintiffs is a finding that retainer fees have continued to accrue after the filing of the Amended Complaint. By provoking the Court to sanction them by way of a default judgment, Defendants are liable as defined by the Amended Complaint and therefore must pay these fees regardless of whether they feel Mr. Brownlow has continued to provide meaningful consulting services. Moreover, the retainer fees were designed not solely for ongoing services, but also as compensation for services already rendered regarding the Strong Brothers property. D.E. 40-5 at 6-7.

The undersigned recommends that damages under the retainer fee provision be assessed as of the date of final judgment. Although the fees may continue to accrue until judgment is rendered, currently 73 months have passed since December 1, 2010, when the first monthly payment was due. D.E. 40-5 at 7. Defendants have already paid $50,000. D.E. 40 at 7-8. Subtracting $50,000 from $730,000 yields a result that Defendants currently owe $680,000 in unpaid retainer fees.

In their brief supporting their Rule 55 motion, Plaintiffs ask for a declaratory judgment that Defendants are liable for future payments, effectively asking for a permanent injunction. D.E. 271 at 16. But they offer no legal argument to support this request, nor do they point to any cases in which such a request was granted. The Court does not recommend such relief.

The next issue under Count I is the minimum royalty payments. Under section 5(f) of the Fourth Amendment, Kentucky Fuel promised to pay NLTM $10,000 monthly for ten months, beginning December 1, 2010, followed by a lump payment of $15,000 on November 1, 2011,

and $75,000 annually beginning on December 1, 2011.  D.E. 40-5 at 5.  The parties agree that the principal and back-interest have been paid.  D.E. 265 at 21; D.E. 271 at 16.  Additionally, on December 1, 2016, Defendants hand-delivered a check for $75,000 to cover this year's minimum royalty fees.  D.E. 295.  Defendants therefore currently owe no damages for failure to make the annual minimum royalty payments under section 5(f) of the Fourth Amendment.

Plaintiffs seek a declaratory judgment that they "are entitled to continue to receive the annual $75,000 Minimum Royalty payments on December 1 of each year."  They argue these payments "should continue until the full amount of the $16,990,900 determined by the Independent Arbiter has been paid, with interest."  D.E. 271 at 18.  Defendants retort that no legal basis exists for such a declaratory judgment.  They argue that under 28 U.S.C. § 2201, there is no "actual controversy" regarding future royalties that may or may not be paid.  D.E. 277 at 13.  In response, Plaintiffs cite case law that a declaratory judgment may issue when the plaintiff alleges facts that show a likelihood that the opponent's injurious conduct will be repeated in the future.  D.E. 282-1 at 8.  Plaintiffs argue that Defendants' history of nonpayment and their "business strategy" of reneging on contracts satisfy this standard.  *Id*. at 8-9.

In this case, Plaintiffs are entitled to default judgment on Count I, and the task before the Court is to assess damages stemming from that entitlement.  The Amended Complaint did not seek any declaratory judgment, and none should be issued at this juncture.  It would also be difficult for the Court to find that Defendants' injurious conduct will be repeated in the future when they are currently up-to-date on these payments.  No declaratory judgment should issue.

### III.  Damages Under Count II
### (Lost Tonnage Royalties for Failure to Mine)

Section 7 of the Fourth Amendment provides as follows:

**7. Events of Default.** If Kentucky Fuel fails to perform under the terms of this Agreement, the occurrence of any of the following events shall constitute an "Event of Default" under the terms of this Agreement:

(a) If Kentucky Fuel fails to perform under the terms of the Prior Agreement or this Agreement; or

(b) If Kentucky Fuel or any successor and assigns fails to perform under the terms of any of the Leases or the Permits.

Upon the occurrence of an Event of Default, NLTM and Fivemile Energy may exercise any and all rights and remedies available to NLTM at law or in equity by reason of such Event of Default including but not limited to recovery of all fees and expenses incurred by NLTM or Fivemile Energy in their enforcement of the terms of this Agreement and specific performance of the obligations of Kentucky Fuel described herein. In the alternative, NLTM and Fivemile Energy may determine the estimated lost royalties that it would have received but for the Event of Default by Kentucky Fuel and such amount shall be immediately due and payable by Kentucky Fuel under the terms of this Agreement. Such royalties shall be determined by an independent arbiter selected by NLTM for the purpose of determining the amount of royalties that would have been paid by Kentucky Fuel to NLTM under the terms of this Agreement. As an additional remedy, NLTM may choose to exercise its rights against the Guarantor pursuant to the terms of the Guaranty Agreement in the form attached hereto as **Exhibit F.**

D.E. 40-5 at 6.

As permitted by the Fourth Amendment, Plaintiffs chose to address Defendants' default by having the lost tonnage royalties calculated by an independent arbiter. As section 7 states, the royalties calculated by the independent arbiter "shall be immediately due and payable by Kentucky Fuel under the terms of this Agreement." The entirety of the Independent Arbiter Report issued by Bob Conway is reproduced below:

**RE: Lost Royalty Estimate of the Five Mile Energy Permit in Breathitt County, KY**

Dear Mr. Brownlow:

Pursuant to your request, I am responding to provide my best professional judgment on the Fivemile Energy permitted areas of Breathitt County, Kentucky. It is my professional opinion that the estimated coal reserves underlying the subject properties, at **18,601,000 tons** of in situ reserves, more or less, underlying

the Five Mile Energy permitted areas. This estimate was formulated from the best available information at the time, circa 2003. No new information is known to this writer at this time. This estimate includes multiple seams at multiple elevations.

In the formulation of the subject permits the mining method was area surface mining and was approved by the regulators, state and federal. The standard 10:1 ratio of overburden to tons of coal was for the most part adhered to except for one area. It is reasonable to assume recovering 90% of the estimated reserves. Those numbers are: For Five Mile Energy: **16,740,000 tons** at 90% recovery.

Based upon the above amounts of recoverable coal, I estimate the lost royalty that NLTM would have received but for the default of Kentucky Fuel (and the $1.00 per ton royalty rate in the Fourth Amendment) the total royalties on Fivemile on **16,740,900** tons of coal are **$16,990,900.**

**Disclaimer:** This report is made in my role as independent arbiter pursuant to Article 7 of the Fourth Amendment of the Assignment of Leases and Permits from New London Tobacco Market to Kentucky Fuel. This report is to be used for that purpose only and for no other purpose without my express approval.

D.E. 40-6.

Count II of the Amended Complaint asserts that "NLTM has been damaged in the amount of at least $16,990,000.00. Pursuant to Section 7 of the Fourth Amendment this amount is immediately due and payable by Kentucky Fuel." D.E. 40 at 11.

Defendants insist that there is a contract-interpretation issue concerning the arbiter. D.E. 262 at 4-9. They ask the Court to construe any ambiguities in the Fourth Amendment against the Plaintiffs, who drafted it. *Id*. at 9. They argue that there never was an "Event of Default" as described in section 7. Kentucky Fuel states they never promised to mine by a certain date, and the Fourth Amendment imposed no time limit. Defendants claim they acted in good faith because mining there at that time was not commercially reasonable—the market was depressed. *Id*. at 5-7. Accordingly, they argue, there was no Event of Default triggering a remedy, and the arbiter never got their side of the story and "never specified the act or failure to act that constitutes the 'Event of Default.'" *Id*. at 11.

However, Defendants are subject to liability premised on accepting as true the well-pleaded facts in the Amended Complaint. This includes the fact that "Kentucky Fuel never intended to mine the properties" at issue. D.E. 40 at 3. This includes Plaintiffs' assertion that, "[n]otwithstanding its covenant to mine as set forth in Section 10 of the Fourth Amendment, Kentucky Fuel has not attempted to mine any of the coal[.]" *Id*. at 9. The Amended Complaint also includes the accusation that Defendants intentionally breached the contract and had "a pattern and practice of disregarding and refusing to pay its contractual obligations." *Id*. at 10. Accepting these accusations as true, Defendants defaulted as defined in section 7. *See also* D.E. 40 (Amended Complaint) at 11 ¶ 31 (establishing breach under section 7).

Defendants' arguments might have had merit, but they are essentially the defenses that could have been raised had they not invited a default judgment. Considering those arguments and defenses now would be incompatible with the sanction imposed by Judge Van Tatenhove. The Court is bound to assess the relief Plaintiffs are entitled to based on the liability established when accepting as true the facts in the Amended Complaint.

The remedies described in section 7 of the Fourth Amendment are clear. Plaintiffs chose to employ an independent arbiter, and his assessment of damages is immediately due and payable. The undersigned recommends assessing $16,990,900 in damages under Count II.

## IV. Compensatory Damages Under Count V
### (Fraud)

As previously noted, Plaintiffs alleged, and have now established, that Defendants entered into the Fourth Amendment with no intention of performing or making payments. Under Count V, Plaintiffs seek compensatory damages "in the amount of $17,000,000, or such other amount that the evidence may show is due and owing." D.E. 40 at 15. Plaintiffs argue in their Rule 55 motion that damages under Count V should include $20,000 for unreimbursed lease

payments for the Strong Brothers Property under section 9 of the Fourth Amendment. D.E. 271 at 19. They argue that the compensatory damages should also include the loss caused by Defendants' "wrongful transfer" of the Fivemile leases and permits to other parties. *Id*. at 20. Plaintiffs aver that there are "several possible ways to measure these damages." *Id*.

The undersigned recommends equating these damages with "the lost royalties of $16,990,900, as estimated by the Independent Arbiter." *Id*. This measure is consistent with Plaintiffs' anticipated benefit of their bargain. As Count V itself states, as a result of the fraud, Plaintiffs "lost the value of the royalties payable in connection with the New Fivemile Energy leases, and have not been reimbursed for the lease payments for the Strong Brothers." D.E. 40 at 14. Under the language of Count V, the proper measure of damages is lost royalties plus the money owed under the Strong Brothers leases.

Plaintiffs argue that the first sentence of paragraph 47 of the Amended Complaint contains broader language, and therefore recovery is not limited to lost royalties. D.E. 284 at 10. That sentence states that, through Defendants' fraud, Plaintiffs "have been damaged in that [Fivemile] conveyed the . . . leases to Kentucky Fuel, in reliance upon Kentucky Fuel's representations that it was entering into the Fourth Amendment in good faith and would perform its obligations thereunder in good faith." D.E. 40 at 14. Plaintiffs argue this sentence shows that their fraud claim "included a claim for damages for the value of the leases." D.E. 284 at 10. They ask the Court to award fraud damages based on the price that another company, New Lead, eventually paid for these leases, which Plaintiffs believe was $21,855,000. *Id*.

This is not a natural interpretation of paragraph 47 of the Amended Complaint. Although the language of the first sentence of paragraph 47 may be broad, the final sentence is more specific and plainly states the damages in narrower terms. "As a result [of the fraud]," it claims,

Plaintiffs "have lost the value of the royalties" and the reimbursements for the Strong Brothers lease payments. D.E. 40 at 14. Here, the specific controls the general. The award of default judgment as a sanction entitles Plaintiffs to what they asked for—lost royalties and Strong Brothers lease reimbursements. The undersigned therefore recommends awarding $16,990,900 (the amount of lost royalties established in the record) plus $20,000, for a total of $17,010,900 in compensatory damages under Count V.

Although Defendants concede they owe compensatory damages for fraud (D.E. 277 at 16), they argue that the damages Plaintiffs seek are impermissibly "duplicative" of their requested contractual damages (*Id*. at 17). However, the fraud and the breach under section 7 are separate causes of action yielding separate injuries. And the default as to liability establishes an entitlement to damages as to both.

Defendants object to the Strong Brothers reimbursements. They accuse Plaintiffs of trying to "circumvent" the Court's dismissal of Count III, which was specifically related to the Strong Brothers property. D.E. 277 at 17. They admit that the lease payments are mentioned in count V,[3] but ask the Court to disregard them because they are "inextricably linked" to Count III's breach-of-contract claims, which have been dismissed with prejudice. *Id*. at 18. But Counts III and V are separate Counts under separate legal theories. And Count V clearly alleges that Defendants' fraud harmed Plaintiffs by denying them the value of the Strong Brothers lease payments. D.E. 40 at 14.

Defendants also argue that these damages would be impermissibly duplicative under Kentucky law. D.E. 277 at 18. One case cited by Defendants states,

> tort damages, including punitives, are sometimes recoverable in the context of a
> contract breach, . . . , but this is so only when the breach involved independently

---

[3] Count V alleges that, as a result of the fraud, Plaintiffs "have not been reimbursed for the lease payments for the Strong Brothers Property Lease." D.E. 40 at 14.

> tortious conduct. Kentucky law has not recognized a fraudulent misrepresentation claim where a contract is involved unless the fraud induced the contract. This is consistent with the law of other jurisdictions, which have disallowed misrepresentation claims where a contract is involved unless the misrepresentation occurred before the contract was formed, it satisfied all the elements of that tort, and it involved either a matter extraneous to the contract's terms or a risk not contemplated to be a part of the contract.

*Thomas v. Brooks*, No. 2005-CA-1983-MR, 2007 WL 1378510, at *2 (Ky. Ct. App. May 11, 2007) (citations omitted). Count V satisfies these standards. Defendant's fraudulent behavior in inducing Plaintiffs to enter the contract is "independently tortious conduct" from their subsequent breaches of contract. As pleaded in the Amended Complaint, the fraud induced the contract. D.E. 40 at 14. The only issue before the Court now is the *amount* of fraud damages.

Defendants also attempt to invoke the "the economic loss doctrine which prevents the recovery of tort damages because of a relationship that was created by contract." D.E. 277 at 20. Apparently acknowledging that Kentucky has not adopted the doctrine, Defendants rely on a concurring opinion in which Justice Keller argued that Kentucky *should* adopt the judicially-created economic loss rule. *Id.* at 20-21 (citing *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 583 (Ky. 2004) (Keller, J., concurring)). Justice Keller recognized, however, that "no Kentucky appellate decision has ever used the specific phrase, 'economic loss rule,' much less indicated its approval or adoption of the rule." *Presnell*, 134 S.W.3d at 585-86; *see also* D.E. 284 at 11. This Court will not create law that Kentucky courts have declined to adopt.

The Court finds that Plaintiffs are entitled to compensatory damages under Count V in the amount of $17,010,900. This figure incorporates the $20,000 owed on the Strong Brothers lease reimbursements and the amount of lost tonnage royalties as determined by the independent arbiter.

## V.  Punitive Damages Under Count V
## (Fraud, Cont'd.)

It is settled that Defendants owe punitive damages.  As Judge Van Tatenhove explained: "Accepting the pleaded facts as true, the Plaintiffs have shown by clear and convincing evidence that the Justice Companies acted fraudulently and, hence, owe punitive damages pursuant to KRS § 411.184.  The amount of punitive damages will be determined at a later date."  D.E. 227 at 6.   The purpose of punitive damages is "to punish what has occurred and to deter its repetition."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 587 (1996) ("*Gore*") (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991)).  The Court acknowledges that the award of default was itself a sanction, a punishment.  But embedded in that sanction was a finding that punitive damages are also appropriate in this case.

The operative Kentucky statute lists five factors to guide the Court's assessment of the amount of punitive damages to award:

> (a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;

> (b) The degree of the defendant's awareness of that likelihood;

> (c) The profitability of the misconduct to the defendant;

> (d) The duration of the misconduct and any concealment of it by the defendant; and

> (e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.

Ky. Rev. Stat. Ann. § 411.186(2) (LexisNexis 2005).

Plaintiffs seek $34 million in punitive damages, which they describe as a "conservative" figure.  D.E. 271 at 21.  Throughout their arguments, they point both to pre-litigation conduct by Defendants and Defendants' conduct during this litigation.

Part of this conduct concerns the "New Lead transactions." During this litigation, Kentucky Fuel transferred the Fivemile leases to a Bermuda company, New Lead Holdings, Ltd. D.E. 271 at 5. Plaintiffs assert that Mr. Justice hid these transactions from Mr. Brownlow and "affirmatively misled him about it." *Id.* at 6. Although Defendants have provided some documents concerning these transactions, Plaintiffs obtained many of the relevant documents from other sources, and they believe that others exist which they have not seen. *Id.* at 10-11. By analyzing the documents they have obtained, Plaintiffs estimate the purchase price was $14,950,000 plus interest. D.E. 258 at 10-11; D.E. 271 at 9 n.2. However, Plaintiffs state that New Lead's 2014 Annual Report to the SEC listed a total price of $21,855,000. D.E. 271 at 8-9.

Defendants claim that the New Lead purchase price was actually $7.5 million (with the Strong Brothers leases excluded), $5 million of which was allocated toward the purchase of a tipple. Furthermore, Defendants claim New Lead has neither mined coal nor paid royalties. Instead, Defendants have "had to pay over $400,000 in royalties, reclamation fees and legal fees owed by Newlead." D.E. 262 at 18-19. The subsequent briefing involves many factual disagreements concerning the New Lead transactions. *See* D.E. 277 at 5-10; D.E. 284 at 5-10. The Court need not wade into this morass because Defendants' pre-litigation and litigation conduct, notwithstanding the New Lead transactions, is sufficient to justify the amount of punitive damages set forth below.

Regarding the first § 411.186 factor, Plaintiffs argue the harm resulting from the fraud "was entirely foreseeable and certain" when Defendants had "an intentional business plan and strategy" of avoiding their contractual obligations. D.E. 271 at 22. Indeed, the Amended Complaint alleges that Defendants made intentional fraudulent statements and planned to avoid their contractual obligations. D.E. 40 at 14; *see also* D.E. 227 at 4. Those allegations have now

been established as true. The Court agrees that this factor supports a significant punitive damages award.

Regarding the second factor, Plaintiffs focus on Defendants' litigation conduct.[4] They argue that Defendants' discovery violations and Mr. Justice's attempt to hide the New Lead transactions are evidence of their awareness of the likelihood of harm. *Id*. at 22-23. The Court need not venture into the weeds of the New Lead transactions because Defendants' well-established discovery violations (D.E. 206) support the second factor. Defendants have manifested "a consistent pattern of obfuscation" (*id*. at 21), which supports a finding that they were aware that what they were doing was causing "serious harm" to Plaintiffs. KRS § 411.186(2)(b). Even if Defendants possessed defenses to liability that they could have pursued in good faith, their consistent obfuscation and sabotage of the orderly progress of this case stymied Plaintiffs' pursuit of the claims. Defendants knew that their conduct would likely interfere with any recovery for Plaintiffs' business injuries. Such intentional conduct should be deterred through a substantial punitive damages award.

The third factor considers the profitability of the misconduct. Here, Plaintiffs ask the Court to consider that, through the New Lead purchase, "Defendants made at least $12,383,034 from their fraud," so a punitive damages award "of some multiple of that figure" would be appropriate. D.E. 271 at 24. Their requested amount of $34 million is "less than three times these actual damages." *Id*. As will be explained below, the Court does not believe the New

---

[4] Defendants object to any reliance on "'litigation conduct' (i.e., discovery violations)" in calculating punitive damages. They propose that "one's conduct during litigation cannot be used to establish their bad faith regarding the alleged conduct that gave rise to the lawsuit." D.E. 277 at 23-24. They provide one case citation, but that case concerned the interpretation of a statute under Kentucky's insurance code. *Id*. at 23 (citing *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 522-23 (Ky. 2006)). Plaintiffs point to cases in which courts took into account litigation conduct in assessing punitive damages. D.E. 284 at 12-13. This Court has no hesitation in considering both pre-litigation and litigation conduct in calculating punitive damages against Defendants. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1216 (6th Cir. 1988) ("[T]he court may award punitive damages when a party's conduct during the course of litigation is either frivolous or in bad faith."). Defendants' behavior in this case sets an unfortunate new low in the undersigned's experience.

Lead transactions provide the best barometer for a punitive damages award. But certainly the fraud was profitable for Defendants, because they have so far avoided paying millions of dollars in royalties and fees and sold the property with the coal reserves intact. Like the other factors, this one supports a robust punitive damages award.

The fourth factor concerns the duration and concealment of Defendants' misconduct. Plaintiffs argue that Defendants' fraudulent failure to comply with the Fourth Amendment began immediately, and has continued for five-and-a-half years. D.E. 271 at 24. Relevant conduct includes not paying retainer fees since May 2011, concealing the New Lead transactions, and providing phony tax returns.[5] *Id*. at 25-26. Regardless of the contested details of the New Lead transactions and the recently-provided tax returns, Defendants' reprehensible litigation conduct, including prolonged concealment of relevant discovery, is well-supported in the record. Because Defendants have spent years defying the Court's discovery orders, factor four supports a copious punitive damages award.

Concerning the fifth factor, Plaintiffs argue that Defendants have taken no action to remedy the misconduct once it became known. D.E. 271 at 29. Instead, Defendants have "doubled down" on their misconduct. Plaintiffs argue that Defendants continue to fail to pay the minimum royalties to the Fivemile landowners, some of whose leases have now been terminated or expired. By causing these landowners to suffer, Defendants have also "tarred" Plaintiffs'

---

[5] The Court ordered Defendants to produce their tax returns in 2013. DE. 128, 156. Defendants did not timely comply with that order. *See* D.E. 206 at 11-13 (describing how Defendants had not fully complied with these orders in September 2014). In March 2016, Plaintiffs received what was purported to be the tax returns. *See* D.E. 265-1 at 2. But these documents were not actually "copies of tax returns," even though the accompanying letter indicated they were. Instead, Defendants later clarified that they were internally prepared accounting documents. *See* D.E. 265-21 at 1. Defendants then sent another set of accounting documents that Plaintiffs characterize as inconsistent with the first set. *See* D.E. 265-22 at 1; D.E. 265 at 5-6. Plaintiffs claim that both sets of documents are hoaxes. D.E. 265 at 5-6. In April 2016, Defendants finally produced their actual tax returns along with a signed authorization allowing Plaintiffs to obtain copies directly from the IRS. *See* D.E. 269 at 2. Defendants' defiance of the Court's orders, stretching even beyond the award of default judgment as a sanction, constitutes relevant litigation conduct that supports the imposition of prodigious punitive damages.

reputations. *Id*. at 29-30. The Court observes that, although Defendants have caught up on their minimum royalty payments, they have not taken any other meaningful steps to remedy their misconduct. Instead, their continuing misconduct has frustrated the prompt administration of justice. This factor does not help them.

Even though KRS § 411.186 supports a hefty punitive damages award, the Court must also consider Constitutional limitations. In *Gore*, the Court laid out the following factors to ensure that a punitive damages award satisfies the need for fundamental fairness: the degree of reprehensibility, the ratio of punitive damages to actual damages, and any disparity between the punitive damages award and other civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575.

Plaintiffs argue Defendants' conduct is reprehensible because it is repetitious. D.E. 271 at 31. It is "now established by the default judgment [that] not paying their debts was their business plan and strategy." *Id*. They continue to "stiff" the "small Fivemile landowners," *id*. at 32, and their "bad-faith actions throughout this case are also relevant to the reprehensibility of their conduct." *Id*. Plaintiffs point to a mineral royalties case, *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 (1993), in which the Court upheld punitive damages of a 52:1 ratio when the failure to pay royalties was "part of a larger pattern of fraud, trickery, and deceit." *Id*. Plaintiffs also urge the Court to consider the concealment of evidence and the false tax returns. *Id*. at 33.

The Court agrees that the degree of reprehensibility supports a large punitive damages award. As the Amended Complaint alleges, Defendants' "business plan and strategy" included willfully ignoring their contractual obligations. D.E. 40 at 3, 7. Additionally, Defendants'

litigation conduct that led to this entry of default was "contumacious," "perverse in resisting authority and stubbornly disobedient." D.E. 206 at 5.

The second *Gore* factor focuses on the ratio between the punitive damages and the amount of compensatory damages awarded on the fraud count. The recommended compensatory damages are $17,010,900. There is no strict constitutional formula for setting this ratio; no "categorical approach" to the ratio question. *Gore*, 517 U.S. at 582-83. However, the Court in *Gore* explained that

> low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id*. at 582. Here, the compensatory damages are not exactly "low." Seventeen million dollars is nothing to sneeze at. And this is not a case in which the injury is difficult to detect or its noneconomic harm difficult to determine. Accordingly, the Court will hew to a low ratio, specifically a ratio of 1:1. As the Supreme Court stated in *Campbell*, "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Of course, the award must be assessed case-by-case "upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id*. Here, assessing an additional $17,010,900 suffices, in the Court's view, to punish Defendants for their fraud and deter them from future fraud without threatening to violate due process under *Gore*. A ratio of 1:1 is appropriate.

Regarding the third *Gore* factor, Plaintiffs point to Kentucky statutory sanctions and conclude that their request is reasonable because state law allows for treble damages in certain

contexts.  D.E. 271 at 34.  Defendants argue that the statutes Plaintiffs cite (such as ones for tree piracy and tax evasion) are not comparable to a breach of contract action, and cannot guide the Court.  D.E. 277 at 24.  The Court believes that applying a punitive damages ratio of 1:1 avoids any problem regarding the third *Gore* factor while still fulfilling the purpose of punitive damages.  The Court will recommend punitive damages in the amount of $17,010,900.

## VI.  Attorneys' Fees

Because the sun has not yet on this litigation, the Court is not equipped to recommend a precise award of attorneys' fees and expenses.  Plaintiffs' Rule 55 motion is accompanied by declarations documenting the fees and expenses.  These total $696,888.16 including interest through June 1, plus $46,983.75 in "additional out-of-pocket costs."  D.E. 271 at 34-35. According to their motion, Plaintiffs plan to file an additional supplemental statement of fees after any related proceedings occur.  They ask for prejudgment interest to apply from the date of each invoice.  *Id*. at 35.

Defendants object to any award of fees incurred by R. Culver Schmid, "who is not counsel of record in this matter, yet apparently was a 'ghost writer' of the complaint."  D.E. 277 at 28.  They claim that if Schmid is indeed corporate counsel, then he should be salaried and his fees not compensable.  *Id*.  However, Schmid's declaration and invoices make clear he was a member of two outside law firms when he billed the time in this case.  D.E. 270-32.  Schmid did not appear in previous fee applications because he was not involved in the sanctions motions. The undersigned recommends awarding fees for Schmid's work.

Schmid's invoices contain references to unidentified persons named "GPS" and "JMS," who billed $200 an hour without details of their qualifications provided.  GPS billed 1.8 hours. D.E. 270-32 at 16-17.  JMS billed 3.2 hours.  *Id* at 16-19.  Defendants challenge these

individuals' hours. D.E. 277 at 28. Plaintiffs respond NLTM has "validated" the work of GPS and JMS by paying all of Schmid's invoices. Despite the fact that "no details regarding their qualifications have been provided," their roles were "minor" and the issue is "not material." D.E. 282-1 at 16. "Plaintiffs defer to the Court's discretion on this point." *Id.* The Court takes this as a concession that the billing for GPS and JMS is not adequately supported by the record, and recommends that their billed hours—totaling five hours—not be included in the Court's award of attorneys' fees and expenses.

A full account of Plaintiffs' attorneys' fees and expenses must be deferred until the issuance of final judgment.

## VII. Prejudgment Interest

"In diversity cases in this Circuit, federal law controls postjudgment interest but state law governs awards of prejudgment interest." *F.D.I.C. v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000). A determination of prejudgment interest is "a matter of substantive state law." *Diggs v. Pepsi-Cola Metro. Bottling Co.*, 861 F.2d 914, 924 (6th Cir. 1988). Under Kentucky law, "The legal rate of interest is eight percent (8%) per annum." Ky. Rev. Stat. Ann. § 360.010 (LexisNexis 2008). "Absent a contractually agreed upon rate, the appropriate rate of interest is governed by [KRS § 360.010]." *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 857 (Ky. Ct. App. 2003).

When damages are "liquidated," prejudgment interest "follows as a matter of course." *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991). Thus, when damages are liquidated, a successful plaintiff in Kentucky is "entitled to interest at the legal rate of eight percent (8%) per annum." *Poundstone v. Patriot Coal Co.*, 485 F.3d 891, 903 (6th Cir. 2007) (quoting *Pursley v. Pursley,* 144 S.W.3d 820, 828 (Ky. 2004)). Stated a bit more precisely, "if

damages are both undisputed and liquidated, prejudgment interest is payable as a matter of law. However, if the damages are either disputed or unliquidated, or both, then the decision as to whether prejudgment interest is due is left to the sound discretion of the trial court." *Barnett v. Hamilton Mut. Ins. Co. of Cincinnati, Ohio*, No. 2009-CA-2234-MR, 2011 WL 43307, at *4 (Ky. Ct. App. Jan. 7, 2011); *see also Denzik v. Denzik*, No. 2004-CA-944-MR, 2006 WL 3107110, at *3 (Ky. Ct. App. Nov. 3, 2006) (using identical language). "Interest should not be *required* except for a claim which is for a liquidated amount, and which is not disputed in good faith." *Wittmer v. Jones*, 864 S.W.2d 885, 891 (Ky. 1993) (emphasis added).

Whether damages are liquidated "is not always clear, but in general 'liquidated' means '[m]ade certain or fixed by agreement of parties or by operation of law.'" *Nucor*, 812 S.W.2d at 141 (quoting *Black's Law Dictionary* 930 (6th ed.1990)).[6] In contrast, "unliquidated" damages are damages "which have not yet been determined or calculated" or are "not yet reduced to certainty in respect to amount." *Id.* (quoting *Black's* at 1537). "[T]he key issue is whether the amount is fixed as between the parties to the litigation either by agreement or operation of law." *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 276 (6th Cir. 2010). "[I]n determining if a claim is liquidated or unliquidated, one must look at the nature of the

---

[6] As one authority defines them:

"Liquidated damages" are a set amount of money, or a certain formula, expressly stipulated in a contract as the amount of damages to be paid by a party that breaches the agreement. Liquidated damages can also be defined as the amount which has been ascertained by judgment or by specific agreement of the parties or which are susceptible of being made certain by mathematical calculation from known factors. The amount must be stipulated and agreed upon by the parties at the time the contract is entered and compensate for injuries in the event of contract breach.

Damages are "liquidated" when the proper amount to be awarded can be determined with exactness from the cause of action as pleaded, i.e., from a pleaded agreement between the parties, by an arithmetical calculation, or by application of definite rules of law.

22 Am. Jur. 2d Damages § 504.

underlying *claim,* not the final award." *3D Enterprises Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).

Plaintiffs cite a Sixth Circuit case from Michigan (D.E. 258 at 19) for a definition of liquidated damages: "Liquidated damages are those damages which are reasonably ascertainable at the time of the breach, measurable by a fixed or established external standard, or by a standard apparent from the documents upon which plaintiffs based their claim." *Ramada Dev. Co. v. U. S. Fid. & Guar. Co.*, 626 F.2d 517, 525 n.11 (6th Cir. 1980); *see also G.D. Deal Holdings, Inc. v. Cincinnati Ins. Co.*, No. 1:05-CV-3-TBR, 2007 WL 3306109, at *2 (W.D. Ky. Nov. 6, 2007) (applying this definition in a federal case in Kentucky).

For any unliquidated damages, awarding prejudgment interest lies at the discretion of the Court. *Nucor*, 812 S.W.2d at 143. In such cases,

> "Interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness; it is denied when its exaction would be inequitable . . . . the tendency of the courts is to charge and allow interest in accordance with the principles of equity, to accomplish justice in each particular case."

*Id*. (quoting 47 C.J.S., "Interest and Usury" § 6 (1982)).

> Further,

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

*Id*. (quoting Restatement (Second) of Contracts § 354 (1981)).

"Kentucky courts rarely award prejudgment interest on unliquidated claims on equitable grounds." *Kentucky Commercial Mobile Radio Serv. Emergency Telecommunications Bd. v.*

*TracFone Wireless, Inc.*, 712 F.3d 905, 917 (6th Cir. 2013). But such interest is available in any case when equitably appropriate. *Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 461-62 (6th Cir. 2016). Imposing prejudgment interest often turns on whether the defendant disputed its liability in good faith, or whether there were allegations of bad faith. *Kentucky Commercial*, 712 F.3d at 917 (citing *Meridian Citizens Mut. Ins. Co. v. Horton*, No. 5:08-CV-302-KKC, 2010 WL 1253084, at *9 (E.D. Ky. Mar. 25, 2010)); *Owensboro Mercy Health Sys. v. Payne*, 24 S.W.3d 675, 679 (Ky. Ct. App. 1999)). For each damages award, the Court must determine whether the award amount is liquidated and unchallenged. If not, the Court must determine in its discretion whether prejudgment interest is just and equitable.

## A. Count I

First, the monthly retainer fees under Count I are liquidated. The value of the fees is clearly set out in section 9 of the Fourth Amendment. D.E. 40-5 at 7. Prejudgment interest of 8% is therefore automatic. Regarding the minimum royalty payments under Count I, although these payments may have been tardy, the payments have been made, including interest (D.E. 271 at 17), so there is no need to consider interest at this juncture.

## B. Count II

Second, the arbiter-determined award for lost tonnage royalties under Count II is unliquidated. Although the amount of lost royalties determined by the arbiter is "immediately due and payable" (D.E. 40-5 at 6), the amount had to be calculated through a factual investigation outside the terms of the contract. The amount was not "ascertainable at the time of the breach" by use of a fixed standard. *Ramada*, 626 F.2d at 525 n.11. Additionally, despite obstructing the progress of this case, Defendants have contested the applicability and validity of the arbiter's findings.

Although this damage award is technically unliquidated, equity tips in favor of assessing prejudgment interest. Under the contract, this amount was "immediately due and payable." D.E. 40-5 at 6. Plaintiffs have gone for years without receiving any royalties from the Fivemile leases, and they have explicitly accused Defendants of bad faith in regard to this aspect of the litigation:

> Plaintiffs' election to retain an independent arbiter to estimate damages represented a tradeoff by which they opted for the right to have a quicker remedy ("immediately due and payable") while giving up the right to possibly recover greater compensatory damages if they used a retained expert to pursue the their legal rights. Of course, what Plaintiffs did not fully appreciate at the time was that they would be saddled with the detriment of a lower award but without the benefit of "immediate" payment, due to the Defendants' bad-faith refusal to honor their contractual obligations.

D.E. 265 at 11-12. This argument is persuasive. Interest is particularly appropriate here because (1) the breach in Count II was made possible by Defendants' fraud-in-the-inducement (Count V), and (2) in light of Defendants' obstructive discovery tactics. *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 496-97 (6th Cir. 2013) (upholding 8% interest in a RICO case in light of Defendants' fraud and "unfair obstruction of the pretrial proceedings"); *S.E.C. v. Antar*, 44 F. App'x 548, 553 (3d Cir. 2002) (upholding a District Court's award of prejudgment interest based on the fact that Defendants committed fraud); *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1257 (10th Cir. 1988) ("In particular, where a defendant's behavior has involved dishonest or fraudulent conduct, the equities favor an award of prejudgment interest as compensatory damages.").

Defendants contend that prejudgment interest should not be awarded because they have disputed liability in good faith. The Court is not persuaded. Merely asserting a defense to such liability in their Answer does not paint the whole picture regarding their conduct. Instead, that assertion was a necessary procedural step to defend the case and set up a posture in which they

could drag things out through litigation misconduct. They may have reasonably disputed liability for the lost tonnage royalties at the onset of the case, but raising that dispute was one small step taken to further their "appalling" pattern of conduct. D.E. 206 at 21. Defendants converted this Court's processes into a tool for obstruction and delay. The totality of the circumstances supports an award of prejudgment interest. *Journey Acquisition–II*, 830 F.3d at 461-62.

The undersigned recommends that the Court, in its discretion, assess 8% interest on damages under Count II. Interest should be calculated from the date of the independent arbiter's report, May 1, 2012. D.E. 40-6 at 2.

### C. Count V—Compensatory Damages

Third, the $20,000 for the Strong Brothers leases under Count V is unliquidated. Under section 9, Defendants agreed to reimburse Plaintiffs for "all payments of rent or any other payments due" under the Strong Brothers leases within seven days of a repayment request by Plaintiffs. D.E. 40-5 at 7. The "payments of rent or any other payments due" had to be assessed in light of facts beyond the bounds of the contract. Although the payments amounted to $5,000 a year, the amount and regularity of the payments is not apparent from the Fourth Amendment itself. However, the amount owed is not disputed. Assessing interest is equitable in this case because Defendants had no good faith basis to avoid making these reimbursements. The undersigned recommends assessing 8% interest to the unpaid Strong Brothers reimbursements, with the interest beginning to accrue seven days after each repayment request.

Mr. Brownlow describes the payments made on the Strong Brothers leases in his Supplemental Declaration of April 28, 2016 (D.E. 271-1 at 17-18 ¶ 36), and provides an account statement (D.E. 270-28). The account statement provides as follows:

| Lease Payment Due Date | Principal Balance Due |
|---|---|
| 10/1/2011 | $5,000 |
| 10/1/2012 | $5,000 |
| 10/1/2013 | $5,000 |
| 10/1/2014 | $5,000 |
| | $20,000 |

Mr. Brownlow also provides a collective exhibit containing his requests for reimbursement from Kentucky Fuel. D.E. 270-29. The requests were sent on October 7, 2011, September 27, 2012, November 15, 2013, and April 21, 2016. *Id.* Defendants do not dispute that these requests were sent. The undersigned recommends assessing prejudgment interest at a rate of 8% beginning October 14, 2011, for the first $5,000 payment, beginning October 4, 2012, for the second, beginning November 22, 2013, for the third, and beginning April 28, 2016, for the fourth $5,000 payment.

The fourth question concerning interest also relates to Count V. Because the remaining fraud damages under Count V consist of "the lost value of the royalties" (D.E. 40 at 14), they are similar to the arbiter-determined award under Count II. But it does not necessarily follow that interest is warranted. As previously discussed, these damages are unliquidated and contested. Furthermore, in contrast to Count II, Plaintiffs proffered alternative methods for calculating these damages. D.E. 271 at 20-21. Additionally, Count V is a tort claim, not a contract claim. Kentucky allows prejudgment interest in a tort claim. *Nucor*, 812 S.W.2d at 143-45 (relying on Restatement (Second) of Torts § 913 (1979)). Under the Restatement, a prevailing Plaintiff is entitled to interest "from the time of the accrual of the cause of action to the time of judgment, if the payment of interest is required to avoid an injustice." Restatement (Second) of Torts

§ 913(1)(b).  In this case, the Court cannot say that prejudgment interest on Count V is *required* to avoid an injustice, especially when interest is already awarded for Counts I and II.  The undersigned will not recommend interest on the compensatory damages related to lost royalties under Count V.

### D.  Count V—Punitive Damages

What about prejudgment interest on the punitive damages?  "Punitive damages are clearly not liquidated[.]"  *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974).  "The majority of courts . . . deny the collection of prejudgment interest on punitive damages, finding that such interest is not recoverable on punitive damages because prejudgment interest has a compensatory purpose while punitive damages are essentially meant to punish."  *Ortiz v. Bright*, No. 2:98-CV-1031, 2006 WL 1133296, at *3 (S.D. Ohio Apr. 26, 2006) (collecting cases); *see also McCoy v. Alfrey*, No. 7:08-CV-112-ART, 2010 WL 4366120, at *8 (E.D. Ky. Oct. 28, 2010) (amending a judgment to remove prejudgment interest on punitive damages).  The Court is loathe to depart from the majority view.  The undersigned does not recommend prejudgment interest for the punitive damages.

### E.  Attorneys' Fees and Expenses

The remaining category of damages is attorneys' fees and expenses.  Clearly these damages are unliquidated.  *See Travelers*, 598 F.3d at 275-76 (finding that attorney's fees were not liquidated when the parties could not have calculated them in advance of litigation).  The total amount of these fees and expenses is yet to be determined.  No compelling equitable considerations exist that would warrant an assessment of prejudgment interest on these fees.

## F. Whether Interest Should Be Compound

Plaintiffs request that interest be compounded annually. D.E. 258 at 16, 20; D.E. 271 at 35. "Kentucky law typically awards simple interest, but compound interest is also allowed in the court's discretion." *Travelers*, 598 F.3d at 265 (citing *Reliable Mechanical, Inc. v. Naylor Indus. Services, Inc.*, 125 S.W.3d 856, 858 (Ky. Ct. App. 2003). "[C]ompound interest may be awarded to accomplish justice in accordance with the principles of equity and the circumstances of each particular case." *Leasure v. Coleman Am. Companies, Inc.*, No. 2006-CA-1673-MR, 2008 WL 2065235, at *3 (Ky. Ct. App. May 16, 2008) (citing *Reliable Mech.*, 125 S.W.3d at 857).

District Judge Van Tatenhove has previously analyzed the compound interest question under Kentucky law:

> The Kentucky Court of Appeals explained its reasoning for allowing compound interest in *Reliable Mechanical* because the defendant had deprived the plaintiff "of the use of the money rightfully due and owed to it for nearly eight (8) years" when the defendant arguably "would have been capable of earning compound interest on its money during this lengthy time period." *Reliable Mech.*, 125 S.W.3d at 858. The court in that case went on to explain that the award of compound prejudgment interest there "[did] not constitute a punitive reprisal as to Reliable. Rather, it is an equitable means of recognizing the economic reality that Reliable has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from Naylor." *Id.* Awarding compound interest can be a means of "adjust[ing]" the inequitable result of providing the prevailing party with money that it might have earned itself but for the wrongful actions of the opposing party. *Id.*; *see also Prima Int'l Trading v. Wyant*, 2009 WL 722609, at *3 (E.D. Ky. Mar. 17, 2009) (quoting the reasoning in *Reliable Mech.*, 125 S.W.3d at 858, as basis for awarding compound prejudgment interest).

*Journey Acquisition-II, L.P. v. EQT Prod. Co.*, No. 6:12-CV-108-GFVT, 2015 WL 3916353, at *18 (E.D. Ky. June 25, 2015); *see also Groupwell Int'l (HK) Ltd. v. Gourmet Exp., LLC*, No. 4:09-CV-94-M, 2014 WL 2618601, at *20 (W.D. Ky. June 12, 2014) (awarding compound interest and noting that "[a]t any time during the pendency of this litigation [Defendant] could have stopped the running of this interest by paying [Plaintiff] what it admittedly owed. Instead,

it kept the money and used it to fund its own operations"); *Prima Int'l Trading v. Wyant*, No. 6:07-CV-338-REW, 2009 WL 722609, at *3 (E.D. Ky. Mar. 17, 2009) (awarding compound interest under *Reliable Mechanical*); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 596 F. Supp. 2d 1020, 1026 (W.D. Ky. 2008) (awarding simple interest when the defendant had "not unreasonably withheld payment from [Plaintiff] for such a lengthy period of time that would require compound interest"), *aff'd*, 598 F.3d 257 (6th Cir. 2010).

This is a case where equity tips in favor of awarding compound interest. The scenario is similar to that found in *Reliable Mechanical*, where the defendant deprived the plaintiff "of the use of the money rightfully due and owed to it for [multiple] years." *Reliable Mech.*, 125 S.W.3d at 858. Plaintiffs "[a]rguably . . . would have been capable of earning compound interest on its money during this lengthy time period." *Id.* Awarding compound interest recognizes "the economic reality that [Defendants have] enjoyed a long opportunity to earn interest on the money that [they] wrongfully withheld from [Plaintiffs]." *Id.* Here, Defendants clearly owed the retainer fees and the reimbursements on the Strong Brothers Leases. And the arbiter's award was designed to be "immediately due and payable." Defendants should have made these payments. By refusing to do so, they have deprived Plaintiffs of the compound interest they could have otherwise earned on this money. *See Journey Acquisition*, 2015 WL 3916353, at *18 (awarding compound interest under *Reliable Mechanical*); *Groupwell*, 2014 WL 2618601, at *20 (same). In this case, equity demands that interest be compounded.

## VIII. Conclusion

For the reasons explained, the undersigned **RECOMMENDS** an award of damages to Plaintiffs as follows:

(1)     For Count I, as of the date of this Report, Defendants owe $680,000 in unpaid retainer fees.  That amount continues to increase by $10,000 on the first day of each month.  The Court should assess 8% interest on these fees, compounded annually.  No amount for unpaid minimum royalties should be awarded.

(2)     For Count II, Defendants owe $16,990,900, as determined by the independent arbiter, with 8% prejudgment interest compounded annually beginning May 1, 2012.

(3)     As compensatory damages under Count V, Defendants owe $16,990,900, without interest, for lost royalties.  They also owe $20,000 for the Strong Brothers lease reimbursements, plus 8% compound interest beginning October 14, 2011, for the first $5,000 payment; October 4, 2012, for the second; November 22, 2013, for the third; and April 28, 2016, for the fourth $5,000 payment.

(4)     As punitive damages under Count V, Defendants owe $17,010,900, without interest.

(5)     Under section 14 of the Fourth Amendment, Defendants owe "all attorney fees and expenses" in connection with this lawsuit (D.E. 40-5 at 7).  But the total amount cannot yet be assessed.  After Judge Van Tatenhove acts on this Recommendation and all motions are resolved, the undersigned recommends that Plaintiffs be allowed to file an affidavit of fees and costs with an opportunity for a response from Defendants.  *See* Fed. R. Civ. P. 54(d)(2)(C).  Interest should not be applied to the award of attorneys' fees and expenses.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Report and Recommendation, issued under subsection (B) of the statute.  *See also* Rule 72(b).  Within fourteen days after being served with a copy of this decision, any party

may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 17th day of January, 2017.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge