NEW LONDON TOBACCO MARKET, INC. )   **ELECTRONICALLY FILED**
AND FIVEMILE ENERGY, LLC    )
              )
    Plaintiffs,    )
              )    No. 6:12-cv-00091-GFVT-HAI
v.             )
              )
KENTUCKY FUEL CORPORATION and )
JAMES C. JUSTICE COMPANIES, INC. )
              )
    Defendants.    )

## OBJECTIONS TO REPORT AND RECOMMENDATION

Defendants, Kentucky Fuel Corporation ("KFC") and James C. Justice Companies, Inc.

("JCJC"), pursuant to Rule 72(b)(2), Fed. R. Civ. P., respectfully submit these Objections to the

January 17, 2017 Report and Recommendation by Magistrate Judge Ingram [D.E. 302].

## I. INTRODUCTION

Magistrate Judge Ingram recommends that this Court award more than $60 million in

default damages against Defendants, even though there is nothing in the record to suggest that

Plaintiffs have been damaged as a result of the breaches alleged in Plaintiffs' Amended

Complaint. Awarding $60 million in damages to Plaintiffs for Defendants' having failed to mine

Plaintiffs' coal in a region (Breathitt County) where, because of low coal quality and depressed

market conditions, virtually no coal has been mined since the execution of the parties'

Agreement, is in no way compensatory. Instead, the suggested damages award is solely and

exclusively penal in nature, fashioned to punish the Defendants rather than to compensate the

Plaintiffs for any damages they suffered. Indeed, it is apparent from Magistrate Judge Ingram's

ruling, and from his refusing to even entertain oral argument — let alone to hold an evidentiary

hearing to consider Defendants' challenges to Plaintiffs' absurdly overblown damages requests — that Magistrate Judge Ingram allowed his anger toward Defendants, for what he perceived as their disrespect to this Court, to drive his suggested damages award.

Magistrate Judge Ingram's proposed damages award rests on his conclusion that determining the amount of coal that Defendants would have mined under the subject lease had they "use[d] commercial and reasonable good faith and best efforts to maximize, within the constraints of industry standards, the amount of coal extracted…"[1] did not require him to account for the merchantability or even the mineability of Plaintiffs' coal. Instead, the Magistrate Judge applied the contractually stipulated royalty rate to each and every ton of coal underlying the leased property, and he assumed, without absolutely no supporting record evidence, that all of that coal, **16,740,900** tons, would have been surface mined by May 2012 – only 1-1/2 years after the execution of the governing Fourth Amended Lease. This was a rather incredible assumption, given that less than **120,000** tons of coal was surface mined in all of Breathitt County during this same period; given that not one ounce of coal has been mined from the adjacent permit acquired by Plaintiffs at the time they executed the governing lease (Deep Wood); and given that less than three million tons of coal has been mined in all of Breathitt County under any method, surface or underground, from the date of the parties' lease through to the end of 2016.

The resulting royalty, $16,990,900, computed by applying the contractually stipulated royalty to the 16,740,900 tons that Magistrate Judge Ingram assumed in his damages calculation, was increased to more than $25 million based on the Magistrate Judge's conclusion that **compound pre-judgment** interest should be awarded from May 2012, even though it was sheer fiction to conclude that even the most diligent mining would have entitled Plaintiffs to any

---

[1] *See* The Fourth Amendment of Assignment of Leases and Permits ("the Fourth Amended Lease"), ¶10 [D.E. 40-5]. The Fourth Amended Lease, executed as of November 22, 2010, is the governing lease that Plaintiffs have sued on in this case.

royalties by that date. The award then climbed to nearly $60 million by virtue of Magistrate Judge Ingram's conclusion that this same punitive sum ($16,990,900) should be awarded a second time on Plaintiff's fraud count (even though it was for the very same royalty damages already awarded on the contract claim) and then again a third time on Plaintiff's punitive damages count (even though the damages awarded on the contract and the fraud counts were already themselves punitive).

The final component of Magistrate Judge Ingram's suggested damages award came from his conclusion that, even though he had already awarded $17 million in royalty damages to Plaintiffs, as of May 2012, on every ton of coal underlying their lease, Defendants' obligations to make lease payments would still continue, unabated, after May 2012. As a result, Magistrate Judge Ingram suggests that Defendants be required to pay Plaintiffs $550,000 in consulting fee lease payments after May 2012 (plus an additional $10,000 per month after December 2016) and that no portion of the $375,000 in minimum royalty payments that Defendants had already paid to Plaintiffs after May 2012 should be credited against the $17 million royalty award.

The case law on default judgments in this Circuit is clear. A court may not rubber stamp the non-defaulting party's damages calculation; it must instead conduct a sufficient inquiry to ascertain the amount of damages with reasonable certainty. As evidenced by the enormity of the award and its lack of proportion to the damages actually suffered by Plaintiffs, and as underscored by Magistrate Judge Ingram's refusal to even entertain oral argument, let alone to hear evidence, on damages, the Magistrate Judge merely rubber-stamped the Plaintiffs' damages calculation; he did nothing to assure that his $60 million plus damages suggestion had any legitimate basis. It is thus this Court's responsibility to independently assess the evidence, and to

give Defendants a meaningful opportunity to challenge Plaintiffs' damages claims, in its *de novo* review of the record.

Alternatively, the sheer enormity of Magistrate Judge Ingram's suggested default judgment precludes this Court from adopting his Report and Recommendation on an independently sufficient ground. As set forth in the Motion to Set Aside Default filed contemporaneously herewith, a default must be set aside where the amount of the resulting judgment would be wholly disproportional to the conduct sanctioned. Defendants are not proud of their litigation conduct in this case. However, Defendants were never warned of and did not appreciate the potential consequences of their conduct, and a dispassionate review of the record reflects that the actual impact on the proceedings of that conduct was minor. And while Plaintiffs' counsel was certainly able to inflame Magistrate Judge Ingram by his habit of sensationalizing these violations, they did not warrant a $60 million penalty which, at best, will bankrupt the companies, cost hundreds of jobs, and undermine the companies' ability to satisfy environmental and other critical regulatory obligations in Kentucky and throughout Central Appalachia.

## II.    PROCEDURAL BACKGROUND

On September 30, 2014, this Court entered a default against Defendants. [D.E. 206.] As this Court made clear by its September 15, 2015 Order, this default was for liability only [D.E. 227, p. 2] and, as such, the Court still had the duty to determine the amount of the damages with reasonable certainty. Indeed, this Court directed Magistrate Judge Ingram, by its September 15, 2015 Order, to hold such proceedings as were necessary to this determination. [*Id.,* p. 7.] Moreover, in a more recent Order, this Court recognized that granting Plaintiffs' motion to drop Counts III and IV of their Amended Complaint would "clear the way for the Magistrate to

**conduct a hearing regarding damages as to Counts I, II and V,** and it again directed

Magistrate Judge Ingram to "hold any proceedings necessary to make appropriate findings of law

and fact regarding damages as to Counts I, II and V of the Plaintiff's Amended Complaint."

[D.E. 251, pp. 4, 6.]  Notwithstanding this Court's directives, however, and notwithstanding the

enormity of the damages at issue and Defendants' repeated requests (predominantly filed in

response to Plaintiffs' numerous motions seeking the entry of default without inquiry) [*see, e.g.*,

D.E. 214, 223, 262, 277], the Magistrate Judge refused to hold any hearing; indeed, he even

denied Defendants' request for oral argument at which Defendants could present their position

on why the record did not provide a sufficient basis for the award of damages to Plaintiffs and

why an evidentiary hearing was warranted.  [D.E. 290, 294, 303.]

The only hearing which Magistrate Judge Ingram ever proposed was a telephonic hearing

at which the parties were directed to limit their arguments solely to addressing what efforts

Defendants had made, back in 2013, to take discovery into Plaintiffs' damages.  [D.E. 297.]  As

Magistrate Judge Ingram had already denied Defendants' ability to take such discovery, by his

ruling denying Defendants' motion to compel on the grounds that Plaintiffs' response to that

discovery would have come due two days after the September 1, 2013 discovery cutoff and by

his ruling denying Defendants' timely filed motion to extend the discovery deadline by one

month (from September 1, 2013 to October 1, 2013), and as Defendants were fully prepared to

proceed at a damages hearing despite these rulings, the proposed telephonic hearing would not

have provided Defendants with any meaningful opportunity to address Plaintiffs' damages.  [*See*

D.E. 298.]  In any event, Magistrate Judge Ingram cancelled even this limited hearing. [D.E.

299.]  Thus, by his January 17, 2017 Report and Recommendation, Magistrate Judge Ingram

determined that $60 million of damages should be awarded against Defendants without the benefit of any "proceedings" and without affording Defendants any opportunity to be heard.

## III.    DEFENDANTS' OBJECTIONS

Defendants object to the each of the following findings and conclusions in the January 17, 2017 Report and Recommendation:

1.    That the Court could award over $60 million damages without conducting an evidentiary hearing — or even hearing argument from the parties — where the record provided no legitimate basis for any damages award;

2.    That the Court could award lost royalty damages on Plaintiffs' Count II contract claim that were contrary to all of the available evidence, lacked any adequate legal foundation, and constituted an unlawful penalty;

3.    That the damages which the Court awarded on Plaintiffs' Count V fraud count, which were precisely the same royalty damages ($16,990,900) that it had already awarded on Plaintiffs' contract count, were "separate" from the contract damages and did not result in a prohibited double recovery;

4.    That the Court could award punitive damages after already awarding contract and fraud damages based on a wholly punitive measure;

5.    That the Court could award fraud damages or punitive damages based on conduct which was expressly contemplated by the parties' contract (Defendants' failure to mine Plaintiffs' coal);

6.    That the Court could award pre-judgment interest, and then compound that interest, on an unliquidated sum which was solely punitive and had no relationship whatsoever to what the Plaintiffs could have expected to recover had their contract been fully performed; and

7.     That the Court could: (1) award additional damages under the lease after May 2012 (unpaid lease consulting fees in the amount of $10,000 per month from May 2012 through to the entry of final judgment) despite awarding royalty damages for every ton of coal underlying the lease as of May 2012 and (2) refuse to credit against the royalty damages the additional $375,000 in minimum royalties that the Defendants paid after May 2012.

## IV.     ARGUMENT

### A.     Magistrate Judge Ingram Should Have Afforded Defendants a Hearing on Damages, Which Would Have Revealed a Complete Lack of Basis for a $60 Million Award.

The rule in this Circuit is clear:

> Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true.  The District Court must instead conduct an inquiry in order to ascertain the amount of damages with a reasonable certainty.

*Vesligaj v. Peterson*, 331 F. Appx. 351, 354-55 (6th Cir. 2009).  This position is consistent with those taken by other jurisdictions.  As summarized in *Minyard v. Burrell*, No. 1:09-cv-90, 2011 WL 5188937, *1 (W.D. Mich., Aug. 9, 2011):

> A court may not rubber-stamp the non-defaulting party's damages calculation, but rather must ensure that there is a basis for the damages sought. *See Overcash v. United Abstract Group, Inc.,* 549 F.Supp.2d 193, 196 (N.D.N.Y.2008); *see also Northwest Administrators, Inc. v. Uzunov Trucking, LLC,* No. C09–1229, 2010 WL 933873, at * 1 (W.D.Wash. Mar. 11, 2010) ("The entry of default does not convert this court into a rubber stamp for whatever judgment a plaintiff proposes."). "Even in the default judgment context, '[a] court has an obligation to assure that there is a legitimate basis for any damage award it enters.'" *Ward v. Real Ships, Inc.,* No. 09–65, 2009 WL 2783217, at * 3 (S.D.Ala. Aug.31, 2009) (quoting *Anheuser Busch, Inc. v. Philpot,* 317 F.3d 1264, 1266 (11th Cir.2003)).

Thus, however the Court decides to proceed in a default context, it cannot determine damages by simply relying on the plaintiff's complaint, and it must do whatever is necessary to independently determine the quantum of damages. And while conducting an evidentiary hearing is not always required, the Sixth Circuit has recognized that determining damages without an evidentiary hearing should be the exception rather than the rule. *See Antoine v Atlas Turner, Inc.,* 66 F.3d 105, 110 (6th Cir. 1995) ("Ordinarily, the District Court must hold an evidentiary proceeding in which the [defaulted] defendant has the opportunity to contest the amount of damages.").

Here Magistrate Judge Ingram made no independent determination; he relied solely on Plaintiffs' complaint in determining that default damages equal to $60 million should be assessed. Again, not only did Magistrate Judge Ingram deny Defendants' request that he hold an evidentiary hearing, but he even refused Defendants' request that he hold an oral argument at which their counsel could present their position on the outstanding damages issues. While the Magistrate Judge stated (in an effort to analogize this case to cases where courts have permissibly determined damages based on extensive and undisputed record proofs) that "the record in this case is robust," he largely ignored, by his own admission, everything contained in that "robust record" beyond what was pled in the Amended Complaint:

> In this case, the record available at the time of the award of default contains sufficient evidence for the Court to make an informed calculation of damages. These documents include the Amended Complaint, the Fourth Amendment (the operative contract between the parties) [which was attached to the Amended Complaint], and the independent arbiter's report [which was attached to the Amended Complaint.]. It is true that subsequent affidavits and other documents have been filed in the record, but the Court's reliance on these is minimal.

[D.E. 302, p. 5.]   Indeed, Magistrate Judge Ingram "determined" that the Count II contract damages equaled $16,990,900 solely because, as alleged in the Amended Complaint, Plaintiffs hired a mine engineer to write a four paragraph letter adopting this ludicrous damages measure and then called it an "independent arbiter's report."   [D.E. 40, ¶ 31 and Exhibit 6.]   This same "determination" by Magistrate Judge Ingram constitutes virtually the entire basis for his suggested fraud damages award on Count V ("the undersigned recommends equating these damages with "the lost royalties of $16,990,900, as estimated by the Independent Arbiter'"). And the independent arbiter's determination constitutes virtually the entire basis for Magistrate Judge Ingram's suggested punitive damages award on Count V (determining punitive damages based on a ratio of the compensatory damages awarded on Count V).   In short, Magistrate Judge Ingram did exactly what the law precludes; he simply "rubber-stamp[ed] the non-defaulting party's damages calculation."   *Overcash v. United Abstract Group, Inc.,* 549 F. Supp. 2d 193, 196 (N.D. N.Y. 2008).

The Magistrate Judge's willingness to adopt, without hearing or inquiry, Plaintiffs' engineer's findings in this case is all the more egregious given the glaring deficiencies of those findings.   As reflected on the face of the report of Robert Conway, Plaintiffs' mining engineer, Conway does nothing more than apply the contractually stipulated royalty rate to 90% of all the coal underlying Plaintiffs' property.[2]   He makes no attempt to determine the quality of the coal, the physical or regulatory restraints to mining the coal, or any other of the variables that determine the mineabilty and merchantability of coal (that is, the quantum of coal that could be commercially mined at the property).   Nor does Conway determine the amount of coal that could

---

[2]  Conway assumes that 90% is a reasonable rate for recovery of surface mined coal, but he does no analysis and makes no finding that all of the coal can be surface mined, as opposed to auger mined or underground mined, methods with much lower recovery rates.  Indeed, in the permit application that Conway himself prepared for a portion of Plaintiffs' property back in 2005, Conway projected that one third of that coal would be auger mined, a method which customarily yields a recovery rate of only 50%-70%.  [D.E. 214-4, p.3.]

be mined in any given year or, stated otherwise, the amount of time that it would take to "diligently" mine his 16,740,900 tons of coal, thus making it impossible to determine the amount of damages through to any date certain or, if future damages were allowed, impossible to determine the proper discount rate for the time necessary to complete the mining. Instead, Conway' report simply applies the contractually stipulated royalty rate to 90% of the coal that Conway says might ever be mined (16,740,900 tons yielding $16,990,900 in royalties). Thus, not only is there no basis in Conway's report for determining how much coal was mineable and merchantable, but there is no basis in that report for concluding, as was a necessary finding to Magistrate Judge Ingram's conclusion that Plaintiffs should have been paid $16,990,900 in royalties by May 2012 (a mere 18 months after the lease was executed), that Defendants, had they diligently mined, would have mined 16,740,900 tons by that date.

The Fourth Amended Lease precludes such an approach. According to that Lease, Kentucky Fuel "covenants to use commercial and reasonable good faith efforts to maximize within the constraints of industry standard the amount of coal extracted from these properties." [D.E. 40-5, ¶ 10.] And, in the event that Kentucky Fuel breaches this covenant, the Fourth Amended Lease provides that "royalties that [Plaintiffs would have received but for the Event of Default by Kentucky Fuel] shall be determined by an **independent** arbiter selected by [Plaintiffs] for the purpose of determining the amount of royalties **that would have been paid by Kentucky Fuel to Plaintiffs under the terms of the Agreement.**" [*Id.,* ¶ 7.] Thus, the parties' Lease does not provide that damages can be determined, like Conway determined them, simply by estimating the amount of black stuff under the ground. Instead, the arbiter, who needed to be independent, was directed to determine damages based on "the amount of royalties that Plaintiffs' would have recovered" had Kentucky Fuel reasonably and in good faith mined the

commercially (economically) recoverable coal. *See* Black's Law Dictionary (10th ed. 2014) (defining "commercial", *inter alia,* as "[o]f, relating to, or involving the ability of a product or business to make a profit"); *see also Citri-Lite Co. v. Cott Beverages, Inc.*, 721 F. Supp. 2d 912, 926 (E.D. Cal. 2010) (reviewing cases and, while finding that there is no universally accepted definition of the term "commercially reasonable efforts," concluding that virtually all cases agree that the performing party may consider its own economic business interests under the standard); *LeMond Cycling, Inc. v. PTI Holding, Inc.*, No. CIV.03-5441, 2005 WL 102969, at *5 (D. Minn. Jan. 14, 2005) (commercial reasonableness standard includes not only notions of industry practice, but also the financial interests of the contracting parties because "[n]o business would agree to perform to its detriment").[3]

In light of the Agreement's plain terms, Magistrate Judge Ingram could not properly credit Conway's damages determination without any inquiry simply because Plaintiffs alleged that Conway was an independent arbiter. First, Magistrate Judge Ingram needed to determine Conway's independence. Defendants proffered numerous reasons in their briefing on the damages issues that should have called into question Conway's independence,[4] foremost among them that Conway was paid by Plaintiffs; engaged in *ex parte* communication with Plaintiffs; never talked or otherwise contacted Defendants; and conducted no hearings or other proceedings at which Defendants could appear and offer their input. It is also notable, in regard to Conway's independence, that Conway had been hired by Fivemile Energy Resources, Inc., the predecessor to Plaintiff Fivemile Energy, LLC, to prepare the surface mining permit application for the

---

[3] Plaintiffs' construction to the contrary, *i.e.,* that Defendants were obligated to mine all of the coal at the property regardless of economics, is not only defeated by the Fourth Amended Lease's reference to Defendants' *commercial* and reasonable good faith efforts, but it is also defeated by that Lease's provision for minimum royalties. [D.E. 40-5, ¶ 5(f).] There would be no need for a minimum royalty provision if all of the coal needed to be removed regardless of economics.

[4] *See, e.g.,* D.E. 262, pp. 9-11.

Fivemile property, and in that permit application he estimated that there was a grand total of 2,011,527 tons (not 16,740,900 tons) of recoverable coal in the permitted area. [D.E. 217-1, p. 2.] And as Plaintiffs' Amended Complaint alleges that this permitted area covered most of the leased property [D.E. 40, ¶ 9], it is hard to square the 2,011,527 tons in Conway's permit application with the 16,740,900 tons in his arbiter's report.

In the arbitration context, arbitrators — even party appointed arbitrators — are held to a far higher standard of independence. *See, e.g.,* American Arbitration Association, Commercial Arbitration Rules and Mediation Procedures, Rules R-13, R-18 and R-19, www.adr-org/aaa/ShowPDF?doc=ADRSTG_004130 (barring *ex parte* communications with arbitrators, and requiring independence and impartiality of arbitrators, even party appointed arbitrators); *see also* KRS 417.090 (requiring arbitrators, unless there is an agreement to the contrary, to conduct hearings at which parties are entitled to be heard, to present evidence material to the controversy, and to cross examine witnesses). And there is no basis for concluding that an "independent arbiter" should be held to any lower standard; if anything, the standards for an independent arbiter are higher. *See, e.g.,* Black's Online Law Dictionary, http://thelawdictionary.org/arbiter (defining "arbiter" as "[a] person bound to decide according to the rules of law and equity, as distinguished from an arbitrator, who may proceed wholly at his own discretion").

Second, Magistrate Judge Ingram needed to determine that Conway had followed the dictates of the agreement under which he was appointed. This is required in the arbitration context, where the Courts uniformly hold that a determination by the arbitrator that does not substantially comply with the terms of the terms of the submission (the agreement under which the arbitrator is appointed) is not binding on the parties and will not be upheld. *Tackett v. Campbell Corp.,* 781 S.W.2d 758, 760 (Ky. App. 1989); *Nat'l Children's Ctr., Inc. v. Serv.*

*Employees Int'l Union, Local 500*, 68 F. Supp. 3d 96, 104 (D.D.C. 2014) (arbitration award may be set aside where the arbitrator "acts outside the scope of his contractually delegated authority"); *see also Elec. Data Sys. Corp. v. Donelson*, 473 F.3d 684, 688 (6th Cir. 2007) ("Arbitrators exceed their power when they 'act beyond the material terms of the contract from which they primarily draw their authority, or in contravention of controlling principles of law.'"). And given that **arbiters** are bound to follow the law even more so than **arbitrators,** *see* Black's Law Dictionary Online*, supra,* Conway's manifest disregard of the terms of the Lease should have caused Magistrate Judge Ingram to disregard Conway's damages determination.

Throughout the briefing on the damages issues, Defendants repeatedly called the Court's attention to the need for the Court to conduct an evidentiary hearing on the disputed fact issues regarding Conway's independence[5] and to conduct a sufficient inquiry to determine the legal sufficiency of Conway's Report, *inter alia,* whether Conway followed the dictates of the Lease under which he was supposedly appointed in calculating damages.[6] Yet Magistrate Judge Ingram did not even address the questions about Conway's independence in his Report and Recommendation, and he dismissed what he referenced as the "contract-interpretation" issue regarding the arbiter's report, again without any hearing or oral argument, as mere defenses to liability that were "incompatible with the sanction imposed by Judge Von Tatenhove."

Magistrate Judge Ingram was dead wrong on this critical point. The arbiter's failure to follow the parties' agreement, which directed the arbiter to determine the amount of royalties

---

[5] *See, e.g.,* D.E. 262, pp. 9-11; D.E. 214, pp. 12-14.

[6] In addition to calling out the need for Magistrate Judge Ingram to determine whether Conway had followed the dictates of the parties' agreement in calculating damages, Defendants also called out the need for Magistrate Judge Ingram to determine whether Conway's damages calculations, if applied under the Lease, would constitute an unlawful penalty. [D.E. 262, pp. 14-17.] As with Defendants' other challenges, Magistrate Judge Ingram refused to consider Defendants' penalty challenges (either through an evidentiary hearing or even oral argument of counsel) and, as explained *infra* at pp. 15-20, this failure provides another independently sufficient reason why this Court must refuse to adopt the suggested damages.

that Plaintiffs would have recovered had Defendants mined all of the commercially recoverable coal, rendered his determination of damages fatally deficient. By refusing to consider how much commercially (economically) recoverable coal underlay the property and how much of that coal could be economically removed in any given year (and by simply determining the total amount of black stuff underlying the lease), the arbiter failed to follow the dictates of the parties' agreement in determining the amount of damages. Nothing in this Court's sanctions rulings precluded the Magistrate Judge's review of the damages calculation; to the contrary, those rulings required that the Magistrate Judge carefully consider same. [D.E. 251, pp. 4, 6 (concluding that the default entered by this Court was for liability and not damages and directing Magistrate Judge Ingram to hold proceedings as are necessary to determine damages).]

Nor finally can Magistrate Judge Ingram's refusal to hold a hearing — or to conduct any other inquiry into Plaintiffs' damages claims — be justified by his finding that "Defendant[] fail[ed] to engage in any timely discovery concerning Plaintiffs' claimed damages." [D.E. 302, p. 5.] First of all, as the Magistrate Judge concedes, no party is required to engage in such discovery in order to pursue a defense. [*Id.*] Second, it is not at all clear that Defendants' discovery was untimely [*see* D.E. 298, pp. 4-5] and even if it was, it was only untimely by two days as a result of the application of a three day mailing rule that has since been abolished by the December 2016 amendments to Fed. R. Civ. P. 6(d) and as a result of Magistrate Judge Ingram's refusal to grant Defendants' timely request for a thirty day extension of the discovery deadline (which expired less than six months after Plaintiffs' first filed their fraud and punitive damages claims in this case).[7] Third, while Magistrate Judge Ingram states his view that Defendants' failure to engage in timely discovery (in 2013) is simply emblematic of their obstructionist

---

[7] The discovery cut-off, which Magistrate Judge Ingram refused to extend, was September 1, 2013. [D.E. 16.] The Amended Complaint, in which Plaintiffs first asserted their fraud and punitive damages claims, was filed on March 15, 2013, only five and a half months before the discovery cutoff. [D.E. 40.]

behavior such that it "sullies…their motivation at this point" [D.E. 302, p. 5], the Magistrate Judge has already punished Defendants for their delays — by denying Defendants' motion to extend the discovery deadline [DE 167] and by recommending that Defendants be defaulted on liability [DE 189]. *See, e.g., Paradigm Oil v. Retamco Operating, Inc.,* 372 S.W.3d 177, 185-187 (Tex. 2012) (as the role of compensatory damages is to fairly compensate and not to punish, court cannot preclude defaulted party from participating in damages hearing where that party had already been defaulted on liability for its discovery abuses). To use Defendants' delays in taking discovery from Plaintiffs to compound the penalties already visited upon Defendants, by depriving Defendants of the opportunity to challenge Plaintiffs' claim to a $60 million plus windfall for Defendants' failure to mine coal where no the record contains no cognizable evidence of damage, is not an appropriate or a proportional sanction.

**B.** **Not Only Was There No Basis in the Record for an Award of $16,990,900 in Lost Royalty Damages, but that Award was also Contrary to All of the Available Evidence, Lacked Any Adequate Legal Foundation and Constituted an Unlawful Penalty.**

Magistrate Judge Ingram's refusal to conduct any inquiry into Plaintiffs' damages claim was especially prejudicial in this case, where all the available evidence suggests that this claim was grossly disproportional to any damage that Plaintiffs might conceivably have suffered. In adopting Plaintiffs' claimed lost royalty damages on Count II, Magistrate Judge Ingram suggests an award of $16,990,900, based on mining 16,740,900 tons, and he calculates prejudgment interest (compounded, no less) from May 2102. Thus, Magistrate Judge Ingram's suggested award necessarily assumes that had Defendants mined Plaintiffs coal as required under the Fourth Amended Lease, that is, had they mined all commercially mineable coal in a reasonably diligent fashion, Defendants would have mined 16,740,900 tons of coal within a period of only

eighteen months from when that Lease was executed. The evidence against such a finding is overwhelming.

First, as alleged in Plaintiffs' Amended Complaint [D.E. 40, ¶ 23(e)], Defendants would have needed to obtain a Section 404 permit from the Army Corps of Engineers before commencing any mining at the property. Even assuming that a permit could have been obtained, which is not at all certain, it takes more than two years to obtain such a permit.[8] Thus, under no circumstances could Defendants even have begun mining Plaintiffs' coal by May 2012, and the necessary assumption behind Magistrate Judge Ingram's damages calculation, *i.e.,* that Defendants' would have mined 16,790,900 tons of Plaintiffs' coal by May 2012 had they honored the parties' agreement, is off by 16,790,900 tons.[9]

Second, the Court can take judicial notice of the fact that, by 2013, the very earliest date that Defendants could possibly have begun mining Plaintiffs' coal, coal prices had collapsed in Eastern Kentucky and, at all times since 2013, those prices have remained depressed.[10] Thus, there is no way that Plaintiffs can establish that any significant portion of the coal could ever have been commercially mined by Defendants, and all the available evidence suggests directly to the contrary.[11]

Finally, even assuming that, contrary to common sense and the language of the Fourth Amended Lease, Defendants were obligated to mine the coal at Plaintiffs' property even if it was

---

[8] *See* Declaration of Zachary Wright, Exhibit 1, ¶ 4; Declaration of Seth Schwartz, Exhibit 2, ¶¶ 24, 29; Declaration of Roland B. Doss, PE, Exhibit 3, ¶ 4.

[9] Even without accounting for the time to get a 404 permit, the state surface mining permit at the property only covered approximately two million tons as estimated by Mr. Conway. [D.E. 217-1, p. 2.] It would have taken at least one and one half to two years to obtain a surface permit to cover the remainder of the Fivemile property, which Mr. Conway estimates to have contained nearly seventeen million tons of recoverable coal. *See* Declaration of Roland B. Doss, PE., Exhibit 3, ¶ 3.

[10] *See* Declaration of Seth Schwartz, Exhibit 2, ¶¶ 14-22.

[11] Declaration of Seth Schwartz, Exhibit 2, ¶¶ 9-13, 25, 28, 32; *see also* Declaration of Zachary Wright, Exhibit 1, ¶¶ 2, 3.

unprofitable to do so, it still defies reason to calculate damages as if Defendants would have mined anywhere close to 16,790,900 tons through to the present date, let alone during the eighteen months following the execution of that Lease, as Magistrate Judge Ingram's suggested damages calculation assumes. A review of publicly available information from the U.S. Energy Information Administration ("EIA") reveals that a total of less than 120,000 tons was surface mined in all of Breathitt County during that eighteen month period and that less than three million tons of coal has been surface or underground mined in all of Breathitt County from the date of the parties' lease through to the end of 2016.[12] Moreover, publicly available data from MSHA reveals that no coal has been mined by Plaintiffs or its lessees from the adjacent permit (Deep Wood) acquired by Plaintiffs at the time they executed the governing lease.[13] There has been little to no mining in Breathitt County in recent years because Breathitt County lies on the extreme western edge of the Central Appalachia coalfields and the quality of its coal, and the price that can be obtained for that coal, is quite low as compared to the coal reserves in other areas of Eastern Kentucky.[14] And even accounting for all the coal mined in all of Eastern Kentucky, very few surface mines produce more than 500,000 tons per year. For example, in 2013, only seven out of 155 Eastern Kentucky surface mines produced as much as 500,000 surface tons, and that number has steadily declined since 2013, such that in 2016, only one Eastern Kentucky surface mine produced more than 500,00 tons of coal.[15]

Thus, any proper measure of damages, even accepting Plaintiffs' fanciful argument that Defendants' are required to mine even unprofitable coal and even assuming *arguendo* that future

---

[12] Declaration of Seth Schwartz, Exhibit 2, ¶22.

[13] Declaration of Zachary Wright, Exhibit 1, ¶ 5.

[14] Declaration of Seth Schwartz, Exhibit 2, ¶ 10.

[15] *See* Declaration of Seth Schwartz, Exhibit 2, ¶ 27.

royalty damages can be awarded under the parties' agreement,[16] would need to account for the fact that mining could not have commenced until 2013 at the earliest, that no more than 500,000 tons of coal would have been produced in any one year, and that it would take at least thirty years to mine seventeen million tons of coal.[17] Thus, rather than applying a compounded prejudgment interest rate to $16,990,900 from May 2012, the proper damages calculation would need to reduce that amount by a reasonable present value discount interest rate over thirty plus years. Any other methodology would result in the assessment of an unlawful penalty. *See Paducah Area Public Library v. Terry,* 655 S.W.2d 19, 24-25 (Ky. App. 1983) (adopting the "universal rule require[ing] that awards for lost future earnings be in present worth…[a]ny other rule may tend to overcompensate…and turn injury into profit, a result forbidden under our sense of justice"). Applying this rule, the Kentucky Court of Appeals in *Moore v. Ford Motor Credit Co.,* 778 S.W.2d 657, 659 (Ky. App. 1989), instructed the trial judge to reduce the amount owed on the balance of the term of a lease to its present value to avoid imposing an unlawful penalty, explaining:

> …we hold that the failure of the default provision to discount the accelerated rent to its present value constitutes an unlawful penalty. *See Credit Alliance Corp. v. Adams Construction Corp., Ky.*, 570 S.W.2d 283 (1978). Under Kentucky law, only those liquidated damages provisions which bear a reasonable relationship to the anticipated damages are enforceable. *Miles v. Proffitt, Ky.*, 266 S.W.2d 333 (1954). Accelerated rentals that are not discounted do not bear a "reasonable relationship" to actual damages suffered. *See also Taylor v. Commercial Credit Equipment Corp.*, 170 Ga. App. 322, 316 S.E.2d 788 (1984)*; United Leasing and Financial Services, Inc. v. R. F. Optical, Inc.*, 103 Wis.2d 488, 309 N.W.2d 23 (1981); and *Northwest Collectors, Inc. v. Enders*, 74 Wash.2d 585, 446 P.2d 200 (1968). Further, since the penalty clause allows the lessor both the car *and* the rental payments (with one year's less

---

[16]  As Defendants explained in the damages briefs they submitted to Magistrate Judge Ingram, the Fourth Amended Lease does not provide for the independent arbiter to determine future damages. [*See, e.g.,* D.E. 262, pp. 7-9.]

[17]  *See* Declaration of Seth Schwartz, Exhibit 2, ¶¶ 24, 26, 33.

depreciation than bargained for), failure to discount the accelerated rents to present value obviously results in the lessor being unjustly enriched.

*Moore*, 778 S.W.2d at 659.

The same principles apply in this case.  Magistrate Judge Ingram's damages calculation awards damages to Plaintiffs as if the Fourth Amended Lease required Defendants to mine every ton of coal underlying the property within eighteen months, by May 2012.  However, even if the Lease required Defendants to mine all of the coal regardless of its profitability, mining seventeen million tons under the "constraints of industry standards" (*i.e.,* on the average of 500,000 tons per year) would have taken more than thirty years — not eighteen months.[18]  Thus, discounting the damages based on a realistic assumption that the royalty payments would be paid at the rate of 500,000 tons per year and applying Magistrate Judge Ingram's 8% interest rate as the present value discount rate, the resulting sum would be $5,692,719 rather than $16,990,900 as of May 2012.[19]  And even in the default context, the Court must decline to award damages that constitute an unlawful penalty.  *See Borek, Stockel & Co. v. Slevira*, 609 N.Y.S.2d 679, 679-80 (N.Y. Super. 1994) (after default judgment, court vacated the damages award and ordered a new assessment of damages, because the liquidated damages clause which was the basis of the award was an invalid penalty under New York law).

Finally, Defendants appreciate that Plaintiffs will argue that Defendants should not be permitted to proffer expert evidence that was not timely served back in 2013.  However, if the Court does not allow its desire to punish Defendants to outweigh its duty to properly ascertain damages, it should admit such evidence.  For the Court to have any evidentiary basis upon which

---

[18]  Declaration of Seth Schwartz, Exhibit 2, ¶ 33.

[19]  *Id.*  Even this discounted rate gives a windfall to Plaintiffs as they are receiving both royalty payments for the removal of their coal as well as the coal itself, all of which remains undisturbed.  Thus, if the coal underlying the Fourth Amended Lease property can really be commercially recovered, as Plaintiffs must necessarily contend, Plaintiffs, by the suggested damages award, would not only be paid as if Defendants had removed all of their coal, but they will also be able to re-lease — or to themselves mine — that same coal.

to make a damages award, Plaintiffs would be required to supplement their expert disclosures in order to satisfy their burden of proving damages, to establish, at the minimum, the amount of economically recoverable coal and the amount of coal which could reasonably be mined within industry constraints in any given year.[20] Defendants should correspondingly be entitled to offer expert evidence on these critical damages issues, especially in a case where the damages claimed are so high. Alternatively, if Defendants' failure to timely file expert reports is going to preclude them from offering expert testimony at any hearing on damages, then this same restriction must be imposed on Plaintiffs, in which case they will have failed, as a matter of law, to establish the necessary evidence to support a damages award.

> **C. Awarding Lost Royalty Damages Under Each of Two Different Legal Theories Allows Plaintiffs an Improper Double Recovery.**

Even setting aside the flawed evidentiary basis underlying Magistrate Judge Ingram's calculations, the recommended damages award grossly overcompensates the Plaintiffs. "There is a strong public policy in this Commonwealth against double recovery for the same elements of loss." *Eckstein v. Cincinnati Ins. Co.*, 618 F. Supp. 2d 707, 711 (W.D. Ky. 2007); *see also Asher v. Unarco Material Handling, Inc.*, 862 F. Supp. 2d 551 (E.D. Ky. 2012) (discussing how election of remedies doctrine operates to prevent double recovery for the same injury). Ignoring this policy, the Magistrate Judge recommends a judgment which would award $16,990,900 to compensate Plaintiffs for a single injury (lost royalties) twice (once under Count II for breach of contract and once under Count V for fraud.) [*See* D.E. 302, p. 13 (contract provides for lost royalties assessed by independent arbiter); p. 14 (equating fraud damages with "the lost royalties

---

[20] Plaintiffs implicitly acknowledge as much by their untimely filing, on November 13, 2014, of an expert report that purports to account for these factors. [D.E. 215-2, pp. 4-10.] This untimely report is deficient on its face, as it calculates damages beginning in 2006 for Defendants' failure to diligently mine, five years before the execution of the Fourth Amended Lease which first imposed such duty upon Defendants, and Magistrate Judge Ingram did not rely on its contents. Certainly, the expert reports attached to these Objections are more than sufficient to raise fact issues on Plaintiffs' untimely expert report, which should be resolved at an evidentiary hearing.

of $16,990,900 as estimated by the Independent Arbiter").]   Thus, Magistrate Judge Ingram

recommends that Plaintiffs be awarded $33,981,800 in compensatory damages for the loss of

royalties that are worth, according to Plaintiffs' mining engineer, $16,990,900 (but that in reality

are worth nothing).

Both common sense and Kentucky law preclude such a result.  Regardless of the number

of legal theories pled or proven, a plaintiff may recover only once for each injury.  *See Hickson*

*Corp. v. Norfolk So. R.R. Co*., 260 F.3d 559, 567 (6th Cir. 2001).   Thus, in a case in which

defendants breached various contractual, common law and statutory duties, the court allowed the

plaintiffs to recover only once for their financial loss.  The Court held

> [w]e agree with the district court that Defendants are liable under
> these common law theories, but we decline to conduct an
> exhaustive review of these claims because Plaintiffs will be fully
> compensated by the RICO damages awarded by the district court.
> Regardless of the theory of liability, Plaintiffs losses remain the
> same. Having upheld the district court's judgment on the RICO
> claim, any further damages would be duplicative.

*In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 494 (6th Cir. 2013); *see also Hickson*, 260

F.3d at 567 (where plaintiff suffers only one injury, "it cannot collect a double recovery for

actual damages that are coextensive under the contract and tort claims"); *Trost v. Trost*, 525 F.

App'x 335, 346 (6th Cir. 2013) ("At trial, Sherry permissibly pursued all legal theories that were

available to her, and the jury found for her on two of them. The trouble is that the jury verdict

form failed to explain that damages for one claim may not be duplicative of damages awarded in

another."); *Rest. Supply Sols., Inc. v. Leischow*, No. CIV. 3:04-0786, 2007 WL 2904838, at *14

(M.D. Tenn. Sept. 30, 2007), *aff'd in part, vacated in part, remanded,* 309 F. App'x 979 (6th Cir.

2009) ("Whether the theory of recovery is breach of contract, intentional misrepresentation, or

promissory fraud, if the damages claimed under each theory overlap, the Plaintiff is only entitled to one recovery.").

Here, Magistrate Judge Ingram's recommendation acknowledges that there is only one injury – lost royalties as assessed by the independent arbiter. Once Plaintiffs have recovered those royalties pursuant to their breach of contract claim, they stand in as good a position as they would have had the contract been performed, have received the full benefit of the bargain, and have suffered no damage (no loss of the royalty value of their property) as a result of the alleged fraud. *See Kentucky Cent. Ins. Co. v. Schneider*, 15 S.W.3d 373, 374–75 (Ky. 2000) ("The object of compensatory damages is to make the injured party whole to the extent that it is possible to measure his injury in terms of money. . . . The object is not to place the plaintiff in a better position than he would have been had the wrong not been done."). While the Magistrate Judge states that the fraud and breach yield separate injuries, his own findings compel to the contrary. Indeed, he concludes that, by breaching the Fourth Amended Lease, Defendants deprived Plaintiffs of the value of the royalties as calculated by the independent arbiter, and that, by their fraud, Defendants deprived Plaintiffs of the value of the royalties as calculated by the independent arbiter. In short, Magistrate Judge Ingram's recommendation is for a result that the law precludes; he has recommended that Plaintiffs recover $16,990,900 twice for the same injury. And just because Plaintiffs have pleaded two causes of action that entitle them to recover the same damages, that does not mean that they can recover those damages twice. *See Hysell v. Iowa Public Serv. Co.*, 559 F.2d 468, 473 (8th Cir. 1977) (duplicative recovery is one which compensates "a single injury under two different names"); *Brooks v. Doherty, Rumble & Butler,* 481 N.W.2d 120, 128 (Minn. App. 1992) ("In order to recover under theories of both contract

and tort, appellant had the burden of proving *separate damages* for fraud and for breach, lest the damage award be duplicative.") (emphasis added).

**D.     Any Separate Award of Punitive Damages is Also Duplicative.**

Also duplicative was the determination by the "independent arbiter" that Plaintiffs' lost royalty damages equaled $16,990,900 and the determination by the Magistrate Judge that Plaintiffs should recover that same amount again as punitive damages.   "Although the rule against double recovery arises most often in the context of compensatory damages, it applies to punitive damages as well."  *Mason v. Oklahoma Tpk. Auth.*, 115 F.3d 1442 (10th Cir. 1997) *overruled on other grounds, TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011).   In this case, the award of $16,990,900 on Plaintiffs' Count II contract claim was itself wholly punitive.  Rather than attempting to determine "the lost royalties [Plaintiffs] would have received but for the default," as required by the provisions of the Fourth Amended Lease, the Plaintiffs' arbiter calculated Plaintiffs' lost royalty damages by robotically assessing a royalty on all of the coal underlying the subject property, ignoring that the calculation of damages should have been limited to a royalty on that coal that Defendants were required to mine under the Fourth Amended Lease, and the Magistrate Judge merely adopted that robotic assessment.  As explained above, this extraordinary method of calculating damages resulted in an award ($16,990,900) that grossly exceeded any damage that could have proximately resulted from any breach of the Fourth Amended Lease; it was fashioned to punish Defendants and not to compensate Plaintiffs.  Under these circumstances, an additional award of punitive damages is impermissibly redundant.  *See, e.g., Richardson v. Bart's Car Store, Inc.*, No. 1:14-cv-00707, 2014 WL 7184433, *6 (S.D. Ind. Dec. 15, 2014) (allowing statutory treble damages and common law punitive damages would impermissibly grant a duplicative remedy); *Watson v. Dillon*

*Companies, Inc.*, No. 08-cv-00091, 2013 WL 4547477, *7 (D. Co. Aug. 28, 2013) (plaintiff may not recover both punitive damages and treble damages because both damages serve same purpose); *Bailey v. Container Corp. of America*, 660 F. Supp. 1048, 1052 (S.D. Ohio 1986) ("Common sense tells us that liquidated damages constitute a recovery that is punitive in nature. Therefore, in order to avoid the award of a duplicative recovery in the present case, plaintiff's recovery of punitive damages will be offset by his recovery of liquidated damages . . . .").

In this way, the case closely resembles *Harrod Concrete and Stone Co. v. Crutcher*, 458 S.W.3d 290, 296-97 (Ky. 2015), in which the Kentucky Supreme Court considered the proper damages for innocent and willful trespass to minerals. While an innocent trespasser can deduct its expenses from the damages owed, a willful trespasser is liable for the full value of the mineral with no allowance for expenses. *Id.* at 296. This second measure of damages both compensates the mineral owner and serves as a penalty for the trespasser's wrongdoing, "thus obviating the need for additional punitive damages." *Id.* Thus, despite the willful behavior of the trespasser, Kentucky's highest court determined that punitive damages could not be awarded where the measure of damages for willful trespass had already served to punish the trespasser. *Id.*; *see also Bach v. First Union Bank*, 149 Fed. Appx. 354, 366 (6th Cir. 2005) (ordering remittitur or remand of punitive damage award that was duplicative of much of compensatory award); *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 218 (3d Cir. 1992) (requiring election of either statutory treble damages for anti-trust violations or common law punitive damages for tort claims), *cert. denied,* 507 U.S. 921, 113 S. Ct. 1285, 122 L.Ed.2d 677 (1993); *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987) ("In the absence of separate and distinct findings of actual damages on both the acts of negligence and the deceptive acts or practices, an award of exemplary damages *and* statutory treble damages would be necessarily

predicated upon the same findings of actual damages and would amount to a double recovery of punitive damages.").[21]

### E. In Any Event, the Economic Loss Doctrine Precludes the Award of Fraud or Punitive Damages In This Case.

The fact that the failure to mine and pay royalties for the sale of Plaintiffs' coal (the basis of both the contract and tort damages awards) was specifically contemplated in the parties' agreement precludes an award of damages for fraud. While Magistrate Judge Ingram concluded that Kentucky has not adopted the economic loss doctrine [D.E. 302, p. 16], that is just not so.

In *Giddings & Lewis, Inc. v. Indus. Risk Insurers,* 348 S.W.3d 729, 733 (Ky. 2011), the Kentucky Supreme Court held that the economic loss rule applied in Kentucky to claims for negligence, strict liability and negligent misrepresentation. While the facts before the *Giddings* Court did not require it to address fraudulent inducement claims, the courts in this District and the Western District of Kentucky have forecasted, based on the *Giddings* Court's stated preference for a broad application of the doctrine, that the Kentucky Supreme Court would extend the doctrine to fraudulent inducement claims. Accordingly, these cases have held that, under Kentucky law, "the economic loss rule precludes a plaintiff from recovering under a fraud theory when that claim is intertwined with a breach of contract claim." *Derby City Capital, LLC v. Trinity HR Services*, 949 F. Supp. 2d 712, 727 (W.D. Ky. 2013) (predicting economic loss rule would preclude fraudulent inducement claim relating to sale of interest in limited liability company); *see also Biszantz v. Stephens Thoroughbreds*, LLC, No. 5:13-CV-348, 2015 WL 574594, *13 (E.D. Ky. Feb. 11, 2015) (applying economic loss rule to fraudulent inducement

---

[21] This principle applies with equal force to Magistrate Judge Ingram's decision to consider Plaintiffs' litigation conduct as a factor supporting the punitive damages award. The sanctions under Rule 37 themselves serve a punitive purpose, *see SPX Corp. v. Bartec USA, LLC*, 574 F. Supp. 2d 748, 756 (E.D. Mich. 2008), and the default has punished Defendants for that behavior. Imposing punitive damages again for the same conduct amounts to a second impermissible double recovery.

claim); *Ashland Hosp. Corp. v. Provation Medical, Inc.*, No. 14-44, 2014 WL 5486217, **4-5 (E.D. Ky. Oct. 29, 2014) (same, noting the Kentucky Supreme Court has indicated a preference for a broad application of the economic loss doctrine).  The rule rests on the premise that sophisticated and experienced parties should have the freedom to allocate the risks of their relationship by mutual agreement, without fear that either party can execute an "end run" around the contractually established remedies.  *See Ashland Hosp.,* 2014 WL 5486217 at *5 (doctrine encourages parties to address purely economic losses through contract-based theories of recovery); *Biszantz*, 2015 WL 57494 at *13 (doctrine upholds parties' allocation of risk). Where, as here, the Plaintiff's fraud claims center around the performance of the obligations addressed in the agreement, those claims are inextricable from the contract claims and the economic loss doctrine applies.  *Id.*, at **13-14 (fraud based compensatory damages and punitive damages are unavailable for economic losses addressed by the contract).

Although upon default the Court accepts all the well pleaded allegations of the complaint as true, the Court cannot completely abdicate its duty to enter a judgment which conforms to the law.  *See Anderson v. Johnson*, 194 F.3d 1311 (6th Cir. 1999) (unpublished), No. 98-1931, 1999 WL 1023753, *2 (6th Cir. Nov. 4, 1999) ("Even if a default has been entered against a party, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law."); *see also* Wright & Miller, 10A Federal Practice & Procedure Civ. §2688.1 (4th ed) (same); *Kwik-Sew Pattern Co. v. Gendron*, No. 1:08-CV-309, 2008 WL 4960159, at *1 (W.D. Mich. Nov. 19, 2008) (citing *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, (9th Cir.1988) for the proposition that "a court may not enter default judgment upon a legally insufficient claim"); *see also In re Biery*, No. 10-

23338, 2013 WL 4602698, at *1 (Bankr. E.D. Ky. Aug. 29, 2013) ("a default judgment cannot stand on a complaint that fails to state a claim").

Here, the injury allegedly resulting from the fraud, and the corresponding damages, are the exact ones contemplated by the parties' agreement. Thus, on the face of the complaint, Plaintiffs' fraud claim (and as such their punitive damages claim) is barred by the economic loss rule, as that doctrine has developed in Kentucky during the pendency of this case. In just these circumstances, courts have refused to award default judgment on tort claims which merely duplicate the damages claimed on breach of contract. *See, e.g.*, *Torus U.S. Servs., Inc. v. Hybrid Ins. Agency, LLC*, No. CV 14-01630 (KM), 2015 WL 6445788, at *3 (D.N.J. Oct. 22, 2015) ("I find that the plaintiffs' tort claims, negligence and conversion (Counts I and III), would be barred by the 'economic loss doctrine.' I therefore decline to enter a default judgment as to either defendant on those counts."). Given the current state of the law, which prohibits Plaintiffs from asserting claims to recover tort damages which merely replicate those awarded on the breach of contract claim, Magistrate Judge Ingram erred in recommending that the Court award either compensatory or punitive damages based on fraud. *See Webb v, McJAS, Inc*., 745 S.E.2d 21, 25 (N.C.App. 2013) (on default, trial court had obligation to review complaint and to deny damages requested by plaintiff where complaint, on its face, was legally insufficient to support the extent of the requested recovery); *Allied Bank of Dallas v. Pleasant Homes, Inc.*, 757 S.W.2d 460, 462 (Tex.App. 1988) (court could not enter default upon pleadings which show claim was barred by doctrine of res judicata).

**F.** **The Award of Prejudgment Interest On Plaintiff's Count II Lost Royalties Damages ($16,990,900) is Improperly Punitive and Inequitable - Even More So When It Is Compounded.**

The Magistrate Judge acknowledged that the compensatory damages relating to the lost royalties were unliquidated. In such circumstances, when considering an award of prejudgment interest, "[t]he Court's duty is to balance the undisputed facts and equities and decide whether prejudgment interest is appropriate." *Gresh v. Waste Servs. of Am., Inc.*, 738 F. Supp. 2d 702, 716 (E.D. Ky. 2010) (discussing standards governing court's discretionary award of interest); *see also Schumacher v. AK Steel Corp. Retirement Accumulation Pension Plan*, 711 F.3d 675, 686 (6th Cir. 2013) (in exercising court's discretion, "proper determination of prejudgment interest involves consideration of various case specific factors and competing interest to achieve a just result"); *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 143 (Ky. 1991) (equitable principles govern the court's award of interest on unliquidated sum). Rather than balancing all the relevant factors, however, the Magistrate Judge concluded that "prejudgment interest often turns on . . . allegations of bad faith," and used the same basis for the award of prejudgment interest as he used to support the entry of default.[22] [D.E. 302, p. 27.]

In doing so, the Magistrate Judge improperly ignored the role of prejudgment interest and the equities of this particular case. Prejudgment interest is intended to compensate the plaintiff for the loss of the use of funds which it would have had available, not to further punish the defendant. *See ClassicStar*, 727 F.3d at 495 ("Because prejudgment interest is compensatory in nature, it should not be awarded if it would result in the overcompensation of the plaintiff."); *Nucor*, 812 S.W.2d at 143 (interest is intended as compensation to the one who has been deprived of the use of money); *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d

---

[22] In fact, the case cited by the Magistrate Judge simply noted that Kentucky courts rarely award prejudgment interest on unliquidated sums, but when they have done so, often those cases involve an element of bad faith. It did not establish that a finding of bad faith by itself justifies such an award.

856, 858 (Ky. App. 2003) (approving of an award of compound pre-judgment interest which did "not constitute a punitive reprisal"). Thus, in considering a discretionary award of prejudgment interest, the Sixth Circuit cautioned that the courts must "strike a balance between making sure not to impose a punitive measure" and making an award which would put the plaintiff in "the position he or she would have occupied but for the defendant's wrongdoing." *Schumacher*, 711 F.3d at 686.

Magistrate Judge Ingram made no attempt to strike such a balance. Awarding interest from May 2012 put the Plaintiffs in a far better position than they would have occupied but for Defendants' wrongdoing, because it is inconceivable that even the most diligent mining would have entitled Plaintiffs to any royalties by that date. As previously explained, mining could not have commenced until 2013 at the earliest, and it would take another thirty or so years to mine seventeen million tons of coal. Thus, while the Magistrate Judge accepted, as "persuasive," Plaintiffs' argument that the independent arbiter's calculation "represented a tradeoff by which they opted for a right to have a quicker remedy…while possibly giving up the right to possibly recover greater compensatory damages if they used a retained expert to pursue their legal rights" [D.E. 302, p. 28], this argument, that Plaintiffs' arbiter's $16,990,00 lost royalties calculation was really quite conservative, is not persuasive – it is patently absurd. [23]

Two variables go into the determination of lost royalty damages: (1) the amount of coal that would have been mined in any given time period had Defendants complied with their diligent mining obligations under the Fourth Amended Lease and (2) the proper royalty rate to be applied to that coal (under the Lease, the greater of $1 per ton or 2% of the sales price of the

---

[23] Plaintiffs argument that the Court should accept Conway's calculation without questioning Conway is based on their contention that the Conway is an "independent arbiter and not a retained expert." This Court has concluded to the contrary. [*See* D.E. 39 (holding Conway to the requirements of a Rule 26(a)(2) expert witness).]

coal).[24]  On the amount of coal, Plaintiffs can hardly contend that any expert could have come up with a higher amount than **every ton of coal underlying the leased property** (which they paid their arbiter to compute without accounting for the coal's mineability or merchantability or how long it would actually take to mine).  Similarly, on the proper royalty rate, Plaintiffs' arbiter was not being conservative in selecting $1 per ton.  Plaintiffs produced no evidence to suggest that prices for Plaintiffs' coal (FOB rail minus the trucking and loading costs)[25] would have exceeded $50 per ton (which is the point at which the 2% royalty measure would result in a royalty exceeding $1 per ton), and the plain market reality is that the coal would have sold for less than that price.[26]

Thus, while Magistrate Judge Ingram purported to base his decision to award pre-judgment interest (compounded) on his $16,990,900 of lost royalty damages because Plaintiffs have gone years without receiving that amount, he made no attempt to assess whether Plaintiffs would have received $16,990,900 or any other amount of royalties on this order of magnitude had Defendants' mined Plaintiffs' coal as required under the Fourth Amended Lease in May 2012 or at any time.  Had he considered that issue, which could have been presented in an evidentiary hearing or, at least, at an oral argument, he would have necessarily concluded that Plaintiffs would not have received these royalties by May 2012 — or at all.

Moreover, in basing his award solely on Defendant's bad faith, the Magistrate Judge gave no consideration at all to the fact that awarding compound prejudgment interest with no regard to the realities of the mining industry served to punish Defendants (for a fourth time) for the same behavior that he was already punishing by his punitive measure of contract damages,

---

[24] *See* Fourth Amended Lease [D.E 40-5, ¶¶ 5(d) and 5(e)].

[25] Fourth Amended Lease, ¶ 5(e) [D.E. 40-5].

[26] *See* Declaration of Seth Schwartz, Exhibit 2, ¶ 25.

his duplicative measure of fraud damages, and his award of punitive damages. Applying compound prejudgment interest from May 2012 on the $16,990,900 amount awarded for lost royalties, instead of reducing that amount by a reasonable present value discount rate over thirty plus years, which is the actual amount of time it would have taken, under normal industry practices, to mine that coal, both overcompensates Plaintiffs and imposes an improper penalty on Defendants. The Magistrate Judge's recommendation for compound prejudgment interest does not comport with the Court's obligation to balance the equitable considerations and award prejudgment interest only when the result is just.

**G.** **An Award of Additional Damages after May 2012, and Without Credit for the Minimum Royalty Payments, Lacks Any Legal Basis and Overcompensates Plaintiffs.**

Finally, the Magistrate Judge's recommendation that the Court award damages under the Fourth Amended Lease, ¶ 9, for consulting services after May 2012 ($550,000 through year end 2016 and $10,000 per month thereafter) and his refusal to credit Defendants for the $375,000 of minimum royalty payments that Defendants paid Plaintiffs after that date once again overcompensates Plaintiffs. The Magistrate Judge has recommended that the Court award royalty damages for every single ton of coal underlying the leased property as of May 2012. Were one to accept this extraordinary measure of damages, it would leave no further basis upon which to award subsequent damages – the benefits to be gained under the Fourth Amended Lease would have all been realized and the term of that Lease would have come to an end. Thus, Magistrate Judge Ingram's award of post May 2012 consulting fees under the Fourth Amended Lease cannot be squared with his lost royalty damages calculation under Count II.

For this same reason, all minimum royalties that Defendants paid to Plaintiffs under the misconception that the Lease was still in effect after May 2012 (not knowing that the Court

would award lost royalty damages based on all of the coal underlying the leased property being mined as of May 2012) must now be credited against those lost royalty damages.[27]  *See Antoine*, 66 F.3d at 111 ("Therefore, even if Atlas is bound on the issue of liability, it still has the opportunity to respond to the issue of damages. Such a response includes possible offsets to which Atlas may be entitled . . . ."); *James v. Frame*, 6 F.3d 307, 309 (5th Cir. 1993) (upon entry of default, district court was required to offset claimed damages with penalties provided for in Texas usury statute).  Once again, the Magistrate Judge recommended a damages award which vastly overcompensated Plaintiffs for any damages that they conceivably could have suffered.[28]

## V.   CONCLUSION

The foregoing Objections should not be misconstrued by this Court as Defendants' unwillingness to accept the consequences of the Court's Orders regarding discovery in this case. However, Defendants' violations of those Orders, no matter how egregious they may be deemed to be by the Court, cannot under any fair minded analysis justify the manifestly unjust damages award recommended by Magistrate Judge Ingram.  The suggested award not only fails to account for Defendants' due process rights, but it is wholly at odds with principles of fundamental fairness, and not least of all, the rule of law governing defaults.  As difficult as the Court may find it to do in this instance, especially given the disdain it apparently holds towards Defendants

---

[27]  Even if the Lease continued after May 2012 despite Magistrate Judge Ingram's suggestion that production royalty damages be awarded as if all of the leased coal were mined by that date, the Lease terms require that the production royalties be credited against the minimum royalties.  [*See* Fourth Amended Lease [D.E. 40-5, ¶¶ 5(f) and 5(g).]

[28]   With regard to Count I, the Court acknowledged that Defendants' argument regarding Mr. Brownlow's abandonment of the consulting arrangement may have been valid.  However, the Court awarded $680,000 plus $10,000 per month until entry of final judgment solely because Plaintiffs alleged that Justice "is further obligated to pay all such future fees that accrue from and after the filing of this Amended Complaint."  [D.E. 302, pp. 8-9.]  This last statement is a legal conclusion, not a fact, and by refusing to independently examine the basis for these damages, Magistrate Judge Ingram improperly abdicated his obligation to ascertain the amount of damages available after default with a reasonable certainty.  *See Vesligaj*, 331 F. Appx. at 354-55 (court has obligation to determine whether damages have reasonable basis); *Anderson*, 1999 WL 1023753 at *2 (default does not require court to accept conclusions of law).

(which is in large part a result of Plaintiffs' repeatedly successful efforts to distract the Court from the glaring weaknesses of the merits of their own arguments), the Court must unbiasedly view the evidence, analyze the facts, use its common sense, protect Defendants' due process rights, and insure that a thorough and dispassionate review is made of all the evidence before a determination on damages is made.

Ignoring even the blatantly obvious proposition that a $60 million damages award will bankrupt these Defendants, there is much more at stake in this matter. Magistrate Judge Ingram's suggested award puts at risk hundreds jobs for struggling families in Eastern Kentucky, and puts at risk the vitally important environmental and regulatory protections these communities depend on. Before rubber-stamping such a death warrant to so many, the Defendants implore the Court to treat them fairly and provide a meaningful disposition of this matter – one that incorporates the necessary evidentiary hearings and findings that the law requires.

For all of the foregoing reasons, this Court should not adopt the Report and Recommendation of the Magistrate Judge that it assess more than $60 million dollars of damages against Defendants where there is no basis in the record for awarding any damages. Instead this Court should independently assess the evidence, and give Defendants a meaningful opportunity to challenge Plaintiffs' damages claims, by scheduling a brief pre-trial period, during which each side can supplement their expert proofs, and then a damages trial. In light of the enormity of the damages sought by Plaintiffs, and in light of this Court's duty to independently assess the damages proofs in order to ascertain damages with reasonable certainty, no other outcome is permissible.

Respectfully submitted,

/s/ Barry D. Hunter
Barry D. Hunter
Medrith Lee Norman
FROST BROWN TODD LLC
250 West Main Street
Suite 2800
Lexington, KY 40507
Tel.: (859) 231-0000
Fax: (859) 231-0011
Email: bhunter@fbtlaw.com

and

John F. Kelley, Jr.
KELLEY, BROWN & BREEDING, PSC
P.O. Drawer 490
London, Kentucky 40743-0490
Tel.: (606) 878-7640
Fax: (606) 878-2364
Email: jfkelley@kbblaw.net

and

Johnnie L. Turner
JOHNNIE L. TURNER, PSC
P.O. Box 351
Harlan, Kentucky 40831
Tel.: (606) 573-9000
Fax: (606) 573-4404
Email: jlt@harlanonline.net

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will provide notice to all counsel of record.

/s/ Barry D. Hunter
COUNSEL FOR DEFENDANTS

0130678.0623447  4823-4343-8912v1