1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                    SOUTHERN DIVISION AT LONDON

 3                           - - -
    NEW LONDON TOBACCO          :
 4  MARKET, INC.,               : Civil No. 6:12-CV-91
    FIVEMILE ENERGY, LLC,       :
 5                              :
              Plaintiffs,       :
 6                              :
    -vs-                        :
 7                              : Tuesday, December 11, 2018
    KENTUCKY FUEL CORPORATION,  : London, Kentucky
 8  JAMES C. JUSTICE COMPANIES, : 9:55 a.m.
    INC.,                       :
 9                              : Evidentiary Hearing Day 1
              Defendants.       :
10                           - - -
          TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
11            BEFORE THE HONORABLE HANLY A. INGRAM
                 UNITED STATES MAGISTRATE JUDGE
12                           - - -

13  APPEARANCES:

14  For the Plaintiffs:          JOHN A. LUCAS, ESQ.
                                 Howard & Howard, P.C.
15                               4820 Old Kingston Pike
                                 Kingston, Tennessee 37919
16
                                 SCOTT MARLOW WEBSTER, ESQ.
17                               Tooms, Dunaway & Webster
                                 1306 West Fifth Street, Suite 200
18                               London, Kentucky  40743-0905

19  For the Defendants:          RICHARD A. GETTY, ESQ.
                                 The Getty Law Group, PLLC
20                               250 West Main Street
                                 1900 Lexington Financial Center
21                               Lexington, Kentucky  40507

22  Court Reporter:              S. DIANE FARRELL, RDR, CRR
                                 Official Court Reporter
23                               310 South Main Street, Suite 317
                                 London, Kentucky  40741
24
          Proceedings recorded by mechanical shorthand,
25  transcript produced by computer-aided transcription.
```

2

1      (In open court.)

2          THE COURT:  Madam Clerk, would you call the matter

3  set for 10:00, please?

4          THE CLERK:  Yes, Your Honor.  It's London Civil

5  12-CV-91, New London Tobacco Market, Inc., Five Mile Energy,

6  LLC versus Kentucky Fuel Corporation, James C. Companies, Inc.

7          THE COURT:  Okay.  Thank you.

8      Counsel, state your appearances, please.  We'll start with

9  counsel for the plaintiffs.

10          MR. LUCAS:  Your Honor, I'm John Lucas for the

11  plaintiffs.

12          THE COURT:  Good morning to you, Mr. Lucas.

13          MR. WEBSTER:  Your Honor, Scott Webster for the

14  plaintiffs.

15          THE COURT:  Mr. Webster, good morning to you.

16  Mr. Lucas, who else is seated with you this morning?

17          MR. LUCAS:  Your Honor, there's Mr. Tyler Haskins,

18  who is an associate in our office.  He is not counsel of

19  record.

20          THE COURT:  And the last name is Haskins?

21          MR. LUCAS:  Yes, Your Honor.  He's not counsel of

22  record, but he's assisting me.

23          THE COURT:  Sure.

24          MR. LUCAS:  And my client, Mr. Brownlow.

25          THE COURT:  Okay.  Good morning to both of you

3

1   gentlemen.

2              MR. LUCAS:  May I introduce some of the other people?

3              THE COURT:  Sure.

4              MR. LUCAS:  I have several members of Mr. Brownlow's

5   family.  His wife was here at a hearing four years ago,

6   Ms. Candy Brownlow; his daughter, Brewton; and his son,

7   Johnson.

8              THE COURT:  Okay.  Fair enough.  All right.  Counsel,

9   if the defendants would state your appearances, please.

10             MR. GETTY:  Good morning.  Richard A. Getty and

11  Danielle Brown on behalf of the defendants.  Also present at

12  the table present with us is Jay Justice of the Justice

13  Companies, and Mr. Steve Ball, who is general counsel, is also

14  present.

15             THE COURT:  Okay.  Good morning to all of you as

16  well.  The matter is set for an evidentiary hearing referred to

17  me by District Judge Van Tatenhove to cover several matters;

18  the damages due pursuant to the default that's been entered as

19  a sanction on Counts 1, 2, 5 of the amended complaint and the

20  request from the plaintiffs, their renewed motion for sanctions

21  filed at Docket Entry Number 378.

22        We've had a preplanning call to discuss the hearing.  It's

23  been planned for quite some time.  There have been a number of

24  matters submitted before the hearing.  I've done my best to

25  rule, where possible.  I wasn't able to rule on objections to

4

1   exhibits, although I reviewed them.  I always find it's a real

2   challenge to make substantive rulings on exhibits outside the

3   context of the evidentiary presentation, so I wasn't able to do

4   that.

5       I have a few matters to cover.  One scheduling issue I'll

6   just go ahead and mention.  During the call when we scheduled

7   the hearing, the parties reported they thought it could be

8   completed in two days.  I kept my schedule clear for a third

9   day.  I have some deadlines that are imposed upon me by statute

10  in criminal cases, so I have had to schedule a couple of

11  hearings on Thursday afternoon.  And one of those, at least if

12  it goes in the way that it's anticipated, will be lengthy.

13      So we do need to proceed deliberately.  I will note

14  everyone is familiar with the case and it seems to me that the

15  issues to be presented have been thoroughly addressed in the

16  briefing memo at a far more detailed level than what occurs in

17  a regular civil trial, so I think the concept of surprise or

18  inability to prepare for the hearing just does not apply.  I

19  think everybody knows what the issues are and what the

20  evidentiary presentation will look like.  So I do expect that

21  we'll proceed deliberately.

22      I do have a matter that has some sensitivity that I need

23  to raise and make the parties and counsel aware of.  It was

24  reported to me yesterday.  So on Friday, of course, the defense

25  filed that motion for prehearing rulings.  I read that motion

5

1    early Saturday morning and entered a ruling by gavel order.   On

2    Monday morning, one of my law clerks reported to me some

3    contact with Mr. Webster that I need to make clear on the

4    record.   And I do this because of Canon 3A(4) of the Code of

5    Conduct for United States Judges.   Just as the lawyers

6    have rules of professional conduct they're required to follow,

7    I have to follow what this canon says.   And in part, that

8    portion says if a judge receives an unauthorized ex parte

9    communication bearing on the substance of a matter, the judge

10   should promptly notify the parties of the subject matter of the

11   communication and allow the parties an opportunity to respond

12   if requested.

13       I have two law clerks.   One of them, Brennan Hughes, is

14   present in the courtroom.   He's been with me since 2015.   He's

15   my career clerk.   He's been assigned to this case since he

16   began working with me.   The other is Taylor Poston.   She began

17   working for me in August.   She's had no responsibility or

18   involvement in the case except there was one day when Brennan

19   was out of the office, a call came into the clerk's office, I

20   think from Mr. Webster, about what appeared to be a typo in one

21   of my orders.   The clerk's office relayed that message to

22   Taylor.   She forwarded it on to me.   I told her, "I'll talk to

23   Brennan when he returns to the office the next day."   That's

24   been -- Ms. Poston, P-o-s-t-o-n, that's her only involvement in

25   the case.

6

1       On Monday she reported to me that she had some contact
2   with Mr. Webster on Friday of last week that made her
3   uncomfortable.   And here's what has been reported.
4       At 8:30 on Friday night, my law clerk, Taylor Poston, and
5   her husband went to the Laurel County Bar Association party
6   with some friends of theirs.   Apparently the party was held at
7   Carolyn Robinnette's Party Barn; not familiar with that.
8   Ms. Poston says she sat down with her food and was seated next
9   to Mr. Webster and his wife.   Mr. Webster's wife was between
10  him and my law clerk.
11      They introduced themselves.   Ms. Poston said she was my
12  law clerk.   And Mr. Webster said -- this is according to my law
13  clerk -- said, "I'll be spending a lot of time with you next
14  week then."   My law clerk purportedly laughed and said "yes" or
15  something to that effect.   Then my law clerk reports that
16  Mr. Webster said or asked if she had seen the motion filed on
17  Friday afternoon.   She responded no.
18      She then says that Mr. Webster said, "I would pay you
19  $1 million to talk about the case or 60 million to talk about
20  the case."   She was uncomfortable, tried to sort of laugh it
21  off, apparently.   And Mr. Webster said something to the effect
22  of, "I'd like to talk about it on an academic level many years
23  from now."   She reports to me that several minutes passed.   She
24  engaged in conversation with Mr. Webster's wife, I believe
25  Rebecca, about a relationship that Rebecca has with -- or well,

7

1    about Rebecca knowing Jamie Christman.  Now, I don't want to

2    confuse anyone.  Jamie Christman is, I think, the former

3    staffer for Chief Judge Caldwell years ago when Chief Judge

4    Caldwell was on the London docket.  It sounds as if

5    Mr. Webster's wife got to know Jamie Christman somehow.

6         Then my law clerk reports Mr. Webster said something to

7    the effect of, "You must have read plenty of my filings with

8    Judge Caldwell, and my law clerk responded yes.  Then

9    apparently Mr. Webster asked if my law clerk would be sitting

10   in on the evidentiary hearing.  My law clerk responded that she

11   did not know.  And then her husband interjected and said, "She

12   doesn't -- my law clerk's husband, that is, interjected and

13   said, "She doesn't like talking about work."  And Scott said,

14   "I know" -- excuse me, Mr. Webster said, "I know we can't talk

15   about it."  And there were no further communications after that

16   with Mr. Webster about the case.

17        Now, I have my own views of the matter.  It doesn't give

18   me any pleasure to raise it, because I think it implicates the

19   canon that I mentioned before and causes me some concern about

20   that interaction.  But I need to hear from counsel as to their

21   reaction.  If you need to take a recess to confer with your

22   clients, that's fine.  I'll certainly allow for that.  I

23   covered a lot there, I think, at a pace that everyone should

24   have been able to understand.  If anyone has any question, I'll

25   be happy to answer that now.

8

1    Mr. Lucas, let me start with you, sir.

2         MR. LUCAS:  Your Honor, I listened carefully to the

3    recitation and frankly, I didn't hear anything, any

4    communications alleged that went to the substance of the

5    matter.  So -- and I say this not as an advocate but as an

6    officer of the Court.  I understand Your Honor's concern.  I

7    think it's probably appropriate for you to raise this so

8    everyone is aware of any conversation, however innocuous social

9    conversation may have been, but it didn't sound like anything

10   of substance was discussed.  So that's my comment, and I would

11   yield to Mr. Webster if he cares to respond.

12        MR. WEBSTER:  Please, Your Honor.

13        THE COURT:  Yes.

14        MR. WEBSTER:  I feel sick that I made her

15   uncomfortable.  The premise of everything I said was, we can't

16   talk about this, which is why I said some day a long -- many

17   years from now, we'll talk about this on an academic level.  I

18   didn't address the substance at all.  And again, the premise of

19   the colloquialism about what I'd give to be able to discuss it

20   with her was that I couldn't, in fact, discuss it with her.

21   The only -- and we -- and we didn't at all.  I don't recall

22   asking her:  Have you seen the motion?  I may have, but I just

23   did know that I -- just before I had left to come, seen that a

24   motion was filed.  And that was, I think, the first thing I

25   said to her when she said that she was your clerk.

9

1      There was no substance at all.  I don't know that she said

2    anything beyond the word "no" to me the whole time.  And I

3    didn't -- beyond -- I think she's reported every word of

4    everything that was said by me probably verbatim quotations.

5    And I saw her talking to my wife after that.  No idea.  I don't

6    even know this other person you mentioned.  I didn't know they

7    had discussed that.

8      There was absolutely no discussion whatsoever of the

9    substance of any -- I just -- I didn't know her at all.  She

10    and her husband came in and sat down.  I don't know that she

11    knew me.  I feel absolutely terrible that I made her

12    uncomfortable.  But there was absolutely no substance of

13    anything discussed at all.

14          THE COURT:  Okay.  Anything further, Mr. Webster?

15          MR. WEBSTER:  No, Your Honor.

16          THE COURT:  Okay.  Mr. Getty?

17          MR. LUCAS:  Yes, Your Honor.  I appreciate your

18    sensitivity to the matter.  You know, I think if you practice

19    in the Eastern District you know you don't talk to the law

20    clerks.  It's just not proper.  And either directly or

21    indirectly.  So I can appreciate your sensitivity.  And I do

22    appreciate your raising it and being straight up about it.  I

23    have not had an opportunity, obviously, to consult with my

24    client, but I think I would like to have maybe five minutes to

25    do that.

10

1        I'd like one clarification.

2              THE COURT:  Yes.

3              MR. LUCAS:  What you reported -- I wasn't sure

4    whether you said Mr. Webster's comments were, I'd pay you a

5    million dollars or I'd pay you -- was it 16 or 60?

6              THE COURT:  I would pay you $1 million to talk about

7    the case or $60 million to talk about the case, with the later

8    comment, I'd like to talk about it on an academic level many

9    years from now.

10             MR. LUCAS:  I wasn't sure.  I thought you said 16

11   because the number 16 is significant here in terms of the prior

12   proceedings.  But you know --

13             THE COURT:  That's a fair question.

14             MR. GETTY:  -- I think the Court is fully aware at

15   this point that we have some sensitivity of our own about what

16   kind of hearing we're going to receive here.  We hope it will

17   be fair and impartial.  And I trust that that is the Court's

18   goal, but I would like to discuss it for maybe three to five

19   minutes with my client.

20             THE COURT:  That's fine.

21        Mr. Webster?

22             MR. WEBSTER:  Your Honor, I am certain that I did not

23   say, "I would pay you money."  What I said is, "I'd pay to be

24   able to talk about it."  But a colloquialism.  I'm sure I did

25   not say the word "you."  I'm positive.  That would be -- that's

11

1   disgusting.

2          THE COURT:  I'm reporting what was reported to me.

3          MR. WEBSTER:  It was loud.  It was a Christmas party.

4   It was Christmas music.  There were people literally screaming.

5   So just --

6          THE COURT:  Anything else to add, Mr. Webster?

7          MR. WEBSTER:  No, Your Honor.

8          THE COURT:  As I say, I'm reporting what was reported

9   to me yesterday.  The canon requires that it be made -- in my

10  view, that notice be made to the parties, quote, promptly.  And

11  so that's what I've done.  We're going take a five-minute

12  recess.  Anything we need to address before that, Mr. Lucas?

13         MR. LUCAS:  No, Your Honor.

14         THE COURT:  Okay.  Mr. Getty, a five-minute recess.

15         MR. GETTY:  No, Your Honor.

16         THE COURT:  Okay.  We'll reconvene in five minutes.

17     (A recess was taken from 10:11 to 10:18.)

18         THE COURT:  Thank you.  We're back on the record.

19  Mr. Getty, did you have enough time to talk to your client?

20         MR. GETTY:  Yes, I did, I think.

21         THE COURT:  Your thoughts?

22         MR. GETTY:  Well, I would like to have some direct

23  discussions with the Court.  My client is very concerned about

24  it, and I'd like to have the opportunity to maybe explain fully

25  why.  What I would suggest is either we perhaps just counsel

12

1   and a client representative on each side could meet in chambers

2   with you off the record or alternatively we can maybe excuse

3   everyone else from the courtroom while we discuss it.

4           THE COURT:   What would justify closure of the

5   courtroom?

6           MR. GETTY:   Pardon me?

7           THE COURT:   What would justify closure of the

8   courtroom?   That's a pretty extraordinary step to take to close

9   to the public.

10          MR. GETTY:   Chambers would be fine, Your Honor.

11          THE COURT:   What's the need for the secrecy, though?

12          MR. GETTY:   Well, I don't -- we have witnesses who

13  are going to testify if we go ahead and move forward with the

14  hearing here.   I'm just trying to spare them any -- any

15  exposure to this, really.

16          THE COURT:   Well, is there any objection to invoking

17  the rule of separation, Mr. Lucas?

18          MR. LUCAS:   No, Your Honor.

19          THE COURT:   Okay.   Mr. Getty?

20          MR. GETTY:   I have no objection.

21          THE COURT:   Okay.   So but a party representative can

22  certainly stay in the courtroom.   So who would that leave you

23  with Mr. Lucas?   Mr. Brownlow?

24          MR. LUCAS:   My party representatives for Fivemile

25  Energy, LLC, Mr. Johnson Brownlow, who is a member of that LLC.

13

1    For New London Tobacco Market is Mr. Will Brownlow.  And of the

2    other people in the courtroom, none are witnesses except the

3    other gentleman that I neglected to introduce earlier,

4    Mr. Patton, who is our expert witness, who may testify.

5            THE COURT:  Okay.  Well, he should be excluded at

6    this time.  He should exit from the courtroom.  Do you agree,

7    Mr. Lucas?

8            MR. LUCAS:  Your Honor, in view of the limited nature

9    of this, I'm not sure he needs to stay.  For the trial, my

10   understanding generally of the practice the Court has

11   discretion to allow experts to remain in the courtroom during

12   the testimony.  So I would ask for that.  On what Mr. Getty

13   proposes to raise now, I have no objection to him stepping out.

14           THE COURT:  Okay.  You haven't done anything wrong,

15   but if you would exit the courtroom for me, please.  And you

16   can re-raise his presence, Mr. Lucas.  Thank you.

17       (Mr. Patton exited the courtroom.)

18           MR. GETTY:  We would have Mr. Justice here, who is

19   obviously the representative of Kentucky Fuel.  And Mr. Ball is

20   general counsel for the Justice Companies, so I think he should

21   be present also.

22           THE COURT:  Here's the question.  The question is do

23   the defendants have any objection to multiple party

24   representatives being here on behalf of the various entities

25   and do plaintiffs have any objection to Mr. Ball remaining in

14

1    the courtroom.  Mr. Lucas?

2             MR. LUCAS:  As long as it's a goose-gander rule.

3             THE COURT:  Fair enough.

4             MR. GETTY:  We don't have any objection.  What is

5    good for the one is good for the other.

6             THE COURT:  Does that cure the sensitivity you have?

7             MR. GETTY:  Yes.  Yes, it does.

8             THE COURT:  Go ahead with your thoughts.  Sure.

9             MR. GETTY:  I guess what I would like to say, when we

10   stepped out of the room, you know, the first thing Mr. Justice

11   said to me, he said, "You realize the $60 million reference was

12   the amount that Magistrate Judge Ingram recommended?"  And I

13   said, "No, I sort of overlooked that.  I thought it was

14   16 million."

15       And he said "That was just one element of the total."  So

16   he said, "I'm really concerned that, you know, there's these

17   discussions have been going on or may be going on or have

18   attempted to be going on locally, you know."  And I understand.

19   And I appreciate -- I feel for Scott.  I know he practices here

20   locally.  You know him.  You see him all the time.  In fact,

21   you referred to him as Scott.

22            THE COURT:  That's how it was described in the

23   minutes.

24            MR. GETTY:  I can feel for the Court being put in

25   that situation, and I appreciate you bringing it up.  It's us

15

1   just sort of like reading between the lines.  You could almost

2   say, here's Mr. Webster, he's sitting next to the law clerk,

3   and he says, "Oh, did you see that other motion?"  You know,

4   and is the implication, yeah, they filed another, you know,

5   crap or baseless motion and, you know, we're going to get

6   $60 million, and I'd almost give it to you just to know your

7   thoughts on certain things or be able to talk to you about the

8   case?

9       I mean, I think this whole situation -- and, Your Honor,

10  understand, I have the greatest respect for you as a person.

11  We've had cases together.  I think you were an excellent

12  practicer, you know, when we had cases together.  You always

13  conducted yourself professionally.  I think we had a good,

14  civil relationship.  And we handled some significant issues.

15      But the way this whole case has played out since I came in

16  it -- and I'm looking at it, you know, sort of with fresh

17  eyes -- it is just -- the impression I get is that from day one

18  there has been an effort to paint my clients as, you know, bad

19  people, that they haven't done things right, you know, that

20  they're just really, really bad people and to sort of poison

21  the Court.

22      And, you know, I wonder now, you know, if there's been an

23  effort, not just the other day, but maybe previously, to

24  poison, you know, the Court's staff.  I mean, it just -- it

25  sticks in the back of my head, is what I'm saying.  And I

16

1    understand we've all prepared for this hearing, but overall I

2    think the Court really should take pause and think about are we

3    all just better off to get somebody from somewhere else to come

4    here and do the evidentiary hearing and remove this cloud from

5    my client's mind, so that, you know, we don't have this -- this

6    uncertainty?

7         And I got to say one thing.  I think when I first entered

8    this case, if you recall, I think I said on the transcript that

9    I was hired by the Justice Companies on a number of matters.

10   And my -- my instructions were, try them, settle them, mediate

11   them, get them done.  And from the day that I came to the point

12   of representing the Justices, I want the Court to know this,

13   and I hope you take my words, they have been nothing but

14   truthful, nothing but honorable, and nothing but honest.

15        They have done what I've said because at the outset I made

16   it clear, "If you don't do what I ask you to do, I don't

17   represent you anymore."  I never had a bit of problem, neither

18   with the work or the response to my request or with respect to,

19   you know, the bills that I send them.  I mean, they've been

20   good clients.  And I think there's a whole another story here

21   that this Court has never seen.  And I just think that, you

22   know, the Court's perception has to be tainted to some degree

23   by the bad lawyering that went on earlier on behalf of my

24   client.  They did not have the best -- I hate to say this, the

25   best representation or the most -- what's the word I'm

17

1   searching for?

2          THE COURT:  I'll hear from you Mr. Lucas.  Just

3   take -- just be patient.

4          MR. GETTY:  I guess there were some missteps that

5   redounded to my client's detriment in these proceedings,

6   without question.  I do want you to know, we're here, this is a

7   new day, it's new counsel, and we're here to do the right thing

8   and to try the case properly and fairly and bring out what we

9   think is the truth here.

10         THE COURT:  Well, that --

11         MR. GETTY:  We have -- my client has a significant

12  problem, and I really think you should consider -- give some

13  thought to, in light of this problem that has now come up -- I

14  know we're all here and we've all spent all this time, but I

15  think in the long run we'd all be better off and my client

16  would feel better, calmer about it, and have no uncertainty in

17  the back of his mind, nor would I, if the Court would consider

18  resetting this promptly, and with a matter -- if we can get

19  another -- someone else to conduct it.  I think that's the

20  thing we ought to do on this.

21         THE COURT:  Okay.  Mr. Lucas?

22         MR. LUCAS:  The reason I stood up, Your Honor, was we

23  are going off on a tangent with efforts to blame prior lawyers

24  and whatnot.  I'm not going to try that lawsuit here.  That's

25  water under the bridge.  But I -- you know, I'm at a

18

1   disadvantage of some sorts when my adversary says, "My clients

2   are wonderful people, everything they said is true, they've

3   just been victimized by bad lawyers."  So I interpose an

4   objection to that just because that's not what we're here

5   about.  It is not fair to my clients to let that sort of thing

6   go unremarked upon when I'm not going to try that case here

7   today.  Don't intend to.

8        As to the substance of what he said -- I wrote down in my

9   notes early on -- that it was another run at trying to make a

10  disqualification or recusal motion.  And it is no more

11  well-founded than the last one.  This is now the third one.

12       Counsel said in adding to the report that Your Honor got

13  from the law clerk -- the words that I heard him suggest might

14  have been said was, "Did you see there's another baseless

15  motion?"  Well, that's not what was reported to the Court.  And

16  that "I would give you money to know your thoughts on this."

17  That's certainly not what was reported to the Court, not

18  consistent either with the law clerk's comments or the comments

19  of Mr. Webster.

20       So this idea of Mr. Justice has these things in his mind,

21  maybe other things were said in spite of the law clerk's fairly

22  succinct report to Your Honor, that maybe other things were

23  said, let us hypothesize that maybe someone, sometime, some day

24  said something to the Court staff to prejudice them.  Let's

25  hypothesize about all of that.  Then let's take those

19

1    hypothetical conditions and let's assume that any have

2    influenced Your Honor where the Justice organization cannot get

3    a fair trial in this case.

4         That is beyond ludicrous.  It is beyond unsupported.

5    There's absolutely not a shred of evidence to support the

6    notion that Your Honor cannot preside over a fair trial here.

7    In fact, the fact that Your Honor raised this, even though, as

8    I said, and as I fairly believe and think objectively, there

9    was nothing of substance reported.  The fact that Your Honor

10   bent over backwards to disclose it shows that absolutely

11   they're going to get a fair trial.  Because the Court has done

12   the absolute proper thing, bent over backwards, I would say.

13        So there is no support in the record for this.  It's just

14   another effort to delay, another effort to try to get the now

15   twice-denied recusal motion, and we object to it as strongly as

16   we can.

17             THE COURT:  Okay.  Fair enough.  Mr. Getty, I'll give

18   you last word, sir.

19             MR. GETTY:  Sure.  Your Honor, so it's perfectly

20   clear, I -- when I said what I said, it was it's the

21   implication that was there.  I think I used the word

22   "implication" that we know this occurred and what was the

23   implication on that occasion, you know, sort of reading between

24   the lines.  And the other implication is, has there been other

25   instances.  We don't know.  But, you know, if you look at the

20

1   statute --

2          THE COURT:   Which statute, Mr. Getty?

3          MR. GETTY:   The statute that deals with --

4          THE COURT:   28 U.S.C. 455?

5          MR. GETTY:   -- recusal.

6          THE COURT:   Well, that's disqualification, 28 U.S.C.

7   455.

8          MR. GETTY:   One of the things that is embedded in

9   that statutory provision is if there's an appearance of

10  impropriety.  And what I'm saying is, given what this -- what

11  has come out this morning and given the history of this case,

12  the character assassination, what I -- what I have referred to

13  as the poisoning or attempt -- attempt to poison the record --

14  I'm not saying it's been successful because I have a lot of

15  confidence in this Court.  And that's why I said what I said

16  earlier, but that's not the issue.

17      The issue is, does this give rise to an appearance of

18  impropriety where we ought to just hit the restart button, you

19  know, and make everybody feel comfortable.  Nothing like this

20  is ever easy.  I know it's an inconvenience to everyone.  We're

21  all here.  We've worked hard.  But I just think it's something

22  the Court ought to really give serious consideration to because

23  of the implications and the appearance of impropriety.

24          THE COURT:   Okay.  Fair enough.  I appreciate that.

25  And you started, Mr. Getty, by suggesting that the information

21

1   I revealed should give the Court some pause, and it did.  And

2   that's what I undertook to evaluate yesterday, was the nature

3   of this reported communication and any effect it would have on

4   the proceedings.

5       Ms. Poston has no role in the case.  There's ample law

6   that law clerks can be shielded from participation in a case

7   and that doesn't create any ethical concern for the presiding

8   judge.

9       The statute that Mr. Getty has relied on doesn't require

10   recusal when there's alleged impropriety.  The standard is

11   impartiality might be reasonably questioned.  Judge Van

12   Tatenhove has ruled on that, and I'm duty bound to follow Judge

13   Van Tatenhove's rulings, just as the parties are duty bound to

14   follow the Court's rulings.

15       So the short version is, when Judge Van Tatenhove enters

16   an order, I have to do what he says.  So the recusal has been

17   denied by him.  This information that's been reported by me

18   doesn't, in my view, create any circumstance in which

19   impartiality might reasonably be questioned.  So for the

20   reasons that he stated, to the extent there's an oral motion

21   for disqualification under 28 U.S.C. Section 455, that's

22   denied.  I'm duty bound to proceed with the hearing.  The

23   evidentiary hearing has been defined by Judge Van Tatenhove's

24   rulings.

25       The rulings on a point that Mr. Lucas made a few moments

1    ago are clear.  Liability has been established with respect to

2    Counts 1, 2, and 5 of the amended complaint.  That includes an

3    award of punitive damages in plaintiffs' favor.  So there's no

4    need to hear liability issues in this evidentiary hearing.

5    That's a waste of everybody's time.

6         The focus today is on the -- and as we continue, the focus

7    will be on the evidence in support of the plaintiffs' theory of

8    damages and the defendants' evidence with respect to the

9    mitigation of those damages.  That's how Judge Van Tatenhove

10   defined it in his order.  With respect to the motion for ruling

11   on mitigation of damages that I denied without explanation, the

12   theory there is that the plaintiffs' damages should be limited

13   to the delay costs that can be established by virtue of --

14   well, the transactions that have been amply described in the

15   record.

16        In my view it's not appropriate for the defense, by way of

17   what is a global motion in limine, to limit the plaintiffs'

18   theory of their damages.  I'm here to hear the evidence from

19   both sides as to what their damages or mitigation of damages

20   proof is and make a determination based on that evidence.  So

21   when I looked at that motion, it looked like this sort of

22   global motion in limine, saying, well, Judge, we understand

23   their theories, but we don't think they should be able to put

24   on that evidence.  And that's not the purpose of the hearing,

25   as defined by Judge Van Tatenhove.

23

1    I ruled with respect to witnesses.  We've invoked the rule

2    already.  I have held, of course, that the rules of evidence

3    will apply to the proceeding.  We need to proceed with

4    deliberateness in getting the matter to a conclusion.  And I

5    want the parties to be really sure as to what the process is.

6        So I'm a United States Magistrate Judge.  I'll be making a

7    recommendation in writing to the district judge after the

8    hearing about what the damages should be.  It's just a

9    recommendation.  The parties have the ability to object within

10   14 days.  Judge Van Tatenhove will make the final decision.  So

11   he's the final decision-maker with respect to the damages that

12   is put into the default judgment.  And it will be his judgment

13   that will be entered.

14       So, as I say, he is the final decision-maker with respect

15   to the recommendation that I'll be making after the hearing.

16       Are there any other preliminary matters that counsel need

17   to raise before we begin the presentation of the evidence,

18   Mr. Lucas?

19             MR. LUCAS:  I have a couple, Your Honor.

20             THE COURT:  Okay.  Go ahead.

21             MR. LUCAS:  And a couple of things that I just wanted

22   to perhaps in the interest of -- I think it might be helpful to

23   know.  Mr. Getty and I have had some discussions about the

24   time.

25             THE COURT:  Okay.

1     MR. LUCAS:  And we think -- and we're starting a

2  little bit later than we anticipated --

3     THE COURT:  Yes.

4     MR. LUCAS:  -- but that's fine.  But we, as Your

5  Honor said, had originally anticipated we would each take about

6  a total of two days with the third day as spillover.  We've

7  agreed, as late as this morning, that should probably be a good

8  schedule.  We're not ruling out we may need to go Thursday, but

9  we hope to finish tomorrow.

10     THE COURT:  Okay.

11     MR. LUCAS:  My case, I'm going to try to abide by

12  Your Honor's guidance and keep it fairly short.  Just so you

13  will know, just to put some of the damages in context, we'll go

14  into a little bit of the background with Mr. Brownlow, but

15  we're not going to abuse that.

16     THE COURT:  And the reason I say that, I have zero

17  authority to question Judge Van Tatenhove's default or his

18  finding that liability has been established.  So I have to

19  follow that ruling, just as the parties do.  And that should

20  narrow the focus of the presentation of the evidence.

21     Go ahead, Mr. Lucas.

22     MR. LUCAS:  Sure.  Your Honor, there are -- and

23  basically -- and my witnesses today, Mr. Getty asked me who my

24  first one will be.  It'll be Mr. Brownlow.  And I'll tell the

25  Court, it'll be Mr. Johnson -- or Johnson Brownlow, excuse me,

1    after that.  And we may hold the rest of our witnesses for

2    rebuttal if necessary.  So my prima facie case today may well

3    be a two-witness case.

4            THE COURT:  Fair enough.

5            MR. LUCAS:  He's indicated he's got Mr. Sarver,

6    Mr. Merritt, Mr. Jeff Hooper, and Mr. Ball and Mr. Justice as

7    potential witnesses.

8        I have two motions that I would like to renew now.  One of

9    them -- and this is in our pretrial memorandum -- is to exclude

10   any testimony by Mr. Justice because of his failure to appear

11   at his deposition, and so he hasn't been deposed.  And I

12   understand that his expected testimony today is expected to be

13   quite lengthy on a witness that we've never deposed.  And

14   because he didn't show up, I would ask that his testimony be

15   excluded and that would still leave them with four or five

16   other witnesses on whatever they're going to testify about.

17       I've got one other motion, also.  Do you want me to raise

18   it --

19           THE COURT:  Yeah, go ahead.

20           MR. GETTY:  -- at this time?

21           THE COURT:  Go ahead.

22           MR. LUCAS:  And that is on the other witnesses, the

23   descriptions in the disclosure of witnesses are somewhat vague.

24   They generally say -- and I'm not trying to quote each one, but

25   that they're going to testify about the relationship between

26

1    and the dealings between the parties.   They're not much more

2    specific than that.   In fact, none of them were identified to

3    testify about amounts of damages.   But what is apparent to me,

4    in looking at the exhibit list and those exhibits that I have

5    seen from the other side, is that I expect that they're going

6    to be trying to offer expert testimony through nonretained

7    experts such as Mr. Ball and Mr. Justice.

8        Your Honor had a comment about that, I think, in your

9    order.   But what Your Honor doesn't know is that there's no

10   disclosures that -- even lay witnesses who may offer testimony

11   under Rule 26(a)(2)(C).

12       THE COURT:   Right, nonretained expert written

13   summaries.

14       MR. LUCAS:   Yes, sir.   There has to be, not a written

15   report, but a disclosure that includes the subject matter on

16   which the witness is expected to present evidence and a summary

17   of the facts and opinions to which the witness -- witness is

18   expected to testify.

19       THE COURT:   Right.   That amendment was effective

20   December 1st, 2015.   Do you know when the expert disclosure

21   deadline was for the defendants in the case?

22       MR. LUCAS:   Well, those, under the rule, are required

23   to be made 90 days before trial unless -- the expert disclosure

24   deadline was back in the spring of 2013.

25       THE COURT:   See, that rule didn't exist at the time.

27

1   The Supreme Court's order makes it applicable to this case

2   where just and practicable, but if the expert disclosure

3   deadline expired before the rule was adopted, how could it be

4   used retroactively?

5           MR. LUCAS:   Because they're not retained experts.

6   That expert disclosure rule I believe in the pretrial order was

7   for retained experts.   This rule, the rule says unless the

8   Court orders otherwise, it's 90 days before trial.   I, frankly,

9   think you could fairly regard the scheduling order when you

10  told us to file a witness list 30 days before trial, as

11  ordering otherwise, but at a minimum, they should have -- those

12  disclosures should have been made on November 15.   And there

13  have been none made.

14          THE COURT:   Okay.   Additional matters to raise,

15  Mr. Lucas?   And I'm sorry to interrupt you.   I just wanted to

16  make clear that that rule was not in effect at the time the

17  scheduling order was put in place.

18          MR. LUCAS:   I understand.   But it was at the time

19  these disclosures were due under Your Honor's August order.

20          THE COURT:   Okay.

21          MR. LUCAS:   Your Honor, the other matter is just an

22  administrative matter.

23          THE COURT:   Yes.

24          MR. LUCAS:   You want me to address it now?

25          THE COURT:   Sure.

1          MR. LUCAS:  We have brought with us, and I'm, again,

2     trying to streamline the process in the interest of time.

3     We've got a big file of original exhibits.  And we're not going

4     to likely use all the exhibits on our list.  So don't -- don't

5     assume that it'll take too much time because of the length of

6     our list.  But I think it will expedite things.

7        We're got notebooks, tabbed notebooks, with indices of all

8     of our exhibits.  I have copies for the witnesses, copies for

9     Your Honor, and copies for opposing counsel.  If it's

10    acceptable to Your Honor, instead of pulling out manually each

11    exhibit separately as the official filed copy, if it's

12    acceptable to the Court, we'd like to just propose to use the

13    copy in the notebooks, because they all are marked with the

14    pink stickers as plaintiffs' exhibits, and it'll go a lot

15    faster, I think, if we can do that.

16         THE COURT:  So these will be the original exhibits,

17    and they have call-outs in them, basically?  Is that what

18    you're suggesting?

19         MR. LUCAS:  I didn't hear the last part of --

20         THE COURT:  And they have sort of call-outs in them

21    for identification to the witness; in other words, you are

22    highlighting portions or a page?

23         MR. LUCAS:  I haven't highlighted things on them.

24    There's no highlighting on them.  They're just as they were.

25         THE COURT:  Okay.

29

1          MR. LUCAS:  But they're in the notebook so that we

2     don't have to pull out of a file this long separate exhibit --

3          THE COURT:  Sure.

4          MR. LUCAS:  -- and hand it up with a big pile on the

5     witness desk.

6          THE COURT:  Sure.  I'll hear Mr. Getty on it.  But

7     that's fair enough.  Anything further, Mr. Lucas?

8          MR. LUCAS:  No, Your Honor.

9          THE COURT:  Mr. Getty, let's hear your response to

10    the motion to exclude Mr. Justice.

11         MR. GETTY:  Well, I'll take them in reverse order if

12    I may.

13         THE COURT:  Sure.

14         MR. GETTY:  We've already informed the clerk that we

15    have binders.

16         THE COURT:  Okay.

17         MR. GETTY:  Usually in any evidentiary hearing or

18    trial, we use binders.  We conferred on that.  I know he has

19    binders.  He knows I have binders.  So the Court and the

20    witness and the Court's staff will have both sides' binders and

21    hopefully it will make things easier.

22         THE COURT:  Hopefully I'll be able to see over the

23    binders at the conclusion of the hearing.  Go ahead, Mr. Getty.

24         MR. GETTY:  The second point in the reverse order.

25         THE COURT:  Sure.

1        MR. GETTY:  This is just another -- I mean, I find

2   with Mr. Lucas, we get along quite well.  But here we are on

3   the morning of the evidentiary hearing and it's sort of like

4   this is the most recent ambush.  I mean, he never raised this

5   with me when we gave our list of witnesses and we listed Jay or

6   Steve or whatever.  No objections were made to them.

7        He objected to other witnesses on our list because they

8   had not been disclosed.  These witnesses were disclosed.  He

9   made no objection whatever.  And your point is well taken, Your

10  Honor, that what he refers to has no application here in terms

11  of, you know, these witnesses.  These witnesses are perfectly

12  capable of testifying as to what they believe the damages are

13  and why they believe the damages are what they are.

14       And obviously, Mr. Justice is a critical witness.  He's a

15  critical part of our case.  He will be our first witness.  I'm

16  not saying he will take as long as the implication from

17  Mr. Lucas seems to be.  We'll put every witness on as quickly

18  as we can and maybe shortcut them in order to get them out of

19  here.  My suspicion is, is because of the time that we're

20  looking at right now, we probably -- there's a good chance we

21  will spill over.

22       THE COURT:  Well, let me ask --

23       MR. GETTY:  And I'm going to make my best effort not

24  to.

25       THE COURT:  If he's a critical witness, doesn't his

31

 1    failure to appear for his deposition underscore the prejudice

 2    to the plaintiffs of allowing him to testify now?

 3              MR. GETTY:  Well, there's an explanation for that.

 4              THE COURT:  Not that's been provided until in the

 5    last couple of months.  I mean, at the time the sanction was

 6    recommended, there was no factual explanation of any substance

 7    provided as to why he missed that deposition.

 8              MR. GETTY:  What, in fact, occurred and what

 9    Mr. Justice would testify to, as is supported by Mr. Ball, is

10    that we asked for alternative dates, and Mr. Lucas never got

11    back.  I mean, you know, you can play games here and then say,

12    oh, well, you know, exclude him.  But there's absolutely -- you

13    know, all things considered, he should be permitted to testify.

14              THE COURT:  Okay.  Thank you.

15         Okay.  Mr. Lucas, quickly, you do get the last word.

16    They're your motions.

17              MR. LUCAS:  Yes.  I know Mr. Getty has had a steep

18    learning curve here, but he's incorrect about our objections

19    on -- our objections to their initial list, which didn't have

20    any description.  It was just a list counsel exchanged.  I

21    objected, and this is Document 391 at page 4:  "Defendants

22    should not be allowed to call Jay Justice as a witness.  As has

23    been well documented, he failed to appear for his properly

24    noticed deposition.  In light of that failure it'll be unfair

25    to allow him to testify now."

32

1     So we did object at the time then, and again when we got

2   the filed witness list, which included descriptions.   And our

3   response to that and our objections in Docket 402, at page 2,

4   we said:   "Defendants Final Witness List also is an obvious

5   effort to evade - once again - the Court's prior rulings

6   excluding expert testimony on their behalf."   For example, it

7   identifies multiple proposed witnesses who will testify as to

8   'issues of mineability and merchantability' or the alleged

9   'poor quality of the coal.'   These obviously are subjects of

10  opinion testimony."

11    And then I talk about another witness, who apparently is

12  not going to be here.   But we did object to both expert

13  testimony and the testimony by Mr. Justice.   And we renew those

14  objections.

15          THE COURT:   Okay.   The record does reflect those

16  objections were asserted.   I'm going to deny both motions.

17  I'll allow Mr. Justice to testify.   It is the case that his

18  failure to appear for deposition could pose particular

19  prejudice for the plaintiffs.   I'll consider that prejudice in

20  allowing perhaps flexibility with respect to cross-examination.

21  But I'll overrule that motion.

22    With respect to prohibiting any expert testimony, we're --

23  it's sort of open field running on that.   I need to hear the

24  evidence.   I need to hear whether it's an opinion from what is

25  basically a fact witness, an opinion that is otherwise

1   admissible, before I can actually decide whether it is

2   admissible.  I'll overrule that motion.  But, Mr. Lucas, you

3   can object to the proffer of -- or questions that you think are

4   going to lead to opinion testimony that you don't think are

5   admissible.

6        So, Sheila, are you on board with the binders?  We have --

7   as I understand it then, we have binders that are premarked as

8   the exhibits, and the only suggestion is instead of having

9   documents that were sort of free and loose, they be provided in

10  binders, correct, Mr. Lucas?

11           MR. LUCAS:  Yes, Your Honor.

12           THE COURT:  Okay.  As long as they're premarked,

13  that's fine with me.

14       One other matter that -- I knew there was something on

15  requesting that someone else handle the hearing that I wanted

16  to make clear for the record.  Going forward in the case, all

17  communications with my chambers need to be by formal filing in

18  the record or only as permitted through use of my chambers

19  email address by a specific order.  Is that clear, Mr. Lucas?

20           MR. LUCAS:  Clear, Your Honor.

21           THE COURT:  Okay.  Mr. Getty?

22           MR. GETTY:  Yes, Your Honor.

23           THE COURT:  Okay.  Mr. Lucas, unless there's

24  something further, call your first witness, please.  And by the

25  way, with respect to --

34

1    MR. GETTY:  Your Honor, there is one --

2    THE COURT:  Let me finish my thought.  With respect

3  to the rule on separation of witnesses, you all are going to

4  have to help me.  I don't know who your witnesses are.  If

5  someone comes in the courtroom and they're a witness, you all

6  will have to enforce that rule.

7    MR. LUCAS:  Your Honor, can Mr. Patton come back in

8  now?

9    THE COURT:  Okay.  Well, Mr. Getty, your position on

10  that?

11    MR. GETTY:  I'd rather he not be in here, to be

12  honest with you, if he's going to testify.

13    THE COURT:  Okay.  There is discretion to allow

14  experts to hear the fact witnesses testify.  I'm going to allow

15  it.  I think it'll serve the interest of efficiency in the

16  case.  And it is sort of -- I think to the extent that we're

17  going to hear opinion testimony that is admissible from the

18  defense that has not been previously disclosed, that would

19  allow -- the cure of any prejudice to allow that expert to

20  remain in the courtroom.  So I'll allow that.  His name again?

21  Patton?

22    MR. LUCAS:  Yes, Your Honor.

23    THE COURT:  P-o-t-t-o-n?

24    MR. LUCAS:  P-a-t-t-o-n.

25    THE COURT:  Okay.  Thank you.  Mr. Getty, you had

35

1    something else?

2            MR. GETTY:  Yeah, just two things.

3            THE COURT:  Okay.  Yes.

4            MR. GETTY:  There may be times when I have to sit.

5            THE COURT:  Yes.

6            MR. GETTY:  I had the back surgery.  It really took

7    care of my right side, but I'm having really bad problems with

8    my left leg.

9            THE COURT:  You can remain seated the whole time.

10   You're not going to bother me.

11           MR. GETTY:  I'll try not to.

12           THE COURT:  No.  Listen, I don't want anyone to be in

13   pain because they're in a hearing in my courtroom.  If you need

14   to sit, sit.  Both sides can do that during the hearing.

15   That's fine.

16           MR. GETTY:  I'll do the best I can.  We'll see how it

17   goes.

18       The only other thing -- I don't know whether Mr. Lucas

19   intended to make any kind of real short opening.  I had

20   prepared comments that could be made in about three minutes,

21   and I'd like to do that.

22           THE COURT:  Mr. Lucas?

23           MR. LUCAS:  I have not prepared one, no, Your Honor.

24   But if Mr. Getty wishes to, I have no objection.

25           THE COURT:  All right.  Three minutes, starting now,

36

1   Mr. Getty.

2           MR. GETTY:  Okay.

3           THE COURT:  I'm going to hold you to it.

4       I'm sorry?

5           THE CLERK:  You need to open the courtroom back up.

6           THE COURT:  Oh, they closed the courtroom?

7           THE CLERK:  For the hearing.

8           THE COURT:  All right.  Yes.  We do need to open the

9   courtroom door.  It wasn't supposed to be closed.

10      Okay.  Three minutes, starting now, Mr. Getty.  And I'll

11  hold you to it.

12          MR. GETTY:  All right.  That's fine with me, Judge.

13      We obviously hope we can get a fair and impartial hearing

14  here.  You know, we've seen a lot of what I would characterize

15  as bad rhetoric, false accusations, name calling.  We hope

16  that's over.  And we trust that you'll be able to evaluate the

17  evidence using proven industry standards.  And I think the key

18  here, which the other side has just swayed away from, from day

19  one, you know, is what is the standard here.

20      You know, all that matters here are the facts and the

21  evidence.  We believe the facts establish that this coal is

22  marginal at best.  We believe that the proper standard is not

23  the blown-up exaggeration of damages that is inconsistent with

24  industry standard.  And if you look at the key paragraph here,

25  what the Court should be focusing on is the words, quote,

37

1    within the constraints of industry standard.  What they present

2    to you here or presented to you before, is not -- does not

3    comply with that.

4         So, you know, we believe that that's the standard.  And we

5    believe that when you hear our evidence, you will find that the

6    damages are not blown-up, exaggerated, bonus that Mr. Brownlow

7    would like to obtain, but fair, reasonable damages, complying

8    with that standard in the industry.

9              THE COURT:  Okay.  Mr. Lucas, call your first

10   witness, please.

11             MR. LUCAS:  Mr. Brownlow, Your Honor.

12             THE COURT:  Okay.  If you would approach to be sworn,

13   please, sir.

14                  WILLIAM G. BROWNLOW IV - SWORN

15             MR. LUCAS:  Your Honor, I've asked Mr. Haskins to get

16   our exhibit books for most of the exhibits that I'm going to

17   use, and I'll pass them up to the marshal for the Court.

18             THE COURT:  The CSO.  That's fine.

19             MR. LUCAS:  And for opposing counsel.

20             THE COURT:  Are these Court copies in this box here?

21             MR. LUCAS:  Court copies.

22             THE COURT:  Yeah, that's fine.

23             MR. LUCAS:  Is that more than the Court's copies?

24             MR. HASKINS:  No.

25             MR. LUCAS:  I just want to give them the first four

38

1    notebooks.  I don't want to inundate them with everything.

2              MR. HASKINS:  Okay.

3              THE COURT:  Go ahead with your questioning.

4              MR. LUCAS:  Your Honor, Ms. Harlan just advised me

5    they've got copies, and if I can just mention to Mr. Haskins

6    and the Court, we don't need to give them copies of the

7    notebooks.  They have them.

8              MR. HASKINS:  Okay.

9              THE COURT:  Okay.  Yes.

10             MR. LUCAS:  Thank you.

11             THE WITNESS:  Your Honor, before we start, can I ask

12   that they close the blinds in the back?

13             THE COURT:  We'll do our best, yes.  The middle set

14   of blinds, is that what is bothering you, sir?  The middle

15   windows, excuse me.

16             THE WITNESS:  Yes, sir.

17             THE COURT:  It looks like they're just sort of out

18   of -- they're just kind -- no, the middle set, please.

19             COURT SECURITY OFFICER:  The middle set?

20             THE COURT:  The middle ones.

21             MR. LUCAS:  Does the witness have copies?  Do you

22   have copies?

23             THE COURT:  I think that's the best we're going to

24   do, Mr. Brownlow.

25             THE WITNESS:  Thank you.

WILLIAM G. BROWNLOW IV - DIRECT EXAM          39

1          THE COURT:  You're welcome.

2          COURT SECURITY OFFICER:  Do you need a copy?

3          THE CLERK:  No, I'll get those when he gets finished.

4          MR. LUCAS:  The copies, we had a commercial copy

5    service make duplicates of some of these.  The notebooks --

6    there may be more exhibits in one notebook.  He's got two

7    notebooks where I've got four, so the notebooks don't reconcile

8    exactly, but the exhibits are identical.

9                    DIRECT EXAMINATION

10   BY MR. LUCAS:

11   Q.   Mr. Brownlow, would you first, for the record, state your

12   full name and tell us where you live?

13   A.   William Gannoway Brownlow, IV, Knoxville, Tennessee.

14   Q.   Okay.  And you're a married man.  I believe your

15   family's -- or part of your family's here in the courtroom, was

16   introduced earlier --

17   A.   Yes, sir.

18   Q.   -- is that correct?  And are members of your family

19   involved in your business, also?

20   A.   Yes, they are.

21   Q.   And of the companies that are plaintiffs here today, who

22   are the members of Fivemile Energy, LLC?

23   A.   Brewton Couch, my daughter; Johnson Brownlow, my son;

24   Cassandra Brownlow, my wife; and myself.

25   Q.   And can you just give the Court just a short synopsis of

WILLIAM G. BROWNLOW IV - DIRECT EXAM          40

1   the kind of work that you are in as it relates to New London

2   Tobacco Market and Five Mile Energy, LLC?  Let's take New

3   London first.  Just describe its business, where it is, and

4   what it does.

5   A.   I've been involved in New London Tobacco Market for

6   30-some-odd years.  Our current business focuses on two

7   separate areas.  One is industrial warehouse rental, and the

8   second is greenhouse production.  Our greenhouse production is

9   primarily growing started tobacco plants and growing mother

10  plants and clones for hemp.

11  Q.   Okay.  Who is your customer base for that?

12  A.   My customer base for both the started tobacco plants and

13  the started clones are farmers throughout Tennessee, Kentucky,

14  Virginia, primarily.

15  Q.   Okay.  And just physically where is that business located?

16  A.   The business is located on Tobacco Road here in London,

17  about a mile from the courthouse here.

18  Q.   And how many employees do you have there?

19  A.   We have seven employees.

20  Q.   All right.  I want to direct your attention to the

21  background of the agreements that are the subject of this

22  hearing today.  And if I ask you "you," I'm referring,

23  obviously, to you individually or the companies, as the context

24  may indicate.

25       How did you become involved with what's been termed the

WILLIAM G. BROWNLOW IV - DIRECT EXAM          41

1   Fivemile properties?

2   A.   I was approached in early 2005 to help finance an

3   individual who wanted to buy the permits; the permit and

4   application for Deep Wood and the permit application for

5   Fivemile.   I did finance for him the purchase of those and took

6   back as security the leases and the permits; permit for Deep

7   Wood and permit application for Fivemile as security.   He did

8   not repay the loan, and so I foreclosed on the loan and

9   acquired the leases and permits as part of that foreclosure.

10  Q.   All right.   And then what did you do with them?

11  A.   After the foreclosure, which occurred sometime in late

12  September of 2005, about two weeks later I entered into a deal

13  with Kentucky Fuel, which they bought the leases and permits

14  for both properties from me.

15  Q.   And was that the original assignment of leases and permits

16  that is attached as an exhibit to the complaint in this case?

17  A.   Yes.   Dated October 5, 2005.

18  Q.   And look, if you would, in one of your notebooks there at

19  Plaintiffs' Exhibit 1.   And you recognize that as the amended

20  complaint filed in this case?

21  A.   Yes, sir.

22  Q.   And does it have attached to it the original assignment of

23  leases and permits that you just described?

24  A.   Yes.

25           MR. LUCAS:   Your Honor, I would offer Plaintiffs'

WILLIAM G. BROWNLOW IV - DIRECT EXAM          42

1   Exhibit 1.

2            THE COURT:  Any objection, Mr. Getty?

3            MR. GETTY:  No.

4            THE COURT:  It'll be admitted into evidence.

5            MR. LUCAS:  Your Honor, we've got a number of other

6   exhibits to which there are no objections.  There are

7   objections to some, as Your Honor knows.  In the interest of

8   time and efficiency, I propose to call them out now and move

9   their introduction.

10           THE COURT:  Identify them, please.

11           MR. LUCAS:  That's Plaintiffs' Exhibit 1, which is

12  the amended complaint, Plaintiffs' Exhibit -- you want me to

13  give the description also or does the number suffice?

14           THE COURT:  A short description.

15           MR. LUCAS:  Plaintiffs' Exhibit 1a, which is the

16  fourth amendment to the assignment of the leases and permits.

17  And Exhibit 1b, which is the report of the independent arbiter.

18  Both of those are also attachments in the complaint.  We've

19  identified them as separate exhibits just for ease of

20  reference.

21     Exhibit 1c is a hundred thousand dollar check from

22  Kentucky Fuel to New London dated 5/17/2011.  Plaintiffs'

23  Exhibit 2 and 2a, which are the Fivemile permit application and

24  related correspondence.  And 2a is excerpts of that

25  application, which includes correspondence.

WILLIAM G. BROWNLOW IV - DIRECT EXAM          43

1     Plaintiffs' Exhibit 3 is -- it's actually 3a, which is

2  Mr. Conway's death certificate; 3b, his expert report with

3  exhibits; and 3c, a declaration by Mr. Conway.

4     Exhibit 4a, 4b, and 4c, and they are respectively -- 4a is

5  the calculations of the amounts due, per the independent

6  arbiter's report, with interest.  4b is the amounts due, an

7  alternative calculation, based upon the sale price of the coal

8  without interest.  And 4c is amounts due based upon a mining --

9  numbers in a mining plan.

10     Plaintiffs' Exhibit 6, which is the defendants' memorandum

11  in support of their ruling as to damages.  That's Doc. 375-1.

12  Plaintiffs' Exhibit 7, which are the defendants' supplemental

13  responses to plaintiffs' first set of discovery.  That's

14  document 56-4.  Plaintiffs' Exhibit 8, which is an -- account

15  statements for the amounts due pursuant to the Strong Brothers

16  leases.

17     Does it help if I call out the document numbers, Your

18  Honor?

19          THE COURT:  Well, what I want to make sure is that to

20  the extent you're moving to have them admitted globally,

21  Mr. Getty knows which exhibits you're talking about and he

22  doesn't have an objection.

23          MR. LUCAS:  Okay.  Okay.  He's got my index.  But

24  I'll continue to call out the numbers then.

25          THE COURT:  Okay.

WILLIAM G. BROWNLOW IV - DIRECT EXAM          44

1      MR. LUCAS:  Plaintiffs' Exhibit 9, which is Doc.
2  270-29, is the various letters written requesting payment for
3  the Strong Brothers amounts.
4      Plaintiffs' Exhibit 10, I'm going to hold right now,
5  until we see how the evidence falls out.
6      Plaintiffs' Exhibit -- same for Plaintiffs' Exhibit
7  11.
8      Plaintiffs' Exhibit 12, which is the summary of the
9  amounts due for the retainer fees.
10     Plaintiffs' Exhibit -- I'm skipping over the 13
11  series, because they are the ones that there have been
12  objections to.
13     THE COURT:  Right.
14     MR. LUCAS:  Plaintiffs' Exhibit 15, which is a
15  partial list of litigation that the defendant companies have
16  been involved in.
17     Bear with me one moment, Your Honor.
18     Plaintiffs' Exhibit 16, which is a Rule 1006 summary of
19  documents relating to efforts to mine the Fivemile properties.
20  And then 16a through 16m, and I'll call out the document
21  numbers for those, those are various documents, primarily
22  emails, which are referenced in that summary, which is Exhibit
23  16.  So 16a is Doc. 358-1.  16b is Doc. 358-2.  16c is Doc.
24  358-4.  16d is 358-5.  16e is 358-6.  16f is 358-7.  15 -- or
25  16g is 358-9.  16h is 358-8.  16i is 358-12.

WILLIAM G. BROWNLOW IV - DIRECT EXAM          45

1      16j is not a document.  It was a document -- it's an email

2   chain that was produced to us, Bates numbered 5288.

3      16k is also a letter from Mr. Fay with a draft mining

4   agreement.  It was Bates numbered 5301.  16l is another email

5   from Mr. Lusk to Mr. Justice and Deane, Bates numbered 5323.

6   16m is another set of emails between Mr. Ball and Justice,

7   Bates number 5327.  And Exhibit 17, which is an email from

8   Mr. Schmid to Mr. Ball and Mr. Merritt.

9      And then we have the tax return related documents.

10  Exhibit 18 is Doc. 271.  Exhibit 19 is also Doc. 271.  Exhibit

11  18 is a 2005 schedule combined income and deductions.  19 is a

12  2005 combined balance sheet.

13     Exhibit 20 is also part of Doc. 271, and it's Schedule B

14  to the James C. Justice Companies 2013 tax return.  Exhibit 21

15  is a letter from Mr. Kelley, counsel for the defendants, to me.

16  Exhibits 22a through i are the first alleged tax returns for

17  Kentucky Fuel for the years 2005 through 2013 in chronological

18  order, so that 22a is for 2005, 22b is for 2006, and so forth,

19  until we get down to 22i, which is for 2013.

20     23a through i are the first alleged tax returns for the

21  James C. Justice Companies, Inc. for the same period of years.

22  And they were documents, beginning with document 265-11.  23a

23  is the Justice Companies tax returns for 2005 and they go

24  chronologically through 23i, which is the James C. Justice

25  Companies tax returns for 2013.

WILLIAM G. BROWNLOW IV - DIRECT EXAM     46

1   24 is a letter from Mr. Kelley to me dated March 15, 2016.

2   25 is a letter from Mr. Kelley to me dated March 18, 2016 -- or

3   excuse me, the first -- I misspoke.  24 is a letter from me to

4   Mr. Kelley dated March 15, 2016.  Exhibit 25 is a letter from

5   Mr. Kelley to me dated March 18, 2016.  Exhibit 26 is an email

6   from a Ms. Owens in Mr. Kelley's office to me dated April 1,

7   2016.

8   Exhibits 27a through i are the second alleged consolidated

9   tax returns for the James C. Justice Companies and subsidiaries

10  for the years 2005 through 2013, again in chronological order,

11  so that 27a is for 2005, 27b is for 2006, and so on, through

12  27i, which is for 2013.

13  27 -- or correction, 28a through l are comparisons of

14  portions of those first alleged tax returns and the second

15  alleged consolidated returns from 2000 -- Exhibit 28a is a

16  comparison of the first and second alleged returns for the

17  Justice Companies for 2005.  28b is a similar comparison of the

18  first and second alleged returns for Kentucky Fuel for 2005.

19  28c is the comparison for the Justice Companies alleged

20  returns, both sets, for 2006.  28d is the comparison for the

21  Kentucky Fuel's returns for 2006.  28e and f are the

22  comparisons for Justice Companies and Kentucky Fuel

23  respectively for 2007.  28g and h are the comparisons

24  respectively for the Justice Companies and Kentucky Fuels for

25  2008.  28i and j are the comparisons again respectively for the

WILLIAM G. BROWNLOW IV - DIRECT EXAM      47

1    Justice Companies and Kentucky Fuel for 2009.  28k through 1

2    are the comparisons for the Justice Companies and Kentucky Fuel

3    respectively for 2010.

4        And so I would -- those -- there are no objections to any

5    of those that have been filed, Your Honor.  So I would offer

6    all of those at this time.

7            THE COURT:  So it's 1 through 28l except for 10, 11,

8    and 13a, correct?

9            MR. LUCAS:   1 through -- exception of 10, and what

10   was the other one?

11           THE COURT:  11 and 13a.  You said you would hold

12   on --

13           MR. LUCAS:  It's all of the 13 series.

14           THE COURT:  Yeah.  I'm sorry, all of 13.

15           MR. LUCAS:  Yes, sir.

16           THE COURT:  You said you would hold on 10, 11, and

17   all of 13?

18           MR. LUCAS:  Yes.  Yes, sir.  And I believe they've

19   also objected to Exhibits 14 and 15.  So I didn't call them

20   out.

21           THE COURT:  Okay.

22           MR. LUCAS:  15, though, is just a partial list of

23   their litigation.  I don't know if there's an objection now to

24   it or not.

25           THE COURT:  Okay.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                48

1          MR. LUCAS:  But there was at one time.

2          THE COURT:  And 14?

3          MR. LUCAS:  That was for 15.

4          THE COURT:  Yes.

5          MR. LUCAS:  14, there is an objection to.

6          THE COURT:  Okay.  So then we're talking about 1

7    through 281, except for 10, 11, all of 13, and 14, and possibly

8    15, correct?

9          MR. LUCAS:  Yes, Your Honor.

10         THE COURT:  Mr. Getty, objection to those being

11   admitted into evidence, sir?

12         MR. GETTY:  There is an objection to the list of

13   other litigation matters.  That's 15.  I don't see why, you

14   know, that should come in at all.  I mean, there -- this is a

15   trial about this compressed issue of, you know, industry

16   standards

17         THE COURT:  I'll reserve ruling on that until it's

18   presented to the witness at the time.  Any other objection,

19   Mr. Getty?

20         MR. GETTY:  Also, Exhibit 16, I probably should have

21   raised this early on, but I overlooked it.  I apologize.  The

22   Exhibit 16 are a series of documents that deal with this

23   NewLead transaction.

24         THE COURT:  Yes.

25         MR. GETTY:  And in your earlier recommendation, the

WILLIAM G. BROWNLOW IV - DIRECT EXAM          49

1   conclusion you reached was that NewLead had not been pled, it

2   wasn't part of this.  And you indicated that you weren't going

3   to get into NewLead.  I want to call it NewLead, but NewLead --

4              THE COURT:  Uh-huh.

5              MR. GETTY:  -- which is this Greek entity that was

6   involved at the back end of some of the dealings with

7   Mr. Williams.

8       We don't think that those -- if we get into those, we're

9   going to take three days.  And based on your earlier ruling, I

10  don't think that those matters should be addressed here at this

11  evidentiary hearing.  And we raised that, you know, previously.

12  And I don't think it's ever been addressed at this point since

13  we -- since we brought it up again.

14      Your earlier ruling, the recommendation seems to be pretty

15  clear.  And I think we even quoted back to you, and Judge Van

16  Tatenhove affirmed it.  So, you know, if we're going to get

17  into New -- NewLead, it's going to consume -- it's going to be

18  a whole --

19             THE COURT:  Judge Van Tatenhove didn't --

20             MR. GETTY:  -- side trial.

21             THE COURT:  You're quoting from my recommended

22  disposition on damages, correct?  Judge Van Tatenhove didn't

23  affirm that.

24             MR. GETTY:  Pardon me?

25             THE COURT:  I believe you're quoting from the R&R I

1  issued with respect to what the damages for the default should

2  be.

3          MR. GETTY:  Right.

4          THE COURT:  Judge Van Tatenhove did not affirm that.

5          MR. GETTY:  No, he set that aside as to the damages

6  only.  But as I read his opinion, he did nothing with that --

7  that ruling.

8          THE COURT:  Okay.  Mr. Lucas.  I think we're talking

9  about all of 16 now.

10          MR. LUCAS:  Yes, Your Honor.  And I don't wish to

11  argue the measure of damages at this point.

12          THE COURT:  Right.

13          MR. LUCAS:  I don't think now is the time to do it.

14  My main point right now is we tendered that list, we tendered

15  it initially, we filed it, and there's never been any

16  objections to that 16 series.

17          THE COURT:  The reason I think they're admissible is

18  following Judge Van Tatenhove's referral back to me for an

19  evidentiary hearing, he also included the renewed motion for

20  sanctions, which is premised upon the NewLead transaction.  So

21  I need to hear the evidence on those.

22      Those are going to be admitted, Mr. Getty.

23          MR. GETTY:  That was the basis of our objection,

24  that, you know, it was only brought up, you know, belatedly and

25  there's been no discovery of any sort with respect to those

WILLIAM G. BROWNLOW IV - DIRECT EXAM                51

1    issues.

2              THE COURT:  I understand.  The record is clear as to

3    why there was no discovery with respect to those issues.  I'm

4    going to allow those exhibits to be admitted into evidence.  Do

5    you have further objections to the exhibits listed?

6              MR. GETTY:  There is an objection to the -- well, I

7    don't know if it's an objection, but the tax returns that they

8    put into the -- into the record.  And we went ahead on the

9    NewLead, out of an abundance of caution -- NewLead.  We

10   designated some of the same exhibits.

11             THE COURT:  Right.

12             MR. GETTY:  And I guess one of our witnesses will go

13   through that to explain -- you know, explain those matters and

14   put them in context.  Also, they basically, really, blatantly,

15   falsely accused us of filing, you know, false tax returns.  And

16   it's -- I guess it's because of the lack of sophistication of

17   the other side that, you know --

18             THE COURT:  I'm hearing evidentiary objections to

19   admitting the exhibits that Mr. Lucas has described.

20             MR. GETTY:  Well, we'll address that, I guess, in the

21   testimony.  But I think the allegation, if they had done some

22   due diligence, talked to an accountant, a tax accountant --

23             THE COURT:  Do you have objections to the admission

24   of the exhibits?

25             MR. GETTY:  Under seal.  That's all.  We want those

WILLIAM G. BROWNLOW IV - DIRECT EXAM                52

1    tax returns filed under seal.  They're confidential.

2              THE COURT:  Mr. Lucas, sealing -- which exhibits

3    would that be then?

4              MR. LUCAS:  Your Honor, the ones that they are now

5    saying are the true tax returns are the Exhibit 27 series.  I

6    have no objection, for the time being, to having those under

7    seal.

8        The ones that are prior to that, the 22 series and the 23

9    series, the ones that I called out as the first alleged

10   returns, are not tax returns.  They were not filed with the

11   IRS, and the numbers on them are totally different than what

12   they are saying are the real tax returns, so they should not be

13   sealed.

14             MR. GETTY:  They should all be sealed.  And there'll

15   be an explanation.  I mean, here's --

16             THE COURT:  Well, okay.  I will tentatively seal 27,

17   22, and 23.

18             MR. GETTY:  If they understood the concept of a

19   consolidated tax return --

20             THE COURT:  Mr. Getty.

21             MR. GETTY:  -- and a dummy filing, which accountants

22   use when you have subsidiaries, they would never have made that

23   allegation.  And they ought to withdraw it.

24             THE COURT:  I understand your client feels strongly

25   about it, but let's focus on the specific issues that are

WILLIAM G. BROWNLOW IV - DIRECT EXAM          53

1   raised.  And this one is only the admission of the exhibits.

2   And so --

3          MR. GETTY:  On the other issue, perhaps Mr. Lucas and

4   I -- perhaps I can educate him on that during one of the

5   breaks.  Maybe they'll withdraw their allegation.

6          THE COURT:  Or present your evidence.  Okay.  So then

7   that means Plaintiffs' Exhibit 1 through 281 are admitted into

8   evidence, except included in that range, 10, 11, and 15, I'm

9   reserving ruling on those until they're proffered at the time

10  during the presentation of any testimony.  13a is the NewLead

11  exhibits, correct, Mr. Lucas?

12         MR. LUCAS:  13 -- 13 and 13a through --

13         THE COURT:  Yes.

14         MR. LUCAS:  -- 13hh are all NewLead exhibits, Your

15  Honor.

16         THE COURT:  Yes.  And those are admitted as well,

17  based on the ruling I just made.

18         MR. LUCAS:  You say they are admitted?

19         THE COURT:  Yes.

20         MR. LUCAS:  Okay.

21         THE COURT:  Okay.  That covers all the exhibits that

22  you raised to be admitted at this time, correct?

23         MR. LUCAS:  Yes, sir.  So let me make sure I've got,

24  in view of that, on the NewLead exhibits, we would have 13, 13a

25  through hh and 14, which is also just the purchase price

WILLIAM G. BROWNLOW IV - DIRECT EXAM                54

1   summary for the Fivemile assets.

2           THE COURT:  Yes.  Mr. Getty didn't object to 14?

3           MR. GETTY:  No.  I did object to 16.  It also deals

4   with NewLead, NewLead.  It's just emails and correspondence.

5           THE COURT:  Yes.

6           MR. GETTY:  But given your earlier ruling, I assume

7   you're going to let that come in.

8           THE COURT:  Okay.  So 14 is admitted as well then,

9   and the 16 -- the 16 series that Mr. Getty just described.

10       Are we all on the same page, Mr. Lucas?

11          MR. LUCAS:  I think we are, Your Honor.

12          THE COURT:  Mr. Getty?

13          MR. GETTY:  I think so, Your Honor.

14          THE COURT:  Okay.  Go ahead, Mr. Lucas.

15          MR. LUCAS:  All right.  Thank you.

16          THE COURT:  You're welcome.

17          MR. LUCAS:  And I apologize for that kind of hiatus

18  in the exam, but I think it saved us a lot of time.

19          THE COURT:  That's fine.

20  BY MR. LUCAS:

21  Q.   Mr. Brownlow, going back now to the original assignment,

22  just briefly that was executed when?

23  A.   October 5th, 2005.

24  Q.   At the time were there any -- what discussions, if any,

25  were there with Kentucky Fuel about whether or not -- what it

WILLIAM G. BROWNLOW IV - DIRECT EXAM                    55

1   was going to do with the property?

2   A.   My recollection of the conversation at that time is

3   they're interested in the property because they're interested

4   in the coal and wanted to mine it.

5   Q.   Okay.  Did they say whether or not they would mine it?

6   A.   I don't recall them saying that at that time.

7   Q.   Okay.  What happened then in the subsequent years between

8   then in 2005 and 2010 when the fourth amendment was executed?

9   Just generally what happened with that property and any efforts

10  to mine it?

11  A.   Well, the landowners within that property -- which there

12  are multiple landowners on both the Fivemile property and the

13  Deep Wood property.  And each of those landowners had a lease

14  and each of those leases called for an annual minimum royalty.

15  And after the first two or three years, the annual minimum

16  royalty, which was a payment that they had assumed when they

17  took over the leases and the permit, they failed to make those

18  payments.

19  Q.   When you say "they," who failed?

20  A.   I'm sorry.  Kentucky Fuel, who had assumed the liability

21  for those annual minimum royalties, failed to make the annual

22  minimum royalties, starting sometime in 2008.  And so I started

23  receiving calls from landowners saying, "We're not getting

24  paid.  What can we do about getting these annual minimum

25  royalties paid?"

WILLIAM G. BROWNLOW IV - DIRECT EXAM          56

1     In response to that, I didn't want to see the property

2  fall apart.  I started trying to get in touch with Kentucky

3  Fuel, and they would neither answer the phone nor return the

4  phone calls.  So ultimately I formed a new company, called

5  Fivemile Energy, LLC, and began leasing up the properties that

6  they had not renewed the leases on or that had not had the

7  annual minimum royalties paid into the new entity I formed

8  called Fivemile Energy.  And those were nonpaid or -- nonpaid

9  leases or leases in default.

10 Q.    Okay.  So coming forward now to the fall of 2010, and just

11 put that in context.  When was what we're calling the fourth

12 amendment, the fourth amendment to the assignment, to the

13 original assignment of leases and permits, when was it

14 negotiated and executed, just what month?

15 A.    October and November of 2010.

16 Q.    All right.  Now, directing your attention to the early

17 fall of 2010, before that agreement was finalized, were there

18 still some of the Fivemile landowners whose original leases

19 with Kentucky Fuel were still good and hadn't been terminated?

20 A.    There were some few leases that were still good and still

21 within their purview, yes.

22 Q.    There were other leases that you just described that had

23 been allowed to expire, and for the reasons you described, you

24 got new leases in the name of Fivemile Energy LLC?

25 A.    Correct.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                 57

1  Q.   All right.  And what happened then?

2  A.   Well, let me back up just for a second.  Prior to 2010 I

3  had been contacted by Kentucky Fuel and they had asked me to

4  serve as a cat's paw for them to buy some other coal

5  properties.  And I had approached a bankruptcy trustee in

6  Lexington and talked about some properties that were for sale

7  in the bankruptcy court and had actually closed two deals on

8  two purchases of property for them.  And they must have

9  appreciated what I did, because they then later came to me in

10 the summer or early fall of 2010 and asked me if I could help

11 them straighten out a problem they had with Strong Brothers.

12 Strong Brothers was a permit they were operating on in

13 Breathitt County and they had alienated both the permit holder

14 as well as the property owner.

15 Q.   Who -- I'm sorry, when you say "they" had alienated?

16 A.    I'm sorry.  Kentucky Fuel had alienated the permit holder

17 and the property owner, and in addition to that had a CO, a

18 cessation order, on the property for their failure to do

19 reclamation on the property.

20 Q.   Just in a nutshell, what is a cessation order?

21 A.   They means they totally have to stop mining until they

22 clean up the reclamation problem that they have.

23 Q.   Okay.  Go ahead.

24 A.   The problem was, was that because the landowner refused to

25 deal with them and talk to them, they couldn't get on the

WILLIAM G. BROWNLOW IV - DIRECT EXAM                58

1  property.  And because the permit holder wouldn't sign anything

2  and didn't get along with them, they couldn't get any movement

3  on the permit.  They were between a rock and a hard place.

4  They really didn't have any way to go.  And so they came to me

5  and said, "Could you possibly go talk to the landowner and go

6  talk to the permit holder and get the necessary forms where we

7  can get back up on Strong Brothers permit and start mining up

8  there?"

9  Q.    Let me ask you this.  I apologize for interrupting you.

10 But in view of the cessation order, telling them to stop

11 mining, what was the impact of that order on Kentucky Fuel's

12 operations throughout the Commonwealth of Kentucky?

13 A.    My understanding was that it stopped them.

14 Q.    Stopped them what?

15 A.    I think -- I honestly don't know whether it's systemwide

16 or just on that permit.

17         MR. GETTY:  Just that permit.

18 Q.    Okay.  Go ahead.

19 A.    But at the same time they asked me in September, October

20 time frame to go to the Strongs and to the landowners under the

21 Strong Brothers permit, which were the Combs family and the

22 Barnett family, so I went over and started negotiating with

23 them.

24     At the same time, we had some adverse parties trying to

25 obtain the entrance leases to the Deep Wood and the Fivemile

WILLIAM G. BROWNLOW IV - DIRECT EXAM          59

1   properties.  In other words, there were some leases that were

2   not renewed that I had not yet been able to obtain, that an

3   adverse party had obtained.  And he had those entrances to

4   where if you wanted to mine it, you couldn't get off the road

5   and onto the property.

6        And he had filed a suit with the Department of Natural

7   Resources, claiming that the permit and the landowners were no

8   longer married together.  In other words, Kentucky Fuel owned

9   the permit, but they didn't have the leases.  And so without

10  the two of them going together, there was a case before the

11  Department of Natural Resources to revoke the permit for both

12  Deep Wood and Fivemile.

13  Q.   Okay.

14  A.   So all of that was going on in October and November of

15  2010.  That was kind of the -- the lead-up to the negotiations

16  over the fourth amendment.

17  Q.   Okay.

18            MR. GETTY:  Your Honor, I haven't objected to any of

19  this background.  I just -- and I'm not.  I just hope I'll be

20  given the same latitude with Mr. Justice.

21            THE COURT:  We'll see how the testimony unfolds.

22       Go ahead.  Go ahead, Mr. Lucas.

23  BY MR. LUCAS:

24  Q.   Would you explain how that background led to the

25  negotiation of the fourth amendment or how it led to the fourth

WILLIAM G. BROWNLOW IV - DIRECT EXAM          60

1   amendment?

2   A.   Well, I was very concerned that there was a very valuable

3   asset here, called Fivemile.  It was -- excuse me.

4           THE COURT:  There's some water there for you, sir.

5   There's water there if you need it.

6   A.   There's a second asset, called Deep Wood, and both of

7   those seemed to me to be falling apart for lack of attention

8   and for lack of any interest in mining the property.

9   Q.   Deep Wood is not part of the lawsuit anymore.  So let's

10  just focus on Fivemile.  Okay?

11  A.   Yes, sir.

12  Q.   I apologize if I interrupted you.  Go ahead, please.

13  A.   So I was interested in coming together with an agreement

14  that essentially remarried all of the leases with the permit,

15  with a promise to go forward and mine the property.  And that's

16  what led to the fourth amendment.

17  Q.   All right.  Well, how did the negotiations open over that?

18  A.   We started negotiating in the middle of October.  It

19  started out with Steve Ball requesting that we make a

20  suggestion with regard to what sort of new agreement there

21  would be.  We went back and forth for -- with multiple

22  agreements.  Ultimately a meeting was scheduled to meet with

23  the Kentucky Fuel representatives and myself at The Greenbrier

24  in West Virginia on the 11th and 12th of November 2010.

25  Q.   Okay.  And you said you met at The Greenbrier with

WILLIAM G. BROWNLOW IV - DIRECT EXAM          61

1   representatives.  Who were those representatives?

2   A.   Marc Merritt, Steve Ball, and there was a third gentleman

3   there for them, but he didn't really participate.

4   Q.   All right.  Where and when were those negotiating sessions

5   held with you and Mr. Merritt and Mr. Ball?

6   A.   We met first -- the 11th was a Thursday.  We first met at

7   dinner, 6:00 or 7:00 on Thursday night, and negotiated there

8   for a couple of hours.  And then we got back together again the

9   next morning and negotiated further on the morning of the 12th.

10  And then it ended about noon on the 12th.

11  Q.   Was there anyone with you?

12  A.   Yes, my attorney, Culver Schmid.

13  Q.   Okay.  And in those negotiations, was there anyone else

14  other than Kentucky Fuel that you had been talking to about

15  doing a deal with them on these properties if you couldn't do

16  one with Kentucky Fuel?

17  A.   Not really.

18  Q.   Okay.  In those negotiations, what were your principal

19  concerns that you wanted to come out of the deal with?

20  A.   Essentially there was two things that were foremost in my

21  mind.  Number one was, this is a very valuable asset, and the

22  coal needs to be mined so that I can be paid on that asset.

23  And number two is, if there was no mining, there needed to be a

24  defined remedy for the failure to mine.

25  Q.   All right.  I would like for you to look at Plaintiffs'

WILLIAM G. BROWNLOW IV - DIRECT EXAM     62

1    Exhibit 1a there.  Do you recognize that as what we're calling

2    the fourth amendment?

3    A.   Yes, sir.

4    Q.   Okay.  You said that you had two principal concerns.  One

5    was that you wanted to make sure the coal got mined.  How was

6    that addressed in this agreement before the fourth amendment?

7    A.   In the paragraph titled "Covenant to Mine."

8    Q.   Okay.  And what paragraph is that?

9    A.   Paragraph 10.

10   Q.   Okay.  Paragraph 10 on page -- I think it's numbered 6 of

11   the agreement?

12   A.   Yeah.

13   Q.   Number 6 at the bottom of the page?

14   A.   Yes, sir.

15   Q.   All right.  And was that specific paragraph negotiated

16   with the -- with the defendants?

17   A.   Yes.

18   Q.   With Kentucky Fuel?

19   A.   Yes, sir.

20   Q.   Was it snuck into the agreement later?

21   A.   No.

22   Q.   The other concern, I forget how you phrased.  You said you

23   wanted a definitive remedy?

24   A.   Yes, sir.

25   Q.   How was that addressed?

WILLIAM G. BROWNLOW IV - DIRECT EXAM                63

1   A.    In paragraph 7, underneath "Events of Default."

2   Q.    Okay.  Just in your own words, describe to the Court what

3   you wanted and how it was addressed, this, what you've termed

4   the definitive remedy in paragraph 7 of the fourth amendment?

5   A.    Essentially the seventh paragraph, Events of Default, says

6   that if there is a default under this agreement, that the

7   defaulting party would be subject to --

8         Excuse me.  Let me back up.  The person to whom the

9   default occurs essentially has two choices with regard to how

10  to obtain justice under this agreement.  And those two

11  alternatives are first, at law or equity, which in my mind

12  meant that you could go to court, retain experts, lawyer up,

13  spend six years litigating back and forth, and maybe have a

14  resolution or maybe not have a resolution.  Or secondly, you

15  could use an independent arbiter.

16        And the independent arbiter would be brought in, he would

17  do his analysis, and his opinion would be final with regard to

18  the damages.

19  Q.    Okay.  And that's embodied in Article 7 of paragraph 7 of

20  the fourth amendment?

21  A.    Yes, sir.

22  Q.    All right.  When you mentioned the dinner, do you know

23  whether Mr. Justice had any involvement in negotiations at that

24  stage?

25  A.    From time to time the representatives from Kentucky Fuel,

WILLIAM G. BROWNLOW IV - DIRECT EXAM          64

1   Mr. Ball and Mr. Merritt, would say, "Jay is in a different

2   part of The Greenbrier, we need to consult with him, let us go

3   talk to him and we'll come back."

4   Q.   Okay.

5   A.   So they would leave the dinner table and be gone for a

6   short time, and they'd return and we'd go back to the

7   negotiations.

8   Q.   All right.  During these negotiations, what

9   representations, if any, were made about whether or not

10  Kentucky Fuel would mine this property?

11  A.   I asked the question at least five, maybe ten times, what

12  assurance do we have that this property is going to be mined.

13  And repeatedly they said, we're going to mine it this time.

14  Q.   All right.  I want to direct your attention to the

15  payments that brings us all here today that are required under

16  the fourth amendment that you just described.  Can you just

17  kind of give the Court a roadmap describing the payments that

18  were due to you under the fourth amendment?

19  A.   There are essentially five payments due under the fourth

20  amendment, of which four are due to me.  One, which I'll list

21  first, which is not due to me, is due to the landowners.

22  They're required to maintain the leases and pay the landowner.

23  The payments due to me, being New London Tobacco, are the

24  initial payment due at closing, which is a reimbursement of

25  expenses.  And that was $150,000.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                65

1   Q.   And when was that due to be paid?

2   A.   It was due on November the 22nd of 2010.  And it was

3   actually paid on January the 20th, 2011.

4   Q.   Okay.

5   A.   The next payment due was for retainer fees and that was

6   due monthly, and the first payment was due on December the 1st,

7   2010, and it was due monthly thereafter.  The only payment made

8   on that was on May the 20th, 2011, and it paid through April

9   the 1st of 2007.

10  Q.   How much was that payment?

11  A.   That payment was $50,000.

12  Q.   For the retainer fees?

13  A.   Correct.

14  Q.   Okay.  Go ahead.

15  A.   In addition, the third category is annual minimum

16  royalties.  And the annual minimum royalties in the first year

17  were due at a rate of $10,000 per month.  So the first payment

18  was due on the first of December.  And then it was due --

19  excuse me -- first of each month thereafter.  The payment made

20  in 2011 on the monthly amounts was $50,000, one-time payment,

21  again, on May 20th, 2011.

22       The next payment due on the annual minimum royalties was

23  December 1st, 2011.  And then they were due -- of $75,000.  And

24  then they were due in that same amount annually on that same

25  day going forward.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                66

1   Q.    All right.

2   A.    And there's a fourth category.

3   Q.    Before you go to that, let me ask you, on the minimum

4   royalties, you said they were $10,000 a month starting

5   December 1?

6   A.    Correct.  And then, actually, the very last month was

7   15,000, so that the payment due for the first year in total was

8   125,000.

9   Q.    Okay.  And just to clarify, that's $10,000 every month

10  starting December 1 through November of the following year,

11  2011, but the November payment is for 15,000; is that correct?

12  A.    That's correct.

13  Q.    All right.  And then the next minimum royalty was then

14  December 1, and it was how much?

15  A.    75,000.

16  Q.    All right.  Okay.  You were going to tell me about the

17  next category.

18  A.    Well, let me just finish on the last payment.  That

19  payment of 75,000 due in December of 2011 was not paid for

20  another 2 1/2 years --

21  Q.    Okay.

22  A.    -- after this suit was filed.

23  Q.    And you mentioned the lease payments to the landowners.

24  Were there lease payments also due to the Strong Brothers?

25  A.    Yes.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                    67

1   Q.   And just to clarify, is the Strong Brothers property and

2   leases, are those part of the Fivemile leases?

3   A.   No, sir.

4   Q.   Separate piece of property?

5   A.   They're totally separate.

6   Q.   Where is it located in relation to the Fivemile property?

7   A.   The Strong Brothers is about three miles down the road

8   from where the Fivemile property is.

9   Q.   All right.  Go ahead.  You had another category?

10  A.   The fourth category is the production royalties.  And

11  that -- truthfully, in the sales price of the leases and the

12  permit, that is where the value is.  That's the production

13  royalty of the greater of a dollar per ton or 2 percent of the

14  sales price per ton.

15  Q.   All right.  What about on the Strong Brothers?  Who

16  actually had the leases with them?

17  A.   I went to the landowners, which was the Combs family and

18  the Barnett family, and asked them about leasing to Kentucky

19  Fuel.  And they were both adamant that they would never again

20  do a deal with Kentucky Fuel.  And over the course of a month

21  or so of negotiations, I finally talked them into entering into

22  a lease with Fivemile Energy.  And so I did enter a lease with

23  them in the name of Fivemile Energy for the property that the

24  Kentucky Fuel folks needed in order to work on their

25  reclamation.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                68

1    Q.    How much were those annual lease payments?

2    A.    The annual minimal royalty was $5,000.

3    Q.    And under the fourth amendment, who was required to pay

4    that?

5    A.    Fivemile Energy, which is me.

6    Q.    Okay.  And then did you have an agreement with Kentucky

7    Fuel in Article 9 of the -- paragraph 9 of the fourth amendment

8    about the payment of the Strong Brothers' lease payment?

9    A.    Yes.  There's a specific reference to that with the --

10   they agreed that once they received notification from me, they

11   would send me reimbursement for that payment within seven days.

12   Q.    All right.  And have they done that?

13   A.    No.

14   Q.    Look, if you would, at -- did you -- you made demands for

15   payment, I believe.

16   A.    Yes.

17   Q.    Okay.  Look, if you would, at Exhibit 9, Plaintiffs'

18   Exhibit 9.  Do you have it?

19   A.    Yes, sir.

20   Q.    All right   Tell the Court what that is.

21   A.    These are the demand letters for the Strong Brothers lease

22   payment, annual minimum royalty.

23   Q.    Okay.  And the first one dated September 27, 2012, sent by

24   certified mail, I see, this -- which year is that requesting

25   payment for, for which Strong Brothers?

WILLIAM G. BROWNLOW IV - DIRECT EXAM                    69

1   A.   The payment due for October 7, 2011.

2   Q.   All right.  And what about 2012?

3   A.   It's the same.  I sent the letter and never got paid.

4   Q.   Okay.  Look at the next letter in that exhibit.  Do you

5   have a letter there dated November 15th, 2013?

6   A.   Yes, sir.

7   Q.   And does it reiterate or request for payment for the same

8   two payments that you requested in the -- in the first letter?

9   A.   Yes, sir.

10  Q.   Okay.  Were those paid?

11  A.   No.

12  Q.   Look at the last letter dated April 21, 2016.  Is that

13  another letter you sent?

14  A.   Yes, sir.

15  Q.   Were any of those paid for either 2011, 2012, 2013, or

16  2014?  Were you reimbursed for any of those payments?

17  A.   No, sir.

18  Q.   Look if you would, at Plaintiffs' Exhibit 8.  Can you

19  identify it or just tell us what it is?

20  A.   It's a -- it's a list of the amount due on the Strong

21  Brothers minimum royalty payments.

22  Q.   All right.  I want to direct your attention next to the

23  retainer fees.  You've touched on this already.  The retainer

24  contract is in which section of the fourth amendment?  I

25  believe that's in Article 9, also.  Is that correct?  That's

WILLIAM G. BROWNLOW IV - DIRECT EXAM          70

1   Exhibit 1a, the fourth amendment.

2   A.    Yes, sir.

3   Q.    Okay. And you've testified earlier they were $10,000 a

4   month.   Other than the payment that you described that was made

5   in May of 2011 for 50,000 -- and when did that pay it through?

6   A.    Through April the 1st, 2011.

7   Q.    All right.  Have you received any more payments on the

8   retainer fees other than that?

9   A.    No.

10   Q.    All right.  Look at -- just for the record, would you

11   identify Exhibit 1c?

12   A.    That's the check I received in payment of $50,000 on the

13   annual minimum royalties and 50,000 on retainer fees.

14   Q.    All right.  Has Kentucky Fuel ever terminated the

15   agreement in Article 9 for payment of the retainer fees?

16   A.    No.

17   Q.    Okay.  Look at Exhibit 12.  Can you identify that or just

18   tell us what it is?

19   A.    That's a list of the past due retainer fees.

20   Q.    All right.  And how was the interest that's shown on that

21   computed?

22   A.    Annual compound.

23   Q.    Okay.

24   A.    At 8 percent.

25   Q.    Okay.  I want to go to the minimum royalties that you

WILLIAM G. BROWNLOW IV - DIRECT EXAM                    71

1    mentioned earlier.  And you said already that Exhibit 1c, that

2    $100,000 check, half of that was for minimum royalties,

3    correct?

4    A.    Correct.

5    Q.    Okay.  When you -- this lawsuit was filed, and you can

6    look at it if you need to.  I don't know if you remember it or

7    not.  Do you remember how much you were owed in minimum

8    royalties on May 8, 2012, when this suit was filed?

9    A.    I think it was 150,000.  I'm not positive.

10   Q.    But everything per month other than that one $50,000

11   payment?

12   A.    Under the royalties or under the --

13   Q.    Under the minimum royalties.

14   A.    They would have owed 75,000 -- I'm sorry, I don't

15   understand.

16   Q.    I misspoke.  I mixed up the check.  The check was for

17   consulting fees and the minimum royalties due at that time,

18   correct?

19   A.    Correct.

20   Q.    And after November of 2011, refresh my memory on how much

21   the minimum royalties went to after that.

22   A.    75,000.

23   Q.    Okay.  By the time this -- so that was 75,000.  That first

24   75,000 was due on December 1 of which year?

25   A.    '11.

WILLIAM G. BROWNLOW IV - DIRECT EXAM          72

1   Q.   Okay.  So by the time you filed suit in 2012, on May 8th,

2   had that minimum royalty been paid?

3   A.   There would be 225,000 outstanding at that point.

4   Q.   All right.  Did you ever get a payment that caught you up

5   on the minimum royalties?

6   A.   Yes.

7   Q.   Okay.  When?

8   A.   It would have been either '14 or '15.  Not long ago.

9   Q.   Okay.  Let me ask you this.  Do you recall getting a

10  payment in August of 2013?

11  A.   Yes.

12  Q.   Okay.  And how much was that?

13  A.   225,000.

14  Q.   Okay.  And did that catch up on the minimum royalties due

15  as of that time?

16  A.   No.

17  Q.   Okay.  Were the -- on December 1 of that same year, of

18  2013, was the minimum royalty due on that date paid at that

19  time?

20  A.   I'm sorry, which year?

21  Q.   2013.  After you got the check for 225,000 in August, was

22  the 75,000 that was due on December 1 paid on time?

23  A.   No.

24  Q.   Okay.  Do you recall when it was paid?

25  A.   I think it was paid in August of the following year.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                73

1   Q.   Okay.   In the last couple of years, has Kentucky Fuel paid

2   the minimum royalties on time?

3   A.   Yes.

4   Q.   Okay.   Do you still have any concerns about whether or not

5   they would make the future payments or whether they will make

6   them on time?

7   A.   Absolutely.

8   Q.   Why?

9   A.   Well, they have a history of not paying their bill.   And

10  my belief is the only reason I received this amount of minimum

11  royalty so far is because this lawsuit is still ongoing.

12          MR. GETTY:   Objection.   He's speculating at this

13  point.   It's current.   They've paid them right current.

14          THE COURT:   Overruled.   Go ahead, Mr. Lucas.

15  BY MR. LUCAS:

16  Q.   All right.   And is that why you are asking the Court for a

17  declaratory judgment, that those fees are owed?

18  A.   Yes.

19  Q.   All right.   I want to direct your attention now to the

20  spring of 2012.   And to put that in context, the suit was filed

21  on May 8th of 2012.   And you've described so far the payment

22  defaults of some of these specific payments.   Had you been paid

23  any production royalties yet?

24  A.   No.

25  Q.   Had Kentucky Fuel began to mine?

WILLIAM G. BROWNLOW IV - DIRECT EXAM          74

1   A.    No.

2   Q.    Had there been any discussions between you and Kentucky

3   Fuel about the failure to mine?

4   A.    Yes.

5   Q.    Tell us about those.

6   A.    When I could get through to them and talk to them and ask

7   them what their plan was, when are they going to mine, they

8   would say, "Oh, we're going to get around to it, just not now."

9   But they never did anything.

10  Q.    Okay.  Did they ever, in those discussions, make any

11  claims to you that they weren't mining or couldn't mine because

12  it wasn't economical or wasn't profitable?

13  A.    No.

14  Q.    So what did you do as a result of the fact you weren't

15  being paid and no mining was going on?

16  A.    Well, at that point I was at least a year or more behind

17  in terms of the payments.  There seemed to be no indication

18  that I would be paid.  And so I contacted Mr. Schmid, who had

19  drafted the agreement, and talked and worked with him with

20  regard to what would be a plan going forward.

21  Q.    All right.  And did you contact anyone else?

22  A.    I did.  After meeting with Mr. Schmid, he and I went over

23  and reviewed the consequences, the alternatives that we had

24  vis-a-vis how to get them to perform under the agreement.  And

25  looking at the two consequences; one being the law or equity,

WILLIAM G. BROWNLOW IV - DIRECT EXAM                    75

1   and the other being the arbiter, it seemed to both he and I

2   that the arbiter was the way to go, that that would be shorter,

3   less expensive, and would resolve it sooner.

4   Q.   So did you then retain an independent arbiter pursuant to

5   article -- or paragraph 7 of the agreement?

6   A.   I did.

7   Q.   And who was that independent arbiter?

8   A.   Bob Conway.

9   Q.   Okay.  And had you had any prior business relationship

10  with Mr. Conway?

11  A.   I really had not had a relationship with him.  He is the

12  person who had completed the permit application for the

13  Fivemile property.  And my understanding of the permit

14  application as I went through it is that it is a great

15  application in terms -- it's an application of civil

16  engineering skill to the ground that he's working with.  He

17  seemed to be the most knowledgeable because he had, in fact,

18  spent two or three years putting together the permit

19  application.  And so he knew the property.  He knew the

20  resources.  And he had good understanding of those sorts of

21  things.  So he was the guy that, to me, was somebody that would

22  not have to reinvent the wheel on this property.

23  Q.   And is that why you chose him to be the independent

24  arbiter?

25  A.   Yes.  He seemed to me to be the most knowledgeable person

WILLIAM G. BROWNLOW IV - DIRECT EXAM          76

1    that I could think of.

2    Q.   All right.  I'm going to ask to you identify the permit

3    application.  It's pretty voluminous, right?

4    A.   Yes, sir.

5    Q.   Just while Mr. Haskins is trying to retrieve that over

6    here so that the Court can see it, just describe just generally

7    how extensive is a permit application like the application for

8    the Fivemile permit?

9    A.   The Fivemile permit in print pages is approximately 1800

10   pages long.  And it includes multiple schedules, all the civil

11   engineering movements of water and ground and dirt and land and

12   all that have to go into a surface mine -- surface mining

13   operation.

14             MR. LUCAS:  Your Honor, may we approach the witness

15   with this?

16             THE COURT:  With all four of those binders?

17             MR. LUCAS:  Yes, Your Honor.

18             THE COURT:  Those are exhibits or you just want him

19   to identify the permit application?

20             MR. LUCAS:  They're actually in evidence at this

21   point.

22             THE COURT:  Okay.

23             MR. LUCAS:  We're not going to ask anybody, unless

24   they want to, to read them.  They're really more a

25   demonstrative exhibit than anything to show the extent of the

WILLIAM G. BROWNLOW IV - DIRECT EXAM          77

1  work performed by Mr. Conway in connection with the

2  application, so --

3            THE COURT:  Okay.  Is there any dispute over those

4  being the permit application, Mr. Getty?

5            MR. GETTY:  Well, I don't think there's any question

6  that a permit application was presented.  As to the status of

7  it currently, I'm not certain of that.

8            THE COURT:  Right.

9            MR. GETTY:  But, I mean --

10           THE COURT:  The point is it's a voluminous

11 application.  It's not contested, correct?

12           MR. GETTY:  I don't see any reason for him to show it

13 to the witness.  We can all see it.

14           THE COURT:  Yes.  I think you've established that

15 it's voluminous.

16           MR. LUCAS:  Well, just so, Your Honor, it's clear,

17 this document has been given to Mr. Getty.  I mean, I don't

18 expect him to review it all.

19           THE COURT:  That's fine.

20           MR. GETTY:  I didn't say that it hadn't been given to

21 me.

22           THE COURT:  I understand.

23           MR. LUCAS:  But you are welcome to.

24 BY MR. LUCAS:

25 Q.  Mr. Brownlow, it comprises here a total of four Redwells,

WILLIAM G. BROWNLOW IV - DIRECT EXAM          78

1   and there are a number of red tabs that we all can see on

2   those.   And who placed those there and why?

3   A.    Those tabs were placed there by myself and my wife.   We

4   went through the entire application to determine exactly how

5   many times Bob Conway had prepared the schedules and signed off

6   with his professional licensed engineering staff on those

7   particular items within the application.

8             MR. GETTY:   Your Honor, what does this have to do

9   with anything?   Bob Conway is gone.   He's dead.   His report

10  was, you know, rejected by Judge Van Tatenhove.   I mean, there

11  is just --

12            THE COURT:   Is there an objection, Mr. Getty?   That's

13  the question.

14            MR. GETTY:   Yes, I think he's gone well beyond the

15  reasonable scope of his testimony.

16            THE COURT:   I'm going to overrule the objection.   Go

17  ahead, Mr. Lucas.

18            MR. LUCAS:   Thank you, Your Honor.

19  A.    Just if I may finish.   We went through all four of the

20  books of this, and his stamp, signature, and work product -- I

21  don't know exactly how many pages are his work product, but his

22  stamp and signature appear approximately 340 times within those

23  1800 ages.

24  Q.    All right.   When you hired, retained Mr. Conway as the

25  independent arbiter, what did you tell him you wanted him to

WILLIAM G. BROWNLOW IV - DIRECT EXAM                79

1   do?

2   A.   I told him that I wanted him to follow the instructions

3   within the letter I gave him with regard to determining the

4   amount of lost royalties that -- as defined within the fourth

5   amendment.

6   Q.   All right.  And I'm going to now direct your attention --

7   did he issue a report?

8   A.   Yes, he did.

9   Q.   It's attached to your complaint in this case, I believe.

10  A.   Yes.

11  Q.   Look at exhibit -- you can either look at it -- it's an

12  exhibit to the Plaintiffs' Exhibit 1, which is the amended

13  complaint.  It's also identified as a separate Exhibit 1b.  So

14  take a look at that if you would.

15  A.   Yes, sir.

16  Q.   You've got it.  Okay.  Can you identify that, sir?

17  A.   Yes.  That's the -- that's the report of the independent

18  arbiter.

19  Q.   All right.  And that was attached to the complaint in this

20  case?

21  A.   Yes, sir.

22  Q.   Has that amount ever been paid by Kentucky Fuel?

23  A.   No, sir.

24  Q.   Can you turn to Exhibit 4a and tell us what that is?

25  A.   Yes, that's a calculation of the amount from the

WILLIAM G. BROWNLOW IV - DIRECT EXAM                80

1   independent arbiter's report plus the addition of interest over

2   time, through December 1st of this year.

3   Q.   All right.  Turn to Exhibit 1b.  What is that?

4   A.   1b or 4b?

5   Q.   I'm sorry.  I misspoke.  4b.  Thank you.

6   A.   4b is a calculation of what the amount of royalty that

7   could have been earned had the coal been mined and what the

8   amount of that royalty would amount to at different sales

9   prices per ton.

10  Q.   You are not asking the Court to award that today, are you?

11  A.   No, sir.

12  Q.   All right.  For what purpose did you prepare that?

13  A.   The point here is, is that the independent arbiter, while

14  being theoretically more succinct and to the point and you get

15  the whole process completed sooner, ends up less money than you

16  could have had if it had actually been mined and sold at market

17  prices.

18  Q.   All right.  Look at Exhibit 1c -- or, excuse me, 4c.  What

19  is that?

20  A.   That's a calculation based upon the NewLead mining plan in

21  terms of the volumes they suggested could come out of the

22  ground, and uses the prices as reported in the Helms and the

23  Patton expert report.

24  Q.   Okay.  And are you asking the Court to award that as

25  damages?

WILLIAM G. BROWNLOW IV - DIRECT EXAM          81

1   A.    No.

2   Q.    Mr. Conway is not here today, is he?

3   A.    No, sir.

4   Q.    Look at Exhibit 3a.  What is that?

5   A.    That's Mr. Conway's death certificate.

6   Q.    All right.  I want to turn your attention to the tax

7   return documents that we have discussed somewhat earlier.

8              MR. LUCAS:  I need the tax return.

9              MR. GETTY:  Is it a good time for maybe a quick

10  bathroom break?

11             THE COURT:  Sure.  We can consider a lunch break now.

12  We can hear more testimony.  It's really up to you all.  I

13  would anticipate going until at least 5:30 today.

14             MR. GETTY:  Sure.  Whatever your pleasure, Judge.

15  You want to break for lunch now?  I just need to go to the

16  bathroom.

17             MR. LUCAS:  That's fine.

18             THE COURT:  Okay.  You want to take a lunch break?

19             MR. LUCAS:  Lunch would be fine, Your Honor.

20             THE COURT:  1:00.  Is that okay?

21             MR. GETTY:  Sure.

22             MR. LUCAS:  Can we say 1:15?

23             THE COURT:  We can.  We'll need to proceed quickly

24  after that.  1:15 is fine.  I want to hear if counsel have an

25  objection to a standing rule that counsel will have to enforce,

WILLIAM G. BROWNLOW IV - DIRECT EXAM                82

1    that during any recess like this the witness is not to discuss

2    their testimony, its subject matter in any way with counsel.

3    And that would go forward throughout the remainder of the

4    hearing.

5         Any objection to that, Mr. Lucas?

6              MR. LUCAS:  Are we allowed to discuss prospective

7    testimony that we're not covering what's already been covered

8    but, you know, what we're going to cover this afternoon?

9              THE COURT:  Mr. Getty.

10             MR. GETTY:  It just ought to be a blanket rule.  I

11   can live by it, and so can he.

12             THE COURT:  I would rather just have the rule in

13   place.  Everyone should be ready for the hearing at this point.

14   No discussion of the subject matter of the testimony while

15   there's a recess and any witness has not completed that

16   testimony.

17             MR. LUCAS:  That's fine.

18             THE COURT:  Okay.  Anything else, Mr. Lucas?

19             MR. LUCAS:  No, Your Honor.

20             THE COURT:  Mr. Getty?

21             MR. GETTY:  No, Your Honor.

22             THE COURT:  We'll be in recess until 1:15.

23        (A lunch recess was taken from 12:06 to 1:16 p.m.)

24             THE COURT:  Thank you.  We're back on the record.

25   Counsel are present.  Mr. Brownlow is still on the witness

WILLIAM G. BROWNLOW IV - DIRECT EXAM                83

1   stand.  Mr. Lucas, you can resume your questioning, sir.

2              MR. LUCAS:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4   BY MR. LUCAS:

5   Q.   Mr. Brownlow, I'm going to direct your attention to some

6   of the issues relating to the tax returns that have been

7   introduced.  I'm going to ask you first to turn to Plaintiffs'

8   Exhibit 21.

9   A.   Yes, sir.

10  Q.   Sir, do you recognize that as a letter from defendants'

11  former counsel, Mr. Kelley, to me and Mr. Webster?

12  A.   Yes, sir.

13  Q.   And turn to the second page.  And what did it indicate

14  that he was enclosing with this letter?

15  A.   The James C. Justice Companies tax returns from 2005 to

16  2013 and the James C. Justice Companies financial statements

17  for 2012 and '13.

18  Q.   Okay.  I'm going to direct your attention on the second

19  page to the third paragraph.  You see where it says, "tax

20  returns prepared for"?

21  A.   Yes, sir.

22  Q.   Okay.  Did you receive the -- what he enclosed as the tax

23  returns for both companies, Kentucky Fuel and James C. Justice

24  Companies?

25  A.   Yes.

WILLIAM G. BROWNLOW IV - DIRECT EXAM          84

1   Q.   Okay.  And at the bottom, it says there's enclosures.  Do

2   you see that?

3   A.   Yes.

4   Q.   Is there anything that indicates to you there that those

5   are not the real tax returns?

6   A.   No.

7   Q.   All right.  And are the returns enclosed with that the --

8   what we have referred to as the personal alleged returns that

9   are marked as Plaintiffs' Exhibit 22 and 23 series?

10  A.   Yes, sir.

11  Q.   All right.  I direct your attention next to Plaintiffs'

12  Exhibit 24.

13  A.   Yes, sir.

14  Q.   Okay.  And do you recognize that as a letter from me to

15  Mr. Kelley raising questions about those first alleged returns,

16  Exhibits 22 and 23?

17  A.   Yes, sir.

18  Q.   All right.  Turn next to, please, Exhibit 25.

19  A.   Yes, sir.

20  Q.   You recognize that as a letter from Mr. Kelley to me dated

21  March 18, 2016, responding to my letter, which was Exhibit 24?

22  A.   Yes.

23  Q.   Okay.  And when you received this letter -- or strike

24  that.

25         Turn next to Exhibit 26.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                    85

1   A.   Yes, sir.

2   Q.   And do you recognize that as an email to you forwarding an

3   email from Mr. Kelley, Mr. Kelley's office, transmitting the

4   consolidated returns that have been marked as -- I think it's

5   series 27?

6   A.   Yes.

7   Q.   All right.  And did you understand from this that 27 were

8   the tax returns that the defendants claim to have filed?

9   A.   Yes.

10  Q.   Okay.  And once you had the first alleged returns, one set

11  for Kentucky Fuel, one set for James C. Justice Companies, and

12  then once you got the consolidated returns that were forwarded

13  with that email, Plaintiffs' Exhibit 26, what did you do?

14  A.   Prepared the schedules as to the differences in the

15  financial figures on those returns.

16  Q.   Okay.  Did the first alleged returns appear to be accurate

17  tax returns for either of the two companies?

18  A.   No.

19  Q.   Can you describe just generally -- I'm not asking you for

20  line by line, but what -- the types of differences that you

21  observed between these first alleged returns and then the

22  second set of consolidated returns that are the Exhibit 27

23  series?

24  A.   Well, the first set of returns, particularly for Kentucky

25  Fuel, were different from the evidence in this case, where the

WILLIAM G. BROWNLOW IV - DIRECT EXAM                86

1   Kentucky Fuel attorney had said that Kentucky Fuel does not

2   file separate returns, they filed consolidated returns.   So

3   they provided us a series of separate returns, which was at

4   odds with his previous testimony.

5   Q.   Okay.  And you mentioned you did a comparison.  Would you

6   look, please, at Exhibit 28.  And it's actually a series of 28a

7   through l.  Tell me when you have them.

8   A.   Yes.

9   Q.   Okay.  Just generally, just tell the Court, what are the

10  Exhibits 28a through l, just generally?

11  A.   They're comparisons of the first return and then the

12  second return in terms of just the account categories and the

13  dollar figures in those account categories on that particular

14  return.

15  Q.   All right.  I'm not going to ask you to go through every

16  one of them, but we'll look at a few examples.  Would you turn

17  please to Exhibit 28, 28g?

18  A.   Yes, sir.

19  Q.   Okay.  Just what is that?

20  A.   That -- excuse me -- that's a similar comparison for James

21  C. Justice Companies for 2008, based on the first return, and

22  then the second return.

23  Q.   And by "the first return," are you referring to what we've

24  referred to as the first alleged tax returns?

25  A.   That's correct.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                87

1  Q.   Okay.  And, for example, here, I have a question on one of

2  your terminology.  There's a top line there for "Total Assets"

3  and beneath that we have "Accounts Payable," "Notes Payable"

4  and "Other Current."  What is "Other Current?"

5  A.   Those would be other payments that are due within 12

6  months --

7  Q.   Okay.

8  A.   -- or other liabilities of some sort that are due within

9  12 months.

10  Q.   All right.  At the risk of pointing out the obvious, would

11  you, just using the "Other Current" as an example, just

12  describe for the Court the kind of comparison you did and what

13  you saw as the differences?

14  A.   Well, when you look at the returns, just starting with the

15  first heading, under Assets, Cash, there's a $21,000

16  difference.  On total assets there's a $8,540,000 difference.

17  Go down the list.  Other payables, for example, are decreased

18  by 167,966,000.  Other liabilities are increased by

19  175,954,000.  The first returns showed no gross sales.  The

20  second had 19 million in sales.  And the difference in income

21  is $14,894,000 loss in the first one and $4 million loss in the

22  second, a difference of 10,854,000.

23  Q.   All right.  Let's look at one more.  Exhibit 2i.  Can you

24  just illustrate again?  You don't have to pick out every one

25  but just the ones that you think are notable.

WILLIAM G. BROWNLOW IV - DIRECT EXAM                88

1   A.   Well, if you look at the difference in income under total

2   income, the difference is 443,000.  And under ordinary income,

3   the difference is 265,000.  So those are certainly large

4   figures.

5   Q.   Wait.  I'm sorry.  I may have lost you there.  You are on

6   Exhibit i now?

7   A.   I apologize.  I'm on h.

8   Q.   Okay.  I should have asked you to identify what Exhibit i

9   is.

10  A.   I'm sorry.  2009 is i.

11  Q.   For which company?

12  A.   For James C. Justice Companies.

13  Q.   Okay.

14  A.   The difference in cash, for example, between the first

15  return and the consolidated return is a million 258,000.  The

16  difference in total assets is 29,880,000.  The difference in

17  accounts payable is 46,165,000.  And the difference in income

18  is an increase of 38,892,000.

19  Q.   So what was it showing as the income in the first alleged

20  return of ordinary income?

21  A.   A loss of 35,030,000.

22  Q.   And what did that change to when you got the second

23  return?

24  A.   A profit of 38,892,000.

25  Q.   Let's look at just one more.  Those two have been by James

WILLIAM G. BROWNLOW IV - DIRECT EXAM            89

1  C. Justice Companies.  Look at Exhibit 281 and identify it for

2  us.

3  A.    That's a comparison of Kentucky Fuel Corporation, 2010.

4  And the difference, for example, cash goes up from 818,000 to

5  2,187,000, an increase of a million 369,000.  Other

6  liabilities, for example, go down 14,126,000.  Gross sales goes

7  up 4,977,000.  And ordinary income declines by 38,585,918.

8  Q.    All right.  I want to direct your attention briefly to

9  some issues relating to the NewLead transaction.  You need your

10  book there with Exhibit 14 in it.  Do you have it, sir?

11  A.    Yes, sir.

12  Q.    All right.  Based upon the NewLead related documents that

13  have been produced by the defendants, have you been able to

14  determine what the defendants contend is the value of the

15  Fivemile assets as evidenced by the NewLead transaction?

16  A.    Based on the limited information we have, I have been able

17  to total up what's -- what that information contains.

18  Q.    All right.  And is Exhibit 14 -- what is that?

19  A.    Exhibit 14 are the payments that are within those emails

20  that we've seen in that document of payments to Kentucky Fuel.

21  Q.    All right.  And the Footnote 1 there, you see that

22  referring to the payment amounts on very specific dates?

23  A.    Yes.

24  Q.    And what is the source of that information?

25  A.    Email confirmations included within their document

WILLIAM G. BROWNLOW IV - DIRECT EXAM          90

1    production.

2    Q.   Well, is that as set forth in Mr. Ball's declaration,

3    277-5?

4    A.   That's consistent with that, yes.

5    Q.   Okay.  And according to Mr. Ball's declaration, as you

6    have it outlined here, what was the total received by Kentucky

7    Fuel, according to Mr. Ball, for the NewLead transaction?

8    A.   8,552,876.

9    Q.   Okay.  Based upon your review, are you confident that that

10   is an accurate figure or do you have concerns or questions that

11   it may be more?

12   A.   I think it's an inaccurate figure.

13   Q.   All right.  Let me ask you this.  Look at Exhibit 13t.

14   A.   Yes, sir.

15   Q.   You have that.  All right.  I'm going to direct your

16   attention to page -- and what is 13t?

17   A.   The fifth amendment to the asset purchase agreement

18   between Williams Industries, Kentucky Fuel, James C. Justice

19   Companies, March 18th, 2013.

20   Q.   All right.  And turn, if you would, to the last page of

21   that exhibit, the very last page of the document.  Is it also

22   signed by NewLead?

23   A.   Yes.

24   Q.   Okay.  I'll direct your attention, sir, to fifth page of

25   that document.  And to put it in context, if you want to start

WILLIAM G. BROWNLOW IV - DIRECT EXAM                91

1   at -- look at the fourth page at the very bottom, the sentence

2   beginning, "Buyer shall be entitled to remove," and just read

3   that sentence into the record for us.

4   A.    "Buyer shall be entitled to remove and sell any and all

5   coal, and NewLead shall pay the following payments."

6   Q.    Okay.  And turn to the next page.  You see there where it

7   itemizes the payment that NewLead shall make to the seller?

8   A.    Yes.

9   Q.    And what did those -- and there's also payments to

10  Williams, correct?

11  A.    Correct.

12  Q.    And who is Williams?

13  A.    He's one of the participants in the NewLead deal.

14  Q.    What is the name of his company?  Do you know?

15  A.    Williams Industries.

16  Q.    And have you totaled up the payments required to be made

17  by this agreement to Kentucky Fuel by NewLead that are itemized

18  there?

19  A.    Yes.

20  Q.    And what do they total?

21  A.    $11 million.

22          MR. LUCAS:  Your Honor, that is all I have of

23  Mr. Brownlow at this time.

24          THE COURT:  Okay.  Fair enough.

25      Mr. Getty, your cross-examination, sir.  You are welcome

WILLIAM G. BROWNLOW IV - CROSS-EXAM                92

1    to remain seated if you are more comfortable.

2            MR. GETTY:  I think these books are not a blessing.

3                        CROSS-EXAMINATION

4    BY MR. GETTY:

5    Q.   Mr. Brownlow, are you an accountant?

6    A.   I have CPA certificates in Tennessee and Georgia, but I

7    have not practiced in a long time.

8    Q.   Okay.  And how long has it been you've not practiced?

9    A.   Since 1973.

10   Q.   '83, '93, '13.  So that would be 35 -- 35 years?

11   A.   Maybe 45.

12   Q.   45 years.  Okay.  And you were never -- you were never a

13   tax accountant or a tax preparer, were you?

14   A.   I was.

15   Q.   Where?

16   A.   In Atlanta with one of the Big 8 accounting firms.

17   Q.   Was that 45 years ago?

18   A.   Yes.

19   Q.   Okay.  So you don't know what the regs say currently, you

20   don't know what -- how companies with subsidiaries or LLCs deal

21   with consolidated returns?

22   A.   I actually have filed my own returns for the last 45

23   years.

24   Q.   That's not what I asked you.

25   A.   I have a reasonable idea how to file a return.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                    93

1    Q.    That's not what I asked you.  Do you know what the regs

2    provide for the filing of consolidated returns where there is a

3    consolidated return and subsidiaries?

4    A.    I'm not a tax expert.

5    Q.    Would it surprise you if I told you -- I mean, you've come

6    into this court and you have alleged and walked through and

7    even did a comparison between what was given to you first and

8    what was given to you second, right?  And the basis of that is

9    to show somehow that my client lied to you and gave you two

10   different kind of tax returns, right?

11   A.    Well, I think what I said was that the information on

12   those two forms were very different.

13   Q.    Were different.  Well, isn't it a fact -- have you

14   learned -- have you taken the step to go out and talk to an

15   expert to find out whether I'm correct that there are

16   discrepancies between what the accountants call the

17   consolidated return and the subsidiary return or what

18   they actually call in the industry the dummy tax return?  Have

19   you heard that phrase?

20   A.    Never heard that.

21   Q.    Never heard that phrase.  All right.  Let's just walk

22   through some of this.  Are you aware that members of a

23   consolidated group that are generally C corporations or LLCs

24   sometimes elect to be treated as corporations?

25   A.    I'm sorry, I didn't -- say that again.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                94

1   Q.   Are you aware that corporations -- C corporations or LLCs

2   sometimes elect, from a tax point of view, to be treated as a

3   corporate entity?  You would know that, wouldn't you?

4   A.   Yeah.

5   Q.   And you would acknowledge, would you not, that their books

6   and records are prepared on separate -- on a separate company

7   basis, right?

8   A.   They can be, certainly.

9   Q.   And you know that the Justice Companies is the holding

10  company -- or it was at the time, the holding company for

11  various subsidiaries like Kentucky Fuel Corporation, right?

12  A.   They did have subsidiaries.

13  Q.   Okay.  And you knew Kentucky Fuel Corporation at that time

14  was a subsidiary of the Justice Companies, didn't you?

15  A.   Yes.

16  Q.   Okay.  Did you make any effort to determine that when

17  consolidated returns are prepared, that they use digital tax

18  preparation services in which they enter each entity's data on

19  an as-if separate company basis?  Did you know that?

20  A.   I honestly didn't know how they prepared the tax return.

21  Q.   Okay.  And do you know when -- that they then create an

22  eliminations entity to enter all the eliminating and

23  consolidating entries?  Did you know that?

24  A.   I certainly did know they did.

25  Q.   Pardon me?

WILLIAM G. BROWNLOW IV - CROSS-EXAM                    95

1    A.    Yes, I'm aware there are elimination entities.

2    Q.    As a CPA, or let's call it a former practicing CPA, 45

3    years ago, you knew that, right?

4    A.    I know it now, too.

5    Q.    You know it now.  And I take it you are aware that these

6    entries -- would you agree with me that these entries are never

7    recorded on the books of each member, because they generally

8    include only one side of an entry for one entity and the other

9    side of the entry for another entity in order to eliminate the

10   effect of the adjustment on a consolidated return?

11   A.    Eliminations has pluses and minuses, that's correct.

12   Q.    Right.  And these eliminations can include balance sheet

13   items on a parent company, like investment in the subsidiary,

14   right?

15   A.    It's possible.

16   Q.    And the corresponding equity section of the particular

17   subsidiary or intracompany loans, et cetera, would be reflected

18   on the other return, right, on the subsidiary return?

19   A.    Say that again.

20   Q.    Well, I said theses entries -- the corresponding entry

21   would be reflected differently on the return, separate return

22   by the subsidiary?

23   A.    Differently from what?

24   Q.    There'd be different numbers because of the eliminations,

25   right?

1   A.    Well, you'll have a debit and a credit and they'll

2   balance.   The debits and credits should balance.

3   Q.    All right.   Isn't it an example that sales or expenses

4   between entities are frequently eliminated?   Let me give you an

5   example.

6        If Parent A receives a management -- receives management

7   fee income from Subsidiary B, a consolidated elimination would

8   zero out the income and expense reflected between the two in

9   order to arrive at the consolidated taxable income, would it

10  not?

11  A.    That's correct.

12  Q.    And these entries are not posted on the individual

13  company's books.   They're posted on the consolidated return,

14  right?

15  A.    Okay.

16  Q.    Okay.   And just to sort of try and wrap this up, the

17  printout of a separate member of a consolidated group tax

18  return would clearly not match the amounts included in the

19  consolidated return because of these eliminations, wouldn't it?

20  A.    Assuming there are eliminations.

21  Q.    And, however, though, the separate company return may be

22  necessary to file because of state or local law.   You know, you

23  file tax returns for local government, like Lexington.   I have

24  to file tax returns for intangible property taxes, for school

25  taxes, for, you know, other purposes, for state taxes in

1  Kentucky, right?

2  A.   I honestly don't know.

3  Q.   Okay.  You honestly don't know.  And if I told you that

4  the regs -- that it's understood by anybody who really studies

5  or knows this that sometimes the separate company return -- may

6  be necessary to file separate state or local return where

7  consolidation is either not allowed or not required.  And in

8  that instance, did you ever know, before you came in this

9  courtroom, that when those separate returns are prepared before

10  the eliminations occur, that that gives rise to what tax

11  accountants, like the expert I conferred with, says are called

12  dummy tax returns.  Have you heard that phrase "dummy tax

13  returns?"

14  A.   I still haven't heard it.

15  Q.   Well, other people have.  And the bottom line here is, you

16  went through this meaningless comparison of these two different

17  sets of returns because you didn't know anything about

18  consolidated tax returns and eliminations.  You didn't get up

19  to speed with respect to these regs and this procedure.  You

20  didn't even know what in the tax parlance a dummy return is,

21  did you?

22  A.   Actually, what I knew was that the addresses on those

23  returns were an office space they never occupied during that

24  time.

25  Q.   Well, does it surprise you now that what I have just

WILLIAM G. BROWNLOW IV - CROSS-EXAM                98

1   walked you through, that you made -- have you had a new

2   revelation now?  Do you understand now that you -- that you

3   recklessly accused my client of filing false tax returns when

4   the truth of the matter was you weren't diligent enough or up

5   to speed enough to consult with a tax return specialist like I

6   did who would explain the difference to you, did you?  Did you

7   ever talk to an expert?  No.  Did Mr. Lucas ever talk to an

8   expert before he alleged it?

9          THE COURT:  Mr. Getty, you need to limit the

10  questions to the personal knowledge of the witness.

11         MR. GETTY:  I think the point has been made.

12         THE COURT:  And he hasn't answered the question.

13  Mr. Getty answered it.

14         THE WITNESS:  Was there a question in there?  I'm

15  sorry.

16  BY MR. GETTY:

17  Q.   Did you ever consult with any tax specialist before you

18  made these allegations against my client?

19  A.   No.

20  Q.   Do you understand, given what I just walked you through,

21  that if you would have done so, that you would not have made

22  those allegations as recklessly as you did?

23  A.   I don't know whether I can believe that or not.

24  Q.   Given what I have told you, Mr. Brownlow, are you prepared

25  to offer an apology to Mr. Justice and the rest of the

1   representatives of my client?

2   A.    No.

3   Q.    All right.  Let's go into some other stuff.  I just

4   thought it would be appropriate to take that up first.  Thank

5   you.

6         You said that at the outset you dealt with -- on this

7   property, you dealt with, is it Ray Vaughn Wolford?

8   A.    He is the individual to whom I loaned some money, very

9   early on.

10  Q.    Okay.  That was back in 19 -- or 2002, 2003?

11  A.    2005.

12  Q.    2005, okay.  And even before 2005, you had these

13  properties.  And you hadn't done anything between --

14  A.    Wait.  That's not true.

15  Q.    Did you ever mine these properties?

16  A.    I didn't have these properties prior to 2005.

17  Q.    Okay.  Well, once you got them.  Since the time you got

18  them, have you ever made any efforts to mine them yourself?

19  A.    I actually owned the permit and the leases between the

20  fourth week of September and the 5th of October in 2005.

21  Q.    Okay.

22  A.    I have owned them for approximately two weeks on my own.

23  Q.    Okay.  Did you have a company called Fivemile in 2002,

24  2003?

25  A.    I did not.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                 100

1    Q.   Did Mr. Doug Terry work for you at some point in time?

2    A.   Never.

3    Q.   Never worked for you at all?

4    A.   Never.

5    Q.   Was never the president of Fivemile?

6    A.   He had a company named Fivemile Energy, but he never

7    worked for me.

8    Q.   Okay.  There was another company named Fivemile Energy

9    that Mr. Terry was the president of, had nothing to do with

10   you?

11   A.   Not prior to September of 2005.

12   Q.   Okay.  After September of 2005, have you had any

13   relationship with Doug Terry?

14   A.   No.

15   Q.   Has he ever worked for you since then?

16   A.   No.

17   Q.   You ever had a company with him?

18   A.   No.

19   Q.   You've approved, authorized him to try and mine some seams

20   of this coal, haven't you?

21   A.   I'm written him several letters.  And I don't know that

22   that is a full authorization, but I have written him several

23   letters regarding this property.

24   Q.   We'll put those in the record at some point later on.  But

25   in terms of the property itself, Mr. Terry hasn't mined

WILLIAM G. BROWNLOW IV - CROSS-EXAM                    101

1   anything yet, has he?

2   A.   Not that I know of.

3   Q.   And let's go back.  Did Mr. Ravon Wolford actually mine

4   the property or try to mine it?

5   A.   I have no idea.

6   Q.   You loaned him money and he was supposed to pay that money

7   back?

8   A.   That's correct.

9   Q.   When did you loan it?

10  A.   January of 2005.

11  Q.   '5.  And when did he default?

12  A.   In July of 2005.

13  Q.   Six months?

14  A.   Yes, sir.

15  Q.   Okay.  Did he ever put any equipment on the property?

16  A.   I don't know.

17  Q.   Did you ever go up and find out?

18  A.   No.

19  Q.   You just know that you loaned him money, he didn't pay you

20  back, and then he was gone, right?

21  A.   Well, it went into foreclosure.

22  Q.   You foreclosed on it and took the permits and other --

23  what you have taken, the security interest on it was, I think,

24  you said the permit?

25  A.   And the leases.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                102

1  Q.    And the leases.  You took them back, right?

2  A.    I never took them back.  I never had them before.  I just

3  had them as collateral for the loan.

4  Q.    Okay.  And after that there have been a number of other

5  people who have looked at the Fivemile property and the Deep

6  Wood property, and they have either walked away from the

7  property or decided not to mine it, right?

8  A.    There have been quite a number of people, it's my

9  understanding, that have looked at it and want to mine it.

10 Q.    And they didn't.  Not a one of them have mined it, except

11 for the Justices have tried?

12 A.    I don't know if the Justices have ever tried.

13 Q.    Well, they tried to mine the Strong Brothers that is

14 adjacent.

15 A.    The Strong Brothers is about three miles down the line,

16 down the road.  It's on the other side of the river.

17 Q.    Right.

18 A.    And it's completely different and separate.

19 Q.    It's called the Delta permit, isn't it?

20 A.    It was always the Strong Brothers permit to me.

21 Q.    Okay.  And their attempt to mine that, they tried, but

22 they shut that down, reclaimed it, and never mined again, did

23 they?

24 A.    Well, they actually mined it in 2005, and then they walked

25 away from it and apparently didn't pay the royalties on it.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                103

1   And that led to me going back in on it in 2010 to try to get

2   them a lease so they could get back up there and resolve the

3   cessation order they had from the reclamation they failed to do

4   five years earlier.

5   Q.   You seem to be focused on, you know, not the coal or the

6   quality of the coal, but who they didn't pay and who you had to

7   pay and how you protected these leases.  Is that a major --

8   major point of your testimony here?

9   A.   It seems to be quite a theme with the Justices.

10  Q.   Okay.  And with respect to the type of coal in that

11  general area, would you agree with me that the coal in this

12  area is pretty uniform from the Skyline on down to the Hazard

13  7, 8, 9?

14  A.   I'm not a coal expert, so I don't know about that.

15  Q.   Well, if Mr. Justice says -- or others say it's pretty

16  uniform in that general area and it's a poor quality, do you

17  have anything to dispute that?

18  A.   Well, the evidence I have to dispute that would be that

19  there seemed to be a number of people willing to put real money

20  into buying the opportunity to mine that coal, which suggests

21  to me that there must be something of value there if they are

22  willing to put real money up to mine.

23  Q.   Well, let's see who did that.  Addington did, and they

24  never mined a lump of coal, did they?

25  A.   I don't know about that.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                104

1   Q.   They had this property -- one of these properties in that

2   area, didn't they?

3   A.   I have no idea.

4   Q.   And let's see who else.  We talked about the Justices and

5   the Strong Brothers.  Do you know who Jeff Hoops is, Revelation

6   Coal?

7   A.   I've met Jeff Hoops.

8   Q.   You know who he is?

9   A.   Generally.

10  Q.   He's one of the people in the mining industry, right?

11  A.   I don't know that.  I just met him.

12  Q.   And he looked at this property and he tried to mine it and

13  he walked away from it, didn't he?

14  A.   I don't know that.

15  Q.   Well, can you tell me anybody in the world that ever

16  attempted to mine this coal or made an effort at it other than

17  the Justices in this general area?

18  A.   Well, Williams Industries said they wanted to mine it.

19  Cypress Camon said they wanted to mine it.  NewLead Industries

20  said they wanted to mine it.  And now Doug Terry says he wants

21  to mine it.

22  Q.   And he hasn't mined a lump of coal yet, has he, Doug

23  Terry?

24  A.   His business, called GSI, my understanding is right on the

25  verge of mining coal.  Whether he has or not, I don't know.

WILLIAM G. BROWNLOW IV - CROSS-EXAM              105

1   Q.   He hasn't mined an ounce of coal yet.  And if you go back,

2   you mentioned three people.  Williams Industries, have they

3   mined any coal?  They didn't, did they?

4   A.   Not to my knowledge.

5   Q.   NewLead, did they mine any coal?  They didn't, did it --

6   did they?

7   A.   Not to my knowledge.

8   Q.   And this Camon company, which was owned by some guy in the

9   Greek Islands, did they ever mine a lump of coal?  They didn't,

10  did they?

11       MR. LUCAS:  Your Honor, I'm going to object to

12  basically counsel testifying with these preambles before his

13  question.

14       MR. GETTY:  It's important, Judge, to prove -- you

15  know, what Mr. Brownlow wants here is some sort of bonus or

16  windfall.  I mean, nobody has mined these properties because

17  they are marginal at best.  The only proof they got here in

18  this case is they got some guy, who is now dead, to go out --

19       THE COURT:  I'll allow you to argue in the future the

20  issues.  But the question is proper.  I'll allow it.  I'll

21  overrule the objection.

22       Go ahead, Mr. Getty.

23       MR. GETTY:  Thank you, Judge.  I appreciate it.

24  BY MR. GETTY:

25  Q.   So all the people, that long list I gave you, Ravon

WILLIAM G. BROWNLOW IV - CROSS-EXAM          106

1  Wolford, Addington, NewLead, Williams, Camon whatever it is,

2  and Jeff Hoops, a credible miner, not any one of them ever

3  mined a lump of coal from these properties, did they?

4  A.   Well, I've answered all of those people so far.

5  Q.   And the answer is no, right?

6  A.   Well, the ones I know, the answer is no.  I don't know

7  some of them.

8  Q.   Okay.  Can you point me to anybody else that made any

9  effort to mine this other than Mr. Terry hopes maybe he'll be

10 able to get some small amount of coal out of this?

11 A.   I've answered that.

12 Q.   Pardon me?

13 A.   I have answered your question.

14 Q.   Okay.  When you said that Justice first came to you -- I

15 tried to take real complete notes.  Sometimes I'm not that

16 good.  And to be honest with you, sometimes I take a note and I

17 can't read it afterward.  But this one I read, and I wrote it

18 carefully.  When you were asked what representations, what

19 statements were made by the Justices at the very outset that

20 they were going to mine the coal -- Mr. Lucas asked you that

21 question, and you said, I don't recall them saying they would

22 mine it.  Do you stand by what you said?

23 A.   That is what I said earlier today.

24 Q.   Okay.  And that's truthful?

25 A.   Back in 2005, that's correct.

1  Q.   Okay.  And by the way, later on -- let's just sort of jump

2  forward.  You said you went up to The Greenbrier.  I'm sorry to

3  go out of sequence, but I think these two things tie together.

4  You went up to The Greenbrier and you had a dinner meeting, and

5  then you had another meeting that lasted from the morning until

6  about noon, right?

7  A.   Correct.

8  Q.   And that's the agreement -- that's the session where you

9  basically ended up agreeing to what iteration of documents came

10  about being the fourth amendment here that's at issue, right,

11  the document --

12  A.   The document that came out of these meetings is the fourth

13  amendment, yes.

14  Q.   Is the fourth amendment.  That was the result.  And it's

15  your testimony that during that meeting somebody at Justice

16  said they're going to mine the coal?

17  A.   Absolutely.

18  Q.   Okay.  Can you tell me who it was?

19  A.   Yes.

20  Q.   Who was it?

21  A.   Steve Ball and Marc Merritt.

22  Q.   Steve Ball and Marc Merritt.  Was anybody else with you?

23  A.   Yes.

24  Q.   Who?

25  A.   Culver Schmid.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                    108

1   Q.   Culver Schmid.  Where is Culver Schmid?  Is he here today?

2   A.   Not today.

3   Q.   Is he coming?

4   A.   Yes, sir.

5   Q.   Oh, okay.  You were represented by counsel.  You knew at

6   that time that this was an important issue or important

7   representation, right?

8   A.   Absolutely.

9   Q.   You would never have entered into that agreement unless

10  you had that kind of representation, right?

11  A.   If I hadn't had a lawyer, I wouldn't have done it?  Is

12  that what you're saying?

13  Q.   No.  If the Justices purportedly hadn't said yes, we're

14  going to mine this coal, you would have walked out of there and

15  said, I'm not doing a deal with you, correct?

16  A.   Correct.

17  Q.   You wouldn't have done the deal.  If that was important

18  and you had a lawyer right there arm in arm with you, what

19  prevented you or Culver Schmid from ever writing a letter to

20  them and saying, we had this meeting at The Greenbrier and you

21  all represented to me that you intend to mine this coal, it was

22  on such and such a date in our meeting at The Greenbrier and I

23  want to confirm it.  You never wrote that letter, did you, sir?

24  A.   Actually, we have entered into the fourth amendment, which

25  memorialized our meeting and our agreement.

WILLIAM G. BROWNLOW IV - CROSS-EXAM          109

1   Q.   There's no representation whatsoever of that statement in

2   the agreement.  Did you ever write that letter that I just

3   asked you about?  You did not, did you?

4   A.   Well, the fourth amendment actually has a covenant to

5   mine.

6           THE COURT:  Let me hear the objection.

7           MR. LUCAS:  Your Honor, that's an example of my

8   objection to form.  He makes the statement --

9           THE COURT:  That question needs to be rephrased,

10  Mr. Getty.

11          MR. GETTY:  I will.

12          THE COURT:  Because you actually asked three

13  questions in one.  You do need to rephrase that one.

14          MR. GETTY:  I understand.  I do that sometimes, get

15  carried away.

16  BY MR. GETTY:

17  Q.   You never wrote such a letter confirming such

18  representation, did you?

19  A.   There was no need for a letter because I had the fourth

20  amendment.

21  Q.   Is that a no, I never wrote the letter?

22  A.   I would have to go back and look in my file to see what

23  correspondence there was because I was relying on the fourth

24  amendment.

25  Q.   We find no such letter.  Is it your statement here that

WILLIAM G. BROWNLOW IV - CROSS-EXAM                110

1    you never wrote that letter, to your knowledge?

2    A.    I will have to look.

3    Q.    And there's no such letter from Mr. Schmid either.  Is it

4    your understanding that Mr. Schmid never confirmed that in

5    writing either?

6    A.    I would have to ask him.

7    Q.    Oh, one thing I forgot to ask you.  You talked about that

8    certain third parties had bought entry access.  You know who

9    that was, don't you?

10   A.    The rumor I heard was that it was Mr. Wolford.

11   Q.    Pardon me?

12   A.    I had heard it was Ravon Wolford, but I never knew exactly

13   who it was.

14   Q.    You didn't know it was Elmer Whittaker and L.D. Gorman?

15   A.    No, I didn't know that.

16   Q.    How much experience in mining coal do you believe

17   Mr. Whitaker and Mr. Gorman had?  Would it be fair to say

18   decades and decades?

19   A.    I don't know those gentlemen.

20   Q.    You don't know who L.D. Gorman is.  If I represented to

21   you he's from Hazard and he has mined throughout Eastern

22   Kentucky, you didn't know that?

23   A.    I've heard his name, but I've never met him.

24   Q.    Well, I'll represent to you that that's my understanding.

25   And I'll also represent to you that after they bought that

WILLIAM G. BROWNLOW IV - CROSS-EXAM          111

1   access, they never mined a lump of coal either.  Did you know

2   that?

3   A.   Well, they actually got turned down at the Department of

4   Natural Resources level in Kentucky.  And the permits and the

5   lease were married back together in Kentucky Fuel's name.  And

6   that happened on the 25th of November, 2011.

7   Q.   So you're sitting here under oath and you are --

8   A.   Excuse me, 2010.

9   Q.   Excuse me.  I didn't mean to interrupt you.  You're

10  sitting here and you're testifying under oath as to how

11  valuable this property is that my client didn't mine.  And

12  sitting here today, though, you can't tell me anybody that

13  either tried or successfully tried to mine any of this coal,

14  can you?

15  A.   Well, part of the problem is that the Justices have had it

16  tied up for the 13 years I've been involved in it and haven't

17  done anything with it.

18  Q.   Did you ever go and find a third party and go to the

19  Justices and say, these guys will mine it, step aside?  Never

20  did that, did you?

21  A.   No.

22  Q.   And you think there's -- there's some reason that this is

23  so valuable, nobody else wants to mine it?  Usually something

24  that is valuable, people want, right?

25  A.   You've asked that question before, and I'll be glad to

WILLIAM G. BROWNLOW IV - CROSS-EXAM          112

1    answer it again.  And the answer is the same, and that is,

2    people have paid real money to have an opportunity to mine this

3    coal.  And I'll be glad to give you the names again if you need

4    them.

5    Q.   And once they analyzed it, they decided it wasn't worth

6    it, right?

7    A.   Well, apparently it was worth it, because you all are

8    still holding their money.

9    Q.   I don't know what hearsay that is, but I'll just go on to

10   something else to try and save time.

11       The bottom line here is that nobody else has mined this

12   property throughout this period of time, have they?

13   A.   While it's been under your control, no, nobody has.

14   Q.   If you would look at exhibit -- Plaintiffs' Exhibit 1a.

15   And also take a look at -- sort of make a marker, if you would,

16   and I've got something here you can flag it with, if you want.

17           THE COURT:  If the witness needs it, you can pass it

18   up to the court security officer.

19       You can take that up, Roger.  Leave it up there if you

20   want.

21   BY MR. GETTY:

22   Q.   Flag 8, Exhibit 8.  This is Plaintiffs' 8, not -- this is

23   Defendants'.

24           MR. GETTY:  Okay.  We probably need to pass our books

25   out at this time because I'm going to use some of my exhibits.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                113

1        THE COURT:  Okay.  That's fine.  That's fine.  Sure.

2   Have these exhibits been provided to the plaintiffs?

3        MR. GETTY:  Yes, sir.

4        MR. LUCAS:  Which exhibits are you referring to of

5   yours?

6        MR. GETTY:  8.

7        MR. LUCAS:  Your Exhibit 8?

8        MR. GETTY:  Yes, sir.

9        THE COURT:  I'll take those, Roger.  I think those

10  are mine.

11       MS. BROWN:  John, do you want a set?

12       MR. GETTY:  He's got a set, I think.

13       MR. LUCAS:  Your Honor --

14       THE COURT:  Yes.

15       MR. LUCAS:  -- I have an objection to this exhibit.

16  It's one of the many exhibits that have never been identified

17  or produced to us in the litigation at any time until we got it

18  just, I think, on December 3rd, last week.

19       THE COURT:  Well, it hasn't -- there's not been a

20  request to admit it into evidence.  There hasn't been a

21  question based on the exhibit.  I'll note that objection.  Let

22  me hear where the testimony is going first.

23  BY MR. GETTY:

24  Q.   Mr. Brownlow, take a look at the fourth amendment, please.

25  It's Plaintiffs' -- your Exhibit 1a.

WILLIAM G. BROWNLOW IV - CROSS-EXAM          114

1   A.    Yes, sir.

2   Q.    Okay.  And this is the document you signed as a result of

3   that meeting in The Greenbrier, right?

4   A.    Yes.

5   Q.    Let's just sort of walk through it.  As you go through it,

6   it basically talks in "Recitals" about -- paragraph 1, that New

7   London "owns all the outstanding issued membership interest in

8   Deep Wood and all the outstanding issued capital stock."  And

9   then it says, "Deep Wood leased various properties pursuant to

10  separate lease agreements," and "Fivemile leased various

11  properties," right?  Does that summarize the "Recitals" on page

12  1 pretty well?

13  A.    Okay.

14  Q.    You agree?

15  A.    If that's what it says.

16  Q.    Okay.  And then if you flip over to the top of the page of

17  page 2, it says, the purpose of the agreement is Kentucky Fuel

18  agrees to assign to your entity all its right, title, and

19  interest in the Deep Wood leases and Deep Wood permit.  Had

20  Kentucky Fuel -- I take it Kentucky Fuel had previously looked

21  at the Deep Wood property because they had the permits and the

22  leases at that point, right?

23  A.    Correct.

24  Q.    And what were they doing here?  They were giving it back

25  to you, weren't they?

WILLIAM G. BROWNLOW IV - CROSS-EXAM                115

1   A.    Correct.

2   Q.    They didn't want that property anymore?

3   A.    That's correct.

4   Q.    And they had looked at it and they had evaluated it, and

5   they had made a determination that the coal was marginal and

6   you couldn't economically mine it, could you?

7   A.    I don't know what their evaluation was.

8   Q.    Well, let's not argue about their evaluation.  They gave

9   it back to you, they didn't want it, right?

10  A.    As part of this agreement, it was returned.

11  Q.    Have you taken the first step yet of mining the Deep Wood

12  permits or leases?

13  A.    Actually, immediately after it came back to me I turned

14  around and sold it to Jeff Hoops.

15  Q.    Okay.  And Jeff Hoops looked at it, and he didn't mine it

16  either?

17  A.    I honestly don't know.  He paid me real money for it.  But

18  I don't know what he did with it.

19  Q.    Let's see now.  You got real money from Mr. Justice's

20  company, and he didn't mine it.  And you said Jeff Hoops, he

21  paid you real money for it, too, and he didn't mine it.  So is

22  that two people you duped on the Deep Wood leases?

23  A.    I don't think so.

24  Q.    Going -- walking down, it says, Fivemile wishes to assign

25  to Kentucky Fuel the Fivemile Energy Leases, and it talks about

WILLIAM G. BROWNLOW IV - CROSS-EXAM                116

1   a guaranty, right?  And then the assignment of the Deep Wood,

2   there's a paragraph 2 where formally there is an assignment of

3   the Deep Wood leases and permits.  And then there's an

4   assignment in paragraph 4 of Fivemile.  And then there's a

5   purchase price.  It says, the payment to New London of a

6   royalty for the first 250,000 tons in an amount equal to

7   whatever is greater, 2 percent of the average monthly selling

8   price of each and every ton of 2,000 pounds, or $2 per ton of

9   2,000 pounds of coal mined.  So 2 percent of whatever you can

10  sell it to somebody, right, whatever the market brings,

11  correct?

12  A.    Correct.

13  Q.    Or $2 per ton, whichever is greater?

14  A.    That's correct, on the first 250,000 tons.

15  Q.    Yes.  And then later on, part of what happened here in

16  this instance was -- when was your original -- your original

17  agreement with Justice entered into?  This is 2010.  Was the

18  first one in 2005?

19  A.    Yes, sir.

20  Q.    So it'd been five years where you had been getting paid

21  under those arrangements, right?

22  A.    Well, I never received any money.

23  Q.    Okay.  But you had an arrangement with them?

24  A.    It was part of the original assignment.

25  Q.    In that five years they never mined either of those

WILLIAM G. BROWNLOW IV - CROSS-EXAM          117

1  properties?

2  A.    Correct.

3  Q.    Okay.  And here, not once but twice in paragraph (b) and

4  paragraph (c), you make reference to the phrase "Average

5  Monthly Selling Price," right?  So you contemplated that you

6  would get a percentage of what was sold, right?

7  A.    That's the way it is written, sir.

8  Q.    And if it didn't get sold, you knew you wouldn't get

9  anything, right?

10  A.    Under that part of the agreement, that's correct.

11  Q.    And then down in C, it talks about the Strong Brothers,

12  that New London -- payment of New London for the first 2,050 --

13  250,000 tons of coal tonnage using Fivemile leases but not to

14  include coal tonnage mined from the Strong Brothers property.

15  That was separate.  They were doing -- they were trying to do

16  something over there across the river with Strong Brothers,

17  right, Justices were?

18  A.    Correct.

19  Q.    And they walked away from that one, too, didn't they?

20  A.    I don't know exactly what happened.

21  Q.    Well, I think we talked about they did mine some and then

22  they shut it down and reclaimed it and never went back.

23      Down here it says, after the completion of mining the

24  first 250 in paragraph (d), it says, payment to New London in

25  an amount equal to the greater of a percentage tonnage royalty

1  of 2 percent of the average monthly selling price or $1 per ton

2  per 2,000 pounds of coal."

3       So on the first 2,050 (sic) if they ever mined it, you get

4  $2 minimum, right?  After the first 250, it's one, $1?

5  A.    That's right.

6  Q.    Okay.  But let's see now.  If coal sold -- I'm not great

7  with math.  So I might need some help on this.  If you sold

8  coal for $30 a ton, and you're calculating getting paid at

9  2 percent of the sale price, I think that comes out to like 60

10 cents.  Am I right?

11 A.    Yes.

12 Q.    Okay.  But if you sold a ton of coal, you at least got the

13 $1, right?

14 A.    Correct.

15 Q.    So the $1 was so that you'd be at least guaranteed $1 if

16 the price of coal wasn't sufficient to get the 2 percent that

17 was comparable or greater, right?

18 A.    Correct.

19 Q.    Okay.  And you knew when you entered into this that it was

20 contemplated that you wouldn't get anything unless the coal was

21 sold, right?

22 A.    That's what these paragraphs deal with.

23 Q.    Yeah.  And it says, "average monthly selling price."  That

24 doesn't say average amount of coal tonnage Jay Justice's

25 Company digs out of the ground, sits there and stockpiles it,

WILLIAM G. BROWNLOW IV - CROSS-EXAM          119

1  even though it cost millions of dollars to build the roads, you

2  know, put the equipment in, and not be able to sell it, right?

3  A.   I didn't understand the question.

4  Q.   You never contemplated that Jay Justice would have any

5  obligation to you or Justice Companies would have any

6  obligation to you to pay you just to mine coal and put it on

7  the ground and never sell it, did you?

8  A.   He promised to mine -- his company promised to mine the

9  coal.

10  Q.   Did he ever promise to mine coal and not sell it?  This

11  says "average monthly selling price," doesn't it?

12  A.   I think the entire -- you have to read the agreement as an

13  entire agreement.

14  Q.   And the entire agreement is very clear, based on these

15  paragraphs, isn't it, sir, that it was contemplated that you

16  wouldn't get anything unless you could sell the coal, right?

17  A.   I don't think that's what it says.

18  Q.   You don't think it says average monthly selling price of

19  either 2 percent or $2 or $1?

20  A.   I think it's an entire agreement.  I don't think it's a

21  one-paragraph agreement.

22  Q.   Can you show me where it says in this agreement --

23          THE COURT:  You need to let him finish his answer,

24  Mr. Getty.

25          MR. GETTY:  I'm sorry.

WILLIAM G. BROWNLOW IV - CROSS-EXAM          120

1   BY MR. GETTY:

2   Q.   Can you show me anywhere in this agreement where it says

3   the Justices have to mine the coal, not sell it, just stockpile

4   it, to pay you anything?  It doesn't say that, does it?

5   A.   That specific language is not in the agreement.

6   Q.   And over on page 4 you wanted to change the recoupment

7   because up until a certain point in time the minimums that

8   would be paid to you would be recoupable against actual mined

9   coal, right?

10  A.   There had been no minimums paid in the prior agreement.

11  Q.   Pardon me?

12  A.   There had been no minimums paid in the 2005 agreement.

13  Q.   And what you -- you wanted a clause that set out through a

14  certain point in time after December 1, 2013, three years

15  later, the minimum royalty would not be credited against future

16  tonnage, right?

17  A.   Correct.

18  Q.   You would get it, and it didn't have to be credited.

19  You'd keep it, right?

20  A.   The agreement -- I mean, I'll be glad to read it to you

21  but that is what it says.

22  Q.   Well, previously, prior to that 2013 date, if you were

23  paid a minimum royalty, an annual minimum royalty, and they

24  actually did mine coal, they didn't have to pay you earned

25  royalties until that minimum was exhausted, right?

WILLIAM G. BROWNLOW IV - CROSS-EXAM          121

1   A.    That's correct.  It was an incentive to get them to mine

2   the coal.

3   Q.    Exactly.  And then what happened here was after this date

4   that you all put in the agreement, 2013, that if they didn't --

5   if they -- if they didn't mine the coal, the recoup -- the

6   minimums wouldn't accumulate or be recoupable; they'd pay it

7   and you'd keep it whether they mined or not, right?

8   A.    That's what it says.

9   Q.    That's what it says.  And the reason you wanted that was

10  because you knew, yourself, they hadn't mined this property and

11  they weren't likely to mine this property?  You wanted to get

12  that $75,000 a year and put it in your pocket and keep it in

13  your pocket, didn't you?  You didn't want to give it back in

14  the form of recoupable --

15          THE COURT:  Mr. Getty, one question at a time.

16  BY MR. GETTY:

17  Q.    The reason you put that clause in is because you wanted to

18  get that 75,000 and put it in your pocket and keep it?  You

19  didn't want it to be recoupable, did you?

20  A.    That's at least three questions right there.

21          THE COURT:  Okay.  We need to have an efficient

22  presentation of the evidence, Mr. Getty.

23          MR. GETTY:  Okay.

24          THE COURT:  One question at a time.

25  BY MR. GETTY:

WILLIAM G. BROWNLOW IV - CROSS-EXAM                122

1   Q.    The reason you wanted that change was because you wanted

2   to keep and not have it to be recoupable, the $75,000 annual

3   minimum, right?

4   A.    My preference would be to have it non-recoupable, yes.

5   Q.    And that's what you did?

6   A.    That's what we agreed to, mutually.

7   Q.    And that clause -- that change in that clause meant that

8   this coal was never mined and they paid you that minimum annual

9   royalty; you got to keep it?

10  A.    That's what the English says, yes.

11  Q.    And then if you flip over a couple of more pages on page

12  4, it basically says the same thing.  It says, after

13  December 2013 minimum annual royalty shall not be credited.

14  And what I'm interested in is the -- the clause on the bottom.

15  You start at the bottom of page 5 there and come over to the

16  top of page 6.  Can you -- can you start there at the bottom of

17  5, please?  Take a look at that.

18  A.    Okay.

19  Q.    And if you look at paragraph 10 -- there's reference,

20  first of all, in paragraph 9 -- to just wrap that up, it refers

21  to Kentucky Fuel agrees to provide Fivemile all payments for

22  rent or any other payments due under the lease with Strong

23  Brothers within seven days of any request.  And then down below

24  it talks about covenant to mine.  Mr. Schmid wrote this

25  document, didn't he?

1   A.    It was a fully negotiated document.

2   Q.    Who drafted it?  He did, didn't he?

3   A.    I think it was mutually drafted.

4   Q.    I've seen correspondence where he sent a draft.  Do you

5   dispute that?

6   A.    I think it was blacklined backwards and forwards between

7   both parties.

8   Q.    All right.  The initial draft was done by Mr. Schmid, was

9   it not?

10  A.    At Mr. Ball's request, yes.

11  Q.    Okay.  And this covenant to mine -- you know what a

12  covenant to mine is, don't you?

13  A.    I know what this one is.

14  Q.    What'd you understand it to be?

15  A.    That they would mine the coal.

16  Q.    It says, In consideration of NL, New London, Deep Wood,

17  Fivemile, Fivemile Energy in agreeing to the terms, ""Kentucky

18  Fuel covenants to use commercial and reasonable good faith and

19  best efforts to maximize, within the constraints of industry

20  standards the amount of coal extracted from these properties."

21  You know what reasonable and good faith and best efforts means,

22  right?

23  A.    I have an idea.

24  Q.    You understand it means you've got to make an effort, a

25  reasonable effort to do something, right?

WILLIAM G. BROWNLOW IV - CROSS-EXAM                124

1   A.    I would assume so.

2   Q.    But if it makes no sense to do it, you don't have to do

3   it, do you?

4   A.    I'm unclear on your definition of "no sense."

5   Q.    All right.  Well, here's the key point.  This clause says,

6   "best efforts to maximize within the constraints of industry

7   standards the amount of coal extracted from these properties."

8   What did you understand "within the constraints of industry

9   standards" to mean?

10  A.    What that meant to me was that when you have a bed of

11  coal, there's a certain percentage of that coal that you just

12  simply cannot get to market, that it falls by the wayside or

13  it's inaccessible or in some way you can't get it.  And

14  therefore when you have a bed and know how much is there, there

15  is some small percentage of that that you cannot get in a truck

16  or on the train or to the market.  And so that would be the

17  spillage or wastage or whatever they call it.

18  Q.    Doesn't that also mean if the bulk of your coal can't be

19  mined and sold for a profit or economically, you don't have to

20  mine it?

21  A.    That was not what we talked about.  What we talked about

22  was this spillage.

23  Q.    Isn't what you just said about spillage counterintuitive?

24            THE COURT:  Do you have an objection, Mr. Lucas?

25            MR. LUCAS:  Yes, Your Honor.  I want to make sure I

WILLIAM G. BROWNLOW IV - CROSS-EXAM                 125

1   don't sit here and by acquiescence try an issue by agreement or

2   by not objecting.  I think we're very close to trying to retry

3   liability in this case.  It's already been determined that

4   there was a breach, that they didn't mine the coal and never

5   had any intention of mining the coal, and that was the breach

6   of the contract, so that liability is established.  But that

7   seems to be what all of these questions are going to, and I

8   object to them on relevancy grounds for that reason.

9           MR. GETTY:  The questions go to damages.  If you

10  can't mine the coal, because it's not mineable and not

11  merchantable -- and Judge Van Tatenhove specifically said that

12  in his ruling.  He said within the constraints of industry

13  standard or words to that effect.  And, you know, we have got

14  to be able to show, because that's our case, that this document

15  says within the constraints of industry standards.  Industry

16  standards includes whether it's mineable and merchantable.  My

17  client has no obligation to stockpile coal and pay money on it.

18          THE COURT:  I do understand the objection, Mr. Lucas.

19  It's not a line that can be drawn perfectly clearly throughout

20  every question and answer.  I'm going to do my best to draw it.

21  But I'm going to allow to hear the remainder of the question.

22  I interrupted you.

23      Did you have something to add, Mr. Lucas?

24          MR. LUCAS:  I was just going to ask -- and I

25  understand Your Honor's ruling -- so that I don't have to

WILLIAM G. BROWNLOW IV - CROSS-EXAM          126

1   constantly renew that objection --

2              THE COURT:  It's preserved.

3              MR. LUCAS:  -- may I just have a standing objection

4   to that?

5              THE COURT:  It's preserved.  Yes.

6        Okay.  So complete your questioning, Mr. Getty.  I

7   interrupted you.  My mistake.  Go ahead.

8   BY MR. GETTY:

9   Q.   You never understood, did you, given the reference to

10  within the constraints of industry standards, that my client

11  had an obligation to simply mine coal, stockpile it, and lose

12  money on it?

13  A.   I believed he had an obligation to mine the coal.

14  Q.   And lose money?

15  A.   I didn't -- we didn't talk about it making or losing

16  money.  We just talked about mining coal.

17  Q.   How many years have you sort of dabbled in the coal

18  industry?  We go back to at least 2005 with Mr. Ravon Wolford?

19  A.   You've heard my entire experience right here today.

20  Q.   Okay.  So you've got like almost 50 years of experience in

21  the coal business and you don't know -- are you telling me,

22  sitting here telling this Court and telling me that you don't

23  understand that you don't have an obligation to mine coal if

24  it's not merchantable and -- if, number one -- let me just go

25  back and start over.

1      You understand within the industry, that the industry

2  standards say if you can't mine it, it's not mineable, then you

3  have no obligation to mine?

4  A.    I think each contract probably speaks for itself.  And you

5  should look to the language of the contract to see what the

6  obligations of each of the parties are.

7  Q.    Okay.  And your contract says average selling price.  It

8  makes no reference to anything other than if you can sell it,

9  average selling price, doesn't it?

10 A.    The term "average selling price" is in my contract.

11 Q.    And you know there are seams of coal where, you know, ash,

12 and sulfur is important, right, when you're dealing with steam

13 coal?

14 A.    I've heard that.  I don't know much about that, but I've

15 heard it.

16 Q.    If there's too much ash or too much sulfur, it's not

17 marketable, you can't mine it and sell it, can you?

18 A.    I don't know that.

19 Q.    Utilities won't use it, will they?

20 A.    I don't know that either.

21 Q.    Okay.  You don't know any of these things, but yet you

22 have come in here and accused my client and said that under

23 this contract that makes reference repeatedly to average sell

24 price, and it's limited by within the constraints of the

25 industry, that he has an obligation to mine this coal and he

1  didn't and so you are owed a boatload of money because of that?

2  A.   Well, you got four questions that time.  Which one should

3  I answer?

4  Q.   Take your pick.

5  A.   Your client signed the contract and should be obligated by

6  it.  They shouldn't get the opportunity to walk away free,

7  having signed the contract and committed to honor it.

8  Q.   And do you believe he should mine the coal and lose money

9  mining it?

10 A.   I think he should -- he should honor the contract he

11 signed.

12 Q.   So the words "commercial" and "reasonable" and "good

13 faith" and "best efforts" don't mean anything in this contract?

14 They do, don't they?

15 A.   The words of the contract speak for themselves.

16 Q.   And you understand that merchantability means saleability.

17 If you can't sell it, nobody wants to buy it, then you have no

18 obligation to mine it, right?

19 A.   I don't know the word "merchantability" is in this

20 contract.

21 Q.   I'll grant you that.  But the words "within the

22 constraints of the industry" are, aren't they?  Paragraph 10.

23 A.   The words "within the constraints of industry standards"

24 is part of paragraph 10.

25 Q.   Take a look at now -- let's go to paragraph -- to number

WILLIAM G. BROWNLOW IV - CROSS-EXAM          129

1   8.  Plaintiffs' -- or Defendants' Exhibit 8.  Do you have it?

2   A.   Yes, sir.

3   Q.   It's a document that you gave to Mr. Justice.  It's your

4   document.  It was generated and given to my client by you way

5   back, wasn't it?

6   A.   Actually, I think this is Mr. Terry's document.

7   Q.   Okay.  And it was Mr. Terry -- Mr. Terry prepared it.  You

8   took it and you handed it and you gave it to Jay Justice,

9   didn't you, or one of his people?

10  A.   I don't recall, but I could have.

11  Q.   If he says you did, you wouldn't dispute it, would you?

12  A.   I don't remember.

13  Q.   Okay.  Take a look at this.  Would you agree with me that

14  generally the cutoff on ash is 12 or twelve five.  Anything

15  over 12 is not marketable?

16  A.   I don't know that.

17  Q.   Would you agree with me that sulfur -- that you generally

18  don't want more than 1, maybe maximum 1 1/2 percent of sulfur?

19  A.   I don't know that.

20          MR. GETTY:  Do you have it there, Your Honor?

21          THE COURT:  Yes.

22          MR. GETTY:  I would like you to follow along.

23          THE COURT:  I have it right here.

24          MR. GETTY:  Okay.  Great.

25  BY MR. GETTY:

WILLIAM G. BROWNLOW IV - CROSS-EXAM                130

1   Q.   If you look at that document --

2            MR. GETTY:  May I approach him?  It might go faster.

3            THE COURT:  What's the need to approach the witness,

4   Mr. Getty?

5            MR. GETTY:  I just want to walk through these -- most

6   of these are just over the top ash and sulfur.  They're not

7   mineable coal.

8            THE COURT:  Just ask the questions and point him to

9   the portion of the document that you're focusing on, please.

10            MR. GETTY:  All right.

11   BY MR. GETTY:

12   Q.   All right.  If you look at these, you see where it says

13   Skyline 1.  You see that?

14   A.   Yes.

15   Q.   What's the ash?  Ranging from 22 down to 14 percent,

16   right?  All above 12?

17   A.   Skyline 1, ash percent, 11.6 to 7.16.

18   Q.   The third one down -- fourth one down.  You got to look at

19   the description.  There's Skyline 4, 3, 2, 1.  I want you to

20   focus your attention on Skyline 1.

21   A.   Okay.  The line below Skyline 1 is also Skyline 1.

22   Q.   Yeah.  All right.

23   A.   And that's 11.76 to 7.16.

24   Q.   I'm dealing with Skyline, the first Skyline 1.  Okay?  And

25   all the ash there is over the acceptable limit, and so is the

WILLIAM G. BROWNLOW IV - CROSS-EXAM                131

1    sulfur, isn't it?

2    A.    I don't know that.

3    Q.    Okay.  And then you go down to Hindman 11.  You see that?

4    A.    Yes.

5    Q.    17, 16 percent ash, 3.7, 3.9, 2.7, 2.8 sulfur, right?

6    A.    Well, there's actually three different Hindman 11s on

7    there.

8    Q.    Let's look at the second page.  Actually, I just circled

9    the ones that I thought were over the top.  I circled the

10   first, second, third, and the second and third one from the

11   bottom.  All of those have readings that show ash and sulfur

12   that are way out of line for any kind of commercial

13   saleability, don't they?

14   A.    I don't know that.

15   Q.    You don't know that.  Did you know it at the time you

16   handed it to Mr. Justice?

17   A.    No.

18   Q.    When Mr. Terry went in and gave it to you, he had all this

19   coal analyzed.  He did core drills and he had all this coal

20   analyzed by a testing laboratory and these were the results,

21   weren't they?

22   A.    I assume.

23   Q.    And they're atrocious, aren't they --

24   A.    I don't know that.

25   Q.    -- in terms of sulfur and ash?  You heard the phrase

WILLIAM G. BROWNLOW IV - CROSS-EXAM          132

1   "ignorance is bliss"?

2   A.    Actually, the curious part about this is, Mr. Terry is out

3   there mining right now.

4             MR. LUCAS:  Your Honor --

5             MR. GETTY:  I'll withdraw it.

6   BY MR. GETTY:

7   Q.    Is it your plan here to -- when confronted with negative

8   factors like this to simply disclaim any knowledge?  Because

9   that's what you seem to be doing, sir, with all due respect.

10  A.    I'm not an engineer.

11  Q.    But you've been in the coal business over 40, almost 50

12  years, and surely you know --

13  A.    That is absolutely false.

14  Q.    You have some exposure to the business, enough to know,

15  don't you, after that many years this level of ash and this

16  level of sulfur is totally unacceptable in terms of

17  saleability?

18  A.    The fact that I was a CPA 40 years ago does not put me in

19  the coal business for the last 40 years.  So for you to say so

20  is completely false.

21  Q.    But you've been in the coal business enough that you got

22  Jeff Hoops to pay you a whole bunch of money.  He didn't mine

23  the coal.  You got my client to pay you a whole bunch of money,

24  and he never mined the coal.  Is it your intent to just get

25  money and not worry about whether coal ever gets mined?

WILLIAM G. BROWNLOW IV - CROSS-EXAM          133

1     THE COURT:  Mr. Lucas, state your objection.

2     MR. LUCAS:  Yes.  Same thing.  He makes a speech with

3  representations and then he asks him a totally different

4  question.

5     THE COURT:  Rephrase the question, Mr. Getty, please.

6  BY MR. GETTY:

7  Q.   You have given me a couple of instance -- an instance

8  where you have obtained significant amounts of money from

9  different people on these properties and they've never been

10  mined.  Has it been your goal to simply get as much money as

11  you can, knowing the properties are never going to be mined?

12  A.   I don't know that the properties are never going to be

13  mined.  In fact, Mr. Terry, who did those core drills, is out

14  there trying to mine it right now.

15  Q.   But it hadn't been mined up to this point, and you don't

16  know whether Mr. Terry is going to be able to successfully mine

17  it, right?

18  A.   He's trying.

19  Q.   And mining one or two seams that are low enough in sulfur

20  and ash is not mining all 16 or however many millions or

21  dollars' worth of coal that is in -- in -- in place, right?

22  It's not the same?

23  A.   I don't know -- I don't know that -- what your assumption

24  there has any bearing in fact whatsoever.

25  Q.   Well, you know Mr. Conway's report.  I can show it to you

WILLIAM G. BROWNLOW IV - CROSS-EXAM                134

1   here in a minute.  But Mr. Conway's report basically said

2   there's this many tons of coal in place.  This is how much coal

3   is there.  He never said, this is -- this is how much can be

4   commercially mined, did he?

5   A.   I think that's what his report said.

6   Q.   He said it's in place and based on the value per ton, I

7   assess this figure.  He never said, this much can be mined and

8   this much can't be mined, did he?

9   A.   He used a factor to come up with the amount that he

10  believed could be harvested.

11  Q.   He never did core drills, did he?

12  A.   Did he do core drills?  I think he had information he

13  relied on, including his entire application, permit

14  application.

15         MR. GETTY:  It's right in front of me.  Sorry.

16         THE COURT:  It happens.  Go ahead.

17  BY MR. GETTY:

18  Q.   It's Plaintiffs' 1b and 3b.  It's in the plaintiffs' book,

19  Mr. Brownlow.  Do you have them, sir?

20  A.   What number, sir?

21  Q.   1b and 3b, sir.

22  A.   I have 1 but no 1b.

23  Q.   No 1b?

24  A.   (Shaking head.)

25         MR. GETTY:  John, can you help him?

WILLIAM G. BROWNLOW IV - CROSS-EXAM          135

1          MR. LUCAS:  Yeah.

2          THE COURT:  I'm sorry.  There's not a plaintiffs' --

3          THE WITNESS:  In the plaintiffs' book or the

4  defendants'?

5          MR. GETTY:  Plaintiffs' book.

6          THE WITNESS:  Plaintiffs'.  I'm sorry.

7          MR. GETTY:  I'm sorry if I said "defendants."  I

8  don't think I did.

9          THE COURT:  We'll clear it up.

10          MR. LUCAS:  Your Honor, while he's looking --

11          THE COURT:  Yes.

12          MR. LUCAS:  -- I want to interpose an objection here

13  you're familiar with from our trial brief.  It's our position

14  that the independent arbiter's report, because it was required

15  to be paid immediately, is binding; no ifs, ands, buts, no

16  impeachment, no discussion.  And so I object to the relevancy

17  of the questions that are designed to try to undercut that

18  report, Exhibit 1b, because that is not what the parties

19  bargained for in Article 7, paragraph 7.  The idea that he can

20  come back now and critique Mr. Conway's report is totally

21  contrary to the agreement, the amount he determined would be

22  paid immediately, and I object to it on that ground.

23          THE COURT:  And I understand the objection.  The

24  Conway report goes to the heart of the issue that I'm required

25  to hold a hearing on with respect to the damages due.  I'll

WILLIAM G. BROWNLOW IV - CROSS-EXAM          136

1   allow the question.

2        Go ahead, Mr. Getty.

3              MR. GETTY:  Thank you, Your Honor.

4   BY MR. GETTY:

5   Q.   Looking at 1b, his report is a mere two pages, isn't it?

6   I could actually stand here and read it to you probably faster

7   than going through a couple of questions.  But essentially what

8   it says is, he says he estimated.  You know what estimated is,

9   right?  It's an estimate.  He uses the term, "my professional

10  opinion that the estimated coal reserves."  An estimate's what

11  he gave you, right?

12  A.   Correct.

13  Q.   "Underlying subject properties is 18,601,000 tons of

14  in situ reserves."  You know what "in situ" means?  It means

15  on-site, right?

16  A.   Yes, sir.

17  Q.   And down below he says, "This estimate was formulated from

18  the best available information at the time, circa 2003."  He's

19  rendering his report in 2012 and he's relying on information

20  from 2003, correct?  Did I understand that right?

21  A.   Yes.

22  Q.   And he says, "No new information is known to this writer

23  at this time.  The estimate includes multiple seams at multiple

24  elevations."  And he goes down and he says, "The standard 10:1

25  ratio of overburden to tons of coal was for the most part

WILLIAM G. BROWNLOW IV - CROSS-EXAM          137

1   adhered to except for one area."  He said, "It is reasonable to

2   assume recovering 90 percent of the estimated" numbers, and so

3   he comes up with -- he basically takes that number and reduces

4   it by 10 percent to come up with 16,740,000 tons, and he takes

5   your $1 a ton royalty in the fourth amendment and he comes up

6   with a number of 16,990,900, right?

7   A.    Yes.

8   Q.    And he gives you a disclaimer and says, the report is made

9   in my role as an independent arbiter, pursuant to Article 7 of

10  the Fourth Amendment of the Assignment from New London to

11  Kentucky Fuel.  "This report is to be used for that purpose

12  only and for no other purpose without my express approval."

13  Did he give you approval to use it in these proceedings?

14  A.    Yes.

15  Q.    And then he refers to the amendment, the fourth amendment.

16  If you would flip, go back to that, that's -- I had it out in

17  the defendants' -- actually it's in the plaintiffs' book.  It's

18  1a.  So they're all right there together.  You see?

19      You see the paragraph 7 after (b).  It says upon the

20  occurrence of an event of default, New London and Fivemile may

21  exercise any and all rights or remedies available at law or

22  equity, et cetera, et cetera, et cetera.  And then it says, "In

23  the alternative," and "New London and Fivemile may determine

24  the estimated lost royalties that would have been received but

25  for the Event of Default by Kentucky Fuel and such amount shall

WILLIAM G. BROWNLOW IV - CROSS-EXAM          138

1  be immediately due and payable by Kentucky Fuel in the terms of

2  the Agreement.  Such royalty shall be determined by an

3  independent arbiter."  It says "In the alternative, New London

4  and Fivemile Energy may determine the estimated lost

5  royalties."  Did Fivemile participate in any respect in this

6  process with the arbiter?

7  A.   Yes.

8  Q.   I mean, did they provide any information for the arbiter,

9  to your knowledge?

10  A.   Well, inasmuch as I'm Fivemile and I'm wearing both the

11  Fivemile and the London hat, they did participate.

12  Q.   And it says he has to be an independent arbiter.  And but

13  the key phrase I want to talk to you about is in the event --

14  upon the occurrence of an event of default.  What's the event

15  of default here?

16  A.   Well, the failure to pay the retainer fees, the failure to

17  pay the annual minimum royalties.

18  Q.   Did you ever send them a notice of default?  I haven't

19  seen one.

20  A.   Yes.

21  Q.   Where is it?

22  A.   I'd have to look in my files.

23  Q.   Did you ever send them a notice of default that said,

24  gentlemen, in accordance with the provisions of paragraph 7,

25  quote this paragraph, and say, I am hereby notifying you of

WILLIAM G. BROWNLOW IV - CROSS-EXAM           139

1  these events are an event of default?  I haven't seen any such

2  document.

3  A.   I'm quite certain my attorney at that time, Mr. Schmid,

4  sent letters of default --

5  Q.   Did you --

6  A.   -- notices.

7  Q.   Well, I don't think it's been produced, and I could be --

8  I'm the first person in the world to say --

9             THE COURT:  A question, Mr. Getty.

10  BY MR. GETTY:

11  Q.   All right.  I haven't seen it.  And I guess what my next

12  question to you, sir --

13             THE COURT:  Mr. Lucas?

14             MR. LUCAS:  Objection, Your Honor.  We're again

15  litigating whether or not there's a default.

16             THE COURT:  Go ahead with the question, Mr. Getty.

17      Let me interpose for a moment.  The witness has been

18  testifying for an hour and a half.  Do you need a break, sir --

19             THE WITNESS:  No.

20             THE COURT:  -- a bathroom break?  Okay.  Go ahead,

21  Mr. Getty.

22  BY MR. GETTY:

23  Q.   I don't see any reference to any event of default in his

24  report.  What, if anything, did you tell Mr. Conway about an

25  event of default and how did you do it, because I don't see it

WILLIAM G. BROWNLOW IV - CROSS-EXAM          140

1   in his report.

2   A.   I asked him.  I asked Mr. Conway pursuant to his

3   engagement letter to do an analysis of the property and to

4   answer the question as posed within the instructions should

5   there be an event of default.

6   Q.   Should there be an event of default.  Did you tell him

7   specifically here's the event of default?  Because I don't see

8   in his report and I don't see it in his supplement anywhere.

9   You didn't tell him, did you?

10  A.   That there was an event of default?  Yes, I told him.

11  Q.   And what did you tell him?

12  A.   I told him that there'd been a default under this

13  agreement and that we needed an independent arbiter so that we

14  could hopefully come to a quick resolution of the differences

15  that have arisen in this agreement.

16  Q.   Other than telling him there had been an event of default,

17  did you tell him specifically what it was?  You didn't, did

18  you?

19  A.   Yeah, I told him they weren't paying -- under the retainer

20  fees, they weren't paying the minimum royalties.

21  Q.   Incidentally, on the retainer fees, you were retained to

22  basically go out and sort of pin hook properties, to act as a

23  stalking horse to go buy the properties, bid on the properties,

24  so people wouldn't know that the Justices were buying them,

25  right?

1    A.    That's one of the things I was doing.

2    Q.    And you bought some Addington properties, didn't you?

3              THE COURT:  The phrase "Addington," did you say?

4              MR. GETTY:  Yes, sir.

5              THE COURT:  Okay.  I just couldn't hear you

6    correctly.  I wanted to make sure the court reporter --

7    BY MR. GETTY:

8    Q.    You bought some Addington properties.

9    A.    My dealings were with Appalachian Fuels.

10   Q.    It's an Addington entity, Appalachian Fuels.  I represent

11   Addington among other entities.  Did you know you were buying

12   Addington properties?

13   A.    I knew I was buying Appalachain Fuel properties.

14   Q.    And you bought a number of those and you were compensated

15   for that work, weren't you?

16   A.    Yes.

17   Q.    And there came a time where your work was done and you

18   really weren't required to do anything more for them, were you?

19   A.    That's not true.

20   Q.    What did you do?

21   A.    Well, I continued to work with the landowners of the

22   different properties that they had, maintained contact with

23   them, tried to get the leases paid when they were not paid on

24   time, tried to get the royalties paid when they weren't paid.

25   I was the point of contact because the folks at Kentucky Fuel

WILLIAM G. BROWNLOW IV - CROSS-EXAM          142

1    were almost impossible to get in touch with, wouldn't answer

2    their phone, wouldn't return a phone call.  So I was the point

3    of contact that those people could get in touch with somebody

4    that was involved and try to get some answers to their

5    problems.

6    Q.    Okay.  And your statement here today that you would call

7    them and couldn't get in touch with them, that's basically the

8    hearsay from third parties, right?  Third parties told you

9    that?

10   A.    I had the exact same experience.

11   Q.    Okay.  And there came a point in time where they brought

12   all these royalties up current, didn't they, except for your

13   retainer?

14   A.    My royalty?  Yes, but the landowners, no, were not paid

15   current.

16   Q.    So they paid you, but you are saying they didn't pay the

17   landowners?

18   A.    Well, they paid that one portion of what they owed me.

19   Q.    When did that happen?

20   A.    But they owe the landowners out there that they have

21   leases with that they have not paid, including me.

22   Q.    And when you brought up that these landowners were owed

23   money, did they do something to pay them current in some

24   instances?

25   A.    Well, the Fivemile Energy lease on the Strong Brothers

WILLIAM G. BROWNLOW IV - CROSS-EXAM       143

1  property is -- has not been paid since 2010.  So it's well past

2  due, and no, they have not paid.

3  Q.   And that's the property that they tried to mine and across

4  the river and couldn't and they reclaimed it -- shut it down

5  and reclaimed it, right?

6  A.   Well, they never reclaimed it.

7  Q.   Mr. Justice says they reclaimed it.

8  A.   Well, the state has actually just taken their cash bond

9  and done the reclamation themselves, as I understand it.

10 Q.   It's been reclaimed.

11      THE COURT:  Questions.

12 A.   By the State of Kentucky, from what I understand.  It's

13 totally irrelevant here other than the fact --

14 Q.   Yeah, I would agree, it is totally irrelevant, hearsay,

15 what people say.

16      So let's focus on Exhibit 3b.  That's a supplement report.

17 He says he's supplementing his report.  What was the purpose of

18 that?  It's just a couple of pages.

19 A.   The purpose of that was to provide me a little more detail

20 on the --

21      THE COURT:  Hang on just a second, Mr. Brownlow.

22 He's conferring with counsel.  I'm sorry, conferring with his

23 client.

24      State the question again, please, Mr. Getty.

25 Q.   What was the purpose of the supplement?

WILLIAM G. BROWNLOW IV - CROSS-EXAM         144

1   A.    To provide me with some additional background or

2   additional detail information on work that he had done.

3   Q.    Basically, what he's done, looks like to me like he's

4   giving you a chart where he gives you the estimated depths in

5   inches of the various seams from top to bottom, right?

6   A.    Apparently.

7   Q.    And did he alter his number very slightly?  16,991,775.

8   That was a little different than the earlier number, wasn't it?

9   A.    Yes.

10  Q.    Okay.  What was the purpose of this, as you understood it?

11  A.    Just to provide us a little more detailed information.

12  Q.    Okay.  Take a look at defendants' book, if you would, and

13  take a minute and look at -- flip through and look at Exhibit

14  3, Defendants' Exhibit 3.  Do you have it?

15  A.    Yes, sir.

16  Q.    It's an aerial view of the Fivemile and adjacent areas.

17  And what does it show you, Mr. Brownlow?  It shows you mining

18  operations from the sky, doesn't it?  You see all the mining

19  activity there?

20        THE COURT:  One question at a time, Mr. Getty.

21        MR. GETTY:  Okay.

22  BY MR. GETTY:

23  Q.    Would you agree with me?

24        THE COURT:  You've already asked a question.  The

25  question was -- that he hadn't answered, the question was:  It

WILLIAM G. BROWNLOW IV - CROSS-EXAM          145

1   shows you mining operations from the sky, doesn't it?

2       Let's let him answer that question, and then you can ask

3   your next one.

4   A.   I honestly don't know what mining activities from the sky

5   looks like, so I don't know what it shows.

6   Q.   Well, you can see -- you see the yellow where there's been

7   earth disturbance.  There's a lot of mining activity.  You see

8   where it says "Chavies," and above Chavies, there's major earth

9   disturbance, isn't there?

10  A.   I'm not familiar with this map or this map reading.

11  Q.   Okay.  And down below Chavies, near Krypton, there's more

12  mining activities over into Perry County, right?

13  A.   I don't know that because I don't know this map.

14  Q.   You see where Jackson is.  That's Breathitt County, right?

15  A.   Jackson is the county seat --

16  Q.   Yes.

17  A.   -- of Breathitt County.

18  Q.   Right.  And if you look at what we circled as the Fivemile

19  area, there's very little disturbance there.  You don't see the

20  kind of disturbance you see over in Perry County, do you?

21  A.   I've answered that.  And I'm not familiar with this map.

22  Q.   Isn't that because anybody that has thought about mining

23  this area has not done it, and the coal in this general area is

24  not mineable?

25              MR. LUCAS:  Two questions again.

WILLIAM G. BROWNLOW IV - CROSS-EXAM          146

1          THE COURT:  Mr. Getty, can you rephrase those in

2     separate questions, please?  I can help you.  The first

3     question is:  Isn't that because anybody that has thought about

4     mining this area has not done it?

5       Mr. Brownlow, can you answer that, sir?

6          THE WITNESS:  Not from this map I can't.

7     BY MR. GETTY:

8     Q.   I'm sorry?

9     A.   Not from this map, I can't.

10         THE COURT:  The next question, Mr. Getty.

11    BY MR. GETTY:

12    Q.   Would you agree with me that this aerial does not show the

13    same kind of disturbance as over near Chavies or Krypton in the

14    Fivemile area?

15    A.   I don't know that.

16    Q.   You don't know that?

17    A.   No, I don't.

18    Q.   Well, perhaps we ought to move on a little quickly then to

19    one other thing.

20         MR. GETTY:  If you want to take a break, that's fine

21    with me at this point.

22         THE COURT:  Do you need a break?

23         MR. GETTY:  I would like to sit down.

24         THE COURT:  Okay.  That's fine.  Do you need a

25    bathroom break?

WILLIAM G. BROWNLOW IV - CROSS-EXAM          147

1          MR. GETTY:  No, I just need to sit down a minute

2   because of my back.

3          THE COURT:  You can ask him questions while you are

4   seated.

5      Mr. Lucas, do the plaintiffs need a break?

6          MR. LUCAS:  I'm all right, Your Honor.  Thank you.

7          THE COURT:  Be seated.  It's fine.

8          MR. GETTY:  I'm okay if I lean.  I'm actually better

9   if I lean forward because it opens up my facets.

10         THE COURT:  I prefer you to sit instead of putting

11  yourself in discomfort.  Let's take a five-minute recess, okay,

12  Mr. Getty?

13         MR. GETTY:  Thank you, Your Honor.

14         THE COURT:  All right.  Mr. Lucas, anything before

15  the recess?

16         MR. LUCAS:  No, Your Honor.

17         THE COURT:  All right.  We'll be in a recess for five

18  minutes.

19      (A recess was taken from 2:54  to 3:02.)

20         THE COURT:  Thank you.  We're back on the record.

21  Mr. Getty, you ready to proceed, sir?

22         MR. GETTY:  Yes, sir.  May I?

23         THE COURT:  Sure.  Go ahead.

24         MR. GETTY:  Thank you.

25         THE COURT:  You're welcome.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                148

1   BY MR. GETTY:

2   Q.   Mr. Brownlow, you have 3b there.  That's the supplement

3   for the report.  You have Exhibit 1b.  Can you take those and

4   just look at them together or separately?  Either way.  Would

5   you agree with me that there's not one word in either of those

6   documents about what constitutes any kind of default?  1b and

7   3b.

8   A.   You are talking about Mr. Conway's --

9   Q.   Yes, sir.

10  A.   -- two items?

11  Q.   Yes, sir.

12  A.   You say the word "default" is not in there?

13  Q.   There's no mention of what might constitute a default, is

14  there?

15  A.   Well, the last paragraph at the bottom of the first page

16  of 1b is, "Based upon the above amounts of recoverable coal, I

17  estimate the lost royalty that NLTM would have received but for

18  the default of Kentucky Fuel."

19  Q.   Okay.

20  A.   So it does mention default.

21  Q.   "But for the default."  But does it say what the default

22  is or what constitutes it?

23  A.   No.

24  Q.   It doesn't, does it?

25          THE COURT:  Did you hear the answer, Mr. Getty?

WILLIAM G. BROWNLOW IV - CROSS-EXAM          149

1          MR. GETTY:  I didn't.

2          THE COURT:  He answered the question.  Repeat your

3   answer, please.

4          THE WITNESS:  No.

5   BY MR. GETTY:

6   Q.    Going back to the default, you said you declared a

7   default.  When you declared these alleged defaults, you were

8   getting, what, $75,000 a year in minimum royalties?

9   A.    I have not been paid.

10  Q.    Okay.  You were caught up, weren't you, later?

11  A.    No.  Later, much later, after the lawsuit was filed.

12  Q.    Okay.  From 2012 until now, you have been paid the

13  equivalency of $75,000 minimum royalty per year, right?

14  A.    Yes.

15  Q.    And if that -- my math is correct, that's seven years you

16  have received and taken and used $525,000 in minimum royalties;

17  isn't that correct?

18  A.    Which is a mere fraction of the contract.

19  Q.    Well, when this default was declared, did you take that

20  check, put it in an envelope, send it back to Mr. Justice and

21  say, you are in default, I'm not accepting this minimum

22  royalty?  You never did that, did you?

23  A.    We actually filed suit and then he paid on the minimum

24  royalty a year or two years after we filed suit.  I don't

25  recall exact dates.

WILLIAM G. BROWNLOW IV - CROSS-EXAM          150

1          MR. GETTY:  I don't think he's really answered my

2     question.  I asked him specifically, did you ever --

3     BY MR. GETTY:

4     Q.   Now, did you ever take the check, put it in an envelope,

5     and send it back and refuse it?

6     A.   No.

7     Q.   You took it and you used it?

8     A.   Yes.

9     Q.   And you understand the concept of minimum royalty, right?

10    A.   Yes.

11    Q.   You get paid a minimum royalty and the coal company

12    doesn't have to mine it, does it?

13    A.   Well, it depends on what the contract says.  It's not a

14    guaranteed flat rule.  It's just what the contract says.

15    Q.   You understand, generally, don't you, that the minimum

16    royalty is in lieu of conducting mining activity?

17    A.   Can be.

18    Q.   Okay.  Yes.

19    A.   And it cannot be.

20    Q.   And it either can be recoupable or non-recoupable, right?

21    A.   Correct.

22    Q.   And at some point in time, as we discussed, you wanted to

23    make it non-recoupable so that whatever you got every year, you

24    never had to apply it against any mining, right?

25    A.   And the purpose of that was as an incentive to get them to

WILLIAM G. BROWNLOW IV - CROSS-EXAM                    151

1   mine.

2   Q.   Wasn't the purpose of that, really, Mr. Brownlow, to be

3   able to keep the minimum royalty because you knew darn well

4   that they were never going to mine this coal?

5   A.   I never knew that.

6   Q.   Take a look at Exhibit 1, please.

7            THE COURT:  Plaintiffs' or Defendants'?

8            MR. GETTY:  Defendants, sorry.

9   A.   Whose 1?

10  Q.   Defendants' book, please.  It's a map.  Do you know how to

11  read mine maps like this?

12  A.   No, I do not.

13  Q.   Do you know -- on this spot there are several green areas.

14  And those are hollow fills.  Do you know what a hollow fill is?

15  A.   Generally.

16  Q.   When you have a disturbance that might affect water

17  quality, you have to construct and utilize a hollow fill.  You

18  know that?

19  A.   Not really.

20  Q.   Do you know what a 404 permit is?

21  A.   Generally.

22  Q.   Affects water quality?

23  A.   Army Corps of Engineers.

24  Q.   Army Corps of Engineers.  And one of the allegations you

25  have made here is that the Justices had no intent to mine the

WILLIAM G. BROWNLOW IV - CROSS-EXAM            152

1    coal, because -- from 2010 on, because they never got a 404

2    hollow permit, right?

3    A.    Yes.

4    Q.    Did you consult with anyone about what policies the Obama

5    administration implemented starting in 2008 with respect to

6    404(b) hollow fill permits?

7    A.    Did I consult with anyone?

8    Q.    Uh-huh.

9    A.    I don't recall just now.

10   Q.    Are you aware presently that since 2008 it has been

11   virtually impossible, because of the environmental restrictions

12   imposed by the Obama administration on both the EPA and the

13   Corps of Engineers, to obtain a 404 hollow fill permit?

14   A.    No, I don't know that.

15   Q.    You don't know that.  But without knowing that, you made

16   the allegation because they didn't get one, that shows no

17   intent to mine?

18   A.    That's correct.

19   Q.    If they couldn't get one and nobody else could get one

20   since 2008, wouldn't that totally undercut and belie your

21   entire argument that that was evidence of no intent to mine?

22   A.    Well, if one accepts all your assumptions, which I don't

23   think are true.

24   BY MR. GETTY:

25   Q.    Maybe you ought --

WILLIAM G. BROWNLOW IV - CROSS-EXAM          153

1      MR. LUCAS:  Your Honor.

2      THE COURT:  Hang on.  Yes, Mr. Lucas.

3      MR. LUCAS:  I want to interpose a relevancy objection

4  again.  Again, we're relitigating what has been established by

5  the default.  Paragraph 23 of the complaint alleges that the

6  failure to apply -- that they failed to apply for a 404 permit,

7  that the failure by Kentucky Fuel to complete the necessary

8  steps to obtain the necessary regulatory approval to start

9  mining is a further indication of its bad faith.  And that's

10  referring to the failure to get the 404 permit.  It's a breach

11  of covenant of good faith and fair dealing and is an event of

12  default under the fourth agreement.  That is an established

13  fact in the case.  I object to the relevancy of this line.

14      THE COURT:  Just one moment.

15      MR. GETTY:  Sorry.

16      THE COURT:  That's all right.  Mr. Getty, the

17  relevancy of the line of questioning.

18      MR. GETTY:  Well, I think it's -- this is another

19  instance where they have thrown out, you know --

20      THE COURT:  How is it relevant to damages, is what

21  I'm looking for.

22      MR. GETTY:  It's relevant to damages because we

23  couldn't have mined the coal because of the absence of a 404

24  permit.  Nobody could since 2008 in terms of these areas where

25  a hollow fill would be required.

WILLIAM G. BROWNLOW IV - CROSS-EXAM          154

1    THE COURT:  Have you asked all the questions on that
2  topic you intend to ask?
3    MR. GETTY:  Yes.
4    THE COURT:  Okay.  Move ahead, please.  Thank you.
5  BY MR. GETTY:
6  Q.  Mr. Brownlow, let me ask you this question.  If Kentucky
7  Fuel mined one ton a year, would that have fulfilled the
8  covenant to mine?
9  A.  I would say if they had production, that that was what the
10 contract was designed for, was to have production.
11 Q.  And one ton of coal would have satisfied that?
12 A.  I honestly hadn't thought about that before.
13 Q.  And if they mined one ton of coal, based on the change you
14 made as of 2013, you'd still get your $75,000, right?
15 A.  What change did I make in 2013?
16 Q.  2012 on, there's a change where after a certain date -- I
17 thought it was 2013 -- the annual payments that were made to
18 you in December were not recoupable.  So whatever you got in an
19 annual minimum payment, you would keep that anyway, wouldn't
20 you, if they mined a ton of coal?
21 A.  If they paid it, I would keep it, yes.
22 Q.  And you felt no obligation when you declared default to
23 say, here's your money back, I'm pursuing my remedy of tonnage
24 that you haven't mined and the value of that, take your money
25 back and keep it?

WILLIAM G. BROWNLOW IV - CROSS-EXAM     155

1   A.    I actually thought we should follow what the contract

2   said.

3   Q.    At the time that Kentucky Fuel gave you back the Deep Wood

4   permits, what was your expectation of what you would be paid

5   for Fivemile?

6   A.    My expectation for what I would be paid for Fivemile?

7   Q.    Yeah.  What did you think they were going to mine?  I

8   mean, they hadn't mined anything for a number of years.  They

9   were giving you back one permit, said the coal wasn't mineable.

10  A.    Well, actually, what had happened on the Deep Wood permit

11  was that there was one very large landowner who owned -- who

12  got control of essentially all of the mineral.  And that was

13  someone who apparently was not going to be easy to deal with.

14  I think that precipitated the decision not to continue with the

15  Deep Wood permit.  My expectation was, was that they were going

16  to mine the coal and that the permit and the leases were a

17  valuable asset.  And that's what they said in the meeting.  And

18  that's the reason, as I understood, they entered into the

19  fourth amendment.

20  Q.    And you never memorialized that representation in writing.

21  And when you declared default, you kept the minimum, didn't

22  give it back, right?

23  A.    Well, you've got three questions in there.  Which one do

24  you want me to answer?

25  Q.    You never memorialized any representation?

WILLIAM G. BROWNLOW IV - CROSS-EXAM              156

1   A.    Yes, all the representations were memorialized in the

2   agreement.   Secondly, we --

3   Q.    And there's nothing in there about them having told you,

4   we're going to mine the coal, is there?

5   A.    Yes, I think the agreement is quite clear to that.

6   Q.    Did you ever write them a letter and confirm that they had

7   made that specific representation in the meeting and you were

8   relying on it?

9             THE COURT:   You've asked that before.

10            MR. GETTY:   I did.

11            THE COURT:   Let's move on.

12            MR. GETTY:   I'll withdraw it.

13            THE COURT:   Let's not be duplicative.

14            MR. GETTY:   I think I'm getting tired.   Sorry.

15  BY MR. GETTY:

16  Q.    I showed you the high sulfur readings that -- the document

17  you presented Mr. Justice that you received from Mr. Terry.

18  That was Exhibit 8.   I'd like to show you now Exhibit 9.   Take

19  a look at that.   That's a Boyd -- John T. Boyd reserve report,

20  very thick.   April 17th, 2007.

21  A.    I have it.

22  Q.    Do you recall receiving that at or about the time it was

23  issued?

24  A.    I do not.

25  Q.    Okay.   If Mr. Justice says it was provided to you, you

WILLIAM G. BROWNLOW IV - CROSS-EXAM                157

1   wouldn't dispute that, would you?

2   A.   I don't recall it.

3   Q.   Okay.  The report analyzes the seams of the Delta permit,

4   which was really the Strong Brothers coal.  You understand

5   that?  It's the Delta permit?

6   A.   I always understood it to be the Strong Brothers permit.

7   Q.   Okay.  Well, I'll represent to you that that is the

8   same -- the same coal.  And what this -- John T. Boyd is one of

9   the largest mining engineering evaluation firms in the country,

10  are they not?

11  A.   Pardon me?

12  Q.   John T. Boyd Company is a well-renowned mining engineering

13  firm in the country, is it not?

14  A.   I have no idea.

15  Q.   Are you aware that John T. Boyd is sort of like one of the

16  gold standards within the industry?

17  A.   I didn't know.

18  Q.   You don't know that?

19  A.   No, I don't.

20  Q.   Were you aware that that large mining evaluation firm

21  basically concluded that due to poor coal quality results

22  observed in this review, they didn't even prepare coal

23  estimates, pending further discussions, and that their opinion

24  was that the only seam with potentiality to achieve the

25  required mine quality was the Hazard 7?

WILLIAM G. BROWNLOW IV - CROSS-EXAM          158

1        THE COURT:  Mr. Lucas, you have an objection?

2        MR. LUCAS:  Your Honor, I object.  By counsel reading

3   the document, he's trying to essentially get the document or

4   portions of it in evidence.  It's a document that was never

5   identified, never produced.

6      I specifically asked counsel on the 16th day of November

7   to send me their trial exhibits.  I got them on the date -- it

8   was about three weeks later when you ordered them to produce

9   the documents to which we objected.  That's the first time I

10  saw it.  I got it like 6:00 that night.  It came to my

11  paralegal then.  I didn't see them until the next day.

12       THE COURT:  Right.

13       MR. LUCAS:  So this is a perfect example.  I've got a

14  document here that looks like it's a couple of hundred pages

15  long.  If it had been produced a month ago, I would have had

16  time to look at it.  I haven't even had time to look at this.

17  So I certainly object to the admissibility of it.  I further

18  object to counsel's efforts to try to get the contents of the

19  document in evidence by telling the witness, well, this is what

20  it says.

21       THE COURT:  Okay.  Your objection to admission is

22  preserved.  The question was, were you aware of what is

23  contained in the document and what Mr. Getty read.  So I'll

24  allow the question to be answered.

25  A.   No.

WILLIAM G. BROWNLOW IV - CROSS-EXAM          159

1   Q.   Okay.  This report essentially says that the seams of coal

2   in this general area, including Delta, are just not mineable

3   and merchantable, and after a lot of work and a lot of core

4   drilling and other work, they conclude that -- in 2007 that my

5   client should not pursue any further his mining activities.

6   You understand, don't you, that that's exactly what occurred,

7   they mined to some degree, they realized --

8          THE COURT:  Mr. Getty, I'm sorry, you've gotten too

9   far afield.  One question, please.

10          MR. GETTY:  All right.

11  BY MR. GETTY:

12  Q.   You realize that shortly after this report, at some point

13  after attempting to mine, that Delta permit was abandoned and

14  no mining has occurred since then in that area, don't you?

15  A.   I don't know that.

16  Q.   If so many people -- you come here and you tell this Court

17  that this is all value to you.  You have a report that is

18  simply the amount of coal in the ground, no core drills, no

19  other kind of information.  And you say this is valuable coal.

20  Any significance to you, sir, that all these other people who

21  either tried to mine this coal or didn't even bother to mine

22  this coal, walked away from the coal seams in this area,

23  including the same coal seams involved here?

24  A.   What's odd to me is that they would roll forward from this

25  2007 to 2010 and enter into a contract that would promise to

WILLIAM G. BROWNLOW IV - CROSS-EXAM          160

1   mine coal on the Fivemile land and the Fivemile permit.

2   Q.   Did I misunderstand something in the fourth amendment?

3   They gave you back the Deep Wood permit, didn't they?

4   A.   They did.

5   Q.   They didn't want to mine that coal, did they?

6   A.   Not the Deep Wood.

7   Q.   You said that you paid a bunch of royalties and paid all

8   these funds out.  Take a look at Exhibit 15 and 16,

9   Mr. Brownlow.  We're getting close to the end.

10          MR. LUCAS:  Defendants' Exhibits?

11          MR. GETTY:  Yes, sir.

12       May I proceed, Your Honor?

13          THE COURT:  Yes.

14   BY MR. GETTY:

15   Q.   You have the exhibits, sir?

16   A.   Yes, sir.

17   Q.   Exhibit 15, I will represent to you, is a chart showing

18   Fivemile royalty payments that show the various leasehold

19   owner, property owner or leaseholder, lessor, and it shows over

20   the period of time all the royalties that my client has paid to

21   these various people.

22       Do you have any reason to believe that is not accurate,

23   sir?

24   A.   I believe this is virtually identical to the exhibit that

25   Steve Ball presented at his deposition.

1   Q.   Uh-huh.

2   A.   And there were a number of questions about it at that

3   time.  And my recollection is he agreed to supplement the items

4   that were missing from that at that time, and I'm not sure it's

5   been supplemented since then.

6        (Off the record.)

7   Q.   Take a look at Exhibit 16.  This is sort of -- those were

8   the specifics laid out in 15.  And 16 is a summary of the

9   various costs that -- on Fivemile and Deep Wood my clients have

10  paid.  Do you see the paragraph or the column, rather, where we

11  have a total paid to the royalty owners, mineral owner

12  royalties and override?  What is that amount, sir?

13  A.   236,000.

14  Q.   236,000.

15  A.   302.

16  Q.   And you see the other column next to it from 2005 on,

17  Brownlow payments?

18  A.   Yes, sir.

19  Q.   What is that number?

20  A.   The total at the bottom is a million 304.

21  Q.   That's really not up to date, though.  You have to add

22  75,000 to it, so it would be -- you've been paid to date by my

23  client 1,379,613, correct?

24  A.   No, that's incorrect.

25  Q.   Well, didn't you get a $75,000 payment hand delivered to

WILLIAM G. BROWNLOW IV - CROSS-EXAM          162

1    you on December 1?

2    A.    Of 2018?

3    Q.    Yes, sir.

4    A.    Yes, I did.

5    Q.    And wouldn't you add that to this?

6    A.    Well, if this is correct, you would.  But this is not

7    correct.

8    Q.    Okay.  And if they have backup to show that they paid you

9    all these payments, you wouldn't dispute it?

10   A.    No, I would dispute it.

11   Q.    What proof do you have of that other than you're sitting

12   here up on the stand and telling me all about, you know,

13   landowners that said they didn't get paid and now you are

14   saying you didn't get paid?

15   A.    Well, let's start with 2008.  You've listed 49,000.  That

16   actually was paid on October the 7th, 2010.  And it was paid in

17   order for me to sign a new lease with the Combs and the

18   Barnetts in Breathitt County so that the Fivemile property

19   could be re-leased.  That was the amount of the past due

20   production royalty from 2005 that they never received and was a

21   condition before they would enter the lease.  So to say that I

22   got $49,000 there is a total --

23   Q.    Well, you --

24   A.    -- totally wrong.

25   Q.    -- would agree that --

WILLIAM G. BROWNLOW IV - CROSS-EXAM          163

1        MR. LUCAS:  Object.

2        THE COURT:  Yes, yes.  Mr. Getty, he does need to be

3    able to answer the question.

4        Go ahead, Mr. Brownlow.

5    BY MR. GETTY:

6    Q.   You got --

7    A.   The check --

8        THE COURT:  No, no, no.  He needs to answer.

9        MR. GETTY:  I'm sorry, I thought he was done.

10       THE COURT:  Okay.  Go ahead.  If you are finished,

11   Mr. Brownlow, we'll hear a question.  If you are not finished,

12   please continue with your answer.

13   A.   The check was written to me, but I turned around and

14   brought it to the landowners for the production royalty from

15   2005 that had never been paid.

16   Q.   It was owed to you earlier, but you got it later, right?

17   A.   No, I didn't get it later.

18   Q.   You got what was owed to you in 2005 in 2008?

19   A.   No.

20   Q.   Is that what you're saying?

21   A.   No.  In 2010, I signed a new lease on the Strong Brothers

22   property, which is owned by the Combs and the Barnett family.

23   In order to sign that lease, they had to be made whole on the

24   Kentucky Fuel production royalty that had not been paid in

25   2005.  So in order to make them whole required a payment to

WILLIAM G. BROWNLOW IV - CROSS-EXAM     164

1   them of $49,000.  Kentucky Fuel sent me the money, 49,000,

2   which I turned around and gave to the Combs and the Barnetts so

3   that they would then agree to sign the lease on their property

4   for the Strong Brothers permit.

5   Q.   Okay.  Was anything due to you separately other than what

6   needed to be paid for the Strong Brothers?

7   A.   No.

8   Q.   Okay.  So you got -- you actually got the 49,000.  You're

9   saying in that instance you passed it on to somebody else?

10  A.   Well, at Kentucky Fuel's instruction.

11  Q.   Okay.  But you don't dispute that these amounts were paid

12  for you for one purpose or another, including minimum royalties

13  or catch-up on minimum royalties through 2017, do you?

14  A.   Well, there are other amounts in here as well.  For

15  example, you have included in here the sanction payments in

16  this lawsuit that have been assessed against your client.

17  Those are included in here as payments to me.

18  Q.   They paid it to you, didn't they?

19  A.   Well, through the Court order.

20  Q.   So they paid you roughly, if you add the million 304,

21  round numbers, a million 379 on the Brownlow payments, and

22  165,000 in unmined mineral taxes, right, 98,000 in real estate

23  taxes, and then 840,000 in consulting and legal, right, which

24  includes that payment to you, right?

25  A.   I have no idea.

WILLIAM G. BROWNLOW IV - CROSS-EXAM                165

1  Q.   Okay.  And then contract reclamation -- I assume that's
2  probably for the operation they shut down -- they paid
3  $151,000.  Do you know what compliance is?  That's to comply
4  with the laws, right?
5          MR. LUCAS:  Your Honor, I object again.  He's just
6  standing up here reading the document and then he goes on to
7  some other topic and then asks an unrelated question.
8          MR. GETTY:  I'll wrap it up.
9  BY MR. GETTY:
10  Q.   Do you sit here and dispute in any way that my client has
11  paid to either you or others, including landowners, as a result
12  of being involved with you on this Fivemile and related areas,
13  3.128-plus million dollars?
14  A.   Absolutely.  I absolutely dispute it.
15  Q.   Okay.  And I guess we'll hear from Mr. Justice then and
16  the Court will have to decide who --
17          THE COURT:  Questions, Mr. Getty, not argument or
18  characterization.
19          MR. GETTY:  All right.
20          THE CLERK:  Those exhibits.
21  BY MR. GETTY:
22  Q.   Just to wrap up, go back to the tax returns where we
23  began.  If you look at Plaintiffs' Exhibit 21, that's in your
24  all's book, Mr. Kelley, my predecessor, was writing Mr. Lucas
25  and he says, he's had a chance to confer.  You requested that

WILLIAM G. BROWNLOW IV - CROSS-EXAM          166

1   these documents no longer be designated as confidential.  And

2   he says that he's forwarding copies of tax returns for Kentucky

3   Fuel and James Justice.  You see that?  You identified the

4   letter.

5   A.   I'm getting there.

6   Q.   You're getting there.  Books are convenient, but they're

7   not -- sometimes they're unwieldy.

8   A.   Okay.  I'm there.

9   Q.   Okay.  You received a copy of this letter and he was

10  basically forwarding on initially the copies of tax returns

11  prepared for the Justice Companies and Kentucky Fuel from 2005

12  to 2013, right?

13  A.   I don't remember which set of documents this one included.

14  Q.   I believe that was the first set.  And then March 18 -- if

15  you look at Exhibit 25 and 26, those are the two that I wanted

16  to talk to you about.  Mr. Kelley later produced a second group

17  and on March 18th, he says, "The tax returns we did produce are

18  those prepared by internal accounts for each of the companies.

19  They accurately reflect the income made as well as deductions

20  taken....The returns are also reviewed by internal management"

21  and "forwarded to an outside firm for review and incorporation

22  within other returns."

23      He's telling you just what I told you earlier here, that

24  there are consolidated returns and separate returns, isn't he?

25  A.   The letter speaks for itself.

WILLIAM G. BROWNLOW IV - CROSS-EXAM        167

1   Q.   Well, we walked through all that.  There's no sense in

2   going through it again.

3            MR. GETTY:  If I could just have one minute to

4   confer.

5            THE COURT:  That's fine.  We can put the white noise

6   on.

7        (Off the record.)

8   BY MR. GETTY:

9   Q.   Just to wrap up, Mr. Brownlow, it'd be accurate to say you

10  consider yourself an honest and honorable man?

11  A.   Yes, sir.

12  Q.   And you have never engaged in conduct that you would get

13  something for nothing or something you wouldn't be entitled to,

14  right?

15  A.   I don't like to.

16  Q.   And if the Court determines here that this coal was not

17  mineable and not merchantable and you're entitled to the amount

18  my client says, you'll live with that, because you're an

19  honorable, honest man?

20  A.   I don't know what your client says.  He's never said.

21  Q.   You'll live with whatever the Court's ruling is?

22  A.   I'm here at the courts, willing to listen to what they

23  say, for sure.

24  Q.   Even though it may not be the windfall you've been trying

25  to get here, millions and millions of dollars, right?

WILLIAM G. BROWNLOW IV - REDIRECT EXAM     168

1  A.   I'll take what the Court is willing to adjudicate.

2            MR. GETTY:  Yeah.  I would move for the entry of 1,

3  3, 8, 9, 15, and 16, Your Honor.

4            MR. LUCAS:  Your Honor, I stand by my prior

5  objections.

6            THE COURT:  Sufficient foundation for the admission

7  of those was not established.  It can be established on direct

8  of your own witness.  But I'll deny that motion.

9            MR. GETTY:  Okay.  I figured that's what you would

10  do.  Thank you.  Sorry if I took too long.  I just -- my back

11  is killing me.

12            THE COURT:  Okay.  Mr. Lucas, redirect, sir?

13            MR. LUCAS:  Yes, Your Honor.

14                  REDIRECT EXAMINATION

15  BY MR. LUCAS:

16  Q.   Mr. Brownlow, I want to start first with questions

17  following up on what Mr. Getty asked you about the tax returns.

18  And you were asked a series of questions including those just

19  now and earlier about whether these were something called dummy

20  returns, correct?

21  A.   Yes, sir.

22  Q.   And did you understand in that line of questioning that it

23  was being suggested to you that these first alleged returns

24  that you got were created during the relevant tax years and

25  then forwarded to outside accountants who then incorporated

WILLIAM G. BROWNLOW IV - REDIRECT EXAM          169

1  them into a consolidated return?  Did you understand that that

2  was what was being suggested to you?

3  A.   If it was -- I'm not sure I'm following your question.

4  Say that again.

5  Q.   Yeah.  Let me ask you this.  I'll rephrase.  The first

6  alleged returns -- and so that we're on the same wavelength,

7  let me get you looking at one or two of them.  I want you to

8  look, for example, at Kentucky Fuel's 2005 first alleged

9  return, which is Exhibit 22a.  Do you have that?

10              MR. HASKINS:  I've got it.

11  A.   Yes, I have that.

12  Q.   Okay.  And I just want to orient you to the ones I'm

13  talking about.  I'm talking about the 22 series for Kentucky

14  Fuel.  2005 there is 22a.  Take a look, if you would, at 22b.

15  And do you see that is the first alleged return for Kentucky

16  Fuel for 2006?

17  A.   Yes.

18  Q.   And we know that's not a real tax return filed with the

19  IRS, don't we?

20  A.   Yes.

21  Q.   You have never contended that it was, have you?

22  A.   No.

23  Q.   In fact, wasn't that one of your questions that's

24  reflected in my letter to Mr. Kelley, was whether or not these

25  were actually filed?

WILLIAM G. BROWNLOW IV - REDIRECT EXAM          170

1   A.   Yes.

2   Q.   And then just to be clear, look over at the Exhibit 23

3   series, the first alleged returns for the Justice Companies,

4   and just look, for example, at Exhibit 23a for 2005.  Do you

5   see that?

6   A.   Yes.

7   Q.   Okay.  Now, my question is, there's been some suggestion

8   that these were dummy returns that were then prepared in those

9   years, 2005, 2006, so forth, forwarded to outside accountants

10  and then consolidated into the consolidated returns that we got

11  later.  Do you understand that?

12  A.   Yes.

13  Q.   Is that what happened?

14  A.   No.

15  Q.   Okay.  Did these returns -- let's take, for example, 22a,

16  the first alleged return for Kentucky Fuel Corporation.  That

17  document, did it even exist in 2006?

18  A.   No.

19  Q.   Did Exhibit 22b, the 2007 first alleged return for

20  Kentucky Fuel, did it even exist in 2007?

21  A.   No.

22  Q.   What was the first red flag that caught your attention

23  that made you think these documents weren't prepared during the

24  relevant tax years?

25  A.   The address on the return.

WILLIAM G. BROWNLOW IV - REDIRECT EXAM          171

1  Q.   Okay.  And why was that?

2  A.   That was an office building that some Justice entity

3  bought, I think in 2012 or '13, sometime along there.

4  Q.   All right.  So in terms of the notion that these

5  documents, these first alleged returns are just part of the

6  normal course of business prepared during the relevant tax

7  years, sent to outside accountants in the normal course of

8  business and then incorporated, is there any truth to that?

9  A.   No.

10  Q.   Have you also seen in response to filings that we made in

11  this case -- have you seen affidavits filed by outside CPAs for

12  the defendants?

13  A.   Yes.

14  Q.   And did you see where they acknowledged that those

15  documents had, in fact, been prepared in, I believe, 2013?

16  A.   Yes.

17  Q.   And I misspoke.  It was 2006.

18          MR. LUCAS:  And, Your Honor, for the Court, I would

19  refer, Your Honor, in the court record to exhibit -- or

20  Document 269-41, which is an affidavit of Defendants'

21  accountant, Brian Rice, who stated that with respect to these

22  returns in January 2016, "Affiant was engaged as an independent

23  contractor to prepare pro-forma stand alone returns for JCJC

24  and KFC for the years 2005 through 2013."  In a similar

25  affidavit by CPA Rolfe Richmond, was exhibit -- or Document

WILLIAM G. BROWNLOW IV - REDIRECT EXAM          172

1  269-2.

2  BY MR. LUCAS:

3  Q.   You were asked questions about Mr. Doug Terry and

4  questions were phrased in terms of a -- of Fivemile, Fivemile

5  this and Fivemile that.   Are you familiar with a corporation

6  named Fivemile Energy, Inc?

7  A.   I think it's named Fivemile Energy Resources, Inc.

8  Q.   I think you're right.   And I think I will thank you for

9  the correction.   I'll just take your correction right now.

10 It's Fivemile Energy Resources, Inc.

11 A.   Yes.

12 Q.   Who owned that company, as far as you know?

13 A.   Doug Terry and his family.

14 Q.   Okay.  Did you have any involvement in that corporation?

15 A.   Not before late September 2005.

16 Q.   Okay.  And what was your involvement with it after that

17 time?

18 A.   I foreclosed on them in order to obtain the Fivemile

19 leases and permit -- Fivemile leases and permit application and

20 the Deep Wood leases and permit --

21 Q.   Okay.  You foreclosed on them?

22 A.   Correct.

23 Q.   But did you have -- ever have any ownership interest in

24 that corporation?

25 A.   No.

WILLIAM G. BROWNLOW IV - REDIRECT EXAM        173

1   Q.    Okay.  Now, the plaintiff in this case is Fivemile what?

2   A.    Fivemile Energy, LLC.

3   Q.    Okay.  Is Mr. Terry or any member of his family a member

4   of that LLC?

5   A.    No.

6   Q.    I know you probably don't know this exact figure, but

7   you've been asked a number of questions about basically whether

8   Mr. Justice ever intended to mine and didn't, did you

9   understand that he didn't intend to mine.  Have you attempted

10  to do any rough calculations of how much money Mr. Justice

11  invested in this Fivemile property that he supposedly had no

12  intention of mining?

13          THE COURT:  Can you clarify which Mr. Justice you are

14  referring to?

15  BY MR. LUCAS:

16  Q.    I'll rephrase that to say, Kentucky Fuel or any of the

17  Justice entities.

18  A.    Yes.

19  Q.    Go ahead.  Not asking you for an exact figure, just a

20  ballpark approximation from what you have seen.

21  A.    I'm having a hard time remembering that number.

22          MR. GETTY:  The best evidence -- I mean, if he has a

23  document that shows it.  Otherwise, it's --

24          MR. LUCAS:  He just said he couldn't remember, so

25  I'll go on.

WILLIAM G. BROWNLOW IV - REDIRECT EXAM    174

1    THE COURT:  Okay.

2  BY MR. LUCAS:

3  Q.   Mr. Getty, just to clarify, when he asked you a question

4  about whether or not anyone from Kentucky Fuel with whom you

5  were negotiating had ever said that they promised to mine, and

6  you said, I don't recall what they said, was that in connection

7  with the negotiation of the original agreement in '05 or of the

8  fourth amendment in 2010?

9  A.   '05.

10  Q.   Look at Exhibit 1a, please, sir, fourth amendment.  And

11  turn to -- let's look at those paragraphs that Mr. Getty was

12  questioning you about where he kept referring to the percentage

13  royalties of the average monthly selling price of coal.  Do you

14  remember that line of questioning?

15  A.   Yes, sir.

16  Q.   All right.  That's on page -- page numbered 3 of the

17  document.  Page -- the number at the bottom of the page.  Do

18  you have that?

19  A.   Yes.

20  Q.   Okay.  The reference that he was questioning you about for

21  the -- that was tied to the average monthly selling price was

22  for what kind of royalty?  And if you want to just pick one,

23  look at subparagraph d, for example.

24  A.   For the 2 percent royalty.

25  Q.   All right.  What is it if it's the $1 a ton royalty, which

WILLIAM G. BROWNLOW IV - REDIRECT EXAM          175

1    you're claiming?

2    A.    Absolutely no difference in price.  Makes no difference.

3    Q.    Is it also tied to a monthly selling price?

4    A.    No.

5    Q.    What's it tied to?

6    A.    The tons.

7    Q.    Of coal mined, correct?

8    A.    Tons of coal mined, correct.

9    Q.    Any reference to coal sold?

10   A.    No.

11   Q.    Have you ever been aware of -- you were questioned about

12   should the defendants be required to perform the contract if

13   they thought it was uneconomical or thought they would be

14   losing money.  Have you ever been aware -- you've been a

15   businessman for how long?

16   A.    Since 1970.

17   Q.    And have you ever been aware of contracts where companies

18   or people were obligated to continue to perform even though for

19   various reasons it might be unprofitable?

20   A.    Yes.

21          MR. GETTY:  I would object to that.

22          THE COURT:  What's the basis of the objection?

23          MR. GETTY:  Well, I mean, we're -- we're here for

24   this contract and, you know, what he might have thought, what

25   somebody agrees to has nothing to do with this.

WILLIAM G. BROWNLOW IV - REDIRECT EXAM      176

1    THE COURT:  It's a fair question.  I mean, you asked

2  about mineability in a broader sense than this specific

3  contract.  So I'll allow the question.

4    Go ahead, Mr. Lucas.

5  A.   My answer is yes.

6  Q.   Just to put that in context, yes, to what?

7  A.   Yes, I'm aware sometimes you have to fill a contract even

8  though you're going to lose money doing so.

9  Q.   All right, sir.  I think at the outset of your direct, and

10  you were asked about it on cross also, Kentucky Fuel had a

11  number of obligations under the fourth amendment that it was

12  obligated to perform, correct?

13  A.   Correct.

14  Q.   And one of those was the minimum royalties?

15  A.   Yes.

16  Q.   One of those was the retainer fees?

17  A.   Yes.

18  Q.   And one of those was to pay the landowner lessors?

19  A.   Correct.

20  Q.   And one of those was to mine coal?

21  A.   Correct.

22  Q.   And the failure to do any one of those, could it be a

23  default?

24  A.   Yes.

25  Q.   Okay.  Were there defaults on all of those obligations?

WILLIAM G. BROWNLOW IV - RECROSS-EXAM          177

1   A.   Yes.

2              MR. LUCAS:  That's all I have, Your Honor.

3              THE COURT:  Okay.  Mr. Getty, you look like you have

4   some recross.

5              MR. GETTY:  Just a little.

6              THE COURT:  Well, I'm going to strictly apply the

7   rule that recross is limited to new matters raised on redirect.

8   That's all you are allowed to question on.

9              MR. GETTY:  I only plan on questioning on two areas

10  he touched on.

11             THE COURT:  Okay.  Go ahead.

12                       RECROSS-EXAMINATION

13  BY MR. GETTY:

14  Q.   You were asked just a moment ago about the fourth

15  amendment and obligation to fulfill a contract even when you

16  lose money.  I mean, this contract is not a utility contract

17  where sometimes you have -- you agree to sell coal to utilities

18  for X dollars and the price goes up --

19             MR. LUCAS:  Your Honor --

20  BY MR. GETTY:

21  Q.   -- and you are still obligated to sell for what you

22  contracted.  That's not this situation, is it?

23             THE COURT:  The objection, Mr. Lucas?

24             MR. LUCAS:  I'll withdraw it.

25             THE COURT:  Okay.  Go ahead.

WILLIAM G. BROWNLOW IV - RECROSS-EXAM          178

1    BY MR. GETTY:

2    Q.   That's a situation where somebody might have a contract

3    and they're obligated to sell the coal to the utility even if

4    they are going to lose money, right?

5    A.   I'm not aware of contracts where sometimes, based on your

6    industry or your practice, you don't have to fulfill or honor

7    your contract.  If that industry exists, I'm not aware of it.

8    Q.   I'm not sure you are listening to my question, sir.  I

9    gave you an example of a contract where someone might be

10   obligated to produce that product to sell to a utility.  I'm

11   trying to put it in the coal industry.  And the price at which

12   they sell to that utility may be such that because of market

13   changes, they have a contractual obligation to give them the

14   coal.  And they may lose money.  That's a situation like you're

15   talking about, right?

16   A.   Could be.

17   Q.   Okay.  But here they weren't selling you anything.  They

18   were telling you that they would pay you if and when they mined

19   coal, right?

20   A.   Actually they contracted to perform, I believe.

21   Q.   Okay.  And that contract is not like that utility

22   contract.  This has certain caveats or restrictions in it such

23   as if it was reasonable, good faith efforts that they would

24   have to use.  And the clause that I kept showing you that I

25   believe is critical is, this covenant to mine says covenant to

WILLIAM G. BROWNLOW IV - RECROSS-EXAM          179

1    use -- a covenant is a promise.  Covenant to use or promise to

2    use commercial and reasonable good faith and best efforts to

3    maximize, within the constraints of industry standards, the

4    amount of coal extracted from these properties.

5         So if the industry standards say you can't sell it without

6    losing money, you are not obligated to do it under this

7    contract, are you?

8    A.   Actually, I believe the contract says quite the opposite

9    of it.

10   Q.   And the last thing is, on these tax returns, despite the

11   fact that what I showed you about and explained to you under

12   the regs of dummy corporations, you came back and said

13   that Mr. Kelley sent you tax returns dated 2012, and that's how

14   you knew there's something wrong, when he sent them it's 2016.

15   Would you agree with me that if the accountants don't

16   provide --

17           MR. LUCAS:  I object to that, Your Honor.

18   Mischaracterizes his testimony.

19           THE COURT:  Well, let me hear the rest of the

20   question first.

21   BY MR. GETTY:

22   Q.   Would you agree with me that if Mr. Kelley asked my client

23   to have the accountants, you know, print on the computer or

24   generate tax returns, separate subsidiary or, quote, dummy tax

25   returns in 2016, that might be generated and have a file -- a

WILLIAM G. BROWNLOW IV - RECROSS-EXAM           180

1   date of 2012, that would explain why they were dated 2012?

2   A.   You'll have to read that back.   I've got no idea what you

3   said.

4           THE COURT:   It confused me as well, frankly, but I

5   don't think it's objectionable on the basis that Mr. Lucas

6   described because it's separate from the characterization of

7   the testimony.   But rephrase and then I'll hear if there's

8   still an objection.

9   BY MR. GETTY:

10  Q.   My point, Mr. Brownlow, is if at the time the accountants

11  generate the documents, it was because of an earlier date that

12  was on them, 2012, when they were generating them in 2016, that

13  doesn't mean they're fake, fraudulent, or anything along those

14  lines, does it?

15  A.   I didn't use the year 2012.   I was looking at 2005, 2006,

16  2007.

17  Q.   Yeah.   But if they were originally generated for purposes

18  of that production in 2012 and had a 2012 date, that's not

19  nefarious; it's just when they got pumped out of the machine,

20  right?   That's my point.

21          THE COURT:   There is a question.   He did ask his

22  question, Mr. Brownlow.

23          THE WITNESS:   I swear I don't -- I didn't hear the

24  question.

25          THE COURT:   The question was:   If they were

WILLIAM G. BROWNLOW IV - RECROSS-EXAM          181

1  originally generated for purposes of that production in 2012,

2  and had a 2000 date -- excuse me, 2012 date, that's not

3  nefarious; it's just when they got pumped out of the machine,

4  right?

5              MR. GETTY:  Here's what --

6              THE COURT:  No, no.  You asked your question.

7  BY MR. GETTY:

8  Q.   If they're printed in 2016 based on 2005 or '6 or '7 or '8

9  actual information, there's nothing nefarious or wrong with

10  that, is there?

11  A.   Well, there is if you represent it to be the actual

12  return.

13  Q.   Or if you didn't understand the difference between a

14  consolidated return and a separate subsidiary or a dummy

15  return?

16              THE COURT:  All right.  Mr. Brownlow, that concludes

17  the questioning.  So the transcript is clear, Mr. Getty sat

18  down before that question was answered.

19        All right.  Mr. Lucas, your next witness, sir.  Do you

20  need a break?

21              MR. LUCAS:  I'll call Mr. Johnson Brownlow, Your

22  Honor.

23              THE COURT:  Just for planning purposes, any idea how

24  long you anticipate his direct?

25              MR. LUCAS:  He will be short.  And I don't mean to be

WILLIAM G. BROWNLOW IV - RECROSS-EXAM          182

1    evasive.  My expectation, his direct will be ten minutes or

2    under.

3                    THE COURT:  Okay.  Come forward to be sworn, please,

4    sir.

5                    THE CLERK:  Do all the exhibits need to stay up here?

6                    THE COURT:  Let's ask.  That's a good question.

7    Swear the witness, and I'll ask the question.

8                    RICHARD J. BROWNLOW - SWORN

9                    THE COURT:  Mr. Lucas, there are binders surrounding

10   the witness.  Does he need the exhibits?

11                   MR. LUCAS:  I don't think he does, Your Honor.

12                   THE COURT:  Are they in your way, sir?

13                   MR. RICHARD BROWLOW:  No.  They're fine.

14                   THE COURT:  Okay.  Let's just leave them.  Let's just

15   leave them for now.

16                   MR. LUCAS:  Your Honor, give me just a minute.  I've

17   got a file for Mr. Brownlow and with all these Redwells

18   floating around, I'm looking for it.

19                   THE COURT:  That's fine.

20                   MR. GETTY:  Your Honor --

21                   THE COURT:  Yes.

22                   MR. GETTY:  -- do you anticipate starting another

23   witness after, because my cross of him is going to be maybe 10

24   minutes, too.

25                   THE COURT:  Well, it depends.  Perhaps is the answer.

RICHARD J. BROWNLOW - DIRECT EXAM          183

1   Mr. Lucas, I think, said earlier that these may be his only two

2   witnesses today.  So we'll take up the status then.  And if

3   you're ready to call your first witness, I'll hear some

4   testimony from --

5           MR. GETTY:  I'll be prepared to start with a little

6   break.

7           THE COURT:  Sure.  Do you need a break now?

8           MR. GETTY:  No.

9           THE COURT:  Okay.

10          MR. GETTY:  No, I'm fine.

11                    DIRECT EXAMINATION

12  BY MR. LUCAS:

13  Q.   We have found your files.  Would you be so good as to tell

14  the Court your name and where you live?

15  A.   Richard Johnson Brownlow.  I live in Knoxville, Tennessee.

16  Q.   You are Will Brownlow's son?

17  A.   That's correct.

18  Q.   And you are a member of Fivemile Energy, LLC?

19  A.   That's correct.

20  Q.   What's your educational background and training?

21  A.   I have an accounting and finance degree from Washington

22  and Lee University in Lexington, Virginia.  And I have a

23  master's of business administration from Wake Forest University

24  in Winston-Salem, North Carolina.

25  Q.   And where are you currently employed?

RICHARD J. BROWNLOW - DIRECT EXAM                184

1   A.    Property Brands in Knoxville.

2   Q.    I'm sorry, the name?

3   A.    Property Brands.

4   Q.    Okay.

5   A.    In Knoxville.

6   Q.    Is that part of a larger organization?

7   A.    It is a holding company that is currently owned by a

8   private equity company out of New York City.

9   Q.    And what is your position and duties there?

10  A.    I'm the manager of financial planning and analysis, which

11  would include financial reporting, budgeting, and analysis on

12  any new deals or acquisitions that we're interested in

13  pursuing.

14  Q.    All right.  I'm going to direct your attention to the

15  spring of 2013.  Did you have occasion to meet with Mr. Jay

16  Justice?  Is it all right if I just use the informal "Jay"?  I

17  think that's how everybody refers to him as opposed to James

18  C. Justice III, to distinguish him.

19          MR. GETTY:  That's fine with me.

20          THE COURT:  Sure.  That's fine.  As long as it's

21  clear in the record, it doesn't matter.

22          MR. LUCAS:  Did you have an opportunity to meet with

23  Mr. Jay Justice in the spring of 2013?

24  A.    Yes, sir.

25  Q.    How did that meeting come about?

RICHARD J. BROWNLOW - DIRECT EXAM          185

1   A.    Marc Merritt called my father and asked if we had a time

2   that we could come to Roanoke and meet with them.  And so we

3   set up the time and went to Roanoke for the meeting.

4   Q.    Okay.  Why did you agree to meet?

5   A.    We had a business deal at the time.  And we thought it was

6   best practice to meet to discuss our dealings.

7   Q.    Do you recall the date of the meeting?

8   A.    I do.  It was March 19th, 2013.

9   Q.    What day of the week was that?  Do you know?

10  A.    Tuesday.

11  Q.    Okay.  And at that meeting, did you discuss the Fivemile

12  project?

13  A.    Yes, sir.

14  Q.    And what did Mr. Justice say to you?

15  A.    With regards to the Fivemile project, he offered that they

16  were thinking about doing a deal with a third party, which

17  related to -- relating to the Fivemile assets and wanted to

18  talk to us about that since we have -- my understanding is we

19  had a first -- or a -- a right to agree to any assignments or

20  changes that they would make.

21  Q.    Okay.  When he told you that he was thinking about doing a

22  deal with someone during the meeting, did he identify who that

23  someone was?

24  A.    It did come out during that meeting, yes.

25  Q.    And who did he tell you it was?

RICHARD J. BROWNLOW - DIRECT EXAM                186

1    A.    NewLead.

2    Q.    Okay.  Did he tell you who or what NewLead was?

3    A.    Specifically in that meeting, I don't recall whether he --

4    he offered up the -- the specifics of their business or not.

5    Q.    Yes, sir.  I'm not talking any specifics of their

6    business, but just in terms of what kind of company or where it

7    was or what it did, did he tell you anything?

8    A.    Yeah.  That it was just a Greek company, I believe in the

9    shipping business, and that they would be interested in

10   pursuing the Fivemile assets.

11   Q.    And what was your response to that?

12   A.    When asked if we would agree to that, the most important

13   thing to us was to be able to do our own due diligence.  This

14   is a company we had heard of for the first time ever that day

15   and would need to have some of our own background, some further

16   information before being willing to sign up to take on what we

17   believe was a pretty valuable contract and asset.

18   Q.    And have you been involved in due diligence investigations

19   before?

20   A.    Yes, sir.

21   Q.    Ones of any magnitude?

22   A.    Yes, sir.

23   Q.    How large?

24   A.    In terms of the amount of due diligence or the size of the

25   deal?

RICHARD J. BROWNLOW - DIRECT EXAM          187

1   Q.    Size of the deal.

2   A.    The biggest one I've done is about a $300 million cash

3   flow business that I did due diligence, and that's been about

4   three years ago.

5   Q.    Okay.  And so you requested their due diligence file that

6   they had done in connection with this possible deal with

7   NewLead?

8   A.    That's correct.

9   Q.    During this meeting, did Mr. Justice ever say or hint or

10  intimate in any way that he had already done a deal with

11  NewLead or anyone else to transfer the Fivemile assets?

12  A.    No.

13  Q.    Was there any suggestion that they had not only entered

14  into a contract but that they had, in fact, entered into

15  multiple amendments to that contract before you met with them?

16  A.    No.

17  Q.    After you left the meeting, did you receive the --

18  anything from them in response to your request for the due

19  diligence information?

20  A.    Yes.

21  Q.    What did you get?

22  A.    We got a one- to two-page press release that was from the

23  February prior via email the following day.

24  Q.    I didn't hear the last thing you said.

25  A.    Via email the day following the meeting.

RICHARD J. BROWNLOW  - CROSS-EXAM                    188

1   Q.   Okay.

2   A.   So it would have been March --

3   Q.   He sent you a press release by whom?

4   A.   From NewLead.

5   Q.   Okay.  Did he send -- did anyone -- I don't mean he,

6   necessarily Mr. Justice specifically.  Did anyone from Kentucky

7   Fuel or the Justice organization send you any due diligence

8   information other than a press release?

9   A.   No.

10  Q.   Okay.  And if you would look at -- if you can find in one

11  of those thick notebooks -- see if you can find Plaintiffs'

12  Exhibit 13, m as in Mike.  Okay.  Can you identify that?

13  A.   Yes.  It is the news release that was provided the day

14  following the meeting.

15  Q.   All right.  That's all I have, Your Honor.

16             THE COURT:  Okay.  Mr. Getty, your cross, sir?

17                        CROSS-EXAMINATION

18  BY MR. GETTY:

19  Q.   Let me just see if I can recount from my notes.  You have

20  an accounting and financing -- finance degree from W and L?

21  A.   That's correct.

22  Q.   And then you got an MBA at one of my favorites schools,

23  Washington and -- or Wake Forest?

24  A.   Wake Forest, that's correct.

25  Q.   And what years did you get those degrees?

RICHARD J. BROWNLOW  - CROSS-EXAM          189

1   A.   Graduated from Washington and Lee in 2007.  I graduated
2   from Wake Forest in 2011.
3   Q.   So you've been basically in the business area working for
4   the last roughly six and a half, seven years?
5   A.   No, that's incorrect.
6   Q.   You got your MBA in 2011 and the accounting degree in
7   2007.  Did you work that four-year period in the interim?
8   A.   Yes, sir.
9   Q.   Okay.  Takes, what, two years to get an MBA, right?
10  A.   That's correct.
11  Q.   So you worked two years where?
12  A.   Goldman Sachs in New York City.
13  Q.   And what did you do at Goldman Sachs?
14  A.   I was a financial analyst in the controller's department.
15  I worked in credit defaults swaps and interest rate swaps.
16  Q.   I'm smiling because my son is in Atlanta working for Sun
17  Trust doing exactly swaps and derivatives and things of that
18  sort.  That experience exposes you to sophisticated financial
19  products, does it not?
20  A.   Yes.
21  Q.   Okay.  And since you've been in business, I mean, would it
22  be fair to say that you know how to read a financial statement,
23  you know how to break apart transactional documents and things
24  of that sort?
25  A.   Yes.

RICHARD J. BROWNLOW  - CROSS-EXAM                190

1    Q.    Okay.  And your testimony here today is that you work for

2    a company named Property Brands.  What exactly do they do?  I

3    didn't get a real sense of -- do they sell a product?  Do they

4    provide a service?

5    A.    We're a holding company.  We purchase software property

6    management -- excuse me, property management software

7    companies.

8    Q.    Okay.  Companies that manage, for example, shopping

9    centers, apartment complexes, things of that sort?

10   A.    Mostly residential.

11   Q.    Mostly residential?

12   A.    Yes, sir.

13   Q.    When you say "residential," you mean?

14   A.    Where people live.

15   Q.    Do you mean single family or multiple family?

16   A.    All of the above.

17   Q.    Okay.

18   A.    We have 19 companies.

19   Q.    Okay.  And I gather during your career, either at Goldman

20   Sachs or in your educational experience, you had some exposure

21   to what a consolidated return is versus a subsidiary return?

22   A.    I've not dealt with specific tax returns.

23   Q.    Okay.  Are you aware --

24   A.    I only do internal --

25            THE COURT:  He needs to finish that answer.  Were you

RICHARD J. BROWNLOW  - CROSS-EXAM          191

1   finished with your answer, sir?

2   A.   The only thing I focused on is internal reporting and with

3   regards to historical results.  I've not done any tax work.  I

4   have no tax work in my background.

5   Q.   Given your knowledge, your experience with an MBA and

6   accounting finance degree, have you participated in this

7   litigation assisting your father, assisting counsel?

8   A.   To a certain extent but not to a great extent.

9   Q.   Did the topic of, you know, what these tax returns were

10  and whether it was a consolidated return ever come up in the

11  discussions with your father?

12           MR. LUCAS:  Objection.  Beyond the scope of direct.

13           THE COURT:  Let me read the question.  I'll sustain

14  that objection.

15       Go ahead, Mr. Getty.

16  BY MR. GETTY:

17  Q.   My point is you can offer no testimony with respect to

18  that issue here?

19           MR. LUCAS:  Same objection, Your Honor.

20           THE COURT:  Well, he can answer that question.

21  A.   Could you repeat the question, please?

22  Q.   You can offer no testimony with respect to the issue of

23  what the consolidated or dummy returns or what the implications

24  are of those, can you?  You are not here for that purpose?

25  A.   No, sir.

RICHARD J. BROWNLOW  - CROSS-EXAM          192

1  Q.   Okay.  You are here solely to say that when you met in

2  Roanoke with Mr. Justice, that he indicated to you that there

3  was a company involved named NewLead or NewLead, right?  He

4  disclosed that to you?

5  A.   He did not disclose to us that they were involved in any

6  way.  They disclosed to us that they were thinking of doing a

7  deal with a third-party company that we found out during that

8  meeting was a company called NewLead.

9  Q.   So during the conversation, the name NewLead came out?

10  A.   That's correct.

11  Q.   That's the entity that is in some way involved here,

12  right?

13  A.   I would say those are your words.  I mean, they are --

14  they're now involved.  We know that.  At that time of the

15  meeting they were -- as far as we know, they were thinking

16  about doing a deal with somebody and the company was NewLead.

17  Q.   Have you looked at the series of agreements that involve

18  Mr. Williams' company and then Camon-something and then

19  NewLead?

20  A.   I have not studied those.

21  Q.   So you haven't studied them at all?

22  A.   I wouldn't have reason to.

23  Q.   And if you look at those documents, I'll represent to you

24  that they will tell you that the involvement of NewLead was

25  they were financing for Mr. Williams.  Do you know that?

RICHARD J. BROWNLOW  - CROSS-EXAM          193

1    A.    Those are your words.

2    Q.    That's what the documents show.

3    A.    Okay.

4    Q.    So you don't know one way or the other, you can't offer

5    any testimony.  If Mr. Justice takes the stand today or

6    tomorrow and says -- and walks through those documents, or if

7    Mr. Ball does it and shows that NewLead -- NewLead came in

8    simply to finance Mr. Williams because he couldn't come up with

9    the money.  That's somebody financing the company entity you're

10   dealing with.  You're not dealing directly with NewLead, are

11   you?

12   A.    That was not what was represented to us.  What was

13   represented to us was that the deal was with NewLead.

14   Q.    Okay.  And if you look at 13m -- I haven't had time to

15   really look closely at it, but they didn't hide anything from

16   you; they sent you NewLead -- NewLead's press release, didn't

17   they?

18   A.    They did.

19   Q.    And you're here telling this Court that somehow, some way

20   in this conversation, that Mr. Justice didn't tell you the

21   truth, right?

22   A.    I have not said that.

23   Q.    That's the whole purpose of your testimony, isn't it?

24   A.    I don't believe --

25   Q.    Didn't he tell you --

RICHARD J. BROWNLOW  - CROSS-EXAM          194

1    THE COURT:  Let -- no, no, Mr. Getty.  You do need to

2  let him answer your question.  You're interrupting him.  So

3  back to the original question.  Gosh.  I think you said:  That

4  was the whole purpose of your testimony, isn't it?  And we

5  didn't get a full answer to that.

6  A.    Could you repeat the question?

7  Q.    Sure.  I'd be happy to.  The whole purpose of your

8  testimony is to come here and say that you had a meeting with

9  Mr. Jay Justice, and there was something out there with NewLead

10  that -- and he didn't tell you the exact details of it?

11  A.    I believe I've answered that question already.  What he

12  told us was they were thinking of doing the deal that involved

13  a company called NewLead.

14  Q.    Didn't tell you any of the specifics about whether NewLead

15  was financing it, whether they were buying something; he just

16  said there's a company involved called NewLead?

17  A.    That's correct.

18  Q.    And then he sent you this three-page press release?

19  A.    That's correct.

20  Q.    Does that kind of conduct, where somebody sends you the

21  press release that they got from this entity NewLead, does that

22  strike you as somebody that is trying to withhold -- withhold

23  from you information about the entity whose name popped up in

24  the conversation?

25  A.    Given the request that we had that led to the production

195

1   of this particular document, I believe it to be fully

2   inadequate.

3            MR. GETTY:  Okay.  We'll let the Court decide whether

4   it is or isn't.  That's all I have.

5            THE COURT:  Redirect, Mr. Lucas?

6            MR. LUCAS:  No, Your Honor.

7            THE COURT:  Sir, you can step down.  You certainly

8   can remain in the courtroom if you want to watch the rest of

9   the hearing.

10       All right.  Further evidence from the plaintiffs,

11  Mr. Lucas?

12           MR. LUCAS:  Not at this time, Your Honor.

13           MR. GETTY:  I would like five minutes.

14           THE COURT:  Sure.  Sure.  How do you want to proceed

15  this evening?

16           MR. GETTY:  I can start.  I'm sorry.  Let me rise.

17           THE COURT:  You don't need to.  That's fine.

18           MR. GETTY:  As long as I lean on the table, I'm okay.

19  I'm just so used to -- you know, it's --

20           THE COURT:  A reflex.  That's fine.

21           MR. GETTY:  I can start Jay today or I can start him

22  tomorrow.

23           THE COURT:  Well, what's your estimate as to how long

24  his direct will take?

25           MR. GETTY:  I think we probably -- and you correct me

196

1   if I'm wrong, Ms. Harlan.  I would say I can do him in two and

2   a half maybe, three hours max.

3             THE COURT:  His direct testimony in three hours?

4             MR. GETTY:  Less.

5             THE COURT:  And how many other witnesses do you

6   intend to present?

7             MR. GETTY:  Well, we may or may not call Mr. Ball.

8   And we have -- depending upon logistics, we have Mr. Sarver for

9   sure.  We had planned on calling Mr. Terry, but that raises an

10  issue that probably ought to be addressed, brought to your

11  attention.

12            THE COURT:  Yes.

13            MR. GETTY:  Mr. Terry has been subpoenaed --

14            THE COURT:  Yes.

15            MR. GETTY:  -- to appear here.  He lives in Ashland.

16  And he was subpoenaed in Ashland.  I have spoken directly with

17  him.  He told me that he was on his way to -- I think to

18  Rosewood, Tennessee.  He has a 94-year-old father who has just

19  undergone some surgery.  He was going to Rosewood to spell his

20  sister and be with his father.  And he said, I know I've been

21  subpoenaed, but I don't want to be there, I want to be with my

22  father.  So, you know, I'm in a quandary on that.  We'll talk

23  further with him tonight and be able to tell you more tomorrow.

24            THE COURT:  Sure.  In the morning.  That'd be fine.

25            MR. GETTY:  One of the things or one of the

197

1  possibilities I thought in order to try and accommodate him and

2  his father is, you know, I -- I barely got there when my father

3  passed.  So I know -- and I -- I feel for --

4           THE COURT:  I'm sympathetic to the concern.

5           MR. GETTY:  What I might come back and ask is that we

6  hold the record open, take him later by videotape to

7  accommodate him and then submit it.

8           THE COURT:  Well, let's get a status update on that

9  in the morning.  Let's do this.  Let's take a 15-minute recess.

10  We'll start precisely at 4:30 with Mr. Jay Justice's direct.

11  We'll go for approximately an hour.

12      Sheila, are you okay to 5:30?

13           THE CLERK:  I am.

14           THE COURT:  Okay.

15           THE CLERK:  The exhibits from plaintiff have not been

16  admitted yet.

17           THE COURT:  Yes.  They're still by the witness chair.

18  That's your question?

19           THE CLERK:  Well, everything is there.  I want to

20  retrieve all those before we start the next witness.  But I

21  need those removed from the record if they're not going to be

22  admitted.  I can't take them.

23           THE COURT:  That's right.  So do you intend to move

24  for the admission of some of your exhibits through the

25  testimony of Mr. Justice?

198

1          MR. GETTY:  Yes.

2          THE COURT:  So those can remain there for him to

3    review, but you want to get the binders of the Defendants'

4    Exhibits at this time, correct, Sheila?

5          THE CLERK:  Plaintiffs.

6          THE COURT:  Excuse me, I missopke.  Plaintiffs.

7    Okay.  That's fine.  So those can be returned to -- they'll be

8    available if they're needed for examination.

9          MR. GETTY:  I did raise the Mr. Terry situation with

10   Mr. Lucas first thing this morning.

11         THE COURT:  Okay.  All right.  Anything we need to

12   take up, Mr. Lucas, until we take a break until 4:30?

13         MR. LUCAS:  No, Your Honor.

14         THE COURT:  Okay.  We're going to start precisely at

15   4:30 with Mr. Justice's testimony.  We'll proceed basically

16   until 5:30.  We'll stand in recess.

17       (A recess was taken from 4:16 to 4:32.)

18         THE COURT:  Okay.  Thank you.  We're back on the

19   record.  Mr. Getty, call your first witness, please, unless --

20   looks like you have a preliminary issue.

21         MR. GETTY:  Yeah, there is.  Unfortunately, there's a

22   matter I need to bring up to the Court.

23      When we talked about -- at the beginning of the break

24   about what -- how long Jay would be and how --

25         THE COURT:  Yes.

199

1          MR. GETTY:  -- to pare him down, I thought perhaps

2     tonight I could shorten him up if I took another witness.  So I

3     made a sort of tentative decision that I would call Dexter

4     Patton, who I know I can do in less than an hour.  He's their

5     expert.

6          And as I walked out to go to the bathroom, I said, Dexter,

7     I'm going to call you next.  He said okay.  So I brought it up

8     to John as we were -- as I was coming out and he was going into

9     the bathroom.  And I told him, "I'm going to call Dexter next."

10    He said, "No, you're not; he is my expert and you can't call

11    him."  I believe I have the right to call him because our --

12    our list said anybody on their list.

13         I thought it would be more efficient to go ahead and do

14    that.  Jay indicated that he saw and spoke briefly with

15    Mr. Patton.  Mr. Patton was getting on the elevator.  And he

16    said, "Where are you going?"  He said, "I'm just doing what I'm

17    told."  So Mr. Patton is not here.  He apparently has been told

18    to depart so that we cannot call him.

19         So I will call Mr. Justice and begin -- begin his.  But I

20    think the way this transpired, I don't believe Mr. Patton

21    should have been told to leave this courthouse until we could

22    have addressed this.  I told Mr. Lucas I was going to bring

23    this to your attention, and we would deal with it then.  All I

24    can say, if the role was reversed, I would have never told

25    Mr. Patton to leave this courthouse.

200

1          THE COURT:  Was he ever subpoenaed?

2          MR. GETTY:  Pardon me?

3          THE COURT:  Was he ever subpoenaed?

4          MR. GETTY:  He was not.

5          THE COURT:  Mr. Lucas?

6          MR. LUCAS:  I want to correct part of the record.

7   What happened was, at the end -- at the end of the hearing when

8   we took the recess, Mr. Getty asked me, "Where is Mr. Patton?

9   I said, "I don't know."  And he said, "Well, is he going to be

10  here?"  I said, "You know, I don't know.  He's my potential

11  rebuttal witness."  And he kept asking me where he was.  I

12  said, "I don't know."  I didn't tell him to do anything.  I

13  walked out and someone said that Mr. Getty had told Mr. Patton

14  that he was going to be the next witness, not Mr. Justice.  So

15  I told Mr. Getty, I said, "He's my expert, you are not calling

16  him."  I did not tell Mr. Patton to leave the courthouse.  I

17  did not tell him that.  And I told Mr. Getty that I did not

18  tell him to leave the courthouse.

19      Nevertheless, I told him he's not going to call him,

20  because, A, he's not their witness.  He's my expert.  He's not

21  entitled to call my expert.  B, even if his witness -- and that

22  would be true even if he put him on the witness list, which he

23  didn't, but he said he reserves the right to call any witness

24  called to testify.  I haven't called him to testify yet, so

25  he's not a witness.  He's certainly not their witness.  And he

1   needs to put Mr. Justice on the stand.

2           THE COURT:  Okay.

3           MR. GETTY:  I just want some assurance that, you

4   know, I'll have an opportunity to cross-examine.  That's all.

5   I just --

6           THE COURT:  Well, wait a second.  Wait a second.  And

7   I am sorry to interrupt you.  I need to know if there's

8   specific relief that you are seeking from the Court.  And it

9   sounds to me like if he's called, he's going to be called as a

10  rebuttal witness, and of course you would be allowed to

11  cross-examine him if that's what occurs.

12          MR. GETTY:  I just don't want him to disappear and

13  not get the opportunity to cross-examine.

14          THE COURT:  When you say that you want to

15  cross-examine, he hasn't provided any evidence yet.  So you

16  will be afforded the opportunity to cross him if he testifies

17  as a rebuttal witness.

18          MR. GETTY:  I guess we could think about whether we

19  could subpoena him or not.  I just wanted some assurance that

20  he's going to testify and remove the problem.

21          THE COURT:  I can't direct either party --

22          MR. GETTY:  I don't want you to.

23          THE COURT:  No.  Well, let me finish my thought.  I

24  can't direct a party to call a particular witness.

25          MR. GETTY:  I'm not asking.  I was simply asking

JAMES C. JUSTICE III - DIRECT EXAM          202

1   Mr. Lucas to give me his assurance he won't do that.  So we are

2   where we are.

3              THE COURT:  Okay.  Are you ready to call Mr. Justice?

4              MR. GETTY:  Yes, sir.

5              THE COURT:  Okay.  Would you approach, please, to be

6   sworn, sir?

7                    JAMES C. JUSTICE III - SWORN

8                          DIRECT EXAMINATION

9   BY MR. GETTY:

10  Q.   Mr. Justice, please state your full name for the record.

11  A.   James C. Justice, III

12  Q.   Where do you reside?

13  A.   Roanoke, Virginia.

14  Q.   Okay.  And what is your position with the Justice

15  Companies?

16  A.   I am now the president and CEO.

17  Q.   Okay.  Tell the Court, if you would, just a little bit

18  about your educational experience.

19  A.   I have a bachelor's degree from Virginia Tech in building

20  construction, finance, and a minor in agriculture economics.

21  Q.   Okay.  And how long have you been involved in the coal --

22  coal industry, mining industry?

23  A.   Well, I've been involved my whole life, but, you know, I

24  graduated from Virginia Tech in 2003.  I've been full time

25  since then.  But prior to that, you know, I worked in the

JAMES C. JUSTICE III - DIRECT EXAM                    203

1   summer, the weekends, and, you know, a long, long time.

2   Q.   Well, let me ask you this.   How long has the Justice

3   entities or Justice family been in the coal business?

4   A.   I'm the fourth generation, so around 60 years.

5   Q.   Okay.   And were your -- were your grandparents or parents

6   in the coal business?

7            THE COURT:   Can I interrupt for a second?   The chair

8   doesn't move.   The microphone will slide closer if that makes

9   you more comfortable.

10       The question was:   Were your grandparents or parents in

11   the coal business?

12   A.   My father's grandfather was in the coal business; his

13   father, my grandfather, was in the coal business; Dad's been in

14   the coal business; and now I am.

15   Q.   And how many -- how many people does the Justice Companies

16   employ?

17   A.   Well, we have various businesses.   And we employ a lot of

18   people in a lot of different industries, but coal business

19   today employs about 500 people.

20   Q.   Where are they?   Kentucky, West Virginia?

21   A.   They're in Kentucky, West Virginia, and Virginia.

22   Q.   And what kind of coal and quality and what kind of coal

23   are your companies being -- mining right now?

24   A.   Well, over the years we've mined all different types of

25   coal, and all different types of mining methods in five

JAMES C. JUSTICE III - DIRECT EXAM                204

1   different states.  With the downturn, we've cut our production

2   back tremendously from what it once was.  And it's more now

3   than it was at the low point in 2015, but we produce both steam

4   and metallurgical coal, probably about 75 percent metallurgical

5   coal and 25 percent steam coal.

6   Q.   And what kind of methods of mining are you engaged in in

7   these various states?

8   A.   We have underground mines, surface mines, and surface and

9   high wall mine are operational.

10  Q.   Can you tell the Court how you came to know -- or how your

11  company representatives came to know Mr. Will Brownlow?

12  A.   Well, when our companies became to know Mr. Brownlow, I

13  was --

14          MR. LUCAS:  I want to interpose an objection to any

15  hearsay, Your Honor.  It sounds like he's testifying about how

16  other people came to know Mr. Brownlow, and it's not

17  established that he has personal knowledge of that.

18          THE COURT:  Well, but there hasn't been a description

19  of any out-of-court statement yet.  It's not a hearsay issue.

20      If you want to ask him about his knowledge, you can, Mr.

21  Getty.

22          MR. GETTY:  I'll personalize it, Your Honor.

23          THE COURT:  Okay.

24  BY MR. GETTY:

25  Q.   How did you personally come to know Mr. Brownlow?

JAMES C. JUSTICE III - DIRECT EXAM            205

1   A.    The first time I ever met Mr. Brownlow was in probably

2   either October or November of 2010 when he was working on

3   the -- the purchase of the Appalachian Fuels assets in Pike

4   County, which were Bent Mountain and Bevins Branch, on our

5   behalf.

6   Q.    Were those Addington properties?

7   A.    They were.

8   Q.    He was sort of a stalking horse for you, I gather?

9   A.    He was.  He was.

10  Q.    Let's go back a step.  What I would like to know -- what I

11  think would be important to the Court is how did the Justice

12  Companies really get involved in Kentucky coal mining?

13  A.    Well, up until 2004, we were only mining in West Virginia

14  and had only mined in West Virginia.  And Dad had a family

15  friend -- his name was Steve Sarver, and he'll probably be

16  called as a witness.  He works for the company and has since

17  2004.  -- that had gotten involved with a group of other

18  professionals in Bluefield, West Virginia, I think mainly some

19  doctors, and they'd invested in a coal mine in Manchester,

20  Kentucky.  It was called Candle Ridge.  And for good or for

21  bad, you know, the coal business takes a lot of capital to run

22  an operation, and, you know, the coal business probably has

23  made a lot of wealthy people and it's probably broke a lot of

24  people, too.

25        The long and short of it is Mr. Sarver and his other

JAMES C. JUSTICE III - DIRECT EXAM                    206

1   investors kind of got in over their head.  They were losing

2   money and really were on the verge of losing everything they

3   had.  And Steve came to Dad and said basically, you know, can

4   you help us, can you come and look at it.  Can you come and,

5   you know, lend some expertise on how we should mine it, what we

6   can do, you know, could you loan us some money.  And, you know,

7   Dad is this kind of person, you know, he's loyal to his friends

8   and tries to help when he can.  And really sight unseen, he --

9   he told Steve, he said, you know, we'll just buy you out.  And

10  then we'll try to, you know, pick up the pieces and make that

11  work.  So that's what we did.

12  Q.   Did Mr. Sarver subsequently go to work for you all?

13  A.   He did.  As part of that deal, we bought him and the other

14  investors out, and Mr. Sarver then got a job with the company.

15  Q.   Okay.  Did you bring equipment and employees in and

16  actually mine the Candle Ridge property?

17  A.   We did.  We hauled equipment in and sent managers from

18  West Virginia and hired Kentucky operators.  And we ran the

19  Candle Ridge operation for probably 18 months after that.  I

20  don't think we ever made any money at Candle Ridge but, you

21  know, we were able to help out a friend, and it was -- it

22  really was the -- was the thing that got us involved in the

23  Kentucky coal industry.

24  Q.   Okay.  After Candle Ridge mining ceased, what happened

25  next in terms of your activities here in Kentucky?

JAMES C. JUSTICE III - DIRECT EXAM                 207

1   A.   Well, we knew the Candle Ridge operation was not going to

2   be a long-lived operation, and so we were looking for another

3   place to go with our equipment.  And, you know, once somebody

4   knows there's a new kid on the block, you know, you're

5   inundated with -- you know, everybody has got a deal for you.

6   And the guy that was involved in the Candle Ridge operation

7   that was getting the override royalty, his name was Clyde

8   Burchette.  He was actually the football coach here in London

9   several years ago.

10  Q.   Uh-huh.

11  A.   And Clyde, you know, we developed a relationship with

12  Clyde and he -- he, through some form or fashion, introduced us

13  to Will Brownlow and Doug Terry, and those people that were

14  involved in the Fivemile and Deep Wood projects.

15  Q.   What did you learn, if anything, as a result of being

16  introduced to Mr. Brownlow?

17  A.   Well, we were represented -- or our company was

18  represented that there were two permits, Fivemile and Deep

19  Wood, that were very sizeable in tonnage.  Deep Wood was much

20  bigger than Fivemile.  And, you know, the number was

21  represented around 20 million tons that we could tie up.  It

22  was represented it was fully permitted and it was represented

23  that it was, you know, fairly decent quality, low ratios and

24  all those things.

25       And we could acquire the rights to those properties for

JAMES C. JUSTICE III - DIRECT EXAM          208

1    $200,000.  Now, I don't want to minimize in any way that

2    $200,000 isn't a lot of money, but to tie up 20 million tons of

3    permitted coal, you know, that was a pretty -- pretty

4    attractive priced entry there.  And so we kind of did the deal

5    sight unseen and thought, you know, it was worth the risk,

6    worth the gamble.  And that's how we got involved with

7    Mr. Brownlow.

8    Q.   Did you trust Mr. Brownlow's representations about the

9    permitting and other things?

10   A.   Well, you know, I didn't have any firsthand personal

11   interaction with Mr. Brownlow, but, you know, we checked him

12   out and we -- we knew that he was, you know, in business here

13   in London, been in business for a long time and, you know, our

14   guess was, you know, that he was probably representing

15   everything as it should be.

16   Q.   Okay.  What happened?  Did you purchase the permits?

17   A.   We did.  We closed that deal with Mr. Brownlow in the fall

18   of 2005.

19   Q.   Did you enter into any arrangements with respect to

20   overrides or anything of that sort?

21   A.   We did.  We paid him $200,000, as I recall.  And then, you

22   know, we -- we had a tonnage override as we mined coal.

23   Q.   What was the steam coal market like here in Kentucky when

24   you did the original transaction with Mr. Brownlow?

25   A.   Many, many times better than it is today.  You know, you

JAMES C. JUSTICE III - DIRECT EXAM    209

1    had George Bush in office.  You had -- steam coal demand in the

2    country was pretty -- pretty big.  You know, in 2005, probably

3    58 to 62 percent, in that range, of electricity was made by

4    coal.  Today that number is about 33 percent.  And so the

5    demand for steam coal was big.  The price was probably

6    somewhere in the mid 60s, $65 and that would be for twelve five

7    BTU, 12 ash, and 1 percent sulfur.  That's kind of the standard

8    product.

9    Q.    Twelve five BTU, 1 percent ash?

10   A.    Twelve five BTU, 12 percent ash, and 1 percent sulfur.

11   Q.    And what, if any, representations about the property, or

12   let's call it considerations, did Mr. Brownlow make?

13   A.    Well, what we found out after we had purchased the

14   property -- or purchased the rights was that the quality was

15   terrible, you know.  Just to cut to the chase, the quality was

16   terrible.  The ash was, you know, anywhere from probably

17   15 percent on the best seam to 35 percent on the worst seam.

18   Sulfurs were 1 1/2 percent on the best seams and as high as

19   7 percent on the worst seams.

20        And so, you know, boy, did we feel like an idiot because

21   we spent $200,000 and we think we've gotten 20 million tons of

22   coal, and it's coal you just can't mine.  It's just not

23   marketable.

24        And then, you know, we tried to look at, you know, were

25   there ways to kind of cherry pick, you know, mine this seam

JAMES C. JUSTICE III - DIRECT EXAM                210

1   here and not the seam over there, and we found the other

2   problem was that the -- any of the mining required a lot of

3   valley fills.

4   Q.    Explain to the Court what a valley fill is.

5   A.    Well, if you -- if you had this cup, if this was a

6   mountain and you blast this mountain, you can't put the dirt

7   that was previously, before you blast it, you can't put the

8   same amount of dirt back in this cup.  It swells.  It swells

9   between -- in Central Appalachia between 1.25 and 1.35, you

10  know, times.  So that excess dirt, you know, that's a

11  30 percent excess, it has to go somewhere.

12  Q.    You're strip mining?

13  A.    Strip mining.

14  Q.    Pulling the dirt off and getting the coal?

15  A.    So when you blast that, that other 30 percent of dirt, it

16  has to go somewhere.  In Appalachia it goes in a valley.

17  That's -- you know, that's -- the valley is filled with this

18  excess dirt.  Now, 30 years ago, the state issued permits for

19  the valley fills.  In recent years, you know, the federal

20  government has taken over the permitting of the valley fills.

21  And under, you know, George Bush or a Republican

22  administration, things were -- things were tough to get a

23  valley fill permit, but you still could.  It took four or five

24  or six years and millions and millions of dollars to get one.

25         During the Obama years there was a tremendous pullback in

JAMES C. JUSTICE III - DIRECT EXAM          211

1   that and couldn't get one.  And in some cases, you know, there

2   were valley fill permits that were previously issued that were

3   revoked by Obama.  So if you need a valley fill permit, you are

4   just out of luck.  That's just what happened.

5   Q.   When was was that change implemented, roughly?

6   A.   Well, the change started in, you know, January the 15th of

7   2009 or whenever he was sworn in.  And there were no valley

8   fills issued until probably in the last year or so.

9   Q.   Okay.  Basically a moratorium placed on valley fill

10  permits by the Obama administration?

11  A.   That's right.

12  Q.   And what representation or what statements -- well, let me

13  rephrase it.  What, if anything, did Mr. Brownlow tell you

14  about the availability of a 404 valley fill permit?

15  A.   Well, we were represented that the 20 million tons was

16  permitted.

17          THE COURT:  Yes?

18          MR. LUCAS:  May I have a continuing objection to the

19  relevance on the same grounds that I stated earlier about the

20  earlier witness and this line of testimony?

21          THE COURT:  That it doesn't go -- excuse me, that it

22  goes to things that are already established in the record.  Is

23  that the objection?

24          MR. LUCAS:  Yes, Your Honor.

25          THE COURT:  Okay.  Mr. Getty, your response?

JAMES C. JUSTICE III - DIRECT EXAM     212

1    MR. GETTY:  Well, I mean, I'm simply trying -- I'm

2  really now addressing what statements were made that were not

3  adequate when they got in the deal, and I think that's

4  pertinent.

5    THE COURT:  I'll overrule the objection.  There were

6  plenty of questions asked of Mr. Brownlow about what was

7  represented to him at that time the fourth amendment was

8  negotiated.  So I'll overrule the objection.

9    Go ahead, Mr. Getty.

10    MR. GETTY:  Thank you.

11  BY MR. GETTY:

12  Q.   What, if anything, did Mr. Brownlow tell you about a 404

13  permit on this property?

14  A.   We were represented that the properties were permitted and

15  you could fully mine the reserve.

16  Q.   Which properties are you talking about?

17  A.   Deep Wood and Fivemile.

18  Q.   Okay.

19  A.   And so, you know, if -- if I tell you, you know, it's

20  permitted and you can fully mine the reserve, we expect that

21  you have all the -- the pertinent permits, you know, blasting

22  permit, the Clean Water Act permit, the Kentucky permit, the

23  federal permits.  You know, there were no qualifiers made that,

24  oh, I don't have all the permits you need.

25  Q.   I'd like you to -- do you have the Defendants' Exhibit

JAMES C. JUSTICE III - DIRECT EXAM                 213

1   book up there?

2              THE COURT:  No, didn't you obtain those?

3              THE CLERK:  He has defendants'.

4              THE COURT:  Defendants'.  Excuse me.  My mistake.

5   Yes.

6        Go ahead.

7              MR. GETTY:  Yeah.  The defendants'.

8   BY MR. GETTY:

9   Q.   Turn to Exhibit Number 1, if you would, please.

10  A.   Okay.

11  Q.   Can you identify that document, sir, for the Court?

12  A.   That is the Kentucky permit application map that was

13  prepared for Fivemile.

14  Q.   Okay.  And who presented that to you?

15  A.   Who presented the map?

16  Q.   Who prepared it, I mean?

17  A.   It was originally prepared by Summon Engineering, but it

18  was part of the package that we received from Brownlow.

19             MR. LUCAS:  I'm sorry, which exhibit was that?

20             MR. GETTY:  This one.

21             THE COURT:  Number 1.

22             MR. GETTY:  Number 1.

23  BY MR. GETTY:

24  Q.   What does it depict?  We've got some yellow sections, some

25  green, some sort of salmon and then there's some crosshatch

1  green.  I would like you to explain to the Court the

2  significance of each of those.

3  A.   Well, there's a legend up here in the right-hand corner

4  that's really tough to see, but I can tell you what it says.

5  Q.   I would say impossible for someone with my eyes.  I can't

6  read anything.

7  A.   Well, nevertheless, the green -- dark green areas are

8  valley fills.  So those are fill areas needed to be able to

9  mine the permit.

10  Q.   So where you see the dark green areas, that's where you

11  are going to be required regulatorily to fill the valley?

12  A.   That's correct.  And you have to get a 404(b) permit for

13  that.

14  Q.   So how many areas does this show that you would need to

15  get a 404 valley fill permit?

16  A.   There's five valley fills.  And just because I want to be

17  as precise and correct as I can be, the smallest valley fill

18  that is kind of on the -- the bottom half of the map there --

19  Q.   The green hatched area?

20  A.   Green hatched area, the Corps provides a variance for a

21  404 permit if the area was previously disturbed or previously

22  mined.  That green hatched area was previously disturbed,

23  probably in the '60s.

24  Q.   Uh-huh.

25  A.   Very little, kind of a small auger mining operation was

1   there in the '60s.  And so that area was previously disturbed,

2   and there was a fill area there that did not need permitted.

3   And our engineering department figured out that we could mine

4   approximately 50,000 tons on this property and fill right

5   there.  But then --

6   Q.   Where would that mining occur?  Is it depicted on the map?

7   A.   That would be some of the yellow area that is immediately

8   on top of that, that area.

9   Q.   Right.

10  A.   But it would just be very small.  I mean, you know,

11  50,000 tons was -- there is -- there is a million tons

12  permitted on that permit right there.

13  Q.   Okay.

14  A.   And so, you know, you've got 5 percent that you could

15  mine.

16  Q.   All right.  How did that revelation strike you?

17  A.   Well, you know, it was certainly -- certainly not as

18  represented at all.  And, you know, again, the Deep Wood and

19  Fivemile situation has cost us many, many, many millions of

20  dollars and a lot of time and a lot of effort.  And it's just

21  been a debacle from day one.

22  Q.   Was there any discussion about what is called a

23  nonjurisdictional area?

24  A.   That's what I'm referring to.

25  Q.   Okay.  What does that mean?

JAMES C. JUSTICE III - DIRECT EXAM                216

1  A.    That means that it's previously disturbed and so the

2  Corps -- the Corps does not have jurisdiction over a previously

3  disturbed area.

4  Q.    So what you are basically saying here, if I understand you

5  correctly, is the only portion of these areas that could be

6  mined would be that area above the small valley fill out of

7  which you could -- you could gain, you estimated, approximately

8  50,000 tons?

9  A.    That's correct.

10 Q.    Okay.  What about the other areas?  Was it even possible

11 to break ground in any of those other areas where the valley

12 fill permits were needed?

13 A.    No.  No.  It's a federal felony offense to get into waters

14 of the United States without a permit.

15 Q.    Okay.  And I guess the theory is, you got to fill -- you

16 got to have a valley fill permit because there's going to be

17 runoff.  You remove the dirt on the top, you put it down in the

18 valley, and you got to be assured there's not going to be a

19 runoff into the streams that contaminates the water?

20 A.    Well, there's been a progression over the years, but

21 originally the intent was to permit runoff to make sure that

22 the runoff wasn't adversely -- or wouldn't cause an adverse

23 effect to the water quality.  That has migrated to a situation

24 today that even if you get a valley fill permit, the Corps,

25 what -- what they refer to as delineates how many feet of

JAMES C. JUSTICE III - DIRECT EXAM                217

1   stream you are impacting.  So let's say that each one of these

2   valley fills probably impacts maybe 3,000 feet of stream.  And

3   so in this watershed that feeds the Kentucky River, it may cost

4   you a thousand dollars a foot and you have to pay for

5   mitigation credits.  So every one of those valley fills will

6   cost millions of dollars to get.

7   Q.    And am I correct that there also is water quality studies

8   that have to go along with all this?

9   A.    Absolutely.  And those are -- those are why it takes --

10  even if you can get a permit, that's why it takes --

11  Q.    Right.

12  A.    -- four or five or six years to get one.

13  Q.    Because they don't want you to just go in and test the

14  water for two weeks?

15  A.    No.

16  Q.    They want you to monitor, and you got to do it for like

17  six, nine months, a year?

18  A.    You have to test it for six months, and if there's any

19  irregularities, then you have to retest for six additional

20  months.  So it can kind of go for a long time.

21  Q.    Were there any other -- you are basically telling me that

22  Mr. Brownlow didn't tell you 100 percent about the mineability

23  of this coal.  Is that an accurate description?

24  A.    I think without question the status of the permitting was

25  misrepresented, and the status of the coal quality was

JAMES C. JUSTICE III - DIRECT EXAM                    218

1   misrepresented.

2   Q.   Ultimately was information provided to you after you

3   raised issues regarding quality?  Did Mr. Brownlow come forward

4   and provide you some -- some ash, sulfur test results that

5   proved exactly what you suspected?

6   A.   There were core hole data provided, kind of after -- after

7   we had purchased the property.  You went over that, some of

8   that information, this morning.

9   Q.   Is that Exhibit 8 that I think I had out previously with

10  Mr. Brownlow?  That is the Defendants' Exhibit 8, which was the

11  yellow test results?

12  A.   Yes, sir.

13  Q.   Can you flip to that and just sort of tell the Court or

14  summarize what those results show?

15  A.   Well, if you will go back to what I said earlier, the

16  standard Central App steam product is 12,500 BTU.

17  Q.   Central App, you mean Central Appalachia -- Appalachia?

18  A.   That's correct.

19  Q.   Where I come from, up north, they say Central Appalachia,

20  but we say, down here, Central Appalachia, right?

21  A.   What I'm primarily referring to is steam coal that would

22  come from West Virginia, Virginia, Kentucky, Tennessee, and the

23  standard is 12,500 BTU, 1 percent sulfur, and 12 ash.

24  Q.   Once you get beyond that, what is the result?

25  A.   What?  I don't understand what you're saying.

JAMES C. JUSTICE III - DIRECT EXAM          219

1   Q.    Once you are beyond those parameters, what impact does

2   that have on the ability to mine or market the coal?

3   A.    Well, it has a tremendous adverse effect on price.  And I

4   can touch on that a little bit.  The sulfur issue has come and

5   gone and come again.  And what I mean by that is, is in the mid

6   '80's, before the Clean Air Act, sulfur wasn't a problem.  You

7   know, sulfur was 2 percent, you could sell it.  And not

8   7 percent but 2 percent, it was okay.  When the Clean Air Act

9   happened in the late '80s, any coal that was over 1 percent,

10  you couldn't sell it.  You couldn't sell it at all.

11      Then the scrubber technology came online about 2006 or '7.

12  That's why all of the Illinois Basin coal can be mined today.

13  There was no coal mining in the Illinois Basin in the '90s and

14  '80's because of the Clean Air Act.  So what you -- happened

15  is, that's what's, you know, killed Central App because they

16  can mine coal in Illinois for $20 a ton and we mine coal here

17  for $60 a ton.  So, you know, the power plants have scrubbers,

18  and they buy Illinois coal.

19      Now, to get to your specific question is, today, or ten

20  years ago, if we went to a power plant and said we have 20 ash

21  coal, they hang the phone up.  Just they're not going to buy

22  it, regardless of the price.  If you go to a power plant and

23  you've got 4 percent sulfur, hanging up the phone.

24      Now, if you've got today -- I'll make it an example today.

25  If you have twelve five BTU, 1 percent sulfur, today you can

JAMES C. JUSTICE III - DIRECT EXAM                220

1   get $73 a ton.  If you have 12,000 BTU, 13 ash, which is just a

2   little bit higher ash than 12, and 500 BTUs less, that price

3   can be $65.

4                THE COURT:  Mr. Lucas?

5                MR. LUCAS:  Your Honor, I'm going to interpose an

6   objection.  This is classic expert type testimony and rulings

7   on experts are well known to the Court.  So I object to it on

8   that grounds.  I don't want to lose sight of the fact -- I want

9   to make sure I didn't need to renew it, and I object to any

10  testimony by Mr. Justice on the basis he didn't appear for his

11  deposition.

12               THE COURT:  That objection was preserved, so -- well,

13  they both were, frankly.

14       But, okay, Mr. Getty, your response to the objections?

15               MR. GETTY:  It's factual information which bears

16  upon mineability and merchantability of the coal, not only now

17  but during earlier dealings with Mr. Brownlow.  It's clearly

18  pertinent and relevant.

19               MR. LUCAS:  Whether coal --

20               MR. GETTY:  It is clearly probative of the issue

21  before this Court.

22               MR. LUCAS:  Whether coal is mineable and merchantable

23  is a classic subject for expert testimony and there -- he --

24  there were no disclosures made of any expert testimony by this

25  witness.

JAMES C. JUSTICE III - DIRECT EXAM          221

1       THE COURT:  Right.  Okay.  Just a moment.  All right.

2   Mr. Getty is correct, that the evidence is probative of what is

3   allowed in terms of the defendants' presentation of evidence

4   based on Judge Van Tatenhove's ruling.

5       The question in my mind is with respect to the objection

6   that he -- that Mr. Justice wasn't designated as an expert is

7   whether there is the ability to admit the testimony pursuant to

8   Rule 701, opinion testimony by a lay witness.  He clearly is

9   a -- is testifying in his capacity as a lay witness.  The rule

10  reads:  If a witness is not testifying as an expert, testimony

11  in the form of an opinion is limited to one -- testimony in the

12  form of an opinion is limited to one that is rationally based

13  on the witness' perception, helpful to clearly understanding

14  the witness' testimony, or to determining a fact in issue, and

15  not based on scientific, technical, or other specialized

16  knowledge within the scope of Rule 702.

17      So what hasn't been developed, in my view, is a record

18  that would enable Mr. Justice to testify consistently with Rule

19  701 based on his experience and knowledge.  And I think that

20  that is a way to thread the needle between Rule 701 and 702,

21  Mr.Lucas.  Do you disagree with that?

22      MR. LUCAS:  Your Honor, my focus, in addition to

23  that, is Rule 26(a)(1)(C), which even if he qualifies under the

24  Federal Rules of Evidence as a lay witness to give opinion

25  testimony, it must be disclosed.  The summary of the facts and

JAMES C. JUSTICE III - DIRECT EXAM          222

1  opinions to which he is expected to testify, along with the
2  subject matter on the opinion testimony must be disclosed, and
3  it has never been disclosed.
4          THE COURT:  Right.  And that's the issue we spoke
5  about before.  That provision of the rule was not put in place
6  until December 1st, 2015, correct?
7          MR. LUCAS:  I'll accept Your Honor's memory on that.
8  I don't know.  But it was in place at the time that these
9  disclosures were required to be made under Your Honor's August
10 scheduling order.
11         MR. GETTY:  Your Honor --
12         THE COURT:  Hang on.  Hang on, Mr. Getty.  There are
13 a lot of moving parts here, and I need to be able to follow
14 them all.  Just bear with me for a moment.
15         MR. GETTY:  Sure.
16         THE COURT:  But the preamble to the rule, Mr. Lucas,
17 is in addition to the disclosures required by Rule 26(a)(1) --
18 it's not a preamble.  The introduction.  A party must disclose
19 to the other parties the identity of any witness it may use at
20 trial to present evidence under Federal Rule of Evidence 702,
21 703, or 705.
22     What I'm suggesting is that Rule 701 and 702 can be
23 combined, and they are -- well, and they do reflect that a lay
24 witness can, by virtue of experience, knowledge, render
25 admissible opinions that don't fall within Rule 702, and that

JAMES C. JUSTICE III - DIRECT EXAM          223

1  if they don't, then the disclosure obligation you're relying on

2  didn't apply.

3          MR. GETTY:  Your Honor, we -- well, this witness

4  clearly has vast experience.  He's been running this coal

5  company.  He's been in the coal industry now for years.  He

6  obviously is capable of rendering a lay opinion.  And, you

7  know, at the point that we're at, at this point, is simply

8  trying to wrap up on the quality of the coal.  Obviously,

9  Mr. Lucas wants to obstruct or preclude any pertinent

10  testimony.

11          THE COURT:  It's a valid objection.  It doesn't need

12  to be characterized in that way.  It's not going to help me

13  make a ruling.

14          MR. GETTY:  No, I know.  And I apologize.

15          THE COURT:  Okay.

16          MR. GETTY:  What I'm saying is, obviously the other

17  side wants to cut back and object to and preclude as much

18  testimony that's pertinent that they can.  But I think you're

19  correct in your ruling on it.  The two rules read together, and

20  given the fact that what Mr. Lucas previously cited was not in

21  play at that point, I think your previous rulings are

22  appropriate and with respect to other testimony.

23          THE COURT:  I'll allow you to develop a basis for him

24  to testify as to potentially admissible opinions based on his

25  capacity as the president and CEO of these entities.

JAMES C. JUSTICE III - DIRECT EXAM                224

1    But Mr. Lucas has a point, that if you get into the areas

2    that are governed by Rule 702, then I'm not going to allow that

3    because there hasn't been adequate disclosure.

4        Now, Mr. Lucas, I'm constrained by the referral to me to

5    conduct the evidentiary hearing.  And I need to -- obviously I

6    am being faithful to that.  So what I do want to see is if the

7    testimony can be developed in a way that is admissible under

8    those rules.  Is that clear enough, Mr. Lucas?

9            MR. LUCAS:  It is, Your Honor.

10           THE COURT:  Okay.  Mr. Getty, go ahead.

11   BY MR. GETTY:

12   Q.   All right.  Why don't you describe to the Court what

13   experience you've had since you, really, had left college, got

14   in this business, some of the areas that you have worked on.  I

15   assume you have worked, you know, from being, you know,

16   underground or on-site during labor, right on up to your

17   present position?

18   A.   Well, I had worked in all those different, you know,

19   aspects of the company.  I worked in production, engineering,

20   sales, accounting, finance.  You know Dad and he's pretty --

21   you know, drives a pretty hard -- hard road.  So I've had to do

22   all those things.

23   Q.   And would it be fair to say that your experience has been

24   broad-based in nature from top to the bottom of the coal

25   industry?

JAMES C. JUSTICE III - DIRECT EXAM          225

1   A.   Well, I've certainly got knowledge and maybe some

2   expertise in all those facets.  I would say that my primary

3   knowledge is surface mining.  That's probably what I feel most

4   confident about, is anything related to surface mining.

5   Q.   And would it be accurate to say that this experience,

6   given your position or positions, you have come to know what's

7   necessary in the day-to-day operations of surface mining?

8   A.   Sure.

9   Q.   And what it takes to comply with various regulatory rules

10  or provisions in order to mine that coal?

11  A.   And those are a lot of things, but yes.  Yes, I feel like

12  I understand those.

13  Q.   All right.  And would it also be true that as a result of

14  this you have come to know what the standards in the industry

15  are with respect to the mining and the marketability of coal?

16  A.   Sure.  I mean --

17       THE COURT:  Let me clarify the ruling.  When I use

18  the term "experience," Mr. Getty, what I mean is, if the

19  examples that he gave can be supported by actual factual

20  experience that the witness has had, that's a proper way to get

21  the testimony in.

22       But what you are doing now is trying to -- trying to

23  suggest that he is an expert in all of these fields and then

24  you are running afoul of the concern that Mr. Lucas has raised.

25  So when I use the term "experience," what I meant is if he can

JAMES C. JUSTICE III - DIRECT EXAM                226

1   testify that these limitations exist, that if he picks up the

2   phone and he says the sulfur content is X and the other end

3   hangs up, if he can testify to that based on actual factual

4   experience he's had in trying to do that, that I would allow.

5   Does that make sense?

6          MR. GETTY:  Sure.

7          THE WITNESS:  And I can do that.

8   BY MR. GETTY:

9   Q.   Okay.  Well, you know what the Court's looking for.  Can

10  you give us the kind of specific factual real knowledge and

11  experience you've had when you tried to sell coal or considered

12  it, and have been told no?

13  A.   I mean, yes.  And I've got -- I've got to make this

14  statement.  You know, we've invested lots of money and lots of

15  time in these projects, and nobody is in the business to just

16  throw away money.  If the coal could have been mined, we would

17  have mined it.  If the coal could have been, you know, mined

18  within the constraints of the permits, we would have mined it.

19         I mean, we had no -- there was no justification.  There

20  was no -- it didn't do anything for us just to pay a bunch of

21  minimums and consultants and everything just to waste money.

22  So I've got to get that out there.

23         But back to the coal quality.  Today -- you know, we'd

24  have an example today.  Market is pretty good today.  Market

25  is -- is double what the market was in 2015.  In 2015, twelve

JAMES C. JUSTICE III - DIRECT EXAM                    227

1    five BTU steam coal, 1 percent sulfur, sold for $35 a ton.

2    Today it sells for 73, 74.  Now, today, good market.  Why it's

3    a good market is there's a big export demand, and there's no

4    production.

5         You know, Kentucky coal production went from

6    100 million tons a year to 35 million tons a year.  The whole

7    Eastern Coalfield was -- in Kentucky, it was just nonexistent,

8    whether it be our mines or, you know, Alpha's mines or Consol's

9    mines, anybody's mines.  They're all shut down.

10        Today, in a good time, if we try to sell twelve five BTU,

11   same BTU, 1 1/2 percent sulfur, instantly the price would get

12   haircut by $20 a ton.  So you can go from 73, 74 to 53 or 54.

13   That's instantly below our cost.  Ash --

14   Q.   When you say below your cost, are you saying that it cost

15   you X dollars per ton to mine it?

16   A.   Yeah.

17   Q.   And what you could get for it, the difference is you're

18   losing money?

19   A.   Today our costs are in the -- in the low to mid 60s.

20   That's why all these operations were shut down, you know, in

21   Kentucky, whether it be ours or anybody's.  Central App steam

22   coal production cost is going to be somewhere in the high 50s

23   to low 60s.  And like I said, the market today is 73 or 74.  So

24   you can make some money.  But if you -- if you introduce the

25   1 1/2 sulfur and get down to 53 or 54 dollars, you are below

JAMES C. JUSTICE III - DIRECT EXAM                228

1   the cost, so you are losing money.

2   Q.   What about the ash?

3   A.   The ash is a total show stopper.   The maximum ash that

4   any -- any power plant will take that we've ever shipped to is

5   13 1/2, ever.   And so if you introduce 20 percent ash, I mean,

6   they just --

7                MR. LUCAS:   Your Honor --

8   A.   -- doesn't matter.

9                MR. LUCAS:   -- may I interpose an objection?

10               THE COURT:   Yes.

11               MR. LUCAS:   Your Honor, I want to renew my objection

12  on the same grounds, and I ask the Court's permission to voir

13  dire the witness on this point.

14               THE COURT:   Well, I think that the last answer was

15  qualified when he said -- excuse me, the maximum ash any plant

16  will take that we've ever shipped to, I think his answer was

17  factual in nature.   And that's the -- that's the way to thread

18  the needle, is factual information based on what his experience

19  has been as the president and CEO of these corporations.

20               MR. LUCAS:   Well, when -- excuse me.   I didn't mean

21  to interrupt.

22               THE COURT:   And there's clearly prejudice that you

23  weren't able to depose him.   If he were to offer traditional

24  expert testimony and the Court were to rely on it, I think it

25  would be prejudicial to the plaintiffs because they never

JAMES C. JUSTICE III - DIRECT EXAM          229

1  disclosed an expert in a timely fashion.  We've been down that

2  road.  But if the witness can say testimony along the lines of,

3  I know because we just tried to do this deal, or I know because

4  we did do this deal, or I know because I never had a plant

5  accept coal that didn't conform with these specifications, that

6  is testimony based on his experience in his role as CEO and

7  president of the corporations.  How is that objectionable,

8  Mr. Lucas?

9          MR. LUCAS:  Well, Your Honor --

10          THE COURT:  I'm trying to speed things along and help

11  Mr. Getty formulate his questions so we get answers that are

12  going to thread the needle, frankly, because I have the

13  referral from Judge Van Tatenhove that I have to follow.  So

14  how is that testimony objectionable?

15          MR. LUCAS:  Because, Your Honor, going back to the

16  specific question and answer that gave rise to my objection, he

17  was saying -- and I can't quote it exactly -- but he was

18  talking about well, the ash is a real problem and he was

19  talking just generally and nonspecifically about these problems

20  and these prices instead of saying, I have a contract on this.

21          THE COURT:  Okay.

22          MR. LUCAS:  But if Your Honor would indulge me for a

23  very brief period of time, I have some voir dire questions that

24  I think -- that I think I need to ask on his qualifications to

25  testify about this.

JAMES C. JUSTICE III - DIRECT EXAM        230

1        THE COURT:  Let's do this.  Mr. Getty, what I am

2   suggesting is that if you can limit your questions to factual

3   experiences, not assessments of market conditions based on

4   generalized knowledge, factual experiences that the --

5        MR. GETTY:  I was about to do that.

6        THE COURT:  -- that the witness has had, then it's

7   probably going to be permissible testimony.

8       You can reserve the ability to voir dire him, Mr. Lucas,

9   when we get to the cross-examination.  Is that fair enough?

10       MR. LUCAS:  Yes, sir.

11       THE COURT:  So help us move the process along,

12  Mr. Getty, by limiting the questions to factual experience and

13  conclusions that he can draw from those.

14  BY MR. GETTY:

15  Q.   Give me an example of coal of poor quality that you could

16  not sell.

17  A.   The Strong Brothers or Delta permit.

18  Q.   And what was the reason for that?

19  A.   It was high ash and high sulfur.

20  Q.   What was the level?

21  A.   There were three seams; the Hazard 4, which we high wall

22  mined, the Hazard 7, and Hazard 8.  The 4 seam was a low ash

23  product.  It was about a 7 or 8 ash, but it was 4.5 percent

24  sulfur.  This was in 2005, you know, when things were better.

25  The Hazard 7 seam was between a 15 and 18 percent ash and a

JAMES C. JUSTICE III - DIRECT EXAM            231

1   2 percent sulfur.  And the Hazard 8 seam was 25 to 30 ash and

2   it was 4 percent sulfur.

3   Q.    And what happened as a result?

4   A.    Lost a lot of money, and we ultimately reclaimed those

5   sites and -- we shut down and then reclaimed them.

6   Q.    Okay.  Can you give me a example of an operation where you

7   reviewed the quality, the cost to mine and market, and you just

8   decided against mining?

9   A.    Well, there is, you know, many, many of those instances.

10  You know, there's always some level of surprise but, for

11  example, here recently -- you were involved in this -- we had a

12  site in Pike County, Kentucky, that we were planning to mine

13  the whole mountain, but what we found out is that half the

14  mountain was deep mined previously and those deep mine records

15  weren't very good.  And we found out we couldn't mine it.  So

16  we had -- we had to amend their mine plan and not mine those

17  areas.  Those are constantly -- you know, those things

18  constantly come up.

19  Q.    Have those been real life experiences --

20  A.    Sure.

21  Q.    -- in terms of your inability to market or use high ash,

22  high sulfur coal like the Fivemile coal?

23  A.    That's right.

24  Q.    Now, just to sort of wrap this up, I showed you Exhibit 8.

25  How would you characterize the quality shown on that document

JAMES C. JUSTICE III - DIRECT EXAM                    232

1   when it was ultimately given you?

2   A.    30,000 foot view, it's terrible.  You know, you just --

3   you can't -- you cannot mine it.  Certainly can't mine it and

4   make any money.  There are some -- some dots within this

5   information that are -- you know, you could cherry pick, you

6   know, a little bit here and a little bit there, but you can't

7   mine coal like that.  I mean, if you're surface mining coal and

8   there's five seams, you know, you start at the top and come all

9   the way down.  You know, just because the third seam down is

10  okay and all of the rest of the seams are not, you can't do

11  that.  It's just not something that you can do.

12  Q.    You can't make money?

13  A.    No.

14  Q.    Is the coal generally in this Fivemile area, and I -- let

15  me show you this.  Exhibit 3 is this aerial map.

16  A.    Yes, sir.

17  Q.    Is the coal in that general area, the Fivemile area, is it

18  generally uniform pretty much in terms of ash, sulfur, BTU?

19  A.    Usually coal, no matter what area, is pretty uniform, you

20  know.  You know, within a ten-mile radius, you know, sulfur,

21  ash --

22        THE COURT:  Sir, you need to answer the question more

23  specifically.

24        THE WITNESS:  Okay.

25  A.    I think that the coal in the Fivemile area is uniform both

JAMES C. JUSTICE III - DIRECT EXAM                233

1   in ash and sulfur and BTU.

2   Q.   Okay.  What, if anything --

3           MR. LUCAS:  Your Honor, that was a classic piece of

4   opinion.

5           THE COURT:  That was an opinion.  Mr. Getty, again

6   we're back to the point of -- of the same line that I'm trying

7   to mark for both sides to understand.  If he has some actual

8   knowledge based on a study that he can testify about, that has

9   been performed by this company, and he can testify about the

10  facts of that with respect to the issues that you're raising,

11  that may be admissible.  But that -- that is why I told him to

12  answer the question more specifically, because the last answer

13  was classic opinion testimony that would have to be formed by

14  an expert.

15          THE WITNESS:  And I'll do better with that.  Yeah.

16          THE COURT:  Well, let's start over with a new

17  question, I think is the best way to do it.

18  BY MR. GETTY:

19  Q.   What is the basis for your testimony that the coal, based

20  on your own knowledge and experience -- what knowledge and

21  experience personally have you come to have that leads you to

22  conclude that the coal is generally consistent in that area?

23  A.   I would be on-site every day when we -- when we operated

24  the Strong Brothers permit.  I lived in Hazard in a Hampton

25  Inn.

JAMES C. JUSTICE III - DIRECT EXAM                234

1   Q.    And the Strong Brothers permit is what Mr. Brownlow

2   referred to as across the river?

3   A.    It's across the river.

4   Q.    It's the Delta permit?

5   A.    That's correct.

6   Q.    Okay.

7   A.    And it's --

8   Q.    Is it three miles away, like he said?

9   A.    It is.  It may be a mile and a half.  By straight line,

10  it's probably a mile and a half.

11  Q.    Okay.

12  A.    But the quality there was terrible.  And it's kind of

13  right -- right between Fivemile and Deep Wood.  Deep Wood is on

14  one side, and Fivemile is on the other.  We prospected areas

15  around our Strong Brothers permits, drilled it.  We hired John

16  T. Boyd.  All the results were very consistent; high ash, high

17  sulfur, low BTU.

18  Q.    What did you personally find about the quality of Deep

19  Wood?

20  A.    The sulfur at Deep Wood was higher.  As you -- as you went

21  more towards the north in any of these properties, the sulfur

22  got worse.  Deep Wood sulfur was up to 7 percent.  It's ash

23  wasn't quite as bad.  Fivemile's sulfur was not quite as high

24  but its ash was worse.  But they're all in the same -- all in

25  the same ballpark.

JAMES C. JUSTICE III - DIRECT EXAM          235

1   Q.    Generally --

2              THE COURT:  Yes, Mr. Lucas.

3              MR. LUCAS:  Your Honor, the answer points out the --

4   why I've been objecting.  The question he's trying to pose is:

5   Is this coal in Fivemile consistent with all these others?  His

6   answer is:  Well, these others have these, these, these, and

7   these characteristics, but then he wants us to infer because

8   Fivemile is near them, therefore it must be likewise.  That is

9   classic opinion testimony.

10             MR. GETTY:  That's not what he's trying to do.

11             THE COURT:  I don't know exactly where all the

12  questioning is going to go, but here's what I think we should

13  do.  Now, keep in mind what I said at the outset of the

14  hearing, that the end result of the hearing will be, and

15  potential briefing, we'll talk about that, will be that I'll

16  make an R&R to the district judge.  My job is not complicated;

17  wrap it up in a nice package and deliver to it the district

18  judge to consider.

19         So there are going to be evidentiary issues that are

20  raised and objections that are very easily sustained or

21  rejected.  They're going to be some that are closer.  What I

22  think is totally allowable in the scope of this hearing is for

23  Mr. Justice to testify as to the facts of the coal at issue.

24  And if there was a determination about mineability as to that

25  coal, not in comparison to something else but that the

JAMES C. JUSTICE III - DIRECT EXAM          236

1   companies made as to that coal, he can testify as to what the

2   facts was.  He can say:  We determined we couldn't mine it.  We

3   determined we couldn't mine it because of this.

4        But when he tries to draw comparisons like Mr. Lucas is

5   suggesting or base those conclusions on market conditions over

6   a 10- or 15- or 20-year period of time, then we're talking

7   about expert testimony.  But if the theory of the mitigation --

8   excuse me, of the mineability is this coal just can't be mined,

9   that can be admitted not based on opinion, but based on facts,

10  if they exist, of what actually occurred that that witness is

11  aware of.  So overnight, that's what I want you to think about,

12  Mr. Getty, is how to develop that.

13            MR. GETTY:  I was prepared to wrap it up with one

14  question in that area, if I may.

15            THE COURT:  As long as it's not a summation.

16            MR. GETTY:  No.

17            THE COURT:  I mean, you're used to asking experts

18  what their opinions are.  What I'm saying is, you've got to

19  move away from that comfort level and focus on what the facts

20  are with respect to the coal in this case.

21       Mr. Lucas, I'm attempting to draw a line that will -- will

22  conform with the rules, serve the purpose of the hearing, avoid

23  the prejudice that you have identified that I'm sympathetic to,

24  but allow the defense to get the evidence in as well that I

25  think is contemplated by the referral to me.

JAMES C. JUSTICE III - DIRECT EXAM          237

1    So is it -- do you think the line I'm drawing is clear,

2  Mr. Lucas?  I can't control the answers.  I'm setting what the

3  line is.

4          MR. LUCAS:  I think the line is, by necessity, a

5  little fuzzy, but I don't think you can cure that.

6          THE COURT:  Okay.

7          MR. LUCAS:  I think -- I understand what Your Honor

8  is saying.  The problem is, if I may say so, they don't have

9  any studies like that on this property.  And we know that

10  because none have been produced to us in this litigation.  And

11  so what he's trying to do, he can't do through this witness.

12  The only way he can do it is through expert testimony.

13          THE COURT:  He may not.  I don't know what the facts

14  are.  But he may not be able to do it through this witness.

15  What I'm suggesting is, if it's possible, it's possible based

16  on the line that I have drawn, which is fact, experience-based,

17  not based on some market analysis.  What I'm talking about is

18  if these companies looked at the coal and said, we can't mine

19  this any further, then that's a conclusion that they reached.

20  That's a fact that occurred that he can testify about and that

21  I can consider with respect to the referral to me.

22          MR. LUCAS:  I understand that, and I just want the

23  Court to know why I'm forced to keep making these objections.

24  And I say "forced" because to protect my client's interest,

25  because given the circumstances of this case, he can't -- he's

JAMES C. JUSTICE III - DIRECT EXAM          238

1  not going to be able to get there, and I'm not saying that to

2  argue it now, but that's why I must keeping making these

3  objections.

4          THE COURT:  We'll see.  Back to where I started, my

5  R&R will, as required by statute, allow for objections by both

6  sides, and those can be judged by Judge Van Tatenhove.

7      Mr. Getty.

8          MR. GETTY:  Yes.  If I could just ask a wrap-up.

9          THE COURT:  That's fine.

10         MR. GETTY:  Believe me, my back would rather I didn't

11  do it, but I'm going to do it anyway.

12         THE COURT:  Go ahead.

13  BY MR. GETTY:

14  Q.  Can you tell the Court what personal knowledge you gained

15  or what steps you took that led you to conclude that this

16  Fivemile coal could not be mined?

17  A.  We drilled coal and tested coal in the area.  Okay.  And

18  the seams were very consistent.  The core data that was

19  provided to us, if you just rely on that --

20  Q.  You are talking about the sheet I just showed you?

21  A.  The yellow, with the yellow.

22  Q.  If you just relied on that alone?

23  A.  If you just rely on that, nobody would touch it.

24  Q.  And what conclusion did you reach?

25         THE COURT:  Mr. Lucas?

JAMES C. JUSTICE III - DIRECT EXAM                239

 1          MR. LUCAS:  Same objection.

 2          MR. GETTY:  Yes.

 3          MR. LUCAS:  And we drilled in the area.

 4          THE WITNESS:  Okay.

 5          THE COURT:  Again, that -- the last part of the

 6  answer was the type of opinion that is on the wrong side of the

 7  law, and that I've articulated.

 8  BY MR. GETTY:

 9  Q.  Was the core drill information -- this is Exhibit 8, which

10  Mr. Brownlow finally provided to you.  Did you consider that?

11  Was that sufficient in and of itself to conclude this coal

12  could not be mined and sold?

13  A.   I think that's the most conclusive evidence because it was

14  data that was provided at Fivemile on the permit and that --

15  based on that data, you can't mine the coal.

16          MR. GETTY:  Okay.  That's a good stopping point.

17          THE COURT:  Okay.  I do think it's a good stopping

18  point.  And, you know, if we had a jury here, I wouldn't be

19  trying to thread this needle in the way that I am, but I'm

20  trying to move things along, given the nature of the referral,

21  again, to me.

22          MR. GETTY:  Frankly, Judge, I appreciate your valiant

23  effort.  It's been very helpful.

24          THE COURT:  Okay.  Fair enough.  All right.  We'll

25  stop there.  Are there any -- let's convene tomorrow at 9:00.

240

1  Mr. Lucas, that suit you?

2          MR. LUCAS:  That's fine, Your Honor

3          THE COURT:  Mr. Getty?

4          MR. GETTY:  Yes.

5          THE COURT:  9:00 a.m. we'll be prepared to take up

6  further testimony from Mr. Justice.  Are there other issues --

7  any issues I need to address before we adjourn for the day,

8  Mr. Lucas?

9          MR. LUCAS:  Not from us, Your Honor.

10          THE COURT:  Okay.  Thank you.

11      Mr. Getty?

12          MR. GETTY:  No, Your Honor, and I'll try to get more

13  information on Mr. Merritt's situation tonight.

14          THE COURT:  Sure.  I'll be happy to hear about that

15  tomorrow.

16      The exhibits can remain in the courtroom, Sheila.  Are you

17  okay with that?

18          THE CLERK:  Yes.

19          THE COURT:  Okay.  You all can leave your stuff in

20  the courtroom if you want.  What we will do, if the court

21  security officer is all right with that, just lock the

22  courtroom after you leave.  But that's up to you all, what you

23  want to take and what you want to leave.

24      All right.  You can step down, sir.

25      9:00 tomorrow.  Anything else, Mr. Lucas?

241

1              MR. LUCAS:  No, sir.  No, Your Honor.

2              THE COURT:  Thank you.

3         Mr. Getty, anything further, sir?

4              MR. GETTY:  Nothing further, Your Honor.

5              THE COURT:  We'll be adjourned for the day.  Thank

6    you all.

7              (Proceedings concluded at 5:38 p.m)

8                              - - -

9

10                    C E R T I F I C A T E

11        I, S. Diane Farrell, RDR, CRR, do hereby certify that the

12   foregoing is a correct transcript from the record of

13   proceedings in the above-entitled case.

14

15   /s/S. Diane Farrell                January 10, 2019
     S. Diane Farrell, RDR, CRR         Date of Certification
16

17

18

19

20

21

22

23

24

25

242

1                          I N D E X

2    OPENING STATEMENT                              PAGE

3    Opening Statement by Mr. Getty                  36

4

5    WILLIAM G. BROWNLOW                            PAGE

6    Direct Examination by Mr. Lucas                 39
     Cross-Examination by Mr. Getty                  92
7    Redirect by Mr. Lucas                          168
     Recross-Examination by Mr. Gety               177
8

9    RICHARD J. BROWNLOW                            PAGE

10   Direct Examination by Mr. Lucas                183
     Cross-Examination by Mr. Getty                 188
11

12   JAMES C. JUSTICE III                           PAGE

13   Direct Examination by Mr. Getty                202

14

15

16

17   EXHIBITS                      IDENTIFIED   ADMITTED

18   Plaintiffs' Exhibit 1              41          53
     Plaintiffs' Exhibit 1a             42          53
19   Plaintiffs' Exhibit 1b             42          53
     Plaintiffs' Exhibit 2              42          53
20   Plaintiffs' Exhibit 2a             42          53
     Plaintiffs' Exhibit 3a             42          53
21   Plaintiffs' Exhibit 3b             43          53
     Plaintiffs' Exhibit 4a             43          53
22   Plaintiffs' Exhibit 4b             43          53
     Plaintiffs' Exhibit 4c             43          53
23   Plaintiffs' Exhibit 5              -           -
     Plaintiffs' Exhibit 6              43          53
24   Plaintiffs' Exhibit 7              43          53
     Plaintiffs' Exhibit 8              43          53
25   Plaintiffs' Exhibit 9              43          53
     Plaintiffs' Exhibit 10             -           -

243

| | | | |
|---|---|---|---|
| 1 | Plaintiffs' Exhibit 11 | - | - |
| | Plaintiffs' Exhibit 12 | 44 | 53 |
| 2 | Plaintiffs' Exhibit 13 | 44 | 53 |
| | Plaintiffs' Exhibit 13a | 44 | 53 |
| 3 | Plaintiffs' Exhibit 13b | 44 | 53 |
| | Plaintiffs' Exhibit 13c | 44 | 53 |
| 4 | Plaintiffs' Exhibit 13d | 44 | 53 |
| | Plaintiffs' Exhibit 13e | 44 | 53 |
| 5 | Plaintiffs' Exhibit 13d | 44 | 53 |
| | Plaintiffs' Exhibit 13f | 44 | 53 |
| 6 | Plaintiffs' Exhibit 13g | 44 | 53 |
| | Plaintiffs' Exhibit 13h | 44 | 53 |
| 7 | Plaintiffs' Exhibit 13i | 44 | 53 |
| | Plaintiffs' Exhibit 13j | 44 | 53 |
| 8 | Plaintiffs' Exhibit 13k | 44 | 53 |
| | Plaintiffs' Exhibit 13l | 44 | 53 |
| 9 | Plaintiffs' Exhibit 13m | 44 | 53 |
| | Plaintiffs' Exhibit 13n | 44 | 53 |
| 10 | Plaintiffs' Exhibit 13o | 44 | 53 |
| | Plaintiffs' Exhibit 13p | 44 | 53 |
| 11 | Plaintiffs' Exhibit 13q | 44 | 53 |
| | Plaintiffs' Exhibit 13r | 44 | 53 |
| 12 | Plaintiffs' Exhibit 13s | 44 | 53 |
| | Plaintiffs' Exhibit 13t | 44 | 53 |
| 13 | Plaintiffs' Exhibit 13u | 44 | 53 |
| | Plaintiffs' Exhibit 13v | 44 | 53 |
| 14 | Plaintiffs' Exhibit 13w | 44 | 53 |
| | Plaintiffs' Exhibit 13x | 44 | 53 |
| 15 | Plaintiffs' Exhibit 13y | 44 | 53 |
| | Plaintiffs' Exhibit 13z | 44 | 53 |
| 16 | Plaintiffs' Exhibit 13aa | 44 | 53 |
| | Plaintiffs' Exhibit 13bb | 44 | 53 |
| 17 | Plaintiffs' Exhibit 13cc | 44 | 53 |
| | Plaintiffs' Exhibit 13dd | 44 | 53 |
| 18 | Plaintiffs' Exhibit 13ee | 44 | 53 |
| | Plaintiffs' Exhibit 13ff | 44 | 53 |
| 19 | Plaintiffs' Exhibit 13gg | 44 | 53 |
| | Plaintiffs' Exhibit 13hh | 44 | 53 |
| 20 | Plaintiffs' Exhibit 14 | 47 | 54 |
| | Plaintiffs' Exhibit 15 | 47 | - |
| 21 | Plaintiffs' Exhibit 16 | 44 | 54 |
| | Plaintiffs' Exhibit 16a | 44 | 54 |
| 22 | Plaintiffs' Exhibit 16b | 44 | 54 |
| | Plaintiffs' Exhibit 16c | 44 | 54 |
| 23 | Plaintiffs' Exhibit 16d | 44 | 54 |
| | Plaintiffs' Exhibit 16e | 44 | 54 |
| 24 | Plaintiffs' Exhibit 16f | 44 | 54 |
| | Plaintiffs' Exhibit 16g | 44 | 54 |
| 25 | Plaintiffs' Exhibit 16h | 44 | 54 |
| | Plaintiffs' Exhibit 16i | 44 | 54 |

244

| | | | |
|---|---|---|---|
| 1 | Plaintiffs' Exhibit 16j | 44 | 54 |
| | Plaintiffs' Exhibit 16k | 44 | 54 |
| 2 | Plaintiffs' Exhibit 16l | 44 | 54 |
| | Plaintiffs' Exhibit 16m | 44 | 54 |
| 3 | Plaintiffs' Exhibit 17 | 45 | 53 |
| | Plaintiffs' Exhibit 18 | 45 | 53 |
| 4 | Plaintiffs' Exhibit 19 | 45 | 53 |
| | Plaintiffs' Exhibit 20 | 45 | 53 |
| 5 | Plaintiffs' Exhibit 21 | 45 | 53 |
| | Plaintiffs' Exhibit 22a | 45 | 53 |
| 6 | Plaintiffs' Exhibit 22b | 45 | 53 |
| | Plaintiffs' Exhibit 22c | 45 | 53 |
| 7 | Plaintiffs' Exhibit 22d | 45 | 53 |
| | Plaintiffs' Exhibit 22e | 45 | 53 |
| 8 | Plaintiffs' Exhibit 22f | 45 | 53 |
| | Plaintiffs' Exhibit 22g | 45 | 53 |
| 9 | Plaintiffs' Exhibit 22h | 45 | 53 |
| | Plaintiffs' Exhibit 22i | 45 | 53 |
| 10 | Plaintiffs' Exhibit 23a | 45 | 53 |
| | Plaintiffs' Exhibit 23b | 45 | 53 |
| 11 | Plaintiffs' Exhibit 23c | 45 | 53 |
| | Plaintiffs' Exhibit 23d | 45 | 53 |
| 12 | Plaintiffs' Exhibit 23e | 45 | 53 |
| | Plaintiffs' Exhibit 23f | 45 | 53 |
| 13 | Plaintiffs' Exhibit 23g | 45 | 53 |
| | Plaintiffs' Exhibit 23h | 45 | 53 |
| 14 | Plaintiffs' Exhibit 23i | 45 | 53 |
| | Plaintiffs' Exhibit 24 | 45 | 53 |
| 15 | Plaintiffs' Exhibit 25 | 46 | 53 |
| | Plaintiffs' Exhibit 26 | 46 | 53 |
| 16 | Plaintiffs' Exhibit 27a | 46 | 53 |
| | Plaintiffs' Exhibit 27b | 46 | 53 |
| 17 | Plaintiffs' Exhibit 27c | 46 | 53 |
| | Plaintiffs' Exhibit 27c | 46 | 53 |
| 18 | Plaintiffs' Exhibit 27e | 46 | 53 |
| | Plaintiffs' Exhibit 27f | 46 | 53 |
| 19 | Plaintiffs' Exhibit 27g | 46 | 53 |
| | Plaintiffs' Exhibit 27h | 46 | 53 |
| 20 | Plaintiffs' Exhibit 27i | 46 | 53 |
| | Plaintiffs' Exhibit 28a | 46 | 53 |
| 21 | Plaintiffs' Exhibit 28b | 46 | 53 |
| | Plaintiffs' Exhibit 28c | 46 | 53 |
| 22 | Plaintiffs' Exhibit 28d | 46 | 53 |
| | Plaintiffs' Exhibit 28e | 46 | 53 |
| 23 | Plaintiffs' Exhibit 28f | 46 | 53 |
| | Plaintiffs' Exhibit 28g | 46 | 53 |
| 24 | plaintiffs' Exhibit 28h | 46 | 53 |
| | Plaintiffs' Exhibit 28i | 46 | 53 |
| 25 | Plaintiffs' Exhibit 28j | 46 | 53 |
| | Plaintiffs' Exhibit 28k | 46 | 53 |

245

| | | |
|---|---|---|
| Plaintiffs' Exhibit 281 | 46 | 53 |
| | | |
| Defendants' Exhibit 1 | 151 | - |
| Defendants' Exhibit 3 | 144 | - |
| Defendants' Exhibit 8 | 112 | - |
| Defendants' Exhibit 9 | 156 | - |
| Defendants' Exhibit 15 | 160 | - |
| Defendants' Exhibit 16 | 160 | - |