```
                                                                1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                     SOUTHERN DIVISION AT LONDON

3                            - - -
NEW LONDON TOBACCO          :
4  MARKET, INC.,            : Civil No. 6:12-CV-91
FIVEMILE ENERGY, LLC,       :
5                           :
              Plaintiffs,   :
6                           :
-vs-                        :
7                           : Wednesday, December 12, 2018
KENTUCKY FUEL CORPORATION,  : London, Kentucky
8  JAMES C. JUSTICE COMPANIES, : 8:58 a.m.
INC.,                       :
9                           : Evidentiary Hearing Day 2
              Defendants.   :
10                           - - -
           TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
11             BEFORE THE HONORABLE HANLY A. INGRAM
                UNITED STATES MAGISTRATE JUDGE
12                           - - -

13  APPEARANCES:

14  For the Plaintiffs:         JOHN A. LUCAS, ESQ.
                                Howard & Howard, P.C.
15                              4820 Old Kingston Pike
                                Kingston, Tennessee 37919
16
                                SCOTT MARLOW WEBSTER, ESQ.
17                              Tooms, Dunaway & Webster
                                1306 West Fifth Street, Suite 200
18                              London, Kentucky  40743905

19  For the Defendants:         DANIELLE HARLAN, ESQ.
                                RICHARD A. GETTY, ESQ.
20                              The Getty Law Group, PLLC
                                250 West Main Street
21                              1900 Lexington Financial Center
                                Lexington, Kentucky  40507
22
Court Reporter:                 S. DIANE FARRELL, RDR, CRR
23                              Official Court Reporter
                                310 South Main Street, Suite 317
24                              London, Kentucky  40741

25      Proceedings recorded by mechanical shorthand,
    transcript produced by computer-aided transcription.
```

2

1      (In open court.)

2           THE COURT:  Thank you.  Good morning, everyone.  We

3   don't need to have the case called formally, but we're here for

4   the continued evidentiary hearing in Case 12-CV-91, New London

5   Tobacco Market et al, versus Kentucky Fuel Corporation, et al.

6   Counsel and the parties are present in the same fashion as

7   yesterday, though it looks like the younger Mr. Brownlow is not

8   present this morning.  Mr. Justice is on the witness stand to

9   resume his testimony.

10      I have a couple of quick matters I want to mention.  The

11   first one is that I need to correct a mistake I made, I think

12   twice yesterday, on an objection by Mr. Lucas.  Specifically,

13   the objection that because there was no summary of a

14   nonretained expert witness' testimony, that opinion evidence

15   should not be admissible at this point.  I misspoke twice.  The

16   dichotomy and the rules between the retained and nonretained

17   expert and what disclosures are required, that was not a change

18   made effective on December 1st, 2015.  It actually was

19   December 1st, 2010.  So that distinction has been in place and

20   the rule throughout this case.

21      Doesn't change my ruling, though, because it's undisputed.

22   The record establishes there were no expert disclosures from

23   the defendants either with respect to retained or nonretained

24   experts.  And the ruling was -- that stands.  So opinion

25   testimony under Rule of Evidence 702 would not be admissible.

3

1    But to the extent the mineability issues we heard about

2    yesterday could be addressed based on the facts that the

3    witness could describe through his experience, I would

4    potentially allow that testimony, depending on the form that it

5    came in.

6         So I just wanted to correct that date.  It doesn't change

7    the ruling, but I did have it wrong.  There were some

8    amendments on December 1, 2015, that might be implicated later

9    in the case.  We'll see how the evidence develops, but I wanted

10   to correct that.

11        Before we begin the -- or resume the testimony, Mr. Lucas,

12   is there anything else you think we need to address?

13              MR. LUCAS:  No, Your Honor.

14              THE COURT:  Thank you.

15        Okay.  Mr. Getty, anything we need to take up this

16   morning, sir?

17              MR. GETTY:  No.  Except we did talk to Mr. Merritt.

18   He's with his father in Tennessee.

19              THE COURT:  Okay.

20              MR. GETTY:  I told him to stay there, we'd work out

21   later when he would appear or not appear by video or not.

22              THE COURT:  Okay.

23              MR. GETTY:  And that's where I left it with him.

24              THE COURT:  Okay.

25              MR. GETTY:  He's very grateful, so --

JAMES C. JUSTICE III - DIRECT EXAM                4

1    THE COURT:  Okay.  Well, sure.  I'm sure we're all
2    sympathetic to the circumstance.  How we address it, we'll take
3    that up at the conclusion of your -- of your proof, Mr. Getty.
4    MR. GETTY:  I assumed that, Your Honor.
5    THE COURT:  Okay.  All right.  So if you are ready,
6    you can resume the -- hang on just a second.
7    Is there anything we need to take up, Mr. Lucas?
8    MR. LUCAS:  I was just asking Mr. Brownlow -- when
9    Mr. Getty first started talking, I was talking to Mr. Haskins,
10   and I missed the very first part of what he said about his
11   conversation with Mr. Merritt.
12   THE COURT:  Okay.  That he's not here, not going to
13   be here, and we'll take that up, its implications, at the
14   conclusion of defendants' case.
15   Okay.  Anything else, Mr. Getty?
16   MR. GETTY:  No, Your Honor.
17   THE COURT:  Okay.  Go ahead.  Resume your direct
18   examination of Mr. Justice.
19   Sir, you are still under oath.  Do you understand that?
20   THE WITNESS:  I do.
21   THE COURT:  Okay.  Thank you.  Go ahead, Mr. Getty.
22   MR. GETTY:  Thank you.
23                        DIRECT EXAMINATION
24   BY MR. GETTY:
25   Q.  I had given you Exhibit 8.  You have that in front of you?

JAMES C. JUSTICE III - DIRECT EXAM                    5

1   A.    I do.

2   Q.    And I have an extra.   It's easier to hand him up instead

3   of flipping there.   I've got extra copies here.

4           THE COURT:   That's fine.   Is there any objection to

5   Exhibit 8 being tendered to the witness?   I think he's already

6   seen it.

7           MR. LUCAS:   No, Your Honor.

8           THE COURT:   Okay.   Thank you.

9           THE WITNESS:   Thanks.

10  BY MR. GETTY:

11  Q.    I believe we started to address that yesterday.   You

12  identified this, I believe, as a document that had been

13  presented to you by Mr. Brownlow --

14  A.    That's correct.

15  Q.    -- is that correct?   Once you obtained this document, what

16  did you do with it?

17  A.    Well, this is core drillings from the Fivemile property,

18  and it's pretty extensive.   And it's specific mainly to the

19  permit -- permit area.   So we reviewed this, he reviewed it,

20  our engineers reviewed it.   And, you know, we determined that

21  the coal quality is not suitable to mine.

22  Q.    Okay.   What, factually, do the results here indicate to

23  you when you reviewed it?

24  A.    There are some spots, some splits of different seams that

25  are suitable, but by and large, I'm going to say 90 percent of

JAMES C. JUSTICE III - DIRECT EXAM                    6

1    the coal is greater than 2 percent sulfur and greater than

2    15 percent ash and less than 12,000 BTU.

3    Q.   What does that do to this coal in terms of mineability and

4    merchantability?

5    A.   Well, it either renders the product unmarketable at any

6    price or a significantly impaired price.  It's probably a

7    little bit of both.

8    Q.   Okay.  Did you subsequently make some determination as to,

9    given the quality results and the problems with the lack of

10   hollow fill, how much coal could possibly be effectively mined

11   and possibly sold?

12   A.   We did.

13   Q.   What determination did you reach?

14   A.   We determined that approximately 50,000 tons could be

15   mined on the current permit with the hollow fill areas that

16   were able to be used.

17   Q.   Well, what did you determine about the marketability of

18   that 50,000 tons?

19   A.   Same answer as before.  I mean, there are some outliers of

20   some splits here and there that are decent quality.  But by and

21   large, 90 percent of the tons are not marketable.

22   Q.   So how much do you conclude it would be at all possible to

23   market and sell?

24           MR. LUCAS:  Your Honor, I'm going to renew my

25   objection again.  This is opinion testimony.

JAMES C. JUSTICE III - DIRECT EXAM          7

1       THE COURT:  Okay.  The question -- let's see.  Hang

2  on a second before I give a response.  The question:  How much

3  do you conclude would be possible to market?  And so let's see.

4       MR. GETTY:  Perhaps I should have said:  Based on

5  those facts, what did you conclude?

6       THE COURT:  The objection is sustained to the extent

7  it would be answered by an opinion rendered based on market

8  expertise that would be more appropriately the subject of

9  expert testimony.  If you can tie the question to specific

10  factual experience that these companies had with respect to

11  this coal at issue, Mr. Getty, it may be possible to rephrase

12  it.  So why don't you try that for us?

13  BY MR. GETTY:

14  Q.   Have you had instances where you have tried to sell this

15  kind of coal with these parameters?

16  A.   We have.

17  Q.   Okay.  What was that experience?

18  A.   We have the Delta permit, which is adjacent to these

19  properties, and for all practical purposes the same quality,

20  and that product was not marketable.

21  Q.   So am I correct in understanding that you believe you

22  could mine approximately 50,000 tons effectively?

23  A.   If it were marketable.

24  Q.   If it were marketable?

25  A.   That's correct.

JAMES C. JUSTICE III - DIRECT EXAM                    8

1   Q.   And what would be the determining factor on marketability?

2   A.   If you could, I'll use the term "cherry pick" the seams,

3   which is -- which is really not doable.  You could cherry pick

4   the best 50,000 tons and perhaps market those.  But practically

5   you can't do that because, you know, it's -- the best seam is

6   the third one from the top.  So you are going to have to throw

7   the two top seams away.  You know, you'll bury the seams below

8   it, so it's just not feasible.

9   Q.   What does that do in terms of profitability?

10  A.   If you have to throw the two top seams away, your mining

11  ratio, instead of maybe being a 10 or 12 to 1 is going to go to

12  like a 30 to 1, because you have lost two-thirds of your

13  tonnage.

14  Q.   Can you explain to the Court what the ratio means?  I'm

15  not sure everybody understands that.

16  A.   Surface mine ratio means the amount of cubic or -- or

17  cubic yards of dirt you have to move, or rock, divided by the

18  tons of coal.  So if you say you have a 15 to 1 ratio, that

19  means you have to move 15 cubic yards of rock to get one ton of

20  coal.  And just in weight in Central Appalachia normally a

21  cubic yard of this material weighs about 3200 pounds, so a

22  little more than a ton and a half.  So 15 to 1, you know, you

23  would have about 20 tons of rock to -- to one ton of coal.

24  Q.   With respect to this particular coal at Fivemile, was that

25  a fact that you determined?

JAMES C. JUSTICE III - DIRECT EXAM          9

1   A.    Well, we modeled the mining ratio as if you could mine all
2   the tons that were permitted, assuming you had all the valley
3   fills, and that ratio was fairly attractive.   However, if you
4   reduced the amount of coal you could mine to the 50,000, that
5   was not attractive.   And then if you overlaid the quality
6   situation on top of it, it really wouldn't have mattered if it
7   was a 2 to 1 ratio.   With the quality, you couldn't -- you just
8   can't mine it.
9   Q.    And are you saying to the Court that you couldn't
10  profitably mine it under any scenario?
11  A.    That's correct.
12  Q.    I just want to sort of have you quickly look at Exhibits
13  2, 4, and 5.   They appear to be more drawings with respect to
14  the coal or seams.   And just tell the Court what we're dealing
15  with there.   And I've got three of them here.
16          THE COURT:   He's got them.   And I have them as well.
17  Take them one by one.   Let's not group them together.   Take
18  them one by one, please, Mr. Getty --
19          MR. GETTY:   We'll start with 2.
20          THE COURT:   -- with specific questions.
21  BY MR. GETTY:
22  Q.    Tell us what that is.   Describe it.   Tell us what it
23  shows, please.
24  A.    2 is the Deep Wood permit that was provided to us
25  initially by Mr. Brownlow.   The yellow area is the coal removal

JAMES C. JUSTICE III - DIRECT EXAM                10

1  area.  It's kind of difficult to see, but, you know, it's kind

2  of -- in every hollow you can see what looks like upside down

3  triangles.  They're black and white.

4  Q.   Little triangles?

5  A.   Okay.  Those are the valley fills.  And so I think that

6  there is 12 valley fills that were needed on this permit.

7  Q.   Would that have required a 404(b) permit?

8  A.   Required 12 of them.

9  Q.   12 of them.  And what did that do with respect to this

10  coal?

11  A.   Just it rendered it unmineable.

12  Q.   Was that one of the factors involved in surrendering the

13  property and giving it back to Mr. Brownlow?

14  A.   It was.  We didn't see that the Deep Wood property had any

15  value at all.

16          MR. LUCAS:  Objection to relevance, Your Honor, on

17  Deep Wood.

18          THE COURT:  All right.  Mr. Getty, your response to

19  that?

20          MR. GETTY:  I think it -- he's testified previously

21  the coal in this general area, as we saw from the aerial, that

22  is pretty much uniform.  It has not been mined.  People that

23  have looked at it range from Addington to Mr. Hoops and

24  Revelation on down to Mr. Whitaker and Mr. Gorman.  They all

25  walked away from it.  And I think this is an indication of the

JAMES C. JUSTICE III - DIRECT EXAM          11

1    coal in the general area is consistently like Fivemile and, you

2    know, they couldn't mine.   Other people couldn't mine it.

3              THE COURT:   I don't know that we have evidence that

4    the coal was consistent.   But the relevancy bar is very low, of

5    course.   The question is:   Does the piece of evidence make a

6    fact in issue more probable than it would be without the

7    evidence?   And I'll find that this is relevant with respect to

8    the broad proposition of the mineability of the coal in terms

9    of this witness' experience and understanding of how those

10   determinations are made.   I'll overrule the objection.

11       Go ahead, Mr. Getty.

12             MR. GETTY:   Thank you.

13   BY MR. GETTY:

14   Q.   What was the ultimate determination you made then?

15   A.   Specific to Deep Wood?

16   Q.   Yes.

17   A.   That it was essentially worthless and couldn't be mined

18   and the quality was not mineable or merchantable.

19   Q.   And when you surrendered it, were there any protests from

20   Mr. Brownlow?

21   A.   No.   It was my understanding Mr. Brownlow wanted us to

22   surrender it.

23             MR. LUCAS:   Objection, Your Honor.   He's testifying

24   about hearsay.

25             THE WITNESS:   Well, I'll rephrase it.

JAMES C. JUSTICE III - DIRECT EXAM                12

1          THE COURT:  Hang on.  I need to make a ruling
2    following the objections.
3        He is potentially getting into an area where there may be
4    hearsay.  He hasn't discussed an out-of-court statement yet
5    that's been offered for the truth.  He appears to be talking
6    about his assumption of Mr. Brownlow's understanding.  So
7    that's not permissible.
8        Mr. Getty, you do need to focus your questions more
9    specifically to get admissible evidence and responses, please.
10   BY MR. GETTY:
11   Q.   When you surrendered the Deep Wood permit, did you have
12   any direct discussions with Mr. Brownlow where he expressed any
13   discomfort or displeasure that you were doing that?
14   A.   I didn't personally have a conversation with Mr. Brownlow,
15   but he requested our company to surrender it as part of an
16   accommodation to him.
17          MR. LUCAS:  Objection, again, Your Honor.  He's
18   clearly testifying about hearsay.  He just said he didn't have
19   any conversations with him.
20          THE COURT:  Isn't it a statement of a party even if
21   it comes from Mr. Brownlow?  He's the representative --
22          MR. GETTY:  Sure.
23          THE COURT:  -- of both named plaintiffs, correct?
24          MR. LUCAS:  No, Your Honor, I would submit that it's
25   not because he's -- him saying when he didn't hear Mr. Brownlow

JAMES C. JUSTICE III - DIRECT EXAM          13

1    say it.  If he heard Mr. Brownlow say it, it would be a

2    statement by a party.  But he's referring to something that

3    someone else told him that Mr. Brownlow allegedly said.

4              THE COURT:  Mr. Getty?

5              MR. GETTY:  He said Mr. Brownlow requested that we

6    surrender it.  Mr. Brownlow is a representative of a party who

7    obviously is not hearsay.

8              THE COURT:  Well, but what Mr. Lucas is saying is

9    that you always have to do the hearsay analysis in layers,

10   correct, Mr. Lucas, so that the underlying content may not be

11   hearsay because it's from a party or party representative, but

12   to be admissible the initial layer has to be not hearsay or

13   fall within an exception; is that correct, Mr. Lucas?

14             MR. LUCAS:  That is correct.  He could, for example,

15   say, "Mr. Brownlow told me," and that would be admissible as a

16   party admission.  But he can't say, "Joe Blow told me that

17   Mr. Brownlow said this."

18             THE COURT:  Mr. Getty, your response.

19             MR. GETTY:  He didn't say that.  He said his

20   understanding was that Mr. Brownlow requested as part of the

21   accommodation resulted in the fourth amendment.

22             THE COURT:  Okay.  He can -- I mean, the answer was:

23   "I didn't personally have a conversation with Mr. Brownlow, but

24   he requested our company to surrender it as a part of an

25   accommodation to him."  You can try to establish the basis of

JAMES C. JUSTICE III - DIRECT EXAM          14

1   knowledge for that request in a nonhearsay form, Mr. Getty.

2   BY MR. GETTY:

3   Q.   What is the basis for that?  Well, first of all, were you

4   involved in the discussions and negotiations involving the

5   fourth amendment?

6   A.   Again, I didn't personally talk with Mr. Brownlow, but I

7   had to make the decision for our company, based on requests

8   that Mr. Brownlow had made to our company.

9   Q.   And did you comply?

10  A.   I did.

11  Q.   All right.  If we could move on to the next exhibit.  It's

12  Exhibit 4.  And if you could explain to the Court what that is.

13  A.   I can.  And maybe if I could clean something up or just

14  make a statement.  Anytime we evaluate a mining property,

15  whether it be in Kentucky or Alabama or West Virginia, we rely

16  on the core data first and foremost.

17          MR. LUCAS:  Your Honor, I'm going to object.  There's

18  no question pending.  He's not allowed just to start giving

19  narratives from the stand.

20          THE COURT:  Okay.  The question was:  Can you explain

21  to the Court what that is, Exhibit 4?  So you do need to answer

22  that question.

23      Mr. Getty, if you think that there are previous -- there's

24  previous testimony that needs to be clarified, you can ask

25  about that.

JAMES C. JUSTICE III - DIRECT EXAM          15

1   MR. GETTY:  I'll follow up with it.  I'm just trying

2   to move this along as fast as I can.  The less I'm beset by

3   objections, the better we are, so I'll do my best.

4   THE COURT:  Well, the plaintiffs have a right to make

5   the objections.  What I have indicated is that because there's

6   prejudice to the plaintiffs for allowing this testimony now

7   when Mr. Justice didn't appear for his deposition, there'll be

8   a latitude on cross-examination.  But the objections are fairly

9   raised, and I'll rule on them as they come up.

10   MR. GETTY:  All right.  I have a practice, you've

11   probably noticed -- there are objectionable questions in a

12   bench trial.  I don't object.  You can -- you know, you are

13   going to be able to sit through it.  And I don't want to

14   interfere with or obstruct in any way or delay the -- the

15   proceedings, so a lot of objectionable things, I just don't do

16   it.  And, you know, I think smart lawyers -- Gary Johnson once

17   said he doesn't either.

18   THE COURT:  Okay.  Well, let's move it along then.

19   Back to Exhibit Number 4 and your question.

20   BY MR. GETTY:

21   Q.   All right.  Can you tell us what Exhibit Number 4 is?

22   A.   Exhibit Number 4 is Kentucky Fuel's in-house engineering's

23   evaluation of the permit.

24   Q.   Which permit?

25   A.   The Fivemile permit.

JAMES C. JUSTICE III - DIRECT EXAM          16

1   Q.   And what does this show?

2   A.   This shows that the total recoverable tons -- and I want

3   to be specific.   "Recoverable" means, you know, if --

4   Mr. Brownlow spoke earlier about the waste or, you know,

5   partings or those things were discarded.   But the net tonnage

6   was 675,000 tons.   I can't really read that, that legend block.

7   But it's 675,000 total tons.

8   Q.   Okay.

9   A.   And because of the valley fill situation, we could only

10  mine 50,000.

11  Q.   So the recoverable tons, what you would actually get is

12  600,000 some tons, but what is mineable is 50?

13  A.   That's right.   The 675 would have been the tonnage that

14  Mr. Conway probably should have used versus 16 million.

15  Q.   Okay.   All right.   Going back to the core drill --

16          THE COURT:   Mr. Lucas.

17          MR. LUCAS:   Your Honor, it took me a minute to try to

18  read this --

19          THE COURT:   Yes.

20          MR. LUCAS:   -- it's so fine.

21          THE COURT:   Yes.

22          MR. LUCAS:   This is an example of the type of

23  objection, that notwithstanding the argument about making an

24  objection, I'm duty bound to object to.   This document was

25  prepared in November 2018.   From what it appears, that the

JAMES C. JUSTICE III - DIRECT EXAM          17

1    date, it is November 20-something, 2018.

2            THE COURT:    26 in the PDF version.  I can magnify

3    it.  It looks like it's the 26th.

4            MR. LUCAS:  Yeah, and that's the legend at the top.

5            THE COURT:  All right.

6            MR. LUCAS:  They were required to -- to send us their

7    proposed -- at least their proposed exhibits prior to that.  So

8    this document's created after they were supposed to tell us

9    what their exhibits were, and I object to it.

10           MR. GETTY:  That is absolutely not true.  We

11   designated and we listed.  This was a two-step process that he

12   agreed to.  He and I discussed it, and we discussed it with you

13   on August 14th on the record.  And what we decided was we had a

14   two-step process where we would give him a list generally of

15   what it was and then later on we would specifically, two weeks

16   later, give him the actual documents.

17       We followed that agreed-upon procedure, which was reduced

18   to a Court order from day one.  And for him to stand up here

19   and object and try and keep this out, you know, is absurd.

20   It's simply the print date on which we -- you know, the

21   document was actually printed.  It was done much earlier.

22           THE COURT:  Do you know -- Mr. Lucas, do you know if

23   you had the same exhibit with another date on it prior to this?

24           MR. LUCAS:  Your Honor, I don't know because, as I

25   mentioned earlier, I didn't get physical copies of their

JAMES C. JUSTICE III - DIRECT EXAM          18

1    exhibits until way late in the process.  And what counsel

2    said -- I want to go on the record to correct -- is incorrect.

3    The scheduling order provided that counsel were to exchange

4    lists of proposed exhibits, not just general descriptions but

5    proposed exhibits on the -- what ultimately was the 15th.

6        This document -- it's in the legend.  This is not

7    something that is printed as a footer.  It's in the legend.

8    This is a document that when they circulated their proposed

9    exhibits, this document didn't exist then, according to the

10   legend.  I don't know any more about it than what I see in the

11   legend, but I don't know how I can be expected to prepare to

12   respond to exhibits like this --

13            MR. GETTY:  Well --

14            THE COURT:  No, no.  Don't interrupt.  Go ahead.

15            MR. LUCAS:  -- that were prepared after he was

16   supposed to tell me what his exhibits were, and we didn't get

17   until about a week before the trial.

18            MR. GETTY:  Let's just deal with the truth.  The

19   truth of the matter is, the order said we had to list the

20   exhibits.  And we listed it, we described it.  We did not have

21   to produce it until the two -- two weeks hence.  And we did

22   that.  We fully complied with the Court's order.  And for

23   Mr. Lucas to stand up here and represent to this Court that we

24   didn't is just not accurate, and it's not right.

25            THE COURT:  Well, what about the point he's making,

JAMES C. JUSTICE III - DIRECT EXAM                 19

1   that this couldn't have been described on November 15th because

2   it's dated November 26th?

3           MR. GETTY:  Well, I assumed that was the date that it

4   was printed out; once again was done at an earlier time,

5   according to -- Mr. Justice is sitting there shaking his head,

6   saying he can testify it was printed -- it was done on an

7   earlier date.

8           THE COURT:  Okay.  I'll sustain the objection to the

9   use of this exhibit.  If you can ask Mr. Justice questions

10  about the study without reference to the exhibit, that's

11  perfectly permissible.

12  BY MR. GETTY:

13  Q.   Was this done at an earlier date?  When was it done?

14  A.   Excuse me.  It was.  You know, this is pretty in-depth

15  extensive work.  It takes a lot of time to do, the modeling,

16  the auto CAD work.  It was done well ahead of this day.  This

17  is the print date.

18  Q.   Okay.  And was it listed -- did you participate in the

19  pretrial matters here in terms of listing exhibits and

20  producing them?

21  A.   Yes, sir.

22  Q.   And was it listed specifically as one of the exhibits that

23  would later on actually be shown and produced?

24  A.   It was.

25  Q.   And did we follow that procedure that the Court ordered

JAMES C. JUSTICE III - DIRECT EXAM                    20

1    entirely?

2    A.   I hope you did.   I think so, yes.

3              MR. GETTY:   All right.   With that, I think it's

4    admissible.

5              THE COURT:   Mr. Lucas?

6              MR. LUCAS:   Your Honor, first of all, to correct

7    incorrect statements, I requested copies of their exhibits on

8    November 16.   I didn't get them for about three weeks.   Okay?

9        I've never seen this document before.   As I said, it's not

10   a footer.   It's up there in the legend with the other

11   materials, the white and the pink.   And under any version of

12   Your Honor's pretrial order and the scheduling order, what was

13   ordered to be produced or to be identified on the 15th was not

14   documents that didn't exist yet.   If this document existed

15   prior, it would have in the header, the date when it was

16   prepared.   And I renew my objection.

17   BY MR. GETTY:

18   Q.   Can you address --

19             THE COURT:   No, no, no.   Respond to the objection,

20   please.

21             MR. GETTY:   All right.   The document preexisted.

22             THE COURT:   Do you have that version you could

23   substitute with?

24             MR. GETTY:   I don't.   We probably do somewhere, but

25   this is just -- we're looking for the order.

JAMES C. JUSTICE III - DIRECT EXAM          21

1      THE COURT:  I have the order.  Which -- you are

2  looking for my minute entry order dated August 14th?  What's

3  the question about the order?  I mean, it states:  On or about

4  November 13th, 2018, the parties shall exchange a list of

5  proposed witness and exhibits for the hearing.  The deadline is

6  subject to modification upon agreement by counsel.

7      The description obviously has to be sufficient for both

8  sides to understand what the proposed exhibit was to allow --

9      MR. GETTY:  And it was.  I mean it was.

10      THE COURT:  -- to allow for the assertion of

11  objections.  This is a fair point.  If the document is dated

12  November 28th, it didn't exist on or before the deadline.  I'll

13  allow you to substitute it with one that you can show was dated

14  prior to the deadline, but I'm going to sustain the objection.

15      MR. GETTY:  Can we have one printed and sent to us?

16      THE WITNESS:  I assume so, yes.

17      MR. GETTY:  Okay.  Let's do that.

18      THE COURT:  What you can do is ask questions about

19  the analysis without reference to the exhibit.

20      MR. GETTY:  Thank you, Judge.  I apologize.  I

21  periodically have to sit down.

22      THE COURT:  You don't have to say you're sorry.  It

23  doesn't bother me a bit.

24      MR. GETTY:  I'm just used to standing, and I would

25  prefer that --

JAMES C. JUSTICE III - DIRECT EXAM                22

1     THE COURT:  Sure.

2     MR. GETTY:  -- out of respect for the Court and

3  counsel.

4  BY MR. GETTY:

5  Q.   Describe what analysis your engineers or you went through

6  in order to make this determination.

7  A.   To make the determination of the 675,000 tons?

8  Q.   Yeah.

9  A.   They evaluated the core data, primarily the core data that

10  has been provided by Mr. Brownlow.

11     THE COURT:  Do you still have the exhibit in front of

12  you?

13     THE WITNESS:  I do.

14     THE COURT:  Okay.  I want you to close the binder

15  while you are answering these questions about the study.

16     Okay.  Thank you.

17     Go ahead.  Mr. Getty.

18  BY MR. GETTY:

19  Q.   All right.  You may continue.

20  A.   The 675,000 tons was computed based on the core data,

21  which was seam height, you know, and figuring the seam losses,

22  what would you throw away, what you'd keep, based on the core

23  data that was provided by Mr. Brownlow.  It's really important

24  if you -- if you are evaluating a mining area that you have

25  extensive core data.  The SEC standard is you have to have a

JAMES C. JUSTICE III - DIRECT EXAM                23

1   core hole every 2,000 feet.

2   Q.    What is the SEC?

3   A.    Security Exchange Commission.

4   Q.    Okay.

5   A.    You have to have a core hole every 2,000 feet to be proved

6   in reserve because you may have a seam that is -- on one side

7   of the permit that is 22 inches and on the other side of the

8   permit it may be 48 inches.  So you can't just use a carte

9   blanche seam height and say that is what it is.  So all that

10  core data was used to compute these tons.  We feel like those

11  tons are correct.  They're not mineable, but the coal is there

12  in the ground, 675 tons.

13  Q.    Okay.  If you'd go to the next exhibit, Exhibit 5, and

14  tell us what that is.

15  A.    Exhibit 5 is the -- what is called the spoil balance

16  calculation, which --

17          MR. LUCAS:  Same objection, Your Honor.

18          THE COURT:  And I'll sustain that.  I have the PDF

19  version that was presented to chambers.  When I magnified that

20  on my iPad, the date is November 25th or 26th.

21          MR. GETTY:  We'll substitute.  Yeah, 4 and 5, we will

22  go ahead and get you the --

23          THE COURT:  No, I don't need them.  If they're going

24  to be admitted into evidence, that has to be done before the

25  close of the hearing.  You can ask questions, just not with

JAMES C. JUSTICE III - DIRECT EXAM                24

1   reference to Exhibit 5.   You can ask questions based on his

2   memory without aid of the exhibit.

3   BY MR. GETTY:

4   Q.    What steps did you have to go through in order to

5   determine the spoil balance?

6   A.    What the spoil balance is, is the swell of the material.

7   So when you blast it, it swells approximately 30 percent and so

8   you have to -- you have to say, well, where am I going to put

9   that 30 percent.   And you have a very limited space to put that

10  in, because you only have one nonjurisdictional valley fill.

11  And so therefore you kind of back into the fact you've only got

12  50,000 tons you can mine.

13  Q.    And what determination did you reach in terms of

14  mineability or recoverability?

15  A.    We determined you could mine approximately 50,000 tons.

16  Q.    Okay.   Were you aware of any other studies involving core

17  drilling and other --

18              THE COURT:   I'm sorry, Mr. Getty.   We can't hear you,

19  Mr. Getty.

20  Q.    Are you aware of any other studies involving core drilling

21  or other steps that produced any contrary result for this

22  property?

23  A.    I am not.

24  Q.    Do you believe you would -- given your involvement with

25  the property, do you believe you would have found or determined

1  that such studies existed if they did indeed exist?

2  A.   We tried to use all the data we had available and we

3  used the data that was provided for the specific property as

4  well as other data that were from neighboring properties.

5  That's just what you do, you know.  You try to take as much

6  information as you have and use it all.  But we determined that

7  the property was not mineable.

8  Q.   Okay.  Could you flip to your -- to the book to Exhibit 9

9  and identify Exhibit 9 if you would?

10 A.   Yes, sir.  This is a John T. Boyd report that was done on

11 the Delta Permit, the Strong Brothers permit, which is

12 essentially across the river.  It's about 1 to 1 1/2 miles away

13 from Fivemile.

14 Q.   Basically, if you would, visually looking down on these

15 properties to the left, the one side would be Fivemile, right,

16 and then moving to the right would be the Deep Wood, and then

17 across the river, mile, mile and a half, would be the Delta

18 permit?

19 A.   That's correct.

20 Q.   All right.  And what mine -- what seams did the Delta

21 permit involve?

22 A.   Hazard 4, which was a seam that was really low on the

23 mountain, and then the Hazard 7 and Hazard 8.

24 Q.   Were these seams also consistently found over on the Deep

25 Wood and the Fivemile?

1  A.    They were.

2  Q.    Okay.  And did you engage John T. Boyd to evaluate

3  these seams?

4  A.    We did.

5  Q.    And were core drills performed?

6  A.    Yes.  We drilled it ourselves.  And there was limited core

7  data prior to our ownership, but we used both, both what we had

8  and what we obtained with our drilling.

9  Q.    And what was determined by the John T. Boyd Company as

10  evidenced by this report?

11        MR. LUCAS:  Your Honor, I'm going to object again.

12  This is an effort to get in indirectly expert testimony.  It's

13  a document that was not disclosed to us.  We had objected on

14  the grounds that it wasn't, had never been previously disclosed

15  or produced.  And it was simply described on their final

16  exhibit list as a John T. Boyd Company letter to Bluestone

17  regarding CRE hole data, Breathitt County, with analyzed data

18  from Appalachian Fuels.

19        There's no way on earth for us to look at that and figure

20  out what it is, why it's relevant, whether we should object to

21  it or anything about it.

22        THE COURT:  And are you able to point to a request

23  for production of documents that would have sought the

24  production of this during discovery?  I'm just curious as to

25  whether this was produced by way of supplementation.

JAMES C. JUSTICE III - DIRECT EXAM          27

1          MR. LUCAS:  Well, it hasn't been provided, to my

2     knowledge, at any time.  We had asked for all documents

3     relating to the Fivemile transactions.  You know, we wouldn't

4     have said, give us stuff on Bluestone or some other thing.

5     He's now trying to say it relates to Fivemile and so it should

6     have been produced.

7          THE COURT:  Okay.

8          MR. GETTY:  Once again, let's have a little candor

9     about what this says, please.

10          THE COURT:  Direct your arguments to me, Mr. Getty.

11          MR. GETTY:  Yes, sir.  This is our response when he

12     objected.  We told him the majority of this exhibit was

13     previously provided to the plaintiffs.  They had it before.

14     The exhibit was included in paragraph 11 of defendants'

15     proposed exhibit list.  The report and data are relevant

16     because they demonstrate the poor quality of coal throughout

17     the subject areas and demonstrate that Kentucky Fuel did indeed

18     gather data about that quality in making its mining decision

19     and plans.

20          THE COURT:  What's the proof, though, that it was

21     produced?  I mean, that's a representation it was produced.

22     What backs that up?

23          MR. GETTY:  It's our understanding that, you know, it

24     was produced.  Unfortunately, the other lawyers earlier didn't

25     use Bates stamps.  It's our firm understanding it was produced

JAMES C. JUSTICE III - DIRECT EXAM          28

1   to them.

2          MR. LUCAS:  Your Honor, this --

3          MR. GETTY:  I would ask Mr. Lucas to confirm or deny

4   whether parts of the report or the report was produced

5   previously.  It was.

6          THE COURT:  Well, he's represented that it wasn't.

7   Let's --

8          MR. GETTY:  That doesn't necessarily mean that -- I

9   mean, if I have to go back and get an affidavit from Barry

10  Hunter, I'll do it.

11         THE COURT:  We're here for the hearing now.  Let's do

12  this.  You also asserted an objection to this exhibit based on

13  hearsay, correct, Mr. Lucas?

14         MR. LUCAS:  Yes, Your Honor.

15         THE COURT:  Okay.  If you need a moment to look into

16  your file and answer my question, that's fine.  We can take a

17  moment to do that.

18         MR. LUCAS:  Your Honor, may I address --

19         THE COURT:  Yes.

20         MR. LUCAS:  -- one point on this on the production?

21         THE COURT:  Yes.

22         MR. LUCAS:  When we got this exhibit list, many of

23  the descriptions were so vague and there had been, as counsel

24  said, documents produced without Bates numbers, but not by

25  Frost Brown and Todd.  So one of the questions that I posed in

1   my letter of November 16, which is in the record as document

2   391-4 -- I pointed out that.  I said, these descriptions in

3   your initial list are so vague that we really in many instances

4   can't tell what they are, and so we can't be sure if they've

5   ever been produced to us or not.  So I asked him in that letter

6   to please provide either Bates numbers or other evidence that

7   the above documents have been previously identified or

8   produced.  Never got an answer to that.  Still don't have an

9   answer to it.

10          THE COURT:  Mr. Getty, what's the purpose of the

11  exhibit?  Is it being offered for the truth of anything

12  asserted in the letter?

13          MR. GETTY:  I think it's simply offered here, Your

14  Honor, to show the efforts that these people, my clients,

15  undertook to determine whether they could or could not mine

16  this Fivemile coal.  And, you know, they have an experience

17  with the core drills and other information.  They ultimately

18  concluded they could not, not mine it profitably, and they

19  walked away from two other permits, based on data that was

20  provided by third parties; core drills and other things that

21  confirms that's this coal is not mineable, not merchantable.

22          THE COURT:  Is the conclusion that the coal is not

23  mineable or merchantable in this letter?

24          MR. GETTY:  Yes.

25          THE COURT:  It appears to me to be offered for the

JAMES C. JUSTICE III - DIRECT EXAM                    30

1    truth of the matter asserted in the letter, and I'm going to

2    have to sustain the hearsay objection on that basis that was

3    previously made.

4              MR. GETTY:  The report doesn't say it's not mineable

5    or merchantable specifically.  It just says that -- here are

6    the results, it's very poor quality.  And it says that they do

7    not recommend that steps be taken to try to produce mine

8    quality.  It doesn't have the required run line quality

9    specifications that -- you know, here's the conclusion.  Due to

10   the poor quality -- coal quality results observed in this

11   review, except for Hazard 7, coal reserve estimates have not

12   been prepared pending further discussion.

13             THE COURT:  Okay.  We'll, do this.  I'm going to

14   sustain the objection.  If defendants can establish that this

15   was produced during discovery, I'll reconsider.

16             MR. GETTY:  Okay.

17             THE COURT:  But that has to be done during the

18   hearing.

19             MR. GETTY:  All right.

20             THE COURT:  Secondly, what that means is, as we have

21   before, you can -- I'm sorry.  You can ask Mr. Justice

22   questions about his memory of these events without reference to

23   the document.

24             MR. GETTY:  Okay.

25             THE COURT:  Is that ruling clear enough, Mr. Lucas?

JAMES C. JUSTICE III - DIRECT EXAM                31

1        MR. LUCAS:  Yes, Your Honor.

2        THE COURT:  Okay.  Go ahead, Mr. Getty.

3   BY MR. GETTY:

4   Q.    Given what the Court has said, could you just explain to

5   us the sort of -- the personal -- the steps that you went

6   through and what you recall about the just general overall

7   analysis of whether the Fivemile coal was or was not mineable

8   or merchantable in terms of what you determined and how you

9   determined it?

10  A.    Well, when we evaluate any piece of property, Fivemile or

11  a property anywhere else, we look at the core data.  We then

12  look at the trains or trucks or whatever that had been shipped

13  from the adjacent mines.  We look at the pit data from an

14  adjacent mine, whether it be ours or somebody else's, because

15  the actual mining is the most important data.  It carries more

16  weight than even the core data because you've uncovered it, you

17  know, you know how the seams are able to be loaded out.  And

18  you can't tell that from a core drill.  But you can tell a lot

19  from a core drill.  But we rely heavily on the mining that had

20  been done around it.

21  Q.    Okay.  And what did you conclude?

22  A.    We concluded that the coal was very poor quality.  It was

23  low BTU, high ash, and high sulfur.

24  Q.    Do you believe, based on your dealings with Mr. Brownlow,

25  that he knew and understood that this coal was not mineable and

JAMES C. JUSTICE III - DIRECT EXAM                32

1    merchantable?

2              MR. LUCAS:  Objection, Your Honor.

3              THE COURT:  Your response?  What's the basis of the

4    objection, Mr. Lucas?

5              MR. LUCAS:  That he's asking him what Mr. Brownlow

6    knew.

7              THE COURT:  Mr. Getty, your response.

8    BY MR. GETTY:

9    Q.   Was the quality of this coal being at this level

10   communicated by you to Mr. Brownlow?

11   A.    About how poor quality it was, yes.

12   Q.   Okay.  And how was that done?

13   A.    I think that when I've met with Mr. Brownlow, I have

14   definitely told him that the quality was not good; high sulfur,

15   high ash, and at the time that we met, you know, that the

16   market wouldn't support -- support the mining at that time.

17   Q.   Okay.  And what did he say, if anything, or what was his

18   reaction when you described or indicated to him that the

19   quality was poor?

20   A.   It was my feeling that, based on those conversations,

21   Mr. Brownlow tried to distance himself from knowledge of the

22   poor quality and just tried to glance over that and try to

23   dis -- you know, just disregard it.

24   Q.   Okay.  Do you believe you clearly and unequivocally told

25   him that the quality was too poor to mine it?

JAMES C. JUSTICE III - DIRECT EXAM                    33

1   A.    I do.

2   Q.    Do you believe that you clearly and unequivocally

3   communicated to Mr. Brownlow that you couldn't mine it

4   profitably?

5   A.    I do.

6   Q.    And do you believe you communicated to him that certainly

7   under the current market conditions that you couldn't mine it?

8   A.    Yes, specifically under the current market conditions that

9   prevailed at the time that I had those conversations.

10  Q.    Okay.  And when Mr. Brownlow entered into the fourth

11  amendment and had dealings with you or your company, what

12  amount did you all pay him for this coal?

13  A.    We initially paid him $200,000 in 2005.

14  Q.    Okay.

15  A.    And then when we executed the fourth amendment, along with

16  some, you know, ancillary amounts that were specific to the

17  underlying landowners, we entered into an agreement to start

18  paying him minimal royalties going forward.

19  Q.    What's the purpose of a minimum royalty?

20  A.    The purpose -- the sole purpose of a minimum royalty is

21  that an operator, whether it be a coal operator, oil and gas

22  operator, you know, whatever, could pay a minimum to retain the

23  property until such time that it could be produced upon, you

24  know, whether it be drilling for oil or for anything.  That's

25  the sole purpose of a minimum.

JAMES C. JUSTICE III - DIRECT EXAM                34

1   Q.   Okay.  It's in lieu of mining?

2   A.   That's correct.

3   Q.   And if you pay the minimum royalty, do you have any

4   obligation to mine?

5              MR. LUCAS:  Objection, Your Honor.

6              THE COURT:  The basis of the objection?

7              MR. LUCAS:  That's set out in the contract between

8   the parties, which has an integration clause, and he's asking

9   him to interpret the contract.

10             THE COURT:  I think the question was in a general

11  way.  I'll overrule the objection.

12       Go ahead, Mr. Getty.  The question wasn't specific to this

13  contract, so go ahead Mr. Getty.

14             MR. GETTY:  Yes.  I've forgotten the question because

15  of the interruption.

16             THE COURT:  The question was:  "And if you pay the

17  minimum royalty, do you have any obligation to mine?"

18  A.   That's the sole purpose of the minimum.  So, you know, if

19  you have a lease that has a minimum, you pay the minimum and

20  you're able to, you know, delay, you know, production, you

21  know, on that property until such time as the market would

22  sustain that.

23  Q.   Okay.  And what happens if you reach a point where the

24  market won't sustain it and you reach that conclusion?  What do

25  you do then?

JAMES C. JUSTICE III - DIRECT EXAM        35

1   A.    Well, then you typically surrender the property back to

2   its original owner.

3   Q.    Okay.  And if the property were as valuable as

4   Mr. Brownlow testified, sitting up there under oath on the

5   stand, would it be worth more than $200,000?

6   A.    Absolutely.  If in 2005, you know, when 58 percent of the

7   electricity was made from coal -- and a lot of it came from

8   Central App -- if you had 20 million tons that was mineable,

9   that was permitted and you could mine it and it was good

10  quality, it probably would be worth $20 million, not 200,000 --

11  Q.    Do you believe that was an indication or is an indication

12  of the marginal value of this coal?

13  A.    I do, yes.

14  Q.    Did there come a time where you were prepared to actually

15  surrender the Fivemile property?

16  A.    Yes.

17  Q.    How did that transpire?  How did that take place?

18  A.    Well, keep in mind from 2005 through 2010, there were no

19  minimums owed to Mr. Brownlow during that time.  So

20  theoretically, we could have not mined on the property forever

21  and Mr. Brownlow would have gotten his 200,000 initially and he

22  would have never gotten any other dollars.

23  Q.    Okay.

24  A.    When we executed the amendment, Mr. Brownlow was viciously

25  insistent upon getting a minimum that had a very short

JAMES C. JUSTICE III - DIRECT EXAM          36

1   recoupment period, meaning that it wasn't just paid into an

2   escrow account.  He could use those dollars.  Because he knew

3   that --

4              MR. LUCAS:  Your Honor, I object again.  He's already

5   testified that during the negotiation of the fourth amendment,

6   he didn't have any personal dealings with Mr. Brownlow, and now

7   he's testifying about how vicious he was during the

8   negotiations.

9              THE COURT:  Okay.  Your response to the objection,

10  Mr. Getty?

11             MR. GETTY:  I'll lay the groundwork.

12             THE COURT:  I couldn't understand.

13             MR. GETTY:  I'll lay the groundwork for this.

14             THE COURT:  Okay.  Rephrase the question again.

15  Sustained to the extent the --

16  BY MR. GETTY:

17  Q.   You heard this objection that you were not involved in

18  negotiations or had no personal involvement, et cetera,

19  et cetera.  You recall that -- where did the negotiations take

20  place?

21  A.   They took place at The Greenbrier.

22  Q.   Okay.  Were you physically present at The Greenbrier?

23  A.   I was.

24  Q.   And were you in constant communication with Steve Ball and

25  Marc Merritt with respect to those negotiations?

JAMES C. JUSTICE III - DIRECT EXAM                    37

1   A.   I was.

2   Q.   Okay.  Were you kept apprised and consulted from time to

3   time as to what position would be taken?

4   A.   Absolutely.

5   Q.   Okay.  And who was calling the shots on that?  Was it

6   Mr. Ball or Mr. Merritt or was it you?

7   A.   Well, Mr. Ball and Mr. Merritt both are competent, you

8   know, trusted, you know, advisors during that time, but I was

9   making the final decision.

10  Q.   Okay.  And did you make the final decision?

11  A.   Yes, sir.

12  Q.   All right.  And were you fully familiar with what was

13  transpiring moment to moment, hour by hour, day by day?

14  A.   I was getting I would probably characterize it as hourly

15  updates from either Steve or Marc.

16  Q.   And based only on that, I'd asked you earlier what was

17  Mr. Brownlow's position with respect to minimums.

18  A.   He was insistent, and I use the word "viciously

19  insistent," but he was adamant that he had to have a minimum.

20  It had a very short recoupment.  And the need for him to have

21  that was because he didn't really think this coal could be

22  mined.  And he wanted a way to get $75,000 a year.

23  Q.   Did you make a change with respect to the

24  non-recoupability after a point in time?

25  A.   Yes.

JAMES C. JUSTICE III - DIRECT EXAM                    38

1   Q.    And what was that date?

2   A.    I don't know the specific dates.  Mr. Ball will be able to

3   say specifically.  But the recoupment period was very short.  I

4   think one year.

5   Q.    Okay.  And after that period, no recoupment?

6   A.    That's correct.

7   Q.    So if you mined the coal -- if you had, in fact, mined the

8   coal and you paid him the $75,000 under a recoupability clause

9   you would take out -- you wouldn't pay him any royalties until

10  you consumed that $75,000, right?

11  A.    Well, let me be specific, maybe make an example.

12  Q.    Okay.

13  A.    If in 2011 -- the lease was -- was, I guess, restarted in

14  December 1st of 2010.  So if we would have paid a minimum in

15  2011, let's just for -- for example, let's say 75,000.  We

16  would have -- and we would have mined coal in 2011.  Let's say

17  we would have mined 10,000 tons.  We paid -- Mr. Brownlow is

18  owed $2 a ton during the initial period, $1 dollar ton after

19  250,000 tons.  But under this period, 10,000 tons times $2, so

20  there would be $20,000 owed to Mr. Brownlow.  That would be

21  recouped against the 75 that we'd already paid.  So

22  Mr. Brownlow would not receive any additional dollars.

23  Q.    Other than the 75,000 minimum?

24  A.    Yeah.  That he would have been capped at the 75 until

25  production got above that.

JAMES C. JUSTICE III - DIRECT EXAM                39

1   Q.   Would you go ahead and take a look at -- it's one of our

2   exhibits in our book.  Fourth amendment.  It's 1a in their

3   book.

4   A.   Did you say 1a?

5   Q.   She's going to give you the book.

6   A.   Okay.

7          MR. GETTY:  I have an extra loose copy I can give him

8   if that's easier.

9          THE WITNESS:  Would you mind giving that back?

10          COURT SECURITY OFFICER:  To?

11          THE WITNESS:  Mr. Getty.  Thanks.

12          THE COURT:  What was just passed back to Mr. Getty?

13   I didn't see.

14          THE WITNESS:  That was Exhibit 8.

15          THE COURT:  Okay.  Go ahead.

16   BY MR. GETTY:

17   Q.   Do you have that document?

18   A.   I do.

19   Q.   And with respect to -- can you identify that as the fourth

20   amendment, just so we have that on the record?

21   A.   Yes, sir, I do.

22   Q.   As part of the fourth amendment, was Mr. Brownlow also to

23   do some work for you?

24   A.   He was.

25   Q.   Okay.  And what, if anything, did he do with you?  I think

JAMES C. JUSTICE III - DIRECT EXAM                40

1   you maybe covered that briefly.  If you'd be more specific.

2   A.    In late 2010 there was a proceeding of -- a bankruptcy

3   proceeding for the assets of Appalachian Fuel, which were the

4   Addington entities.  And there were certain permits in Kentucky

5   and actually a couple even in West Virginia that were being

6   sold.

7       We contacted Mr. Brownlow, our company, Steve Ball did;

8   Steve Ball and Marc Merritt.  I think early on Steve Ball,

9   because Marc Merritt came to work for us as part of the -- the

10  Appalachian Fuels acquisition.  But Steve Ball contacted

11  Mr. Brownlow and asked him if he would serve as a consultant on

12  a month-to-month basis to purchase these properties for us,

13  work on leases, so forth, as part of the Appalachian Fuel

14  acquisition.

15              MR. LUCAS:  Your Honor, I object again.  He's

16  testifying to matters without his personal knowledge.  He's

17  testified what Mr. Ball asked Mr. Brownlow to do.

18              THE COURT:  He's already -- he's already made the

19  statement.  There's not a pending question.  You are asking me

20  to basically ignore or strike the testimony that was already

21  given, right, Mr. Lucas?

22              MR. LUCAS:  Well, it was hearsay.  It wasn't until he

23  said it that it became obvious that he was reporting what

24  someone else had said to him.  So it's hearsay.

25              THE COURT:  Yeah.  There was plenty of hearsay

JAMES C. JUSTICE III - DIRECT EXAM                41

1  admitted without objection through the cross-examination of

2  Mr. Brownlow.  I'll overrule that objection.  Go ahead,

3  Mr. Getty.

4  BY MR. GETTY:

5  Q.   I'll back to where we were.  Did Mr. Brownlow act as an

6  agent or sort of stalking horse to buy these properties?

7  A.   He did.

8           THE COURT:  Okay.  I'm going to interrupt because

9  it's the third time I've heard that phrase.  What do you mean

10  by "stalking horse"?

11           THE WITNESS:  We thought that publicity-wise and

12  value-wise it would be better for us to have someone else

13  purchase the properties versus us purchasing the properties.

14           THE COURT:  Okay.  Go ahead.

15           THE WITNESS:  So we used Mr. Brownlow as an agent.

16  BY MR. GETTY:

17  Q.   Okay.  And how much of that kind of work did he do for

18  you?

19  A.   I can't remember specifically.  But he worked for us in

20  the fall of 2010, in the spring of 2011, and then -- these kind

21  of one-off type things, you know, once they're bought and

22  they're done, they're done.  So the scope of work was probably

23  a six-month duration, something like that.

24  Q.   Okay.  With respect to acquiring the properties incognito,

25  so to speak?

JAMES C. JUSTICE III - DIRECT EXAM                    42

1   A.    Correct.

2   Q.    And were there also some of the leases that you acquired

3   that were Addington where the underlying lessors had not been

4   paid or were not current?

5   A.    That's correct.

6   Q.    And what, if anything, did Mr. Brownlow do with respect to

7   that?

8   A.    He was definitely involved.  You know, I don't -- I don't

9   know if he was -- if he was the person that kind of got it

10  across the line, but he was definitely involved.  Most all the

11  plots that we bought -- we bought three; one in West Virginia

12  and two in Kentucky.  They were all in pretty bad shape as far

13  as the leases were concerned.

14  Q.    Did you clean those leases up?

15  A.    We did.

16  Q.    Okay.  And if you look at the exhibit you have before you

17  and look at page 3, in b and c at the top of the page there's

18  reference to average monthly selling price?

19  A.    Yes, sir.

20  Q.    When you entered into or authorized entering into this

21  arrangement, I assume you read, understood the final document?

22  A.    Yes, sir.

23  Q.    Did you ever consider that you had any obligation to mine

24  the coal unless you could sell it and market it at a profit?

25  A.    No, that's why we paid the minimum.

JAMES C. JUSTICE III - DIRECT EXAM            43

1   Q.   All right.  What, if anything, did -- with reference to

2   the average monthly selling price mean to you?

3   A.   Well, in this document, it says that -- you know, it's a

4   little confusing because the first 250 tons you pay $2 a ton,

5   and then it goes to $1.

6        But by and large it was $1 a ton across the term.  So it

7   says you pay 2 percent of the gross selling price, average

8   selling price for the month or $1 a ton.  So to get $1 a ton

9   you have to sell the coal for $50 a ton.  Usually when a

10  landlord is insistent upon $1 or $2 or $3 as a fixed number as

11  in -- and/or percentage, they typically are concerned that the

12  coal will be sold for such a low price that they need to have a

13  floor.

14  Q.   Backup?

15  A.   Have a backup, correct.  For example, on a metallurgical

16  lease, you know, when coal would sell for a higher dollar per

17  ton, it may say 5 percent or $10 a ton, you know.  But on a

18  steam coal lease, that's very poor quality, that's why you have

19  a floor.

20  Q.   Okay.  And did you ever contemplate any obligation to mine

21  this coal regardless of whether it was profitable or

22  marketable?

23  A.   Well, we -- you know, nobody wants to lose any money, but

24  we certainly lost our fair share.  But no, that's again why you

25  have a minimum in these leases.  You know, you -- you have that

JAMES C. JUSTICE III - DIRECT EXAM                    44

1   flexibility so if the market is good, you can mine; if the

2   market is bad, you just pay the minimum and kind of the

3   landowner is not hurt either.

4   Q.    Okay.  But anywhere you have that minimum the landowner is

5   getting that minimum to assure him that every year he gets a

6   certain minimum amount, right?

7   A.    Yes, sir.

8   Q.    But did you understand this agreement to be that

9   Mr. Brownlow would have his cake and eat it too, that he'd get

10  the minimum, but you also were required to mine the coal

11  regardless?

12  A.    No, that's not my understanding.  And I don't think that's

13  what the document says.  If you had to mine coal regardless,

14  why would there be a need for a minimum?  It doesn't make any

15  sense.

16  Q.    On page 4 there's a reference to "After December 1, 2013,

17  the annual minimum royalty payment shall not be credited;" in

18  other words, not recoupable?

19  A.    That's correct.

20  Q.    Is that the point at which he gets his 75,000 and it

21  doesn't -- if you ever mined, there's no credit, right?

22  A.    At that point, you know, it's really free money.  You can

23  pocket the money, and doesn't matter if we mine or we don't

24  mine.  You know, that's your money.

25  Q.    And if you flip over to paragraph 5, there's an event of

JAMES C. JUSTICE III - DIRECT EXAM                45

1   default.   It says if Kentucky Fuel fails to perform under the

2   terms of the prior agreement, certain things take place.   Did

3   you ever contemplate that given the minimum payment that

4   failure to mine would constitute a default?

5   A.    I did not.

6   Q.    Okay.   And what, if any, defaults were you informed of

7   under this contract by Mr. Brownlow?

8   A.    There was a -- there was a conversation, both verbal and

9   written, with Steve Ball, that I was made aware of, that there

10  were some consulting fees and arrears that we caught up.   There

11  was never any insinuation that there was a problem with not

12  mining the coal.

13  Q.    By Mr. Brownlow?

14  A.    That's correct.

15  Q.    Okay.   You must have -- at what point did you reach the

16  point where -- timewise, when did you reach the point that you

17  didn't pay him his retainer and why?

18  A.    You're asking about his consulting fee retainer?

19  Q.    Yes, sir.

20          MR. LUCAS:   Your Honor, I understand Your Honor may

21  allow the evidence based on the prior relief, but I want to

22  make a note for the record, I object, because the complaint --

23  the admissions established by default, the complaint

24  specifically alleges that the monthly retainer fees continue to

25  accrue at the rate of $10,000 a month.   So that fact is

JAMES C. JUSTICE III - DIRECT EXAM                46

1  established, and I object to this testimony in contradiction to

2  that fact.

3              THE COURT:  I understand the objection and am

4  sympathetic to it.  Of course, not going to revisit the

5  findings, but I'll allow the question to be asked and answered.

6  BY MR. GETTY:

7  Q.   Go ahead and answer.

8  A.   We started the consulting arrangement, like I said, in the

9  fall of 2010.  And that work continued into the spring of 2011.

10 There was a period that we were behind on the consulting fees

11 in early 2011, and those fees were caught up, I think, on May

12 the 15th or --

13 Q.   So when you caught them up, did Mr. Brownlow accept them?

14 A.   Yes.

15 Q.   He took the money?

16 A.   That's correct.

17 Q.   Did you understand that at that point in time that any

18 complaint about not paying them had been in effect put aside or

19 waived by acceptance of the money?

20 A.   That was my understanding.  That's normally how it works.

21 If you accept the money, you know, you don't send it back, you

22 kind of waive your problem.

23 Q.   Okay.  So at that point, sometime in 2011, you caught the

24 payments up, and did you believe you were current at that

25 point?

JAMES C. JUSTICE III - DIRECT EXAM          47

1   A.    I think we caught the payments up in May that were up

2   through April, so yes, we thought we were current at that

3   point.

4   Q.    And what other payments -- when did you make any kind of

5   decision that Mr. Brownlow's services really weren't necessary?

6   A.    Well, again, you know, after probably March or April of

7   2011, there was nothing really for Mr. Brownlow to continue

8   doing.  It was my understanding that we had a -- kind of a

9   30-day, you know, month-to-month type arrangement and we could

10  cancel in 30 days, and if we didn't have any work, we didn't

11  have any work.

12      I was really under the impression if we didn't have any

13  work, we didn't pay, and if a year down the road we needed

14  Mr. Brownlow to do something else, we would call him up and

15  reassume payment and that's how it would work, but -- that was

16  my understanding.

17  Q.    Okay.  And at the time you signed the fourth amendment,

18  you excepted out the Strong Brothers leases, which came to be

19  known as, what, the Delta permit?

20  A.    That's correct.

21  Q.    And you surrendered the Deep Wood permits?

22  A.    That's right.  Yeah.

23  Q.    When, if at all, did you reach the point where you believe

24  you should surrender the Fivemile permits?

25  A.    Well, I've got to kind of take you through a little bit of

JAMES C. JUSTICE III - DIRECT EXAM                 48

1  a timeline.  Up until signing the fourth amendment -- again, we

2  could have sat on Deep Wood and Fivemile forever.

3            THE COURT:  Mr. Justice, you need to answer the

4  question directly.  We're getting a little bit loose in terms

5  of presentation of the evidence.  The question was:  "When, if

6  at all, did you reach the point where you believe you should

7  surrender the Fivemile permits?"

8  A.    Late 2011.

9  Q.    Okay.  And what was the basis for that decision?

10 A.    We -- Mr. Brownlow had brought Lloyd Williams to us in

11 2010 as a suiter to buy our assets from us, meaning the

12 loadout, Deep Wood, Fivemile, Strong Brothers, all of it.

13 Q.    Uh-huh.

14 A.    So we kept hanging on, if you will, and kept paying

15 minimums and kind of throwing good money after bad.  But

16 Mr. Williams was never able to come through and his closing

17 kept getting delayed and delayed and delayed and delayed and at

18 some point we just couldn't afford to keep throwing money in

19 it.  And so at the end -- or late in 2011, we -- we stopped

20 paying minimums because it was our intention to surrender the

21 property.

22 Q.    Okay.  If Mr. Williams hadn't appeared on the scene, would

23 you have triggered the surrender?

24 A.    Yes.

25 Q.    Okay.

JAMES C. JUSTICE III - DIRECT EXAM                    49

1   A.    And we -- and if Mr. Williams wasn't on the scene, we

2   would have not entered into the fourth amendment.

3   Q.    Okay.  Mr. Williams was in the -- on the scene before the

4   fourth amendment?

5   A.    That's correct.

6   Q.    Before November of 2010?

7   A.    Yes, sir.

8   Q.    Okay.  Take a look at Exhibit -- the exhibit we have

9   before you and look at paragraph 10 on page 6.  That is the

10  covenant to mine, and I'll read it to you for the record as a

11  prelude to the question.  It says, "In consideration of New

12  London, Deep Wood, Fivemile and Fivemile Energy agreeing to the

13  terms described herein, Kentucky Fuel covenants to use

14  commercial and reasonable good faith and best efforts to

15  maximize within the constraints of industry standards the

16  amount of coal extracted from these real properties."  What did

17  you understand that clause to mean, sir?

18  A.    I understood that to mean that we had a duty to mine, if

19  it was commercially reasonable, meaning that it was

20  economically viable and the coal could be sold for a profit,

21  which we would have gladly done.  I mean, we had millions of

22  dollars into these properties and if we could have mined them

23  and made a profit, there would be no reason not to have done

24  that.

25  Q.    And there's a reference to "maximize within the

JAMES C. JUSTICE III - DIRECT EXAM                50

1   constraints of industry standards."  What did you understand
2   that clause to mean?
3   A.   Well, the industry standards are that you have to have
4   something that is mineable and merchantable, meaning that it
5   could be sold and sold for a profit.  And we thought that's
6   what that language meant.
7   Q.   Okay.  If you have this tonnage and you can only mine
8   50,000 tons, is that coal mineable?
9   A.   It's not.  And let me tell you why.  It's because it costs
10  truly millions of dollars to develop a coal mine.  You have to
11  build a road.  You have to get all the permitting done.  You
12  have to -- you know, haul in the equipment, you know, hire the
13  people and all that.  And there's just -- the economies are not
14  there to -- to develop all that for just 50,000 tons.
15  Q.   You have to buy equipment, too, or lease it --
16  A.   Absolutely.
17  Q.   -- right?  And given your experience with respect to these
18  Breathitt County properties, according to your own personal
19  knowledge, how much money did Kentucky Fuel or the Justice
20  Companies spend trying to develop or evaluate these properties
21  before they walked away from every one of them?
22  A.   We spent upwards of $10 million on those plots and that
23  was in leases and costs to hold them and reclamation costs.  So
24  we certainly made a big effort to be able to make a go of it
25  but just couldn't do it.

JAMES C. JUSTICE III - DIRECT EXAM          51

1   Q.    Was the fourth amendment and these bankruptcy sales
2   happening about the same period of time?
3   A.    It was, yes.
4   Q.    And then in roughly the same period of time Mr. Williams
5   appears on the scene?
6   A.    Yes.
7   Q.    And do you believe that you should have surrendered the
8   Fivemile permit?
9   A.    Well, in retrospect, absolutely.
10  Q.    Hindsight is 20/20, huh?
11  A.    Yeah.
12  Q.    Okay.  Mr. Brownlow says you never had any intent to mine
13  the Fivemile property.  What steps can you point out to the
14  Court that you took to show that you had an intention to mine
15  if you could mine profitably?
16        MR. LUCAS:  Same objection as before, Your Honor.
17  It's established by the default in this case that they never
18  had any intent to mine the property.
19        THE COURT:  Mr. Getty?
20        MR. GETTY:  That's not true.  When
21  Judge Van Tatenhove sent this back to determine, you know,
22  whether or not this was -- could be mined, you know, whether --
23  what the amount of damages were within the constraints of
24  industry standards or words to that effect, that issue remains
25  now before this Court.

1   THE COURT:  Well, I'll overrule the objection, but

2   the questioning needs to go to this mitigation of damages,

3   Mr. Getty.

4   MR. GETTY:  Okay.

5   BY MR. GETTY:

6   Q.   You understand this is a damages trial, right?

7   A.   Yes, sir.

8   Q.   Okay.  And in terms of demonstrating for the Court

9   mitigation of damages context, what steps did Justice Companies

10  or Kentucky Fuel, of your own personal knowledge, take that you

11  believe establishes a clear intention to mine, if you could

12  mine it profitably, mine this coal?

13  A.   Well, probably the most glaring example is the

14  transportation and logistics of moving the coal from the mine

15  to the market is a really significant piece of the puzzle.

16  Mr. Brownlow didn't have a loadout, didn't have any way to load

17  the coal, you know, in a railcar.  So after we acquired the

18  permits from Mr. Brownlow, we bought the Haddix or Andy loadout

19  facility from Lexington Coal.  And then after the fact we spent

20  millions of dollars refurbishing that facility, got it up and

21  running, you know, to load coal as of 2008.  And that was a

22  huge investment that we would have never done had we not

23  intended to mine both Deep Wood and Fivemile.

24  Q.   That's the Andy tipple or sometimes referred to as the

25  Haddix tipple?

JAMES C. JUSTICE III - DIRECT EXAM                    53

1    A.    Yes, sir.

2    Q.    And who did you purchase that from?

3    A.    We purchased it from Lexington Coal, which was basically

4    the bankruptcy trustee for the -- the Addington bankruptcy

5    of -- not Appalachian Fuel but the one before that.

6    Q.    HL?  H-something?

7    A.    I think AEI Resources.

8    Q.    AEI.  And how much did you either pay for the tipple or

9    invest in refurbing it, upgrading it, et cetera?

10   A.    In total we had about $5 million in the purchase and

11   refurbishment of the facility.

12   Q.    Did you ever run coal through it?

13   A.    We did.  We hauled some coal from -- from the Strong

14   Brothers Delta permit there and loaded it.  You know, I'm

15   embarrassed to say we probably only loaded one or two trains

16   there because the quality was so bad that we just couldn't --

17   couldn't make a go of it.

18   Q.    Couldn't sell it?

19   A.    No.

20   Q.    Okay.  And after that experience with Strong Brothers

21   coal, what happened to the tipple?  Did it sit idle?

22   A.    It sat idle for 10 or 11 years now, yeah.

23   Q.    It's not operating at all?

24   A.    No.

25   Q.    Did there come a point in time where -- I believe you said

JAMES C. JUSTICE III - DIRECT EXAM                    54

1   that probably in 2011, you should have surrendered the

2   Fivemile properties?

3   A.    Yes, sir.

4   Q.    Was there a point in time where there was an impasse or a

5   dispute between you and Mr. Brownlow that you were aware of any

6   time before he sued you?

7   A.    No.   I mean, I considered Will a friend and, you know, he

8   was -- you know, our friendship was what precipitated us

9   agreeing to pay the minimums, you know, on Fivemile.   We did

10  that as an accommodation, thought it was the right thing to do.

11  We gave up Deep Wood, you know, because of that.   You know,

12  Will had helped us, you know, with the Addington purchases.   We

13  paid him for that, but we were -- we were trying to -- to be as

14  friends should be.   But the lawsuit just kind of came out of

15  the sun.

16  Q.    You were surprised?

17  A.    Oh, absolutely.

18  Q.    And after it was filed, did you make efforts to try to

19  resolve or ameliorate the situation?

20  A.    We made many attempts to resolve the situation, and it's

21  my feeling that Mr. Brownlow hasn't been willing to -- didn't

22  want to resolve the situation.

23        MR. LUCAS:   Your Honor, I think he's straying into

24  attempted settlement negotiations.

25        THE COURT:   Mr. Getty, why is this line relevant with

JAMES C. JUSTICE III - DIRECT EXAM          55

1   respect to trying to resolve the claim?

2           MR. GETTY:  Well, I think it shows the good faith

3   efforts of my clients to try to, you know, not be involved in

4   litigation.

5           THE COURT:  The damages will be presented based on

6   the legal and factual questions presented, not --

7           MR. GETTY:  I agree.

8           THE COURT:  -- discussion.  Move on to another

9   subject.  The objection is sustained.

10  BY MR. GETTY:

11  Q.   There came a time where the default was entered in this

12  case.  Can you sort of -- I don't think you've ever had the

13  opportunity to provide some explanation to this Court about --

14          MR. LUCAS:  Objection --

15          THE COURT:  Sustained.

16  Q.   One instance was you --

17          MR. GETTY:  Geez, can I get the question out?

18          THE COURT:  Well, you can finish the question.  Sure.

19  BY MR. GETTY:

20  Q.   It's alleged that you failed to appear for a deposition.

21          MR. LUCAS:  Objection.

22          THE COURT:  Okay.  Mr. Getty, what is the relevancy

23  with respect to damages of those events?

24          MR. GETTY:  Well, I think it's clearly relevant to

25  show, as its been represented throughout by counsel for

JAMES C. JUSTICE III - DIRECT EXAM                      56

1   Mr. Brownlow, that, you know, Mr. Justice or other

2   representatives simply flaunted their obligations.  It's just

3   not true.  I think he should have an opportunity to explain

4   that, you know, the reason he did not show --

5              THE COURT:  No, no, don't answer the question for the

6   witness.  Tell me why you think it's relevant.

7              MR. GETTY:  I think it's relevant.  It goes to, you

8   know, the level of damages, particularly any punitive damages

9   that might be assessed.

10              THE COURT:  Okay.  I'm going to allow it.  We'll see

11   where it goes.  But I may have questions of my own about the

12   conduct following the presentation of Mr. Justice's testimony.

13              MR. GETTY:  I fully welcome you to inquire.  I think

14   it would be helpful.

15              THE COURT:  Go ahead with the question.

16   BY MR. GETTY:

17   Q.   Can you explain the circumstances of the litigation?

18   First of all, who was representing you at the outset of the

19   litigation?

20   A.   Early on we had used and still use to this day Billy

21   Shelton for regulatory work, primarily in Kentucky.  We didn't

22   have, really, any litigation, you know, that came up of any

23   substance.  And so when the case was filed, we -- you know, the

24   relationship we had was with Billy.  And so Billy, Billy maybe

25   is not the right guy for this, but he --

JAMES C. JUSTICE III - DIRECT EXAM                    57

1   Q.   Good regulatory, though?

2   A.   He is.  He started the case and, you know, the truth is

3   coal business was not good in 2012, getting worse by the day.

4   You know, we were losing -- literally losing millions and

5   millions of dollars a month.  Tax returns show that we were

6   losing upwards of $100 million a year.  So we were naturally

7   trying every way we could to come up with any and every

8   suggestion or idea to tighten our belt, if you will, cut

9   overhead costs, do whatever we could.

10          And one of those things that was on the docket was legal

11  expenses.  And not to take anything away from you, Rich, or

12  others, but you guys are expensive, and we were spending a lot

13  of money, not only on this case, but other legal work across,

14  you know, other companies.  And we made the decision that

15  instead of paying an outside lawyer, you know, 700,000 a year,

16  or an outside law firm, we could hire an in-house attorney for

17  $70,000 a year.  And that was not a wise move on our part at

18  all.

19          We hired attorneys that were overloaded and attorneys that

20  were not probably top-shelf type attorneys, young attorneys,

21  didn't have much experience and the legal -- legal department

22  on a lot of fronts started snowballing out of control.  That's

23  on me.  I certainly owe you an apology.

24              THE COURT:  The testimony you give needs to be in

25  response to Mr. Getty's question.

JAMES C. JUSTICE III - DIRECT EXAM          58

1    A.    Well, I certainly owe the Court an apology for that

2    conduct.  There was certainly no intent or no cavalier

3    disregard for anything.  It's just what happened.  And that's

4    basically what happened to us.

5    Q.    What were the circumstances surrounding -- if you could

6    tell the Court the circumstances surrounding your failure to

7    appear for a deposition.

8    A.    Well, during the same --

9            MR. LUCAS:  Your Honor, I'm going to renew my

10   objection.  This is in the record, extensively was briefed at

11   the time with affidavits, with deposition testimony from

12   Mr. Ball.  That is -- that is all in the record, and I object

13   to the efforts to relitigate that now.

14           THE COURT:  I understand.  And here's what I'm going

15   to do with respect to the objection.  I'll overrule it, but on

16   this basis.  Mr. Getty did finally articulate a basis for why

17   this is relevant and what he said was could be relevant to the

18   punitive damages determination.  That was discussed in Footnote

19   4 of my recommended disposition.  I'm not going to consider

20   this evidence to revisit any finding that there was misconduct,

21   but its nature may be useful in the punitive damages assessment

22   that is required by the default that has been entered by Judge

23   Van Tatenhove.

24       Go ahead, Mr. Getty.

25           MR. GETTY:  Thank you, Your Honor.

JAMES C. JUSTICE III - DIRECT EXAM          59

1   BY MR. GETTY:

2   Q.   Tell the Court the circumstances on which -- what -- what

3   it was involved in your not appearing for a deposition.

4   A.   It was November of the year.  I had a --

5   Q.   2013, correct?

6   A.   That's correct.  During this time we had our in-house

7   attorneys hired and they were handling the case, not very well.

8   But nevertheless, I had a meeting scheduled at Weir

9   International Mining Consultants in Chicago with some overseas

10  business people.  There were people coming from many different

11  places of the world and the meeting had been on the schedule

12  for a long time.

13       And we -- A.J. Dudley was the in-house attorney that was

14  on the case.  I told A.J., you've got to get me an alternative

15  date because I can't be there.  He said, I'll take care of it.

16  He comes back and -- this is after the fact.  I go to the

17  meeting, you know --

18            MR. LUCAS:  Objection --

19  A.   -- two or three weeks later.

20            THE COURT:  The basis of the objection?

21            MR. LUCAS:  There's another basis for the objection.

22  In the identification of witnesses of Mr. Justice, there is not

23  a hint that he's going to try to testify again about this

24  matter.  So I didn't come to Court prepared to litigate that.

25  Had that happened, I could have contacted Mr. Dudley if I knew

JAMES C. JUSTICE III - DIRECT EXAM          60

1  they were going to try to throw him under the bus again, and

2  see if he could come to rebut the allegation.

3      Let me just quote:  Jay Justice is current CEO of the

4  Justice entities.  Mr. Justice will testify to the transactions

5  at issue, the more recent and ongoing interactions by

6  defendants with plaintiffs, GSI, Revelation Energy,

7  Mr. Burchett, Mr. Williams, and others and his experience in

8  the Kentucky and other coal industries, particularly with

9  respect to the mineability and merchantability of coal and the

10  defendants' decisions and efforts related to the subject

11  properties.

12      So he was not identified as a witness even generally on

13  this topic.  And I object to it for that reason, also.

14          THE COURT:  Mr. Getty?

15          MR. GETTY:  I think that -- I think it's appropriate

16  with respect to your earlier ruling on punitive damages

17  assessment.  And I think that any statement that Mr. Dudley

18  would contradict, based on what I know, I'll represent to the

19  Court, is without basis.  Mr. Dudley --

20          THE COURT:  Well, there's no need -- there's no need

21  to make that proffer.

22      I'm going to allow the testimony for the reasons I

23  previously found.  But again, cross-examination will be

24  afforded with leeway.  And I may have questions of my own.

25          Go ahead, Mr. Getty.

JAMES C. JUSTICE III - DIRECT EXAM                61

1          MR. GETTY:   Okay.

2   BY MR. GETTY:

3   Q.   What did you understand was the arrangement with respect

4   to the rescheduling your deposition at a later time?

5   A.   Well, for good or for bad, you know, I've given several

6   depositions over the years.  And, you know, I know that, you

7   know, people have conflicts, whether it be us or anybody.  So

8   it's just kind of ordinary course that, you know, if you can't

9   come on the 10th, you know, you say, well, I can come on the

10  16th, the 18th, and 22nd, and the attorneys work it out.  So I

11  told A.J.  I said, "A.J., I can't go on that day, I've got to

12  be in Chicago."  He said "Fine.  I'll handle it.  I'll get

13  another date and get back to you."

14       I didn't hear anything.  Steve Ball went to his

15  deposition, which was at the same time.  Then I hear after the

16  fact that A.J. Dudley has contacted Mr. Lucas, Mr. Lucas has

17  been nonresponsive, refused to give us other dates, refused to

18  even communicate.  Obviously, it's an effort to probably poison

19  the record or to taint the -- taint the case, but -- and it

20  was -- it was -- again, you know, it all rests on my -- at my

21  feet.  But, you know, I am truly sorry to the Court and, you

22  know.

23  Q.   Did you do something intentionally to flaunt the Court's

24  authority or to ignore it?

25  A.   Not at all.  Wouldn't even ever consider that.

JAMES C. JUSTICE III - DIRECT EXAM                    62

1   Q.   Right.  And if you could look in the book and take a look

2   at Exhibit 52, please.

3   A.   Okay.  What book are you in?

4   Q.   Our defendants' exhibits.

5   A.   Okay.

6   Q.   Volume 2.

7   A.   Okay.  I'm here.

8   Q.   Can you identify Exhibit 52, please, sir?

9   A.   I can.  This is a flight log of my trip to Chicago and

10  back and it should validate what I just said.

11  Q.   Is this a document or a series of documents that are kept

12  in the ordinary course of business?

13  A.   It is.

14          THE COURT:   In the ordinary course of whose business?

15  BY MR. GETTY:

16  Q.   Ordinary course of your company's business?

17  A.   Yes, sir.

18  Q.   In fact, do FAA regulations require that flight logs and

19  these kinds of records be kept?

20  A.   They do.  They're kept for the FAA, and they're also kept

21  for the IRS as well.

22  Q.   What do these show?  It shows a flight log.  It says 11/6,

23  11/7, and 11/8, three pages.  And it shows the crew.  I guess

24  it's a Mr. White and Mr. -- is that Heltzel, Heltzel?

25  A.   Correct.

JAMES C. JUSTICE III - DIRECT EXAM                63

1   Q.   On the 8th it's Heltzel and Bryan, the pilot.  What does

2   it show?

3   A.   It shows the trip to Chicago was myself and three others.

4   These -- this was an engineering type of meeting.

5   Q.   And there's a note on here, said Wednesday.  And it said

6   BKW, ROA, Z. Wright, DPA, BKW, ROA.  It says, DPA, Chicago.

7   Can you decipher that and tell us what those are?

8   A.   BKW, that's Beckley, West Virginia.  They're saying they

9   flew from Beckley to Roanoke to Chicago to Beckley to Roanoke.

10  That's just --

11  Q.   Okay.  So --

12  A.   -- the route.

13  Q.   That's Beckley to Roanoke.  And DPA is what?

14  A.   It's an airport right outside of Chicago.

15  Q.   Okay.  And that shows who was on there, I guess, you, JCJ

16  III, SV, and what's the other one?

17  A.   Robbie Burton.  He was our vice president of engineering

18  at the time.

19  Q.   And who is SB

20  A.   Zac Wright.  He was our head geologist.

21  Q.   ZB, I guess, not an SB.  Okay.  What's the second page

22  show?

23  A.   Shows a flight from Roanoke to Knoxville.  That's where

24  Steve Ball went on his deposition.

25  Q.   The next day?

JAMES C. JUSTICE III - DIRECT EXAM                    64

1   A.    That's right.

2   Q.    Where were you?  In Chicago?

3   A.    Yes.

4   Q.    Okay.  And so he went on the 7th from Roanoke to Knoxville

5   and gave his deposition, I guess.

6   A.    Let me back up.  I want to -- I want to be clear.  I went

7   to Chicago.  It was supposed to be a two-day meeting.  It was

8   supposed to be -- I don't know what day this was.  Maybe this

9   was like a Thursday, maybe, Thursday and Friday.  We came back

10  from Chicago at midnight on Thursday night because the meeting

11  finished up.

12       I was -- the next day I was in Roanoke and -- but again, I

13  was proceeding under the previous understanding from A.J.

14  Dudley that he had rescheduled my deposition and hadn't heard

15  from him.  And so that's why I didn't go.

16  Q.    Okay.  And Steve Ball went to his deposition?

17  A.    Yes.  We never asked Mr. Lucas to reschedule Steve Ball's.

18  Q.    Okay.  Did Steve Ball testify?

19  A.    For Mr. Lucas?

20  Q.    Yes.

21  A.    Yes.

22  Q.    All right.  And then the last couple of pages, there's an

23  email on November 4th from John Sabo to Zachary Wright, your

24  vice president.  What does that confirm?

25  A.    It's an email from if -- hold on one second.  Let me just

JAMES C. JUSTICE III - DIRECT EXAM          65

1    read it.

2    Q.    Appears to show that you are leaving from 8:00 in Roanoke,

3    you are going to be in Chicago at 9:00?

4    A.    That's correct.

5    Q.    And then your secretary, Cindy, has said she'll be making

6    room reservations for all of us, as well as Jay, to spend the

7    night in Chicago on Wednesday night?

8    A.    Okay.

9    Q.    Then she says, "Robbie can drive to Roanoke Wednesday

10   morning to catch the plane with him and Steve and Zac will need

11   to drive to Lewisburg."  And there's some reservations where --

12   I guess the Chicago Marriott, Downers Grove.  You had a

13   reservation there?

14   A.    Yes, sir.  That's what I had said.  You know, the meeting

15   was supposed to be a two-day meeting, and it finished up at,

16   you know, 11:00 or something on the first night.

17   Q.    Okay.  So you got on the plane, went back to Roanoke?

18   A.    That's correct.

19   Q.    Okay.  And were in the office the next day.  What was your

20   understanding as you sat in the office as to whether you had an

21   obligation to appear in Knoxville on that day?

22   A.    Well, again, if I -- if I knew that I had to appear and it

23   wasn't rescheduled, I would have been there.  A.J. Dudley did

24   not tell me that he hadn't gotten ahold of Mr. Lucas, didn't

25   tell me that Mr. Lucas hadn't responded to him.  I didn't find

JAMES C. JUSTICE III - DIRECT EXAM                66

1    out about that until weeks down the road.

2    Q.    So you assumed it had been handled gentlemanly and

3    professionally like other instances usually get handled?

4    A.    Yes.

5    Q.    And you had a new date that you'd be told you had to be

6    there?

7    A.    That's right.

8    Q.    And do you regret having made that assumption?

9    A.    Absolutely.

10   Q.    All right.  Did you do anything or mean to do anything

11   that was contumacious or disrespectful of the Court process or

12   the Court itself in this instance?

13   A.    Not in any way.

14   Q.    And how do you feel about -- well, was this a surprise to

15   you that when the request was put out for another mutually

16   acceptable date that the lawyer on the other side ignored it or

17   didn't respond?

18             THE COURT:  I --

19             MR. GETTY:  I'll withdraw it.

20             THE COURT:  Okay.  There's not a foundation for that

21   question to be asked at this point.

22   BY MR. GETTY:

23   Q.    Do you feel that you did anything wrong whatsoever with

24   respect to failing to appear on that date as opposed to another

25   date you anticipated?

JAMES C. JUSTICE III - DIRECT EXAM          67

1   A.   Well, I -- again, it's -- it's on me because, you know,

2   A.J. works for me and -- or worked for me and, you know, it's

3   ultimately my responsibility.  But, you know, we've had several

4   depositions and, you know, that's just the gentleman thing to

5   do.  You know, if you can't make it on this date, you offer

6   other dates, and those are normally dealt with in a pretty

7   professional manner.

8             THE COURT:  Mr. Getty, is this a good time for a

9   10-minute morning break?

10            MR. GETTY:  Yes, sir.

11            THE COURT:  Mid-morning break of 10 minutes,

12  Mr. Lucas?  Anything we need to take up before the recess?

13            MR. LUCAS:  No, Your Honor.

14            THE COURT:  We'll be in recess for 10 minutes.

15        (A recess was taken from 10:38 to 10:52.)

16            THE COURT:  Thank you.  We're back on the record.

17  Mr. Justice is still on the witness stand.  Mr. Getty, you can

18  continue your questioning.

19            MR. GETTY:  Thank you, Your Honor.

20            THE COURT:  You're welcome.

21  BY MR. GETTY:

22  Q.   Do you have the defendants -- or the Plaintiffs' Exhibits

23  book up there?

24            THE CLERK:  He has one.

25            THE COURT:  Yes, there's one up there.  Which exhibit

JAMES C. JUSTICE III - DIRECT EXAM                68

1    are you going to ask about?

2            MR. GETTY:  I believe it's 22g.

3            THE WITNESS:  I've got 1 through 5.  That's all I've

4    got.

5            THE COURT:  We'll get that to you.  Just a moment.

6            THE WITNESS:  Thanks.  Rich, which one?

7            MR. GETTY:  22g.  Tax return for Kentucky Fuel in

8    2011.

9            THE COURT:  Mr. Getty, are you comfortable going

10   forward?

11           MR. GETTY:  Yeah, I'm fine.

12           THE WITNESS:  Okay.  I've got it.

13   BY MR. GETTY:

14   Q.   Do you have that?

15   A.   I do.

16   Q.   Can you identify that as the tax return for Kentucky Fuel

17   in 2011?  Mr. Justice?

18   A.   Yeah, I just want to read it and make sure.  Yes, you're

19   correct, it's 2011.

20   Q.   Earlier you testified about how much money the company was

21   losing during this period of time, 2011, '12, et cetera.  What

22   does that tax return show in terms of ordinary total loss,

23   ordinary business loss, and profit on this -- this year?

24   A.   $21 million.

25   Q.   Is that a loss of $21 million?

JAMES C. JUSTICE III - DIRECT EXAM                69

1    A.    Yes.

2    Q.    And was that the kind of experience you were having across

3    the board in various Justice entities?

4    A.    It is.  It got worse from here, from -- '13, '14, '15 were

5    the worst.

6    Q.    Okay.  Did Kentucky Fuel and other Justice Companies hang

7    in there right through to today?

8    A.    We did.  And we have.

9              THE COURT:  The microphone will slide if that makes

10   you more comfortable.

11             THE WITNESS:  Yeah, I've got just this big book.

12             THE COURT:  The microphone slides a little bit.

13   There's room there.  That should make you more comfortable.  Go

14   ahead.

15             THE WITNESS:  I'm good.

16   BY MR. GETTY:

17   Q.    Does that show the experience you were enduring during

18   that period of time?

19   A.    It does.

20   Q.    If you would, I'd like to sort of get a couple of other

21   documents before you.  I think we're toward the end of your

22   testimony.  Look at Exhibit 53.  That's a series of documents

23   with respect to --

24             THE COURT:  Which?  Plaintiffs' Exhibit 53?

25             MR. GETTY:  Defendants.

JAMES C. JUSTICE III - DIRECT EXAM                70

1    THE COURT:  Defendants' Exhibit 53.

2    MR. GETTY:  Defendants' Exhibit 53, sir.

3  A.   Okay.  I have it.

4  Q.   Can you identify this document and what it is?  It refers

5  to permit number 813-0269.

6  A.   These are the leases, both surface and mineral, that are

7  applicable to the Fivemile permit.

8  Q.   Okay.  And the actual leases themselves are attached, I

9  take it?

10  A.   Yes, sir.

11  Q.   And just if you could flip over.  After the cover page --

12  this would be five pages over -- this is the Caudill lease.

13  You see that?

14  A.   Yes, sir.

15  Q.   And who does it show is the -- both the preparer and the

16  president of Fivemile Energy Resources, the lessor?

17  A.   Doug Terry.

18  Q.   Okay.  Is that the same Doug Terry who agreed to try to

19  mine this coal?

20  A.   It is.

21  Q.   Okay.  And then if you look at the second lease, it's

22  another lease.  And is that also signed by Doug Terry?

23  A.   Yes, sir.

24  Q.   Is it your understanding that Mr. Terry was instrumental

25  in locating and signing up a number of these leases?

JAMES C. JUSTICE III - DIRECT EXAM                    71

1  A.    Doug Terry has been involved from the get-go.  I mean, he

2  was -- he was involved in 2005 and still is involved today.

3  Q.    Okay.  I looked at the next lease, which appears to be

4  the -- the Deaton lease, people over in Chavies.  And he's the

5  signatory there.  And also on the next page the Spicer lease,

6  he signed that one, too?

7  A.    That's right.

8  Q.    And I'm just flipping through them.  There's an addendum,

9  and he signed that addendum to the Spicer, and there's the Ned

10 Little heirs.  And his signature is on that too, isn't it?

11 A.    Yes, sir.

12 Q.    Actually, I believe I'm just going to finish going through

13 that.  The next one is the Cheek and others.  He signed that

14 and prepared that one too, didn't he?

15 A.    That's right.

16 Q.    And then the Spicer lease, which is next, he also did that

17 one, right?

18 A.    That's right.

19 Q.    And then we've got Hiram Stump.  Is that another Douglas

20 Terry executed lease?

21 A.    It is.

22 Q.    And then that's followed by the Stamper lease.  Is that

23 another Doug Terry?  That is, isn't it?

24 A.    Yes.

25 Q.    Heirs of Elizabeth Arrow estate.  Did he do that one, too?

JAMES C. JUSTICE III - DIRECT EXAM          72

1    A.    Yes, sir.

2    Q.    The next one is Turner Trust, John R. Turner trust.   He

3    signed that one.   I guess he did.

4    A.    He did.  He signed it, yes.

5    Q.    And the Jackie Howell is the next one.   Is that a Terry

6    lease?

7    A.    Yes.

8              THE COURT:   Is there a way to summarize the questions

9    with respect to this exhibit?

10             MR. GETTY:   My understanding is all the remaining

11   several --

12   BY MR. GETTY:

13   Q.    Is it your understanding that all of these were initiated

14   by Mr. Terry?

15   A.    Yes, that's my understanding.

16             THE COURT:   Thank you, Mr. Getty.

17   BY MR. GETTY:

18   Q.    And he has agreed to, at this point, make an attempt at

19   mining process.   Do you know what the status of that is?

20   A.    I saw the site myself approximately two weeks ago.   And

21   he's built a haul road and looks like that he's having a

22   difficult time, you know, mining anything.   I know that he's

23   had conversations with other representatives in our company and

24   told us that it's been tough and the coal that -- that he's

25   getting ready to expose is 5 percent sulfur.

JAMES C. JUSTICE III - DIRECT EXAM                73

1          MR. LUCAS:  Objection.  Hearsay, Your Honor.

2          THE COURT:  Yes.

3      Mr. Getty, your response?

4          MR. GETTY:  I think it's information that should be

5   relevant to the Court as to what the status of this mine is.

6   We have exhibits that we've put in.  They were also attached to

7   our earlier motion to set the baseline for the damages.  And,

8   you know, I believe -- I believe his observations of the site

9   are appropriate.

10          THE COURT:  Those are.  But the statements about what

11  someone else may have said from Mr. Terry, those are hearsay.

12  They're clearly out of Court, offered for the matter asserted.

13  I'll sustain the hearsay objection.  I won't be relying on that

14  testimony.

15          MR. GETTY:  No, I agree with you entirely, Your

16  Honor.

17          THE COURT:  Okay.

18          MR. GETTY:  I think Mr. Justice spoke too much.

19  BY MR. GETTY:

20  Q.   Describe for the Court what you've seen or what the

21  condition is.

22  A.   You know, whether you're mining coal or you're just

23  building a road, you know that when you shoot -- when you blast

24  that dirt, it swells, and you have to put it somewhere.

25  There's nowhere to put the dirt.  And so he's having a really

JAMES C. JUSTICE III - DIRECT EXAM          74

1   difficult time even accessing the site because there's no

2   valley fill permit.  And, you know, I've received emails --

3          MR. LUCAS:  Your Honor, I object again, about the

4   characterization of what Mr. Terry's thinking.

5          THE COURT:  The statement was "he's having a really

6   difficult time even accessing the site" and the testimony is

7   permissible to the extent it's based on this witness' firsthand

8   observations of the site.

9          MR. LUCAS:  And mine wasn't to the "accessing the

10  site."  It was to -- he said something after that about

11  Mr. Terry's having a difficult time accepting something --

12         THE COURT:  No, he said -- I think he said "so he's

13  having a...difficult time even accessing the site."

14         MR. LUCAS:  If so -- if I misheard it, then -- I

15  thought he said "accepting."  And if it was "accessing," I

16  withdraw it.

17         THE COURT:  And I could -- I'm going from the

18  realtime.  I don't know for sure.  But go ahead with the

19  question.

20         MR. GETTY:  I can go back.

21         THE COURT:  The testimony needs to be based on this

22  witness' observations of what's happening.

23  BY MR. GETTY:

24  Q.  If you could just be specific in terms of what -- describe

25  what he personally -- what you personally observed of what has

1  occurred, what the status is and whether there's any mining.

2  A.   What I personally have seen myself is that he's attempting

3  to build a haul road.  He doesn't have anywhere to put the

4  excess material from the haul road from the blasting.  And that

5  is making it very difficult to get access to the site.  I have

6  also seen emails that he has sent to our company stating that

7  the first coal that they have encountered was 5 percent sulfur

8  and almost unmarketable, which I can -- I can attest that

9  5 percent sulfur coal is not marketable.

10  Q.   If you look in our book at Exhibit 11, can you identify

11  that as an email from Mr. Terry to Steve Sarver providing an

12  update and dealing with the transfer of the permit?

13  A.   Yes.

14  Q.   And what's attached to that?  It's a GSI coal permit

15  number, right, prepared by Summit?

16  A.   That's correct.

17  Q.   All right.  And what purpose -- according to your

18  understanding, for what purpose did Mr. Terry send this email?

19  Was that part of the transfer of the permit?

20  A.   That's correct.  The permit transfer takes approximately

21  90 days.  It has to be -- it has to go for public comment.  An

22  operator, such as us, is able to grant permission for a new

23  operator to operate on their permit while the transfer is being

24  done.  So that's what we've done.

25  Q.   Okay.  And you -- you consented to it?

JAMES C. JUSTICE III - DIRECT EXAM                76

1   A.   We did.

2   Q.   Okay.  If you look at 46 and 47, and identify those for

3   the record.  Can you identify -- 47 appears to be labeled

4   "Permit Transfer and Operating Agreement?"

5   A.   Yes, this is the agreement that we did with Doug Terry's

6   entity, GSI, to transfer our permit to that entity and give

7   them authorization to operate on our permit while the transfer

8   is pending.

9   Q.   Okay.  And next, if you would look at 47.  It appears to

10  be a series of emails that -- covering emails from Bob Cochran

11  to Doug Terry.  Who is Bob Cochran?

12  A.   Bob Cochran is a gentleman that is in our engineering

13  department that handles land leases and, you know, mapping,

14  those type things.

15  Q.   And he's sent -- says he's sending on a spreadsheet to

16  determine if any of the leases, if there's a problem.  And then

17  there's a series of emails going back and forth.  Were these

18  emails received by your company in the --

19  A.   Yeah.

20  Q.   -- ordinary course of business?

21  A.   Yes, sir.

22  Q.   And can you locate or point out where, I think you said in

23  one email, Mr. Terry expressed that he was having difficulty?

24  A.   There's an email dated Friday, December 29th, 2017.  And I

25  can read an excerpt from that email where it talks about the

JAMES C. JUSTICE III - DIRECT EXAM          77

1   quality and how that is going to be difficult.

2   Q.   Okay.

3   A.   It says, As you know, most of the seams have some high

4   sulfur, 5 to 6 percent.  But I'm confident I can blend some of

5   the higher quality number 7 to get a decent price.

6        Doug Terry knows this property better than any of us know.

7   And if he knows the coal is 5 to 7 percent -- or 5 to

8   6 percent, rather, you know, that's probably pretty factual.

9   Q.   And what implications are there, if any, of 5 to 6 percent

10  coal?

11  A.   We've never been able to sell any coal, you know, the

12  sulfur that is even approaching that.

13  Q.   Okay.  If you could look at -- I think I showed you

14  earlier Exhibit 16.  Look at Exhibit 54.  You identified

15  earlier a chart as Exhibit 16 showing Fivemile and Deep Wood

16  costs that totaled 3.1 -- 3,128,722.  I've got that if you --

17  A.   Are on you Exhibit 16?

18  Q.   Yeah.

19  A.   Okay.

20       THE COURT:  I'm sorry, Defendants' Exhibit 16?  He

21  should have it.

22       THE WITNESS:  I've got it.

23       THE COURT:  He's got it.

24  BY MR. GETTY:

25  Q.   Can you identify that as a chart reflecting the cost that

JAMES C. JUSTICE III - DIRECT EXAM                78

1    you put into these properties, which is in excess of 3 million

2    1?

3    A.    That's specific to the Brownlow properties.

4    Q.    Yes.  And if you go, flip forward to exhibit -- part of

5    that exhibit was a column that showed a million 304,613, which

6    I showed to Mr. Brownlow.  That's the payments you've made, and

7    you have to add 75,000 for the December 2018 payment?

8    A.    That's correct.

9    Q.    All right.  Look at Exhibit 54.  Is that just a separate

10   rendition of what was been paid to Mr. Brownlow throughout?

11   A.    Yes.

12   Q.    Okay.  Mr. Brownlow referred to the $49,000 that was

13   reflected on 10/7/2010 as advanced royalty, Breathitt County.

14   Was that a royalty paid to him, which was to -- then passed on

15   to the lessor?

16   A.    I heard Mr. Brownlow's testimony.  I don't really know

17   that for sure.

18   Q.    Okay.  But can you identify this as amounts that have been

19   paid to Mr. Brownlow, either personally or for him to use with

20   respect to lessors?

21   A.    Yes.

22   Q.    Okay.  Next, take a look at Exhibit 12.

23   A.    Okay.

24   Q.    If you can identify that.  That's a document we've

25   produced for the other side.

1   A.   This shows that we obtained the necessary bonding to have

2   the site bonded.   That's a requirement to be able to mine.   And

3   those bonds were entered into many, many years ago.   And that

4   furthers our expectation that we were going to mine it.   And we

5   intended to mine it.

6   Q.   Would you have submitted a bond if you had no intention?

7   A.   No, sir.

8   Q.   Okay.   Would you have paid $15,000 for a cash bond and

9   $75,000 to Lexon Insurance for additional permitting bonding if

10  you had no intention?

11  A.   No, sir.

12  Q.   Next, if you could, look at 14, Exhibit 14.   It's from

13  Kelly Lynch, internal email, dated February 8th, 2007.   And it

14  has an attachment, chart, and some other materials.   Can you

15  tell the Court what that -- what that represents?

16  A.   These are payments, partial payments to what was then

17  called Taggart Global.   They were a company that refurbished

18  and built coal preparation plants and loadouts.   So they did

19  this work at the Andy -- Andy loadout.

20  Q.   And is that a summarization with the pages that were made

21  with backup behind?

22  A.   That's a summarization -- we paid them some money down and

23  financed, owner financing kind of the rest, and this is the

24  owner financing portion.

25  Q.   Okay.   And what was just the owner financing portion?

JAMES C. JUSTICE III - DIRECT EXAM                    80

1   A.    It's 855,000.

2   Q.    Did you pay that amount to them?

3   A.    Yes, sir.

4   Q.    Did you pay in excess of that amount to them?

5   A.    Yes.  We -- we have, you know, many, many millions more in

6   that loadout facility than that.

7   Q.    And what does that constitute?  What are the other

8   millions?

9   A.    The purchase of the facility, the --

10  Q.    What was the purchase price?

11  A.    I think it was 450,000.

12  Q.    Okay.

13  A.    And it was basically a gutted facility when we bought it.

14  We were really buying it just to have the track rights.

15  Q.    When you say "track rights," you mean to be able to load

16  on the railroad tracks?

17  A.    Yes.

18  Q.    On the railroad line?

19  A.    Yes.

20  Q.    It's CSX?

21  A.    Yes, sir.

22  Q.    Actually, there's nobody left in Kentucky but CSX, is

23  there?

24  A.    That's it.

25            MR. GETTY:   Used to have L&N.

JAMES C. JUSTICE III - DIRECT EXAM                    81

1       THE COURT:  Okay.  Questions specific, Mr. Getty.

2       MR. GETTY:  I'm sorry.  Just reminiscing.

3    BY MR. GETTY:

4    Q.   And how much have you totally invested in that or did you

5    invest in that entity?

6    A.   Greater than $4 million.

7    Q.   Okay.  Take a look at Exhibit 55 and 56 if you would,

8    please.

9    A.   Okay.

10   Q.   Do you have that?  Can you tell the Court what Exhibit 55

11   is?

12   A.   We have developed -- our company has developed an internal

13   modeling platform, software that we use to model different

14   scenarios and do budgeting for every operation we have.

15   Q.   Okay.  And what does this show?

16   A.   It shows that --

17       MR. LUCAS:  Your Honor, I'm going to interpose an

18   objection again on this exhibit on the grounds it was never

19   previously identified or produced to us until in December after

20   the objections, and so I object to it for that reason.

21       And I object to the witness testifying from it as opposed

22   to his personal recollection.

23       THE COURT:  Mr. Getty?  I couldn't hear you.

24       MR. GETTY:  You couldn't hear me or --

25       THE COURT:  I thought you said something in response

JAMES C. JUSTICE III - DIRECT EXAM                82

 1   to the objection that we couldn't hear.

 2              MR. GETTY:  No.

 3              THE COURT:  Okay.  Well, then I'll sustain the

 4   objection.  Close the book so that exhibit is not in front of

 5   you, please, Mr. Justice.

 6              THE CLERK:  55 or 56?

 7              THE COURT:  55.

 8   BY MR. GETTY:

 9   Q.   Of your own personal knowledge in evaluating the Fivemile

10   properties while you were involved with it, did you run

11   scenarios with respect to at different pricing whether you

12   could or could not profitably mine?

13   A.   We modeled two ways.  One, we modeled how we would mine

14   and got a worst result than this and a higher cost than this.

15   This, we went to the site and figured out what equipment that

16   Doug Terry's entity was going to run or saying they were going

17   to run.  And we modeled exactly what they were going to do.  In

18   both scenarios, the end result was, is even if the coal price

19   was sold for $80 a ton, you couldn't mine the coal and make any

20   money.  This coal is going to sell for 25 or $30 a ton.  But

21   even at $40 -- that's as low as we took the model -- it would

22   lose 347,000 a month on 8,000 tons a month.

23              THE COURT:  Were you just referring to the exhibit?

24              THE WITNESS:  Yes.

25              MR. GETTY:  He told you to close the book.

JAMES C. JUSTICE III - DIRECT EXAM          83

1          THE COURT:  Yes.

2          THE WITNESS:  Oh, okay.  I didn't hear you.  My

3    mistake.

4          THE COURT:  All right.  And I think you looked at the

5    exhibit with respect to that last piece of information.

6    That -- I'm not going to rely on that conclusion of $347,000.

7    I did -- I did ask you to close the book and not look at the

8    exhibit.

9        Mr. Getty, complete your questioning, please.

10         THE WITNESS:  That's my fault.  I just didn't hear

11   you, sir.

12         THE COURT:  Okay.  Go ahead.

13   BY MR. GETTY:

14   Q.   If you heard back when you evaluated the property, or even

15   more recently, was there any scenario under which you could

16   mine this coal at prices ranging from as low as -- selling it

17   low, low as 25 or $30 up to $80 in which you could make a

18   profit?

19   A.   No.

20   Q.   To your knowledge, has anybody else, other than Doug Terry

21   very recently, since 2011 or '12 when you walked away,

22   expressed any interest in this Fivemile property whatsoever?

23   A.   No.  You know, Mr. Terry is not a coal guy.  You know,

24   he's a -- he's a guy that has had a -- I don't want to -- I

25   don't want to demean, but has a dream that this property could

JAMES C. JUSTICE III - DIRECT EXAM                84

1    be mined forever, you know, for many years.

2              MR. LUCAS:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    A.   And, you know, he's conveyed that dream to me.

5              MR. GETTY:  Stop.  He sustained the objection.

6              THE COURT:  Rephrase the question, Mr. Getty.

7              MR. GETTY:  All right.

8    BY MR. GETTY:

9    Q.   Has anyone other than Mr. Terry ever approached you or

10   suggested that they would attempt to mine this coal?

11   A.   The only -- the only person that -- that said they were

12   going to attempt to mine it other than Mr. Terry was

13   Mr. Williams, which was brought to us by Mr. Brownlow, and

14   Mr. Williams was never able to get anything off the ground.

15   Q.   All right.  That takes us to a point of mentioning

16   Mr. Williams.  Who was Mr. Williams and could you explain just

17   generally how a transaction involving Mr. Williams or other

18   companies came to be?  I guess my first question would be, how

19   did Kentucky Fuel come to be introduced to Roy Williams and his

20   company, Williams Industries?

21   A.   Yes, you know, to maybe preempt Mr. Lucas, any dealing

22   that we had with Mr. Williams was with Steve Ball and Marc

23   Merritt, primarily Steve Ball.  But Steve communicated those

24   conversations to me, and I would make any decision and every

25   decision as it would relate to Mr. Williams.

JAMES C. JUSTICE III - DIRECT EXAM                    85

1    Q.    Who introduced your company to Mr. Williams?

2    A.    Mr. Brownlow.

3    Q.    And who was Mr. Williams?  What business was he in?

4    A.    He was in the demolition and scrap business in Pittsburgh.

5    Q.    My hometown.  And had he been involved in mining, to your

6    knowledge?

7    A.    Not to my knowledge.

8    Q.    How had he come to be involved in this?  Do you know?

9    A.    I don't really know how he became involved, but

10   Mr. Brownlow had brought him to us and represented that he was,

11   you know, able to perform and was interested in mining the

12   property.  And we, you know, proceeded ahead with that.

13   Q.    So he presents Williams to you.  At that time Williams was

14   presented to you, to your knowledge, were you having financial

15   difficulties in the markets, your companies?

16   A.    Absolutely.

17   Q.    And to your knowledge, was that -- was that made plain to

18   him?  Was that communicated to Mr. Williams that you would be

19   interested in talking to somebody else because of that?

20   A.    Well, it was made very plain to Mr. Williams and

21   Mr. Brownlow, everyone, that we would be very interested in

22   doing a deal to sell those assets.

23   Q.    Was there any particular -- what assets were we talking

24   about here, just so we know?  We know the Fivemile lease and

25   permit.  Was there anything else?

JAMES C. JUSTICE III - DIRECT EXAM                86

1   A.   Well, we were talking about the Fivemile leases.   Early,

2   early on we were talking about the Deep Wood leases as well,

3   the Strong Brothers permit, the Delta permit, and the

4   associated leases.   And really the crown jewel of the assets

5   was the Andy loadout that we had -- you know, had between 4 and

6   $5 million invested in.

7   Q.   Did you discuss that as part of the package or potential

8   package?

9   A.   Yes.

10  Q.   Was Mr. Williams originally interested in the Deep Wood

11  property?

12  A.   He was.

13  Q.   What happened to the Deep Wood property being involved in

14  it?

15  A.   It was requested by Mr. Brownlow that that property be

16  removed from the -- from our agreement and the -- even in the

17  Williams agreement.   And what we have now learned, he had a

18  side deal to resell that property to Jeff Hoops.

19  Q.   Who did?

20  A.   Mr. Brownlow.

21  Q.   Okay.   That's what he said in his earlier testimony here

22  today --

23  A.   Yes.

24  Q.   -- yesterday.   Did Mr. Hoops mine the property?

25  A.   No, sir.

JAMES C. JUSTICE III - DIRECT EXAM                    87

1   Q.   And with respect to Mr. Williams, was he ever able to put

2   a transaction together, to your knowledge?

3   A.   Mr. Williams tried for, seemed like forever, but, you

4   know, we extended and extended and extended and, you know,

5   you might say, well, why did we leave Mr. Williams on the hook,

6   you know, keep -- keep accommodating him.  We would have done

7   anything to get rid of these properties.  I mean, they're --

8   they're so bad that -- you know, he was the only person that

9   ever showed any interest, so we wanted to keep accommodating

10  him.

11  Q.   Would it be accurate to say that you were ready to

12  surrender them right about that time?

13  A.   Absolutely.

14  Q.   And how did you perceive Mr. Williams coming on the scene?

15  A.   Well, again, we --

16  Q.   I guess I could say, did he appear to be Santa Claus or

17  the Easter Bunny?  I won't say that.

18  A.   I think that any knowledgeable coal operator would not

19  have interest in these properties.  I'll just leave it at that.

20  Q.   How did you react to him coming upon the scene?

21  A.   Oh, I was thrilled to death.

22  Q.   And did he bring other people involved, any investment

23  bankers or other third parties into the situation?

24  A.   Not initially.  At least not that was obvious to us.  He

25  represented that he had his own financing and it was not till

JAMES C. JUSTICE III - DIRECT EXAM                88

1    later down the line that we were introduced to a man.  His name

2    was Dallas Groth, G-r-o-t-h, from Houston.  He had a private

3    equity firm called Cypress Camon.  And he represented that he

4    was the financier for Williams.

5         Dallas came to meet with us, basically to keep us calm and

6    keep us engaged.  And Dallas came to basically say, you know,

7    Williams is going to do the deal, we're involved, we have the

8    money, you know -- you know, give us another extension, which

9    we did.

10   Q.   Were there a multiplicity of extensions?

11   A.   Yes, yes.

12   Q.   Did Kentucky Fuel and Mr. Williams ever reach an

13   arrangement or a transaction?

14   A.   Well, we reached a transaction amount and signed a sales

15   purchase agreement.  And it was amended several times to extend

16   the closing.

17   Q.   Uh-huh.  Was Mr. -- Mr. Williams or his company ever able

18   to perform?

19   A.   They were not.

20   Q.   Okay.  And there's been reference to NewLead or an entity

21   called NewLead.  Who is NewLead, to your knowledge, and how did

22   they come in the transaction?

23   A.   Well, back to what I said earlier, Cypress Camon, Dallas

24   Groth was the second iteration of the Lloyd Williams deal.

25   NewLead came in after that, and NewLead initially was -- was

JAMES C. JUSTICE III - DIRECT EXAM                89

1   supposed to be a -- a partner and a co-financier of the deal.
2   And as time went along, then that turned into a deal where
3   really what was happening was, is Williams had a deal where we
4   would sell the property to Williams and then Williams was
5   turning around and reselling it -- him and Cypress Camon, were
6   reselling it to NewLead.
7   Q.    Okay.  What did you perceive the roles of Cypress Camon
8   and NewLead to be?
9   A.    Well, initially, Williams had his own financing.  That
10  didn't happen.  Then Cypress Camon came in and Cypress Camon
11  was financing Williams.  That didn't happen.  Then NewLead came
12  into the fold, and they were told to us to be financing for
13  Cypress Camon and Williams.  And what happened in the end was
14  NewLead then became the purchaser of the rights that we were
15  supposed to be selling Williams.
16  Q.    Okay.
17  A.    So Williams became basically a pin hooker.  You know he
18  was buying it from us for X and marking it up and selling it to
19  NewLead.  We didn't find NewLead.  Williams found NewLead.
20  Q.    And who was your deal with or transaction with?
21  A.    Our deal was with Williams.
22  Q.    Did you ever have a transaction directly with NewLead?
23  A.    The only participation we had with NewLead was when --
24  when closing was supposed to happen, there was a simultaneous
25  closing between us and Williams and Williams and NewLead.

JAMES C. JUSTICE III - DIRECT EXAM                90

1    Q.   Did you have an arrangement of any sort with respect to

2    the sale directly of these assets to NewLead from you?

3    A.   Well, I want to defer specifics to Steve Ball because he

4    worked on the deal, but not to my knowledge.

5    Q.   Okay.  How do you characterize the end result of when you

6    finally got out of this, you know, through Mr. Williams,

7    NewLead, whoever was involved in the final circular

8    transaction?  What was the end result economically to your

9    company?

10   A.   Well, the end result was we received money, which

11   ultimately came from NewLead.  And we received a -- stock in

12   NewLead or some entity that NewLead had as a -- as part of

13   the -- the consideration.  Williams never performed the

14   closing.  NewLead paid us.  They may have paid Williams as

15   well.  I have no idea.  I would venture to say so.  But NewLead

16   never transferred the permits.  NewLead never made payments

17   that were owed to us for reclamation and various things.  And

18   so today we still have the assets.  We still have the deed of

19   trust on the assets because we haven't been paid in full from

20   NewLead.

21   Q.   Because of defaults?

22   A.   Correct.

23   Q.   Okay.  And of the money that passed hands, how much ended

24   up with your company?

25   A.   Approximately $8 million.

JAMES C. JUSTICE III - DIRECT EXAM                    91

1   Q.   Okay.  And how was that allocated in terms of the assets?

2   A.   We allocated $5 million.  This was a joint agreement with

3   Williams and NewLead, $5 million to the Andy loadout.

4   Q.   Uh-huh.

5   A.   And the other $3 million was allocated to the coal

6   properties, being -- being the Fivemile and associated

7   properties, which was essentially the amount of money that we

8   had invested in the Fivemile properties, which is about

9   3 million.

10  Q.   Okay.  And Mr. Brownlow in his testimony was -- continued

11  to talk about how -- how your company got so much money from

12  this transaction and that your company hit a home run.  Was it

13  a home run?

14  A.   No.  NewLead would have had to pay a -- you know, many,

15  many, many, many millions for us to get whole with what we've

16  lost, you know, with all these -- Strong Brothers, Deep Wood,

17  Fivemile, all these properties.  So it was -- it was an exit,

18  but it was by no means making us whole and it was by no means a

19  home run.

20  Q.   If they paid you five times what you got paid, would that

21  have been a home run?

22  A.   Well, maybe five times but, you know, we were -- we were

23  just happy to get out of it.

24  Q.   And as a result, do you still hold title to the leases?

25  A.   We do.

JAMES C. JUSTICE III - DIRECT EXAM                92

1   Q.   And have you kept the minimums, kept paying Mr. Brownlow?

2   A.   We have kept paying Mr. Brownlow straight through and just

3   made a payment to him last week for 2018.

4   Q.   For how much money?

5   A.   75,000.

6   Q.   Okay.  And there was a time when you stopped making the

7   minimum payments.  Why was that?

8   A.   Well, our intention was to surrender the Fivemile lease.

9   Q.   What changed your mind?

10  A.   You know, we kept playing along initially because of

11  Williams.  But when we figured out that Williams probably

12  wasn't going to happen, then we wanted to surrender.  And then

13  when Mr. Brownlow sued us, we thought that the best thing to do

14  would be -- to protect all of our rights, is to pay the -- the

15  back minimums and keep paying them.  We probably should have

16  paid them into Court versus paying them directly to him.  But,

17  you know, that's -- that's just maybe a mistake on our part.

18  Q.   Okay.  How is your overall feeling, having been involved

19  with Fivemile?

20  A.   Can you restate that again?

21  Q.   I mean, has it been a good experience, mediocre, normal,

22  bad?

23  A.   What experience?

24  Q.   The experience with Mr. Brownlow and the Fivemile leases.

25  A.   It's been terrible.

JAMES C. JUSTICE III - CROSS-EXAM                93

1   Q.   Okay.  And you stopped paying him a retainer agreement, a

2   monthly retainer.  Why did you stop doing that?

3   A.   As I said earlier, I don't think that Mr. Brownlow would

4   even think that he should be paid for nothing.  And he wasn't

5   doing any work, and so we stopped paying him.  And most

6   definitely we stopped his involvement with his us after he sued

7   us.

8   Q.   All right.  Did you feel you had any further obligation

9   under any arrangement to pay him after he sued you?

10  A.   I can't imagine why that we would, but no, not at all.

11  Q.   Did you perceive that it had been terminated?

12  A.   Yes.

13          MR. GETTY:  That's all I have.

14          THE COURT:  Okay.  Cross-examination, Mr. Lucas?

15          MR. LUCAS:  Yes, Your Honor.

16          THE CLERK:  None of those exhibits have been

17  admitted.

18          MR. LUCAS:  We have one exhibit we may want to

19  project on the screen.

20          THE COURT:  Sure, you can set that up.  Can you still

21  see, Mr. Lucas?

22          MR. LUCAS:  Yes, Your Honor.  Thank you.

23                          CROSS-EXAMINATION

24  BY MR. LUCAS:

25  Q.   Mr. Ball -- or, excuse me, Mr. Justice, let me start first

JAMES C. JUSTICE III - CROSS-EXAM                94

1   just to preempt you with some questions about your testimony

2   about your deposition.  Turn to Defendants' Exhibit 52, please.

3   You got it?

4   A.   Yes, sir, I do.

5   Q.   All right.  That, the first page of that, is the flight

6   log for your trip to and from Chicago, correct?

7   A.   Yes, sir.

8   Q.   And just to be clear and make sure there is no

9   misunderstanding, that's dated November 6, 2013.  When we

10  checked on the calendar here, that was a Wednesday.  Would you

11  agree with that?

12  A.   Yes, sir.

13  Q.   All right.  And your deposition was actually scheduled for

14  the following day, correct?

15  A.   That's right.

16  Q.   And that would have been Thursday, November 7th?

17  A.   That's right.

18  Q.   Okay.  And so you flew back from Chicago with Mr. Ball on

19  the 6th, right?

20  A.   I did.

21  Q.   And you got off the plane in Roanoke, you and Mr. Ball

22  spent the night there, and then he continued on to Knoxville

23  for his deposition and you remained in Roanoke, true?

24  A.   I don't know if I remained in Roanoke or I went to -- on

25  to another location the next day, but yes, Mr. Ball did go on

JAMES C. JUSTICE III - CROSS-EXAM                 95

1   to Knoxville.

2   Q.   Okay.  Did Mr. Ball know your schedule for the next day?

3   Did he know where you were?

4   A.   I don't know.

5   Q.   Okay.  You didn't -- that's not the sort of thing you

6   would discuss with him on the plane flying back from Chicago?

7   A.   No.  We had several other people on the plane and, you

8   know, we were pretty guarded to make sure that we don't

9   discuss matters that don't pertain to those people in front of

10  them.

11  Q.   Was what you were going to be doing the next day, was that

12  a secret for some reason?

13  A.   It just didn't have any involvement for a geologist and an

14  engineer.

15  Q.   Had you discussed with Mr. Ball at all around that time

16  frame the fact that your deposition was scheduled for

17  November 7th?

18  A.   I don't know if we discussed it on that day.  Mr. Ball

19  could have been present -- I don't know for sure -- when I met

20  with Mr. Dudley earlier and needed to reschedule, when he was

21  supposed to call you and you didn't call him back.

22            THE COURT:  Mr. Haskins, do you mind to step back

23  until you are needed to operate the device?

24  BY MR. LUCAS:

25  Q.   You just testified that I didn't call him back.  Do you

JAMES C. JUSTICE III - CROSS-EXAM                96

1   know that of your own personal knowledge?

2   A.   I didn't call you.  I'm just basing what I'm saying on

3   what A.J. told me.

4   Q.   No, I'm saying you just testified to the Court that in

5   connection with the schedule that I did not call Mr. Dudley

6   back.  Do you have personal knowledge of whether that's true or

7   not?

8   A.   I do.  Mr. Dudley, that's exactly what he said to me.

9   Q.   That's what someone else told you, correct?

10  A.   That's right.

11  Q.   Okay.  And as I understand your testimony, that the whole

12  nonappearance is either the fault of me for not being

13  professional and courteous and/or Mr. Dudley for not keeping

14  you informed; is that right?

15  A.   I think what I said was ultimately it's my responsibility,

16  but I do think you should have been courteous and I do think

17  you should have called back and I do think you should have

18  proposed other dates, and you didn't.  And I do think

19  Mr. Dudley should have done a better job following up.

20  Q.   When you say I should have proposed other dates and

21  didn't, how do you know that of your own personal knowledge?

22  A.   I know that Mr. Dudley told me that he had called you and

23  maybe even suggested -- well, I'm sure that he did suggest that

24  I could be available on alternative dates, and you refused to

25  return his call.

JAMES C. JUSTICE III - CROSS-EXAM                97

1        THE COURT:  Mr. Getty, I want to make sure that

2   device is not transmitting.

3        MR. GETTY:  No --

4        THE COURT:  Is it?

5        MR. GETTY:  -- I'm sending a -- actually, I'm sending

6   a message to my doctor, Harry Lockstadt, and his PA.

7        THE COURT:  You are not to do that.  You are not to

8   do that during the proceeding.  You can do it during a break.

9        MR. GETTY:  Okay.  I just haven't had time.  I

10  apologize.

11       THE COURT:  There's a general order that prohibits

12  the use of those devices during a proceeding --

13       MR. GETTY:  Sorry.

14       THE COURT:  -- to transmit.

15     Go ahead, Mr. Lucas.  Sorry for the interruption.

16       MR. LUCAS:  That's all right.  I've got a document

17  here that got -- it's in my notebooks out of order, so let

18  me --

19       MR. GETTY:  I'm sorry, Judge.  I just didn't have

20  time earlier today.

21       THE COURT:  You can do it at the lunch hour.

22       MR. GETTY:  Yeah.  I will.

23  BY MR. LUCAS:

24  Q.   So I take it from your answer then, you are laying blame

25  on me for not being courteous and professional and on

1   Mr. Dudley for perhaps not keeping you fully informed?

2   A.   I don't think you've been courteous or professional the

3   whole time.

4   Q.   All right, sir.  Are you aware that your deposition was

5   originally scheduled for July 2013?

6   A.   I am not.

7   Q.   Let me ask you this.  When the motions were filed against

8   your companies for sanctions, did you read the filings?  Was

9   that important enough for you to read the filings?

10   A.   I was aware of the filings.  I was not intimately

11   knowledgeable, didn't read them.  I'm not an attorney.  What I

12   spend most of my days doing is mining coal.  You know, we have

13   attorneys.  We have inside attorneys, outside attorneys, and

14   that's what -- that's what we rely on them to do.  Obviously,

15   they didn't do a very good job.  But that's normally not what I

16   do.

17   Q.   Were you aware that sanctions were being requested against

18   your companies based upon your failure to appear for the

19   deposition?

20   A.   Absolutely.

21   Q.   Okay.  And later you were aware that there was a default

22   judgment entered against your companies, based in part upon

23   that failure, correct?

24   A.   Correct.

25   Q.   Okay.  And then you became aware that the potential

JAMES C. JUSTICE III - CROSS-EXAM                    99

1   magnitude of that default judgment might be substantial,

2   correct?

3   A.   Whether it be substantial or not, we would never want to

4   disrespect the Court or disobey the Court.  So I took it very

5   serious.

6   Q.   My question simply, sir, was did you become aware that the

7   magnitude of that default judgment might be substantial?

8   A.   Any default would be substantial.

9   Q.   Did that cause you to have enough concern before you came

10  to testify today about this topic to review the filings in the

11  record about the matters that you were going to testify about?

12  A.   What that primarily prompted us to do was reconsider our

13  decision to have in-house counsel representing us.  And we --

14  we moved back to outside counsel and, you know, again we take

15  that very serious.

16  Q.   That was not my question, sir.  My question was, given the

17  serious nature of this and given the fact that you were coming

18  here prepared to testify on that for that topic, did you review

19  anything in the Court record about that topic which was simple

20  to the default, your failure to appear, so that you would be

21  fully informed before you gave your sworn testimony today?

22  A.   I did review some documents, not all the documents, and

23  had conversations with my attorney.  But we have discussed

24  those -- those issues.

25  Q.   My question was, did you review the filings with the Court

JAMES C. JUSTICE III - CROSS-EXAM          100

1   about your nonappearance at your deposition?

2   A.   Again, all I can tell you is I can't tell you exactly what

3   documents I did and didn't review.  But I don't think I

4   reviewed all the documents.  I reviewed some of the documents.

5   That's all I can tell you.

6   Q.   I'm aware that you reviewed some of the documents.  Just

7   try to give me a "yes" or a "no" or "I don't recall."

8   A.   I don't recall.

9   Q.   Did you review any of the documents filed with the Court

10  that pertain to your nonappearance at your deposition?

11  A.   I don't recall.

12  Q.   Were you made aware that I wrote to your counsel,

13  Mr. Dudley, on October 18 offering to take the previously

14  scheduled depositions in Roanoke instead of requiring you to

15  come to Knoxville and asking if that was acceptable?  Were you

16  aware of that, sir?

17  A.   No, sir, I was not.

18  Q.   Okay.  Were you aware that -- if you weren't aware of that

19  then, then you weren't aware that the defendants didn't respond

20  to that letter, were you?

21  A.   Unfortunately, like I said, hindsight says we shouldn't

22  have probably had A.J. handling the case, but I'm not

23  intimately knowledgeable with your and A.J.'s correspondence on

24  a daily or weekly basis.

25  Q.   Yes, sir.  You understand, given the nature of your

JAMES C. JUSTICE III - CROSS-EXAM                    101

1   allegations, I want to make sure I know what you do know and

2   what you do not know.  Do you understand that, sir?

3   A.   I do.

4   Q.   All right.  And so to summarize that, you are not aware

5   that I had previously written, saying, I'll be glad to come to

6   Roanoke to save Mr. Justice the inconvenience of coming to

7   Knoxville, and that I never got a response to that letter?  You

8   have no idea about that, right?

9               MR. GETTY:  Your Honor, I assume that, you know,

10  that's in essence a representation to the Court.  I haven't

11  seen any letter, and I haven't objected because I assume he

12  would not make that representation he wrote the letter unless

13  he did.

14              MR. LUCAS:  That is correct.  It's in the record,

15  Your Honor, as Document 150-1, paragraphs 4 and 5 in Exhibit 1.

16              THE COURT:  Go ahead with your questioning,

17  Mr. Lucas.

18              MR. GETTY:  Excuse me.

19              THE COURT:  I can repeat it.

20              MR. GETTY:  Is that a reference to the letter or to

21  your brief?

22              THE COURT:  Mr. Getty, is there -- Mr. Getty, is

23  there an objection?

24              MR. GETTY:  Not at this time.

25              THE COURT:  Okay.  Go ahead, Mr. Lucas.  I can repeat

JAMES C. JUSTICE III - CROSS-EXAM                102

1  the question if you need me to, because we didn't get an

2  answer.  So to summarize that, you are not aware that I had

3  previously written saying I'll be in addition to coming to

4  Roanoke to save Mr. Justice the inconvenience of coming to

5  Knoxville.  I never got a response to that letter.  You have no

6  idea about that, right?  That's on the realtime.

7          THE COURT REPORTER:  It should be "glad" instead of

8  "in addition."

9          THE COURT:  Yes.  I'm glad to come to Roanoke.  I

10  never got a response to that letter.  You have no idea about

11  that, right?

12  A.   I just don't know.

13  Q.   Okay.  And were you aware that I then, not having any

14  response to that, I renoticed your deposition for November 6th

15  in Knoxville?

16  A.   I am aware that my deposition was noticed for

17  November 6th.

18  Q.   Okay.  And that was the day you were scheduled to be in

19  Chicago, correct?

20  A.   Yes, sir.

21  Q.   And Mr. Ball was scheduled to be deposed that same day,

22  right?

23  A.   As far as I know, yes.

24  Q.   Okay.  Are you aware that your counsel acknowledged

25  receipt of the deposition notices on October 22, the same day

JAMES C. JUSTICE III - CROSS-EXAM          103

1   they were received, but without mentioning any scheduling

2   conflict?  Did you know that, sir?

3   A.    I want to back up.  I think our depositions were noticed

4   for the 7th.

5            MR. LUCAS:  May I have this handed --

6            THE COURT:  Is it a Notice of Deposition?  Is it a

7   notice?

8            MR. LUCAS:  Yes, Your Honor.

9            THE COURT:  Yes.

10     Mr. Getty, do you have any objection?

11            MR. GETTY:  None.

12            THE COURT:  That can be tendered to the witness.

13  BY MR. LUCAS:

14  Q.    You recognize that as your deposition notice, sir?

15  A.    I do.  And so I guess we need to clean up the record

16  that -- you had previously said that Mr. Ball's deposition was

17  supposed to be the next day, on the 7th, of which I was

18  supposed to be there as well.  And if that -- and so that was

19  in error.  And I guess it would have to be the 6th, which was

20  the day that I was in Chicago the full day.

21  Q.    No, sir.  Let me correct the record.

22  A.    Okay.

23  Q.    Mr. Ball's deposition was noticed the 6th.  And a

24  Rule 30(b)(6) deposition of Kentucky Fuel was noticed the 7th.

25  Does that refresh your recollection?

JAMES C. JUSTICE III - CROSS-EXAM          104

1   A.   You are the one that just said that I was noticed for the

2   6th.

3              THE COURT:  Mr. Justice, you do need to answer the

4   questions that are asked.

5   A.   Maybe it's best for to you restate the question.

6   Q.   I will withdraw that question.  Can we agree you were

7   noticed for the 6th?

8   A.   Let me take -- I want to read this.  Yes, sir, this

9   document says I was noticed for the 6th.  That was the day I

10  was in Chicago.

11  Q.   All right.  And can we just agree that Mr. Ball was to be

12  deposed on the 6th or the 7th?

13  A.   Well --

14  Q.   Or do you know?

15  A.   I can read what that document says, but -- do you want me

16  to do that?

17  Q.   Go ahead.

18  A.   It says that New London and Fivemile will take

19  the deposition by oral examination or video of Jay Justice

20  C. Justice III, vice president and director of Kentucky Fuel,

21  and vice president and director of James C. Justice Companies

22  before a person duly authorized, et cetera, et cetera.

23  Q.   Okay.  And so you were both noticed for the 6th; is that

24  right?

25  A.   I don't know -- unless I overlooked something, I don't see

JAMES C. JUSTICE III - CROSS-EXAM          105

1   anything here that references Mr. Ball.

2   Q.   Oh, I'm sorry, I thought you just read.  May I see it?

3        THE COURT:  Yes, that can be passed back to the --

4        MR. LUCAS:  I've got it.

5        MR. GETTY:  Do you have a copy for me?

6        THE COURT:  He's reviewing it, Mr. Getty.  Just be

7   patient.  Do you need to get --

8        MR. GETTY:  I need to see the one he's got.

9        THE COURT:  Yes.  Officer Hines, would you get that

10  back from the witness and provide it to Mr. Lucas, please?

11  BY MR. LUCAS:

12  Q.   Okay.  That's what I thought.  This was your deposition

13  notice.  We can agree it was for November 6th, correct?

14  A.   Yes, sir.

15       MR. LUCAS:  All right.  Your Honor, I would offer

16  that as the next exhibit.  I think it would be Plaintiffs'

17  Exhibit 29.

18       THE COURT:  Any objection, Mr. Getty?

19       MR. GETTY:  None.

20       THE COURT:  That will be admitted.  It's probably not

21  marked because this came up sort of at the end.  But you can

22  pass that up through the court security officer to the

23  courtroom deputy clerk for me, please.

24       Do you have some stickers, Sheila?

25       THE CLERK:  I do.

1       THE COURT:  Thank you.

2       MR. GETTY:  May I see it, Your Honor, while we're

3  moving forward?

4       THE COURT:  Yes.  I'm sorry.  Just one moment.

5       MR. GETTY:  Sure.

6       THE COURT:  We're approaching noon.  Are we --

7       MR. LUCAS:  If I can just wrap up this topic and get

8  a stopping point.

9       THE COURT:  That's fine.

10      MR. GETTY:  If that pleases the Court.

11      THE COURT:  That's fine with me.

12  BY MR. LUCAS:

13  Q.   Mr. Justice, are you aware then that your counsel,

14  Mr. Dudley, requested that the depositions be moved to

15  November 7 to accommodate Mr. Ball's schedule?

16  A.   I am not aware.

17  Q.   Okay.  And you are not aware that he told me that Mr. Ball

18  had a meeting in Chicago and wanted to move it to the 7th?

19  A.   As I recall, the meetings in Chicago had a two-step

20  purpose.

21  Q.   That's not my question, sir.

22  A.   Well, it's important that I answer it this way.

23  Q.   Can you give me an answer to my question?

24  A.   Well, restate it, please.

25      MR. GETTY:  Your Honor, he's entitled to answer and

JAMES C. JUSTICE III - CROSS-EXAM                107

1    give an explanation.

2              THE COURT:  The question was:  "And you are not aware

3    that he told me that Mr. Ball had a meeting in Chicago and

4    wanted to move it to the 7th?"  He needs to answer and then can

5    provide an explanation if need be.

6              MR. GETTY:  Thank you.

7    A.   I'm not aware of what Mr. Dudley told you in reference to

8    Mr. Ball.  I do know that Mr. Ball was contemplated as not

9    needed in Chicago as long as I was going to be needed.  He was

10   only supposed to be there for one day, and I was going to be

11   there for two days.

12   Q.   Are you aware, sir, that it is a matter of record in this

13   Court that Mr. Dudley did not identify any conflict regarding

14   your schedule at that time?

15   A.   I don't think that's correct.

16   Q.   Are you aware whether or not -- do you have any knowledge

17   about whether or not he did or did not identify to me a

18   conflict with your schedule?

19   A.   I can just tell you what he told me.

20   Q.   No, sir, I'm not asking you what he told you now.  I'm

21   asking you from your own personal knowledge.  Did you overhear

22   any phone calls, see any correspondence or anything else?

23   A.   I think at some point that I did receive an email but

24   other than that, no.

25   Q.   Are you aware that I did telephone Mr. Dudley on Monday,

JAMES C. JUSTICE III - CROSS-EXAM          108

1   November 4, to suggest in response to the scheduling issues

2   that all of the depositions be postponed by one day with the

3   original sequence to be maintained such that you would be

4   deposed on Thursday, November 7 at 9:00 a.m., followed by

5   Mr. Ball, followed by the Rule 30(b)(6) deposition on Friday,

6   November 8th?  Were you aware of that, sir, that I did

7   telephone?

8   A.   I was not.  That wouldn't have done any good because I was

9   supposed to be gone for the 6th and 7th.

10  Q.   Were you aware that that was confirmed in a letter that I

11  wrote to Mr. Ball on -- on that same date?

12          MR. LUCAS:  And I'd like to put that letter on the

13  screen, Your Honor.

14          THE COURT:  That's fine.  You can publish it.

15          MR. LUCAS:  Can you blow it up?  All right.  May I

16  approach a little closer where I can read it, Your Honor?

17          THE COURT:  Yes.  You can enter the well if you need

18  to.

19          MR. LUCAS:  Beg your pardon?

20          THE COURT:  You can enter into the well if you need

21  to.  There's not much space there, but you're welcome to come

22  around to this side.  It's up to you.

23  BY MR. LUCAS:

24  Q.   Mr. Justice, can you read it from there?

25  A.   Yes, sir, I can.

JAMES C. JUSTICE III - CROSS-EXAM                    109

1   Q.   All right.  Just read it into the record for me.

2   A.   You had previously said you wrote this to Mr. Ball.  It's

3   written to A.J. Dudley.

4   Q.   I misspoke if I said Mr. Ball.

5   A.   Okay.  It says, Dear A.J., Thank you for your telephone

6   call just now.  As we discussed, this confirms our agreement

7   that we will be -- that we will accommodate your client's

8   schedule by sliding the entire deposition schedule by one day.

9   We will not issue new notices of deposition, but begin with

10  Mr. Justice at 9:00 a.m. on Thursday, followed by Mr. Ball,

11  followed by the -- by the two Rule 30(b)(6) deposition on

12  Friday.

13  Q.   Have you ever seen that letter before, sir?

14  A.   No, sir, I haven't.

15  Q.   Are you aware that at -- on Wednesday, November 6th, the

16  date you were originally scheduled, and one day before your

17  rescheduled deposition, that after 6:00 p.m. that the

18  defendants notified me that you would not appear for your

19  deposition but no reason was given?  Were you aware of that,

20  sir?

21  A.   I was aware that I had had the conversation with A.J. that

22  I couldn't make the meeting and he said that he was going to

23  call you and handle it.

24  Q.   And was that on the evening of Wednesday, November 6th?

25  A.   When I had the call with A.J.?

JAMES C. JUSTICE III - CROSS-EXAM                    110

1   Q.    Yes.

2   A.    No, sir.

3   Q.    When was it?

4   A.    It was earlier in the week.

5   Q.    How much earlier?

6   A.    I don't know exactly.  Several days.

7   Q.    Are you aware that on the day of the deposition that your

8   counsel did not offer any reason for your nonappearance?

9   A.    Meaning Mr. Dudley?

10  Q.    Yes, sir.

11  A.    I'm not aware -- I don't know what he said or didn't say.

12  Q.    And speaking of what Mr. Dudley did or did not tell you,

13  you have acknowledged that you're responsible.  You are saying,

14  I, James C. Justice III, I didn't know these things, correct?

15  A.    Yes, sir.

16  Q.    You are aware that your corporation, Kentucky Fuel

17  Corporation, James C. Justice Companies, they act through their

18  officers and agents, correct?

19  A.    I am.

20  Q.    And you are aware that no sanctions motion or contempt

21  motion was filed against you personally, correct?

22  A.    That's correct.

23  Q.    That the sanctions were only sought against the corporate

24  entities, correct?

25  A.    As far as I know, yes.

JAMES C. JUSTICE III - CROSS-EXAM          111

1  Q.   And that they act through their agents such as you and

2  Mr. Dudley, correct?

3  A.   That's what I said, that it's ultimately my responsibility

4  but, you know, Mr. Dudley obviously didn't handle this how I

5  thought it was being handled.

6  Q.   Have you talked to Mr. Dudley recently?

7  A.   Mr. Dudley doesn't work for us anymore.  He's a

8  prosecuting attorney in a neighboring county.  But I see him

9  from time to time.  We still have a good relationship.

10          MR. LUCAS:  That's all I have at this time, Your

11 Honor.

12          THE COURT:  You mean before lunch break or your

13 entirety of cross-examination?

14          MR. LUCAS:  No, I thought you wanted to break for

15 lunch.

16          THE COURT:  Yeah.  Yes, let's go ahead and take our

17 lunch.  Is an hour sufficient time, Mr. Lucas?

18          MR. LUCAS:  We had a little bit of scheduling problem

19 the other day, Your Honor, with just an hour.  Could we go for

20 an hour 15, again?

21          THE COURT:  That's fine.

22     An hour and 15 minutes for lunch, Mr. Getty?

23          MR. GETTY:  That's fine with me, Your Honor.

24          THE COURT:  Okay.  Yeah, there's nothing I need to

25 address.  We'll be in recess then for one hour and 15 minutes.

JAMES C. JUSTICE III - CROSS-EXAM          112

1  Thank you all.

2          (A recess was taken from 12:02 to 1:15.)

3          THE COURT:  Thank you.  We're back on the record.

4  Mr. Justice remains on the witness stand.  Mr. Lucas, you can

5  continue your cross-examination, sir.

6          MR. LUCAS:  Thank you, Your Honor.  Your Honor,

7  before asking questions, I would like to ask the Court to take

8  judicial notice of the documents that are the Court's record

9  that I was referring to earlier.  One is document 150, 1-5-0.

10 The second one is document 150-1 with exhibits.  Those have

11 been previously considered by the Court in connection with this

12 deposition issue and in view of Mr. Justice's testimony, I

13 would simply ask the Court to take judicial notice of those.

14         THE COURT:  Mr. Getty?

15         MR. GETTY:  No objection, Your Honor.

16         THE COURT:  Okay.  I'd be happy to take notice of

17 those as establishing matters that you describe them to be in

18 the record, Mr. Lucas.  Is that the relief that you are

19 seeking?

20         MR. LUCAS:  Yes, Your Honor.  Thank you.

21         THE COURT:  You're welcome.

22 BY MR. LUCAS:

23 Q.  Mr. Justice, as I understand your testimony on direct

24 examination of yesterday, you're basically contending that in

25 connection with the negotiation of the original agreement that

JAMES C. JUSTICE III - CROSS-EXAM                    113

1   Mr. Brownlow made misrepresentations to you.  Is that a fair

2   statement, sir?

3   A.   It is.

4   Q.   Okay.  And in other words, basically in the vernacular,

5   you believe he defrauded you?

6   A.   I don't think I used those words.  Either he grossly

7   misunderstood, you know, the coal quality and the permitting

8   and he made an error because he just didn't understand, or he

9   had knowledge and he tried to misrepresent.  I don't know which

10  one it was, but nevertheless, it was represented far different

11  than what it was.

12  Q.   All right.  And you claim that he misled you in one way or

13  another about the permits and about the quality of the coal; is

14  that correct?

15  A.   Yes, sir.

16  Q.   And you told me that he personally assured you later --

17  you told the Court he personally assured you later -- or,

18  excuse me, you assured him later that, I believe you said

19  clearly and unequivocally, that this was bad coal and that you

20  could not mine it.  Is that your testimony, sir?

21  A.   Yes, it was.  At that point in time, given the way the

22  market was.

23  Q.   Yes, sir.  And that point in time was when you were

24  negotiating the original assignment of leases back in '05,

25  right?

JAMES C. JUSTICE III - CROSS-EXAM                114

1    A.    That's not what I said.  Because I didn't talk to

2    Mr. Brownlow.  The first time I ever talked to Mr. Brownlow was

3    in the fall of 2010.  Now, our company spoke with Mr. Brownlow

4    but what I was referring to was I had conversations after I --

5    I first met with Mr. Brownlow personally about the market, and

6    the coal couldn't be mined given where the market was and the

7    quality and et cetera.

8    Q.   All right.  So the testimony then about that Mr. Brownlow

9    supposedly misled you about the permit, saying it was fully

10   permitted, and that he misled you about the quality of coal by

11   giving you data back in '05, that was not to you personally; is

12   that correct?

13   A.    That was to our company.  And you made it a point earlier

14   to say our company acted as the corporate entity.  And so he

15   did make those representations to our company.

16   Q.   I see.  But you didn't personally hear them or receive

17   them, did you, sir?

18   A.    No, sir.

19   Q.    Okay.  So all of the testimony that you gave yesterday

20   about him misrepresenting that the land was fully permitted,

21   you don't have any personal knowledge of that, do you?

22   A.    Here's the knowledge I have.  We have been over this a few

23   times.

24   Q.   Just answer my question.  You don't have personal

25   knowledge of that, do you?

1  A.   I do have personal knowledge because I was very involved

2  in the original deal.  Even though I didn't talk to

3  Mr. Brownlow personally, you know, our representatives, whether

4  it be Mr. Sarver or Mr. Ball or whoever it may be, would convey

5  what Mr. Brownlow conveyed to them to me and that's what we

6  would make our decision based on.

7  Q.   I see.  So just so you and I are on the same wavelength,

8  when you say I, Jay Justice, have personal knowledge, you may

9  be referring to knowledge that you gained because of your

10 position about what someone else said by virtue of you talked

11 to Steve Ball or Marc Merritt or whomever.  Is that a fair

12 statement?

13 A.   I think it best just to say that there were

14 representations made to our company by Mr. Brownlow that I am

15 very knowledgeable about.

16 Q.   Okay.  Respectfully, sir, that was not my question.  My

17 question was, when you have said that you have personal

18 knowledge -- and I just want to make sure that you and I are on

19 the same wavelength about what personal knowledge is.  That

20 you -- when you say, I, Jay Justice, have personal knowledge,

21 you are not limiting that just to things that you personally

22 have heard from Mr. Brownlow or that Mr. Brownlow gave you, but

23 you are also including in that things that were reported to you

24 by other people in the companies; is that correct?

25 A.   Well, I think we can be specific.  Maybe this will help.

JAMES C. JUSTICE III - CROSS-EXAM                116

1    We were given maps by Mr. Brownlow of both Deep Wood and

2    Fivemile, big maps.  It actually had, you know, all the valley

3    fills on them.  They had all the mining area on them.  And they

4    were represented as these are permitted reserves and here's the

5    maps.  I saw the maps.  We made our decision based on the maps.

6         There was never, here's the maps and, oh, by the way, all

7    the valley fills are not permitted.  That was never discussed.

8    It was never discussed that the coal quality was astronomically

9    terrible.  So I think based on the -- the documents that were

10   provided by Mr. Brownlow that I reviewed personally, I can say

11   that I was made aware of that by Mr. Brownlow.

12   Q.   Do you remember what my last question was, sir?

13   A.   You can ask it again.

14   Q.   Do you remember what it was?

15   A.   No, sir.

16   Q.   Okay.

17        MR. LUCAS:  May I have it read back?  Would that be

18   too much?

19        THE COURT:  Yes, Madam Court Reporter, would you read

20   it back, please, ma'am?

21    (The record was read as follows:

22   QUESTION:  When you have said that you have personal

23   knowledge -- and I just want to make sure that you and I are on

24   the same wavelength about what personal knowledge is.  That

25   you -- when you say, I, Jay Justice, have personal knowledge,

JAMES C. JUSTICE III - CROSS-EXAM          117

1  you are not limiting that just to things that you personally

2  have heard from Mr. Brownlow or that Mr. Brownlow gave you, but

3  you are also including in that things that were reported to you

4  by other people in the companies; is that correct?)

5  A.   I'm saying that I have personal knowledge based on

6  documents that were provided and I also have knowledge that was

7  provided by people that work for the company.

8  Q.   I'm not asking you right now, Mr. Justice, what you had

9  knowledge of.  I'm asking what you mean by "personal

10 knowledge."  If I ask you do you have personal knowledge that

11 Mr. Brownlow made a misrepresentation, I mean did you talk to

12 him, did you hear that from him.  What I gather you're saying

13 is you are including in that also things that you heard from

14 other people that were reported to you about what he said or

15 about what he gave you.  Is that correct?  Yes or no?

16 A.   I can't answer it yes or no.  Obviously, there was

17 information that was relayed to me from others.  But there were

18 documents and specifically maps that were provided from

19 Mr. Brownlow that I reviewed myself.  I told you numerous times

20 that the first time that I ever talked to Will Brownlow was in

21 the fall of 2010, five years after this time.

22 Q.   So when you say, though, just to be clear, that

23 Mr. Brownlow said these maps are fully permitted, he did not

24 say that to Jay Justice, did you -- did he?

25 A.   Like I said, the first time I talked with Mr. Brownlow was

JAMES C. JUSTICE III - CROSS-EXAM                118

1    several years later.

2    Q.    So that was a "no," he did not say that to you?

3    A.    That's correct.

4    Q.    Defendants' Exhibit 8, let me -- I believe that's one of

5    the maps.  Take a look at that, please.  No, I'm sorry, it's

6    not one of the maps.  It's a core data.  Take a look at it if

7    you need to.  When did you get that?

8    A.    This data was provided with the original permit package

9    for Fivemile.  I don't know exactly when it was provided, but

10   it's been a long time ago.

11   Q.    So the original permit package for Fivemile you got

12   sometime around 2005?

13   A.    Yes.

14   Q.    Okay.  You said earlier Mr. Brownlow gave that to you.  Do

15   you wish to correct that at this point?

16   A.    Mr. Brownlow gave it to our company, I guess.

17   Q.    Who did he give it to in the company?

18   A.    I don't know.

19   Q.    And you weren't there when he said whatever he said when

20   he supposedly gave this to you?

21   A.    Well, I guess that -- I didn't meet with Mr. Brownlow

22   until many years later.

23   Q.    When did you -- you said you first met with him.  Did you

24   say in 2010?

25   A.    It's been a long time ago.  I don't know exactly.  But I

JAMES C. JUSTICE III - CROSS-EXAM                119

1   think that's when it was.  I can remember being with him in

2   Lexington, you know, at an attorney's office when he was

3   working on the Appalachian Fuels purchases for us.

4   Q.   Well, when you met with him, what was the purpose of the

5   first face-to-face meeting that you had with him?

6   A.   If indeed that is the first face-to-face meeting, which I

7   believe it to be, could be wrong, but I believe it is that

8   date.  The purpose was he was working as a consultant for us to

9   purchase the Appalachian Fuel assets out of bankruptcy.  We

10  also during that same time were meeting with the bonding

11  company, and I think Will may have been a participant in those

12  meetings as well.

13  Q.   And those were certainly prior to the time this suit was

14  filed, correct?

15  A.   Yes, sir.

16  Q.   All right.  Can we see document 204-4?  Or let me ask you

17  this first.  Is it true that during the transactional

18  negotiations for -- related to Fivemile, both closing and post

19  closing interactions through -- from 2005 through 2012, is it

20  true that you personally had no interaction with Mr. Brownlow

21  at that time as it related to either Fivemile or Deep Wood?

22  A.   That would not be true.

23       MR. LUCAS:  May this be passed up to the witness,

24  Your Honor?

25            THE COURT:  What is it, Mr. Lucas?

JAMES C. JUSTICE III - CROSS-EXAM                     120

1        MR. LUCAS:  It's an affidavit by Mr. Justice, Doc.
2    204-4.
3        THE COURT:  Okay.  Could you show it to Mr. Getty
4    first to see if he has an objection to it being tendered to the
5    witness?
6        MR. GETTY:  Do you have a copy for me?
7        MR. LUCAS:  Yeah.  You can keep that one.
8        THE COURT:  So did Mr. Haskins have the one you want
9    tendered to the witness?
10       MR. LUCAS:  Yes, Your Honor.  That can be passed up.
11       THE COURT:  Yes, if that could be passed to the CSO,
12   please.
13       MR. LUCAS:  I should have kept it.  I apologize.
14       THE COURT:  That's all right.
15   BY MR. LUCAS:
16   Q.   Sir, do you recognize that as an affidavit that you gave
17   in this case?
18   A.   I do.
19   Q.   And turn to the last page, paragraph 10 -- or, excuse me,
20   page 10.  Is that your signature?
21   A.   It is.
22   Q.   And it's sworn to under oath and notarized?
23   A.   That's correct.
24   Q.   Please turn to page 3.  Would you read into the record --
25   and this affidavit was made when, which year?

JAMES C. JUSTICE III - CROSS-EXAM                    121

1   A.    2014.

2   Q.    So event -- strike that.

3        If you would read into the record, so the Court can hear

4   it, what you said in paragraph 10 of your affidavit.

5   A.    "During the transactional negotiations, closing and

6   post-closing negotiations taking place from 2005 through 2012,

7   I personally had no interaction with Mr. Brownlow as it relates

8   to Fivemile and Deep Wood."

9   Q.    Now, the information that you got, whatever you got, when

10  you concluded that you believe that the property was unmineable

11  or had bad coal, you learned that back in the '05 to '06 time

12  frame; am I correct?

13  A.    It was a progression, but probably sometime during that

14  time.

15  Q.    Okay.  And you certainly knew it by 2010, correct?

16  A.    Yes.  I want to clarify that when we met with

17  Mr. Brownlow -- when I first met with him in 2010, he did ask

18  me, what are you going to do about Deep Wood and Fivemile.  And

19  I told him that the quality and the market and so forth, we

20  just couldn't do anything with it at that time, so --

21        MR. LUCAS:  Your Honor, I object.  This is not at all

22  responsive to my question.

23        MR. GETTY:  If he would -- we might know that if we

24  let him finish his answer.

25        THE COURT:  Well, hang on a second.  I'm sorry.

JAMES C. JUSTICE III - CROSS-EXAM          122

1   Well, the question is:  "You certainly knew it by 2010,

2   correct?"  Do you have additional clarification to make,

3   Mr. Justice?

4            THE WITNESS:  Your Honor, all I want to say is that,

5   again, the first time I met with Mr. Brownlow was in 2010, is

6   what I think --

7            THE COURT:  Okay.  Okay.  Let me make sure the

8   process is clear.  Your lawyer will have a chance to ask you

9   questions to clarify your answers in response to Mr. Lucas'.

10  This answer to that one question doesn't seem to me to be

11  particularly objectionable.  I'll sustain -- excuse me, deny,

12  overrule the objection.

13       You can ask your next question, Mr. Lucas.

14            MR. LUCAS:  All right.  Thank you.

15            THE COURT:  You're welcome.

16  BY MR. LUCAS:

17  Q.   The original assignment here, the original assignment of

18  the leases and permits, have you ever read it?

19  A.   No, sir.

20  Q.   Not even before this trial, you haven't read it?

21  A.   I have not.

22  Q.   Okay.  You testified that Mr. Brownlow had misled you

23  about the status of the permits or had misled the company about

24  the status of the permits.  And I take it you were upset when

25  you learned about that, I assume.

JAMES C. JUSTICE III - CROSS-EXAM                123

1   A.   Well, it was certainly -- certainly thought that we had

2   been led astray.

3   Q.   Uh-huh.  And did you feel you had been led astray also

4   with reference to the quality of the coal?

5   A.   Yes, sir.

6   Q.   Okay.  Did you ask anyone in your organization, well, what

7   does the contract say about that?

8   A.   During that point in time we had paid Mr. Brownlow the

9   200,000.  And we didn't have any obligation to pay him anything

10  else.  And could we have gone back and maybe tried to sue

11  Mr. Brownlow?

12  Q.   Did ask anyone in your organization what the contract said

13  about that?

14  A.   I did not.

15  Q.   Okay.  Before you came into Court and accused Mr. Brownlow

16  of misleading you, you didn't feel the need to even see what

17  your contract said about the permits?

18  A.   Look, we try to conduct ourself in the most ethical and

19  honorable fashion possible.  But we all make mistakes.  Will

20  was a friend, and we didn't think that we were played fairly

21  with on Deep Wood and Fivemile.  But Will later on helped us on

22  some things.  Sometimes you just have to overlook things.  And

23  that's what we did.  We weren't on a witch-hunt to go back and

24  see what we could do to get after Mr. Brownlow in 2005.  But

25  the facts are the facts.  Coal is terrible, can't be mined, and

JAMES C. JUSTICE III - CROSS-EXAM          124

1    it's not permitted.

2    Q.   Do you remember my question?

3    A.   Maybe it would be better if you just ask it again.

4    Q.   I take it that's a "no"?

5    A.   That's a no.

6    Q.   My question was, before you decided to come into Court,

7    raise your right hand, swear to tell the truth, and accuse

8    Mr. Brownlow of having misled you, did it occur to you to ask

9    anybody in your company at any time, what does the contract say

10   about that?

11   A.   It did not.

12   Q.   You talked about ethical and honorable.  Do you believe as

13   part of your ethical and honorable requirements that one of

14   those is to live by the contracts that you sign?

15   A.   Well, if you're asking me if I think it's ethical and

16   honorable for someone to mislead you but write into the

17   contract, oh, I don't want to mislead you but you need to

18   overlook that.  Well, that's for the Court to decide, but I

19   don't think it's ethical and honorable, no.

20   Q.   Do you believe -- is it part of what you construe as your

21   ethical and honorable duties as a general matter to abide by

22   the contracts that you signed?

23   A.   I think that we should abide by the contracts we sign and

24   that's what we'll do.  I don't like someone misconstruing the

25   contracts, but we'll abide by what they say.

JAMES C. JUSTICE III - CROSS-EXAM                125

1   Q.   Please look at Exhibit 1, Plaintiffs' Exhibit 1.

2   A.   Okay.

3   Q.   All right.  And Plaintiffs' 1, you'll see, is the amended

4   complaint filed in this case.  It has several exhibits attached

5   to it.  One of those is Exhibit 3, which is the original

6   assignment of leases and permits.  Do you see that?

7   A.   I'm in the wrong book.  Hold on one second.  Are you in

8   the one tabbed --

9   Q.   It's Plaintiffs' Exhibit 1.

10  A.   Okay.

11  Q.   Tell me if you've got that.

12  A.   I do.

13  Q.   An then if you flip back behind the complaint, there are

14  several exhibits, and this is Exhibit 3.  The number at the top

15  of the page is 40-3.

16  A.   I still may not have it.  Okay.  Is it one -- it says 3a?

17  Q.   No, sir.  If you have Exhibit 1.

18  A.   Yeah.

19  Q.   Is your Exhibit 1 an amended complaint?

20  A.   It is.

21  Q.   And you see at the top where it says page 1 of 17?

22  A.   I do.

23  Q.   Okay.  Go back to the -- after the 17th page, and do you

24  have an Exhibit 1 after that?

25  A.   I do.

1  Q.   And it says page 1 of 6 at the top?

2  A.   Yeah.

3  Q.   Okay.  Keep turning until you get Exhibit 3.  It's just a

4  few more pages on.

5  A.   All right.  I've got it.

6  Q.   Okay.  And you have the original assignment of leases and

7  permits, correct?

8  A.   That's right.

9  Q.   All right.  And it's signed by -- who is it signed by on

10 behalf of Kentucky Fuel?  Page 7, if that helps.

11 A.   It's signed by Tom D. Lusk.

12 Q.   Okay.  And he was your chief operating officer?

13 A.   He was.

14 Q.   Okay.  And I'm going to direct your attention to the first

15 page, the page numbered 1 at the bottom.  And is it not true

16 that New London advised you on the first page of this document

17 that the Fivemile permit had been applied for?

18 A.   Can you direct me to what paragraph?

19 Q.   Yes, sir.  There's a large paragraph.  It's the second

20 paragraph under the recitals, which is paragraph numbered 1.

21 It's the paragraph immediately below that, the last sentence in

22 that paragraph.

23 A.   Okay.

24 Q.   And it says, does it not, that the surface coal mining and

25 reclamation operations permit for Fivemile has been applied

1   for, correct?

2   A.   That's right.

3   Q.   All right.  And then turn to the next page, please.  And

4   I'm going to direct your attention to paragraph 8.

5   A.   The warranties?

6   Q.   Yes, sir.  Okay?

7   A.   Okay.

8   Q.   Would you just read that paragraph for His Honor?

9   A.   It says, the sellers -- "The Seller sells the Leases and

10  Permits 'AS IS' without...representations, covenants or

11  warranties except" for the explicit stated in this agreement.

12  "Kentucky Fuel agrees that it has had the opportunity to review

13  the Leases...Permits and accepts the assignment" such "'AS IS'

14  subject to all terms described therein.   Kentucky Fuel

15  understands and accepts that Fivemile permit has not yet been

16  issued but" is "applied for and in the process of being issued

17  by the Commonwealth of Kentucky."

18  Q.   Okay.  And what does this agreement there or anywhere else

19  say about 404 permits?

20  A.   I think that's the problem.  If 404 permits were needed,

21  they should have been part of the application.  There are

22  permits that the state can approve, valley fill permits that

23  are nonjurisdictional.

24  Q.   What does the agreement say about 404 permits?

25  A.   Well, you know the agreement a lot better than I will, so

JAMES C. JUSTICE III - CROSS-EXAM                128

1   is there a section that references 404 permits?

2   Q.    No, sir.

3   A.    Okay.

4   Q.    And, in fact, the closest thing that comes to that is

5   paragraph 8 where there is -- where the assets are sold as is

6   and that you accept them as is.  And there is no further

7   representations and warranties, correct?

8   A.    Yes, sir, I read that paragraph.

9   Q.    Okay.  Look at the next page, paragraph 16.  Do you have

10  that?

11  A.    Yes, sir.

12  Q.    Read that for the Court, please?

13  A.    "This Agreement constitutes the entire agreement

14  concerning the subject matter and supersedes any

15  contemporaneous representations of the agreements not contained

16  herein concerning the subject matter of" the "Agreement."

17  Q.    Okay.  And then if you go just above that in paragraph 13,

18  take a look at that.  It further says if there's any amendments

19  or changes to this agreement, that it can only be amended in

20  writing, correct?

21  A.    That's what it says.

22  Q.    And when you did that in writing, you did it with the

23  amendments like the fourth amendment that is the subject of

24  this lawsuit.  It was a more or less formal process, correct?

25  A.    Yes, sir.

JAMES C. JUSTICE III - CROSS-EXAM          129

1   Q.   Okay.  Let's turn to another topic, Mr. Justice.  I want

2   to ask you about some of the exhibits that your lawyer

3   questioned you about.

4   A.   Are we done with your exhibits for a little bit?

5   Q.   We're done with that for the time being, yes, sir.

6   A.   All right.

7   Q.   I'm going to be referring you to some defendants'

8   exhibits, Mr. Justice, about which you have testified, just to

9   question you about some of the numbers.  I believe you said

10  earlier you were familiar with these, the spreadsheets of the

11  costs and the amounts paid to Mr. Brownlow and New London; is

12  that right?

13  A.   I am.

14  Q.   Okay.  Have you verified those, the figures in those

15  sheets?

16  A.   I haven't personally verified them, but I believe them to

17  be true and accurate.

18  Q.   Why do you believe them to be true and accurate?

19  A.   Well, they're prepared by very competent people that are

20  CPAs and have accounting degrees that are -- that are pretty

21  good at their job.

22  Q.   Okay.  Who prepared them, what person?

23  A.   They were prepared by two different individuals; Amanda

24  Boggs.  She's a CPA.  She's worked for us about ten years.  She

25  has about 30 years of coal experience.  And Sherry Tolley that

JAMES C. JUSTICE III - CROSS-EXAM          130

1   is our director of purchasing that has worked for us for about

2   ten years as well.

3   Q.   All right.  Let's talk first about Exhibit 54.

4             MR. LUCAS:  Does Your Honor have these?  I've got

5   extra copies if you don't.

6             THE COURT:  I've got them.

7             MR. LUCAS:  I don't know if they're in different

8   books, but for ease, if you need an extra copy, I can give

9   them, but I'm going to be looking at 5416 and 15.  15 is a bit

10  hard to read.

11        Tyler, let me have larger copies of this.

12        Would it help if I passed Your Honor a larger copy of 15?

13            THE COURT:  I can read it.  I can read the one I

14  have.

15            MR. LUCAS:  Okay.

16  BY MR. GETTY:

17  Q.   Take Exhibit 54 first.  What is the purpose of this

18  document?  What are you trying to show here?

19  A.   I think the purpose of the document is really the winner

20  here, the only winner, has been Mr. Brownlow.  He's been paid a

21  lot, a lot of money.  He hasn't really had to do anything.  And

22  we've lost a lot of money and tried to make a go of it.  But we

23  certainly have not benefited from this at all.

24  Q.   I'm not asking you, sir, to give me your best argument on

25  your case.  I'm just asking you what is the purpose of this

JAMES C. JUSTICE III - CROSS-EXAM                131

1   particular document and the data on it.  What does it show?

2   A.   It shows all the money that we have paid to Mr. Brownlow

3   or his companies.

4   Q.   Are there any errors on it?

5   A.   I don't know if there's any errors.  Mr. Brownlow flagged

6   that there were -- there was an amount paid to him that he was

7   forwarding on to another landowner.  We didn't differentiate

8   different sources or uses, really, of the money.  These are

9   just dollars that were paid from us to Mr. Brownlow or his

10  companies.

11  Q.   All right.  Were these all paid in connection with

12  Fivemile, which is the subject of this hearing today?

13  A.   They were paid either with Fivemile or Deep Wood.  The

14  initial dollars would have been connected to both and then

15  towards the end it would just be Fivemile.

16  Q.   All right.  Are you able to tell us which ones relate to

17  Deep Wood?

18  A.   I'm really not.  Mr. Brownlow would have to decide how to

19  split up the money between Fivemile and Deep Wood because we

20  bought them as a package deal.  We just wouldn't have any way

21  to split that apart.

22  Q.   Look, if you would, in the left-hand column for the

23  payments to New London.  If you count down several, there's

24  two -- two entries there on August 22, 2013 that have a 1728

25  and 1729 next to them.  Do you see that?

JAMES C. JUSTICE III - CROSS-EXAM                    132

1    A.    I do.  I do.

2    Q.    What is that for?

3    A.    I would -- just by the amounts, I would guess that those

4    were for two years of minimums, the 150, 75 plus 75, and then

5    the other 75 is for one year of minimums.

6    Q.    All right.  Look above that, above Mr. Brownlow, there's a

7    $50,000 entry on the 23rd of March 2010, $50,000.  What is that

8    for?

9    A.    I really don't know.

10   Q.    Then how do you know it has anything to do with Fivemile?

11   A.    Well, the consulting arrangement with Mr. Brownlow, I

12   don't think started until the end of 2010.  So any dollars that

13   were paid prior would have had to have been associated with

14   Deep Wood or Fivemile.  I guess there could have been dollars

15   maybe associated with the Delta permit or Strong Brothers, but

16   I just don't know.

17   Q.    Well, just to put it in context chronologically, the

18   fourth amendment didn't exist until November of that year,

19   correct?

20   A.    That's right.

21   Q.    So there was no consulting agreement in March of 2010,

22   correct?

23   A.    That's right.

24   Q.    Okay.  Did Mr. Brownlow ever work on other projects for

25   you unrelated to Fivemile or Deep Wood?

JAMES C. JUSTICE III - CROSS-EXAM                    133

1   A.   I don't think so.  But he did have some involvement in

2   helping us with some leases on the Strong Brothers property.

3   And I just don't know when that was.

4   Q.   All right.  Are you familiar with a property called WV 3?

5   A.   I am.

6   Q.   Okay.  And that's located in West Virginia --

7   A.   Yes.

8   Q.   -- may I presume?

9   A.   Yes, sir.

10  Q.   Not anywhere close to Fivemile or Deep Wood, is it?

11  A.   No, but that was part of the Appalachian Fuel situation.

12  And that property was actually bought after Bent Mountain and

13  Bevins Branch, which were bought in December of 2010.  So

14  that -- March 2010, that wouldn't -- wouldn't be able to be

15  tied to WV 3.

16  Q.   Okay.  My question was, WV 3 didn't have anything to do

17  with Fivemile and Deep Wood, did it?

18  A.   No, sir.

19  Q.   And Mr. Brownlow got you a contract.  He helped land a

20  contract for that for you, right?

21  A.   I don't understand what contracts you mean landed.

22  Q.   Did he help you get any sort of contract for WV 3?

23        THE COURT:  Mr. Getty, you appear to be suggesting

24  responses to the questions.

25        MR. GETTY:  He wasn't even looking at me.

JAMES C. JUSTICE III - CROSS-EXAM                134

1    THE COURT:  It doesn't matter.  I can't tell who he's

2  looking at.  That's totally improper.  You are not to suggest

3  answers to the --

4    MR. GETTY:  I wasn't suggesting.

5    THE COURT:  Well, it appears as if you were.  I don't

6  know if it was intentional at all, but it's completely

7  improper, and I don't want to see it again.  Okay, sir?

8    MR. GETTY:  I was simply nodding my head to myself,

9  honestly.

10    THE COURT:  I appreciate the explanation.  I don't

11  know what your intent was, and I don't know if the witness was

12  watching, but I've seen this in my court from time to time and

13  it's wholly improper.  Is that clear?

14    MR. GETTY:  I can represent to you, Your Honor, it

15  was not done for that purpose.  I was simply nodding my head.

16    THE COURT:  That's not my question.  My question is,

17  is it going to happen again?

18    MR. GETTY:  Absolutely not.

19    THE COURT:  Okay.  Go ahead with your questions,

20  Mr. Lucas.

21  BY MR. GETTY:

22  Q.   WV 3 didn't have anything to do with Deep Wood or

23  Fivemile, did it?

24  A.   No, sir.

25  Q.   Look at the entry, if you go down below that, on

JAMES C. JUSTICE III - CROSS-EXAM                135

1   October 7, 2010.  And that was also before the -- before the

2   amendment was executed, right?

3   A.   I think so, yes, sir.

4   Q.   And that was also not payment in compensation of anything

5   under the fourth amendment, was it?

6   A.   I think those are the -- the payments that Mr. Brownlow

7   referenced that were sent on to a another landowner.

8   Q.   And that was the Strong Brothers landowner; is that right?

9   A.   To my knowledge, that's who it was.

10  Q.   Do you know if that's right or not?

11  A.   He didn't -- the person that we always dealt -- or I

12  always dealt with was David Strong.  He didn't mention that

13  name, but mentioned the Combs and someone else.  I just -- I

14  forget the name.

15  Q.   But is that another one that you are just not sure what it

16  was for?

17  A.   I'm just saying that's what Mr. Brownlow said.

18  Q.   I'm just asking if you know.  Do you know what that one is

19  for, of your own knowledge?

20  A.   I don't know.

21  Q.   Look at -- if you drop on down below that, on August 27,

22  2013, there's a figure there for $4311.67.  What is that?

23  A.   It says interest.  And that's what it says.

24  Q.   Is that correct?

25  A.   I assume it to be correct.

JAMES C. JUSTICE III - CROSS-EXAM                136

1   Q.   Okay.   Interest on what?

2   A.   I would only be speculating but I would guess that we --

3   it looks like we were late in paying some minimums to

4   Mr. Brownlow and caught those up, and we also reimbursed him

5   for interest.  So he was not harmed.

6   Q.   Okay.  So it's your testimony that you believe that's --

7   more likely than not that it's for interest for what you just

8   described?

9   A.   That's what I believe.  But I just don't know exactly.

10              MR. LUCAS:  All right.  May I have this handed up to

11   the witness, Your Honor?

12              THE COURT:  Any objection, Mr. Getty?

13              MR. GETTY:  No.

14              MR. LUCAS:  I have an extra copy for the Court.

15              THE COURT:  Yes, I would like to see it.  That can be

16   tendered to the witness.

17              MR. LUCAS:  Thank you, sir.

18              THE COURT:  Thank you.

19   BY MR. LUCAS:

20   Q.   Tell me when you've read it, Mr. Justice.

21   A.   Okay.  I read it.

22   Q.   Okay.  You see the amount of this particular sanction,

23   amount of attorneys' fees that your company was awarded --

24   ordered to pay?

25   A.   I do.

Case: 6:12-cv-00091-GFVT-HAI  Doc #: 424  Filed: 01/11/19  Page: 137 of 254 - Page
ID#: 10491

JAMES C. JUSTICE III - CROSS-EXAM          137

1   Q.   What's the date of this order?

2   A.   August 23rd, 2013.

3   Q.   And what's the amount of the attorneys' fees?

4   A.   4311.67.

5   Q.   Okay.  Referring back to our friend, Exhibit 54, does that

6   $4311.67, which was entered four days later, appear to be the

7   payment of these attorneys' fees?

8   A.   It appears so, yes.

9   Q.   Okay.  Do you believe now that the interest is likely

10  incorrect?

11  A.   It appears like that should have said fees other than

12  interest.

13          MR. GETTY:  Okay.  Your Honor, I would ask that this

14  order be introduced as the next Plaintiffs' Exhibit.  I believe

15  that would be 30.

16          THE COURT:  Is that correct, Sheila?

17          THE CLERK:  Yes.

18          MR. GETTY:  No -- no objection.

19          THE COURT:  Okay.  That will be admitted as

20  Plaintiffs' Exhibit 30.

21  BY MR. LUCAS:

22  Q.   Mr. Justice, are you prepared to say whether or not there

23  are any more errors on this spreadsheet, Exhibit 54?

24  A.   Again, I didn't prepare it myself.  I certainly believe it

25  was prepared accurately.  If there's a -- if there's a subject

JAMES C. JUSTICE III - CROSS-EXAM          138

1   or a heading that is different, you know, or should say fees

2   versus interest, perhaps we made that mistake.  But I do

3   believe the amount is correct.

4   Q.   Okay.  I'm -- well, it's important -- if you're trying to

5   say this is how Mr. Brownlow profited because of Fivemile, it's

6   important to know what the entries are for, correct?

7   A.   We were trying to --

8   Q.   Yes or no, please, sir.

9   A.   -- designate how many dollars we paid to Mr. Brownlow in

10  total.

11  Q.   If you are trying to show how much Mr. Brownlow profited

12  from Fivemile, is it not important to know whether the

13  descriptions of these entries is correct?

14  A.   Well, there are also consulting fees that were paid as

15  well that are part of this.  So if we're specifically saying

16  Fivemile only, there's probably some amounts that should have

17  been subtracted.

18         MR. LUCAS:  Your Honor, may I ask the Court if the

19  witness can just be instructed to answer the question.

20         THE COURT:  You do need to answer the question,

21  Mr. Justice.

22         THE WITNESS:  Okay.  Ask again, please.

23         MR. LUCAS:  Would you mind indulging me by reading it

24  back?

25      (The record was read as follows:

JAMES C. JUSTICE III - CROSS-EXAM                139

1    QUESTION:  If you are trying to show how much Mr. Brownlow

2  profited from Fivemile, is it not important to know whether the

3  descriptions of these entries is correct?)

4  A.    Yes.

5  Q.    All right.  If you would -- while you've got that in front

6  of you, I want to turn to Exhibit 16, Plaintiffs' -- or excuse

7  me, Defendants' Exhibit 16.

8  A.    Okay.

9  Q.    All right.  What is the purpose of this document?

10  A.    This document was to capture all the dollars paid to

11  Brownlow, plus the cost that we had associated with Deep Wood

12  and Fivemile that we consider internally as the Brownlow

13  package.

14  Q.    Well, this -- it says at the top, Fivemile and Deep Wood

15  costs?

16  A.    That's correct.

17  Q.    You see that.  Are you trying to depict here all or

18  substantially all of the costs that you incurred in connection

19  with those two properties?

20  A.    I think that there certainly can -- for point of

21  calculation, two things.  One is, there's probably consulting

22  fees that we paid Mr. Brownlow that are in his total.  And

23  there's also -- this could be things that passed through to a

24  landowner or maybe attorney fees in this $4,300 that could be

25  taken out of.  If we're only talking about the actual mine

JAMES C. JUSTICE III - CROSS-EXAM          140

1  permits, there's 75,000 we need to add to this that we paid on

2  December 1st.  That's after we put together this spreadsheet as

3  well.

4  Q.   Yes, sir.  And my question simply was in this exhibit are

5  you just trying to depict, whether it's right or wrong, all of

6  the costs that you incurred in connection with Fivemile and

7  Deep Wood?

8  A.   And our affiliation with Mr. Brownlow.

9  Q.   Okay.  Affiliation with Mr. Brownlow.  You mean outside of

10 Fivemile and Deep Wood?

11 A.   In totality.

12 Q.   So that includes things not directly related then to

13 Fivemile or Deep Wood, correct?

14 A.   That's correct.

15 Q.   Okay.  And how many of these costs relate to Deep Wood?

16 A.   Again, I don't -- I'm sure that we can break that out if

17 the Court would like us to.  But I don't have that in front of

18 me.

19 Q.   All right.  I take it you didn't come today prepared to do

20 that?

21 A.   No, sir.

22 Q.   All right.  Are there any errors on this spreadsheet?

23 A.   Again, I didn't prepare it myself personally, but I

24 believe these totals to be correct and accurate.

25 Q.   And in addition to Fivemile and Deep Wood and you said and

1  other projects, there are payments on here for Strong Brothers

2  also, correct?

3  A.    There could be, yes.

4  Q.    Okay.  Are there?

5  A.    I just don't know.

6  Q.    Okay.  Let's look at the first column where it says year.

7  Is that indicating the year that a particular dollar figure for

8  the right has been paid?

9  A.    It's my understanding that the dates on there are dates

10 when payments are made.  That could be different than perhaps

11 when payments could have been due.  But these were actually

12 dates when payments were made.

13 Q.    That's all I was trying to get.  That's the -- that's the

14 year that things were paid, right?

15 A.    Yes, sir.

16 Q.    All right.  I don't know if I asked you this on this

17 document or not, so forgive me if I already have.  Did you,

18 before you got on the stand to answer counsel's question about

19 this as part of your preparation -- did you at all attempt to

20 verify the accuracy of any of these figures?

21 A.    I think I've answered that, but I'll answer it again.  I

22 have confidence that the people that prepared these prepared

23 them in an accurate and correct manner.  I didn't follow up on

24 them to -- to make sure they did their work.  But I think

25 they're accurate and correct.

JAMES C. JUSTICE III - CROSS-EXAM                142

1   Q.    Okay.  But you haven't personally done anything to verify

2   whether they're right or wrong?

3   A.    No, sir, I haven't.

4   Q.    Okay.  Let's see if we can fix a couple of things.  If you

5   look -- first go down to the 2008 entry.  Do you see that?

6   A.    I do.

7   Q.    And that's for 49,000?

8   A.    Yes, sir.

9   Q.    All right.  That payment wasn't made in 2008, was it?

10  A.    We have a corresponding exhibit says it was made in 2010.

11  Q.    Okay.  So can I just scratch out 2008 there and put

12  2010 -- or strike that.  I'm not going -- I don't want to sound

13  like I'm changing the exhibit.  That one goes under 2010.  Then

14  what goes under 2008?

15  A.    It looks like, from the other exhibit, there were no

16  payments to Mr. Brownlow in 2008.  There were these other

17  costs; property tax and real estate tax and so forth.

18  Q.    I noticed that when I asked you that, if this was the

19  right date, you very quickly referred me to the other exhibit,

20  which shows that it was paid in 2010.  In fact, that was on

21  October 7, 2010, correct?

22  A.    Yes, sir.  We talked several times about that, it being

23  the Strong Brothers pass-through.

24  Q.    Yes, sir.  We hadn't talked about the discrepancy in the

25  date.  You were aware of that date discrepancy, right?

JAMES C. JUSTICE III - CROSS-EXAM                143

1   A.   I'm aware of that date discrepancy now.

2   Q.   Okay.

3   A.   I was not aware of that date discrepancy before today.

4   Q.   Are there any more date discrepancies on here?

5   A.   Not that I'm aware of.

6   Q.   All right.  Let's look at the next one, 2009.  When was

7   that one paid?

8   A.   I don't know.

9   Q.   There's nothing on your other sheet, Exhibit 54, that is

10  supposed to correlate with this.  There's nothing on that to

11  either Mr. Brownlow or New London for 2009, is there?

12  A.   Well, maybe I'm in error that the sheet that we're

13  referring to now, which is Exhibit 16, was when the costs were

14  incurred and the other sheet is when the costs were paid, you

15  know.  Seems like we're kind of splitting hairs, but I stand by

16  the total amount as being correct.

17  Q.   Well, when was the -- when was the $50,000 paid to

18  Mr. Brownlow, according to Exhibit 54 on 3/23/10, when was that

19  cost incurred?

20  A.   I don't know exactly.

21  Q.   Okay.  Well, all we know so far then is that the 2009

22  date, like the 2008 date, is also incorrect, right?

23  A.   It could be.

24  Q.   All right.  Drop down to 2012.  You see the entry there

25  for 75,000?

JAMES C. JUSTICE III - CROSS-EXAM                    144

1   A.    I do.

2   Q.    When was that paid?

3   A.    I don't recall us making any payments to Mr. Brownlow in

4   '12, so I think those were paid in -- in a later year.

5   Q.    Okay.  Which year?  Do you know?

6   A.    I don't really.  I --

7              MR. GETTY:  Your Honor --

8   BY MR. LUCAS:

9   Q.    All right.  I'll leave it at that.

10             MR. GETTY:  -- I'm constrained to object.  I mean,

11  there's no question the amounts were paid, no question the

12  checks were issued.  I mean, we're bickering over --

13             THE COURT:  Mr. Lucas said he's going to leave it at

14  that.  I think he's moving on to another topic.  Is that

15  correct, Mr. Lucas?

16             MR. LUCAS:  Yes, sir.

17             MR. GETTY:  Thank you.

18  BY MR. LUCAS:

19  Q.    Let's look at the third column -- or correction, before

20  that.  Are there any payments to Mr. Brownlow that are counted

21  double on here, to Mr. Brownlow or New London?

22  A.    Not that I'm aware of.

23  Q.    All right.  Look, if you would, in the second column.

24  There's a $49,000 payment, the one that says it was in 2008 and

25  there's a $50,000 payment.

JAMES C. JUSTICE III - CROSS-EXAM          145

1      MR. GETTY:   Which column there and which chart?

2  BY MR. LUCAS:

3  Q.   In the Exhibit 16, the fourth and fifth entries down are a

4  49 and a 50 thousand dollar payment to Mr. Brownlow.  Do you

5  see that?

6  A.   I do.

7  Q.   Okay.  And then those are reflected on Exhibit 54 as that

8  $50,000 payment that you are not sure what it's for to

9  Mr. Brownlow and a $49,000 payment to New London on October 7,

10  2010, right?

11  A.   The 50,000, it's got a date of 3/23/10.  And the other has

12  10/7/10.

13  Q.   Okay.  And that 50,000 and the 49,000, that is our $99,000

14  payment?

15  A.   It could be.

16  Q.   Okay.  Well, look at the next column, the third column on

17  Exhibit 16.  And there's a $90,000 payment there.  Do you see

18  that?

19  A.   A $90,000 payment?

20  Q.   99,000.

21  A.   Okay.  I see that, yes, sir.

22  Q.   And that 99,000 is actually the same as the 49,000 and the

23  50,000 that we saw in the other column, correct?

24  A.   Well, I can't say there -- I mean, I understand that 49

25  and 50 add to 99, but I can't say those are one and the same.

JAMES C. JUSTICE III - CROSS-EXAM                146

1   Q.   Well, look, if you would, at Exhibit 54.  Do you see any

2   other payments that add up to $99,000?

3   A.   Well, if you'll -- just to clarify, this is to land or

4   mineral owner royalties.  This is -- this is not to

5   Mr. Brownlow, this second column here.  So if this is to

6   someone that maybe owns the surface or owns the coal,

7   Mr. Brownlow doesn't own any of those.  So this is a

8   different -- I think we're kind of apples and oranges here.

9   Q.   Oh, so are you testifying now under oath that this 99,000

10  was actually money paid to the landowners of the Fivemile

11  leases in 2010?

12  A.   I'm testifying that it's in the column of land mineral

13  owner royalties and overrides.

14  Q.   I understand it's in that column.

15  A.   And I've told you that I did not prepare this myself.

16  Q.   I understand.

17  A.   Yes, sir.

18  Q.   I understand you didn't prepare it yourself.  I understand

19  which column it's in. I just want to make clear you are not

20  testifying here under oath, are you, sir, that this 99,000 was

21  part of the monies paid to the Fivemile landowners or lessors,

22  are you?

23  A.   Unless you can provide me something that shows that our

24  records are incorrect and which, you know, I'm certainly

25  willing to listen, I have no reason to contradict what our

JAMES C. JUSTICE III - CROSS-EXAM                147

1   people have given me.  So there's -- I don't have any way to --
2   to comment on that.
3   Q.   Well, you understand you are the witness who's been
4   tendered to verify these figures.  You understand you are the
5   one that's talked about these, and I'm sure you understand it's
6   not my job to introduce your exhibits, correct?
7   A.   Yes, sir.
8   Q.   All right.  So my question is very simple, and since this
9   is under the landowner mineral owners royalties and overrides,
10  are you testifying under oath that that $99,000 was used to pay
11  landowners for royalties or overrides?
12  A.   I don't want to tell you anything that's inaccurate, to
13  the best of my knowledge.  I'm telling you I think the people
14  that produced this spreadsheet do a good job.  It's in the
15  column that says landowner surface owner mineral owner
16  overrides.  That's all I can tell you.
17  Q.   All right.  Take a look at Exhibit 15, please.  Do you
18  have Exhibit 15?
19  A.   Yes, sir.
20  Q.   And that's a list of your payments to the landowners from
21  2010 through 2012, correct?
22  A.   Best of my knowledge, this is for Fivemile only and these
23  are payments that we made directly to these -- to these people.
24  Q.   All right.  This is the Fivemile landowners payments in
25  2010 through '12, right?

JAMES C. JUSTICE III - CROSS-EXAM                    148

1   A.    Yes, sir.

2   Q.    What do they total?

3   A.    There's not a total on here, so I guess we can add them

4   up.  But I don't have a total on here.

5   Q.    You haven't attempted to total them before --

6   A.    No, sir.

7   Q.    -- trial today?  All right.  I happen to have an adding

8   machine total for you.  But before I give you that, let me ask

9   you this on this sheet.  And I think you were questioned about

10  it earlier.  Look under the ninth column of the names.  It looks

11  like Matt -- it's hard for me to read.  Is it Hounshell?

12  A.    Yes, sir.

13  Q.    Okay.  And what -- how many payments to him were reflected

14  in that column?

15  A.    One.

16  Q.    And the amount of it is a thousand dollars?

17  A.    That's right.

18  Q.    What's the total at the bottom?

19  A.    Looks like the total is wrong.  It says 500.

20  Q.    Okay.  Look at the far left-hand column.  How many

21  payments are in there to the Caudills?

22  A.    Looks like two.

23  Q.    Okay.  And what do they total?

24  A.    They would total -- the two numbers should total 4800, but

25  it says the total is 2400.

1   Q.   That's wrong, too, right?

2   A.   It is.

3   Q.   Okay.  If you go a few more columns to the right of

4   Mr. Hounshell, if I'm pronouncing that correct, there's a Rosa

5   McIntosh.  Do you see that?

6   A.   I do.

7   Q.   Okay.  And how many entries are there in her column?

8   A.   There's zero entries and there's a negative 1,000.  Now

9   that could mean a check was returned to us, put back in our

10  system.  I just don't know what -- but that could -- that could

11  be what that means.

12  Q.   All right.  Well, you just don't know one way or the

13  other; is that right?

14  A.   No.  And I -- there's not a total for the spreadsheet.

15  You said you totaled them up, all the numbers.  But I think

16  that the background information, you know, the payments that

17  were made are correct.

18  Q.   But you can't reconcile these apparent errors on the

19  spreadsheet, can you?

20  A.   No.  I didn't prepare the spreadsheet.

21  Q.   Okay.  Look over at the very last column, under Jim

22  Thomas.  Or strike that.

23  A.   Jim Thomas.  Is that where you are?

24  Q.   Under Doug Terry.  Let's look at Doug Terry.

25  A.   Okay.  Looks like that one is right.

JAMES C. JUSTICE III - CROSS-EXAM                150

1   Q.   Yeah, that one looks right, doesn't it?

2   A.   It does.

3           MR. GETTY:  So is Jim Thomas.

4   BY MR. LUCAS:

5   Q.   I'm going to hand you this.

6           MR. LUCAS:  May I have this handed to the witness,

7   Your Honor?

8           THE COURT:  Is there any objection, Mr. Getty?  Any

9   objection, Mr. Getty?

10          MR. GETTY:  No.

11          THE COURT:  Okay.  That can be tendered to the

12  witness.  Go ahead, Roger, it's all right to get.

13          MR. LUCAS:  Thank you.

14          THE WITNESS:  Thanks.

15          MR. GETTY:  Does that have the number on it?

16  72,000 --

17          MR. LUCAS:  Yeah.

18          MR. GETTY:  -- 410.59?

19          MR. LUCAS:  Yeah, it's on -- I had the tape totaled.

20  BY MR. GETTY:

21  Q.   Do you see that adding machine tape total there for the

22  totals on this Exhibit 15?

23  A.   I do.

24  Q.   Do you want to check on that or are you willing to accept

25  them as accurate for purposes of our discussion?

JAMES C. JUSTICE III - CROSS-EXAM                151

1    A.    I know I'm not supposed to ask you questions, but did you

2    just total the total column all across or did you total all the

3    numbers throughout the spreadsheet?

4    Q.    It's the total of the totals on the bottom.

5    A.    Well, then it's not accurate.

6    Q.    Okay.  It's not accurate because of the two discrepancies

7    that we pointed out?

8    A.    I mean, we know those are discrepancies.

9    Q.    Okay.  Other than the discrepancies that we spotted and

10   there may have been three that we called out, other than that,

11   does the adding machine tape look right to you?

12   A.    Well, I guess we have to go and do some work here to

13   figure this out.

14   Q.    I'm just asking you if it -- if it accurately appears to

15   add the totals on the bottom of Exhibit 15.  I'm not asking you

16   anything else.

17   A.    Could I get a calculator and just add up all the numbers

18   in the spreadsheet so we have the right number?  Because I hate

19   to confirm that a number could be wrong here.

20   Q.    Yeah.

21   A.    Would you like me to do that?

22        MR. LUCAS:  I suggest that we do it at a break rather

23   than right now.

24        THE COURT:  Do we have a calculator?  Do you want to

25   come back to it after a break?

JAMES C. JUSTICE III - CROSS-EXAM          152

1        MR. LUCAS:  Sure.

2        MR. GETTY:  From my point of view, a break would be

3   good right now.

4        THE COURT:  Okay.  Mr. Lucas, is there an objection

5   to a quick bathroom break?

6        MR. GETTY:  No, that would be fine.

7        THE COURT:  Okay.  We'll stand in a 10-minute recess

8   then.

9        (A recess was taken from 2:19 to 2:31.)

10       THE COURT:  Okay.  Are we ready to proceed?

11       MR. GETTY:  Yes, Your Honor.

12       THE COURT:  We're back on the record, of course.  Go

13   ahead, Mr. Lucas.

14  BY MR. LUCAS:

15  Q.   Okay.  Mr. Justice, did you have a chance to verify the

16  figures on that adding machine tape?

17  A.   I did.  Neither one of us may be right.  But $90,452.18

18  are what all of the payments tally up.  Your number was

19  72,410.59.  So you were about 18,000 low versus on that total

20  line there.

21  Q.   Did you keep a tape of what you did?

22  A.   There's no tape on that calculator.

23       MR. LUCAS:  All right.  Let's leave it at this.  Can

24  we make that tape as the next exhibit for identification?  And

25  we'll go on to something else.

JAMES C. JUSTICE III - CROSS-EXAM          153

1    THE COURT:  That's going  to be Plaintiffs' Exhibit
2  31, is that correct, Sheila?
3    THE CLERK:  That's correct.
4    THE COURT:  Okay.  Is there any objection to that
5  being admitted?
6    MR. GETTY:  I do object because I -- so as long as we
7  write the other number on it, 90,452.18.
8    THE COURT:  Well, the other number has been stated in
9  the record.
10    MR. GETTY:  Okay.  Well, then I have no objection.
11    THE COURT:  Okay. It'll be admitted.
12    MR. GETTY:  He's writing on it.
13    THE COURT:  Don't write on the exhibit unless I allow
14  you to do that, Mr. Justice.
15    THE WITNESS:  All right.  Sorry about that.
16    MR. GETTY:  He's almost like Pavlov's dog.  He hears
17  me say something, and he just does it immediately.
18    THE COURT:  I got it.  Let's not alter the exhibits.
19  And yes, that will be admitted as Plaintiffs' Exhibit 31.  Is
20  the questioning on that finished, Mr. Lucas?
21    MR. GETTY:  Yes, Your Honor.
22    THE COURT:  Okay.  Roger, can you get that for
23  Sheila, please?  Thank you.
24    THE CLERK:  30.  It's there.
25    THE COURT:  Yes, 30 is the order.

JAMES C. JUSTICE III - CROSS-EXAM                154

1          THE WITNESS:  30, 31.

2          THE COURT:  Yes.

3          THE WITNESS:  This, can I just return to Mr. Lucas?

4          THE COURT:  At the end of the questioning, that will

5     be fine.  Thank you.

6          MR. GETTY:  While we have a pause, depending upon how

7     long this cross-examination takes, I have sort of chopped down,

8     I think, substantially Mr. Ball's testimony.

9          THE COURT:  Okay.

10          MR. GETTY:  And we may have him.  And we would

11     probably have Mr. Sarver.  Depending upon how long his cross

12     goes, I think we might be able to finish tonight everything

13     unless we have -- unless we have anything planned by Mr. Lucas

14     tomorrow.  I mean --

15          THE COURT:  We'll see where we are towards the end of

16     the day.  Something came in a while ago that I have to process

17     tonight that's going to take me time.  So we --

18          MR. GETTY:  I'm sorry?

19          THE COURT:  I'm sorry?

20          MR. GETTY:  I misunderstood you.  You have another

21     matter that --

22          THE COURT:  Yes.  That came into chambers that is

23     urgent.  So something else -- I have to turn to something else

24     as promptly as I can.  We'll assess where we are sort of at the

25     end of a typical day, and we'll go from there.

1    MR. GETTY:  All right.  Thank you, Your Honor.

2    THE COURT:  You're welcome.

3 BY MR. LUCAS:

4 Q.   Mr. Justice, I understand that you've been quite actively

5 involved in this litigation, correct?

6 A.   I certainly have been as of the last year or so.

7 Q.   Okay.  And you are familiar with the litigation?

8 A.   Again, I'm not an attorney, but as familiar as one can

9 be --

10 Q.   Okay.

11 A.   -- without being an attorney.

12 Q.   And do you read the filings -- and I'll just limit this to

13 the last three months or so since August.  Do you read the

14 filings that your lawyers make in this case?

15 A.   I do.

16 Q.   And are there any that you are aware of that are incorrect

17 in a material way that need to be corrected?

18 A.   No, sir.

19    MR. GETTY:  Your Honor, if there was something that

20 needed to be corrected, that's incumbent upon counsel to advise

21 other counsel.  We've never been advised of that.  For him to

22 sit here and have a nonlawyer on the witness stand --

23    THE COURT:  Do you have an objection to a question,

24 Mr. Getty?

25    MR. GETTY:  Yes.  I don't think it's proper.

JAMES C. JUSTICE III - CROSS-EXAM          156

1      THE COURT:  He hasn't asked a question.

2      MR. GETTY:  I don't think it's proper to use that

3  kind of document for cross-examination purposes when he's not

4  the lawyer that prepared it or signed it.

5      THE COURT:  Okay.  Well, I don't have any idea if

6  that's even going to be an issue.  Let's see how the

7  questioning unfolds.

8  BY MR. LUCAS:

9  Q.   Mr. Getty came into this case, at least officially, in

10 August.  And I'm sure you and I can probably agree at least on

11 one point, that he had a high hill to climb to get up to speed.

12 Is that accurate?

13 A.   Yes, sir.

14 Q.   All right.  Not the sort of thing where you could just put

15 anyone in a room with files and say, here, learn everything

16 about the case.  People had to talk to him and tell him things?

17 A.   Yes, sir.

18 Q.   And some of those things wouldn't appear in the documents.

19 But without asking you what it is or invading the

20 attorney-client privilege, you would share with him your view

21 of what went on, and Mr. Ball and others would do the same?

22 A.   Yes, sir.

23 Q.   Including things that couldn't necessarily be seen from

24 the documents?

25 A.   We have met numerous times about the case.

1   Q.   And to be fair to him, to -- in statements that would be

2   made, he would have to rely to some extent on what -- what you

3   told him about different events or what Mr. Ball told him,

4   right?

5   A.   Mr. Getty is pretty diligent and I don't know if there's

6   anything, you know, that I've intentionally misrepresented, but

7   he would -- he would know if the facts are the facts and

8   proceed accordingly.

9   Q.   Well, did you just -- for example, did -- there hadn't

10  been that many filings in this case since August compared to a

11  lot of the cases.  You all filed, in August, a memo or a motion

12  and a brief about the measure of damages, essentially saying

13  since GSI was mining this that you wanted to limit the damages

14  that should be awarded to the plaintiffs.  Do you recall that

15  generally?

16  A.   Yes, sir, I do.

17  Q.   I'm sure that was one of the things that you reviewed?

18  A.   Yes, sir.

19  Q.   And more recently each of us filed what was called a

20  prehearing memorandum with the Court -- I think they were filed

21  on November 27 -- that kind of tell each side's story.  I'm

22  sure you reviewed those.

23  A.   Yes, sir.

24  Q.   All right.  With that understanding and background, let me

25  ask you a couple of questions about the negotiation of the

JAMES C. JUSTICE III - CROSS-EXAM          158

1   fourth amendment.  That began in the fall of 2012, correct?

2   A.   No, sir, that's not right.

3   Q.   I'm sorry.  The negotiations began in the fall of 2010?

4   A.   That's right.

5   Q.   Okay.  And you had not been mining before that, had you?

6   A.   Mining on the Deep Wood?

7   Q.   Yes, sir.  No, on Fivemile.  I'm sorry.

8   A.   No, sir, we had not.

9   Q.   Okay.  And you were -- as you testified earlier, you were

10  involved in those negotiations, and by the time of the meeting

11  at The Greenbrier, on an hourly basis, even though you weren't

12  meeting face-to-face with Mr. Brownlow?

13  A.    I was getting updates from Mr. Ball and Mr. Merritt

14  hourly, yes.

15  Q.   Okay.  And you provided input to them or guidance to them

16  and they reported to you and you all made decisions in that

17  manner, correct?

18  A.   That's right.

19  Q.   And prior to this, there had been documents and drafts of

20  the proposed agreement exchanged before you all met at The

21  Greenbrier.  Are you aware of that?

22  A.    I'm not aware of how many, but discussions and

23  negotiations were ongoing prior to The Greenbrier between Steve

24  Ball and Marc Merritt and Mr. Brownlow.

25  Q.   All right.  And even though you may not be familiar with

JAMES C. JUSTICE III - CROSS-EXAM                159

1   the details, are you generally aware that draft agreements were

2   circulated and at least sent by Mr. Schmid for Mr. Ball's

3   review?

4   A.    I don't know -- I don't know when drafts were sent, when

5   they weren't.  I heard Mr. Brownlow testify that Mr. Schmid had

6   been the -- the person that drafted the agreement.

7   Q.    All right.  And I want to direct your attention to the

8   fourth amendment itself, which is Exhibit 1a, Plaintiffs'

9   Exhibit 1a.

10  A.    Okay.  I have it.

11  Q.    Well, you are ahead of me.  I'm looking for my copy.  So

12  bear with me.  Let me just ask you this just to kind of shorten

13  it up based on Mr. Ball's or Kentucky Fuel's deposition.  Can

14  we agree that this document, Exhibit 1a, the fourth amendment,

15  accurately reflects what was agreed to in those negotiation

16  sessions?

17  A.    I don't know if we can agree because we have a -- a vastly

18  different understanding and expectation of what the -- the

19  diligent mining calls meant and what the -- what the meaning of

20  the memos were.  So I don't think we can agree on that.

21  Q.    Yes, sir.  And I'm not asking you -- it's not a trick

22  question.  I'm not asking you if you agree with our

23  interpretation.  But in terms of -- does the document

24  accurately reflect in terms of the way the document is written

25  what was agreed to?

1  A.   Again, I'm not an attorney, but I think that the document

2  generally reflected what was agreed to.  It may be more

3  appropriate to ask Steve Ball because he was, you know,

4  involved firsthand and he is an attorney, may be able to

5  decipher the language a little better than I could.

6  Q.   Okay.  Well, talking specifically about the covenant to

7  mine in Article 10, was there anything, to your knowledge, that

8  was sneaky or underhanded about the way it was drafted?

9  A.   I think in hindsight it should have been clarified more

10  than it has, so we wouldn't be arguing over what the exact

11  interpretation is.  But what I was conveyed that the deal was,

12  was Mr. Brownlow wanted minimums because he was concerned we

13  wouldn't mine.  He wanted those minimums to be recouped in a

14  very short period of time so he could pocket those dollars.

15  And he wanted us to mine the property if we could commercially

16  and reasonably mine it.

17  Q.   Well, my question was specifically about the covenant to

18  mine.  Well, let me just ask you this.  I want to ask you to

19  look at your motion that your counsel filed for a ruling as to

20  the measure of damages.  May I have that handed up?

21          THE COURT:  Any objection, Mr. Getty?

22          MR. GETTY:  As long as I get a copy, I'm happy to --

23  I really have not experienced, honestly, that I can recall,

24  attorneys using pleadings, like marking the amended complaint

25  or briefs or whatever.  I just don't think it's appropriate.

JAMES C. JUSTICE III - CROSS-EXAM          161

1      THE COURT:  Well, let's hear the question.  That's

2  the motion that intended to define the damages theory.  But

3  the --

4      MR. GETTY:  I'm not -- I'm not going to object.  It's

5  already filed.

6      THE COURT:  Right.  I just need to finish my thought.

7  That's your motion to define for the plaintiff their own theory

8  of damages, correct?

9      MR. GETTY:  Yes, it is.

10      THE COURT:  Okay.  I think it's fair.  I want to see

11  where the questions goes.  Is there an objection to that being

12  tendered to the witness?

13      MR. GETTY:  No.

14      THE COURT:  Okay.  That can be tendered.

15      COURT SECURITY OFFICER:  Do you have a copy?

16      MR. LUCAS:  I'm sorry.  I beg your pardon.  He's got

17  it.  He's got a copy.

18      MR. GETTY:  Do you have a copy for me?

19      MR. LUCAS:  That's your file.  That's the only one

20  I've got.

21      THE WITNESS:  Thank you.

22  BY MR. LUCAS:

23  Q.  Do you recognize that as the memorandum in support of the

24  motion of the defendants for a ruling as to the measure of

25  damages that you said you reviewed previously?

JAMES C. JUSTICE III - CROSS-EXAM                162

1   A.    Yes, sir.

2   Q.    All right.   Turn to page 3.

3   A.    Okay.

4   Q.    At the bottom of the page, referencing the negotiations at

5   The Greenbrier, it says as follows.   And this is one of these

6   documents it's apparent, Mr. Getty, because this was just filed

7   in August, he had to rely on things that you and Mr. Ball told

8   him, correct?

9   A.    Or the record as it stood already.

10  Q.    Okay.   It says at the bottom:   "Kentucky Fuel agreed to

11  these proposals through negotiations between Mr. Brownlow on

12  the one hand; and Mr. Steve Ball  (the Justice entities'

13  General Counsel) and Marc Merritt (Vice President for the

14  Justice entities Kentucky operations)."   Then the next sentence

15  says:   "Jay Justice was not involved in the meetings or

16  negotiations in any way."   Do you see that?

17  A.    I do.

18  Q.    That's not correct, is it, sir?

19  A.    I think that is correct.

20  Q.    I thought you said earlier that you were involved because

21  you were kept abreast on an hourly basis by Mr. Ball and

22  Mr. Merritt.

23  A.    Mr. Lucas, again, I don't know where you're going with

24  this, but Mr. Ball and Mr. Merritt negotiated with

25  Mr. Brownlow.   They were certainly keeping me abreast as to how

JAMES C. JUSTICE III - CROSS-EXAM                    163

1   those negotiations were going and, you know, I made the final

2   decision on behalf of our company.  I was not involved in

3   the -- in the meetings, didn't meet with Mr. Brownlow.  I just

4   don't know where we're going here.

5   Q.   Your statement here is that you were not involved in the

6   negotiations in any way.  That's not correct, is it?

7   A.   Again, I'm not an attorney.  Should this wording have

8   said, Jay Justice was not involved in the meetings or

9   negotiations, comma, but he did make the final decision?  Maybe

10  so.  I don't think this -- this statement is an untrue

11  statement.

12  Q.   All right.  Let's read on.  "Although never discussed by

13  Mr. Brownlow, and unbeknownst to Messrs. Ball and Merritt, the

14  amended agreement for the first time included a 'Covenant to

15  Mine,' essentially a diligent mining provision."  And that's

16  paragraph 10 of the fourth amendment that we've been looking

17  at, right?

18  A.   That's correct.

19  Q.   And so you are saying that -- are you saying here that

20  when you signed the document, that it was unbeknownst to

21  Mr. Ball and Merritt that the agreement included a covenant to

22  mine?

23  A.   Well, let me read it again.

24       Okay.  I've read it.  I don't really know exactly what --

25  how to interpret that.

JAMES C. JUSTICE III - CROSS-EXAM          164

1   Q.   Well, I'm not asking you to interpret the document, sir.

2   I'm asking you for your position in a litigation.  Are you

3   saying, as this says, that Mr. Ball and Merritt didn't even

4   know that the covenant to mine was in the fourth amendment,

5   that it was just snuck in?

6   A.   I think what it's trying to convey, that before the fourth

7   amendment, there was not a covenant to mine and for the first

8   time included in the fourth amendment was the covenant to mine.

9   Now, maybe the wording's too legal for me, but that's what I --

10  I think the intent is here to say.

11  Q.   Well, if for the first time they presented the covenant to

12  mine, that would be known to Mr. Ball and Mr. Merritt, would it

13  not?

14  A.   Yes, it would be.

15  Q.   So it wasn't unknown to Mr. Ball and Mr. Merritt?  It

16  wasn't snuck in, was it?

17  A.   I just -- I just don't know how to respond to it,

18  Mr. Lucas.

19  Q.   And then you go on to say that in hindsight, since this

20  was put in unbeknownst to Mr. Ball and Mr. Merritt, you believe

21  that the covenant to mine was put in because Mr. Brownlow was

22  setting you up for litigation.  Do you stand by that, also?

23  A.   Absolutely.  And I'd like to expand upon that if I may.

24  Q.   Your lawyer may give you a chance to do that if he thinks

25  it's proper.  My question is, was he setting you up for

JAMES C. JUSTICE III - CROSS-EXAM          165

1   litigation by sneaking in this covenant to mine?

2   A.   I think it would be wrong to characterize the covenant to

3   mine as snuck in.  I do believe that the covenant to mine

4   language was added as a preamble to this lawsuit.

5   Q.   But you are not contending now, are you, that it was snuck

6   in?  Everybody knew it was there, right?

7   A.   Those are your words, not mine.  I don't think there's --

8   it says snuck in anywhere, does it?

9   Q.   Are you contending that it was in the document, quote,

10  unbeknownst to Mr. Messrs. Ball and Merritt?

11  A.   You'll have to ask Mr. Ball.

12  Q.   As far as you know, is that a true statement or not?

13  A.   I think you'll need to ask Mr. Ball.

14  Q.   Do you know whether or not it is a true statement?

15  A.   How can I tell you what Mr. Ball's thinking in his head?

16  Q.   Because you were kept abreast of the negotiations on an

17  hourly basis.

18  A.   I was aware that Mr. Brownlow added this section to mine.

19  And this section, to me, was offset based by the minimums.  It

20  makes no sense to have the minimums and have a covenant to

21  mine, regardless of any circumstance.  It just makes no sense.

22  Q.   Well, is that -- is that the reason that you think

23  Mr. Ball -- that was the motive in the lawsuit, was to set you

24  up because of his knowledge he knew it was bad coal?

25            MR. GETTY:  You're referring to Mr. Ball.

JAMES C. JUSTICE III - CROSS-EXAM                166

1   BY MR. LUCAS:

2   Q.   I'm sorry, Mr. Brownlow.   I apologize to both of you.

3   A.   I'm a little confused.   Could you restate your question?

4        THE COURT:   Yeah, there was actually another

5   misstatement in the question, Mr. Lucas.   Try again for us,

6   please.

7        MR. LUCAS:   I'm going to withdraw it.

8   BY MR. LUCAS:

9   Q.   Mr. Justice, talking about the language in Article 10 --

10  or section 10 of the fourth amendment, the covenant to mine,

11  fair to say the parties disagree over how that should be

12  interpreted, correct?

13  A.   Yes, sir.

14  Q.   And disagree over whether or not that should be -- strike

15  that.

16        Can we agree it does not include the words "mineable and

17  merchantable" or either of those words?   Can we agree on that?

18  A.   I don't think those words are mentioned.   It mentions

19  commercially reasonable.

20  Q.   Take a look at it.   It's Plaintiffs' 1a.

21  A.   Yes, sir I have it.

22  Q.   All right.   Turn to page 6 of the document, covenant to

23  mine, Article 10.

24  A.   I'm there.

25  Q.   All right.   It's -- the commercial and reasonable modifies

JAMES C. JUSTICE III - CROSS-EXAM          167

1   to use its best efforts to maximize within the constraints of

2   industry standards.  To maximize what?

3          MR. GETTY:  Where are you referring to?

4   A.  You've added another "maximize," I think.

5          MR. GETTY:  Excuse me.  What page?

6          MR. LUCAS:  Page 6.  I'll withdraw that.

7   BY MR. LUCAS:

8   Q.  Let's just go back to the basic proposition.  It does not

9   contain the -- it does not expressly contain the words

10  "mineable" or "merchantability."  Can we agree on that?

11  A.  Those words are not in this paragraph.  However, the

12  mineable and merchantable does apply to industry standards.

13  Q.  And so it's your contention that the other words in this

14  paragraph you should infer the mineable and merchantable

15  limitation also; is that correct?

16  A.  I think that industry standards do constitute -- or that

17  mineable and merchantability is part of the industry standards,

18  and I think commercialable -- commercial reasonableness is also

19  very important here.  I mean, I don't think -- I don't think

20  Mr. Brownlow contemplated for us to go out and just mine coal

21  that's 5 percent sulfur and 30 ash for nothing.

22  Q.  Yes, sir.  That's not my question.  My question is,

23  it's -- you have essentially said this.  You're just asking the

24  Court to say mineable and merchantable standards should be

25  inferred from the other language in this, correct?

JAMES C. JUSTICE III - CROSS-EXAM          168

1   A.    Well, we'll let the attorneys, you know, ask what we're

2   asking the Court to decide on.  But all I'm saying is my lay

3   understanding of this language is if we can't make money mining

4   the coal, we don't have to mine the coal.  But if we don't mine

5   coal, we have to pay a minimum.  That's my understanding of the

6   agreement.

7   Q.    Okay.  Do you remember my question?

8   A.    Maybe best ask it again.

9   Q.    Yes, sir.  Are you just asking His Honor to infer the

10  mineable and merchantable standard, to infer that into this

11  contract based on the other language you have used in the

12  contract?

13  A.    I think we're asking the Court to determine if we had an

14  obligation to mine regardless of any economies, regardless of

15  any qualities, regardless of any -- anything, if we had a -- a

16  duty to mine or not, which I don't think we did.

17  Q.    Well, you have designated in your exhibit list a number of

18  witnesses, including yourself, to talk about the merchantable

19  and mineable issue, and I just want to know, yes or no, are you

20  trying to have that standard that you're only required to mine

21  if it's mineable and merchantable or are you trying to have

22  that implied in this Article 10?

23        MR. GETTY:  Let me object.  Objection, use of

24  "implied."  It's obvious what it says it says.  And, you know,

25  that doesn't necessarily mean that that concept is implied.  It

JAMES C. JUSTICE III - CROSS-EXAM          169

1   may be directly in the concept.

2          THE COURT:  Is there another way to ask the question,

3   Mr. Lucas?

4          MR. LUCAS:  Your Honor, I'm not sure there is.

5          THE COURT:  Couldn't it be resolved by asking if the

6   merchantable and mineable issue -- excuse me -- language

7   appears in Article 10?

8          MR. LUCAS:  I'm sorry, I didn't hear the first part

9   of what you said, Your Honor.

10         THE COURT:  Couldn't this dispute be resolved if you

11  simply asked the question of whether that mineable and

12  merchantable language appears in Article 10?

13         MR. LUCAS:  Well, and it's established.  He's

14  reluctant to admit, but it's established that it's not there.

15         THE COURT:  Right.

16         MR. LUCAS:  And I just want to know their position.

17  It seems to me they're saying -- they keep talking about

18  mineable and merchantable, so they want Your Honor to read that

19  into the contract.  I think that's fairly obvious, but

20  Mr. Justice will not admit that.

21         MR. GETTY:  I don't think that's an accurate

22  statement.  Our position is that within the context of the

23  industry encompasses mineable and merchantable and other

24  standard terms that are readily understood.  There's no

25  implied.  It's part of what reasonable and -- commercially

JAMES C. JUSTICE III - CROSS-EXAM                 170

1   reasonable and within the context of the mining industry means.

2   When you say within the context of the mining industry, that

3   incorporates or means terms that are readily known within the

4   industry and should be known to both parties.  And given what

5   Mr. Brownlow has testified about, his experience, his

6   knowledge, his involvement in the Fivemile properties as early

7   on as 2003 or '4 or '5, that's our position.

8               THE COURT:  Okay.  As I say, because there was no

9   deposition of Mr. Justice in the case, I will allow the

10  question.  Why don't you try one more time, Mr. Lucas, and

11  we'll see if we can't move on.

12              MR. LUCAS:  One more time.  And I apologize, Your

13  Honor, because I thought this was a straightforward question,

14  and it wouldn't have taken anywhere near this long.

15  BY MR. LUCAS:

16  Q.   Are you asking the Court, just yes or no, to infer or

17  imply a mineable and merchantable standard in this Article 10?

18              MR. GETTY:  Same objection.  I would add to it that

19  I'm certain that when these proceedings are done, we're going

20  to brief the proceedings, the issues, submit it to you before

21  you rule.  And I am absolutely certain that both sides will

22  probably brief what does that mean.

23              THE COURT:  Understood.  The objection is overruled.

24  Answer the question, please, Mr. Justice.

25  A.   Mr. Lucas, I view the industry standards as being the --

1  the -- the header for a whole array of things that go into
2  mineability, merchantable, mineable, et cetera.  The words
3  "mineable," I believe, and "merchantable" are not listed in
4  this paragraph.  The words "industry standards" are listed.
5  "Commercial reasonableness" is listed.  And I believe that
6  that -- that's my final answer.
7  Q.    All right.  In fact, when your company wants to include a
8  mineable and merchantable standard or limitation in your
9  contracts, you know very well how to do that because you put it
10 in your contracts, right?
11 A.    Well, unfortunately, you know, let's take for example
12 Natural Resource Partners, they're our largest landlord.  Their
13 lease is what their lease is.  It's a take-it-or-leave-it
14 lease.  It's not a negotiable lease.  We don't really get to
15 craft the language.  Mr. Ball will have to decide if
16 Mr. Brownlow gave him or Mr. Merritt an opportunity to amend
17 the language.
18     But again, we just continue to split hairs.  I mean, we
19 are paying a minimum royalty that has a purpose to pay when you
20 don't mine.  And the coal on this property is terrible.  It's
21 absolutely terrible, and it can't be mined.  We can't mine it.
22 There's been a whole array of people that have tried and they
23 can't mine it either.
24        MR. LUCAS:  Your Honor, this is a nonresponsive
25 answer.

JAMES C. JUSTICE III - CROSS-EXAM          172

1    THE COURT:  I think he's doing his best to answer.
2  Finish your response, Mr. Justice.
3  A.   I really believe if Mr. Brownlow wanted to take the
4  position in the amendment that we have to mine no matter what,
5  no matter if the coal price is a thousand dollars a ton or $1 a
6  ton, no matter if the coal is the best coal in the world or the
7  worst coal, then he should have put, you'll mine the coal; if
8  you don't mine the coal, you're in default.  And there
9  shouldn't have been a need for minimums or recoupment at all.
10  What if we were to mine 1 ton a year, mine 1 ton a year?
11    MR. LUCAS:  Your Honor.
12    THE COURT:  Yes, at that point I'm going to stop you,
13  Mr. Justice.  Mr. Lucas gets to ask the questions.  And you
14  finish your answer, and then we'll hear the next question.
15  A.   It makes no sense.  If we would have mined one ton a year
16  and checked the box --
17    MR. LUCAS:  Your Honor, may I ask the witness to
18  answer the question?  And I'll be glad to repeat it.
19    THE COURT:  I want to hear the remainder of the
20  answer and then you can repeat the question.
21  A.   What I was saying is, it makes no sense.  If we would have
22  mined 1 ton of coal a year and sold it for $25 a ton and paid
23  Mr. Brownlow a $75,000 year minimum, Mr. Brownlow would have
24  only gotten 75,000.  If we would have mined 50,000 tons a year,
25  he would have only gotten $75,000.  So asking us to go out and

JAMES C. JUSTICE III - CROSS-EXAM                173

1   mine coal that is not mineable and not merchantable and not
2   permitted, it just seems really disingenuous you would force
3   that and get a minimum at the same time.
4        We've paid Mr. Brown over a million dollars.  No matter
5   how we break the numbers and move them around and put them in
6   different columns, paid him a lot, of lot of money for nothing.
7        So I'm ready for the next question.
8            THE COURT:  Would you like to have it read back,
9   Mr. Lucas?
10           MR. LUCAS:  I would like to have it read back.  Thank
11  you, Your Honor.
12       (The record was read as follows:
13       QUESTION:  All right.  In fact, when your company wants to
14  include a mineable and merchantable standard or limitation in
15  your contracts, you know very well how to do that because you
16  put it in your contracts, right?)
17  A.   Mr. Lucas, again, I thought I answered that.  But most of
18  our landlords have a form lease that use the terms either
19  "industry standards" or "mineable and merchantable," sometimes
20  both.  All of the leases have commercially reasonableness, and
21  they all have minimums.  And if you don't mine, you pay a
22  minimum.  That's just what the business does.  And I don't know
23  how to say anything different than that.
24  Q.   Well, a lease that requires you to only mine coal if it's
25  mineable and merchantable, that actually operates in your favor

JAMES C. JUSTICE III - CROSS-EXAM          174

1    because it limits your obligation, correct?

2    A.    It limits your exposure to go out and mine coal when

3    economic conditions are such that you can't.  This is a

4    commodity business.  It has good times.  It has bad times.

5    It's very volatile.  We all know that.  Mr. Brownlow should

6    know that.  I certainly know it.  And that's why you have a

7    minimum royalty.  You mine in the good times.

8    Q.    I haven't asked anything about minimum royalty.

9    A.    I understand.

10   Q.    The limitation requiring you to mine only mineable and

11   merchantable coal, that's for your benefit so that you -- if

12   that clause is in there, you don't have to mine coal that is

13   not mineable and merchantable, right?

14   A.    But you still have to pay a minimum.

15   Q.    That was the agreement with my question?  Is it correct

16   that the limitation requiring you to mine only mineable and

17   merchantable coal, that's to protect you?

18   A.    That is protecting us.  But the landowners -- you know,

19   it's a two-way street.  You are paying a minimum for nothing,

20   too.  If you don't mine, you pay a minimum.  Well, that's

21   what -- that is something that is good going back to the

22   landowner.  So it's a give and take.

23   Q.    And the purpose of the mineable and merchantable

24   limitation is to prevent someone from taking the position that

25   you must mine the coal no matter what, even if it's not

JAMES C. JUSTICE III - CROSS-EXAM                175

1   mineable and merchantable?  That's the purpose of putting it in

2   there, right?

3   A.   I'll try to answer specifically.  If the language had said

4   in this lease, you mine the coal no matter what, we would have

5   never signed the lease.  Nobody would ever enter an agreement

6   like that.

7            MR. LUCAS:  Would you read the question back please,

8   Madam Court Reporter?

9        (The record was read as follows:

10       QUESTION:  And the purpose of the mineable and

11  merchantable limitation is to prevent someone from taking the

12  position that you must mine the coal no matter what, even if

13  it's not mineable and merchantable?  That's the purpose of

14  putting it in there, right?)

15  A.   That is the purpose and it's -- this is not a have your

16  cake and eat it, too.  If we get the flexibility to not mine

17  when it's not economically feasible, then you pay a minimum and

18  the landowner benefits from that.  And that's just part of the

19  deal.

20           MR. LUCAS:  Your Honor, I've got an exhibit I'd like

21  to have tendered to the witness.

22           THE COURT:  Is there an objection, Mr. Getty?

23           MR. GETTY:  I haven't seen it.  It's another lease,

24  North Fork and Justice Companies.  This is cross-examination,

25  so I have no objection.

1      THE COURT:  Okay.  That can be tendered to the

2  witness.

3      THE WITNESS:  Okay.

4  BY MR. LUCAS:

5  Q.   All right.  Do you see that coal lease agreement between

6  the James C. Justice Companies, Kentucky Fuel, and North Fork

7  Holdings, LLC?

8  A.   Yes, sir.

9  Q.   And if you look in the first paragraph where it says,

10  witnesses, as part of the preamble, the defendants in this

11  case, Kentucky Fuel and James C. Justice Companies, are granted

12  all of the mineable and merchantable coal in this particular

13  coal seam, correct?

14  A.   Yes, sir.

15  Q.   Turn, if you would, to page 8.

16      MR. LUCAS:  Your Honor, and I've got an extra copy

17  for you, if I may hand that up if you want.

18      THE COURT:  Sure.  I'll take a look.  That's fine.

19  Thank you.

20  BY MR. LUCAS:

21  Q.   Do you see at the top of the page of page 8, section 3.9,

22  there's a definition of mineable and merchantable?

23  A.   You don't mind if I read this real quick?

24  Q.   Please, go ahead.

25  A.   Yes, sir, I see it.

JAMES C. JUSTICE III - CROSS-EXAM          177

1  Q.   Okay.  And that's pretty much standard language that

2  appears in a lot of your contracts, isn't that correct?

3  A.   Some variant of that would, yes, sir.

4  Q.   Yes, sir.  And it expressly limits it to coal, if you look

5  at that third line, that when reached in the normal mining

6  process could be mined at a profit, right?

7  A.   That's right.

8  Q.   Okay.  And that is the type of limitation that you want to

9  make sure is imposed on this contract that's at issue in this

10 lawsuit, correct?

11 A.   I have a really difficult time with your side trying to

12 take the position that you suckered us into a deal once,

13 suckered us into an amendment to force us to mine no matter

14 what, and get a minimum.  I really have a tough time believing

15 that that was Mr. Brownlow's intent.  If it was, it's bad.  But

16 I really -- I hope that he's a better person than that.

17 Q.   Do you remember my question?

18 A.   I do.

19 Q.   What was the question?

20 A.   I think you asked me if this language was consistent like

21 this in our other agreements, and I wanted to impose this into

22 this agreement.

23 Q.   My question was, is this, the restriction that you want to

24 be imposed into this contract, the fourth amendment, similar to

25 this language that you are only obligated to mine coal that can

JAMES C. JUSTICE III - CROSS-EXAM          178

1   be mined at a profit by the use of good business practices?  Is

2   that the standard that you seek to imply to the fourth

3   amendment?

4           MR. GETTY:  And I object to the use of -- he can use

5   the word "implied" or he can use the word "imposed."  It's our

6   position the clause says what it says and it says --

7           THE COURT:  Overruled.  The defendants have injected

8   issues of contract interpretation into the measure of damages.

9   That's overruled.  And I'm going to instruct the witness to

10  answer the question.

11  A.   I agree with you, it's different wording.  I think that

12  your definition and the definition in this unrelated but

13  similar lease are trying to say the same things.  That's what I

14  think.

15  Q.   So was that a yes to my question?

16  A.   Just to be clear, why don't you ask it one more time just

17  so I'm correct.

18          MR. GETTY:  Would you mind, please, Madam?

19      (The record was read as follows:

20      QUESTION:  "My question was, is this, the restriction that

21  you want to be imposed into this contract, the fourth

22  amendment, similar to this language that you are only obligated

23  to mine coal that can be mined at a profit by the use of good

24  business practices?  Is that the standard that you seek to

25  imply to the fourth amendment?")

JAMES C. JUSTICE III - CROSS-EXAM                 179

1           MR. GETTY:  Just for the record, I do raise the same

2    objection.

3           THE COURT:  It's overruled.  Answer the question,

4    Mr. Justice.

5    A.   Yes.

6    Q.   Thank you.  Turn, if you would, if you have Plaintiffs'

7    Exhibit 16 series.

8           THE COURT:  The last document, Mr. Lucas, was that

9    intended to be --

10          MR. LUCAS:  I did intend to introduce that as an

11   exhibit, Your Honor.  Would it be thirty --

12          THE CLERK:  Two.

13          THE COURT:  Is there an objection, Mr. Getty?

14          MR. GETTY:  No.

15          THE COURT:  Okay.  That will be admitted as

16   Plaintiffs' 32.

17   BY MR. LUCAS:

18   Q.   Do you have Exhibit 16e, Mr. Justice?

19   A.   Yes, sir, I do.

20   Q.   All right.  And that is -- that is actually a draft mining

21   agreement circulated between you, Kentucky Fuel, and NewLead

22   Holdings, correct?

23   A.   Yes, sir.

24   Q.   And that was for mining for this same property, right?

25   A.   That is correct.

JAMES C. JUSTICE III - CROSS-EXAM                180

1   Q.   Okay.  Would you turn to the first page of Exhibit 16e?

2   A.   Okay.  I'm here.

3   Q.   At the bottom, where it says "Description of Work," can

4   you just read the first sentence of that into the record for

5   me?

6   A.   "Subject to the provisions of Section 2 below...Kentucky

7   Fuel will provide all labor, supervision, equipment, and" the

8   "supplies necessary to mine and ship the mineable coal from the

9   Fivemile...project."

10  Q.   All right.  Now turn over to the next page.  At the top,

11  starting at the end of the fourth line down, it has a

12  definition of mineable coal, correct?

13  A.   Can you --

14  Q.   Yes.

15  A.   -- tell me where --

16  Q.   The fourth line down at the end, where it begins with the

17  words "As used herein."  I'll just read it.  "As used herein,

18  'mineable coal' shall mean coal which, when taken in the course

19  of KFC's mining operations, can be removed economically and

20  safely by the use of prudent surface mining techniques,"

21  correct?

22  A.   Yes, sir.

23  Q.   And that was in a contract drafted by Mr. Ball for

24  NewLead's consideration, correct?

25  A.   Yes, sir.

JAMES C. JUSTICE III - CROSS-EXAM                181

1    MR. LUCAS:  I've got one more I'd like to have passed

2    up to the witness, please.  And I have an extra copy for the

3    Court.

4    THE COURT:  Okay.  Let's give Mr. Getty a chance to

5    look at it and let me know if there's an objection.

6    MR. GETTY:  I'm fine.

7    THE COURT:  Okay.  That can be tendered to the

8    witness.

9    BY MR. LUCAS:

10   Q.    And do you recognize that's the memorandum of a lease

11   signed by Mr. Marc Merritt, along with a surface lease

12   agreement also signed by Mr. Merritt?

13   A.    Mr. Lucas, if you'll just give me just a second to look at

14   it.

15   Q.    Certainly.

16   A.    Okay.  I'm here.

17   Q.    All right.  I'm going to direct your attention to the page

18   numbered 4 of the lease agreements, number 4 at the bottom.

19   It's paragraph 12.  Just take a minute and read that to

20   familiarize yourself with it.

21       Have you read it?  So without getting too laborious, fair

22   to say that in this -- this is another type of a agreement,

23   another language where Kentucky Fuel gives itself the right to

24   terminate its obligation to mine, if in Kentucky Fuel's

25   judgment at any time the mining of said coal shall be or become

JAMES C. JUSTICE III - CROSS-EXAM                    182

1   unprofitable.  You see that?

2   A.   Yes, sir.

3   Q.   That gives you a quick exit from this, if it's

4   unprofitable mining, correct?

5   A.   I believe that any coal lease that was entered into

6   between sophisticated parties, you would find language that

7   would be defined by the industry standards that would give the

8   mine operator the ability to not mine if it was not profitable.

9   Q.   Uh-huh.  And this says that very clearly and directly in

10  plain English, doesn't it?

11  A.   It says it in a different manner than the other lease and

12  a different manner than your lease.

13  Q.   And to know whether you have the right to cease mining if

14  it's not profitable, you don't have to infer anything into this

15  contract because it says so in black and white.  Can we agree

16  on that?

17  A.   Yes, sir.

18           MR. LUCAS:  All right.  I would offer that as the

19  next exhibit, Your Honor.

20           THE COURT:  Objection, Mr. Getty?

21           MR. LUCAS:  No.

22           THE COURT:  That will be -- that's Plaintiffs' 33,

23  Sheila?

24           THE CLERK:  Yes.

25  BY MR. LUCAS:

JAMES C. JUSTICE III - CROSS-EXAM          183

1   Q.   And this contract was entered into just a few months

2   before the fourth amendment in this case, correct?

3   A.   Yes, sir, that's correct.

4            MR. LUCAS:   I've got one more I'd like to hand up.

5            MR. GETTY:   Two copies, again.

6            THE COURT:   Objection, Mr. Getty?

7            MR. GETTY:   Just a point of inquiry.

8            THE COURT:   Yes.

9            MR. GETTY:   Were these in your proposed exhibits?

10           MR. LUCAS:   No.

11           THE COURT:   Is that an objection, Mr. Getty?

12           MR. GETTY:   Well, I -- you know, I'm not going to

13  object because I intend to use them myself.

14           THE COURT:   Okay.

15           MR. GETTY:   So -- but I think it's improper to be

16  handing up exhibits -- I mean, we had -- we spent at least one

17  hour the first day with Mr. Lucas arguing that because we

18  hadn't given him something or listed it properly or whatever,

19  it ought to be excluded and he was objecting to it.  And then

20  he stands up here today and hands document after document after

21  document that he's never provided to us, that he's never put in

22  the books, you know.  And I think they're objectionable, but

23  I'm not going to object because, frankly, I think they help our

24  case and I intend to use them.

25           THE COURT:   Okay.  Fair enough.  You can ask the

JAMES C. JUSTICE III - CROSS-EXAM                184

1   witness --

2          MR. GETTY:  I'm frankly astounded that he's putting

3   them into the record.

4          THE COURT:  You can ask the witness questions once

5   he's got the document, Mr. Lucas.

6          THE WITNESS:  Thank you.

7   BY MR. LUCAS:

8   Q.   And take a minute to familiarize yourself with that, sir.

9   I think you'll see it has -- if you look at page 4 of this

10  lease, paragraph 12, it has the same language of the lease that

11  we just looked at.

12         MR. LUCAS:  Your Honor, while he's doing that, did I

13  get my last exhibit marked and entered?

14         THE CLERK:  I do not have them.  It's still at

15  defense table.

16         MR. LUCAS:  But it's entered, right?

17         THE CLERK:  It is.

18         THE COURT:  It is, but I don't want to get them

19  confused.  Which ones don't you have, Sheila?

20         THE CLERK:  I do not have 32, 33 or, this new one,

21  34.

22         THE COURT:  Okay.  Let's get 32 and 33 to you --

23         MR. GETTY:  What is 32?

24         THE COURT:  -- because I don't think they're marked

25  at all.

JAMES C. JUSTICE III - CROSS-EXAM        185

1          THE CLERK:  The coal lease with North Fork.

2          THE COURT:  Yes.  And 33 is the lease with Ron Saros.

3          MR. GETTY:  The mining agreement, the affidavit of

4  James C. Justice III, what is that one?

5          THE COURT:  That wasn't marked as an exhibit, I don't

6  believe, was it, Mr. Lucas?

7          MR. LUCAS:  The mining agreement, yes, Your Honor.

8          THE COURT:  No, no.  The affidavit.

9          MR. LUCAS:  Oh, Mr. Justice's affidavit?

10         THE COURT:  That was not designated as an exhibit,

11  correct, Sheila?

12         MR. LUCAS:  I don't think it was.  It's in the

13  record.

14         THE COURT:  Yeah.

15         THE WITNESS:  I've got an affidavit.  And then I've

16  got a motion, also.

17         THE COURT:  Yes.  I understand.  The difference we're

18  talking about is that some are marked and they become formal

19  pieces of evidence.

20         THE WITNESS:  Okay.

21         THE COURT:  Some are just asked about and they're not

22  actually entered into evidence.  So apparently those are not

23  going to be.

24         THE WITNESS:  Okay.

25         MR. GETTY:  Just for point of clarification.

JAMES C. JUSTICE III - CROSS-EXAM                186

1           THE COURT:  Yes.

2           MR. GETTY:  The 33 is --

3           THE COURT:  Is the one that's just been tendered

4    to --

5           MR. GETTY:  RPS Investments.

6           THE COURT:  Hold on.  33 --

7           MR. GETTY:  And that's Saros.

8           THE COURT:  Yes, Saros.  That's right.  33 is the

9    memorandum of lease dated August 11th, 2010 between KFC and Ron

10   Saros, correct, Sheila?

11          THE CLERK:  That's correct.

12          MR. GETTY:  32 is the coal lease agreement?

13          THE CLERK:  Yes.

14          MR. GETTY:  No, that's in Saros' --

15          MS. HARLAN:  Oh, we have two copies.

16          MR. GETTY:  We ended up with, somehow, two copies

17   instead.  I think we didn't get one of these.

18          MR. LUCAS:  There's a memorandum of lease and there's

19   two of them that look very similar.

20          MR. GETTY:  Okay.  I got you.  Which one is which?

21          MR. LUCAS:  They have different dates on them.

22          MR. GETTY:  Well, which -- just give me the dates.

23          THE COURT:  Let's sort out -- let's sort out the

24   exhibits during a break.  And the courtroom deputy clerk will

25   assist you with that.  Right now we're looking at potentially

JAMES C. JUSTICE III - CROSS-EXAM          187

1    number 30.  The next number is 34.  And if it's going to become

2    an exhibit, it's already been tendered to the witness.  So go

3    ahead, Mr. Lucas.

4    BY MR. LUCAS:

5    Q.   And, Mr. Justice, have you had a chance to look at that,

6    sir?

7    A.   Yes, sir, I have.

8    Q.   And did you look at that paragraph 12 that I directed you

9    to?

10   A.   Yes, sir, I think this is the same language.

11   Q.   It has the exact same language that we just looked at that

12   was Exhibit 33, right?

13   A.   Yes, sir.  I think this is a form surface lease that

14   Kentucky Fuel used with all of its surface owners that it was

15   trying to get surface leases with.

16   Q.   Okay.  And this one, the other one was dated a few months

17   before the fourth amendment.  This one is dated about, what,

18   two months or so after, right?

19   A.   Yes, sir.

20   Q.   All right.

21        MR. LUCAS:  Your Honor, I would move the admission of

22   Exhibit 34 at this time.

23        THE COURT:  Objection, Mr. Getty?

24        MR. GETTY:  None.

25        THE COURT:  That will be admitted into evidence.

JAMES C. JUSTICE III - CROSS-EXAM                188

1          THE WITNESS:  Can I give you this?

2          THE COURT:  Yes.  Brian, let's get it --

3      Hang on just a second, Mr. Lucas, so the witness can

4  focus.  My mistake.

5      Thank you, Brian.

6      Go ahead with your question, Mr. Lucas.

7          MR. GETTY:  Mr. Justice, before this lawsuit was

8  filed, were any of the payments that were due to New London or

9  Fivemile under the fourth amendment, were any of those payments

10  made on time?

11  A.   I don't really know that answer.  I think they have all

12  been made.  They may have been made late, but I think they've

13  all been made.

14  Q.   Okay.  Do you know when the first ones were made?

15  A.   No, sir, I don't.

16  Q.   Let's just break them down.  First the minimum royalties.

17  10,000 a month, right?

18  A.   The initial term, yes.

19  Q.   Okay.  And for the first year, right, 10,000 a month, at

20  least until November of 2011?

21  A.   And then I think it went to 15 the last month.

22  Q.   And was a single one of those minimum royalties during the

23  first year paid on time?

24  A.   I told you earlier I don't know the exact date on the

25  payments.

JAMES C. JUSTICE III - CROSS-EXAM                189

1   Q.   I'm not asking you for exact dates.  Can you just tell us

2   as a general proposition, was a single one paid on time?

3   A.   I don't know.

4   Q.   Do you know how much of them have been paid at all?

5   A.   Now?

6   Q.   Yes, sir.  Do you know that now?

7   A.   I know that -- I'm a little hesitant because, you know,

8   it's -- I know it's important to you, you know, what columns

9   that the dollars are in and, you know, what dates and all that.

10  But I do know, as I said earlier, we paid Mr. Brownlow well in

11  excess of a million dollars specific to Fivemile and, you know,

12  we've sure not gotten anything out of it.

13  Q.   Let me ask just about the one that was due on December 1

14  of 2011, the first $75,000 payment.  How late was it paid?  Do

15  you have any idea?

16  A.   I just don't know.  I know they've all been paid.  I'm

17  not -- I'm not sitting here saying that they were all paid on

18  time.  They may have been a little late.  They've all been

19  paid.  I know as of the 2018 payment that was due on

20  December 1st, I know that was paid on time.

21  Q.   You mean of this year?

22  A.   Yes, sir, 2018 payment.

23  Q.   Okay.

24  A.   I know that was paid on time.  It's just been so long ago

25  I just don't know, you know, specific dates going back six or

1  seven years ago.

2  Q.  All right.  I'm sorry, I didn't mean to interrupt you.

3  Had you finished?

4  A.   Yes, sir, I'm done.

5  Q.  All right.  You responded to one of Mr. Getty's questions

6  and you said you stopped paying the minimum in late 2011.  Let

7  me stop with that much of it.  You say you stopped paying them

8  in late 2011.  Had you paid them all up until then?

9  A.  As I recall, their minimums were due monthly and then they

10 turned into annual minimums.  We got behind.  We caught them

11 up.  Maybe got behind, caught them up.  And then in late 2011,

12 we had a payment due December 1st, 2011, and I do not think we

13 made that payment on time, sir.

14 Q.  Okay.  And I'm sorry, but I've got -- I've got a question

15 on what you just said.  You said you got behind and you caught

16 them up and then you got behind and you caught them up.  Are

17 you talking about during 2011?

18           MR. GETTY:  Excuse me.

19           THE COURT:  Yes.  Do you have an objection?

20           MR. GETTY:  I have a suggestion.  Can we -- to

21 shorten this up, I think given what is in the record, either

22 with Mr. Brownlow or Mr. Justice's testimony, can we stipulate

23 that all mineral royalties have been paid and accepted by

24 Mr. Brownlow?  Because I believe that is the evidence.

25           THE COURT:  Mr. Lucas?

JAMES C. JUSTICE III - CROSS-EXAM                191

1        MR. LUCAS:  Your Honor, I am not going to stipulate

2   right now.  The evidence is what it is.  But I don't -- I don't

3   think this is -- is proper or appropriate.  This goes to the

4   declaratory judgment.

5        MR. GETTY:  We're wasting our time here with these

6   kind of questions when it's clear that Mr. Brownlow got the

7   check.  He may have gotten it late.  He took it.  He accepted

8   it.  He never sent it back, and as of the moment we sit here in

9   court today, all minimum royalties have been paid in full.

10       THE COURT:  The issue with respect to the declaratory

11  relief sought is one that I need to resolve.  I will in terms

12  of making a recommendation.  So the plaintiffs are allowed to

13  develop their theory with respect to that claim.

14       MR. LUCAS:  And, Your Honor, if I may add, there's

15  another aspect to it, too, that Mr. Justice says things that,

16  frankly, I didn't anticipate, but he says -- like we caught up

17  and we got behind and then we caught up and then we got behind

18  and we caught them up.  That's not the evidence.  But he's

19  constantly saying things like that and when he does, I have to

20  cross him on it.

21       MR. GETTY:  Well, we did get behind, and we did catch

22  them up because they're current as of right now.

23       THE COURT:  As I've said, Mr. Lucas gets some leeway

24  in terms of cross-examination because of the way discovery

25  proceeded in the case.

JAMES C. JUSTICE III - CROSS-EXAM          192

1    So, Mr. Lucas, ask your next question, sir.

2          MR. GETTY:  I understand your ruling.  I can see it.

3    I just was trying to shorten things up.

4          THE COURT:  I understand.  Go ahead, Mr. Lucas.

5    BY MR. LUCAS:

6    Q.   And my question was, when you said we got behind and we

7    caught them up and we got behind and we caught them up, were

8    you referring to 2011?

9    A.   I want to make sure we're straight here.  I think I said

10   we got behind and we caught up and we may have gotten behind

11   again and caught up.  Can we read what I said?

12   Q.   My only question is, were you referring to 2011?

13   A.   Yes, sir.

14   Q.   Okay.  When did you get behind and have them fully caught

15   up and fully paid in 2011?  When?

16   A.   I want to say -- I was referring to 2011 and then I was

17   referring to subsequent years after that as well.

18   Q.   But in 2011, when did you get caught up on them?

19   A.   We made a payment in -- I think, it was May that -- that

20   caught up a lot of the minimums, as well as a consulting fee

21   payment.  And then after that I think we got behind again.

22   Q.   When you say "caught them up," you didn't mean when you

23   made that payment in May that they were fully paid then; you

24   just meant by caught up that you were paying some of the past

25   dues, right?

JAMES C. JUSTICE III - CROSS-EXAM                    193

1    A.    Mr. Lucas, I don't know exactly if we paid through April

2    and it was due for May.  But conceptually we were -- we were

3    behind and we caught up the payments.  And in the future we got

4    behind again and we've caught them all up.  And I can tell you

5    that the payments that were due December 1st were made on time.

6    Q.    You understand, I'm sure, that there's no limitation in

7    here, there's no termination of the minimum royalties in this

8    contract, is there?  There's no time when that obligation

9    expires?

10   A.    I would rather you ask our attorney that.  I can't -- I

11   can't answer that.

12   Q.    You are not aware one way or the other?

13   A.    I'm not aware one way or the other, sir.

14   Q.    Okay.  Well, you said earlier on direct, you said you

15   stopped paying in late 2011.  And then, as you said, you have

16   been paying on them in recent years.  My question is, do you

17   believe in view of the fact you concluded what you concluded,

18   do you believe that any more minimum royalties are due?

19   A.    We have continued making the minimum royalties because we

20   have not received a default from Mr. Brownlow as it relates to

21   the diligent mining provision of the contract.  And we intend

22   to keep making them the minimum payments under the lease.

23   Q.    So you are representing to the Court then that you are

24   going to continue to make those minimum royalty payments on

25   December 1 of every year?

JAMES C. JUSTICE III - CROSS-EXAM          194

1      MR. GETTY:  If I can interpose, now that I'm counsel

2  in the case, we may actually seek -- we haven't fully discussed

3  but we may file a motion to pay the Court.

4      THE COURT:  A motion to -- all right.  Mr. Getty, the

5  witness needs to answer the questions.

6    Go ahead with your questioning, Mr. Lucas.

7  BY MR. LUCAS:

8  Q.   Okay.  Are you committing to the Court that you will pay

9  those minimum royalties payments on December 1 of every year to

10 Mr. Brownlow or New London?

11 A.   I'm a little confused about how long those payments should

12 last and given that there is no ability to mine the coal.  And

13 I don't think there ever will be, given the quality.  We would

14 most definitely surrender the property, surrender the permits

15 to Mr. Brownlow, do that immediately if he would so desire.

16 Q.   I take it in view of your confusion that you just

17 described, you are not prepared to make the commitment to the

18 Court that I just asked you about.

19 A.   I would -- I would like to reserve our right to deal with

20 that at a later date.

21 Q.   Okay.  You said you had -- you were prepared to tender the

22 permits and leases back to Mr. Brownlow.  Is there -- would you

23 share with me the provision of the contract that allows you to

24 do that and to terminate your minimum royalty obligations?

25 A.   I didn't cite a specific piece of the contract.  I just

JAMES C. JUSTICE III - CROSS-EXAM                195

1   said if Mr. Brownlow would like them back, we'll be more than

2   glad to give them back.

3   Q.   Let me ask you about the Strong Brothers lease payments.

4   Are you familiar with that obligation?

5   A.   There are several leases, but I don't know if I'm up to

6   speed on that 100 percent, no.

7   Q.   Are you familiar with the obligation in the fourth

8   amendment to pay Fivemile Energy for all of the Strong Brothers

9   lease payments within seven days of the demand for them?

10  A.   I think we're supposed to pay for -- Mr. Brownlow for

11  out-of-pocket expenses, maybe such as those lease payments,

12  within seven days.

13  Q.   Okay.  Are you aware of the specific provision on the --

14  on the -- on the Strong Brothers property for that?

15  A.   No, sir.

16  Q.   Okay.  Take a look at -- it's in the fourth amendment,

17  page 5 and 6, Article 9.  Tell me when you've read it.

18  A.   Okay.  I've read it.

19  Q.   All right.  Are you generally familiar with that

20  obligation, sir?

21  A.   Yes, sir, I read it.

22  Q.   All right.  Were you familiar with it before you read it

23  just now?

24  A.   You know, generally I was, yes.

25  Q.   All right.  Maybe this is a nonissue.  Let me ask you

JAMES C. JUSTICE III - CROSS-EXAM          196

1    this.  When the magistrate judge in this case entered his

2    initial report and recommendations on damages, he recommended

3    20,000 for that.  In your objections that you filed I'll

4    represent to you I think without contradiction that you did not

5    object to that particular recommendation.  Do you object to it

6    now so that's an issue and I need to question you about it or

7    is that one that you will concede and that we can move on?

8    A.   I think we'll stand by what we said previously.

9    Q.   What was that?

10   A.   You said we agreed previously, right?

11   Q.   Okay.  So you're not objecting then, just so we're all

12   clear, to that $20,000 liability?

13   A.   No, sir, I think we're okay with that.

14   Q.   Okay.  Do you have any plans to pay that at any time?

15   A.   Let me talk to our --

16            MR. GETTY:  Objection.  It's not a final ruling.

17            THE COURT:  No, it's not.  I think the question is

18   fair with respect to how I'm going to determine the damages in

19   the case.

20       Go ahead, Mr. Justice.  You can answer the question.  You

21   should not reveal anything that is attorney-client privileged.

22   And if you need help with that concept, we can get it for you,

23   Mr. Justice.

24   A.   Mr. Lucas, can we get back to you on that?

25   Q.   Certainly.

JAMES C. JUSTICE III - CROSS-EXAM          197

1   A.   Okay.

2   Q.   Now, I want to switch topics now to the retainer fees, and

3   you know they're 10,000 a month, correct?

4   A.   Yes, sir, I do.

5   Q.   And those fees, do you know any more about them than you

6   do on the minimum royalties, so when they were paid and how

7   many have been paid?

8   A.   I actually probably do know a little bit more on the

9   retainer fees.

10  Q.   Okay.  How much of them have been paid?

11  A.   We -- like the minimums, we got behind on the retainer

12  fees as well.  And we -- we received a letter from Mr. Brownlow

13  that indicated that he was not going to continue working since

14  he wasn't being paid.  Made a reference to Steve Ball that --

15       MR. LUCAS:  Your Honor, I'm sorry to interrupt, but

16  that's not at all responsive.

17       THE COURT:  Just a second.  Just a second.

18       MR. LUCAS:  My question was --

19       THE COURT:  I know.  The question was:  "How much of

20  them have been paid?"

21  Mr. Getty, I do want to hear from you.  What were you

22  about to say, sir?

23       MR. GETTY:  I think he's in the process of trying to

24  explain what exactly happened, you know, from the time up until

25  current, which he's entitled to do.

JAMES C. JUSTICE III - CROSS-EXAM                198

1    THE COURT:  The question, Mr. Justice, is how much of
2    them have been paid.  Can you answer the question for us,
3    please?
4    A.    I don't know exactly but I think probably 50 to 75
5    thousand dollars.
6    Q.    Okay.
7    A.    I would like to explain what I was going to explain, if
8    you'll allow me to.
9    Q.    I may ask you a question where you'll get an opportunity
10   to do that.
11   A.    Okay.
12   Q.    Would you look at Plaintiffs' Exhibit 12, please, sir?
13   A.    You've got too much information in these books.  Too hard
14   to turn the pages.  You said 12.  What?  12?
15   Q.    Yes, sir.
16   A.    Which 12.  This 12?  Okay.  All right.
17   Q.    Plaintiffs' 12.
18   A.    All right.  I've got it.
19   Q.    And that's been previously introduced.  That's a schedule
20   of the retainer fee amounts and the payments.  I'm not asking
21   you right now to agree to all the amounts are owed, but in
22   terms of the numbers shown on there and the one $50,000
23   payment, do you have any reason to agree with that figure, that
24   that $50,000 is the only payment of the retainer fees?
25   A.    Well, I previously said 50 to 75.  I know that we made a

JAMES C. JUSTICE III - CROSS-EXAM                199

1   $50,000 payment in May of '11.  I thought that we maybe had

2   made some payments during the negotiation of the fourth

3   amendment and -- or right there about the same time.  I don't

4   know if we did or not.  But that's -- but this range is 50 to

5   75 thousand.

6   Q.   All right.  And what were those retainer fees?  In lawyer

7   language, what was the consideration for them?

8   A.   Well, the consideration means -- let me back up and ask a

9   question.  Are you asking what services Mr. Brownlow provided

10  for those?

11  Q.   I'm asking you your knowledge in the contract of what was

12  the consideration for that $10,000 a month that you agreed to

13  in the fourth amendment.

14  A.   That Mr. Brownlow would work on -- what we were working on

15  at the time was the Appalachian Fuel's acquisition, as well as

16  any other projects that we asked him to work on, such as

17  leasing properties or so forth.

18  Q.   Okay.  Anything else?

19  A.   I don't know exactly what the fourth amendment says but

20  that was -- that was generally my understanding.

21  Q.   Take a look at it.  It's Exhibit 1a.

22  A.   What page is it on?

23  Q.   It's on page 6.  It's Article 9.  The heading of that is

24  Strong Brothers property.  It's the heading of the section.

25  A.   I mean, it mentions Strong Brothers but what -- I don't

JAMES C. JUSTICE III - CROSS-EXAM                 200

1   see anything else.

2   Q.    Do you have Article 9?

3   A.    I do.

4   Q.    Okay.  Take a look at it.  Let's look at it together.

5   A.    I've got it in the floor here.

6   Q.    Okay.  You want to pick it up?

7   A.    Sure.

8   Q.    It's up to you.

9   A.    Yeah.  All right.

10  Q.    You got it?

11  A.    I do.

12  Q.    All right.  Look at Article 9 there at the bottom of page

13  5.  Tell me when you have it.

14  A.    I've got it.

15  Q.    Okay.  At the end, after it talks about the Strong

16  Brothers, you see it says.  "Additionally, Kentucky Fuel has

17  requested that NLTM, from time to time, provide additional

18  services to Kentucky Fuel in connection with multiple

19  properties and assignments, including but not limited to the

20  Strong Brothers..."  Do you see that?

21  A.    I do.

22  Q.    And it says -- it refers to in the past.  "Kentucky Fuel

23  has requested."  Do you see that?

24  A.    At the time we did, yes.

25  Q.    Okay.  And then the next sentence recites the

JAMES C. JUSTICE III - CROSS-EXAM                201

1   consideration.  And see if you agree with me.  It's in two

2   parts.  It says, "In consideration," and the first one is "of

3   the previously performed services."  And then the second one is

4   "and the anticipated future services to be provided by NLTM,

5   Kentucky Fuel agrees to pay NLTM a monthly retainer in the

6   amount of $10,000" and so on.  Do you see that?

7   A.    I do.

8   Q.    So can we agree that the consideration for the $10,000 a

9   month retainer fees was, one, past services; two, anticipated

10  future services?

11  A.    Again, it appears like that you are trying to get

12  something for nothing.  Didn't do anything.  He sent us a

13  letter that said, I'm not going to do anything because I

14  haven't been paid.  That was in 2011.  Surely you can't

15  possibly expect to get paid for years and years and years when

16  you haven't done anything and then sued us.

17  Q.    Do you remember my question?

18  A.    I do.

19  Q.    Okay.  Before you told me that my client was trying to get

20  something for nothing.  My question was, can we agree that the

21  consideration to which Kentucky Fuel agreed, by the signature

22  of Stephen Ball on the fourth amendment -- yes, Stephen Ball,

23  that the consideration was, one, previously performed

24  services -- that's part of what he did to earn the 10,000 a

25  month -- and two, anticipated future services?  Can we agree

JAMES C. JUSTICE III - CROSS-EXAM                202

1    that's what the agreement says?

2    A.   We can.

3    Q.   All right.

4           THE COURT:  Are you moving to another topic,

5    Mr. Lucas?

6           MR. LUCAS:  Yes, Your Honor.

7           THE COURT:  We're going to take a 15-minute break.

8    Did you have something?

9           MR. LUCAS:  Wait.  I may have misunderstood.  Your

10   first question to me was what?

11          THE COURT:  Are you going to move to another topic

12   now?

13          MR. LUCAS:  Oh, I wasn't right this instant, but I

14   was taking that as a hint from the Court you wanted me to.

15          THE COURT:  No, no.  We're going to take a break.

16          MR. LUCAS:  I'm happy to take a break.

17          THE COURT:  Okay.  We will reconvene at 4:15.  Stand

18   in recess.

19         (A recess was taken from recess 3:58 to 4:14.)

20          THE COURT:  Back on the record, Mr. Lucas.

21          MR. LUCAS:  Your Honor.  I apologize.  I misheard.

22   From time to time my hearing is not always the best.  So

23   sometimes I may not hear you and ask for clarification.

24          THE COURT:  No worries.  It happens to me, too.  Go

25   ahead with your questioning.

JAMES C. JUSTICE III - CROSS-EXAM                203

1      MR. LUCAS:  Just to put it -- to remind myself in the

2  context, could I have the last question and answer read back?

3  Before you told me that my client was trying to get something

4  for nothing.

5      (The record was read as follows:

6      QUESTION:  "Before you told me that my client was trying

7  to get something for nothing.  My question was, can we agree

8  that the consideration to which Kentucky Fuel agreed, by the

9  signature of Stephen Ball, on the fourth amendment -- yes,

10  Stephen Ball, that the consideration was, one, previously

11  performed services -- that's part of what he did to earn the

12  10,000 a month -- and two, anticipated future services.  Can we

13  agree that's what the agreement says?"

14      ANSWER:  "We can.")

15  BY THE COURT:

16  Q.   All right.  And the -- the agreement -- direct your

17  attention, Mr. Justice, back to Article 9 of the fourth

18  amendment, it gives you a remedy, if you say Mr. Brownlow is

19  not performing.  It gives you a specified way that the parties

20  agreed on in this contract to terminate your obligation to pay

21  those retainer fees.  Can we agree on that?

22  A.   Yes, sir.

23  Q.   And can we also agree that Kentucky Fuel did not take

24  advantage of that termination provision and has never sent

25  Mr. Brownlow a written notice -- written 30-day notice,

JAMES C. JUSTICE III - CROSS-EXAM                   204

1   terminating the retainer fee obligation?

2   A.   Actually, Mr. Brownlow sent us a notice saying that he was

3   not working because he hadn't been paid.  So we took that as

4   his termination.

5   Q.   I'll ask you about that in a moment.  But just to clarify,

6   you took something that he wrote as his termination but you

7   never sent him a termination notice, correct?

8   A.   Yes, sir, that's correct.

9   Q.   Okay.  And the letter that you referred to, have you read

10  it?

11  A.   Yes, sir, I have.

12  Q.   When?

13  A.   I have read it probably three or four years ago and then

14  I've read it again, actually, in the last week or so.

15  Q.   Oh, good.  So you remember what it says then, right?

16  A.   Yes, sir, I do.

17  Q.   And do you recall when you described it just now a moment

18  ago, you were actually paraphrasing the letter, correct?

19  A.   I was.  I don't remember the exact word for word.

20  Q.   Right.  And just in an abundance of candor here, he didn't

21  say, I'm not going to work for you anymore, did he?

22  A.   Maybe -- maybe best just to let me read the exact what it

23  said, because I don't want to mix words.

24  Q.   Well --

25  A.   But basically in candor, he said, I haven't been paid and

I'm not going to work if I haven't been paid. And he made a reference to Steve Ball, said you wouldn't work for Kentucky Fuel if you hadn't been paid.

Q. Did he not say, you can't expect me to work when I'm not being paid?

A. I think that's --

Q. That's what he said, isn't it?

A. So that would mean that he's not going to work.

Q. Okay. I'm just asking if we can agree what he said was -- let me back up.

MR. GETTY: That's -- show him the document.

THE COURT: Let's get the question finished before the objection is asserted. And just hold off on your answer, Mr. Justice. Finish the question, Mr. Lucas.

MR. LUCAS: Now I have forgotten my last question.

THE COURT: I'm just asking if we can agree what he said was -- I'm sorry. Madam Court Reporter, can you read it back?

MR. LUCAS: I know what I was going to ask.

THE COURT: Well, here's the issue, Mr. Getty. The court reporter can't transcribe both you and Mr. Lucas when you talk over him, nor can I understand your statement. I'm happy to hear the objection, but I've got to go back to hear the question because I didn't hear it. Should we start over with a new question? Where are we?

JAMES C. JUSTICE III - CROSS-EXAM                206

1    MR. LUCAS:  I will start over with a new question.

2    THE COURT:  Okay.  Go ahead.

3  BY MR. LUCAS:

4  Q.    At the time you got that letter, in fact, Mr. Brownlow

5  hadn't been paid anything for his retainer fees, correct?

6  A.    That's correct.

7  Q.    And he wrote you a pretty strong letter, right?

8  A.    Very strong.

9  Q.    And he said, I'm not being paid and you can't expect a man

10  to work without being paid.  Isn't that what he said?

11  A.    Yes, sir.

12  Q.    Okay.  I told your lawyer I'd save time.  I want to ask

13  you some questions about going back to that motion that you

14  filed that we talked about earlier about the damages.  And I

15  want to make sure I understand your position.  As I understand

16  that motion, you are saying -- first of all, you have

17  contracted to GSI where they're going to mine the properties,

18  correct?

19  A.    We have.  And that was urged by Mr. Brownlow as well.

20  Q.    We're not arguing about that.  He -- and you are saying,

21  as I understand that motion, because the property is now going

22  to be mined by GSI, that the plaintiffs' only damages are the

23  time value of the lost money and therefore the plaintiffs'

24  damages should be limited to that.  Is that your position?

25  A.    Yes, sir, that's correct.

1  Q.   Okay.  And is that because you say that they will suffer

2  no actual damages, that the full amount of the damages is going

3  to be paid by royalties generated by GS -- the GSI mining?

4  A.   That's my position, yes, sir.

5  Q.   Okay.  And do you believe that to be true?

6  A.   I believe that there are a lot of people out there that

7  are competent miners.  I think we're a competent miner.  And I

8  think that if the coal can be mined, that the GSI group will --

9  will mine the coal.

10 Q.   I appreciate that, sir, but with utmost respect, that

11 wasn't my question.  My question was, in view of what you're

12 asking the Court, are you asking the Court not to award damages

13 because the full amount of the royalties will be paid by the

14 GSI mining?

15         MR. GETTY:  The pleading speaks for itself.  It says

16 what it says.  You denied the motion, but we have not gotten

17 yet, I assume we will, some opinion or some --

18         THE COURT:  Yeah, the basis will be further described

19 in the recommended disposition.  This is a fair follow-up to

20 the question that the witness previously answered.

21    Go ahead again with the question, Mr. Lucas.

22         MR. LUCAS:  May I ask you, please.

23         THE COURT:  Yes, that's fine.  Go ahead, Madam Court

24 Reporter.

25    (The record was read as follows:

JAMES C. JUSTICE III - CROSS-EXAM          208

1    QUESTION:  "My question was, in view of what you're

2  asking the Court, are you asking the Court not to award damages

3  because the full amount of the royalties will be paid by the

4  GSI mining?")

5  A.   I need to answer this in a descriptive form versus just a

6  yes or no.  Can I do that?

7  Q.   Can you try me with a yes or no and then add your

8  description?

9  A.   Yes.

10  Q.   Thank you.

11  A.   Okay.  And here -- here's my description.  I believe if --

12  if GSI -- if the coal is mineable, GSI will mine the coal.  I

13  think that GSI will likely not mine any more coal than would be

14  due under the minimum provision annually, meaning that if it's

15  a dollar a ton, I think he'll probably mine less than 75,000

16  tons.

17      Now, Mr. Brownlow could potentially take the position that

18  there could be more tons mined early on than the 75,000.  I

19  don't think that is accurate, but he could take that position.

20  So I really don't know how Mr. Brownlow is harmed at all

21  because he's got all of his minimums, GSI is mining the coal.

22  Everybody should be happy.  That's my answer.

23  Q.   All right.  So I'm -- as I hear your answer, as to whether

24  or not the GSI mining will ultimately result in the payment of

25  all of the royalties, it's maybe, maybe not.  Is that about

JAMES C. JUSTICE III - CROSS-EXAM                209

1    right?

2    A.   I don't know.   I've got to make a -- make a statement to

3    make the point here.   If there is three feet of coal where your

4    podium is, you can't assume there's three foot of coal in the

5    whole courtroom.   There's not data to support the three feet of

6    coal in the whole courtroom.   So -- and we know that the

7    permitted tonnage is somewhere between 50,000 tons and

8    650,000 tons -- or 675,000 tons, rather.   So I don't think

9    there's any way, any time, under any circumstances that anybody

10   will ever mine 16,900,000 tons.

11        What I think is more likely is there'll be limited mining,

12   that the minimums will be more than the mining, and that will

13   just go on for a long, long time.   I think that's what'll

14   happen.

15   Q.   Let me just ask you one thing on that.   You said the

16   permed tonnage.   Of all the Fivemile properties, only a portion

17   is actually covered by the existing permit, correct?

18   A.   Yes, sir, you're correct.

19   Q.   And that is what you meant by the permitted tonnage?

20   A.   Yes, sir.

21   Q.   And, in fact, industry practice is, if you have a larger

22   piece of property, like this, to get it permitted in different

23   increments, correct?

24   A.   Yes, sir.

25   Q.   And you keep all the property under lease and, in fact,

JAMES C. JUSTICE III - CROSS-EXAM                    210

1   that's what you were trying to sell to Williams, NewLead,

2   whomever, was all of the acreage with an understanding you got

3   a permit over a portion of it and then as you develop that,

4   you'd then expand that to other areas.  Is that the way it

5   generally works?

6   A.   That's right.  And I just -- just to clarify my answer, I

7   was trying to articulate that by saying that the Conway report

8   took the position that the coal height at your podium is three

9   foot high for an example, so the whole property has three foot

10  of coal.  That's just not how it works.  Maybe over at the door

11  there's six foot of coal and over at the Judge there's six

12  inches of coal.  That's just how it works.  So you -- so the

13  Conway report didn't quantify the tonnage that's really there.

14  And I think that the permitted tonnage is somewhere between 50

15  and 675.  And as you mine that coal, you probably will try to

16  go out and try and get another permit if economic conditions

17  would support that.

18  Q.   Are you aware that the reserve studies that were in the

19  NewLead documents that NewLead got from someone was that the

20  total reserves were in the 18 million ton range?

21  A.   No, sir, I'm not aware of how NewLead would get any

22  information.  But I would -- I would --

23  Q.   That's all I asked you, is if you were aware of that.

24        MR. LUCAS:  Your Honor, that's all I have of this

25  witness at this time.

JAMES C. JUSTICE III - REDIRECT EXAM                211

1      THE COURT:  Okay.  Fair enough.  Redirect, Mr. Getty?

2      MR. GETTY:  Yeah.

3                      REDIRECT EXAMINATION

4  BY MR. GETTY:

5  Q.   You were just asked about a reference to a study done for

6  NewLead?

7  A.   Yes, sir.

8  Q.   Let's find that in the book.  Do you recall that that was

9  an estimate of on-site, not proven or drilled?

10 A.   I was.  And I would also say that numbers that were given

11 to NewLead were given by Williams in an effort to NewLead -- or

12 for Williams to flip the property to NewLead.  So I don't

13 know -- I don't know and I can't comment on the accuracy or the

14 dependability of those numbers at all.  I would guess that

15 those numbers were incredibly inflated to facilitate

16 Williams --

17     MR. LUCAS:  Your Honor, I'm going to object to the

18 speculation.

19     THE COURT:  To your point, Mr. Getty, he did say, I'm

20 guessing.

21     MR. GETTY:  You can't speculate.

22 A.   Okay.  I do know this.  I do know those were in situ tons,

23 meaning that you took the three feet of coal at the podium, you

24 extrapolated that across all acres, which is just not how it's

25 done.  And there was no -- no workup done to see what was --

JAMES C. JUSTICE III - REDIRECT EXAM          212

1   what was proven, what was probable, what was mineable, what was

2   not.  And if that exercise had been done, I think that 16 or

3   18 million would probably be haircut by, you know, 50 percent

4   at the minimum and maybe 75 percent at the maximum.

5             MR. GETTY:  Your Honor, can you -- you referred to,

6   during your examination, to the NewLead letter that has a

7   report from Summit Engineering attached to it.

8             MR. LUCAS:  It's one of our exhibits.  I don't have

9   it at my fingertips.

10            MR. GETTY:  All right.  That's going to take me a

11  minute to locate it.  So I'll come back to it.

12  BY MR. GETTY:

13  Q.   But my point here is for purposes right now, you saw that

14  document briefly, did you not, in preparation for the trial?

15  A.   Well, the NewLead document I saw earlier was the contract

16  mining agreement with NewLead.

17  Q.   Okay.  I'm talking about the document that NewLead

18  presented from Summit Engineering.

19  A.   No, sir, I haven't looked at that today.

20  Q.   Okay.  I thought you had seen it earlier.  With respect to

21  the retainer, if you look at the chart that was previously

22  referred to -- it's the chart showing payments.  Let's look at

23  that.  And I looked at it a moment ago.  You made a payment to

24  Mr. Brownlow of $50,000 in May of 2011?

25  A.   That's correct.

JAMES C. JUSTICE III - REDIRECT EXAM          213

1   Q.   That caught you up?

2   A.   That's correct.

3   Q.   And you received a letter from Mr. Brownlow shortly

4   thereafter, did you not?

5   A.   We did.

6   Q.   I'm looking for their chart.  Looking for their chart.

7   A.   Rich, it's Exhibit 12.

8   Q.   The $620,000.

9   A.   It's Plaintiffs' Exhibit 12.

10  Q.   All right.  You had that presented to you and shortly

11  thereafter Mr. Brownlow wrote you a letter.  It was the letter

12  that Mr. Lucas talked to you about, but he didn't actually show

13  you the letter.

14          THE COURT:  Take your time.  Let's put the white

15  noise on for a moment, Sheila, until they get their document

16  together.

17          MR. GETTY:  Document -- what is it.  It's document

18  277.6, I think, in the record.

19          MS. HARLAN:  .16.

20          MR. GETTY:  .16 in the record.

21  BY MR. GETTY:

22  Q.   And I've got it here.  I'm going to read you.  He writes

23  to Mr. Ball --

24          MR. LUCAS:  May I look on it with you?

25  BY MR. GETTY:

1  Q.   -- and complains about not being --

2         THE COURT:  Can Mr. Lucas look over your shoulder,

3  Mr. Getty?

4         MR. GETTY:  Sure.

5  BY MR. GETTY:

6  Q.   He says, "I am confident that you would not work for

7  Kentucky Fuel if it did not pay you, so I am sure that you

8  understand that Kentucky Fuel cannot treat people this way and

9  then expect them to keep doing business with you."

10        What understanding did you have with respect to what

11  Mr. Brownlow said?

12  A.   My understanding of the whole situation is from the outset

13  we were behind paying him his consulting from December 2010.

14  We caught them up in May, which paid him through April.  By

15  that point in time all the work had been done.

16  Q.   Addington properties had been bought?

17  A.   Those had been bought, all the work had been done.

18  Q.   Was he doing anything for you?

19  A.   He was not.  So we stopped paying him.  Didn't pay him any

20  further.  And he wrote us a letter and said, you know, my

21  interpretation was, you know, you haven't paid me, I'm not

22  going to do any work.  We're done.

23  Q.   Did you take it -- after he wrote that letter, did you

24  take -- did you take it that he was saying he was done, he

25  wasn't going to work?

JAMES C. JUSTICE III - REDIRECT EXAM                215

1   A.    That's correct, yes, sir.

2   Q.    And as a result of not having any work for him to do and

3   then ultimately he writes you this letter shortly after not

4   having any work to do, what conclusion did you reach as to the

5   viability of his retainer payment?

6   A.    I thought it was over.  I mean, I thought -- I thought

7   he -- you know, we stopped paying him.  He said he wasn't going

8   to do any more work and I thought we were done.  You know --

9   Q.    The document, the fourth amendment itself, Mr. Lucas

10  actually read you the language.  I've got it right here.  But

11  it says --

12  A.    It's page 5.

13  Q.    Right.  5 and it follows over to 6.  It says, in

14  consideration of the previously performed services, and any

15  anticipated future services to be provided Kentucky Fuel agrees

16  to pay a monthly retainer in the amount of $10,000 paid in

17  arrears, beginning December 1, and on the first day of each

18  month thereafter and continuing until terminated by mutual

19  agreement of the parties.

20      It says, provided, however, either one shall directly

21  terminate payment upon providing 30 days' prior written notice,

22  and thereafter neither side shall have any further obligation

23  to provide services.

24      So it says for past services.  Did you pay him for the

25  past -- in consideration of the past services?

JAMES C. JUSTICE III - REDIRECT EXAM          216

1   A.   Yes, sir.

2   Q.   And it said also, in consideration for future services.

3   You understand that the concept in a contract must be supported

4   by adequate consideration?

5   A.   Yes.

6   Q.   And, in other words, a promise to do something and then do

7   something, right?

8   A.   That's correct.

9   Q.   And in terms of future services, did Mr. Brownlow ever

10  provide any future services after all the Addington work was

11  done and had been concluded and after you stopped paying him?

12  A.   No, he did not.

13  Q.   All right.  And from that day forward, did you believe you

14  had any obligation to pay him after the last payment?

15  A.   I did not.

16  Q.   Is that the reason you ceased paying him?

17  A.   That's correct.

18  Q.   And did there come a point where in 2012 he actually filed

19  a lawsuit against you?

20  A.   Yes, sir.

21  Q.   All right.  Did you feel like when the other party had

22  sued you, did you have any continuing obligation of any sort?

23  A.   I didn't think we had a continuing obligation past May of

24  2011.  The lawsuit was filed, I think, about a year later, so I

25  don't think we had any obligation during that -- that period as

JAMES C. JUSTICE III - REDIRECT EXAM          217

1   well.  And again, I mean, just seems like Mr. Brownlow is

2   trying to get something for nothing, because he didn't do any

3   work and he shouldn't be paid for not doing work.

4   Q.   Can you look at Exhibit 13q?  That's the Summit letter.

5   We located it?

6   A.   Is this defendants'?

7   Q.   Plaintiffs'?

8   A.   Plaintiffs'.

9   Q.   It's sent to a Dan Berkowitz, and the second paragraph, if

10  you would take a look there.

11  A.   Okay.  I've got it.

12  Q.   Okay.  There's reference to within the permit area, there

13  are 2 million 169 in-place tons of permitted coal is included.

14  There are approximately 16 million in-place tons, which are

15  currently under lease and which could be mined.  What do you

16  understand the phrase "in place"?

17  A.   In place tons are the acres times the height, and that's

18  in-place tons.

19  Q.   Just a simple calculation saying, we estimate or -- we

20  estimate the thickness of the seam as X and then you multiply

21  it by, what, the acreage?

22  A.   Well, there's 145 tons in an acre if it's one inch thick.

23  So, you know, that's how you calculate it.  You get into acres,

24  times 145, times the inches of coal.  Now that is nowhere

25  anywhere close to the amount of coal that you can actually

JAMES C. JUSTICE III - REDIRECT EXAM                218

1   recover from that mountain.

2   Q.    Okay.  Does it mean that there's been core drills to prove

3   the thickness of the seams?

4   A.    Like I said earlier, you know, to have a proven reserve,

5   it has to be drilled every 2,000 feet.  And this property is

6   not -- not even in the ballpark of proven.  There's some of the

7   reserves that were probable, which mean that, you know, there

8   could be coal there.  There could not be coal there.  But

9   there's no -- to actually quantify the tonnage here, you'd have

10  to do, you know, a significant amount of drilling.  And I

11  would -- I would guess that you'll find that the 16 million is

12  a mere fraction of that.

13  Q.    Did Summit do anything different than what had been done

14  by Mr. Conway?

15  A.    No.

16  Q.    Both just simply said, we believe on-site there may be

17  this many tons?

18  A.    Based on maybe a single core hole --

19  Q.    Right.

20  A.    -- you know.

21  Q.    And is that adequate within the industry --

22  A.    No.

23  Q.    -- according to your personal knowledge and understanding?

24  A.    No not at all.

25  Q.    Would anybody ever agree to mine coal without some viable

JAMES C. JUSTICE III - REDIRECT EXAM                219

1  proveable evidence of the extent to which coal is physically

2  present and mineable?

3  A.    No.  I mean, what's happened here is Williams has hired

4  Summit to give an opinion as high as possible so that Williams

5  could flip it to NewLead.  You know, NewLead probably didn't

6  know any better, and Williams didn't care.  He just -- he was

7  just trying to puff up the numbers to be able to inflate the

8  value.

9  Q.    Do they have any coal over in Piraeus, Greece?

10  A.    Not that I know of.

11  Q.    Okay.  So is there any reasonable basis to rely on the

12  figures in either Mr. Conway's report or in the Summit

13  Engineering report?

14  A.    No, sir, there's not.

15  Q.    They're nothing more than estimates, are they?

16  A.    They're very high-level estimates.

17  Q.    Unproven?

18  A.    Unproven.  You know, normally a study would take into

19  consideration quality, you know, the actual coal's thickness,

20  the environmental impact, can you get a permit, you know,

21  community impact, you know, can you blast over top of ten

22  houses, you know.  There's a lot of things that you would take

23  into consideration but none of that was weighted at all.

24  Q.    There was reference to a comment in your affidavit about

25  the meeting, and in a filing, about that you did not meet

1  directly with Mr. Brownlow --

2  A.   Yes, sir.

3  Q.   -- concerning the negotiations.  Would the statement have

4  been totally accurate if the words "face-to-face" had been

5  added, no face-to-face negotiations?

6  A.   Yes, sir.

7  Q.   Okay.  Did you have negotiations or participate in those

8  negotiations?

9  A.   Well, I didn't even talk with him on the phone.  I just

10 talked to our people, Steve Ball and Marc Merritt.  Marc

11 Merritt, Steve Ball then would talk to Brownlow.  Brownlow

12 would talk back to them.  They'd relay a message back.

13 Q.   A standard practice you've utilized with respect to other

14 Justice Company or Kentucky Fuel contractual arrangements?

15 A.   Yes, sir.

16 Q.   I've got a question here about the -- these leases that

17 were shown to you.  Mr. Lucas showed you several leases.  First

18 of all, the draft mining agreement that was presented to you

19 that was drafted for potential mining agreement with NewLead,

20 NewLead --

21           THE COURT:  Which exhibit number are you referring

22 to, Mr. Getty?

23           MR. GETTY:  What is this?  What I was given does not

24 have a number on it.

25           THE COURT:  I hoped you all would work that out

JAMES C. JUSTICE III - REDIRECT EXAM          221

1   during the recess.

2            THE WITNESS:  It's going to be in the 13 series.

3            MR. GETTY:  NewLead, Kentucky Fuel.  It's one of

4   their exhibits.

5            THE COURT:  Oh.

6            MR. GETTY:  Danielle will have it in just a second, I

7   hope.

8            MS. HARLAN:  16e.

9            MR. GETTY:  16e, Your Honor.

10           THE COURT:  Okay.  Thank you.

11  BY MR. GETTY:

12  Q.   Do you have that, Jay?

13  A.   I do.

14  Q.   All right.

15           MR. LUCAS:  Which number was it?  I'm sorry.

16           MR. GETTY:  16e.

17  BY MR. GETTY:

18  Q.   Flip over to the second page.  There's a reference there

19  to mineable coal.  What does that -- what does that say

20  about -- what could be mineable?

21  A.   You want me to read it?

22  Q.   Yeah.

23  A.   It says, "'Mineable coal' shall mean coal which, when

24  reached in the course of Kentucky Fuel's mining operation can

25  be removed economically and safely by prudent surface mine

JAMES C. JUSTICE III - REDIRECT EXAM          222

1  techniques.  KFC shall conduct the mining operations in a

2  proper, skillful, and workmanlike manner in order to secure the

3  greatest possible recovery of the mineable coal..."

4  Q.   Does that clause -- did you understand that clause to

5  articulate or mean that if you couldn't mine it economically,

6  you didn't have an obligation?

7  A.   Yes, sir.

8  Q.   Okay.  Let's take a look at some of these others.  Let's

9  start -- let's just take 32, 33, and 34.  You should have those

10 all up there.

11 A.   I've actually given them back.

12          THE COURT:  We'll get them back for you.  32, 33, and

13 34.

14     Roger, can you provide those to the witness, please?

15          THE WITNESS:  Thanks.

16 A.   Okay, Rich, I've got 32.

17 Q.   All right.  Let's take 32.  That's the North Fork Holdings

18 lease.  And this lease down below refers, in section 2.1, to

19 the transportation or removal of coal.  And over a couple of

20 pages there's a clause that your attention was directed to by

21 Mr. Lucas.

22 A.   I think it was on page 8.

23 Q.   Yeah.  It says the definition of mining and mineral --

24 merchantable, and it refers to that term being used in the

25 context of coal which, when reached in the normal mining

JAMES C. JUSTICE III - REDIRECT EXAM                223

1   process, could be mined at a profit.  And it goes on down and

2   says, such particular section shall be determined to be

3   unmineable and unmerchantable only after due consideration of

4   certain factors, right?

5   A.   Yes, sir.  I think you'll find this in any coal industry

6   release, or some variant of it.

7   Q.   And what is your understanding of whether you have a --

8   whether coal is mineable and merchantable if you mine it and

9   can't make a profit?

10  A.   You don't have any obligation.

11  Q.   And this lease makes it clear that only if you can mine it

12  at a profit are you obligated, right?

13  A.   But if you don't mine it, even in this lease you have to

14  pay them a minimum.

15  Q.   Right.

16  A.   And I would like to note, this lease here was actually on

17  the Strong Brothers property, which was adjacent to Fivemile.

18  Q.   Okay.  And would Mr. Brownlow have been aware of that

19  lease?

20          MR. LUCAS:  Objection, Your Honor.

21  A.   I would say likely so.

22          MR. GETTY:  Pardon me?

23  A.   I don't know for sure but I would think so.

24          THE COURT:  I'll sustain that objection.  Go ahead.

25  Q.   The next two, the Saros leases, they're service leases?

JAMES C. JUSTICE III - REDIRECT EXAM                224

1   A.   Yes, sir.

2   Q.   Okay.  And what does a service lease mean?

3   A.   Well, the mineral and the surface are typically severed in

4   their ownership and you may own the mineral and I may own the

5   surface.  So we both may have to give consent, and we both have

6   to lease to a mine operator.

7   Q.   Okay.  And this basically gives you the right to cross the

8   property?

9   A.   Cross the property, disturb the property.

10  Q.   All right.

11  A.   Because you have surface mine activity, you'll alter the

12  property in a big way.

13  Q.   Okay.  And this basically says that if you discover that

14  the coal does not exist on the property in sufficient

15  quantities to justify the mining thereof or in its judgment at

16  any time the mining of said coal shall be or become

17  unprofitable or if for any cause lessee shall conclude to

18  abandon the property, is hereby given the right to do so by

19  giving written notice.  In other words, if you can't mine the

20  property, coal from the property profitably, you have an out?

21  A.   Yes, sir.

22  Q.   Okay.  And then the same clause is identically almost in

23  the memorandum of lease dated August 11th, 2010, Exhibit 34, is

24  it not?

25  A.   That's correct.

JAMES C. JUSTICE III - REDIRECT EXAM          225

1   Q.   Okay.  And would it be your understanding, given your

2   personal knowledge, experience -- hands-on experience in mining

3   coal and dealing with mineral properties, that if it's

4   understood that the coal can't be mined at a profit, you have

5   no obligation to do so?

6           MR. LUCAS:  Your Honor, again, he's asking for an

7   expert -- expert opinion and for a legal opinion.

8           THE COURT:  Yes, though the last line of questioning

9   that you engaged in, Mr. Lucas, I think fairly -- and that line

10  specifically being what Mr. Justice believes will happen in the

11  future on this particular property, I think fairly opened the

12  door to these questions.

13      Go ahead, Mr. Getty.

14  BY MR. GETTY:

15  Q.   Do you remember the question?

16  A.   I do.  We have hundreds of leases and over the years we've

17  probably entered into thousands of leases.  All of the leases

18  have a provision that, through some language, gives us the

19  right to or gives any coal company the right to stop mining if

20  it's not economically, you know, viable because of the

21  cyclicality of the market.  And during those idle times you are

22  required to pay minimums.  Some of the leases have ability to

23  recoup minimums for many, many, many years and some have

24  ability to recoup minimums for a very short period of time.

25  Obviously the shorter the minimum recoupment, you know, is more

JAMES C. JUSTICE III - REDIRECT EXAM                226

1   punitive to the -- to us.  But that's just how it is.

2   Q.   And with respect to the lease, the fourth amendment that

3   you entered into with Mr. Brownlow, he insisted on a term that

4   after December 2013 there would be no recoupability?

5   A.   Mr. Brownlow insisted upon that solely because he knew the

6   coal couldn't be mined, wouldn't be mined, and he wanted an

7   ability to be able to pocket the $75,000 every year.

8   Q.   And what was the price you paid for not being obligated to

9   mine where economic conditions made it unprofitable?

10  A.   Well, we've -- we've paid since 2010.  You know, it's been

11  eight years.  And eight times $75,000.  I mean, it's a lot of

12  money.  It's $600,000.

13  Q.   Okay.  And the covenant to mine here says that you

14  covenant or promise -- covenant is another word for promise,

15  isn't it --

16  A.   Yes.

17  Q.   -- to use commercially and reasonable good faith and best

18  efforts to maximize within the constraints of industry

19  standards the amount of coal extracted from these real

20  properties.  What did that mean to you at the time this

21  document was entered into?

22  A.   Well, it basically says, to me, that we're promising to

23  use best efforts to commercial -- you know, based on commercial

24  reasonableness, meaning that, you know, if it costs, you know,

25  $80 a ton to mine the coal and you can only sell it for 30,

JAMES C. JUSTICE III - REDIRECT EXAM          227

1   that doesn't seem like it's very commercially reasonable.  And

2   if conditions were such, we would mine the coal.  And if -- if

3   they were not such, it was my -- certainly my understanding

4   that we'd pay a minimum and everybody would be pleased with

5   that.

6   Q.    And within the constraints of the industry standards, of

7   industry standards, what did you understand -- what did you

8   understand that to encompass?

9   A.    Well, the industry standards most definitely contemplate

10  mineability, merchantability, economic factors, you know, all

11  those things.

12  Q.    AND you believe that in your dealings subsequent to this

13  that Mr. Brownlow understood that concept meant mineability and

14  merchantability?

15  A.    Yes, sir.

16  Q.    Incidentally, since this thing was -- since this document

17  was executed, I guess in 2010, has he ever sent a check back or

18  refused a minimum?

19  A.    No, sir.  He's taken every penny we've paid him.

20          MR. GETTY:  That's all I have.  Thank you.

21          THE COURT:  Recross, Mr. Lucas?

22          MR. LUCAS:  Just a couple of various --

23          THE COURT:  That's fine.  I just would sort of give

24  you the same caution I did Mr. Getty, that recross is limited

25  to new matters raised on redirect, please.

JAMES C. JUSTICE III - REDIRECT EXAM          228

1          MR. GETTY:  And I'll honor that.  His redirect really

2   raised something that I hadn't gone into earlier, which was the

3   extent of the services that Mr. Brownlow provided after the

4   time he says he abandoned them.  I had intentionally not gone

5   into this with their witness, but in view of his attempt, I'm

6   forced to now.

7          THE COURT:  That's fine.  Ask your questions.  We'll

8   see how the -- how it goes.

9          MR. LUCAS:  All right.  Let me do this.  First, I

10  have found the letter that was on the screen and that I didn't

11  have when I was questioning you about it.  The letter that

12  Mr. Brownlow wrote.  So I will offer that into evidence.

13  You've heard people talking about it and reading it.

14         THE COURT:  Yes.

15         MR. LUCAS:  But I would like to make it an exhibit.

16         MR. GETTY:  We can make it a joint exhibit if you

17  want.  No, it's fine.  You can just add it.

18         THE COURT:  That will be Plaintiffs', thirty, what,

19  five -- six.

20         THE CLERK:  35

21         THE COURT:  35, I'm sorry.

22         MR. LUCAS:  May we have it handed up?

23         THE COURT:  Yes.  There was no objection.  Mr. Getty

24  read it earlier, right?  There's no objection --

25         MR. LUCAS:  Mr. Getty read one paragraph.

JAMES C. JUSTICE - RECROSS-EXAM                229

1      THE COURT:  Okay.  Roger, that goes -- that goes to

2  the witness, Roger.

3      MR. LUCAS:  If you're looking for it, it's an

4  exhibit -- it was an exhibit in Steve Ball's deposition, it's

5  277-16.

6      MR. GETTY:  Yeah, no, we've got it.

7      MR. LUCAS:  Okay.

8                    CROSS-EXAMINATION

9  BY MR. LUCAS:

10  Q.   Do you have that letter, Mr. Ball?

11  A.   You are calling me Mr. Ball.

12  Q.   I'm sorry.  I'm sorry.

13  A.   I've got the letter.

14  Q.   To whom do I apologize?

15  A.   It doesn't matter.  You just go with it.

16  Q.   All right.

17      MR. GETTY:  Probably Mr. Ball.

18  Q.   I'll put it this way.  Sir, do you have that letter?

19  A.   I do.

20  Q.   And that's the letter you were referring to where you said

21  you interpreted Mr. Brownlow as resigning?

22  A.   That's correct.

23  Q.   And the operative paragraph is the last paragraph on the

24  second -- it's the paragraph on the second page of that letter

25  that your counsel read into the record, correct?

JAMES C. JUSTICE - RECROSS-EXAM                    230

1    A.    That's correct.

2           MR. LUCAS:  Okay.  So this -- I'll offer that, Your

3    Honor, as the next exhibit.  I believe it's 35.

4           THE COURT:  Yes.

5       Any objection, Mr. Getty?

6           MR. GETTY:  No.

7           THE COURT:  That will be admitted as Plaintiffs' 35.

8    A.    And we -- Mr. Lucas, we did pay Mr. Brownlow through

9    April.  So he was paid in full.

10   Q.    Well, the next -- just to be clear, the next payment was

11   due on May 1 of -- when you say -- let me back up.  You said he

12   was paid in full in April?

13   A.    Paid through April.

14   Q.    Okay.  But that was 2011, right?

15   A.    That's right.

16   Q.    And this letter is dated 2012, correct?

17   A.    That's right.

18   Q.    All right.  And he had not been paid between the check

19   that he got in May of 2011, which was through April, he hadn't

20   been paid any of it between then and May 4, the date of this

21   letter of 2012, correct?

22   A.    That's correct.

23   Q.    Okay.  So basically he hadn't been paid for a year?

24   A.    He hadn't been paid for a year, but he hadn't done any

25   work past April of '11.

JAMES C. JUSTICE - RECROSS-EXAM                231

1   Q.   I'll ask you about that in a moment.  And because he --

2   because he hadn't been paid, that's -- if -- just taking it

3   away from you and Mr. Brownlow a minute.  If you had a man

4   working and hadn't been paid for a year, would you find it

5   unusual if he said, I'm sure that you understand that you can't

6   treat people this way and expect them to keep doing business

7   with you?  Would that be an understandable thing to say?

8   A.   Well, I want to clarify.

9   Q.   I'm asking you just generally.  I'll ask you about the

10  specifics.

11  A.   Yes.  And I will even help you out here, too.  My answer

12  is yes.

13  Q.   Okay.

14  A.   And there was definitely a miscommunication.  I felt like

15  that he had stopped working.  I felt like we had paid him

16  through April of '11.  I felt that the agreement was gone.

17  That may have been a misstep on my part -- or our part.  But I

18  would never expect Mr. Brownlow to continue working if he

19  hadn't been paid.  Now, do we get behind from time to time?

20  Sure.  But if somebody does work -- if Mr. Brownlow did do the

21  work, you know, I would expect to pay him.

22  Q.   I'm going to come back to that since you and counsel have

23  raised it, but let me ask you one other question first before I

24  do.  On the letter from Summit Engineering that we were looking

25  at, Exhibit 13a -- you are free to look at it if you want.  I'm

JAMES C. JUSTICE - RECROSS-EXAM                    232

1    just going to ask you a couple of general questions.

2    A.   Okay.  Just give me one second.  Okay.  I've got it.

3    Q.   Okay.  Without arguing about who is right and who's wrong,

4    is it fair just to say that this letter -- in this letter the

5    Summit Engineering disagrees with your analysis about the

6    potential for mining Fivemile in a profitable manner?

7    A.   Yes, sir.

8    Q.   And you disagree with them, but that's what they said?

9    A.   Absolutely.

10   Q.   And basically you are saying, as I gather your testimony,

11   and correct me if I'm wrong, and I don't want to say it in too

12   pejorative of a manner, but you are saying this.  Williams was

13   trying to inflate the figures and he and Summit Engineering

14   were basically trying to take advantage of NewLead and

15   basically run a scam on them?

16   A.   I want to clarify because it's important.  Several of

17   these engineering firms, and I don't want to say for a second

18   they're not all reputable firms.  But they're hired for a

19   service just like you are.  You know, you represent your client

20   and they represent, you know, their -- their mining clients or

21   whoever.  Their information can be swayed.  I think that

22   Mr. Williams probably asked Summit to provide the most

23   inflated, aggressive, favorable information they could, so that

24   he could flip the property to NewLead.  So I don't want to

25   accuse somebody of misrepresentation.  But I think that's --

1   that's the facts of what happened.

2   Q.   I'll use your words then.  You are saying basically that

3   Mr. Williams and Summit Engineering, in your words, inflated

4   the available information to send to NewLead?

5   A.   You are kind of phrasing it in almost a collusion-type

6   manner.  I wouldn't -- I wouldn't go that far, but I would say

7   that Mr. Williams had called Summit and said, hey, I've got

8   this deal going, here's the information I have.  I need it to

9   be as favorable as it possibly can be, and these Greek people

10  probably don't know much about what they're looking at, give me

11  the best report you can give me.  That's what I think happened.

12  Q.   Let me ask you about your testimony when counsel asked

13  you, did Mr. Brownlow ever provide any -- any more services to

14  you.  And you said, quote, no, he did not.  What was the after

15  date there?  When did he stop providing you services where you

16  say he did not do anything after that?

17  A.   Well, I'm probably going to preempt you here.  You know,

18  if Mr. Brownlow received a letter in the mail or an email after

19  this date, I don't know if that constitutes doing services, but

20  I think that all the major work was done by the -- by April of

21  '11.

22  Q.   By when?

23  A.   By April of '11.

24  Q.   April of '11?

25  A.   Yes, sir.

JAMES C. JUSTICE - RECROSS-EXAM                  234

1   Q.   All right.  Isn't it a fact that after that -- and you all

2   were trying to -- you all were still trying to work the Strong

3   Brothers property after that, right?

4   A.   I don't know exactly when we -- I don't -- let me back up.

5   I do probably know this.  I think we last mined on the Strong

6   property in probably 2006.  We had some reclamation that we did

7   after that, but we didn't mine any coal after 2006.

8   Q.   Were you doing reclamation on it after 2006?

9   A.   Yes, sir, we were.

10  Q.   Okay.  Through when?

11  A.   I don't really know.  I would -- I would probably guess

12  maybe 2010 maybe or so.  I just don't know.

13  Q.   Were you aware of all the efforts and the conversations

14  that Kentucky Fuel was making through Marc Merritt and others

15  to try to get the Combs or Strong Brothers -- I'll refer to

16  them as the Strong Brothers -- leases back in shape?

17  A.   I heard Mr. Brownlow's testimony.

18  Q.   Other than that, do you have any knowledge of what he was

19  doing at Mr. Merritt's request?

20  A.   I don't, really.

21  Q.   Okay.  So were you aware that -- that on the 9th day of

22  January in 2012, that Mr. Brownlow inquired of Mr. Merritt

23  about the Combs lease and that Mr. Merritt said that he would

24  try to quote, pry it loose -- were you aware of that -- to try

25  to keep the Strong Brothers lease paid current?

1   A.   I think that lease was in Mr. Brownlow's name, in Fivemile

2   Energy's name.  And looks like -- you know, Marc used pretty

3   descriptive language sometimes.  And probably what Marc -- what

4   I think Marc was saying there is he's going to try to get the

5   payment pried loose for Mr. Brownlow for those, those things.

6   So I don't -- you know, could there be an email here, could

7   there be a letter there, maybe so.  But there was really no

8   work going on past -- past when I told you.

9   Q.   Well, you say the lease was in Fivemile's name, but that

10  was for the benefit of Kentucky Fuel, correct?

11  A.   Yes, sir.

12  Q.   Because they had refused to deal with Kentucky Fuel?

13  A.   I know that's what Mr. Brownlow has testified.

14  Q.   Well, in fact, didn't you allude to that earlier in your

15  testimony when you were talking about Mr. Brownlow being a

16  stalking horse for Kentucky Fuel?

17  A.   That was in relation to the Addington, Appalachian Fuel

18  properties.

19  Q.   Was he also a stalking horse in connection with Strong

20  Brothers?

21  A.   I don't think he was a stalking horse.  We used him to

22  negotiate with those -- those folks there.

23  Q.   Because they wouldn't deal with you?

24  A.   I don't know if they wouldn't deal with us or not.  But

25  Mr. Brownlow knew the area pretty well, and we were just using

JAMES C. JUSTICE - RECROSS-EXAM                    236

1    him as a land agent.

2    Q.   Are you aware that he was trying to work with Marc Merritt

3    in order to get the Strong Brothers leases paid for Kentucky

4    Fuel's benefit so that it could continue to access the

5    property?

6    A.   Well, I thought, based on earlier testimony, that

7    Mr. Brownlow said that he had paid those leases himself and

8    that he was owed reimbursement from us.  So either way I guess

9    the bottom line is, Mr. Brownlow got the leases in some form or

10   fashion for us, and they had a specific term and in 2012

11   Mr. Brownlow was trying to get us to pay the lease payment.

12   Now, I don't think that constitutes a great deal of work,

13   calling and asking to have a lease payment paid, but

14   nevertheless.

15   Q.   Did he go out to see them?

16   A.   I don't know if he did.

17   Q.   Did Mr. Merritt ask him to go out to see them?

18   A.   I just don't know.

19   Q.   Have you ever heard that on -- for example, on January 9th

20   in a conversation Mr. Merritt asked him to go out and

21   Mr. Brownlow said, I'm only making one trip to see Strong

22   Brothers and that he couldn't go without the annual minimum

23   rental?  Are you aware of that, sir?

24   A.   I'm not.

25   Q.   Okay.  What is the Howell lease?  Are you familiar with

JAMES C. JUSTICE - RECROSS-EXAM                    237

1    the Howell lease?

2    A.   The name is a -- is a little familiar.  I just don't know.

3    Q.   It's a Fivemile lease, isn't it?

4    A.   It may be.  I just don't know.

5    Q.   And are you aware Mr. Merritt asked Mr. Brownlow to get --

6    get a Howell lease?

7    A.   I'm not.

8    Q.   And in February of that same year, 2012, did you ask

9    Mr. Ball to try to set up a meeting where Mr. Brownlow would

10   come to the Beaver office to meet with you?

11   A.   In what?  What year?

12   Q.   February of 2012.

13   A.   Yes. Mr. Lucas, I don't mean to minimize this, but --

14   Q.   There's not a question pending.

15          THE COURT:  There's not, Mr. Justice.

16          THE WITNESS:  Okay.

17          THE COURT:  Wait for the next question, please.

18   BY MR. LUCAS:

19   Q.   How many meetings, after, let's say -- let's just take the

20   beginning of 2012.  How many meetings did Mr. Brownlow have

21   with Kentucky Fuel representatives trying to assist them in the

22   various things that they were asking him to do?

23   A.   I don't know, but perhaps I can say this --

24   Q.   Now, that's my question.  If you don't know, just tell me.

25   A.   Okay.

JAMES C. JUSTICE - RECROSS-EXAM                    238

1   Q.   You don't know?

2   A.   I don't know.

3   Q.   Okay.  Let me ask you about even after the suit was filed

4   and shortly before and afterwards.  You said, well, one of the

5   things he was doing was just sometimes forwarding mail to you.

6   Have you looked at the communications when he did that?

7   A.   I have.

8   Q.   Okay.  And are those communications consistent -- the

9   communications from Mr. Brownlow, are they consistent or

10  inconsistent with your testimony that he had abandoned this

11  contract?

12  A.   Mr. Lucas, Mr. Brownlow is getting paid, according to the

13  contract, $10,000 a month.  Quite honestly, that's a pretty

14  good bit of money.  It's actually more money than I get paid.

15  Now, you can ask anybody you want to ask.  I work 7 days a

16  week, 15 hours a day, and you can ask anybody you want to ask.

17  I guarantee you that I'm working a heck of a lot harder for my

18  100,000 than Brownlow was for his 120,000.

19       Did Mr. Brownlow do something that -- that you can daisy

20  chain together that he wrote an email or he made a phone call

21  to try to keep this consulting thing alive?  Maybe he did.  But

22  it wasn't -- you know, we weren't getting $10,000 a month work

23  past April of 2011.  Maybe we were getting $100 a month of

24  work.  But $10,000 a month is a lot of money for what was going

25  on.

JAMES C. JUSTICE - RECROSS-EXAM                    239

1   Q.   Well, do you remember my question?

2   A.   I do.

3   Q.   And what's the answer to it?

4   A.   Well, it's better if you just -- if you restate, it

5   please.

6            THE COURT:  Well, let's have the court reporter read

7   it back, please.

8        (The record was read as follows:

9        QUESTION:  "And are those communications consistent -- the

10  communications from Mr. Brownlow, are they consistent or

11  inconsistent with your testimony that he had abandoned this

12  contract?")

13  A.   There are some emails and there are some mail being

14  forwarded.  I think of that as almost like if -- if tomorrow

15  Mr. Brownlow would fire you as his attorney and then you get a

16  letter three weeks later, you have an obligation just to

17  forward it on to the next guy.  That's what was going on.  So I

18  do think that he had abandoned his post, and I do think that

19  there was no work really that happened after April of 2011.

20  Q.   Well, you compared it to say if Mr. Brownlow fired me and

21  I kept trying to do work.  You didn't fire Mr. Brownlow, did

22  you?

23  A.   We did not write him a formal termination letter.  I agree

24  with that.

25  Q.   Okay.  And when you talked about how much he was getting

JAMES C. JUSTICE - RECROSS-EXAM                 240

1    compared to what you say he was doing, even if we disregard the

2    past services for which that was consideration and just looked

3    to the future services, when you negotiated the fourth

4    amendment, you had the option to pay him retainer fees based

5    upon, say, an hourly -- hourly rate, like lawyers charge,

6    correct?

7    A.   Not that I'm aware of.  I think we suggested -- and keep

8    in mind, Will was a friend.  Will had done some goods things

9    for us, and we were trying to do some good things for him.  We

10   were very unsuspecting that really what was happening was we

11   were getting boxed in to what we're here today for.  I was

12   happy for Will to get $10,000 a month when he was helping us do

13   this, helping us do that.  But $10,000 a month is a lot of

14   money to pay to forward two emails.  Now, did Will offer to

15   work by the hour?  I don't know if he did or not.

16   Q.   That wasn't quite my question.  But maybe it was my

17   question.  So let me retry.  In fact, you're the one in the

18   negotiations you started to say you suggested the 10,000 a

19   month flat fee, right?

20   A.   Yes, sir, I did.

21   Q.   And you could have suggested, instead of that, an hourly

22   rate, we'll pay you a $100 an hour or 200 or whatever?

23   A.   And that would have likely resulted in a lot less money

24   for Will.  And we were trying to be friendly and, you know,

25   cooperative and helpful for Will.  I mean, that's -- we were

JAMES C. JUSTICE - RECROSS-EXAM                    241

1    going over the top.

2    Q.   All right.  Would you look with me at Exhibit 11a?

3            THE COURT:  Defendants' Exhibit?  I'm sorry,

4    Plaintiffs' 11a?

5            MR. LUCAS:  Yes, sir.

6    A.   Okay.

7    Q.   And let me ask you this as a general matter.  If one of

8    your landowners isn't getting paid and may default you or

9    terminate the lease, or if they've tried to default you, that's

10   something you would want to know, right?

11   A.   It is.

12   Q.   Okay.  And so look at 11a.  And you'll see that's an email

13   from Mr. Brownlow to Marc Merritt, and he says that he's

14   forwarding an email from Nanny Turner, who is one of the

15   Fivemile landowners.  And she's not being paid, and he asks

16   what response can be provided to her.

17           MR. GETTY:  Your Honor, this is hearsay.  It's well

18   beyond what I went into.  And this is what I wanted to avoid.

19   And I objected to it at the outset if this was going to be a

20   character assassination bout where we have witnesses, you know,

21   emails from third parties that we don't have the author or

22   someone to authenticate it.

23           THE COURT:  It's already been admitted --

24           MR. GETTY:  Well --

25           THE COURT:  Oh, that's right.  We did -- I did hold

JAMES C. JUSTICE - RECROSS-EXAM                    242

1   that.  I'm sorry.

2           MR. LUCAS:  No, that one --

3           THE COURT:  Are you sure?

4           MR. LUCAS:  That one is admitted.

5           THE COURT:  Nine is the one that --

6           THE CLERK:  The 11 series -- I don't think any of the

7   11 series.

8           THE COURT:  Yeah, we're talking about 10 now.

9           MR. GETTY:  They're not in.

10          THE CLERK:  Oh, they're on 10 now.  I'm sorry.

11          MR. GETTY:  I'm objecting now.

12          THE COURT:  Hang on just a second.  Hang on.  4, 5,

13  9, and 35 is my list.  I think 10 has been admitted.

14          MR. LUCAS:  It was.  Initially, it wasn't because I

15  didn't offer it.  And then later on in the discussion, Your

16  Honor admitted all of that series.

17          THE COURT:  Oh, but now we're on 11a.  You're asking

18  about 11a.  It has another sticker on it that says Plaintiffs'

19  Exhibit 10.

20          MR. LUCAS:  That's a deposition.  Is there not an

21  exhibit sticker on it?

22          THE COURT:  I have 11a.

23          MR. GETTY:  It's 11a in the book.

24          MR. LUCAS:  Yeah, it should be 11a.

25          MR. GETTY:  I'm objecting to it because it's well

JAMES C. JUSTICE - RECROSS-EXAM                243

1   beyond the scope of my redirect.

2          THE COURT:  Hasn't the 11 series been admitted,

3   Sheila?

4          THE CLERK:  I don't have them marked that they have

5   been yet.

6          MR. LUCAS:  I think if we look at the transcript --

7   well, I'll offer them then.  But, I mean, he has said what

8   these are going to show, Your Honor.  I didn't go into this

9   with -- on my cross.  But he testified that Mr. Brownlow did

10  not provide any future services and these exhibits are all

11  relevant to that.  And my very specific recollection is that

12  after some discussion yesterday all of the 11 series was -- was

13  introduced.  Whether they got marked, I don't know.

14         MR. GETTY:  Your Honor, they're hearsay.  This is

15  what I brought up from the beginning.  They are not in.  And,

16  you know, this needs to be -- this needs to be put to a stop

17  because --

18         THE COURT:  Let's -- yes.

19         MR. GETTY:  And --

20         MR. LUCAS:  But --

21         THE COURT:  Hang on.

22         MR. GETTY:  I'm sorry.

23         THE COURT:  Hand on.  We can't talk over each other.

24  I'll just kind of note that it's late in the day and this is --

25  when everyone has been working hard and wants to rush to get

JAMES C. JUSTICE - RECROSS-EXAM          244

1  wrapped up, this is most -- when mistake are most often made.

2  And we're not going to do that.

3      Mr. Lucas.

4          MR. LUCAS:  And you are right, mistakes may get made,

5  and I may have just made one.  Mr. Haskins has given me his

6  notes, and you said that 1 through 281 were admitted except for

7  10, 11 and 15.  You likely were referring to the whole 11

8  series, so I stand corrected.

9          THE COURT:  Okay.  So it has not been admitted.

10         MR. GETTY:  It's not admitted, and I object to it.

11         THE COURT:  Okay.  And the specific question that

12 results in the objection, Mr. Lucas, is.

13         MR. LUCAS:  He's objecting.  I'm sorry.  The question

14 was -- I don't remember the last question.  But it was about

15 the response -- he asked for a response.  What response can be

16 provided to Ms. Nanny Turner and the others, and he never got

17 that response.  And what this series of exhibits --

18         THE COURT:  Well, your questioning about

19 Mr. Brownlow's statement.

20         MR. GETTY:  Exactly.

21         THE COURT:  Are you questioning about Mr. Brownlow's

22 statement in the email, because that's not hearsay.

23         MR. LUCAS:  No, no.  It's to show that Mr. Brownlow

24 communicated this to him.  That's the purpose that it's

25 offered.

JAMES C. JUSTICE - RECROSS-EXAM                  245

1          THE COURT:  Yes.  Let me hear the question again.

2          MR. GETTY:  Yeah.  We probably ought to have the

3  question read back.

4          THE COURT:  I'm not sure you got it out the first

5  time, but let's -- let's try it.

6          MR. GETTY:  Why don't you just rephrase it?

7          THE COURT:  Let's try, if he wants it read back.  No,

8  no, if he wants it read back, he can have it read back.

9      (The record was read as follows:

10     QUESTION:  "And so look at 11a.  And you'll see that's an

11  email from Mr. Brownlow to Marc Merritt, and he says that he's

12  forwarding an email from Nanny Turner, who is one of the

13  Fivemile landowners.  And she's not being paid, and he asks

14  what response can be provided to her."

15         THE COURT:  But that's not -- that's not hearsay.

16  You can answer the question, Mr. Justice.

17  A.   Mr. Lucas, if you'll remember back, I testified that

18  Mr. Brownlow had brought Lloyd Williams to us sometime prior to

19  signing the fourth amendment in late 2010.  The Loyal Williams

20  saga continued from 2011 and into 2012 and ultimately, you

21  know, many, many years after that even.  There was a point in

22  time that we handed the ball, if you will, off to Williams to

23  keep maintaining the leases and so forth.

24     There was probably a ball dropped here and there, a lot of

25  leases, a lot of different landowners, a lot of different

1    heirs, a lot of block and tackle work on the ground that had to

2    be done.  A lot of these landowners had dealt with Will,

3    Mr. Brownlow, in the past, and I'm sure if they couldn't get

4    any satisfaction out of Lloyd Williams, which they have said in

5    this email, that their next point of contact would be call

6    Mr. Brownlow.

7        Again, I'm not running from the fact that Will may have

8    got a phone call or email from time to time.  I have a tough

9    time, you know, that that validates, you know, a hard month of

10   work and, you know, we should -- we should keep paying him

11   based on an email or two.

12   Q.   Okay.  That's not my question.  First of all, the leases

13   with the landowners were not with Mr. Williams.  They were

14   leases with Kentucky Fuel, correct?

15   A.   Yes, sir.  That's correct.

16   Q.   All right.  And so when Mr. Brownlow would hear from a

17   landowner claiming that they hadn't been paid, he would, quite

18   properly, forward those on to Mr. Merritt or Mr. Ball, right?

19   A.   I assume so.

20   Q.   And that's what he did, as evidenced by Exhibit 11a,

21   correct?

22   A.   Yes, sir.

23   Q.   Okay.  And he asks what response can be provided to

24   Ms. Nanny Turner and the others, right?

25   A.   And he did not get a response, right?

JAMES C. JUSTICE - RECROSS-EXAM                    247

1    Q.   You tell me.  Did he get a response?

2    A.   I thought you said he didn't get a response.

3    Q.   I'm asking you.  Did he get a response?

4    A.   I don't really know.

5    Q.   All right.  Look, if you would, at Exhibit 11b.

6              MR. GETTY:  I'm going to have the same objection.

7              THE COURT:  Well, let's hear the question first,

8    Mr. Getty.

9              MR. GETTY:  All right.

10   BY MR. LUCAS:

11   Q.   Okay.  Do you recognize that as an email sent from

12   Mr. Brownlow to Mr. Merritt on May 15, 2012?

13   A.   Yes, sir, I do.

14   Q.   And he was sending him a notice of default that he had

15   received on the Strong Brothers permits and noted that it

16   hadn't been paid since 2011.  Do you see that?

17   A.   I do.

18   Q.   And he had previously actually written Kentucky Fuel about

19   paying that Strong Brothers payment, had he not?

20   A.   Yeah.  I guess I'm a little confused.  You know, I thought

21   Mr. Brownlow had testified earlier that he was making those

22   payments to keep the leases current and we had to forward him

23   the money but -- but that's nor here nor there.  But I see this

24   email.

25   Q.   Okay.

JAMES C. JUSTICE - RECROSS-EXAM                248

1    THE COURT:  I'll overrule the objection.  It's not
2    hearsay.  The statements, 11b, those are not hearsay.
3    BY MR. LUCAS:
4    Q.   And no one paid.  After getting this, no -- when
5    Mr. Merritt asked for a copy of the notice, no one then paid
6    the Strong Brothers, did they?
7    A.   I don't think there was a need to continue the lease with
8    Strong Brothers because the site was reclaimed and all the coal
9    we're going to mine was done, so I don't know if they were paid
10   or they weren't paid.
11   Q.   You say there was a need to keep the lease.  What was the
12   term of the lease?
13   A.   I don't know.
14   Q.   Did Kentucky Fuel take action to terminate or they just
15   stop paying?
16   A.   Most of the time these leases have -- like the surface
17   leases have a -- you know, a three-year term, a five-year term
18   or whatever.  And so, you know --
19   Q.   I'm asking you what you did on this lease.
20   A.   I just don't know.
21   Q.   Isn't it a fact that you just stopped paying?  You didn't
22   terminate it.  The term hadn't expired.  You just stopped
23   paying?
24   A.   Well, I told you I just don't know.
25   THE COURT:  It its 5:30, Mr. Lucas.  If you complete

JAMES C. JUSTICE - RECROSS-EXAM                    249

1   your direct, how long do you think it'll take?

2           MR. LUCAS:  Your Honor, I've got a bunch of these.

3   Like I said, I hadn't planned to go into them.

4           THE COURT:  Right.

5           MR. LUCAS:  But when he claims he didn't do anything,

6   I can't just show one or two, because he says, well maybe he

7   did it sporadically.  I've got, at this rate, probably at least

8   another half-hour.

9           THE COURT:  Okay.  We're going to reconvene tomorrow

10  morning at 9:00, Mr. Lucas.  Is that satisfactory?

11          MR. LUCAS:  Yes, sir.

12          THE COURT:  Okay.  Mr. Getty, tomorrow morning at

13  9:00 a.m.

14          MR. GETTY:  That's fine.

15          THE COURT:  Okay.  I have a hard stop tomorrow at

16  1:00 to prepare for the hearings I have tomorrow afternoon.

17  I'm available Friday morning to pick things up if we're not

18  done.  We haven't talked about that.  I don't have any idea

19  about your all's availability.  Just keep it in mind, but

20  tomorrow I have a hard stop at 1:00 p.m.

21          MR. LUCAS:  Your Honor, and before we break, I would

22  like to move for the admission of 11a and 11b.

23          THE COURT:  Mr. Getty?

24          MR. GETTY:  I think at this point they're prejudicial

25  in terms of -- actually prejudicial.  They're solely for the

250

1   purpose of trying to show criticism of my client even when my

2   client had no further obligation to do anything.

3              THE COURT:  Okay.  To the extent that's an objection

4   based on Rule of Evidence 403, any prejudice would have to be

5   unfair, which means evidence tending to suggest a decision on

6   an improper basis.  These are not reflective of such a

7   decisional basis.  Therefore they're probative of the issues

8   now that have been put into play.  And even if they were

9   prejudicial, they would outweigh substantially the probative

10  value.  And I'll deny that objection.  They'll be admitted.

11  They're clearly not hearsay.

12             MR. GETTY:  Your Honor, we'll be able to -- I'll look

13  at them more carefully and we may be able to stipulate that,

14  okay, from time to time he sent an email, you know, but

15  Mr. Justice's point is sending a email doesn't justify ten

16  grand a month.

17             THE COURT:  Okay.  Yes, sir, Mr. Lucas.

18             MR. LUCAS:  I'm sorry.  I didn't mean to interrupt,

19  Your Honor.

20             THE COURT:  No, go ahead.

21             MR. LUCAS:  I have a suggestion for everybody

22  to consider that may save time.  Preserving Mr. Getty's

23  objection if he wants to for hearsay, understanding Your

24  Honor's ruling, I think we would have the same discussion with

25  every one of these.  I've got 11a through v, as in Victor.

1          My suggestion would be, we may be able to avoid almost, if

2    not all, of any further examination of Mr. Justice on this

3    simply by admitting the documents.  They're in the record.

4    They're going to speak for themselves.  And he can preserve his

5    objection, assuming the Court's ruling would be the same, and

6    that may save us a great deal of time

7               THE COURT:  Yeah.  By preserving, you mean he could

8    still take that up with Judge Van Tatenhove?

9               MR. LUCAS:  Yes, Your Honor.

10              MR. GETTY:  That sounds like something that might be

11   possible.  I'll look at it tonight.

12              THE COURT:  Yes.  I'll look forward to hearing from

13   you, Mr. Getty, first thing in the morning on that.

14          And so, Mr. Justice, you need to return for possible

15   continued testimony tomorrow morning at 9:00.

16              MR. GETTY:  Your Honor?

17              THE COURT:  Yes.

18              MR. GETTY:  When you said you had a hard stop at

19   1:00, does that mean you're not available the rest of the

20   afternoon or some period?

21              THE COURT:  Well, I have -- I have hearings at 2:00

22   and 2:30 that are typically short, but can't -- I can't always

23   predict that.  I have a sealed hearing at 3:00 that if it goes

24   forward will -- will not be short.  So I cannot plan on being

25   available tomorrow after 1:00.

252

1          MR. GETTY:  Okay.  Sounds like we're probably coming

2   back to finish up Friday.

3          THE COURT:  Maybe.  I don't know if everyone is

4   available.  I can do it Friday morning.  On Friday I have

5   another hard stop at probably 12:30 because of other criminal

6   proceedings that can't be moved.

7          MR. GETTY:  The only problem I have with that on the

8   break I made a appointment to -- to have my back attended

9   Friday afternoon.

10          THE COURT:  Okay.  In Lexington?

11          MR. GETTY:  Yes.

12          THE COURT:  What time?

13          MR. GETTY:  4:00.

14          THE COURT:  It's an hour ten minutes drive, and I can

15   tell you that because --

16          MR. GETTY:  I got as far as back as I could.

17          THE COURT:  It's an hour ten minutes drive.  I can

18   tell you that because I've done it hundreds of times.  If I

19   have a hard stop on Friday at 12:30, you'll be there on time.

20          MR. GETTY:  All right.

21          THE COURT:  Mr. Lucas, anything further, sir?

22          MR. LUCAS:  No, Your Honor.

23          THE COURT:  Mr. Getty?

24          MR. GETTY:  No, Your Honor.

25          THE COURT:  We'll reconvene tomorrow morning at 9:00

253

1   a.m. with Mr. Justice in the witness chair.  We'll stand

2   adjourned.

3            (Proceedings concluded 5:31 p.m.)

4                          - - -

5

6                    C E R T I F I C A T E

7       I, S. Diane Farrell, RDR, CRR, do hereby certify that the

8   foregoing is a correct transcript from the record of

9   proceedings in the above-entitled case.

10

11  /s/S. Diane Farrell                    January 9, 2018
    S. Diane Farrell, RDR, CRR            Date of Certification

12

13

14                      I N D E X

15

16  JAMES C. JUSTICE III                          PAGE

17  Direct Examination by Mr. Getty                 4
    Cross-Examination by Mr. Lucas                 93
18  Redirect by Mr. Getty                         211
    Recross-Examination by Mr. Lucas              229
19

20                      I N D E X

21  EXHIBITS                        IDENTIFIED   ADMITTED

22  Plaintiffs Exhibit 11a              240         250
    Plaintiffs Exhibit 11b              247         250
23  Plaintiffs' Exhibit 29              105         105
    Plaintiffs' Exhibit 30              137         137
24  Plaintiffs' Exhibit 31              152         153
    Plaintiffs' Exhibit 32              179         179
25  Plaintiffs' Exhibit 33              182         182
    Plaintiffs' Exhibit 34              186         187

254

```
1    Plaintiffs' Exhibit 35                    228      230

2    Defendants' Exhibit 2                       9       -
     Defendants' Exhibit 4                       9       -
3    Defendants' Exhibit 5                       9       -
     Defendants' Exhibit 8                       4       -
4    Defendants' Exhibit 9                      25       -
     Defendants' Exhibit 11                     75       -
5    Defendants' Exhibit 22g                    68       -
     Defendants' Exhibit 46                     75       -
6    Defendants' Exhibit 47                     75       -
     Defendants' Exhibit 52                     61       -
7    Defendants' Exhibit 53                     69       -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```