1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF KENTUCKY
2          SOUTHERN DIVISION AT LONDON

3                    - - -
NEW LONDON TOBACCO          :
4  MARKET, INC.,            : Civil No. 6:12-CV-91
   FIVEMILE ENERGY, LLC,    :
5                           :
            Plaintiffs,     :
6                           :
   -vs-                     :
7                           : Thursday, December 13, 2018
   KENTUCKY FUEL CORPORATION, : London, Kentucky
8  JAMES C. JUSTICE COMPANIES, : 8:59 a.m.
   INC.,                    :
9                           : Evidentiary Hearing Day 3
            Defendants.     :
10                   - - -
        TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
11         BEFORE THE HONORABLE HANLY A. INGRAM
              UNITED STATES MAGISTRATE JUDGE
12                   - - -

13  APPEARANCES:

14  For the Plaintiffs:        JOHN A. LUCAS, ESQ.
                               Howard & Howard, P.C.
15                             4820 Old Kingston Pike
                               Kingston, Tennessee 37919
16
                               SCOTT MARLOW WEBSTER, ESQ.
17                             Tooms, Dunaway & Webster
                               1306 West Fifth Street, Suite 200
18                             London, Kentucky  40743-0905

19  For the Defendants:        DANIELLE HARLAN, ESQ.
                               RICHARD A. GETTY, ESQ.
20                             The Getty Law Group, PLLC
                               250 West Main Street
21                             1900 Lexington Financial Center
                               Lexington, Kentucky  40507
22
    Court Reporter:            S. DIANE FARRELL, RDR, CRR
23                             Official Court Reporter
                               310 South Main Street, Suite 317
24                             London, Kentucky  40741

25      Proceedings recorded by mechanical shorthand,
    transcript produced by computer-aided transcription.

2

1        (In open court.)

2            THE COURT:  Okay.  Thank you.  Good morning,

3    everyone.  We're back on the record in case 12-CV-91, New

4    London Tobacco Market, Inc. et al, versus Kentucky Fuel

5    Corporation, et al, for the continued evidentiary hearing.  I

6    see that counsel and client -- well, we have some change.  I

7    see that counsel are present.  I don't see the younger

8    Mr. Brownlow today, Mr. Lucas.  But I see the other

9    Mr. Brownlow is here as your party representative, correct?

10           MR. LUCAS:  Yes, Your Honor.

11           THE COURT:  Okay.  Thank you.

12           MR. GETTY:  There's another gentleman in the

13   courtroom, but I inquired of Mr. Lucas.  He's not a witness.

14           THE COURT:  Okay.  Fair enough.  We left off

15   yesterday near the conclusion or the anticipated conclusion of

16   Mr. Justice's redirect examination.  There was a matter

17   discussed at the end concerning the potential global admission

18   of some -- of plaintiffs' exhibits.

19        Mr. Getty, you look like you've got something on your

20   mind.

21           MR. GETTY:  We resolved that.  We're just going to --

22   I want to preserve my objection to them.  I don't think they're

23   relevant, and, you know, for the purpose of simply, you know,

24   statements from the third parties complaining about lease

25   payments being late, et cetera, et, cetera, but, you know,

3

1   we'll stipulate they can go in.  In addition --

2          THE COURT:  And those -- where did we leave off?  Is

3   it the 11 series of plaintiffs' exhibits?

4          MR. GETTY:  Yes.

5          MR. LUCAS:  Your Honor, it's 10, Plaintiffs' Exhibits

6   10, 11, and 11c through 11v, Charlie through Victor.  11a and b

7   are already in.

8          THE COURT:  Okay.

9          MR. GETTY:  I don't recall discussing anything other

10  than 11.  What's 10?

11         MR. LUCAS:  10 is just the summary of the Brownlow

12  contacts with them.  It's just a summary exhibit.

13         MR. GETTY:  That's fine.

14         THE COURT:  Okay.  So those exhibits that Mr. Lucas

15  just identified will be admitted as unobjected to, although you

16  have the right to object to their relevancy and any objection

17  to my recommendations, Mr. Getty.

18         MR. GETTY:  I understand, Your Honor.

19         THE COURT:  Okay.

20         MR. GETTY:  There are a couple of other things, if I

21  may.  We also discussed additional -- additional witnesses.

22  And after Mr. Justice, which I assume at this point is

23  finished, we're going to call Steve Ball.  And we -- we believe

24  that much of what Mr. Sarber would testify as to the coal

25  quality, the inability to sell it, Mr. Justice has addressed,

4

1   and Mr. Ball can also address.  So we're going to let him go

2   sell coal instead of being here.  And we also understand from

3   Mr. Lucas this morning that he will not call Mr. Patton or

4   Mr. Schmid.  They will not be appearing.

5       I wanted very much to cross-examine Mr. Patton because,

6   you know, I believe he would admit that, you know, coal has to

7   be mineable and merchantable.  Frankly, I think his report

8   speaks for itself.  I would object to the entry of his report

9   or the use of his report, since he did not appear here.  So

10  you'll have to resolve that, I guess, one way or another.

11          THE COURT:  It hasn't been raised yet.  It hasn't

12  been entered as an exhibit yet, has it, Mr. Lucas?

13          MR. LUCAS:  No, Your Honor, it has not.

14          THE COURT:  I didn't think so.  Go ahead, Mr. Getty.

15          MR. GETTY:  Then we may not have an issue there.

16          THE COURT:  Well, we'll find out.

17          MR. GETTY:  And the last issue I want to raise now

18  rather than later, they intend, I was informed this morning, to

19  call Mrs. Combs, who is a lessor.

20          THE COURT:  Uh-huh.

21          MR. GETTY:  The royalties with respect to that would

22  be due and owing to Mrs. Combs, Mr. Justice indicated that we

23  have no objection to that $20,000.  There's no issue any longer

24  with that.  We're obligated to reimburse that to Mr. Brownlow.

25  We know Mr. Brownlow paid it.  And, you know, we see no purpose

5

1  in Ms. Combs coming here simply to effectively criticize our

2  client for being late or not paying royalties.

3      She has -- the key issue here is what does this fourth

4  amendment involve, the interpretation of it, does it encompass

5  mineable and merchantable.  You know, do we have an obligation

6  to sell coal we can't profit from?  She can offer no testimony

7  on that.  She's obviously not -- has no expertise in that, to

8  my knowledge.  And all that testimony is going to be is to sort

9  of create prejudice against my client.  So I would object to

10  the use of Ms. Combs.

11      It's my expectation, and Mr. Lucas indicated, that the

12  only possible rebuttal he may have would be some short rebuttal

13  for Mr. Brownlow.  I spent a considerable amount of time and so

14  did Danielle -- she spent more time than me, frankly, in paring

15  down Mr. Ball's testimony.  And I think I can get through

16  Mr. Ball's testimony on cross, he can be offered for

17  cross-examination, and we can be done, except for any short

18  rebuttal by Mr. Brownlow.  So I anticipate there's a good

19  chance, if we don't -- you know, if we exclude Ms. Combs, that

20  we'll be done by 1:00.

21      THE COURT:  Okay.  We'll see how things unfold.  So

22  am I understanding correctly, Mr. Getty, after Mr. Justice

23  completes his testimony, your only anticipated witness is

24  Mr. Ball?

25      MR. GETTY:  That's correct.

JAMES C. JUSTICE - EXAM BY THE COURT                    6

1      THE COURT:  Okay.

2      MR. GETTY:  That's correct, Your Honor.

3      THE COURT:  Okay.  Mr. Lucas, any comment in response

4  to what I have heard from Mr. Getty this morning?

5      MR. LUCAS:  I'm not going to address the Mrs. Combs

6  issue until she gets called.  Based upon counsel's stipulation,

7  I have no further questions of Mr. Justice.

8                        EXAMINATION

9      THE COURT:  Okay.  I have a few questions for

10  Mr. Justice.

11                EXAMINATION BY THE COURT

12      THE COURT:  Okay.  Sir, would you remind me again.

13  You are the president and CEO of Kentucky Fuel Corporation,

14  correct?

15      THE WITNESS:  Yes, sir.

16      THE COURT:  And what is your position with Jay

17  Justice Companies, Inc.?

18      THE WITNESS:  The same position.

19      THE COURT:  Okay.  How long have you been president

20  and CEO of KFC?

21      THE WITNESS:  Probably since January of '17.

22      THE COURT:  And who had that role before that?

23      THE WITNESS:  My father.

24      THE COURT:  All right.  And how long was he in that

25  role?

JAMES C. JUSTICE - EXAM BY THE COURT                    7

1    THE WITNESS:  From inception of both companies, and I
2    think KFC was probably started in '02 or '3, maybe '4, and
3    James C. Justice about 2001.
4         THE COURT:  Okay.  While your father was president
5    and CEO of Kentucky Fuel Corporation, what was your position?
6         THE WITNESS:  Probably not in the first three or four
7    years, but at this point, in the last -- certainly during the
8    2010 through 2017, I was the executive vice president.
9         THE COURT:  Okay.  And did you have that same role
10   with Kentucky -- excuse me, James C. Justice Companies, Inc.?
11        THE WITNESS:  Yes, sir.
12        THE COURT:  Okay.  Did you have any other official
13   position or role with either of those corporations?
14        THE WITNESS:  No, sir.
15        THE COURT:  And was that the position you were in at
16   the time this lawsuit was filed until you became president and
17   CEO?
18        THE WITNESS:  Yes, sir.
19        THE COURT:  Can you describe for me what your duties
20   and responsibilities were as the executive vice president of
21   those entities?
22        THE WITNESS:  My primary time that I spent with
23   Kentucky Fuel was actually running the mining operations.  I
24   was the direct report above the, you know, superintendent or
25   engineering level people.  So I was out in the field most all

JAMES C. JUSTICE - EXAM BY THE COURT                8

1   the time going from operation to operation.  James C. Justice

2   Companies is just basically a holding company, so there's no

3   real, you know, day-to-day type activities.  But that's --

4   that's what I did in Kentucky Fuel.

5           THE COURT:  Did your responsibilities as the

6   executive vice president extend to oversight and management of

7   the corporation's legal affairs?

8           THE WITNESS:  No, sir, it did not.

9           THE COURT:  Did you have any role in how Kentucky

10  Fuel Corporation or James C. Justice Companies responded to

11  legal complaints?

12          THE WITNESS:  I would -- I think I would be remiss if

13  I said I didn't have any involvement, but, you know, we have or

14  have had and continue to have general counsel that kind of

15  takes care of those things.  And there was a gentleman

16  mentioned at one point, Tom Lusk.  He was our chief operating

17  officer and he -- Tom was basically in the office and, you

18  know, Tom dealt with, you know, kind of office-related type

19  things more than I did.  Tom retired in, I guess, two thousand

20  maybe nine, and he was gone from us.  And then he worked

21  probably another stint maybe in 2014, '15, you know, for a year

22  or so.

23          THE COURT:  And since you've been the president and

24  CEO, since January 2017, so almost two full years, what

25  responsibility or duties do you have with respect to litigation

JAMES C. JUSTICE - EXAM BY THE COURT                    9

1   involving KFC or James C. Justice Companies?

2          THE WITNESS:  Well, just by necessity I've probably

3   been a lot more involved than I would like to be, but, you

4   know, I'm certainly involved in this case and what has been

5   going on.  Just from a day-to-day matter, you know, KFC and

6   James C. Justice Companies have limited operations ongoing.

7   Most all the Kentucky Fuel Corporation operations were shut

8   down in Kentucky in probably 2013, '14, because of the market.

9   We are in the process of trying to get some of those operations

10  back online now.  But there hasn't been a lot of day-to-day for

11  a number of years.

12         THE COURT:  All right.  Since you became president

13  and CEO in January 2017, can you estimate for me how many

14  lawsuits KFC is involved in, state and federal?

15         THE WITNESS:  I certainly don't want to give you a

16  wrong number.  You know, there seem to always be, you know --

17  something, you know, that's at play, you know, but I would say,

18  you know, there -- there are a couple, you know, maybe -- maybe

19  four or five.  I just don't know exact numbers.

20         THE COURT:  Okay.  You think Mr. Ball would have

21  better information on that?

22         THE WITNESS:  He should, yes.

23         THE COURT:  So you think since January of 2017, KFC

24  and James C. Justice have been involved in four or five filed

25  lawsuits in state and federal court?

JAMES C. JUSTICE - EXAM BY THE COURT          10

1     THE WITNESS:  Well, is your question --

2     THE COURT:  My question is --

3     THE WITNESS:  -- ongoing?

4     THE COURT:  My question is, you've been the president

5  and CEO for nearly two years, correct?

6     THE WITNESS:  That's right.

7     THE COURT:  You're responsible for all those

8  corporations' operations and affairs; is that correct?

9     THE WITNESS:  That's right.

10     THE COURT:  Do you report to anyone in connection

11  with those responsibilities?

12     THE WITNESS:  I don't.

13     THE COURT:  Do you have a board of directors?

14     THE WITNESS:  We do.

15     THE COURT:  Okay.  How many members are there on the

16  board of directors?

17     THE WITNESS:  Currently there are two.

18     THE COURT:  And does your obligation to report to the

19  board of directors include responsibility for the corporation's

20  legal affairs?

21     THE WITNESS:  Yes.

22     THE COURT:  So my question is, since January of 2017,

23  can you estimate for me how many lawsuits filed in state and

24  federal court Kentucky Fuel Corporation and James C. Justice

25  Companies have been involved in?

JAMES C. JUSTICE - EXAM BY THE COURT          11

1          THE WITNESS:  Newly filed during that time?

2          THE COURT:  Pending at any point during those two

3    years.

4          THE WITNESS:  Judge, there are -- there are

5    cases that were filed probably when we had to close these

6    operations in, you know, '13, '14, '15, you know, that are

7    really remnants from that that are still ongoing.  I'm really

8    not aware of any -- you know, I wouldn't say there's not -- I'm

9    not aware of any recently filed additional cases.  But we do

10   have ongoing matters from those, you know, '13, '14, '15 type

11   years.

12         THE COURT:  And when we add those to newly filed

13   lawsuits in the last two years, can you estimate the number?

14   I'm just looking for an estimate, don't need an exact figure.

15   Can you estimate the number of lawsuits Kentucky Fuel

16   Corporation and James C. Justice Companies, Inc. have been

17   involved in?

18         THE WITNESS:  I would say five would be a good

19   estimate, five -- you know, they're probably pretty

20   duplicative.  You know, if Kentucky Fuel Corporation gets

21   named, James C. Justice probably gets named, vice-versa.  So we

22   probably have five ongoing, would be a guess.

23         THE COURT:  In the last four or five years, you think

24   there have been a total of five lawsuits?

25         THE WITNESS:  Yes.

JAMES C. JUSTICE - EXAM BY THE COURT          12

1          THE COURT:  How many of those are in federal court?

2          THE WITNESS:  I don't know that.  Mr. Ball could

3    answer these a little better than I could.

4          THE COURT:  I imagine that's true.  Do you regularly

5    get reports from Mr. Ball about the statuses of the cases?

6          THE WITNESS:  I do.

7          THE COURT:  Has Kentucky Fuel -- other than in this

8    case, has Kentucky Fuel Corporation ever been sanctioned by any

9    courts for any conduct relating to any litigation that you are

10   aware of?

11         THE WITNESS:  Not that I'm aware of.

12         THE COURT:  Okay.  Other than in this case, has James

13   C. Justice Companies, Inc. ever been sanctioned for any conduct

14   that you are aware of related to a lawsuit?

15         THE WITNESS:  Not that I'm aware of.

16         THE COURT:  Okay.  Do you think Mr. Ball would have

17   better information about that?

18         THE WITNESS:  He would.  He would.

19         THE COURT:  Would you expect if there were a sanction

20   imposed on either one of those companies by a court, that that

21   would be reported to you?

22         THE WITNESS:  If it's been, you know, in the last

23   two -- say, two years or so.

24         THE COURT:  Who would it have been reported to before

25   that period of time?

JAMES C. JUSTICE III - FURTHER DIRECT EXAM         13

1    THE WITNESS:  Probably Tom Lusk at some point and
2    maybe my father at some point.
3    THE COURT:  Have you heard anything at all other than
4    in this case -- I don't want you to reveal anything that is
5    attorney-client privileged.  I don't want the substance of any
6    conversation, but in your entire time with these companies,
7    other than in this case in this court, have you ever heard of
8    those companies being sanctioned by a court?
9    THE WITNESS:  I don't think so but, you know, I
10   wouldn't stake my life on it.  But I just don't think so.
11   THE COURT:  Okay.  Counsel certainly can ask
12   follow-up questions to mine.  Mr. Lucas, do you have any, sir?
13   MR. LUCAS:  No, Your Honor.
14   THE COURT:  Okay.  Mr. Getty, follow-up questions?
15   MR. GETTY:  Just one.
16                FURTHER DIRECT EXAMINATION
17   BY MR. GETTY:
18   Q.   Jay, you are aware that there may be cases where the
19   companies would be named but they're turned over to insurance,
20   you know, like insurance carriers and companies really have no
21   involvement, some insurance lawyer comes and takes care of it?
22   A.   I am.  What I'm speaking of about the five is cases that
23   we're working on on an ongoing basis.  Now, if the insurance
24   company is working them, you know, workers' comp claim or
25   something of that nature, that wouldn't be included in my

STEPHEN W. BALL - DIRECT EXAM                    14

1  number.

2  Q.   That's why I raised that.   Because we get slide cases that

3  get turned over to carriers.   You know you --

4           THE COURT:   Okay.   Questions only.   I'll hear from

5  Mr. Ball.   Maybe he has better information.

6           MR. GETTY:   All right.

7           THE COURT:   All right.   Mr. Justice, you can step

8  down.   Of course you can return to counsel table.   Thank you

9  for your testimony.

10      Your next witness, please, Mr. Getty.

11           MR. GETTY:   Steve Ball, please.

12           THE COURT:   Okay.   Sir would you approach to be

13  sworn?

14                    STEVE W. BALL - SWORN

15           THE COURT:   Go ahead, please, Mr. Getty.

16           MR. GETTY:   Thank you.

17                    DIRECT EXAMINATION

18  BY MR. GETTY:

19  Q.   Steve, state your full name and address for the record,

20  please.

21  A.   Stephen William Ball, Roanoke, Virginia.

22  Q.   And what is your position with respect to the Justice

23  Companies, Kentucky Fuel?

24  A.   Vice president and general counsel.

25  Q.   And can you give me just sort of a snapshot of your

STEPHEN W. BALL - DIRECT EXAM                    15

1   educational background, undergraduate, law school?

2   A.   In 1997 I received a bachelor's degree in finance from

3   Marshall University, and in 2001 I received a law degree from

4   West Virginia University.

5   Q.   Okay.  And post graduation from law school, what has been

6   your employment history, just in a summary?

7   A.   In 2001, I started as assistant CFO and general counsel

8   for Bluestone Industries, Inc., remained in that role through

9   2009.  Starting in 2009, I was vice president of operations and

10  general counsel for James C. Justice Companies and affiliates.

11  I remained in that role through 2015.  From 2015 to the end of

12  '17 I was general counsel for Greenbrier Hotel Corporation, and

13  since that time I've been vice president and general counsel

14  for James C. Justice and Kentucky Fuel Corporation.

15  Q.   What offices do you hold currently?

16  A.   Currently, the only office I hold is vice president.  At

17  various times I have also held the office as secretary.

18  Q.   Okay.  And you are currently general counsel?

19  A.   Yes.

20  Q.   I noticed in some of the earlier correspondence there was

21  a Roger Hunter as general counsel.  During some of the events

22  involved here was Roger Hunter the general counsel?

23  A.   Yes.  From 2011 through late 2014, he was general counsel.

24  Q.   Okay.  Is he still with the company?

25  A.   He is not.

STEPHEN W. BALL - DIRECT EXAM                    16

1    Q.    Okay.   Where is he now?

2    A.    He currently works at Bowles Rice in Charleston, West

3    Virginia.

4    Q.    In private practice?

5    A.    Yes.

6    Q.    Okay.   Can you give me just a general description of your

7    current duties?

8    A.    Today I manage the legal affairs of the company and I also

9    oversee some of the office functions, similar to what

10   Mr. Justice had mentioned a minute ago that Mr. Lusk used to

11   do.   I coordinate with people in the office on various affairs,

12   financing and things like that.

13   Q.    You heard Mr. Justice's testimony regarding the number of

14   major suits pending?

15   A.    Yes.

16   Q.    Is that consistent with yours?

17   A.    That's -- I can't recall all of them off the top of my

18   head, but that is definitely in the range of what I think is

19   pending against Kentucky Fuel and James C. Justice Companies.

20   Q.    Okay.   Would that include a mudslide or a blasting case

21   that has been turned over to insurance carriers, insurance

22   counsel?

23   A.    In that instance, I think it would.   It would not include

24   things like workers' comp or black lung.   Many times those do

25   not even make their way to our office.   They go straight to the

STEPHEN W. BALL - DIRECT EXAM            17

1    insurance carrier, especially in a black lung claim.  So I

2    can't give you a good number.  I do know that Kentucky Fuel has

3    black lung claims out there, but we do not keep track of those.

4    Q.   I mean, I'm aware of some cases involving --

5            THE COURT:  Yes.  Mr. Getty, the witness needs to

6    testify, please.  Questions only.

7    BY MR. GETTY:

8    Q.   Are you aware of one or two cases that have come in

9    recently involving land disputes that have been turned over to

10   insurance?

11   A.   Yes.  I mean, one instance of that is a landowner's

12   complaining of methane leaking from an underground mine.  They

13   have named Kentucky Fuel and Consol of Kentucky in that suit.

14   And we have turned that in to our insurance, and the insurance

15   has retained counsel.  And at that point we'll obviously

16   cooperate with assigned counsel, but the insurance company, for

17   all practical purposes, will manage that litigation.

18   Q.   So Kentucky Fuel's name may be on the deed as a defendant

19   or Justice Company might be listed as a defendant, but it's

20   been turned over to counsel --

21   A.   Yes.

22   Q.   -- insurance counsel?

23   A.   Yes.

24   Q.   All right.  Are you familiar with what has been referred

25   to in these proceedings as the NewLead transaction?

STEPHEN W. BALL - DIRECT EXAM                18

1   A.   Generally.  I typically think of that as the Williams

2   transaction, if we're talking about the same thing.  But yes, I

3   was involved from start to finish in that.

4   Q.   And I apologize to you, because I -- when we came here to

5   do this evidentiary hearing, I kept pronouncing it NewLead.

6   And I may still do that, so correct me if I do.  When did

7   Mr. Williams appear on the scene?

8   A.   It was in the fall of 2010.  I was contacted by a

9   gentleman whose name is Chuck Neihous.  I think he was based

10  out of Ohio somewhere.  Chuck had received my name from

11  Mr. Brownlow, and he called me and told me that he represents

12  Lloyd Williams and Lloyd Williams had interest in our Andy

13  tipple.

14  Q.   Who did you come to understand had directed Mr. Williams

15  or Mr. Neihous to Kentucky Fuel?

16  A.   Mr. Brownlow.

17  Q.   Okay.  And did there come a time where actually there was

18  a meeting that took place and which Mr. Brownlow attended?

19  A.   I can't recall if Mr. Brownlow attended, but there

20  definitely was a meeting set up in Beckley where Mr. Neihous

21  and Mr. Williams were there and Marc Merritt and I were there.

22  And Mr. Brownlow was definitely instrumental in setting up the

23  meeting, but I just -- I can't recall if he was there or not.

24  Q.   Okay.  It's your testimony that Mr. Brownlow was one of

25  the, if not the moving force getting this going at the outset?

STEPHEN W. BALL - DIRECT EXAM                19

1   A.   Yes.

2   Q.   And what properties or equipment were -- were these

3   people, Mr. Williams and Mr. Neihous interested in when you had

4   the meeting?

5   A.   When they reached out to me, they were interested in the

6   Strong Brothers permit and the Andy tipple.  They had already

7   discussed the Fivemile property and the Deep Wood property with

8   Mr. Brownlow.  At first they -- they didn't realize that we

9   also had involvement and control with the Deep Wood and

10  Fivemile, and so it changed a little bit over time.  It was

11  somewhat fluid.  But they had initially reached out to us about

12  the Andy tipple and Strong Brothers.

13  Q.   Okay.  And where was Mr. Williams getting any financing

14  for this transaction?

15  A.   Initially, it was not disclosed to us.  It was just

16  Mr. Neihous advising me that he was working not only on the

17  transactional side but also on the financing side.  And other

18  than verbal assurances that he thought financing was available,

19  I'm not aware of who his financing was in the beginning.

20  Q.   Okay.  In time, how did this relate to the timing of the

21  November of 2010 fourth amendment that is at issue here?

22  A.   The initial meetings were roughly 60 days before the

23  fourth amendment to the assignment of leases.  They -- "they"

24  being Mr. Williams and Mr. Neihous -- actually made a proposal

25  to us.  But it did not involve any -- any money attachment.

STEPHEN W. BALL - DIRECT EXAM                    20

1   They just wanted to pay overrides and lease payments and things

2   of that nature, and so we rejected that and then we moved

3   forward with the fourth amendment with Mr. Brownlow.

4   Q.   So in the meantime, did that fourth amendment arrangement

5   close?

6   A.   It did.

7   Q.   Okay.  And as the negotiations moved forth, did

8   Mr. Neihous continue to appear on behalf of Mr. Williams?

9   A.   He did for a while.  Beginning in the early part of 2011,

10  he reached out to us again and assured me that he thought that

11  financing was imminent once again and wanted to restart

12  conversations.  This time he wanted them to be a little broader

13  to specifically include Fivemile and Deep Wood now that he had

14  a better understanding of the relationship between Kentucky

15  Fuel and New London.

16  Q.   That was Mr. Neihous or Mr. Williams?

17  A.   It was.  I talked to both of them.

18  Q.   Okay.

19  A.   But generally speaking, the Williams -- the Williams

20  company and Mr. Neihous through multiple conversations that was

21  taking place in early 2011.

22  Q.   Did Mr. Neihous continue or did he disappear from the

23  scene?

24  A.   At some point he disappeared from the scene, and shortly

25  thereafter Douglas Groth with Cypress Camon appeared as what he

STEPHEN W. BALL - DIRECT EXAM                21

1   represented to be a partner of Mr. Williams.

2   Q.   Who was Douglas Groth?  What did he do?

3   A.   I forget the exact name of the -- Cypress Camon wasn't his

4   day job, for lack of a better description.  He had a day job as

5   a -- he worked in the financial industry.  But in this

6   instance, he was the owner or managing partner of Cypress

7   Camon, and he was providing the funding for Williams

8   Industries.

9   Q.   All right.  And did there reach a point where there was a

10  proposed agreement signed?

11  A.   Yes.

12  Q.   When did that take place?

13  A.   The first proposed agreement was in the spring of 2011.

14  It was never able to be consummated.  First agreement to be

15  finally consummated occurred in May of 2011.

16  Q.   And would it be accurate to say that you were involved in

17  the first negotiations through the execution of the final or

18  sixth amendment?

19  A.   Yes.

20  Q.   Okay.  Let me show you the asset purchase agreement.  If

21  you look in the defendants' exhibit book, which should be up

22  there --

23          THE COURT:  It needs to be provided to the witness,

24  please.  Which number are you focused on?

25          MR. GETTY:  Exhibit 17, Your Honor.

STEPHEN W. BALL - DIRECT EXAM                    22

1          THE COURT:  Defendants' exhibit book?

2          MR. GETTY:  Yes.

3    BY MR. GETTY:

4    Q.    That is the asset purchase agreement dated May 10, 2012.

5    Can you identify that as the first document actually executed?

6    A.    Yes.

7    Q.    And who are the parties to the agreement?

8    A.    Williams Industries, LLC, as the buyer, and Kentucky Fuel

9    Corporation as the seller.

10   Q.    If you would look over at page 6 of the document under

11   purchase and sale of assets, tell the Court what assets were

12   deemed sold by Kentucky Fuel to Mr. Williams and his company?

13   A.    There are several categories.  The first one is the owned

14   real properties related to the Andy tipple, including any

15   improvements located thereon.  The next category is the leased

16   property related to the Strong Brothers permit.  The third

17   category is the leased real property related to the Fivemile

18   permit.  The next category is all of seller's owned equipment

19   referenced on the schedule.  And then the next category is

20   the -- any and all permits, approvals, orders, authorizations,

21   consents, licenses, certificates.  There's a long list of

22   things related to the sell permits.

23   Q.    Yeah, such as any inventory stockpiles, intellectual

24   property, things of that sort?

25   A.    Correct.

STEPHEN W. BALL - DIRECT EXAM                    23

1   Q.   Can you just identify the major assets being transmitted

2   or proposed to be transmitted?

3   A.   Yes.

4   Q.   The Andy tipple, can you tell me something about the

5   history of the Andy tipple, when you bought it, what you did

6   with it?

7   A.   The Andy tipple was originally owned by Lexington Coal

8   Company.   It was available for sale, I think, as part of an

9   auction process.   We acquired in approximately 2005.   And after

10  that time we undertook refurbishing and updating to be able to

11  use it with our operations in the area.

12  Q.   How much did you invest in that property in terms of

13  acquisition and upgrading?

14  A.   I would defer to Mr. Justice's testimony on that.   I don't

15  know the number specifically.

16  Q.   He testified it was probably in the range of 4 1/2,

17  5 million.

18  A.   That's my understanding, yes.

19  Q.   Okay.   This refers to the Strong Brothers property.   Did

20  that continue to be part of the arrangement or was that

21  removed?

22  A.   It was later removed.

23  Q.   Okay.   And if you look at Article 3, does that address the

24  purchase price and the closing?   That's on page 10, starts on

25  page 10.

STEPHEN W. BALL - DIRECT EXAM                    24

1   A.   It does, yes.

2   Q.   Okay.  And what was -- what did that involve?

3   A.   The closing was to occur within 30 days, and the purchase

4   price was 8 1/2 million dollars.

5   Q.   All right.  There's a schedule 3.4.  Can you address that

6   to the Court, please?

7   A.   Schedule 3.4 is the allocation of the purchase price.

8   Q.   Okay.  Where is that?

9   A.   That was something that had to be done prior to closing

10  and --

11  Q.   Where is it so the Court can --

12  A.   The page I'm looking at is not numbered.

13           THE COURT:  It simply says, buyer to propose; is that

14  correct?

15           THE WITNESS:  Yes.  Yes, sir.

16           THE COURT:  Okay.

17           MR. GETTY:  Okay.  I just wanted to make sure the

18  Court had located it.

19  BY MR. GETTY:

20  Q.   And when does it say Article 3 provides for the closing?

21  A.   Within 30 days.

22  Q.   Okay.  So the effective date here is May 10th.  Did the

23  transaction close by June 10th, 2012?

24  A.   It did not.

25  Q.   And why not?

STEPHEN W. BALL - DIRECT EXAM                    25

1    A.   Mr. Williams and Mr. Groth had not arranged any financing

2    to allow them to close the transaction.

3    Q.   In terms of the purchase price, had there been earlier

4    discussion about the value of the Andy tipple?

5    A.   Mr. Williams and I at that point had conversations for

6    going on a year and a half, and his early proposal to us he had

7    valued the Andy tipple at $5 million.  So we had always stuck

8    with that number on the Andy tipple.

9            MR. LUCAS:  Your Honor, I'm going to object to the

10   hearsay.

11           THE COURT:  Yes.  The question was whether there were

12   discussions.  So the answer did include a statement provided

13   that appears to me to be offered for the truth.

14       Your response to the objection, Mr. Getty?

15           MR. GETTY:  I'll just rephrase it, Your Honor.

16           THE COURT:  Well, the issue wasn't the phrasing of

17   the question.  It was the phrasing of the answer.  Your

18   question asked were there discussions, not what the discussions

19   were.  But I'll sustain the objection and will not be relying

20   on that valuation in that answer.

21       Go ahead, Mr. Getty.

22   BY MR. GETTY:

23   Q.   During the course of these conversations, had Mr. Williams

24   proposed a figure for the Andy tipple?

25   A.   Yes.

STEPHEN W. BALL - DIRECT EXAM                26

1        MR. LUCAS:  Your Honor, I still object.  He's

2   testifying about what another person said.

3        THE COURT:  We'll see what the next question is.

4      Mr. Getty.

5   BY MR. GETTY:

6   Q.   Were you in agreement with that amount?

7        MR. LUCAS:  Objection, Your Honor.  There's no

8   foundation for that question.

9        THE COURT:  There's no amount that's been established

10  that's admissible.

11     Next question, Mr. Getty.

12  BY MR. GETTY:

13  Q.   When you proposed the $5 million purchase price for the

14  Andy tipple, was there an objection leveled by either

15  Mr. Williams or his representative?

16        MR. LUCAS:  Objection, Your Honor.  It's still

17  hearsay.

18        MR. GETTY:  I think that's proper.

19        MR. LUCAS:  Silence can be a statement.

20        MR. GETTY:  Oh, come on.

21        THE COURT:  Okay.  The question was:  "When you

22  prepared the $5 million purchase price for the Andy tipple, was

23  there an objection by either Mr. Williams or his

24  representative?"  I think that you can ask questions along

25  those lines in a way that won't lead to the introduction of

1  hearsay evidence.  So it -- can you rephrase, Mr. Getty?

2  BY MR. GETTY:

3  Q.   What amount did you propose as an allocation for the Andy

4  tipple?

5  A.   5 million.

6  Q.   Okay.  And was there any disagreement with respect to what

7  you proposed?

8          MR. LUCAS:  Your Honor, I will object again.  He's

9  again asking about out-of-court statements by absent people.

10          THE COURT:  Well, he hasn't asked for the substance

11  of a statement yet, Mr. Lucas.  He's asking was there any

12  disagreement.

13          MR. LUCAS:  But what he's trying to offer it for,

14  Your Honor, he's trying to offer the silence as affirmative

15  statement as proof of the value.  That is hearsay.

16          MR. GETTY:  We're not going to make 1:00 at this

17  rate, so I'll just move on.

18          THE COURT:  I'm not -- let me make clear what I

19  mentioned yesterday about the schedule.  I do have to stop

20  today at 1:00, but I'm available to resume tomorrow or at

21  another date.  So you don't need to limit your presentation of

22  the evidence based on the Court's schedule.

23          MR. GETTY:  It's pretty obvious to the Court that I'm

24  in some pain, and I would like to get out of here by -- by

25  1:00.

STEPHEN W. BALL - DIRECT EXAM                    28

1    THE COURT:  Okay.  Go ahead with your questioning.

2   BY MR. GETTY:

3   Q.  All right.  I guess I'll ask it this way.  Was the

4   $35 million allocation eventually memorialized in the contract

5   documents?

6   A.  Yes.

7   Q.  Would you look at Exhibit B to the agreement, the original

8   agreement?  Do you have that, sir?

9   A.  Not yet.

10  Q.  I'm sorry.  I apologize, Mr. Ball, if I'm a little --

11  appear a little anxious or abrupt.

12  A.  It's fine.  I'm there.

13  Q.  All right.  Does Exhibit B show what leases are being

14  assigned to Mr. Williams or Williams Industries?

15  A.  Exhibit B is the assignment of leases document.  I do not

16  see -- unless I'm overlooking it, I do not see the actual list

17  right there in Exhibit B.  I do think it's in a separate

18  schedule, though.

19  Q.  Okay.  Was the transaction between anyone other than

20  Williams Industries and Kentucky Fuel?

21  A.  No.

22  Q.  Would it be accurate to say that everything relating to

23  the asset purchase -- assets being purchased was a transaction

24  that ran solely between Kentucky Fuel on the one hand and

25  Williams on the other?

STEPHEN W. BALL - DIRECT EXAM               29

1   A.    Yes.

2   Q.    In the interest of time and because most of these

3   documents are in the record, I would like to introduce

4   Defendants' Exhibit 18 through 33, 35 through 39, and 41

5   through 42 for entry.  I don't know if there are objections to

6   those or not.  But I'd just like to put those in.

7              MR. LUCAS:  I couldn't even write the numbers down,

8   much less know whether I object to all of those right now or

9   not.

10             THE COURT:  Yes, the exhibits are 18 through 33.  35

11  through 39, and 41 through 42.

12             MR. GETTY:  They're the basic transaction documents

13  from beginning to end.

14             THE COURT:  Of the NewLead transaction?

15             MR. GETTY:  Yes.  Of the Williams transaction.  It's

16  been referred to by the other party as the NewLead transaction.

17  It's the Williams transaction.  And he'll explain that.

18             THE COURT:  Okay.  Let's have -- let's give Mr. Lucas

19  a moment to consider whether there are any objections.

20             MR. GETTY:  While he's doing that, with the Court's

21  permission, I'll sit down.

22             THE COURT:  You can sit and remain seated for the

23  entirety of the proceeding if you like.

24             MR. GETTY:  Thank you.

25             THE COURT:  Are you comfortable going forward,

STEPHEN W. BALL - DIRECT EXAM                    30

1   Mr. Getty?

2           MR. GETTY:  Yes, Judge, you know me.

3           THE COURT:  Well, but you've been in pain.  And if

4   you can't --

5           MR. GETTY:  I'm good.  Trust me.

6           THE COURT:  Okay.

7           MR. GETTY:  I would tell you.

8           THE COURT:  That's what you need to do, is if you

9   have a problem, given your health condition, going forward, you

10  need to tell me.

11          MR. GETTY:  I would.

12          THE COURT:  Okay.

13          MR. GETTY:  You have my word.

14          MR. LUCAS:  Your Honor, I can call immediately the

15  exhibits from our list that we have no objections to.  The

16  others I'm going to probably want to just look at and verify

17  it, but we may not have objections on many of these.  We have

18  no objections to those that you identified 19, 20, 23, 26, 28,

19  29, 30, 33, 35.

20          MR. GETTY:  37?

21          MR. LUCAS:  37, 38, 39, 40 -- or correction -- yeah.

22          THE COURT:  40 is not in issue.

23          MR. LUCAS:  He didn't offer 40.

24          MR. GETTY:  41.

25          MR. LUCAS:  41, no objection. 42, no objection.

STEPHEN W. BALL - DIRECT EXAM                    31

1          THE COURT:  Okay.

2          MR. LUCAS:  The others I'm just going to have to look

3     at.

4          THE COURT:  You want to take a break to do that?

5          MR. LUCAS:  I can do it whenever we have a break or

6     later.  I don't think it'll take long.  We didn't have those

7     documents.  They may match ours, and we may have no objection.

8          THE COURT:  Okay.  Postponing a ruling on those, will

9     that interfere with your presentation of the evidence,

10    Mr. Getty?

11         MR. GETTY:  Well, I'm prepared to respond to the ones

12    that he says he may object to.

13         THE COURT:  Well, we don't even know if there's an

14    objection yet.  I'll admit Defendants' Exhibit 19, 20, 23, 26,

15    28, 29, 30, 33, 35, 37, 38, 39, 41 and 42.  I'll reserve ruling

16    on the remainder until Mr. Lucas has had time to see if there's

17    an objection.  You can, in the meantime, tender those exhibits

18    or have the witness testify about them without having them

19    being formally entered into evidence as exhibits, Mr. Getty.

20    Is that fair enough?

21         MR. GETTY:  Surely.

22         THE COURT:  Okay.  Was my list correct, Sheila, or

23    did you keep track?

24         THE CLERK:  No, I did, and you were correct.

25         THE COURT:  Okay.  Go ahead, Mr. Getty.

STEPHEN W. BALL - DIRECT EXAM                    32

1          MR. GETTY:   Thank you, Your Honor.

2    BY MR. GETTY:

3    Q.   Take a look at Exhibit 34.   That's the fourth amendment.

4    This document is labeled "Fourth Amendment to Asset Purchase

5    Agreement" and it's dated February 12th of 2013.   What was the

6    purpose of this document?

7    A.   There was a payment that was due at the end of January

8    under the asset purchase agreement and Williams Industries was

9    unable to make it.   And at this point NewLead had entered the

10   picture as the -- providing the funds for Williams to acquire

11   the assets.   And because they were not able to provide the

12   payment, they had requested an extension to that payment date.

13   And this document is to memorialize that extension.

14   Q.   Okay.   And up to this point in time, until Exhibit 34 came

15   into being, would it be accurate to say that all the exhibits

16   that I identified, 18 through 33, involved only Williams and --

17   Williams or some other financing entity?

18   A.   There's one -- I'd have to look at the exhibit number.

19   But there's one prior to this where NewLead made the commitment

20   to pay the 7 1/2 million dollars in the form of a promissory

21   note.

22   Q.   Okay.   And is this the first -- Exhibit 34, the first

23   document in which NewLead was --

24   A.   They appear on this for acknowledging and acceptance, and

25   it was their request, along with Williams, to extend the

STEPHEN W. BALL - DIRECT EXAM                    33

1    payment date, yes.

2    Q.   And there's a clause in the document you can point to

3    specifically if you want.  But it confirms the parties and

4    NewLead are signing only as, I quote, acknowledgment and

5    acceptance.  What's your understanding of that term?

6    A.   They're not a party to the agreement in the sense that

7    they're not a buyer or seller, but we had asked that they be

8    included because they were providing the funds.  And it had

9    been made clear to us at this point they were providing the

10   funds.  So any extensions that were granted, we felt it

11   important to make sure they were included in that

12   documentation.

13   Q.   Was it you, in fact, or Kentucky Fuel that insisted that

14   they be added as a signatory?

15   A.   I know we suggested it.  I don't think there was any

16   pushback on that.

17   Q.   Okay.  And why was this amendment dated February 12th,

18   2013 necessary?

19   A.   Again, as of January 29th, they were in default under

20   their promissory note obligations, NewLead was.  And under the

21   agreement, Williams Industries was in default because the

22   payment was due on January 29th.  So we had two separate

23   events, a default where they had asked for more time.  And in

24   order to document that, this agreement came about.  And in

25   return for that extension of time, we did ask for extension

STEPHEN W. BALL - DIRECT EXAM                    34

1  payments.

2  Q.   In point of fact, these various amendments were primarily

3  because of extending closing dates or pushing matters back to

4  give Mr. Williams more time, weren't they?

5  A.   Correct.

6  Q.   Okay.  And with respect to NewLead's role, what did you

7  understand their role, if any, was in the Williams transaction?

8  A.   I don't know the full understanding of the

9  Williams-NewLead relationship.  I know as it relates to us,

10  they had agreed to perform on a promissory note to satisfy the

11  purchase price of 7 1/2 million dollars.  I do know they had

12  other arrangements with Williams Industries.

13  Q.   "They" being NewLead?

14  A.   Correct.

15  Q.   Okay.  And was Williams Industry a guarantor?  Was it also

16  liable?

17  A.   They remained liable for payment under the agreement.

18  Q.   Okay.  What did NewLead agree to do in consideration for

19  Kentucky Fuel extending the due date on this note that they had

20  provided?

21  A.   They made a $100,000 deposit into escrow.  If they were

22  able to close prior to February 15th, that $100,000 would be

23  applicable to the 7 1/2 million dollar promissory note.  If

24  they were unable to do that, it would be released to Kentucky

25  Fuel, and it would not be a credit against the purchase

1  price -- purchase price.  They had actually asked for a second

2  extension as well, and if it was not closed by February 15th,

3  then in addition to receiving the $100,000, NewLead agreed to

4  provide $175,000 worth of their stock.

5  Q.   Of NewLead's stock?

6  A.   Of NewLead's stock, correct.

7  Q.   Was it unrestricted and immediately resellable,

8  purportedly?

9  A.   Yes.

10  Q.   Okay.  Plaintiffs describe these additional payments as a

11  forbearance agreement.  Is that accurate?

12  A.   I agree that these are forbearance payments.  The

13  transaction was originally scheduled to close in June of 2012.

14  And we had given them approximately eight months of extensions

15  without any additional payments being required.  And so at this

16  point we felt it was necessary, if we were going to consider

17  extensions, they should have some monetary component to them.

18  Q.   And was it in consideration of another extension at the

19  time that the note be made?

20  A.   Yes.

21  Q.   In the first full recital on the second page, paragraph 2,

22  there is reference to a second closing.  You see that?

23  A.   Yes.

24  Q.   What does the second closing in the first full recital on

25  the second page refer to?

STEPHEN W. BALL - DIRECT EXAM                    36

1   A.   After receiving title to the assets from Kentucky Fuel,

2   Williams Industries had made some type of commitment to NewLead

3   to transfer the assets to NewLead.

4   Q.   Okay.  Do you know the details of that transaction between

5   Williams and NewLead and any others?

6   A.   I only know the portions of it that were included in some

7   of our documentation.

8   Q.   Okay.  Fair to say that you only knew whatever you read?

9   A.   Correct.

10  Q.   Nothing more?

11  A.   No.

12  Q.   Is there a reference to a RLJT Investments along with

13  Williams and Cypress Camon?  Is it Camon or Camon?  Spelled

14  C-a-m-o-n.

15  A.   They always pronounced it Camon.

16  Q.   All right.  And this was Dallas Groth's company?

17  A.   Dallas Groth was the only representative of Cypress Camon

18  that I ever met.

19  Q.   Do you know who RJLT Investments is?

20  A.   No.

21  Q.   Was it in any way related to your transaction with

22  Williams?

23  A.   No.

24  Q.   So basically there were two transactions and two closings;

25  is that correct?

STEPHEN W. BALL - DIRECT EXAM                    37

1   A.   Yes.

2   Q.   And the Kentucky Fuel transaction with Williams Industries

3   and Williams was one, right?

4   A.   Yes.

5   Q.   And the other transactions was between who?  Mr. Williams

6   and NewLead?

7   A.   The only parties that I'm aware of are Williams Industries

8   and NewLead, and these references to RJLT, which again, I don't

9   know who that is, but the name is referenced in some of our

10  documents.

11  Q.   Would you take a moment and flip to the fifth amendment?

12          THE COURT:  Do you have an exhibit number?

13          MR. GETTY:  Exhibit 40.  I'm sorry.

14  A.   Okay.

15  Q.   Do you see that?

16  A.   Yes.

17  Q.   You discussed with me earlier that this amendment is

18  confusing.  Can you tell the Court in what way you believe this

19  amendment is confusing?

20  A.   Again, these page numbers aren't numbered, but it's --

21  Q.   I mean, the reason I raise this --

22          THE COURT:  Mr. Getty, you did have a question

23  pending.

24          MR. GETTY:  Okay.

25          THE COURT:  And he was attempting to answer it.

STEPHEN W. BALL - DIRECT EXAM                    38

1        Go ahead, please, Mr. Ball.

2    A.   It's on page 5 of the exhibit.  The page starts "To

3    Seller."  And then it goes into these payments that are monthly

4    payments.  The way the paragraph reads on its face, you -- it

5    would -- a reasonable person would read that to think that

6    Kentucky Fuel, as seller, is receiving all of those payments.

7    Those payments are not only what Kentucky Fuel is receiving but

8    there are also monies that are going to Williams Industries,

9    and I don't know the breakout, but possibly RJLT under the

10   second closing.  We later clarified this in the sixth

11   amendment.  But this fifth amendment read by itself is

12   confusing.

13   Q.   Okay.  And you signed it?

14   A.   I did.

15   Q.   And what happened?

16   A.   I'm going to give the answer that lawyers hate to hear,

17   but at the time I was relying on -- Roger Hunter was helping me

18   with this transaction.  I find Roger to be very competent.  He

19   and I had discussed it.  He presented --

20        THE COURT:  Let him finish the answer, Mr. Getty.

21   A.   He presented me with the signature page, and I signed it.

22   In hindsight, this was not very well written and should have

23   been written more clearly.

24   Q.   Okay.  What was the very purpose of the fifth amendment?

25   A.   They had yet asked for more time.  And at this point we

STEPHEN W. BALL - DIRECT EXAM                    39

1   weren't willing to just continue extending without some

2   payments beginning to start right away.  And we wanted some

3   structured payment schedule.  And so this amendment was

4   intended to establish a payment schedule for the extension of

5   time.

6   Q.   Had NewLead expressed any interest in attempting to mine

7   this property?

8   A.   That is referenced in this document as well.  They had

9   indicated that they would like access to the property.  In the

10  original agreement, they had signed a nonoperating certificate,

11  where -- I'm sorry, Williams Industries had signed a

12  nonoperating certificate where they had agreed that they would

13  not operate on the property prior to the 7 1/2 million dollars

14  being paid.  And so at this point they had asked for access to

15  the property.

16  Q.   Okay.  And did you agree to the payment schedule but

17  insist on immediate payments?

18  A.   We did, yes.

19  Q.   All right.  And was there a desire to wrap all payment

20  obligations into a single payment?

21  A.   Not necessarily for us, but at the same time these

22  documents were going to the closing agent that was handling the

23  first and second closing.  And that's how the payments were

24  grouped together.

25  Q.   There are several recitals here in this document that

STEPHEN W. BALL - DIRECT EXAM                    40

1   refer to the fact that the promissory note from NewLead on

2   behalf of Williams to Kentucky Fuel was 7.5 million.  If you

3   look at the first paragraphs, paragraph 2, do they reference a

4   $7.5 million note?

5   A.   Yes.  The payment obligation to Kentucky Fuel never

6   changed.

7   Q.   Okay.  And when you get to the fifth page, the agreement

8   is written as though the seller is receiving several payments

9   of 350,000 and 1 million 105,555.56.  Do you see that?

10  A.   Yes.

11  Q.   It says, "provided however that NewLead shall be entitled

12  to a credit."  Can you explain what that clause was intended to

13  mean or does mean?

14  A.   Basically, if they were able to pay the amount prior to

15  the middle of July, they would receive a credit for the

16  interest they were paying.  It was an incentive to pay quickly.

17  Q.   Who would receive a credit?

18  A.   NewLead would.

19  Q.   Okay.

20  A.   They were -- these payments were designed to include or

21  they were to accrue interest.

22  Q.   Okay.

23  A.   And if they paid interest, and they paid off the entire

24  amount prior to July, they would receive a credit for some of

25  the interest that had been paid.

STEPHEN W. BALL - DIRECT EXAM                    41

1   Q.   What amount was being paid as a result of this proposed

2   transaction of Kentucky Fuel?

3   A.   Again, the total amount never changed.   It was -- it

4   always remained 7 1/2 million dollars.

5   Q.   And how was that 7 1/2 million dollars allocated?

6   A.   It was -- under this payment schedule, we only -- I

7   believe we only ever received one of the $350,000 payments.   We

8   ultimately revised this payment schedule with another amendment

9   and received payments under that payment schedule.

10  Q.   Okay.  Was there an allocation with respect to the assets

11  of the 7 1/2 million dollars?

12  A.   Yes.  When we did the closing of December of '12.

13  Q.   Uh-huh.

14  A.   Technically, as between us and Williams Industries, we

15  conveyed the assets to Williams Industries in December of 2012.

16  We retained a security because the purchase price had not been

17  paid yet.  The allocation was $5 million to the Andy tipple.  I

18  think it was $2,250,000 to the Fivemile leases, and $250,000 to

19  the permits and other intangibles, generally.

20  Q.   Okay.  The document that we have before you, it references

21  $11 million as the entire amount being paid not only to you but

22  also Williams and RJLT.  Beyond --

23           MR. LUCAS:  I'm sorry, where are you referring to?

24           MR. GETTY:  Hold on.

25

STEPHEN W. BALL - DIRECT EXAM                42

1   BY MR. GETTY:

2   Q.   If you add up the numbers at the top of page -- I guess

3   it's page 4.  Let's see.  One, two, three, four, five.  Do

4   those numbers up add totally to $11 million?

5   A.   I believe so, yes.

6   Q.   Okay.  And I forgot my train of thought because of the

7   interruption.  Give me a second.  Do you know where the amounts

8   above 7.5 million were going?

9   A.   Yes.

10  Q.   Where?

11  A.   2 million to Williams Industries and a million and a half

12  dollars to RJLT.

13  Q.   Okay.  Where did RJLT come from?

14  A.   I don't know.  That was totally on that side of the

15  transaction, part of the second closing.  We never had -- "we,"

16  as Kentucky Fuel, never had any interaction with RJLT.

17  Q.   Does that fifth amendment, which totals up to 11 million

18  dollars, 7.5 of which is to Kentucky Fuel, does the fifth

19  amendment now, to use the plaintiffs' phrase, blow the whistle

20  that NewLead agreed to pay Kentucky Fuel more than 7.5 on

21  behalf of Williams?

22  A.   No.

23  Q.   What documents can you point us to to demonstrate that the

24  promissory note was for 7.5 million and no more?

25  A.   Williams Industries and NewLead defaulted on this

STEPHEN W. BALL - DIRECT EXAM                43

1  amendment, and in September of 2013 we issued a default letter

2  to them.  And at that same time they had made a proposal to us

3  to resolve the default, so there was a response to that

4  proposal.  And in both of those letters our demand was only for

5  the 7 1/2 million dollars minus the 350,000 dollar payment that

6  we had received.

7  Q.   Can you identify or turn to Exhibits 43 and 44 and

8  identify those documents as the default letters?  Exhibit 43 is

9  from Roger Hunter, who was then the general counsel, to a

10  Mr. Zolotas -- I don't know how to pronounce it --

11  Z-o-l-o-t-a-s.

12  A.   I believe it's Zolotas.

13  Q.   Zolotas?

14  A.   Yes.

15  Q.   It's dated September 23, 2013, Exhibit 43.

16  A.   Correct.

17  Q.   What was the purpose of this?

18  A.   Again, they had failed to make the scheduled payments

19  under the fifth amendment, and so we were sending them a notice

20  of default and giving them a chance to cure the default by

21  September 25th --

22  Q.   Okay.

23  A.   -- 2013.

24  Q.   The document, the letter refers to 7,696,58.14.  That's

25  something more than 7.5 million.  What's the difference?

STEPHEN W. BALL - DIRECT EXAM                    44

1   A.   So we started with the 7.5 million, subtracted the

2   $350,000 payment and then charged interest.  The interest

3   equaled $546,598.14.  And then we also provided them with a per

4   diem of interest.  So the excess amount is interest.

5   Q.   Okay.  If you look at 44, that says "Notice of Default:

6   Alternatives For Moving Forward."  Can you tell the Court what

7   the purpose of this letters was?

8   A.   So at the same time we issued the default letter, there

9   had been conversations between the parties about how to move

10  forward, and this is a letter from me to Mr. Zolotas offering

11  alternatives as a way to move forward.

12  Q.   Incidentally, before I forget, can you flip back to

13  Exhibit 22 just real quickly?  There's no objection to that.

14  It's already admitted.

15            THE COURT:  No, that's not correct.  22 is not --

16            MR. GETTY:  I'm sorry.

17            MR. LUCAS:  -- one of the ones that was admitted.

18            MR. GETTY:  Oh, it is.

19  BY MR. GETTY:

20  Q.   Can you refer to that document?  It's a special warranty

21  deed.  And what does that deed represent or what is it for?

22  A.   It's between Kentucky Fuel, who is conveying the parcels

23  to Williams Industries, as of December 27, 2012.

24  Q.   Consideration for total sum of $5 million?

25  A.   Correct.

STEPHEN W. BALL - DIRECT EXAM                    45

1    Q.   I guess the question is, is that the conveyance -- can you

2    identify it as the conveyance of the Andy tipple?

3    A.   Yes.   This -- this is the special warranty deed where

4    Kentucky Fuel transferred the Andy tipple to Williams

5    Industries.

6    Q.   Okay.  And who prepared this document?  It's John McCague,

7    M-c-C-a-g-u-e, with Eckert Seamans Cherin and Mallott in

8    Pittsburgh?

9    A.   Correct.  That was Lloyd Williams' attorney at this time.

10   Q.   All right.  You all didn't prepare it, Mr. Williams'

11   lawyers prepared it?

12   A.   Correct.

13   Q.   And they chose to put $5 million as the consideration?

14   A.   That's the agreed upon amount between the parties.

15   Q.   Okay.  Look at Exhibit 19.  That's -- that's already

16   admitted, according to my colleague, who is never wrong,

17   Ms. Harlan.

18   A.   Okay.

19   Q.   It's the second amendment.  It's dated October 5, 2012.

20   And is that document executed by both Kentucky Fuel and

21   Williams Industries?

22           MR. GETTY:  Do you have it, Your Honor?

23           THE COURT:  Yes.

24   BY MR. GETTY:

25   Q.   Can you find the amended and restated schedule 3.4 to the

STEPHEN W. BALL - DIRECT EXAM                    46

1   asset purchase agreement, which is labeled "Allocation of

2   Purchase Price"?

3   A.    Yes.

4   Q.    I have one marked to save some time.

5   A.    No, I found it.

6   Q.    You found it.  And what is the -- what are the allocation

7   figures set forth on this document?

8   A.    Fee simple real estate, $5 million; leasehold real estate,

9   $2,250,000; intangibles, and then, in parentheses, permits,

10  $250,000, for a total of $7,500,000.

11  Q.    Okay.  And can you more specifically identify those first

12  is the real estate, the Andy tipple in Haddix, Kentucky?

13  A.    Yes.

14  Q.    And the leasehold release the 2 million 250, is that the

15  Fivemile permits, Fivemile leases?

16  A.    It's the Fivemile lease, and I think technically that also

17  includes a couple of the CSX leases that were related to the

18  Andy tipple.

19  Q.    Okay.  And the intangibles, it says permits.  That would

20  be the Fivemile permits?

21  A.    Same caveat.  I think there's a permit associated with the

22  Andy tipple, so it would be the Fivemile permit and the Andy

23  tipple permit.

24  Q.    Okay.  Going back to Exhibit 44, what alternatives or

25  options did you provide with respect to the Williams

STEPHEN W. BALL - DIRECT EXAM          47

1  transaction and moving it afford?

2  A.   In the letter, in option 1, we state, "Close the

3  transaction by 5:00 p.m. Eastern Daylight Savings time on

4  Monday, September 30th, 2013, and pay by wire transfer of

5  immediately available funds all unpaid principal and accrued

6  interest at such closing in the amount of $7,702,531."  We tell

7  them what we would do upon receipt of that.

8       And then option two is another extension.  But that

9  extension would include a forbearance payment of $1 million.

10 Q.   All right.  What happened as a result of this proposal?

11 A.   We entered into a sixth amendment with Williams Industries

12 and NewLead.  And at this point, they had introduced us to a

13 group called the Hanover Group, and the Hanover Group was

14 proposed to purchase the NewLead promissory note.

15 Q.   Who introduced you to Hanover?

16 A.   They just came to the table through Williams Industries

17 and NewLead.

18 Q.   Okay.  Do you know who was Hanover Industries?

19 A.   I don't know specifically.

20 Q.   Okay.  Did they have counsel in this instance?

21 A.   They did have counsel, yes.

22 Q.   And who is that?

23 A.   I can't recall the names off the top of my head.

24 Q.   Are they referred to here?  I guess they're not

25 A.   Hanover's counsel drafted what ultimately became the debt

STEPHEN W. BALL - DIRECT EXAM                48

1  purchase agreement.  That's how I know they had counsel.  But I
2  just can't recall their name.
3  Q.   Do you have the sixth amendment?  I may have already asked
4  you that.  So I apologize.
5  A.   I do.
6  Q.   What was the purpose of the sixth amendment?
7  A.   This was to inject the Hanover Group into the payment
8  process.  They were purchasing the debt of NewLead, the
9  7 1/2 million dollar promissory note that they were providing
10 on behalf of Williams.
11 Q.   Despite all their promises, have NewLead been able to
12 actually close with their financing?
13 A.   No.
14 Q.   And was the Hanover Group buying the NewLead -- NewLead
15 promissory note for the principal amount plus interest?
16 A.   Yes.
17 Q.   Okay.  And how was this done?  What vehicle was utilized
18 here?  You might want to look at the debt purchase agreement
19 attached to the sixth amendment.
20 A.   Yes.  And that is how it was done.  Hanover purchased the
21 debt of NewLead and agreed to a schedule of payments to
22 Kentucky Fuel.
23 Q.   Okay.  And does that refresh you that -- it looks as
24 though there are notices; a notice goes to Kentucky Fuel.  It
25 goes to either you or Roger Hunter, who is the general counsel,

STEPHEN W. BALL - DIRECT EXAM          49

1   correct?

2   A.   Yes.

3   Q.   For Hanover it goes to a gentleman at Robinson, Brog,

4   Leinwand, L-e-i-n-w-a-n-d, Greene, Genovese & Gluck in New

5   York, correct?

6   A.   Yes.

7   Q.   It also says the attention of David Danovitch.  Do either

8   of those names ring a bell or not?

9   A.   Those names do not ring a bell.  I do recall they had

10  counsel, and I do recall it was in New York.

11  Q.   It looks -- if you flip through it, it looks as though

12  that firm also was purporting to act as an escrow agent?

13  A.   Correct.

14  Q.   Okay.  Did that transaction close, the sixth amendment?

15  A.   Yes.

16  Q.   Did you say hurray?  No.

17  A.   It took a while.  It wasn't exactly as laid out in that

18  document, but we did ultimately receive the payments under the

19  debt purchase agreement.

20  Q.   How much time passed between the date of the promissory

21  note and the debt purchase agreement?

22  A.   The promissory note was entered into in December of 2012

23  and was supposed to be paid in full by the end of January 2013,

24  and this was entered into in November of 2013, so approximately

25  11 months.

STEPHEN W. BALL - DIRECT EXAM                    50

1   Q.   Okay.  And is it your position that this amendment

2   supports Kentucky Fuel's position that all that it received was

3   7.5 million?

4   A.   That was the principal amount.  We did, by the end of it,

5   receive some interest and some forbearance payments for

6   extensions.

7   Q.   Okay.  Earlier there was an exhibit, I think it was 16e,

8   plaintiffs', that was a proposed contract mining or a mining

9   agreement.  Did you play any role in that -- preparation of

10  that document?

11  A.   Yes.

12  Q.   Okay.  And there's a clause in there that refers to

13  mineable coal, is there not?

14  A.   Correct.

15  Q.   Okay.  And did you understand that if any coal were to be

16  mined in the future, that it would have to be mineable and

17  merchantable?

18  A.   Yes.

19  Q.   Okay.  Was any coal ever mined?

20  A.   No, not under that proposed agreement.

21  Q.   All right.  And if you look at the fifth amendment and the

22  sixth amendment together and read them together, what does that

23  tell you in terms of how the payments were to be allocated of

24  any $11 million that was referred to in the fifth amendment?

25  A.   It clearly lays out that of the 11, 7 1/2 million was

STEPHEN W. BALL - DIRECT EXAM          51

1   allocated to Kentucky Fuel, 2 million was allocated to Williams

2   Industries, and a million 5 to RJLT.

3   Q.   So in reality the fifth amendment provides for a total

4   payment by NewLead of $11 million, allocated how?

5   A.   I'm sorry, can you repeat that?

6   Q.   The $11 million reflected in the fifth amendment was to be

7   allocated how?

8   A.   7 1/2 million to Kentucky Fuel, 2 million to Williams

9   Industries, and a million 5 to RJLT.

10  Q.   If you look at the sixth amendment, final paragraph, you

11  see the "whereas" clause at the top of page 4?  It says,

12  Whereas in order to cure the defaults referenced in the KFC

13  default notice, the Williams Industries default notices, any

14  RJLT default notice, NewLead Holdings -- NewLead Holdings

15  proposes to, one, make or cause Hanover to make a payment in

16  the amount of 1 million five in the aggregate to Chicago Title

17  for the benefit of KFC, Williams Industries, and RJLT, the note

18  holders, to be distributed no later than October 31st, 2017, on

19  a pro rata basis.  Did that occur?

20  A.   I can't recall specifically if that particular payment was

21  made into escrow.

22  Q.   Did you understand that this sixth amendment was, in

23  effect, bringing in an additional party to cure any of those

24  early defaults in the form of Hanover, whoever they were?

25  A.   It was to cure NewLead's default for failure to pay.

STEPHEN W. BALL - DIRECT EXAM                    52

1   Q.   Okay.  And with respect to these agreements and

2   amendments, who did you or other representatives of Kentucky

3   Fuel negotiate with about which assets were being sold?

4   A.   All of the negotiations for the actual sale of the assets

5   were with Lloyd Williams.

6   Q.   All right.  And who did you negotiate with for the sale

7   price of those assets?

8   A.   Lloyd Williams.

9   Q.   And when you learned of NewLead's role, had the assets to

10  be sold and the price for those assets already been

11  established?

12  A.   Yes.

13  Q.   With whom?

14  A.   Lloyd Williams.

15  Q.   Did you ever have any really direct dealings of any sort

16  with respect to any matters concerning your sale to Williams

17  with NewLead?

18  A.   Our only interaction with NewLead related to payment.

19  Q.   Okay.  I'd like you to take a look now at the fourth

20  amendment, which is exhibit, Plaintiffs' 1a.  I have an extra

21  copy if that would save some time.  You have the document?

22  A.   I do, yes.

23  Q.   What was your role in the negotiation and consummation of

24  this agreement?

25  A.   I worked with Mr. Brownlow and Culver Schmid, his

STEPHEN W. BALL - DIRECT EXAM                53

1  attorney, on this document.

2  Q.   Was that the meeting that took place at The Greenbrier?

3  A.   It culminated at the meeting with The Greenbrier.  We had

4  earlier conversations.

5  Q.   By telephone?

6  A.   I believe they were all by telephone, yes.

7  Q.   Were they both with Mr. Brownlow and Mr. Schmid?

8  A.   I have talked to Mr. Schmid without Mr. Brownlow before,

9  so I can't say that they were both on every phone call.

10 Q.   Okay.  Did you talk to Mr. Brownlow without Mr. Schmid?

11 A.   Yes.  Mr. Brownlow and I had a business relationship as

12 well.

13 Q.   Okay.  And you heard Mr. Justice's testimony about his

14 role in the negotiations that took place finalizing the

15 agreement at The Greenbrier?

16 A.   Yes.

17 Q.   Would you agree with his characterization?

18 A.   I would, yes.

19 Q.   Was he available -- readily available throughout the

20 negotiations over that two-day period?

21 A.   He was, yes.

22 Q.   Did you communicate with him from time to time?

23 A.   I did.

24 Q.   And who was the ultimate decider, so to speak, as to

25 agreeing to this arrangement?

STEPHEN W. BALL - DIRECT EXAM                    54

1   A.   Mr. Justice was.

2   Q.   Okay.  And did you or anyone else on behalf of Kentucky

3   Fuel ever agree, pursuant to this arrangement, that you would

4   mine the Fivemile coal no matter what, whether you could mine

5   it profitably or not?

6   A.   No.

7   Q.   Would you have ever agreed to that?

8   A.   No.

9   Q.   Have you ever experienced in your lifetime any steam coal

10  arrangement where there was that kind of agreement that you

11  would mine the coal even if you mined it at a loss and couldn't

12  make a profit?

13  A.   Not in my experience, no.

14  Q.   All right.  Was Mr. Merritt in the meeting with you?

15  A.   He was.

16  Q.   Okay.  To your knowledge, given his knowledge and

17  experience, would he -- did he, to your knowledge, ever agree

18  to such an arrangement?

19            MR. LUCAS:  Objection, Your Honor.

20            THE COURT:  The question, to your knowledge -- let's

21  see.  Your response?  The basis for the objection?

22            MR. LUCAS:  Hearsay, Your Honor.

23            THE COURT:  Mr. Getty, your response?

24            MR. GETTY:  I'm asking him generally.  I'm asking him

25  generally, to his knowledge, did Mr. Merritt ever agree to any

STEPHEN W. BALL - DIRECT EXAM                55

1   such arrangement?  I think he testified to that.

2            THE COURT:  That seems to be an event, not a

3   statement offered for the truth, Mr. Lucas.  We'll need to see

4   the answer, of course.  Am I misunderstanding the objection,

5   Mr. Lucas?

6            MR. LUCAS:  I believe he's asking if Mr. Merritt ever

7   agreed to that, and if he had agreed to it, it would be hearsay

8   unless it was in his presence.  If it's confined only to things

9   that Mr. Merritt said in his presence, I have no objection to

10  that.

11           THE COURT:  Well, no.  Wait a second, Mr. Getty.

12  Mr. Merritt was employed by KFC, correct?

13           MR. GETTY:  Yes.

14           MR. LUCAS:  Yes, Your Honor.

15           THE COURT:  So how was it hearsay?  It's a statement

16  he may have made.

17           MR. LUCAS:  Well, if he's offering an out-of-court

18  statement by Mr. Merritt, it's not an admission by a party

19  opponent.  He's trying to testify as to what someone else in

20  his organization said, and that would be hearsay.

21           MR. GETTY:  It's not -- that's not an accurate

22  understanding of hearsay.  I've heard hearsay after hearsay

23  after hearsay objection.  This is not one that is proper.  I

24  asked him -- I asked him was he aware of Mr. Merritt ever

25  agreeing to any such arrangement, to his knowledge.  He can

STEPHEN W. BALL - DIRECT EXAM                56

1  testify as to whether he ever understood that Mr. Merritt --

2  for that matter, anybody else in that organization.  It's

3  obvious nobody would.

4          MR. LUCAS:  Your Honor, to clarify, I have no

5  objection to him saying what Mr. Merritt said in his presence.

6          MR. GETTY:  Just wasting more time.

7          THE COURT:  Mr. Getty.

8          MR. GETTY:  I'm sorry.  I'm sorry.  I'm in pain.  I

9  apologize.  I'm just -- I'm just at the point where there's

10 been one hearsay objection after the other and most of them

11 have been improper.

12         THE COURT:  It's not appropriate to characterize the

13 objection in, my view.  It doesn't help us advance --

14         MR. GETTY:  I agree with you.

15         THE COURT:  -- the cause.

16         MR. GETTY:  I agree with you.

17         THE COURT:  The cause is of course -- my sole focus

18 is on the merits, not any disparagement.

19         MR. GETTY:  I understand.

20         THE COURT:  Why don't you rephrase the question,

21 Mr. Getty, in light of the objection, and let's see?

22         MR. GETTY:  I'll just rephrase.  I'll ask him a whole

23 new question.

24 BY MR. GETTY:

25 Q.   Would you or anyone else, to your knowledge, within the

STEPHEN W. BALL - DIRECT EXAM                    57

1   Justice organization, ever have agreed to a lease that would

2   provide an obligation to mine even if you lose money?

3            THE COURT:  Mr. Lucas.

4            MR. LUCAS:  Objection to that as to what other people

5   might do.  It's totally inappropriate.

6            THE COURT:  I'll sustain that.  He did answer the

7   question with respect to what Mr. Ball would do.  So that -- I

8   will sustain that objection.

9   BY MR. GETTY:

10  Q.   Is your position with respect to any such arrangement

11  consistent with what you understand would be the policy of the

12  company?

13  A.   Yes.

14  Q.   Did Mr. Brownlow, to your knowledge, want to incentivize

15  KFC to mine the coal?

16  A.   Mr. Brownlow definitely wanted someone to mine coal at

17  Fivemile.  The purpose of that meeting was more focused on he

18  had been or was out of pocket for some leases that they had

19  gone out and acquired in the new Fivemile entity that he

20  created.  And he did want to establish a means of cash flow

21  going forward.

22  Q.   During the course of these meetings, did you make it clear

23  to Mr. Brownlow that Kentucky Fuel and the Justice Companies

24  would only mine coal off the Fivemile leases if market

25  conditions would allow it to be mined, to be mineable coal and

STEPHEN W. BALL - DIRECT EXAM                58

1   that you could sell it at a profit?

2   A.   It was made very clear to Mr. Brownlow and Mr. Schmid that

3   Kentucky Fuel would only mine coal if market conditions

4   allowed.

5   Q.   Would you take a look at the fourth amendment?  Look at

6   paragraph 10.   There is a clause, a covenant to mine, that

7   says, "In consideration of New London, Deep Wood, Fivemile,

8   Fivemile Energy agreeing to the terms described herein,

9   Kentucky Fuel covenants to use commercial and reasonable good

10  faith and best efforts to maximize within the constraints of"

11  the industry standards -- "within the constraints of industry

12  standards the amounts of the coal extracted from those real

13  properties" -- "real properties."  What did you understand that

14  clause to mean?

15  A.   Just that if -- if market conditions allow, the coal will

16  be mined.   It's -- it's similar to the language that I see

17  in -- in just about every coal lease that I work on.   And I've

18  worked on hundreds of them.   You look for key phrases,

19  "commercially reasonable," "within industry standards," "within

20  industry constraints."   A phrase I've heard a lot here,

21  "mineable and merchantable" does get used a lot.   But you look

22  for those key phrases.

23  Q.   And the phrase, "within the constraints of industry

24  standards," what did you understand that to mean or encompass?

25  A.   It absolutely means that if market conditions will allow.

STEPHEN W. BALL - DIRECT EXAM          59

1   And I think there's another component, that we think that means

2   is within industry standards; if it can be -- if it can be

3   mined by law.   I don't think that's limited to just a financial

4   component, because in a lot of leases you also see a component

5   that it has to be able to be mined safely and lawfully.   So in

6   addition to an economic component, that also has a legal

7   component to it.

8   Q.   Do all Justice leases include a diligent mining provision?

9   A.   Justice Companies globally, that's a pretty broad

10  statement.   Most of them do.   I would -- I am careful just to

11  say all of them.   But I think -- I think most of them do --

12           THE COURT:   Mr. Getty, let him finish the answer.

13           MR. GETTY:   Okay.   Go ahead.

14  A.   I think most of them do, yes.

15  Q.   I just wanted the question to be to Kentucky Fuel and

16  steam coal.   Would your answer be the same?

17  A.   Yes.   And it would be -- it would have limitations in it,

18  just like this paragraph does, that are qualified by commercial

19  reasonableness and industry standards.

20  Q.   Do you believe the covenant to mine in the fourth

21  amendment has any different meaning than the mineable and

22  merchantable in the leases presented by Mr. Lucas to

23  Mr. Justice yesterday?

24  A.   No.

25  Q.   And with respect to this clause, as you have interpreted

STEPHEN W. BALL - DIRECT EXAM                    60

1   it, do you interpret it in any way as being a clause that says

2   you have to mine coal regardless, whether you can make money or

3   not?

4   A.   I've never understood this clause to mean that.

5   Q.   And do you believe that that kind of interpretation is

6   reasonable, given the constraints of the industry standards as

7   you know them?

8   A.   That interpretation's not reasonable.

9   Q.   Okay.  And if you want to write a lease to say that you've

10  got to mine under any circumstances, it'd be logical to assume

11  that you'd say it specifically, wouldn't you?

12  A.   Yes.  And although I have never seen it in the steam

13  industry, you do see those types of leases in the metallurgical

14  coal industry.

15  Q.   And what you have seen in the met coal, where it says

16  you've got to mine within certain constraints or a certain time

17  period, that's not like this, is it?

18  A.   No, that's not this at all.

19  Q.   Not anywhere near?

20  A.   It's very specific.

21  Q.   All right.  And just one last thing.  There's a reference

22  to the independent arbiter here.  What was the -- the

23  independent arbiter, did you ever understand that to be

24  intended to be an automatic accelerator of all royalties

25  potentially payable under a default?

STEPHEN W. BALL - DIRECT EXAM                61

1   A.   No.   No.   It's not uncommon in coal leases to have an

2   alternative dispute resolution mechanism.   Typically it's for

3   things like if there's a dispute over what the average selling

4   price is.   You know, you can have disputes over coal weights

5   and things like that.   If the parties can't work that out, they

6   get submitted to a third party.   Never have I seen one where it

7   is just an acceleration of rents.

8           MR. GETTY:   May I have a moment?   Can we take a

9   break now?   It's about time.

10          THE COURT:   That's fine.   Ten minutes break.

11  Anything we need to address, Mr. Lucas?

12          MR. LUCAS:   No.

13          THE COURT:   It may be useful -- 10 minutes is not

14  much time if you need to use the bathroom, Mr. Lucas.   It may

15  be useful to consider the list of exhibits that was not

16  admitted but within the range that Mr. Getty tried to admit

17  earlier after the break.   Are you able to speak to that?

18          MR. LUCAS:   Your Honor, I'll say we've reviewed them

19  and say they weren't on our list.   We had filed objection to it

20  on a number of grounds, including they hadn't been previously

21  identified or produced.   And in some cases, they were not on

22  the original list that was circulated.   They are not

23  identified.   They were apparently, although not specifically

24  identified, just grouped under the general category of

25  NewLead-related documents.

STEPHEN W. BALL - DIRECT EXAM                    62

1        THE COURT:  Yes.

2        MR. LUCAS:  So I want to stand on my objection as to

3  those documents.

4        THE COURT:  As to all, 18, 21, 22, 24, 25, 27, 31,

5  32, and 36?

6        MR. LUCAS:  Yes, Your Honor.  May we go through each

7  one before the break to address that now?

8        THE COURT:  No, let's do it after the break.

9        MR. LUCAS:  And I'll see if I can work out something

10  with Mr. Getty where we can do that in an expeditious manner.

11        THE COURT:  Fair enough.  We'll take -- we'll

12  reconvene at 10:45 with Mr. Ball on the witness stand again.

13  We'll be in recess.

14        (A recess was taken from 10:31 to 10:44.)

15        THE COURT:  Thank you.  We're back on the record.

16  We'll pick up where we left off with the exhibits.  Was there

17  any progress made on those matters during the break, Mr. Lucas?

18        MR. GETTY:  Yeah, I think Mr. Lucas and I discussed

19  it and he's agreed to do the same thing I did, which is object

20  to them, but let them go ahead and be admitted.

21        THE COURT:  Mr. Lucas, is that correct?

22        MR. LUCAS:  Yes, Your Honor.  As long as the

23  objections are not considered waived by doing that.  We want to

24  preserve the objections on our objections to the exhibit list,

25  but --

STEPHEN W. BALL - DIRECT EXAM                    63

1              THE COURT:  Yes.

2              MR. GETTY:  That's what we did, and that's fine with

3    us.

4              MR. LUCAS:  Same as he did.  It's a goose/gander

5    rule.

6              THE COURT:  They're preserved.  Meaning I can pass it

7    along to Judge Van Tatenhove.

8              MR. LUCAS:  Yes, Your Honor.

9              THE COURT:  The list of the exhibits is 18, 21, 22,

10   24, 25, 27, 31, 32, and 36?

11             MR. LUCAS:  Yes, Your Honor.

12             THE COURT:  Okay.  Mr. Getty, did I overlook

13   anything?

14             MR. GETTY:  No.  And we also used 34 and 22, which I

15   think were already in.  I'm not sure they were.

16             THE COURT:  They weren't in.

17             MR. GETTY:  Okay.

18             THE COURT:  Look.  Hang on just a second.

19      Sheila, is my list correct?

20             THE CLERK:  Yes, it was.

21             THE COURT:  Okay.  Are you moving to admit 22 and 34?

22             MR. GETTY:  Yes.  That's a special warranty deed,

23   Your Honor.  Part of the same package.  And 34 was in the

24   series of documents.

25             THE COURT:  Yes.  Mr. Lucas?

STEPHEN W. BALL - CROSS-EXAM                    64

1          MR. LUCAS:  Which numbers?

2          THE COURT:  Defendants' Exhibit 22 and 34.

3          MR. LUCAS:  22 -- 22 was one of the ones we were

4     preserving our objection to.

5          THE COURT:  I'm sorry.  I just admitted 22.  Yeah.

6          THE CLERK:  Yeah.

7          THE COURT:  34 was not -- I'm sorry if I created

8     confusion.  34 was not in the original range identified by

9     Mr. Getty, but he's now adding it, Mr. Lucas.

10         MR. LUCAS:  That's the fourth amendment?

11         THE COURT:  Yes.

12         MR. LUCAS:  That's our -- that's already in as one of

13    our exhibits.  I have no objection to it.

14         THE COURT:  Okay.  So Defendants' Exhibit 34 will be

15    admitted as well.  Are you ready for your continued

16    questioning, Mr. Getty?

17         MR. GETTY:  I have no further questions.

18         THE COURT:  Okay.  All right.  Fair enough.

19       Your cross-examination, Mr. Lucas.

20                         CROSS-EXAMINATION

21    BY MR. LUCAS:

22    Q.   Mr. Ball, let me -- let's start with the negotiations at

23    The Greenbrier.  Just to put it in context, you all were

24    negotiating, "you all"; you, Mr. Schmid, Mr. Brownlow,

25    Mr. Merritt, and Mr. Justice in another room, were all

1  negotiating over the terms of the fourth amendment that

2  Thursday evening at The Greenbrier, right?

3  A.   I can't say Thursday for sure.   It definitely started on

4  an evening and carried into the next day.

5  Q.   All right.   Was that -- does November 12 sound right?

6  A.   It could.

7  Q.   Okay.   November 11 or 12, somewhere in that range?

8  A.   It could be, yes.

9  Q.   All right.   And in terms of the fourth amendment itself --

10  and it's Plaintiffs' Exhibit 1a, if you need to look at it.

11  And you and I have discussed this previously, but just to make

12  sure we're all on the same wavelength, we agreed that's what we

13  lawyers call an integrated document, correct?

14  A.   Yes.

15  Q.   And that's in fourth amendment, I believe, paragraph 13,

16  which says it's the entire agreement and supersedes any prior

17  or contemporaneous representations, et cetera, right?

18  A.   That's correct.

19  Q.   Okay.   And you also agreed with me prior, when you and I

20  had our discussion at your deposition, that you believe even

21  though we may disagree over how to interpret certain things,

22  that the fourth amendment actually reflects what you agreed to

23  that evening?

24  A.   Yes.

25  Q.   Okay.   In fact, fair to say we disagree over how to

STEPHEN W. BALL - CROSS-EXAM                66

1  interpret paragraph 10 of the fourth amendment, which would be
2  the -- what your counsel is calling the diligent mining
3  provision, right?
4  A.    We disagree over paragraph 10, correct.
5  Q.    All right.  And what I understand you saying, correct me
6  if I'm wrong, you are saying that the language in there about
7  the industry standards, that that requires you to consider the
8  economic circumstances of the industry and whether or not you
9  can do it at a profit, future, what the current coal, current
10 prices are, and that type of thing; is that right?
11 A.    And I don't think that can be disconnected from the
12 commercial and reasonable good faith.  I think when read
13 together, that's what those two say, yes.
14 Q.    So you are saying that language includes that type of
15 thing?
16 A.    Yes.
17 Q.    And so basically you are saying that your interpretation
18 of that is that you have got leeway to interpret those kind of
19 economic factors, prices and the like, in a reasonable way and
20 determine if it's prudent for you to mine?
21 A.    Yes.
22 Q.    Okay.  Isn't it true that that type of language was
23 actually in one of the earlier drafts and that during
24 negotiations sessions it was omitted?
25 A.    I don't recall.

STEPHEN W. BALL - CROSS-EXAM                    67

1   Q.   Would you look at Plaintiffs' Exhibit 17?

2   A.   I don't think I have Plaintiffs' Exhibit 17.

3              THE COURT:  We'll get the book for you.

4   BY MR. LUCAS:

5   Q.   And before you look at that, sir, let me just ask you.

6   You and Mr. Schmid -- he actually had taken a whack at the

7   initial draft of the agreement and emailed it to you, right?

8   A.   I think he made the initial draft, yes.

9   Q.   Okay.  And then you all went back and forth through the

10  negotiation process, both on the evening of November 12 and on

11  the morning of -- during the day on -- excuse me, evening of

12  November 11, which I'll represent to you was that Thursday, and

13  then on the following day you all went back and forth on some

14  specific terms?

15  A.   I apologize.  I missed most of your question.  I don't

16  have the right book.

17             THE COURT:  That's our mistake.

18             THE WITNESS:  I'm sorry.

19             THE COURT:  It's the first book of defendants'

20  exhibits?

21             MR. LUCAS:  No, it's Plaintiffs' 17.

22             THE CLERK:  17.  Did I send the wrong one up?

23             THE WITNESS:  This says 27g.

24             THE CLERK:  Sorry.

25             THE COURT:  I'm sorry, Sheila, it's the second book.

STEPHEN W. BALL - CROSS-EXAM                    68

1          THE CLERK:  Yeah.

2          THE COURT:  Thank you.

3    BY MR. LUCAS:

4    Q.   And, Mr. Ball, I apologize.  I was asking you a question

5    while --

6    A.   I'm just going to tell you I missed the question because I

7    was looking and thought I was overlooking it.

8    Q.   No problem.  Let me try to redo it.  You don't need it

9    yet.

10   A.   I'll stop.

11   Q.   I'm going to direct you in a minute.  I'll represent, and

12   you can verify, that November 11 was a Thursday evening and

13   Friday was November 12.  Will you accept that for purposes of

14   your and my discussion here today?

15   A.   Yes.

16   Q.   And so after you got the initial draft of the agreement

17   from Mr. Schmid -- and that was prior to your meeting, right?

18   A.   Yes.

19   Q.   So you had something to talk from at the meeting?

20   A.   I believe that's correct, yes.

21   Q.   And after that, you and he exchanged various others drafts

22   and blacklined agreements, correct?

23   A.   I don't recall that specifically, but I -- that would not

24   be uncommon.

25   Q.   Okay.  And you know what I mean by blackline?

STEPHEN W. BALL - CROSS-EXAM                    69

1    A.    Yes, I do.  Yes.

2    Q.    So just so it's on the record, explain what a blackline or

3    redline is?

4    A.    I know some law firm's software is more sophisticated than

5    mine.  I use Microsoft Word.  If you elect the track changes

6    function, if you make any changes to the document that comes to

7    you at all, it'll reflect those changes in whatever color you

8    ask it to, typically red.

9    Q.    All right.  Thank you.  Look then at the first page of

10   Plaintiffs' Exhibit 17.  And this was sent -- do you recognize

11   that as an email to you and to Mr. Merritt from Mr. Schmid on

12   November 12 at 5:36 p.m., November 12th, 2010?

13   A.    Yes.

14   Q.    Okay.  And with this email, he transmitted to you a new

15   version of the agreement after your negotiation the previous

16   evening that had blackline changes showing revisions made,

17   correct?

18   A.    I can't tell from this email who created the blackline.

19   It just simply says "for your review a new draft of the

20   agreement from the document we reviewed this morning with the

21   blackline changes showing revisions from the draft you read

22   this morning."

23   Q.    I understand.  But all I'm asking you right now is the

24   email is -- on its face says it's transmitting blackline

25   revisions to you, correct, in the opening paragraph?

STEPHEN W. BALL - CROSS-EXAM                    70

1    A.    Yes.

2    Q.    Okay.  And then he has a number of numbered paragraphs

3    where he specifically calls your attention to some of the

4    changes that he's making, correct?

5    A.    Yes.

6    Q.    And he says those changes are based upon the discussions

7    you had showing the revisions from the draft that you had read

8    that Friday morning, right?

9    A.    Correct.

10   Q.    All right.  And so, for example, if you look at paragraph

11   number 1, he said, "I removed the $80,000 payment in section

12   4a."  And then if you turn behind that to page 2 and look at

13   section 4a, you see in, this case, the bluelining.  You see

14   where he has removed that, an $80,000 payment, correct?

15   A.    Yes.

16   Q.    All right.  And if you -- turn down on paragraph 7 on that

17   email.  He calls out to your attention that he had revised

18   section 10 regarding Kentucky Fuel's obligation to mine.  Do

19   you see that?

20   A.    Yes.

21   Q.    And turn over to page 7 of the blackline on the covenant

22   to mine.  Do you see that?

23   A.    Yes.

24   Q.    And all of the blueline with the lines drawn through it,

25   that has been deleted from the draft that you read Friday

STEPHEN W. BALL - CROSS-EXAM                    71

1   morning, correct?

2   A.   I can't tell if it was blue or not.  My copy is black and

3   white.

4   Q.   Okay.

5   A.   But there are definitely several lines that have been

6   deleted.

7   Q.   All right.  Under that Article 10 on your copy, they start

8   with the fourth line down after the end of the words "these

9   real properties." It deletes everything else there, correct?

10  A.   Yes.

11  Q.   And that was deleted, obviously, from an earlier draft

12  that you had read that morning, correct?

13  A.   It appears so, yes.

14  Q.   Okay.  And those deletions included the definition of

15  industry standards, allowing you to consider the economic

16  circumstances of the coal industry, future coal prices, current

17  conditions of the buyer, and other circumstances as a

18  reasonable prudent coal producer would consider at the time of

19  making such determinations.  That was all deleted after your

20  negotiations, correct?

21  A.   Can I take a second to read it?  I mean, there are other

22  things deleted, but that language that you read, it has been

23  deleted.

24  Q.   Yes, sir.  And if you look back at the first page of that

25  exhibit in the paragraph that follows the numbered paragraphs,

STEPHEN W. BALL - CROSS-EXAM                    72

1   Mr. Schmid asks you to review these and make sure that he had

2   correctly incorporated your discussions, correct?

3   A.   Yes.

4   Q.   And then the -- if you want to compare it, if you need

5   to -- I know you've probably got it memorized by now -- but the

6   Article 10 or paragraph 10 in the finalized fourth amendment

7   that everyone signed, that is with no changes from this

8   blacklining; in other words what we saw on the blacklining was

9   deleted and what was left in the blacklining, that's what

10  became the final, isn't it?

11  A.   I believe so, yes.

12  Q.   Let me ask another question about the fourth amendment.

13  You said that -- you said that frequently your agreements have

14  alternative dispute resolutions on them.  And I think probably

15  all the lawyers in the room are familiar with that.  Would that

16  be a fair statement?

17  A.   I think so, yes.

18  Q.   And those typical alternative dispute resolutions may vary

19  in the exact remedy, but typically it's for mediation or

20  arbitration or a combination of both?

21  A.   I wouldn't say -- limit it to only those two, but those

22  are not uncommon.

23  Q.   Okay.  Would you say that's typical?

24  A.   That those two are included, just so I understand your

25  question?

1  Q.   Yes, sir.

2  A.   It's not uncommon to have mediation and arbitration

3  included.

4  Q.   Okay.  And arbitration frequently is under -- do some of

5  your agreements have them where the arbitration is under the

6  auspices of an organization like the American Arbitration

7  Association or an outfit called JAMS or some other organization

8  like that?  Do you all use those?

9  A.   We have used those organizations before, yes.

10 Q.   And even where you don't use one of those orgranizations,

11 it will frequently call for the appointment of one or more

12 arbitrators which can be selected in a variety of methods.  Am

13 I right so far?

14 A.   If it's going to be the ultimate decision-maker, yes.

15 Q.   Uh-huh.  And then those arbitrators will hold a hearing

16 with whatever rules the parties agree on, and each party comes

17 in and argues and puts on their evidence and makes their

18 argument, right?

19 A.   Again, if it's intended to be the ultimate resolution,

20 yes.

21 Q.   Yeah.  And you have some, I assume, where it's like a

22 mediator where the mediator can't make the ultimate

23 determination, but they try to act as a neutral third party

24 just to bring you together?

25 A.   I've seen those, as well, yes.

STEPHEN W. BALL - CROSS-EXAM                    74

1   Q.   Okay.  This provision in Article 7 for the appointment of

2   an independent arbiter -- let me back up.   In those typical

3   arbitration provisions that we see, the arbitrators hold the

4   hearings and then the arbitrator, or arbitrators, they render

5   an award after whatever proceedings they hold with the parties

6   and then that award may or may not be subject to Court review,

7   right?  That's how it works normally?

8   A.   It just depends, but that is one possible way it goes,

9   yes.

10  Q.   Have you ever entered into their other agreements like

11  this which say that in the event of default, that one party

12  unilaterally can select an independent arbiter who can estimate

13  the amount of the damages, and that his award, as estimated, is

14  immediately due and payable?

15  A.   I don't think that's what this says, but -- but this is

16  fairly unique language.

17  Q.   Okay.  And when you say "fairly unique," you haven't

18  entered into any other contracts with that type of language,

19  have you, sir?

20  A.   Not word for word, no.

21  Q.   Have you entered into any other, irrespective of whether

22  it's word for word, where one party can appoint an independent

23  arbiter to estimate the damages and that such amount shall be

24  immediately due and payable as opposed to holding a contested

25  procedure with lawyers arguing and expert witnesses and the

STEPHEN W. BALL - CROSS-EXAM                75

1   like?

2   A.    Again, I don't think that's what this agreement says.  I

3   think you are interchanging the words "damages" with

4   "royalties."  But we do have contracts where one side, in its

5   sole discretion, can use a third party to adjudicate an issue.

6   Coal quality is a common issue.

7   Q.    On coal quality?

8   A.    Yes.

9   Q.    Do you have any like that on lost royalties?

10  A.    I do believe we have certain leases that if the parties

11  can't come to an agreement, the landlord, in its sole

12  discretion, can make a determination.  And then at that point,

13  obviously, if we disagree with it, we would take that up with

14  the Court.

15  Q.    I see.  Okay.  And make -- the landlord could make the

16  determination as to what?

17  A.    It's not uncommon to have disputes over what the sales

18  price is over weights on some of these jobs.  It maybe just

19  doesn't justify having truck scales on the job, so you are

20  estimating weights.  So it's not uncommon to get into a dispute

21  with the landlord over the actual quantity of coal that has

22  been removed.

23  Q.    Your leases, do those leases provide that the landlord can

24  determine the amount of money due to the landlord, and that the

25  amount determined by the landlord must be paid immediately?

STEPHEN W. BALL - CROSS-EXAM                76

1   A.    Normally, it would be due within the -- whatever the

2   agreement says.  So if a royalty is due by the 20th of the

3   following month, and they make a determination as to what the

4   average sales price is, this comes into play if they don't

5   believe you are selling to a true third party, if they believe

6   you are selling to a related party, and so they try to

7   interpose a different sales price.  If you can't reach an

8   agreement, they will send you a notice that says, this amount

9   is due.  And typically it would be due on the due date under

10  the lease.

11  Q.    Let me ask you just to make sure that we're -- there's no

12  misunderstanding on the sequence involving the introductions

13  that Mr. Brownlow made of -- was it Lloyd Williams, I think you

14  mentioned, through his attorney, a Mr. Neihous?

15  A.    That's correct.  I was contacted by Mr. Neihous first.

16  Q.    Yeah.  And I think I understood your testimony, but some

17  of it may have blurred together, and I just want to make clear.

18  A.    Okay.

19  Q.    When you said that Mr. Brownlow was the moving force

20  behind setting up a meeting, that was the meeting in Beckley

21  County that you described where he may or may not have been

22  present, correct?

23  A.    Being a West Virginian, I have to correct you.  It's

24  Raleigh County, but it's Beckley, the town of Beckley.

25  Q.    Okay.  Forgive me.  And that meeting was in 2010, right?

STEPHEN W. BALL - CROSS-EXAM                    77

1  A.    Yes.

2  Q.    Roughly August, September time frame?

3  A.    I think it was September, but I can't rule out August.   It

4  was definitely late summer, early fall.

5  Q.    And that was prior to the execution of the fourth

6  amendment?

7  A.    That's correct.

8  Q.    And one of the things at that time, correct me if I'm

9  wrong, in the back and forth between you and Mr. Schmid, he was

10  saying, you know, at that point Mr. Brownlow's company,

11  Fivemile Energy, LLC, had gone out and acquired new leases and

12  married those up with the old Fivemile leases.   That's what

13  ultimately became the fourth amendment?

14  A.    Correct.

15  Q.    And Mr. Brownlow, through Mr. Schmid, was saying to you, I

16  want something done with this property and, you know, we can

17  try to do what became the fourth amendment; if not, I've got

18  other possibilities and we need to look at those, right?

19  A.    Correct.

20  Q.    Okay.  And as part of that process, somehow he had come in

21  contact with Mr. Williams, that's Lloyd Williams?

22  A.    That's Lloyd Williams, yes.

23  Q.    And he had introduced Lloyd Williams to you in an effort

24  to try to do something with this property and said this -- this

25  fellow wants to mine the property and you may want to talk to

STEPHEN W. BALL - CROSS-EXAM                78

1    him.  Is that a fair statement?

2    A.    Yes.

3    Q.    Okay.  And so you did talk to him, and I think ultimately

4    concluded and even discussed with Mr. Brownlow that you all

5    collectively didn't think Mr. Williams had enough money to

6    finance, I think Mr. Justice mentioned it was a substantial

7    capital expenditure, to start mining, and you all concluded

8    that Williams probably couldn't carry that freight, right?

9    A.    Yes.

10   Q.    And so as a result of that, the discussion with Williams

11   went nowhere and you wound up doing the fourth amendment.  Is

12   that a fair way to summarize it?

13   A.    The only clarification is the conversations with Williams

14   continued, but they weren't gaining any traction.  I mean, he

15   definitely remained interested, but because there was no

16   reasonable expectation of a pretty quick transaction with him

17   in the fall of '10, we moved forward with the fourth amendment.

18   Q.    Okay.  And so you entered into the fourth amendment, and

19   actually that amendment, I think we can all agree, has

20   basically a nonassignment clause that your obligations under

21   that can't be assigned to someone else without New London's

22   consent, right?

23   A.    I believe that's right, yes.

24   Q.    Okay.  And later on -- I think you said it was in May 2012

25   when you entered into the first agreement with Mr. Williams or

STEPHEN W. BALL - CROSS-EXAM                79

1   his companies, that ultimately led to what -- what I call the

2   NewLead transaction, and what your learned counsel calls the

3   Williams transaction, right?

4   A.   Correct.

5   Q.   Okay.  And that was done just because Mr. Brownlow had

6   introduced you to Mr. Williams roughly a year earlier, you had

7   done the deal with Mr. Brownlow, and then later on,

8   Mr. Williams somehow, through you all, came back into the

9   picture?

10  A.   Mr. Williams stayed involved throughout 2011, and actually

11  worked some with Doug Terry.  And I think Doug Terry had

12  reached out to Mr. Brownlow on keeping the leases together.  So

13  I can't make it sound like that he went nowhere and then just

14  showed back up in 2012.

15  Q.   And I am not trying to --

16  A.   Okay.  I may have misunderstood.

17  Q.   -- imply that you are.  But would you say Mr. Brownlow was

18  the catalyst?  He had introduced him to you sometime in 2010.

19  That deal went nowhere, but he continued to hover around the

20  edges?  Is that a kind of fair summary?

21  A.   All the parties remained the same, yes.

22  Q.   Okay.  The Court asked you earlier -- or asked Mr. Justice

23  about other litigation, and one of the questions that His Honor

24  asked Mr. Justice was whether or not either company had ever

25  been sanctioned by any other federal court.  Do you know the

STEPHEN W. BALL - CROSS-EXAM                    80

1  answer to that?

2  A.   I'm not aware of any other federal court off the top of my

3  head.

4  Q.   How about state courts?

5  A.   Kentucky Fuel has been sanctioned in state court before.

6  Q.   How many times?

7  A.   The only one that is coming to me off the top of my head

8  is in Harlan County, Kentucky.

9  Q.   What case was that?

10 A.   It was Michael Branham versus Kentucky Fuel and Bluestone

11 Coal Corporation.

12 Q.   B-r-a --

13 A.   -- n-h-a-m.

14 Q.   And was -- rough time frame, when was that case pending?

15 A.   It's been during the pendency of this case.

16 Q.   Okay.

17 A.   And I'm going to say 2013-ish.

18 Q.   When was it finally disposed of?

19 A.   Its still -- it's still pending.

20 Q.   You're not aware of any by any federal courts, other than

21 this Court?

22 A.   I certainly could refresh myself, but as that question

23 came up this morning, I've been racking my brain and I can't

24 think of any off the top of my head.

25 Q.   What about by administrative agencies?  Have they ever

STEPHEN W. BALL - CROSS-EXAM                    81

1   been sanctioned by them?

2   A.    That's a -- I'm not trying to be difficult here, but

3   that's a difficult thing for me to answer when you get into

4   administrative agencies, because in the mining industry we

5   routinely receive various types of violations that we deal with

6   through the administrative process.  So I -- I would need to

7   better understand what you are trying to describe as a

8   sanction.

9   Q.    I'm not talking about -- I'm sorry, I didn't mean to

10  interrupt you.  I apologize.

11  A.    No, that's fine.

12  Q.    I'm not talking about cessation orders or environmental

13  penalty or the like, but basically for conduct during

14  litigation or during contested proceedings before an agency or

15  a board.  Has it been sanctioned?  Have either company been

16  sanctioned?

17  A.    Not that I can think of.

18  Q.    You were aware, I'm sure, that one of the questions that

19  we asked you in interrogatories in this case was about prior

20  lawsuits that either company had been involved in.  Do you

21  remember that?

22  A.    Yes.

23  Q.    And do you recall that we specifically excluded from that

24  workers' comp suits?

25  A.    I don't remember that exclusion specifically, but I'm

STEPHEN W. BALL - CROSS-EXAM                    82

1   willing to take your representation to that.

2   Q.   All right, sir.  And just by the way, if you have another

3   suit carving out workers' comp suits and if you -- if that is

4   an insured event or you've got insurance coverage and the

5   insurance company hires a counsel to defend you, who is still

6   the client in that case?

7   A.   Whoever the named defendant is.

8   Q.   That would be, in our case, either Kentucky Fuel or the

9   James C. Justice Companies, Inc., right?

10  A.   Correct.

11  Q.   So the insurance company -- if you are asked for cases to

12  which you have been a party, the fact that it's being defended

13  pertinent to an insurance contract doesn't somehow relieve you

14  of the obligation to identify that type of suit, does it?

15  A.   No.

16  Q.   And you understand, I'm sure, and correct me if I'm wrong,

17  if I'm incorrect, that one of the reasons in litigations that

18  you ask for the other lawsuits that an opposing party has been

19  in is to try to see if there are other lawsuits that may be

20  similar or that may raise the same issues so we can -- so that

21  a party can determine if there are any inconsistencies in what

22  you say or do in this case or what you -- I don't mean you,

23  personally -- but what the party says or does in another case?

24  Is that -- can we agree on that?

25  A.   I'm going to defer to the lawyers on that.  I'm not sure

STEPHEN W. BALL - CROSS-EXAM                    83

1  why different lawyers ask for that information, but I'll take

2  your word that that's why you asked for that information.

3  Q.   All right.  I'd like for you to look, please, at

4  Plaintiffs' Exhibit 7.

5           THE COURT:  You have it there, Mr. Ball?

6           THE WITNESS:  I do, yes.

7  BY MR. LUCAS:

8  Q.   Do you have it, sir?

9  A.   I do.

10  Q.   All right.  Turn, if you would -- and just for the record,

11  that is the defendants' -- both defendants' supplemental

12  responses to the plaintiffs' first interrogatories and request

13  for production of documents.  Do you see that?

14  A.   Yes.

15  Q.   Look at page 12.  I'll give you a minute just to -- it's

16  in the record, so just read that interrogatory to yourself and

17  look at your answer and tell me when you have, and then I'll

18  ask you a couple of questions about it.

19  A.   Okay.

20  Q.   All right.  And does that refresh your memory as to

21  whether or not we asked you to identify all suits to which you

22  had been a party, excluding workers' comp suits?

23  A.   Yes.

24  Q.   And this interrogatory answer has never been supplemented

25  in this litigation, has it?

STEPHEN W. BALL - CROSS-EXAM                    84

1    A.    I don't know if it has or not.

2    Q.    To your knowledge, it hasn't?

3    A.    To my knowledge, it has not.

4    Q.    And this is a number of actions in state courts.  Those

5    state courts are all in Kentucky, right?

6    A.    Yes.

7    Q.    During the period 2005 up until today, has either company

8    been involved in any state court litigation in West Virginia?

9    A.    Yes.

10   Q.    North Carolina?

11   A.    I can't say for sure.  I'm not -- I'm not recalling a

12   North Carolina lawsuit off the top of my head.

13   Q.    Virginia?

14   A.    I'm not recalling any Virginia lawsuits off the top of my

15   head.

16   Q.    Tennessee?

17   A.    I don't believe -- excuse me.  I don't believe there have

18   been any suits in Tennessee.

19   Q.    Any other states other than West Virginia and Kentucky?

20   A.    Not that I can recall.

21   Q.    All right.  How about federal court suits?  There's none

22   identified on here.  Have they been involved in any federal

23   litigation from 2005 to the present?

24   A.    Off the top of my head, I can't recall either of these

25   entities being sued in federal court.

STEPHEN W. BALL - CROSS-EXAM                    85

1   Q.   Other than this lawsuit right here --

2   A.   Correct.

3   Q.   -- correct?  Isn't it a fact these defendants are

4   involved, not the one that my client filed, in another case

5   in this very court?

6   A.   It's not coming to me off the top of my head.  If you'll

7   refresh me, I'm happy to consider it, but --

8   Q.   Does it refresh your recollection if I suggest to you that

9   during this time, both at the time these interrogatories were

10  served on you -- and by the way, who signed these?

11  A.   I did.

12  Q.   Okay.  Were they notarized and sworn?

13  A.   Yes.

14  Q.   All right.  Before you signed these, what sort of due

15  diligence did you do to make sure that your answers were

16  accurate?

17  A.   We typically maintain a master litigation list for the

18  organization as a whole.  And at this time I would have relied

19  on A.J. Dudley and Dustin Dean and Roger Hunter to make sure

20  this accurately reflected the master litigation list.

21  Q.   Well, did you and Mr. Justice and other officers of the

22  company, in addition to what somebody might be maintaining on a

23  piece of paper or a computer screen somewhere, did you have

24  knowledge in your head about other litigation you were involved

25  in?

STEPHEN W. BALL - CROSS-EXAM                    86

1  A.   If a piece of litigation would have been in my head that

2  was not on the -- excuse me, not on the list, I would have

3  pointed that out.

4  Q.   Well, isn't it true that during this same time frame you

5  were involved, "you," meaning the companies, were involved in

6  litigation in federal courts literally from New York to Texas

7  and all sorts of places in between?

8  A.   I'm not aware of any suit ever in Texas.  I'm happy to be

9  refreshed, but I've never been involved in litigation in Texas.

10 We have had actions in New York.  I don't know that these

11 entities were involved.  But if -- I'm happy to -- if you want

12 to tell me the names of them, I'm happy to tell you if I'm

13 aware of them or --

14 Q.   Let me ask you about some other states first.  Isn't it a

15 fact, during this same time frame, you were involved in

16 litigation in federal court in West Virginia?

17 A.   I think I already answered that.  Off the top of my head,

18 I can't recall these two entities being served or being sued in

19 federal court.

20 Q.   Okay.  Let me just tick through some and see if the whole

21 picture refreshes your recollection.  Isn't it a fact during

22 that same time frame you've been involved in federal court

23 litigation in West Virginia, Louisiana, Virginia, Tennessee,

24 Kentucky, Pennsylvania, United States Court of Appeals for the

25 Fifth Circuit, United States Court of Appeals for the Sixth

STEPHEN W. BALL - CROSS-EXAM                    87

1   Circuit, Delaware, Texas, New York, and Georgia?

2          MR. GETTY:  I'm going to object.  There are other

3   organizations like Greenbrier and, you know, Greenbrier

4   Corporation --

5          MR. LUCAS:  I object to the speaking objection.

6          THE COURT:  Yes.

7          MR. GETTY:  I mean --

8          THE COURT:  Mr. Getty, the witness needs to answer

9   the questions.  This is a fair line of questioning, and it's

10  not proper to suggest the answer.  If you want to limit the

11  question to these entities or some others, Mr. Lucas, that

12  might help things along.

13         MR. LUCAS:  All of these questions --

14         THE COURT:  I'll overrule the objection.  Go ahead,

15  Mr. Lucas.

16         MR. LUCAS:  Thank you.  I didn't mean to talk over

17  the Court.  I apologize.

18  BY MR. LUCAS:

19  Q.   Turn to Plaintiffs' Exhibit 15, please, sir.  Tell me when

20  you've had a chance to look at it.

21  A.   Okay.

22  Q.   Now that you have -- you recognize that as a list of -- at

23  least a partial list of litigation to which Kentucky Fuel

24  and/or James C. Justice Companies, Inc. have been involved in

25  federal court from October 21, 2010 until the present?

STEPHEN W. BALL - CROSS-EXAM                88

1   A.   That's what it appears to be, yes.

2   Q.   Okay.  Look at the third page.  Top of the page, Short v

3   Kentucky Fuel Corporation and Southern Coal Corporation.

4             THE COURT:  You are -- are you still on Plaintiffs'

5   Exhibit 15?

6             MR. LUCAS:  Yes, Your Honor.

7             THE COURT:  Okay.  The copy that I have is a single

8   page.  It may have been a copying error.

9   BY MR. LUCAS:

10  Q.   Is this the copy that you have?

11  A.   I have three pages.

12  Q.   All right.  Your Honor, it is the partial list but --

13            THE COURT:  It's only page 1.

14            MR. LUCAS:  All right.  I apologize to the Court.

15            THE COURT:  Okay.  Thank you.  Thank you.

16  BY MR. LUCAS:

17  Q.   That case of Short v Kentucky Fuel Corporation, what court

18  is that pending in?

19  A.   It says Eastern District of Kentucky.

20  Q.   Look at the second page.  Sixth line down, and I may need

21  your assistance in the pronunciation again.  Circuit court.

22  How do you pronounce that.  Magoffin?

23            THE COURT:  Magoffin.

24            MR. LUCAS:  Magoffin.  Thank you, Your Honor.  Thank

25  you.

STEPHEN W. BALL - CROSS-EXAM                89

1    BY MR. LUCAS:

2    Q.   What's that lawsuit about, sir?

3    A.   I'm not familiar with that lawsuit.

4             MR. LUCAS:  Bear with me for one moment, Your Honor.

5             THE COURT:  Take your time.

6             MR. LUCAS:  I've got a copy I would ask to be passed

7    up to the witness.  I have a copy for counsel and a copy for

8    the Court.

9             THE COURT:  Okay.  Is the document not previously

10   marked as an exhibit?

11            MR. LUCAS:  It is not, Your Honor.

12            THE COURT:  What is it?

13            MR. LUCAS:  It's a certified copy of a complaint with

14   attachments and some summary judgment materials from that

15   Magoffin County lawsuit.

16            THE COURT:  Any objection to that being tendered,

17   Mr. Getty?

18            MR. GETTY:  No.

19            THE COURT:  That can be tendered to the witness,

20   Roger.  Thank you.

21            MR. LUCAS:  And I have a copy for the Court, also.

22            THE COURT:  Okay.  Thank you.

23            THE WITNESS:  Thank you.

24   BY MR. LUCAS:

25   Q.   Do you have in front of you now, Mr. Ball, a certified

1   copy of those papers from the lawsuit of Evans versus -- Evans,

2   et al versus Kentucky Fuel Corporation in the Circuit Court of

3   Magoffin County?

4   A.   Yes.

5   Q.   And that is litigation over the assignment of a coal

6   lease, correct?

7   A.   I would have to read this.  I'm not familiar with this

8   litigation.

9   Q.   All right.  Well, take a moment to familiarize yourself

10  with it.  Let me do this.  I may be able to shorten this.  Look

11  at the very last page.  There's a document there.  If you start

12  three pages from the back -- and by the way, my copy is copied

13  front and back.  Is your copy copied front and back?

14  A.   Mine is front only.

15  Q.   Okay.  If you look, then, probably five or six pages from

16  the back of yours, there's a document that says Execution

17  Version, Assignment of Real Properties Agreements.  Do you see

18  that?

19  A.   Okay.

20        MR. GETTY:  I don't think --

21  A.   Apparently some of mine are front and back.

22        MR. GETTY:  Mine are.

23  A.   It's really small, but I did find it.

24        MR. GETTY:  Mine has one page.  I don't see any

25  signature page.  It looks like it's just the first page of

STEPHEN W. BALL - CROSS-EXAM                    91

1  something.

2          MR. LUCAS:  May I see yours?

3          MR. GETTY:  I don't see a second page.

4          MR. LUCAS:  I think your pages on this may be out of

5  order.  Let me see another copy.  These pages are out of order.

6  Your Honor, I was using a copy that I had.

7          THE COURT:  Yes.

8          MR. LUCAS:  May I retrieve the original?  I want to

9  make sure we're all looking at the same document.

10         THE COURT:  Sure.  Roger, would you get the document

11 the witness has and return it to Mr. Lucas for me, please?

12         MR. LUCAS:  We had found this, and then we got the

13 certified copy from the clerk, and it may be in a slightly

14 different order than what I had.  Let me --

15     I'm going to keep this one.  And I think we're on the same

16 page now.

17         THE COURT:  Okay.  So it's the same document being

18 returned to the witness?

19         MR. LUCAS:  Yes, Your Honor.  Yes, sir.

20     You got yours back?

21         MR. GETTY:  No, I didn't get one back.

22         THE WITNESS:  Thank you.

23 BY MR. LUCAS:

24 Q.  I'm going to ask you right now to look seven pages from

25 the back.  And there's a page numbered 5, and it's signed by

STEPHEN W. BALL - CROSS-EXAM                    92

1   someone on behalf of Kentucky Fuel Corporation, and who is

2   that?

3   A.   Did you say seven pages from the back?  Because I'm not

4   seeing a signature seven pages from the back.

5   Q.   Okay.  Do you see a signature page where at the top it

6   says, assignee by Kentucky Fuel Corporation, a Delaware

7   corporation?

8   A.   Yes.

9   Q.   Okay.  And who signed it?

10  A.   James C. Justice II.

11  Q.   Okay.  And he was signing as the assignee of an assignment

12  of a real property agreement, correct?

13  A.   Yes.

14  Q.   All right.  And he refers in that, if you look -- look at

15  the fourth page from the back.  It says, "Assignment of real

16  property agreements," and that's a page numbered 1.  And go

17  down to the paragraph numbered 1.  Do you have that?

18  A.   Is it moving forward in the document from where I just saw

19  that, which is page number 5?

20  Q.   Well, look at -- if you keep going behind it, there's a

21  document called "Assignment of Real Property Agreements."  I

22  believe it is four pages from the end.

23  A.   Okay.

24  Q.   Do you see that?

25  A.   Yes.

STEPHEN W. BALL - CROSS-EXAM                    93

1   Q.   And it refers to a Schedule II.  Do you see that?

2   A.   Yes.

3   Q.   Okay.  And if you flip back a little earlier in the

4   document, because it looks like this is a certified copy, the

5   pages are a little bit out of order, but there is a Schedule II

6   there.  Do you see that?

7           MR. GETTY:  And that's the one -- I don't have a

8   second page.  I only have one page.  You see?  There's no other

9   page.

10          MR. LUCAS:  You've got them out of order.  It starts

11  with this page 1 and there's page --

12       (Off the record.)

13  BY MR. LUCAS:

14  Q.   All right.  Do you have a Schedule II?

15  A.   Yes.

16  Q.   Okay.  You found the Schedule II?

17  A.   Does it say page 437 up in the top right-hand corner?

18  Q.   Yes.

19  A.   Yes.

20  Q.   At the bottom, does it have a stamp that says Exhibit B?

21  A.   Correct.

22  Q.   All right.  And in spite of all these pages on this copy

23  being out of order, turn over to the next page after the one

24  you just looked at.  And does it have --

25          MR. GETTY:  What page?

STEPHEN W. BALL - CROSS-EXAM                    94

1   BY MR. LUCAS:

2   Q.   Does it have a 6 at the bottom -- or, excuse me, I believe

3   it's an 8.

4   A.   It's an 8.

5           THE COURT:  I'll tell you that I cannot find those

6   last page references, Mr. Lucas.  It's an unwieldy document.

7   Go ahead with your questioning.  If I need to see a copy, I'll

8   hopefully get a better one.

9           MR. LUCAS:  I will.  I apologize.  We got them from

10  the court as a certified copy, and we didn't think it was

11  appropriate to change the pages.

12          THE COURT:  Okay.  Go ahead.

13          MR. LUCAS:  They obviously are not in the right

14  order.

15          THE COURT:  Go ahead with your question.

16  BY MR. LUCAS:

17  Q.   On that page you see Article 1.4?

18  A.   Yes.

19  Q.   And under the first subpart of that subpart in defining

20  the coal that royalties will be paid on, it specifically limits

21  it to mineable and merchantable coal in that exact language,

22  correct?

23          MR. GETTY:  I don't see this.

24          THE COURT:  I found it now in my copy.

25          MR. GETTY:  Show me your page.

STEPHEN W. BALL - CROSS-EXAM                    95

1              THE COURT:  What is confusing is --

2              MR. LUCAS:  Here, I'll let you have that one.

3    A.   Yes.

4    Q.   Okay.  How many of these other cases, if you have any

5    idea, might have other lease agreements that Kentucky Fuel is a

6    party to or involved with that have similar language where it

7    specifically calls out mineable and merchantable coal as

8    opposed to the type of language that we have in the fourth

9    amendment?

10             THE WITNESS:  Can you remind me what exhibit that

11   litigation list was?

12             THE CLERK:  15.

13             THE COURT:  15.

14             THE WITNESS:  15.  Thank you.

15   BY MR. LUCAS:

16   Q.   And I'm not confining the question, sir, just so we

17   understand, to Exhibit 15, but as to -- that's only federal

18   suits -- any other litigation that you haven't disclosed to us.

19   Are you able to say how much of that litigation could lead to

20   the discovery of other admissible evidence?

21             MR. GETTY:  Just for the record, this is not just

22   federal cases.  There are several state cases.  Greenbrier

23   County, West Virginia, and Magoffin County

24             MR. LUCAS:  I did misstate.  There are two state

25   cases on there.  I mentioned one of them earlier.  And you're

STEPHEN W. BALL - CROSS-EXAM                96

1   correct, Greenbrier County.

2              THE COURT:  You want to, please, restate the

3   question, Mr. Lucas?

4              MR. LUCAS:  I'll withdraw the question, Your Honor.

5              THE COURT:  Well, okay.  That's your choice.

6              MR. LUCAS:  Let me ask this.  What did the Court

7   perceive was the problem with the question?

8              THE COURT:  That it had been hanging too long with an

9   addition by Mr. Getty and then a clarification by you.

10             MR. LUCAS:  All right.

11             THE COURT:  There are actually two questions.  The

12  first was followed by a clarification.  And Mr. Getty had a

13  point that you agreed with.  I wanted to make sure that the

14  witness had a clear question posed to him.

15             MR. LUCAS:  Thank you.  And I'll do that.

16  BY MR. LUCAS:

17  Q.   Other than the two state court cases shown on here and the

18  other federal cases, are you able to say how many other cases

19  that have not been disclosed to us, that if we had access to

20  those files, it might lead to the discovery of admissible

21  evidence?  Do you know?

22  A.   I'm not aware of any other ones.  And the case you have

23  identified is the only case that I see that involves a landlord

24  on Exhibit 15.

25  Q.   What about other litigation that has not been disclosed to

STEPHEN W. BALL - CROSS-EXAM                97

1   us that is not on this particular list?  Do you know?

2   A.   I'm trying to think if there is any other litigation, and

3   I can't think of any involving these parties.

4              MR. LUCAS:  May I have just a moment, Your Honor?

5              THE COURT:  Take your time.

6          (Off the record.)

7   BY MR. LUCAS:

8   Q.   All right.  Mr. Ball, let's turn to one last topic, if we

9   may.  You talked about -- will you forgive me if I refer to

10  it -- I'm so used to -- as the NewLead transaction?  I know you

11  regard it as the Williams transaction.

12             THE COURT:  I'm sorry.  In the interest of time,

13  Mr. Lucas, the last document that was handed to the witness,

14  was that intended to be admitted as an exhibit?

15             MR. LUCAS:  Yes, Your Honor.

16             THE COURT:  Okay.  Is there an objection to that,

17  Mr. Getty?

18             MR. GETTY:  No.

19             THE COURT:  That 35, now, Sheila?

20             THE CLERK:  It's 36.  What about Exhibit 15?  It has

21  not been admitted either.

22             THE COURT:  Okay.  Thank you for raising that.

23  Exhibit 15?

24             MR. LUCAS:  I do offer that, Your Honor.

25             THE COURT:  Mr. Getty?

STEPHEN W. BALL - CROSS-EXAM                    98

1      MR. GETTY:  No objection.

2      THE COURT:  So Plaintiffs' Exhibit 15 and 36, those

3  will be admitted into evidence.

4   Mr. Lucas, I'm sorry to have interrupted your train of

5  thought.

6      MR. LUCAS:  No, I appreciate -- I appreciate you're

7  doing it, Your Honor.

8  BY MR. LUCAS:

9  Q.   Mr. Ball, correct me if I have a misunderstanding.  I

10  understand from one of your prior filings in this case, that --

11  you claimed that one of the reasons that you wanted to do this

12  NewLead transaction was to generate reserve that you could use

13  to mitigate damages; is that correct?

14  A.   I'm not familiar with that specific filing.

15  Q.   Okay.  I'm referring to your response to plaintiffs'

16  renewed motion for sanctions.  That response was filed on

17  November 27 of this year.  And given the recent filing, is that

18  one of the documents that you would have reviewed at the time?

19  A.   No.

20  Q.   Okay.  In it, in referring to some of the emails related

21  to NewLead, the document says Kentucky Fuel was interested in

22  getting these payments, i.e., the payments from Magnum or

23  Hanover or NewLead, because it remained responsible for these

24  payments under the fourth amended assignment of leases and

25  permits.

1    So my question is, in reading that language, what that

2    tells me -- and I want to make sure I'm interpreting it

3    right -- is that you are saying you wanted to get these

4    payments from NewLead because you were still liable to the

5    plaintiffs under the fourth amendment, correct?  Or is that

6    correct?

7    A.   The way I understand what you just read, yes.

8    Q.   Okay.  And you understand, I'm sure, that pursuant to

9    Judge Van Tatenhove's order, that one of the reasons that we're

10   here -- or the reason that we're here is to hear what evidence

11   that the defendants have about their efforts to mitigate

12   damages.  Do you understand that?

13   A.   I'm not overly familiar with Van Tatenhove -- or Judge Van

14   Tatenhove's order.  If that's what it says.

15   Q.   Okay.  Well, so my question then is, did the defendants

16   regard the payments to be generated by this Williams-NewLead

17   transaction to be monies to be used in mitigation of damages?

18   A.   Those payments were received in 2013 and '14.  So I

19   don't -- I can't connect that with this statement made in 2018.

20   Q.   Okay.

21   A.   I'm not sure I understand.

22   Q.   So when the payments were made, can we agree when the

23   payments were made to you in whatever amount -- at least 8 1/2

24   million, correct?

25        MR. GETTY:  Objection.

STEPHEN W. BALL - CROSS-EXAM                    100

1   A.   I think we received --

2        THE COURT:  Hang on just a second.  There was an

3   objection.  The basis of the objection, Mr. Getty?

4        MR. GETTY:  It's inconsistent with what he testified

5   as to what they received.  They did not receive 8 1/2 million

6   dollars.

7        THE COURT:  Hang on just a second.

8        MR. GETTY:  7 1/2.

9        THE COURT:  Mr. Lucas, the 8 1/2 million figure does

10  appear to be different than the 7 1/2 or the 11 million.  Can

11  you break it down a different way?

12       MR. LUCAS:  I'll ask the witness about that.

13       THE COURT:  Okay.

14  BY MR. LUCAS:

15  Q.   The principal amount of the note from NewLead payable to

16  Kentucky Fuel was 7 1/2 million, correct?

17  A.   Yes.

18  Q.   You actually received, according to your figures,

19  something in excess of 8 1/2 million, right?

20  A.   Just over 8 1/2.

21  Q.   Uh-huh.

22  A.   A year and a half later.

23  Q.   All right.  So back when that was received, did Kentucky

24  Fuel do anything to mitigate its damages by remitting that

25  money to the plaintiffs?

STEPHEN W. BALL - CROSS-EXAM                101

1  A.    It continued to pay the annual minimums.

2  Q.    It paid the annual minimums.  Did it do anything else to

3  mitigate damages?

4  A.    I think it's Kentucky Fuel's understanding that all that

5  is required under the fourth amendment is the minimum payments.

6  Q.    Okay.  So other than paying the minimum royalties

7  required, the proceeds from the Williams-NewLead transaction

8  weren't remitted to the plaintiffs to pay the plaintiffs for

9  any of the amounts that the plaintiffs claim are owed that are

10 the subject of the lawsuit; is that fair?

11       MR. GETTY:  Objection.  Assumes an obligation.

12 That's what you are here to determine.

13       THE COURT:  Well, yes, I am here to make a

14 determination as to damages, but it's a perfectly fair question

15 about the facts of whether payments received from NewLead were

16 sent to the plaintiff.  That's a fair question.

17       MR. GETTY:  That assumes that --

18       THE COURT:  No, no.  I don't think it's fair for you

19 to characterize or to add what is really a response to the

20 question.  You will be allowed to redirect the witness,

21 Mr. Getty.  I'll overrule the objection.

22    Go ahead with your questioning, Mr. Lucas.

23       MR. LUCAS:  Okay.

24 A.    Only the minimum payments.

25 Q.    Okay.  When the payments for NewLead were received or --

STEPHEN W. BALL - CROSS-EXAM                    102

1   excuse me, when the payments were received in connection with

2   that transaction, they didn't go into any kind of separate

3   account, either a nominal account or any kind of separate

4   account earmarked for the minimum royalties, they were just put

5   in general accounts, correct?

6   A.    Yes.

7   Q.    And one of those general accounts that they were put into

8   was the personal brokerage account of Mr. James E. Justice III,

9   correct?

10  A.    I'm not familiar with that.

11  Q.    You're not?

12  A.    Not off the top of my head, no.

13  Q.    Are you testifying that Mr. Justice didn't have that money

14  deposited into his brokerage account or you just don't know?

15  A.    I don't know.

16  BY MR. LUCAS:

17  Q.    Would you look at Plaintiffs' Exhibit -- if you got this

18  book -- 13bb?  We got to 13z, and it starts over again with

19  just 13b again.  I'm not sure how yours is tabbed.

20  A.    I have a 13bb.

21  Q.    Bb, boy?

22  A.    Boy, yeah.

23  Q.    Okay.  And do you recognize that -- who is Summer

24  Harrison?

25  A.    She's the vice president of treasury.

STEPHEN W. BALL - CROSS-EXAM                103

1  Q.   And she sent this email on December 19, 2013, to Jay

2  Justice, right?

3  A.   The top email, yes.

4  Q.   Okay.  And she said to him that Roger -- would that be

5  Roger Hunter?

6  A.   Yes.

7  Q.   And by the way, where it says "category," what is "red

8  category"?

9  A.   I don't see that.  Can you direct me to where that is?

10  Q.   Yes, sir, at the top portion of that email, about seven

11  lines or so down it says "categories."

12  A.   I'm not familiar -- I'm sorry.  I'm not familiar with what

13  that is.

14  Q.   You don't know what "red category" means.  Does that

15  signal to you it's very important or anything?

16  A.   No.

17  Q.   Okay.  And then she says "Roger" -- that would be Roger

18  Hunter, right?

19  A.   Correct.

20  Q.   -- "said we should get paid on Monday for NewLead.  This

21  is teed up to go to your account at GS."  Do you see that?

22  A.   Yes.

23  Q.   And Mr. Justice, Mr. Jay Justice, maintained a personal

24  brokerage account at Goldman Sachs, right?

25  A.   I can't say.

STEPHEN W. BALL - CROSS-EXAM                    104

1   Q.    Look at the next exhibit, please, which is 13cc.  And that

2   was an email from Mr. Hunter, correct?

3   A.    Yes.

4   Q.    And who is Marc Manuel?  Is he at the Magna Group?

5   A.    I can't say for sure, but that's my recollection.

6   Q.    And that's part of Hanover, right?

7   A.    I believe they're somehow associated.

8   Q.    Okay.  And this is the wiring instruction for that payment

9   to Mr. Jay Justice's personal brokerage account at Goldman

10  Sachs, correct?

11  A.    That's what this says, yes.

12  Q.    And how much was that payment?  Do you remember?

13  A.    Not off the top of my head.

14  Q.    How much total amount of the NewLead payments went into

15  Mr. Justice's personal brokerage account?  Do you have any

16  idea?

17  A.    No.

18  Q.    All right.  Look, if you would, at Plaintiffs' Exhibit 14.

19  Do you have that?  Or strike that.  I'll withdraw that.

20       Going back to NewLead and the issue of mitigation of

21  damages in this lawsuit, the defendants previously tried to

22  prevent the plaintiffs from learning the amounts that were paid

23  by or on behalf of NewLead; isn't that right?

24  A.    I'm not familiar with that.

25            MR. GETTY:  Your Honor --

STEPHEN W. BALL - CROSS-EXAM                    105

1          THE COURT:  Yes.

2          MR. GETTY:  -- my colleague, Ms. Harlan, has reminded

3    me any issue about fraudulent advances, that matter has been

4    stayed by the Court.  I'm not sure any of this is really

5    relevant in light of that revelation.

6          THE COURT:  Mr. Lucas, did you hear the objection,

7    sir?

8          MR. LUCAS:  I did not, Your Honor.

9          THE COURT:  Can you restate it, Mr. Getty?

10         MR. GETTY:  Yeah, Danielle just reminded me that with

11   respect to any allegation where money went or fraudulent

12   conveyances, allegedly, that the fraudulent conveyance has been

13   stayed by the Court.  I don't think it's pertinent here.

14         THE COURT:  Mr. Lucas?

15         MR. LUCAS:  I'm not trying a fraudulent conveyance

16   here.  But they've testified that the money from NewLead came

17   in and they said that $8.5 plus million went to Kentucky Fuel,

18   and so I'm testing the accuracy of that statement.  It didn't

19   all go to Kentucky Fuel.  Some went into Mr. Justice's personal

20   brokerage account.  I think that's relevant.

21         THE COURT:  Mr. Getty, did the stay apply to

22   evidentiary hearings in this proceeding?

23         MR. GETTY:  I think it would.

24         THE COURT:  Well, on what basis?  Are you speculating

25   or do you have a Court order?

STEPHEN W. BALL - CROSS-EXAM                106

1      MR. GETTY:  In that proceeding, those claims have

2  been stayed.  They wouldn't be part of this evidentiary

3  hearing.

4      THE COURT:  I'll overrule the objection.  I'll allow

5  the evidence because it's relevant to the determination of

6  damages on the claims in this case.

7      MR. GETTY:  He again said 8 1/2.  It's 7 1/2.

8      THE COURT:  Okay.  Well, he's clarified the source of

9  that figure, though, now, Mr. Getty.

10      MR. GETTY:  All right.

11  BY MR. LUCAS:

12  Q.  All right.  I'll try to refresh your recollection on this,

13  Mr. Ball.  I have a document I'll ask to be passed up.

14      THE COURT:  Yes.  Is there an objection, Mr. Getty?

15      MR. GETTY:  No.  It's a pleading.

16      THE COURT:  Okay.  That can be tendered to the

17  witness.  Thank you, Roger.

18      MR. LUCAS:  And, Your Honor, for the record, it's

19  Document 115.  It's the Defendants' Supplemental Motion for

20  Protective Order.

21      THE COURT:  Okay.

22      MR. LUCAS:  And here.  I've got a copy for the Court,

23  also.

24      THE COURT:  I can pull it up if you need that one.

25      MR. LUCAS:  I don't, Your Honor.  Whichever is more

STEPHEN W. BALL - CROSS-EXAM                107

1   convenient.

2          THE COURT:  Would you grab that for me, Roger?  Thank

3   you.

4   BY MR. LUCAS:

5   Q.   Do you see that that is your company's supplement to their

6   motion for protective order, which was filed on the 16th day of

7   August, 2013?

8   A.   Yes.

9   Q.   Okay.  And direct your attention to the second page,

10  paragraph 6.  Would you just read that into the record?

11  A.   "Even for assets/rights which relate to the leases and are

12  being transferred, the monetary consideration defendants are to

13  receive should not have to be disclosed to anyone, even the

14  plaintiffs."

15  Q.   Okay.  And you actually gave an affidavit in support of

16  that, correct?

17  A.   There's a reference in paragraph 4 to an affidavit given

18  by me, yes.

19          MR. LUCAS:  Okay.  I've got one other filing that I

20  would like to have passed up to the witness, Your Honor.

21          THE COURT:  Okay.  Any objection, Mr. Getty?

22          MR. GETTY:  No, it's Mr. Ball's --

23          THE COURT:  Affidavit.

24          MR. GETTY:  -- affidavit.

25          THE COURT:  That can be tendered to the witness.

STEPHEN W. BALL - CROSS-EXAM                    108

1       MR. LUCAS:  It's Document 115-1, Your Honor.  I

2  apologize, I don't have an extra hard copy.

3       THE COURT:  That's fine.  I've got it right here.

4  BY MR. LUCAS:

5  Q.   And do you recognize this as your supplemental affidavit

6  that was tendered in support of the motion that we just looked

7  at?

8  A.   Yes.

9  Q.   And look, if you would, at the third page.  It's the

10 paragraph that starts on the previous page numbered 6.  And I'm

11 going to direct your attention down to -- seven lines down.

12 And it says, referring to your motion for protective order,

13 "Plaintiffs would seek to extract leverage even and especially

14 in the context of this litigation if plaintiffs learn how much

15 defendants may make or the very transfer defendants have asked

16 plaintiffs to consent to allow."  And then there's a

17 parenthetical.  And then it says "Your defendants therefore

18 request permission to redact preproduction terms regarding what

19 the defendants are to receive."

20      Do you see that?

21 A.   Yes.

22 Q.   And does that refresh your recollection as to whether or

23 not you tried to prevent the plaintiffs from learning about the

24 amount of the payments made in connection -- made to Kentucky

25 Fuels or whomever in connection with the NewLead transaction?

STEPHEN W. BALL - CROSS-EXAM          109

1   A.   At this time, yeah, we were still requesting a consent

2   from New London.

3   Q.   Well, whether or not -- you had already requested a

4   consent, and you were still trying to keep the amount secret

5   because you wanted them redacted from any documents that you

6   produced, correct?

7   A.   Absolutely, yes.

8             MR. LUCAS:  Okay.  Your Honor, I would offer those as

9   the next two exhibits, please.

10            THE COURT:  Okay.  So that's 37 and 38, right,

11  Sheila?

12            THE CLERK:  Yes.

13            MR. GETTY:  No objection.

14            THE COURT:  Okay.  Those will be admitted.

15            THE WITNESS:  Your Honor, do I just lay these up

16  here?

17            THE COURT:  Yes, you can, unless -- are you finished

18  questioning about those?

19            MR. LUCAS:  Yes, Your Honor.

20            THE COURT:  Roger, let's get those and provide them

21  to Sheila for me, please.

22       Thank you Mr. Ball.

23            THE WITNESS:  Thank you.

24            THE CLERK:  Thank you.

25

STEPHEN W. BALL - CROSS-EXAM                    110

1    BY MR. LUCAS:

2    Q.   Mr. Ball, because of the comments that continue to be made

3    that you only got 7 1/2 millions dollars, let's just make that

4    abundantly clear.  In fact -- in fact, that's what you first

5    told the Court when you first filed an affidavit about how much

6    you got.  You said that the defendants received only a total of

7    $7.5 million, correct?

8    A.   I would have to see the exact language, but we received

9    7 1/2 million of consideration for the assets we sold.

10   Q.   Okay.  Principal amount?

11   A.   That's the principal amount.

12   Q.   Okay.  Well, I'll let you see that.  It's document 224-1.

13   If I can have it handed up to the witness, please, the exhibit.

14               THE COURT:  Any objection, Mr. Getty?

15               MR. GETTY:  None.

16               MR. LUCAS:  And I have a copy for the Court.

17               THE COURT:  Okay.  Thank you.  That can be tendered

18   to the witness.  Did you give both copies to the CSO?

19               MR. LUCAS:  Beg your pardon?

20               THE COURT:  Did you give both copies to the CSO?

21               MR. LUCAS:  I didn't have an extra copy.

22               THE COURT:  You don't.  I misunderstood you.  That's

23   fine.  I've got it.  I've got it here.

24               MR. LUCAS:  I thought I did, but I don't.

25               THE COURT:  The document number again?

STEPHEN W. BALL - CROSS-EXAM          111

1          MR. LUCAS:  224-1.

2          THE COURT:  Yes.  Okay.  Thank you.

3    BY MR. LUCAS:

4    Q.  And just to kind of orient you here, Mr. Ball, I'm sure

5    you'll be -- you may recall when the plaintiffs first filed

6    documents about this Williams-NewLead transaction, do you

7    remember correcting us because we had been looking at

8    documents, like you pointed out, the fifth amendment, and the

9    fifth amendment says that the payments to Kentucky Fuel would

10   be -- would be $11 million, correct?

11   A.  It was very poorly written, yes.  It could be read that

12   way, correct.

13   Q.  Well, I mean, let's be clear.  It not just could be read

14   that way, that's exactly what it says, right?

15   A.  I think that's what a reasonable person would conclude if

16   they read it.

17   Q.  Just to be clear, let's look at 13y, Plaintiffs' Exhibit

18   13y.

19          THE COURT:  Okay.  Sorry.  You have covered that

20   language in some depth already, correct, Mr. Lucas?

21   BY MR. LUCAS:

22   Q.  And I correct that, Plaintiffs' Exhibit's 13t.

23   A.  Okay.

24   Q.  And that's the fifth amendment to the asset purchase

25   agreement, correct?

STEPHEN W. BALL - CROSS-EXAM                    112

1    A.    Correct.

2    Q.    And look -- turn to the fourth page.  And if you go to the

3    very bottom, the last sentence on that page, it says, "Buyer

4    shall be entitled to remove and sell any and all coal, and

5    NewLead shall make the following payments."  Do you see that?

6    A.    Yes.

7    Q.    Okay.  And if you go to the next page at the top of the

8    page, it sets out two payments to the seller, and that's

9    Kentucky Fuel, right?

10   A.    Correct.

11   Q.    And then to Williams, right?

12   A.    Yes.

13   Q.    And those payments, where it says NewLead will make the

14   following payments to seller and it gives amounts and dates in

15   there, those all total $11 million to the penny, right?

16   A.    I believe so, yes.

17   Q.    All right.  So it's not a matter of interpretation or what

18   a person might think; that is what the document says, true?

19   A.    In that paragraph, yes.

20   Q.    Okay.  And so you can understand, I'm sure, why the

21   plaintiffs, in looking at that document, thought that Kentucky

22   Fuel got $11 million and not some other number, right, even

23   though you say that's incorrect now?

24   A.    If they only looked at that document, I can understand

25   that.  I can't if they had looked at all the documents.

STEPHEN W. BALL - CROSS-EXAM                113

1   Q.   You are saying they would have to have looked at the sixth

2   amendment?

3   A.   That's where it gets clarified, correct.

4   Q.   Are you aware that you all, at that time, had not produced

5   the sixth amendment to the plaintiffs?

6   A.   I don't know that.

7   Q.   And then if you look at your affidavit -- and what was the

8   date of that, of that fifth amendment?

9   A.   March 18th, 2013.

10  Q.   All right.  And what is the date of your affidavit that is

11  document 224-1?  When did you sign that, or when was it filed?

12  A.   December 16th, 2014.

13  Q.   Okay.  So roughly a year and a half later?

14  A.   Yes.

15  Q.   All right.  And look at page 3.  And in response to what

16  the plaintiffs were saying, where we were saying we thought

17  Kentucky Fuel got 11 million, in paragraph 9 you said

18  defendants received only a total of $7.5 million, not

19  11 million as stated, correct?

20  A.   Yes.

21  Q.   And that was actually incorrect, wasn't it?

22  A.   No, it is not.

23  Q.   Okay.  Didn't you receive something north of $8.5 million?

24  A.   Yes.  But not in the context of the 11 million.

25  Q.   Well, when you said here in this affidavit that in

STEPHEN W. BALL - CROSS-EXAM                    114

1    connection with the amounts from NewLead that you received only

2    a total of 7.5 -- 7.5 million dollars, did you disclose

3    anywhere that you had received forbearance fees, interest,

4    additional payments, additional stock, or anything else other

5    than that 7.5 million?

6    A.    That wasn't the purpose of that statement.

7              MR. LUCAS:  Your Honor, I would offer that affidavit

8    as the next exhibit.

9              THE COURT:  Any objection, Mr. Getty?

10             MR. GETTY:  No.

11             THE COURT:  That will be admitted as Defendants 39.

12             THE CLERK:  Yes.

13             THE COURT:  Yeah, you can leave it right there.

14   That's fine, Mr. Ball.

15             THE WITNESS:  Okay.  Thank you.

16   BY MR. LUCAS:

17   Q.    Let's go back and look at the fifth amendment -- or,

18   excuse me -- yeah, the fifth amendment.  Do you still have

19   that?  It's Plaintiffs' Exhibit 13t.

20   A.    Okay.  Okay.

21   Q.    Okay.  And you had mentioned earlier a $100,000

22   nonrefundable deposit that got paid, and depending on when it

23   was paid, it might -- if it was paid on time, it would be a

24   credit against the $7.5 million note, and if it was paid later

25   than whatever date that was, it would just be an additional

STEPHEN W. BALL - CROSS-EXAM                    115

1   payment.  Do you remember testifying about that?

2   A.   Yes.

3   Q.   And, in fact, it was paid later, so it wasn't credited

4   against the note, right?

5   A.   Correct.

6   Q.   But it was paid, right?

7   A.   I can't recall.

8   Q.   Okay.  Well, look at the sixth amendment.

9   A.   Where is the sixth amendment?

10  Q.   I'm sorry.  I'm sorry.  I misspoke.  Fifth amendment.

11          THE COURT:  It's Plaintiffs' Exhibit 13t.

12  BY MR. LUCAS:

13  Q.   Plaintiffs' Exhibit 13t.

14  A.   I'm on the fifth amendment.  I'm sorry.

15  Q.   Okay.  You got the fifth amendment?

16  A.   I thought you said sixth amendment.

17  Q.   I did.  I misspoke.

18  A.   Sorry.

19  Q.   Fifth amendment, 13t.  It describes that -- if you look at

20  the second page of the fifth amendment down in the last

21  "whereas" paragraph, it describes that NewLead actually did

22  deposit that $100,000 with Chicago Title, right?

23  A.   Yes.

24  Q.   So that money was deposited with Chicago Title, and they

25  disbursed all the money that they had, right?

1  A.    The bottom of that paragraph, it says -- well, it says was

2  to be released on February 18th.

3  Q.    Yeah.  And Chicago Title didn't hold on to any money, they

4  disbursed everything, right?

5  A.    I just can't recall off the top of my head.

6  Q.    Do you have reason to disagree with that, based on this

7  documentation, that Chicago Title paid that money?

8  A.    I don't know.

9  Q.    Okay.  You simply don't know if Kentucky Fuel got that

10 100,000 or not, is that what you're saying?

11 A.    As I'm sitting here, I don't recall if that hundred

12 thousand was released.

13 Q.    All right.  And then in addition to that hundred thousand

14 dollars, there was another $175,000 that you also received that

15 started out as stock but then was transformed into cash, right?

16 A.    I believe so, yes.

17 Q.    Okay.  So -- and just to be clear what I meant by that.

18 Originally you were entitled to receive $100,000 in NewLead

19 stock as part of the consideration, right?

20 A.    Not as part of the consideration.  It was as an extension

21 payment.

22 Q.    Okay.  To get the deal closed?

23 A.    To ask for more time for an opportunity to get the deal

24 closed.

25 Q.    Okay.  And then that hundred thousand dollar stock was not

STEPHEN W. BALL - CROSS-EXAM                117

1   delivered at that time, so that was changed to an obligation

2   for an additional -- or, excuse me, 100,000 -- $175,000 in

3   stock, there was a later amendment that actually changed that

4   to $275,000 cash in lieu of stock, right?

5   A.   I believe so, yes.

6   Q.   And you did get that?

7   A.   I think so, but I can't recall for sure.

8   Q.   Okay.  You just testified a moment ago you did.

9   A.   I think so, yeah.

10  Q.   Okay.  And then when that stock was changed to a

11  commitment to pay cash, in addition, you did get another

12  $175,000 of NewLead stock, right?

13  A.   I don't recall that.

14  Q.   Well, look at Plaintiffs' Exhibit 13u.  That's the direct

15  registration device for 290,000 shares of NewLead common stock.

16  Do you see that?

17  A.   Yes.

18  Q.   Does that refresh your -- I believe there's also one of

19  your defendants' exhibits of these stock transfer agreements.

20  Does that refresh your recollection?

21  A.   I don't know that I ever had a personal understanding of

22  whether or not this was received.  But it does appear like this

23  stock was transferred to Kentucky Fuel Corporation.

24  Q.   Now, the payments, if you go back to our friend,

25  Plaintiffs' Exhibit 13t, the fifth amendment, and if you go

STEPHEN W. BALL - CROSS-EXAM                    118

1   back to where on -- the page where it itemizes the payments to

2   the seller, that's page 5 of 9 at the top.

3   A.   Okay.

4   Q.   Where it itemizes those $11 million payments that you say

5   was corrected later, those are payments to be made from and

6   after the date of this agreement, right --

7   A.   Yes.

8   Q.   -- the hundred thousand dollars and the $175,000, and

9   they'd already been previously transferred or previously paid,

10  right?

11  A.   There were extensions for February, which would have been

12  a month earlier.

13  Q.   Yeah.  So they would have had to have been paid for you to

14  even be at this point in March, right?

15  A.   I would assume so, yes.

16  Q.   Let's go to your --

17           THE COURT:  Mr. Lucas, can we take a five-minute

18  bathroom break?

19           MR. LUCAS:  Of course.

20           THE COURT:  Now, just to update, I have found out

21  that my hearing at 3:00 will be short.  We can reconvene this

22  matter at 3:30.  I'll just take a break at 1:00, move upstairs

23  for some hearings, and come back down here at 3:30 instead of

24  having to end at 1:00.  Is that satisfactory, Mr. Lucas?

25           MR. LUCAS:  It is, Your Honor.  And if it helps the

STEPHEN W. BALL - CROSS-EXAM                    119

1   Court and everyone else, I'm nearing the end with Mr. Ball, so

2   based on that, I think we'll finish today, if that helps people

3   plan their schedules.

4            THE COURT:  Okay.  Mr. Getty, 3:30?

5            MR. GETTY:  That's fine.  I would like to get some

6   ruling, before we conclude this morning, on Mrs. Combs.

7            THE COURT:  Well, it'll be ripe when he calls her.

8            MR. GETTY:  All right.

9            THE COURT:  I just need a five-minute bathroom break.

10           MR. GETTY:  So do I.

11           THE COURT:  We'll be in recess for five minutes.

12       (A recess was taken from 12:21 to 12:28.)

13           THE COURT:  Thank you.  We're back on the record.

14  Mr. Ball remains on the witness stand.  Go ahead, Mr. Lucas.

15       (Off the record.)

16           MR. LUCAS:  Your Honor, my next exhibit is going to

17  be document 277-5, which is an affidavit by -- or declaration

18  by Mr. Ball, and I've got copies here.  It's got a number of

19  exhibits to it.  So just for completion, I'll have them, but

20  I'm getting them separated so I can give you a copy, and

21  Mr. Getty, also.

22           THE COURT:  Okay.  You don't need to worry about

23  getting a copy for me.  I can pull it up easily.

24           MR. LUCAS:  All right, sir.

25           THE COURT:  What's the record entry number again,

STEPHEN W. BALL - CROSS-EXAM                    120

1    Mr. Lucas?

2            MR. LUCAS:  277-5, Your Honor.

3            THE COURT:  Okay.  I got it.  Thank you.  Any

4    objection to that being tendered, Mr. Getty?

5            MR. GETTY:  No.

6            THE COURT:  Okay.  That can be provided to Mr. Ball.

7            MR. LUCAS:  Your Honor, for the record, this is

8    277-5, which is a declaration by Mr. Ball.  It has Exhibits A

9    through K.  On this particular hard copy, Exhibit I is not

10   included.  I can get it.  I have a copy here.  I'll correct it.

11   I now have an Exhibit I --

12           THE COURT:  Okay.

13           MR. LUCAS:  -- and can add to the witness copy.  It's

14   not anything that I'm going to question the witness on.

15           THE COURT:  Mike, you can go on and provide that to

16   Mr. Ball.

17       And you don't have to get it in its correct place.  If

18   that's burdensome, Mr. Ball, you can put it at the end.  That's

19   fine.

20           THE WITNESS:  Okay.

21   BY MR. LUCAS:

22   Q.  Mr. Ball, in your declaration here submitted in June of

23   2016 -- turn to page 5.  Do you have it?

24   A.  Yes.

25   Q.  And direct your attention to paragraph 12.  It itemizes

STEPHEN W. BALL - CROSS-EXAM                     121

1   there the payments that you say Kentucky Fuel received from

2   Williams and NewLead beginning on March 30, 2013, right?

3   A.   Yes.

4   Q.   And all of those payments that were made on that date --

5   or, excuse me, that are reflected on your affidavit were made

6   after the date of the fifth amendment, Exhibit 13t that we just

7   looked at a moment ago, right?

8   A.   The first payment's March 30th, 2013.

9   Q.   Yes, sir.  And that's after the execution of the fifth

10  amendment to the asset purchase agreement, right?

11  A.   Yes.

12  Q.   Okay.  And so payments made to Kentucky Fuel prior to that

13  date are not reflected in that $8,552,876 figure that you have

14  itemized there, are they?

15  A.   I can't say that for sure.  That's why when you were

16  questioning me earlier, I was saying I don't recall if we

17  received those or not.  Because I recall this affidavit and

18  this is the amount that was given to me by our accounting and

19  treasury department.  And just simply because they predate the

20  fifth amendment, I can't tell you for sure if they were

21  received or not.

22  Q.   Well, those are payments, you testified five minutes ago,

23  that had to be made prior to the sixth amendment because they

24  were payments to get an extension of time in order to get to

25  the sixth amendment, right --

STEPHEN W. BALL - CROSS-EXAM                    122

1    A.    To the sixth amendment.

2    Q.    -- or fifth amendment?

3    A.    They were payments that were part of the extension

4    request.  And they were incorporated into the fifth amendment.

5    Your specific question to me was do I know that we received

6    them.  And I think I told you several times, I don't know for

7    sure if we did receive.

8    Q.    After you said that initially, you also testified that

9    those payments had to be made because they were payments for

10   extensions in February, they had to be made before the sixth

11   amendment because those payments had to be made to get you to

12   the sixth amendment.  Do you recall giving that testimony?

13   A.    Into escrow.  And then you asked me if it was released to

14   us.  And I think my testimony was I don't know for sure if it

15   was released.  But I do believe they made the payment into

16   escrow.

17   Q.    Let me ask you this.  Even if -- if they were -- the stock

18   wasn't paid in escrow, was it?

19   A.    Not that I'm aware of.

20   Q.    And the payments to Chicago Title were, of course,

21   originally held in escrow by Chicago Title.  That's why they

22   were called deposits.  But they were released by Chicago Title,

23   as you had testified earlier, pursuant to the instruction given

24   to me, correct?

25   A.    I believe my answer to that is I don't know if they

STEPHEN W. BALL - CROSS-EXAM                123

1   released it or not.

2   Q.   Okay.

3         MR. LUCAS:  Your Honor, I would offer that as the

4   next exhibit.

5         THE COURT:  Any objection, Mr. Getty?

6         MR. GETTY:  No.

7         THE COURT:  Plaintiffs' Exhibit 40 will be admitted.

8   BY MR. LUCAS:

9   Q.   Mr. Ball, I want to question you a little bit just to

10  orient you to the next subject about the values that you

11  assigned to the leases and to tipple.  If you pick up, again,

12  your affidavit, that was document 224-1, Exhibit 39.

13        THE COURT:  Let's have that passed back to the

14  witness.  Which exhibit number?  Is that 39?  Okay.

15        MR. LUCAS:  Exhibit 39.

16        THE WITNESS:  Thank you.

17  BY MR. LUCAS:

18  Q.   Do you have that there, sir?

19  A.   Yes.

20  Q.   All right.  And you say here that the value of the leases

21  was based upon an estimated tonnage on the Fivemile permits of

22  2.5 million at $1 a ton or $2.5 million, right?

23  A.   That's what this says, yes.

24  Q.   Okay.  Is that, in fact, how you valued these for purposes

25  of the NewLead transaction?

STEPHEN W. BALL - CROSS-EXAM                124

1   A.    I don't recall that.

2   Q.    That's what you said in this affidavit.  Is that how it

3   was?

4   A.    That is what I said on December 16th of 2014.  I don't

5   recall that specific of a valuation on the coal on Fivemile,

6   but I wouldn't have said this without some basis for that.  I

7   just can't recall what it was.

8   Q.    Well, let's make sure we're clear on that.  This

9   declaration that you gave in '14, if you look just above it,

10  it's talking about the negotiations by which the leases were

11  assigned and the tipple was sold, and it was sold to Williams

12  Industries and NewLead Holdings for a total of 7.5 million,

13  right?

14  A.    That's what it says, yes.

15  Q.    Okay.  And then you say in this affidavit -- and that was

16  again sworn to, right?

17  A.    Yes.

18  Q.    So it's not something you did lightly, I'm sure?

19  A.    I've already said that.  I would not have done this

20  lightly.  I would not have done it without basis.

21  Q.    All right.  So you said the way you derive the value of

22  the lease -- well, you said, we got 2 1/2 million tons

23  permitted, we're going to value it at a dollar a ton, so that's

24  2.5 million.  That's what you said, right?

25  A.    Do you want me to just read the statement?

STEPHEN W. BALL - CROSS-EXAM                    125

1   Q.   I mean, just in common everyday language, is that what you

2   said?

3   A.   It says, "Of the total consideration, $5 million was

4   allocated towards the purchase of the Andy tipple.  The

5   assignment of the coal leases was based upon the estimated

6   tonnage located on the Fivemile permit, i.e., 2.5 million tons

7   valued at $1 per ton or $2,500,000.

8   Q.   All right.  And that breakdown of the values, of the

9   values allocated to the tipple and the leases, you've got a

10  specific formula, specific way of calculating the lease value,

11  and then the tipple value is the difference between that and

12  the 7.5 million purchase price, right?

13  A.   Mathematically it is.  I don't know if that's -- I don't

14  know how it was arrived at, but mathematically that works.

15  Q.   Well, this says you had a specific way, a specific -- not

16  just a number you pulled out of the air but a specific way of

17  determining the value of the leases, right?  You value them at

18  a dollar a ton?

19  A.   That's what this says, yes.

20          MR. LUCAS:  Okay.  And may I use the easel, Your

21  Honor.  May I approach that?

22          THE COURT:  Yes.

23  BY MR. LUCAS:

24  Q.   Just so we're clear, you said the leases, permitted area

25  only, 2.5 million tons times $1 per ton equals $2.5 million.

STEPHEN W. BALL - CROSS-EXAM                126

1   And so you had a specific way of calculating the value of the

2   leases and that's what it says on your affidavit, right?

3   A.    I've already said this several times.  My affidavit says

4   the assignments of the leases was based upon the estimated

5   tonnage located on the Fivemile permit, i.e., 2.5 million tons

6   valued at $1 per ton or $2.5 million.

7   Q.    All right.  And then you took a purchase price of

8   7.5 million, and if you subtract that 2.5 million from that, it

9   leaves you $5 million for the tipple, correct?

10  A.    That's not how it was arrived at, but mathematically that

11  works.

12  Q.    So now as I understand what you're saying, you're saying

13  it was arrived at a different way and you valued the tipple not

14  by that type of formula but you valued the tipple by how much

15  money you put into it; is that correct?

16  A.    That's not what I said.

17  Q.    Okay.  How did you value the tipple?

18  A.    It was by mutual agreement with Lloyd Williams, who had

19  established it as $5 million, very early on, well before we

20  ever signed an agreement with him.  And the entire allocation

21  of purchase price was by mutual agreement.  And if he wanted to

22  assign 2 1/2 million dollars to the tonnage, we were agreeable

23  with that.

24  Q.    Oh, okay.  I got it.  So you are saying you didn't really

25  come up with the value of the tipple, Mr. Williams did, and you

STEPHEN W. BALL - CROSS-EXAM                127

1  just accepted his figure?

2  A.   We had an agreement to allocate the purchase price, and

3  the parties agreed to allocate $5 million to the tipple.  We

4  actually believed it to be much higher than that, but that was

5  an agreed-upon allocation.

6  Q.   And that was based upon a figure that Mr. Williams gave

7  you; is that right?  I know you agreed to it.  But are you

8  saying that Mr. Williams said he -- you said he had valued the

9  tipple and then you agreed to it; is that correct?

10  A.   That was the agreed-upon allocation.  I can't tell you, as

11  I sit here today, did he throw out 5 million or did we.  I

12  don't believe it was us, because we believed it was more

13  valuable than 5 million.

14  Q.   Well, if the tipple then -- if you arrived at a value of

15  the tipple and said the tipple was worth 5 million, is that

16  because you -- you had to allocate 7.5 million purchase price

17  and you were saying, well, the tipple is 5 million, so the coal

18  must be worth 2 1/2 million?  Or were you saying the coal was

19  worth $1 a ton for the permitted area?

20  A.   Well, what we were saying is we agreed to 7 1/2 million

21  dollars, and the parties have to agree to allocate that

22  purchase price.  And I don't think that's uncommon at all in

23  commercial transactions, that once a total amount is agreed to,

24  then the parties can mutually agree how to allocate the

25  purchase price.  A buyer sometimes has different incentives

STEPHEN W. BALL - CROSS-EXAM                    128

1  than the seller for tax reasons.  I don't know what

2  Mr. Williams' incentives were.  But that was the agreed upon

3  allocations.

4  Q.   Well, what I want to know -- I know you agreed upon it and

5  you've made that clear, that you and Williams and everyone

6  agreed upon it.  But I want to know how you agreed upon it.  So

7  that's the -- just so you understand, that's the reason for my

8  questions.

9       So did you -- the total of those two figures -- may I

10  approach again, Your Honor?

11            THE COURT:  Yes.

12  BY MR. LUCAS:

13  Q.   The total purchase price that you're paying -- principal

14  amount that you are paying is 7 1/2 million, right?

15  A.   Received.

16  Q.   And you wanted to come up with -- you were allocating the

17  price between the tipple and the leases so that it would total

18  7 1/2 million, right?

19  A.   Correct.

20  Q.   Okay.  And so you allocated 5 million -- 5 million to the

21  tipple.  Are you saying, well, he wanted the tipple or we agree

22  that the tipple is worth 5 million, therefore the leases --

23  we're going to put the remaining 2 1/2 to the leases?  Or did

24  you say the leases, by golly, are worth $1 a ton for the

25  permitted area, so that's 2.5 million, and it's just a

STEPHEN W. BALL - CROSS-EXAM                    129

1   coincidence that the two of them total 7 1/2 million?  Which

2   way did you do it?

3   A.    It wouldn't be a coincidence.  It would be we agreed to a

4   total purchase price, which is $7.5 million.  And then it is

5   simply a math problem at that point as to what values you

6   assign and what the balance is.  So once the tipple had been

7   agreed upon and the real property had been agreed upon,

8   whatever was left was to be allocated to reserves, permits,

9   leases, what have you.

10  Q.    Okay.  So you say once the tipple had been agreed upon,

11  then the balance was attributable to the leases.  Did I hear

12  you right?

13  A.    Yes.

14  Q.    Okay.  I'd like for you to look at Plaintiffs' Exhibit

15  13a.  And if you'll also look at section 3.4 on page 11.  And

16  that deals with what we're talking about, right?

17  A.    Yes.

18  Q.    Okay.  And it says it'll be allocated among the assets as

19  set forth in schedule 3.4, and I think we may have already

20  looked at that, but turn to that, please.

21        All right.  And that says that on the allocation of the

22  purchase price, that the buyer -- that would be Mr. Williams --

23  is to propose how it gets allocated, correct?

24  A.    Yes.

25  Q.    All right.  Now, in fact, that got changed where it was

STEPHEN W. BALL - CROSS-EXAM                    130

1    Kentucky Fuel who set the allocation, not the buyer, isn't that

2    true?

3    A.    I don't know.

4    Q.    Okay.  Look at Plaintiffs' Exhibit 13b, which is the

5    second amendment to the asset purchase agreement.  Tell me when

6    you have it.

7    A.    Okay.

8    Q.    If you look at the first page, the fourth "whereas"

9    clause, just read that into the record for me.

10   A.    "WHEREAS, the Seller and the Seller Parent" -- it's a

11   typo -- "where named in a lawsuit filed against them on

12   May 8th, 2012 by New London Tobacco Market, Inc., a Kentucky

13   corporation in the United States Court for Eastern District of

14   Kentucky, London Division as Case 6:12-CV-0091-GFVT (such

15   lawsuit referred to herein as the 'NLTM litigation')".

16   Q.    All right.  And that's our lawsuit that brings us all here

17   today, correct?

18   A.    Correct.

19   Q.    All right.  And, in fact, when the original agreement was

20   executed, it was dated as of May 10.  You weren't aware that

21   this lawsuit had been filed yet then, were you?

22   A.    I can't say.  They were around the same time, but I don't

23   recall if we knew or if we didn't know.

24   Q.    Okay.  Turn then to the next -- the next -- second

25   amendment, 13b, I believe.  Turn to page 4.  Tell me when you

STEPHEN W. BALL - CROSS-EXAM                    131

1   have it.

2   A.    I'm there.

3   Q.    All right.  And it says, the amended and rescheduled --

4   restated schedule.  The schedules to the purchase agreement,

5   and that includes the schedule or 3.4 that we just looked at,

6   right?  Schedules to the purchase agreement, that includes our

7   friend, schedule 3.4, right?

8   A.    Yes, it's part of the schedules.

9   Q.    You're saying that those schedules that relate to, among

10  other things, leases, regulatory matters, and litigation have

11  been amended and restated by whom?

12  A.    Seller.

13  Q.    Okay.  That would be Kentucky Fuel?

14  A.    There are certain schedules that only Kentucky Fuel could

15  schedule, yes.

16  Q.    Okay.  Well, this doesn't refer to any schedules amended

17  and restated by the -- by the buyer.  It says that the

18  schedules that have been restated by the seller, right?

19  A.    Yes.

20  Q.    Okay.  And it says that the reason that they have been

21  rescheduled is to reflect certain recent developments relating

22  thereto and discussed by the parties, right?

23  A.    Yes.

24  Q.    And one of those amended and restated schedules is our

25  friend, Schedule 3.4, correct?

STEPHEN W. BALL - CROSS-EXAM                132

1   A.    Yes.

2   Q.    And that's the one you identified earlier that allocated

3   5 million to the tipple and 2 1/2 million to the leases and

4   permits, right?

5   A.    Correct.

6   Q.    And so that was done pursuant to the second amendment for

7   the reasons that are recited in the document that we've just

8   looked at?

9   A.    No, not that schedule.

10  Q.    Okay.  How much did you say the tipple is worth now?

11  A.    I'm sorry?

12  Q.    How much do you say the tipple is worth?

13  A.    Me, Steve Ball?

14  Q.    Yeah.

15  A.    I don't have an opinion of value on the tipple.

16  Q.    All right.  All right.  Well, even at $5 million, that's

17  the value put on it, if that were a correct value, that would

18  be -- that'd have been a heck of an investment for Kentucky

19  Fuel, wouldn't it?

20  A.    It's a lot of money.

21  Q.    I mean, that would have been -- well, you didn't pay

22  5 million for it, did you?

23  A.    From what I understand the testimony, that we put at least

24  that much in it.

25  Q.    You put 5 million in it?

STEPHEN W. BALL - CROSS-EXAM                133

1   A.   I mean, you have more than the purchase price.  My

2   understanding, from the testimony, was it was very dilapidated

3   at the time of the acquisition.  It was coming out of

4   bankruptcy, and a substantial investment was made into it.

5   Q.   Okay.  Are you able to -- as the -- you're no longer the

6   financial officer of the companies, are you?

7   A.   No.  I don't know that --

8   Q.   There's been --

9           THE COURT:  Mr. Lucas, let him finish his answer.

10          MR. LUCAS:  I'm sorry.

11          THE COURT:  Go ahead, Mr. Ball.

12  A.   I only stated I was the assistant CFO when I first started

13  and that was -- that ended in 2009.

14  Q.   And I apologize for interrupting.  Sometimes you may be at

15  a comma, but I think you're at a period.

16  A.   I think I was still mid sentence, but go ahead.

17  Q.   How much did you pay for the tipple?

18  A.   I don't recall.  I think Mr. Justice said 450,000.

19  Q.   That you paid for the tipple?

20  A.   That's what I believe his testimony was, but I don't

21  recall.

22          MR. LUCAS:  I'll ask the witness be shown this

23  document.

24          THE COURT:  Okay.  Let's see if there's an objection

25  from Mr. Getty.

STEPHEN W. BALL - CROSS-EXAM                    134

1      MR. GETTY:  To the exhibit?  What is it?  Can you
2  identify what it is?
3      MR. LUCAS:  Well --
4      THE COURT:  Okay.  Why don't you hand it to the CSO?
5  So, Mr. Getty, take a moment to look at it.  Have you seen
6  it before, Mr. Getty?
7      MR. GETTY:  No.
8      THE COURT:  Okay.  Let's see where the questioning
9  goes.  It can be provided to the witness.
10      MR. LUCAS:  And I have a copy for the Court.
11      THE COURT:  Thank you.
12  BY MR. LUCAS:
13  Q.   Mr. Ball, do you recognize this as the tax assessment
14  information for the tipple?
15  A.   No.
16  Q.   Okay.  Looking at the bottom of -- looking at the
17  document, it says 2012 assessment information.  Or stop.  The
18  bottom in the middle in bold.  Do you see that?
19  A.   I can't read it.  Hold on.
20  Q.   It's embolded.
21      THE COURT:  He needs his glasses.
22      MR. LUCAS:  Oh, okay.
23  A.   I need my glasses.  I wasn't trying to -- okay.
24  Q.   Have you ever seen a tax assessment document like this
25  before?

STEPHEN W. BALL - CROSS-EXAM                    135

1   A.   I'm not familiar with this form, no.

2   Q.   All right.  You see at the bottom where it indicates that

3   on 12/27/12, Kentucky Fuel sold this for a price of $5 million

4   in an arm's length transaction recorded in deed book 241, page

5   554?  Do you see that?

6   A.   Yes.

7   Q.   Okay.  And you see just beneath that it recites that you

8   acquired it from Lost Mountain Mining, Inc. on 12/9/2005 for

9   $20,800, recorded in deed book 217, page 249.  Do you see that?

10  A.   That's not correct.

11  Q.   It's not correct?

12  A.   That is not who Kentucky Fuel received it from.  So I --

13  Q.   Okay.

14  A.   I don't think this record is accurate.

15          MR. LUCAS:  All right.  That's all I had on that,

16  Your Honor, at this time.

17          THE COURT:  Do you intend for that to be an exhibit?

18          MR. LUCAS:  I think based on his testimony, I

19  don't -- I don't think I can have an exhibit.  I'd like to have

20  it marked for identification at this time, just marked as

21  identification.

22          THE COURT:  But not admitted?

23          MR. LUCAS:  Correct.

24          THE COURT:  You can mark it Plaintiffs' Exhibit 42.

25          THE CLERK:  41.

STEPHEN W. BALL - CROSS-EXAM          136

1       THE COURT:  41, but it can be returned to Mr. Lucas,

2  Well, I'm sorry, it needs to be provided to Sheila to be

3  marked, and then returned to Mr. Lucas.

4       MR. LUCAS:  Well, the reason I asked the Court -- and

5  maybe the procedures are different here, marked as identified,

6  so it's in the record but it's not admitted as an exhibit for

7  Your Honor to consider.  That was --

8       THE COURT:  Well, it would be returned to you.

9     It wouldn't be kept unless it's admitted into evidence by

10  the clerk's office, correct, Sheila?

11       THE CLERK:  That's correct.

12       MR. LUCAS:  I'll just take it back.

13       THE COURT:  Okay.  So strike that and start over.

14  The current number is 41 then.  That is the next number.

15       THE CLERK:  Yeah, it would be 41.

16       THE COURT:  Yes.

17       MR. LUCAS:  Will Your Honor give me just a moment?

18       THE COURT:  Yes.

19       MR. LUCAS:  That's all I have of Mr. Ball, Your

20  Honor.

21       THE COURT:  Okay.  We're going to take our break

22  then, 1:00 break we've discussed now on a couple of occasions.

23  We'll reconvene at 3:30 with Mr. Ball on the witness stand.  Is

24  there anything I need to take up before the recess, Mr. Lucas?

25       MR. LUCAS:  No, Your Honor.

STEPHEN W. BALL - CROSS-EXAM                    137

1          THE COURT:  Mr. Getty?

2          MR. GETTY:  Well, I guess we'll take up Ms. Combs if

3   she's called.

4          THE COURT:  Yes.  I mean, the urgency in getting a

5   ruling on that, Mr. Getty, I'm not sure I follow.  Why is it

6   that you want a ruling on that now?

7          MR. GETTY:  I would just like to know what more

8   we're, you know, looking at this afternoon.  Obviously, I have

9   some questions for Mr. Ball.

10          THE COURT:  And I may as well.

11          MR. GETTY:  Right.  And I believe Mr. Lucas said he

12   intends to call, solely, Mr. Brownlow as a possible rebuttal

13   witness.  And I may have to call Mr. Justice depending upon,

14   you know, what transpires through that timing.

15          THE COURT:  Mr. Lucas?

16          MR. LUCAS:  Your Honor, I plan to call Ms. Combs and

17   she'll actually be examined by Mr. Webster and Mr. Brownlow.  I

18   will offer some deposition excerpts that we've previously

19   identified.  My understanding is that's Your Honor's general

20   practice, we just mark those and hand them up to Your Honor as

21   opposed to reading them in.  But I'll do whatever the Court

22   prefers.

23          THE COURT:  No, I can -- I can review them unless

24   there's an objection to that.

25          MR. GETTY:  Which -- which depositions?

STEPHEN W. BALL - CROSS-EXAM                138

1        MR. LUCAS:  We designated them on our exhibit list.

2        THE COURT:  Just make sure he knows which ones you

3   are talking about, Mr. Lucas.

4        MR. GETTY:  Which ones are you talking about?

5        MR. LUCAS:  Williams, Ball, and Kentucky Fuel, and

6   I'll show you what they are so there's no doubt.

7        THE COURT:  So the point is, as a bench trial,

8   there's no need to read it to me.  I can read it once it's

9   admitted.  Talk about that, make sure you are on the same page

10  with respect to what they are.  I'll take objections to the

11  witnesses as they are presented.

12     Anything further, Mr. Getty?

13       MR. GETTY:  No.

14       THE COURT:  Okay.  We'll be in recess in this

15  proceeding then until 3:30.  Thank you all.

16       (A recess was taken from 1:00 to 3:30.)

17       THE COURT:  Thank you.  We're back on the record with

18  counsel and party representatives present.  Mr. Ball has

19  returned to the witness stand.  You completed your

20  cross-examination; is that correct, Mr. Lucas?

21       MR. LUCAS:  I have, Your Honor.

22       THE COURT:  Okay.  Thank you.  Is there any matter we

23  need to take up before redirect?

24       MR. LUCAS:  No, Your Honor.

25       THE COURT:  Mr. Getty, your redirect, sir.

STEPHEN W. BALL - REDIRECT EXAM                139

1      MR. GETTY:  Certainly.

2      (Off the record.)

3                    REDIRECT EXAMINATION

4  BY MR. GETTY:

5  Q.  Mr. Ball, do you have the document that was presented to

6  you by Mr. Lucas earlier?  It's the Schmid letter there.  It's

7  an additional exhibit.

8  A.  It's not obvious to me if I do.

9  Q.  It's a plaintiffs' exhibit.

10      MR. LUCAS:  17.  Are you looking for 17?

11      MR. GETTY:  Is that the Schmid --

12      MR. LUCAS:  With the blackline?

13      MR. GETTY:  Yes.

14  A.  Yes, I have that.

15  Q.  And you were asked about the interlineations on the

16  document.  Do you see where, in paragraph 10, there were some

17  language -- some specific language, about mineability,

18  et cetera, that had been redlined out?

19  A.  Yes.

20  Q.  Okay.  And if you compare it to -- you also have, I think

21  it's 1a, the actual fourth amendment.  It's Plaintiffs' 1a.

22  Should be in your book up there.

23      How did the discussions -- if you could sort of summarize

24  how, from beginning to end, the fourth amendment discussion

25  came into being?

STEPHEN W. BALL - REDIRECT EXAM                    140

1  A.   Leading up to the meetings at The Greenbrier in early

2  November, I and Marc Merritt had been communicating with

3  Mr. Brownlow regarding -- Lloyd Williams was in play at that

4  point, so we had had conversations over that.

5       And then also, as I mentioned earlier, Mr. Brownlow had

6  acquired certain leases in the name of a new Fivemile entity,

7  and he was out of pocket for those leases.  So we had

8  been having conversations about incorporating those into the

9  original package of leases.

10 Q.   So who would -- if you take the paragraph that ended up

11 being part of paragraph 10, it begins with "in consideration,"

12 and ends with "extracted from these real properties."

13      How did the additional language that was interlineated

14 come about?  Who added it?

15 A.   You know, I really couldn't tell from the email exchange.

16 I just know that at some point it was inserted.  And then it --

17 that language, plus there's other language in there that we

18 didn't discuss.  But there was -- basically the last two-thirds

19 of that paragraph was deleted.  But I can't recall who

20 originally inserted it.

21 Q.   Okay.  And what was your understanding as to the ultimate

22 intent of this paragraph?

23 A.   Just what I have mentioned earlier, that the -- the leases

24 would have a commercial reasonableness element to them, just

25 like every -- pretty much every other thermal coal coal lease

STEPHEN W. BALL - REDIRECT EXAM          141

1  that we enter into.  And I felt like the general language

2  within the constraints of industry standards and the commercial

3  reasonableness qualifier were sufficient to do that.

4  Q.  And that's where it started out --

5  A.  Yes.

6  Q.  -- with that language; is that correct?

7  A.  I can't tell for sure between these two documents, but I

8  believe so, yes.

9  Q.  And then someone, either you or Mr. Schmid, added more

10  specific language that was --

11          MR. LUCAS:  I'm going to object to this now.  I have

12  not objected to a leading question in the last two days.  But

13  counsel is now testifying, and he just said he didn't know who

14  put the language in there.  Counsel is trying to suggest

15  otherwise in a leading question.  I object to it.

16          MR. GETTY:  Well, I didn't object to any leading

17  questions, but I'll rephrase it.

18          THE COURT:  Okay.  Rephrase it.  Thank you.

19          MR. GETTY:  Okay.

20  BY MR. GETTY:

21  Q.  And the language that was excised, the interlineated

22  language, how did you view its excision or deletion, I guess is

23  what I would say?

24  A.  To me, it didn't change the intent of the agreement or

25  what the agreement says.  It was just more specificity to the

STEPHEN W. BALL - REDIRECT EXAM                    142

1    language above.  So I didn't feel like it materially changed

2    the agreement in any way.

3    Q.    Okay.  And were you comfortable with that?

4    A.    Yes.

5    Q.    And why were you comfortable with that excision?

6    A.    In my experience, these provisions, as long as they have

7    the elements of commercial reasonableness and within the -- as

8    this one puts it, the constraints of industry standards, I'm

9    comfortable with that.

10   Q.    Okay.  And to your knowledge, was Mr. -- Mr. Schmid and

11   Mr. Brownlow comfortable with it?

12   A.    Yes.

13   Q.    They executed it?

14   A.    Correct.

15   Q.    Or Mr. Brownlow did?

16   A.    Yes.

17   Q.    That document was executed November of 2010.  After

18   November 2010, when January and February and April and May and

19   June and July came along, did you mine any coal?

20   A.    No.

21   Q.    By that point in time, what determination had been made

22   about -- made by Kentucky Fuel as to the mineability of the

23   coal?

24   A.    I'm not sure at that point I was involved in that.  I know

25   Mr. Justice testified to that.  But I wasn't involved in that

STEPHEN W. BALL - REDIRECT EXAM                    143

1   determination.

2   Q.   All right.  What was your understanding as to whether or

3   not any mining was likely to occur?

4   A.   My understanding was that it was highly unlikely that any

5   was going to occur, due to the quality of the coal.

6   Q.   Would that be based upon both the quality and the

7   marketability?

8   A.   Absolutely.

9   Q.   And do you have any -- do you have any knowledge as to

10  why -- if Mr. Brownlow interprets this clause that you're

11  supposed to mine coal regardless of whether you make money or

12  not, why he didn't write you a letter?

13            MR. LUCAS:  Objection, Your Honor.

14            THE COURT:  Mr. Getty, it does call for speculation.

15  I'll sustain the objection.  Go ahead.

16  BY MR. GETTY:

17  Q.   Did Mr. Brownlow write you a letter telling you that you

18  needed to start mining because you were obligated to mine

19  regardless?

20  A.   No.

21  Q.   Did he do that in January 2011?

22  A.   No.

23  Q.   Did he do it anytime during 2011?

24  A.   No.

25  Q.   Did he do it at any time prior to the filing of this

STEPHEN W. BALL - REDIRECT EXAM     144

1  lawsuit in 2012?

2  A.   No.

3  Q.   What was the date he filed the lawsuit?  When?  I think

4  May of 2012?

5  A.   It was either April or May of 2012.

6  Q.   Had the Williams transaction begun to be formulated by

7  that time, by May of 2012?

8  A.   Yes.  It was ultimately signed early May 2012, I think on

9  the 10th.  But it was very much in the works February, March,

10  and April of 2012.

11  Q.   Okay.  And do you find any correlation between the

12  Williams transaction coming on the scene and the filing of this

13  lawsuit?

14  A.   I believe they're related, yes.

15  Q.   And how do you believe that?

16  A.   I believe that Mr. Brownlow --

17       MR. LUCAS:  Your Honor, I think he's asking him for

18  speculation again.

19       THE COURT:  Let's hear the question:  Do you find any

20  correlation between the William transaction coming on the scene

21  and the filing of this lawsuit?

22     Your response to the objection, Mr. Getty?

23       MR. GETTY:  I think he can answer whether he believes

24  there's any correlation.  There's no hearsay.  No speculation.

25       MR. LUCAS:  His opinion about any alleged speculative

STEPHEN W. BALL - REDIRECT EXAM                145

1   correlation is irrelevant, his opinion is.  And it is

2   speculation.

3              THE COURT:  Can you rephrase it in terms of a factual

4   question, Mr. Getty?

5   BY MR. GETTY:

6   Q.   Do you find any relationship at all between the Williams

7   transaction beginning and the filing of this lawsuit?

8              MR. LUCAS:  Objection.  Lack of foundation.

9   Irrelevant.

10             THE COURT:  Mr. Getty, your response?

11             MR. GETTY:  I think it's a proper question.  I'll

12  stand by it.

13             THE COURT:  I'll allow the question.  Go ahead,

14  Mr. Getty.  I'll overrule the objection.

15  A.   I believe so, yes.

16  Q.   And what do you believe?

17  A.   I believe that Lloyd Williams, along with Kentucky Fuel --

18  there were leases that were being reinstated leading up to the

19  signing of the agreement in May of 2012.  And while that was

20  going on, Mr. Brownlow was aware of that.  And so he was aware

21  of the transaction.

22             MR. LUCAS:  Objection.  Your Honor, he's speculating

23  again.

24             THE COURT:  I'll let you recross him on it,

25  Mr. Lucas.

STEPHEN W. BALL - REDIRECT EXAM                    146

1        MR. GETTY:   Okay.

2   A.   And so he was aware that Mr. Williams was trying to close

3   the transaction.

4   Q.   Did, anytime before the lawsuit was filed, Mr. Brownlow

5   communicate in any way, orally or in writing, that you were in

6   breach of this covenant to mine because you had not commenced

7   mining?

8   A.   No.

9   Q.   You were asked by Mr. Lucas about the -- any lawsuits

10  where there were any sanctions.

11  A.   Correct.

12  Q.   And you identified the Branham suit?

13  A.   That's correct.

14  Q.   Right.  You know, is that lawsuit like every other lawsuit

15  in Kentucky, online, to your knowledge, where you can go in and

16  look at the docket sheet and all the orders, et cetera?

17  A.   I'm not overly familiar with Kentucky, but my

18  understanding is it would be, just like any other Kentucky

19  case.

20  Q.   Do you understand the word -- what the word "innuendo"

21  means?

22  A.   I have some understanding of that, yes.

23  Q.   Okay.  What's your understanding of the word "innuendo"?

24  A.   Making a statement to where it's left open-ended so an

25  implication can be drawn from it.

STEPHEN W. BALL - REDIRECT EXAM                    147

1  Q.    An implication that's perhaps not accurate?

2  A.    It could definitely be a negative inference.

3  Q.    And in the Branham suit, Mr. Lucas didn't ask you anything

4  more about that discovery.  Was it a discovery sanction?

5  A.    It was a -- it was the result of a discovery issue, yes.

6  Q.    And was it -- I mean, what are we talking about

7  dollarwise?  Was it a minor amount?

8  A.    It was similar to this case in the sense that they sought

9  default judgment.

10 Q.    Okay.  And with respect to the sanction that was entered,

11 what happened to it?

12 A.    It was later set aside.

13 Q.    So it's set side entirely as of this moment?

14 A.    Correct.

15 Q.    Do you think if Mr. Lucas had checked the file and looked

16 at it carefully, like anyone could, do you think he would have

17 seen it was set aside?

18            MR. LUCAS:  Objection, Your Honor.

19            THE COURT:  Mr. Getty?  I'll sustain the objection.

20 He said he doesn't know how the system works.  Go ahead,

21 Mr. Getty.

22            MR. GETTY:  Okay.

23 BY MR. GETTY:

24 Q.    Does that sanction, that minor -- the discovery sanction,

25 does it exist today?

STEPHEN W. BALL - REDIRECT EXAM          148

1   A.   No, it was set aside.

2   Q.   Okay.  Let me show you now what I want to mark as --

3   Mr. Lucas has got me enamored with marking pleadings.  So I

4   want to mark as the next exhibit the response, prehearing

5   memorandum that was filed in these proceedings earlier by John

6   Kelley.  You have it, don't you?  It'd be 57.

7           MR. LUCAS:  No.  I am going to object to that.  I

8   have used -- marking filings by them, by an adverse party.  I

9   don't think it's proper for them to introduce their own filings

10  for the truth of it.

11          THE COURT:  Well, I don't know that that's what it's

12  being offered for yet.  I'll allow for some initial questions

13  to see where it's going.

14      What number would we be on, Sheila?

15          THE CLERK:  57.

16          THE COURT:  Okay.  Plaintiffs' Exhibit 57.

17          THE CLERK:  Defendants'.

18          THE COURT:  You can mark it -- Defendants', excuse

19  me.  I'm not ruling it's admissible at this point, but I'll let

20  you question the witness.

21          MR. GETTY:  Okay.

22          THE COURT:  Do you have a copy for Mr. Lucas?

23          MR. GETTY:  I have a copy for the Court and for the

24  witness.

25          THE COURT:  Does Mr. Lucas have a copy?

STEPHEN W. BALL - REDIRECT EXAM          149

1          MR. GETTY:  Do you have a copy?

2      You can get the document number.  It's 262, Your Honor.

3          THE COURT:  Okay.  And provide that other one to

4  Mr. Lucas, if you can.  Looks like you have an extra there,

5  don't you?

6          MR. GETTY:  I have an extra for him.

7          THE WITNESS:  Thank you.

8  BY MR. GETTY:

9  Q.   One of the allegations in this case is that the $10,000

10  retainer amount is due and owing.  In fact, I think there was

11  an exhibit put in that through a certain point in time

12  Mr. Brownlow alleges there's 620,000 plus due and owing to him.

13  Do you recall that?

14  A.   Yes.

15  Q.   If you would flip over to page 20 of 36.

16          MR. LUCAS:  Your Honor, again, I'm going to object to

17  the witness looking at this document.  To use their own

18  filings, their advocate's filings, and try to have the witness

19  testify from that, I think is totally improper.

20          THE COURT:  Mr. Getty, your response?

21          MR. GETTY:  I think it's highly probative and highly

22  relevant as to the issue of whether or not Mr. Brownlow's

23  alleged retainer agreement was, in fact, canceled, or whether

24  or not they were on notice that it was canceled.  Because on

25  page 22 of this document, Mr. Kelley, my predecessor, clearly,

STEPHEN W. BALL - REDIRECT EXAM                150

1   after recounting --

2           MR. LUCAS:  I'm going to --

3           MR. GETTY:  -- several matters, that he now provides

4   clear notice that Mr. Brownlow's services were and have been

5   terminated.

6           THE COURT:  Okay.  Go ahead, Mr. Lucas, with the

7   thought you were going to express.

8           MR. LUCAS:  I would yield to the Court.  Your Honor

9   was about to say something.

10          THE COURT:  This is different than the use that

11  Mr. Lucas made of pleadings, in my view.  There's no need to

12  have the witness reiterate your clients' positions in the

13  pleadings, Mr. Getty.  I've done that.

14      What Mr. Lucas used pleadings, and that includes the

15  affidavits that were filed, to do was to question facts that

16  the Court has to make a determination about in formulating its

17  recommended disposition.  So I do think that the uses are

18  different.  And I've read the pleadings.  So it's not necessary

19  to have a witness reiterate positions that have been stated.

20          MR. GETTY:  As long as you are aware of it, that's

21  fine.

22          THE COURT:  I'm certainly familiar with what the

23  defendants' position is on whether that particular course of

24  conduct amounts to termination, yes.

25          MR. GETTY:  I assumed that, but I wasn't a hundred

STEPHEN W. BALL - REDIRECT EXAM                    151

1   percent certain.  I should have known that you -- knowing your

2   diligence, that you were.

3              THE COURT:  Well, I addressed it in the recommended

4   disposition.

5              MR. GETTY:  Okay.

6              THE COURT:  Okay.

7   BY MR. GETTY:

8   Q.   What is the position of Kentucky Fuel?  And you are the

9   general counsel.  What is the position of Kentucky Fuel as to

10  whether or not Mr. Brownlow's retainer agreement has been

11  terminated?

12  A.   It has been terminated since 2012.

13  Q.   Okay.  And with respect to -- there's been some sort of

14  innuendo or allegation about the sixth amendment that clarified

15  who was getting what and what amount?

16  A.   Right.

17  Q.   Was the sixth amendment, along with other transaction

18  documents involving the Williams transaction produced in these

19  proceedings to Mr. Brownlow's counsel?

20  A.   To my knowledge, yes.

21  Q.   And at the time they got the sixth amendment, do you

22  believe if they read it, they would understand that any

23  discrepancy in the fifth amendment was being cleared up by the

24  sixth?

25  A.   Yes.  I think it's very straightforward in clarifying the

STEPHEN W. BALL - REDIRECT EXAM                    152

1    mistakes of the fifth.

2    Q.    Okay.  There was some reference to, in your affidavits,

3    the one affidavit where you insisted on confidentiality.  Why

4    did you insist on confidentiality with respect to certain

5    aspects of the Williams transaction?

6    A.    Typically, we always request confidentiality relating to

7    business transactions, especially ongoing business

8    transactions.

9    Q.    Is that a normal business practice or procedure?

10   A.    I find it to be, yes.

11   Q.    And according to your understanding, did you -- did you

12   believe you're under an obligation to protect information

13   concerning that transaction?

14   A.    Yes.

15   Q.    All right.  Ultimately, did you propose that Mr. Brownlow

16   execute a confidentiality agreement?

17   A.    At some point I know that was requested.  I can't remember

18   exactly when that was, but yes.

19   Q.    Okay.  And what happened?  Did he agree?

20   A.    My recollection is he refused to sign it.

21   Q.    Okay.  There also was some reference to the stock

22   transfer.  What, if any, significance did the stock, this

23   transfer of stock -- first of all, what was the stock transfer,

24   the purpose of that?

25   A.    It was -- they were unable to close at the end of January

STEPHEN W. BALL - RECROSS-EXAM                153

1   as originally contemplated.  They originally asked for a short

2   extension, and then they came back and asked for a second

3   extension.  And obviously they were having cash flow problems.

4   And so it was proposed that stock might be a way to acquire an

5   extension.

6        At that point it had been dragging on for -- with

7   Williams, since May of the prior year.  And so we thought it

8   only made sense that, if we were going to give additional

9   extensions, they should be supported by some compensation.

10  Q.   Okay.  And was the stock transfer part -- was it a payment

11  pursuant to the extension?

12  A.   Yes.

13  Q.   Okay.  All right.

14          MR. GETTY:  That's all I have.

15          THE COURT:  Okay.  Recross, Mr. Lucas?

16          MR. LUCAS:  Yes.

17  BY MR. LUCAS:

18  Q.   Mr. Ball, if I may borrow one of Mr. Getty's words, in

19  view of the innuendo in his questions about what a search by me

20  or anyone else in the Harlan County suit would have disclosed,

21  are you aware -- I'm sure you are -- that documents in that

22  suit have been sealed?

23  A.   I don't know the extent of the seal.  I know that -- I

24  know that some have been requested.  There are financial

25  documents involved, but I'm not aware of what the status of the

STEPHEN W. BALL - RECROSS-EXAM                    154

1   record as a whole is.

2   Q.   So you don't know whether the documents showing what

3   happened later after the initial sanctions had been sealed or

4   not?

5   A.   I don't know.

6   Q.   On the last point that you were making about when you

7   cleared up the amounts payable to Kentucky Fuel as not being

8   that full 11 million shown on the fifth amendment, but in the

9   sixth amendment -- you're correct, you did produce that sixth

10  amendment to us, right?

11  A.   That's my understanding.

12  Q.   And you produced it in 2016, correct?

13  A.   I'm not aware of the exact time frame.

14  Q.   In that supplemental -- did you not produce it in that

15  supplemental production that was the subject of the renewed

16  sanctions motion that we filed?

17  A.   I don't remember exactly when it was disclosed.

18  Q.   Okay.  Well, if it was produced then, that would have been

19  three years after the affidavits that you and I discussed,

20  where we were talking about whether the plaintiffs knew that it

21  was 11 million versus knew it was 7.5 million or some other

22  number as opposed to 11 million, right?  Because that was in

23  2013.  Do you remember that?

24  A.   Generally.  I think some of them were in 2014, but I -- I

25  generally agree with you.

STEPHEN W. BALL - EXAM BY THE COURT          155

1   Q.   Okay.  Mr. Getty asked you a few questions about the

2   blacklined agreement and the prior drafts, and you were candid

3   enough to say you didn't remember about all that.  In fact, in

4   your document production in this case, you didn't produce any

5   of those emails back and forth between you and Mr. Schmid or

6   any of the blacklined leases, did you -- or, excuse me,

7   blacklined fourth amendment?

8   A.   I don't know.  I know we conducted email searches.  I

9   don't know if -- if any of these were a part of that disclosure

10  or not.

11  Q.   And had all of those been produced, they might shed more

12  light on who drafted which document first, I'm sure, wouldn't

13  they?

14  A.   If they were available, I'm sure that they would, yes.

15  Q.   You testified -- or strike that.

16            MR. LUCAS:   That's all I have, Your Honor.

17                      EXAM BY THE COURT

18            THE COURT:   Okay.  I have a few questions for you,

19  Mr. Ball.

20       The questioning about this Branham case and the sanction

21  that was imposed and that you testified about was lifted was

22  all focused on sanctions imposed by courts.  And that was the

23  use of my term from the questioning I engaged in with

24  Mr. Justice yesterday.

25       Are you aware of any Court finding that Kentucky Fuel

STEPHEN W. BALL - EXAM BY THE COURT          156

1   Corporation has violated a Court order but not imposing a

2   sanction?

3          THE WITNESS:  And I'm just trying to think, Your

4   Honor.  There's not one coming to mind as we sit here today.

5   And I'm also having -- off the top of my head, trying to draw a

6   distinction between these two defendants because --

7          THE COURT:  Well, you can lump them together.  That's

8   perfectly fine.  I'll restate the question.

9      Are you aware of any Court finding that either of the

10  defendants, Kentucky Fuel Corporation, James C. Justice

11  Companies, Inc. violated a Court order but that that finding

12  did not result in the imposition of a sanction?

13         THE WITNESS:  I can't think of one offhand.  We've

14  had a couple of things over the course of litigation that we've

15  been late on before, but we've always corrected.  But off the

16  top of my head, I can't recall if those were specific to Court

17  orders, but I -- I don't recall anything that specifically

18  violated a Court order.

19         THE COURT:  The sanction that was imposed in the

20  Branham case -- am I pronouncing that correctly?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  -- do you recall when that was imposed?

23  You can give me an approximate date, month or year.

24         THE WITNESS:  What's strange is I'm recalling the

25  month.  It was in October.  But I can't recall if it was 2013

STEPHEN W. BALL - EXAM BY THE COURT        157

1    or '14.

2              THE COURT:  Okay.  You think it was one of those two

3    years, sir?

4              THE WITNESS:  I do, yes, sir.

5              THE COURT:  All right.  I think it's clear from your

6    testimony that you're a skilled attorney.  And I'm going to ask

7    you some questions.  And I want to tread carefully because I

8    assume as a part of your training and your experience you've

9    become well versed in attorney-client privilege, correct?

10             THE WITNESS:  Yes, sir.  I'm sorry to interrupt.  I

11   think it was 2013 --

12             THE COURT:  Okay.

13             THE WITNESS:  -- on the last question.  Because

14   Mr. Dudley was still working for us when that occurred.  And he

15   was not with us in the fall of '14.  So in your prior question,

16   I think it was 2013.

17             THE COURT:  Okay.  That's helpful.  Thank you.

18             THE WITNESS:  I'm sorry.

19             THE COURT:  No.  You don't need to apologize.  That's

20   helpful.  Thank you for the clarification.  So again, I --

21   balancing both the need for me to determine the truth of these

22   matters and of course the referral me but also protect any

23   privilege that might apply, I'm going to tread carefully with

24   these questions.  If you have concern -- you are ably

25   represented.  If you have concern about the potential

STEPHEN W. BALL - EXAM BY THE COURT          158

1   privileged nature of an answer, let me know.  Okay?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  All right.  You were present in the

4   courtroom when I questioned Mr. Justice about his nonattendance

5   at his deposition, correct?

6          THE WITNESS:  Yes.

7          THE COURT:  And you saw Mr. Getty question him about

8   those same events, correct?

9          THE WITNESS:  Yes.

10          THE COURT:  And is it true that you traveled with

11   Mr. Justice on the day before the deposition that you appeared

12   for and that was taken by the plaintiff?

13          THE WITNESS:  It is true, yes.

14          THE COURT:  How long was that trip from start to

15   finish, roughly?

16          THE WITNESS:  Approximate, as I recall, it began

17   probably at 7:00 or 8:00 a.m. in the morning for us.  I think

18   it's about an hour flight to Chicago, maybe an hour and a half.

19   And then we met in the engineering firm's office for

20   practically an entire day.  And then I think we flew back to

21   Roanoke, it was relatively late in the day.  I think it was

22   probably 9:00 p.m. or 10:00 p.m.  So it was a 12- to 14-hour

23   day, approximately.

24          THE COURT:  And where did you go next, once you

25   arrived back in Roanoke?

STEPHEN W. BALL - EXAM BY THE COURT          159

1       THE WITNESS:  I went home for the evening, because I

2    knew I had to leave early the next morning for Knoxville.

3       THE COURT:  And that was to attend your deposition?

4       THE WITNESS:  Yes, sir.

5       THE COURT:  Okay.  Did you speak with Mr. Justice

6    between that time and your deposition?

7       THE WITNESS:  I did not, no, sir.

8       THE COURT:  Now, on the day before, were you with

9    Mr. Justice on that day, do you recall, the day before the trip

10   to Chicago?

11      THE WITNESS:  He and I were definitely near one

12   another.  We were with other people as well.  I don't recall --

13   I don't recall exactly how much time he and I spent together,

14   per se, but we were definitely at the same meeting.

15      THE COURT:  Okay.  Is that the meeting in Chicago, or

16   you mean the day before the Chicago meeting?

17      THE WITNESS:  Oh, I mean the day in Chicago.  I may

18   have misunderstood the question.

19      THE COURT:  It was a poorly worded question.  So the

20   day before that meeting in Chicago, do you recall if you were

21   with Mr. Justice that day?

22      THE WITNESS:  I don't recall.

23      THE COURT:  Okay.  Did you have any discussions with

24   Mr. Justice about his intention to appear for his deposition?

25      THE WITNESS:  I did not discuss it with him directly.

STEPHEN W. BALL - EXAM BY THE COURT          160

1      THE COURT:  At no time prior to the deposition that

2   was to occur on the same day of yours, you had any discussion

3   with Mr. Justice about his intention to appear or not appear

4   for his deposition?

5      THE WITNESS:  Not on that deposition.  We did have

6   depositions that were attempting to be scheduled earlier in the

7   year.  And I know that I worked with him some on those.  But

8   for the ones in the October, November time frame, he was

9   dealing directly with Mr. Dudley on that.  And I was dealing

10  directly with Mr. Dudley on my own as well.  So I was not

11  discussing that with Mr. Justice.

12     THE COURT:  Did you ever become aware of whether he

13  intended to appear for his deposition by any source, Mr. Ball?

14     THE WITNESS:  Actually, I found out from Mr. Dudley

15  when -- I thought I was going to be able to do my deposition

16  early in the morning.  And he advised me that Mr. Lucas said

17  that he couldn't do that because that slot was originally

18  reserved for Mr. Justice.  And that was the first time I became

19  aware.  And I'll be honest with you, Your Honor, because

20  Mr. Dudley had -- the only thing he had represented to me is

21  that he thought it was something he would get worked out with

22  Mr. Lucas.  And so he just thought that I would be able to

23  slide into that early morning slot that next day in Knoxville,

24  and then Mr. Lucas declined to do that.  That was the first

25  time I had heard that Mr. Justice was not appearing and that it

STEPHEN W. BALL - FURTHER CROSS-EXAM          161

1   was potentially an issue with Mr. Lucas.

2          MR. GETTY:  Excuse me.

3          THE COURT:  Did you and Mr. Justice have any

4   discussion about this case on that evening when you returned to

5   Roanoke and you went your separate ways because it was late in

6   the day and you went home?  Did you have any discussion with

7   Mr. Justice about this case at that time?

8          THE WITNESS:  No.

9          THE COURT:  All right.  Okay.  Do counsel have

10  follow-up questions to mine?  Mr. Lucas?

11         MR. LUCAS:  I may have just a couple brief ones, Your

12  Honor.

                    FURTHER CROSS-EXAMINATION

13

14  BY MR. LUCAS:

15  Q.   Mr. Ball, it wasn't clear to me what you said.  I believe

16  the Court asked you this, but it wasn't totally clear to me.

17  When did you first learn that Mr. Justice was not going to

18  appear for his deposition?

19  A.   It was whenever Mr. Dudley advised me that my deposition

20  would not start until later in the day.  Because originally he

21  had told me he thought we would be able to get started earlier.

22  I can't remember if that was the night before or the morning

23  of.

24  Q.   Okay.  And had you ever at any time -- the depositions

25  were in November, right?

STEPHEN W. BALL - FURTHER CROSS-EXAM          162

1   A.    I believe they were, yes.

2   Q.    And I think we've established they were the 7th and 8th of

3   November.  Anytime in the month of November, did you discuss

4   with Mr. Justice that he was scheduled to be deposed?

5   A.    No.

6   Q.    Topic never came up?

7   A.    No.  Well, you mean anytime in the month of November?

8   Q.    Yes.  Before the depositions.

9   A.    Not before the depositions.

10  Q.    When you learned that he was not going to appear for his

11  deposition, did you ask why?

12  A.    No.

13          MR. LUCAS:  That's all I have.

14          THE COURT:  Mr. Getty, do you have any follow-up

15  questions, sir?  Certainly there were new matters raised by me.

16  You --

17          MR. GETTY:  Not on that.  I just want to note for the

18  record, because there was a reference to affidavits in 2016.

19  These two affidavits, Exhibit 39 and Exhibit 38, were executed

20  by Mr. Ball in December 2014 and August 2013, not 2016.

21          THE COURT:  I don't remember the dates.  But if there

22  was confusion, the documents will speak for itself.  Mr. Lucas,

23  any comment on that?

24          MR. LUCAS:  The affidavit I think I was referring to

25  was the one that he gave in 2013.  I believe that's what I

STEPHEN W. BALL - FURTHER CROSS-EXAM          163

1   said.

2          THE COURT:  Well, as I say --

3          MR. LUCAS:  It's all right.

4          THE COURT:  -- the documents will speak for

5   themselves.

6       Mr. Ball, you can step down.  Of course you can remain in

7   the courtroom as a party representative.

8       All right.  Mr. Getty, further evidence on behalf of the

9   defendants, sir?

10          MR. GETTY:  We may have some rebuttal by Mr. Justice.

11          THE COURT:  Potential sur rebuttal, it sounds like?

12          MR. GETTY:  Yes, sir.

13          THE COURT:  All right.  Mr. Lucas, your rebuttal

14   proof, sir?

15          MR. LUCAS:  We'll call Mr. Brownlow, Your Honor.

16          THE COURT:  Okay.  I will have you sworn again just

17   as a precaution, sir.  If you would direct your attention to

18   the clerk for me, please.

19              WILLIAM G. BROWNLOW - SWORN

20          THE COURT:  Mr. Lucas, if you -- what's your best

21   estimate of how long your rebuttal case will take?

22          MR. LUCAS:  Ten minutes, perhaps.

23          THE COURT:  Including any additional witnesses?

24          MR. LUCAS:  Yes, Your Honor.  Yes, Your Honor.  And

25   just so you know, because it's contrary to what I said earlier,

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM          164

1   we're not going to call Mrs. Combs.  It'll only be

2   Mr. Brownlow.

3               THE COURT:  Sheila, I'm going to try to wrap it up

4   today.  Do you need -- are you going to request overtime

5   utilities -- is that why you asked?  Or do you have a

6   commitment?

7               THE CLERK:  I was going to make a phone call if we

8   were going to go past 6:00.

9               THE COURT:  It may be close to 6:00.  We'll see.  I'd

10  like to wrap it up.  I don't think anyone wants to come back

11  just to see each other again tomorrow morning.

12              MR. LUCAS:  I'm sorry, I didn't mean to interrupt.

13              THE COURT:  Go ahead.

14              MR. LUCAS:  When I was referring to ten minutes, I

15  expect my questioning of Mr. Brownlow right now to last 10

16  minutes or less.

17              THE COURT:  We'll see how it goes.  Go ahead with

18  your questioning.

19                     FURTHER DIRECT EXAMINATION

20  BY MR. LUCAS:

21  Q.   Mr. Brownlow, you've heard the testimony given by Mr. Ball

22  and Mr. Justice, correct?

23  A.   Yes, sir.

24  Q.   I'm going to ask you a few direct questions to understand

25  as to things that they have said.  You've heard the testimony,

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM     165

1    I believe, by Mr. Justice that you made representations to him

2    or someone at Kentucky Fuel about the quality of the coal.

3         And let me orient you.  This would be in the time frame of

4    when you were negotiating the -- the original assignment of

5    leases back in 2005.  Did you make any representations to

6    anyone from Kentucky Fuel about the quality of the Fivemile

7    coal?

8    A.    No.

9    Q.    Okay.  Did you --

10   A.    And --

11   Q.    Yeah.  Go ahead.

12   A.    -- may I explain that?

13   Q.    Please do.

14   A.    In January of 2005, I had made a loan to a Mr. Ravon

15   Wolford and his entity, so that to provide financing for him to

16   buy the Deep Wood permit and leases and the Fivemile permit

17   application and leases.  And I have taken this security first

18   interest in both of those four estates, the two -- or the

19   permit, the permit application, and the two packages of leases.

20        His note was due in July.  He did not pay.  I began trying

21   to collect first and then foreclose second.  And the

22   foreclosure process took some time, and so it was actually -- I

23   think it was the 25th of September 2005 when I finally was

24   approved under the foreclosure process in Breathitt County.

25        Once the foreclosure process was complete.  I actually did

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM          166

1    not have a document to pick up or a title to pick up or

2    anything like that.  Mr. Wolford was not coming forth with the

3    documents, and so I felt a little bit like trying to bathe an

4    octopus in the dead of night.  I was looking for things and I

5    didn't know what I was finding.  And I didn't know what I

6    should be getting.  And so I started digging, trying to find

7    leases and trying to find the other aspects of this property.

8              THE COURT:  Can I interrupt you for just a minute?

9          (Off the record.)

10             THE COURT:  Okay.  Mr. Brownlow, if you can complete

11   your thought, and the court reporter may be able to help you

12   with the last thing that you said.  Can you return to where you

13   were, sir?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Go ahead.

16   A.   After I finished the foreclosure procedure on the 25th of

17   September, I began trying to research and find information on

18   the assets that I had, and at about the same time Steve Sarver

19   of Kentucky Fuel came on the scene and indicated they were

20   interested in acquiring the leases and permits and the permit

21   application.  And so 10 days, 12 days, somewhere in that

22   neighborhood after I had acquired them, I transferred and sold

23   to Kentucky Fuel.

24   Q.   So you owned these properties prior to the transfer of

25   them for a total of less than two weeks?

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM     167

1   A.   Yes, sir.

2   Q.   And during that time, did you have access to any core

3   drillings data?

4   A.   No, sir.

5   Q.   Did you ever give any core drillings data, such as some of

6   the exhibits that we have seen, to anyone at Kentucky Fuel?

7   A.   I don't recall doing that.

8   Q.   Okay.  You've heard Mr. Justice's testimony that you made

9   representations to either him or perhaps someone at Kentucky

10  Fuel that -- that all necessary permits to mine the Fivemile

11  properties have been obtained.  Do you remember that testimony?

12  A.   Yes, sir.

13  Q.   Did you ever make a representation like that?

14  A.   No, sir.

15  Q.   At the time did you know all of the permits that were

16  required --

17  A.   No, I did not.

18  Q.   -- by every agency?

19  A.   I'm sorry.

20  Q.   I was slow with the end of the sentence.  I apologize.

21  Did you know all of the permits from every agency that would be

22  required to mine the property?

23  A.   No, sir.

24  Q.   All right.  Did you make any representations about that to

25  Kentucky Fuel other than the representations in the selling

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM          168

1   document that you were transferring them as is?

2   A.   I made no representations, other than the selling

3   documents.

4   Q.   Okay.  Since then have you learned how much would be

5   required if someone wants to find out if the land was properly

6   permitted, you know, how difficult it is to find that out?

7   A.   Well, in my experience, there are federal agencies that

8   issue these permits and the willingness to pick up a phone or

9   to call an engineering firm and ask them to pick up the phone

10  is the basic knowledge required to find out if they have a

11  permit.  For example, the State of Kentucky, you can call

12  either the home office in Frankfort or the regional office,

13  which was at that time in London, and they're more than willing

14  to tell you the status of a given property as far as the

15  Kentucky Department of Natural Resources is concerned.  And I

16  think the same is true with the federal government and with the

17  Corps of Engineers.

18  Q.   Okay.  And you heard Mr. Ball's testimony about you never

19  sent a letter or said, basically, why are you not mining?

20  A.   Yes.

21  Q.   And did you have conversations with Mr. Ball or any

22  representatives of Kentucky Fuel in which you asked them, when

23  are you going to mine, when are you going to mine?

24  A.   Yes, I did.

25  Q.   And how many occasions?

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM    169

1  A.    Many, many.

2  Q.    Can you give us a better idea of that, of how many and

3  over what period of time?

4  A.    I would say that most of my contact, after I had completed

5  the purchase for them under the contract basis of the Benton,

6  Bevins properties in Pike County and the Logan County

7  properties in West Virginia, they brought Marc Merritt on, and

8  so most of my dealings, particularly in the Kentucky

9  properties, was with Mr. Merritt.  And I sent him -- called him

10 on the telephone and sent him emails multiple times asking him,

11 what is the status, when are we going to start mining Kentucky

12 Fuel's obligation under the leases at Fivemile.

13 Q.    What did he tell you?

14 A.    He said, I'll have to check with Jay, and as soon as Jay

15 gives me an answer, I'll let you know.

16 Q.    Did you then typically get an answer back from Jay through

17 him?

18 A.    No, I did not.

19 Q.    Or from Jay directly?

20 A.    No.

21 Q.    Okay.  During the course of all this, did anyone from

22 Kentucky Fuel say something to the effect, what are you talking

23 about, you know, you know that coal is no good and we're not

24 going to mine it because it's poor quality coal?

25 A.    No.

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM          170

1  Q.   Or words to that effect?

2  A.   No, sir.

3  Q.   Did you ever get any -- even so much as an email from them

4  to that effect?

5  A.   No, sir.

6  Q.   You heard Mr. Ball ask questions and testify about his

7  understanding of the phrase industrial -- the "industry

8  standards" in Article 10, and that -- how that word -- words

9  "industry standards" modifies the obligation to maximize the

10  extraction of coal.  What was your understanding of that

11  phrase, based upon the negotiations that you had with Mr. Ball

12  and Mr. Merritt?

13  A.   Well, let me back up and give a little history as part of

14  my answer.  In 2000 --

15          MR. GETTY:  I'd ask that he answer the question

16  first.

17          THE COURT:  We are getting into some pretty narrative

18  descriptions, Mr. Lucas.  At this late hour, can you narrow or

19  focus your questions for us, please?

20          MR. LUCAS:  Yes.

21  BY MR. LUCAS:

22  Q.   What was your understanding -- based upon the negotiations

23  that you had at The Greenbrier that everybody has talked about

24  what was your understanding of the "industry standards" as that

25  phrase is used in the covenant to mine in Article 10 of the

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM          171

1   fourth amendment?

2   A.    That Kentucky Fuel had promised that they would mine the

3   property and that the language with regard to industry

4   standards dealt entirely with this general notion that out of

5   100 percent of the coal you can't get 100 percent; you can get

6   some number less than that, say, 90 percent, because sometimes

7   there's coal that is either lost to scrap or lost over the side

8   or just doesn't make its way into the truck and down the hill.

9   Q.    You heard Mr. Ball's testimony that he somehow knew what

10  you were aware of in connection with Mr. Williams's efforts to

11  try to close the Williams-NewLead transaction.  Prior to the

12  time that you and your son first heard about NewLead from

13  Mr. Justice, prior to that, were you aware that Mr. Williams

14  was trying to close that transaction?

15  A.    No.

16  Q.    One last question just on a document.  In connection with

17  all of the discussion that we've had yesterday and prior to

18  that in this lawsuit about the various tax returns, are you

19  familiar with affidavits that were filed on behalf of the

20  defendants explaining those tax returns?

21  A.    Yes, sir.

22  Q.    All right.  I'd like to have this one tendered to the

23  witness just for identification, Your Honor.

24          THE COURT:  Okay.  Meaning you don't intend to admit

25  it or you may?

WILLIAM G. BROWNLOW - FURTHER DIRECT EXAM          172

1        MR. LUCAS:  After he does.

2        THE COURT:  Okay.

3        MR. LUCAS:  I am going to ask it be admitted.  I'm

4   not going to ask him any questions on it.

5        THE COURT:  Oh, okay.  So that is going to be

6   Plaintiffs' --

7        MR. LUCAS:  I'll just ask him if he recognizes this

8   part of the record.

9        THE COURT:  That's fine.  Objection, Mr. Getty?  You

10  can remain seated.

11       MR. GETTY:  I'm certainly inclined to object at this

12  point.  This is supposedly rebuttal.  I mean, let's just get

13  this done.  I'm not going to object.

14       THE COURT:  Okay.  Your question, Mr. Lucas?

15  BY MR. LUCAS:

16  Q.   You've seen this affidavit before filed by the defendants

17  in this litigation, correct?

18  A.   Yes.

19       MR. LUCAS:  Okay.  Your Honor, I would offer it as

20  the next exhibit.

21       THE COURT:  And that's going to be Plaintiffs' 41,

22  correct, Sheila?

23       THE CLERK:  Yes.

24       THE COURT:  Objection, Mr. Getty?

25       MR. GETTY:  I said no.

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM        173

1    THE COURT:  Okay.  That will be admitted into

2  evidence as Plaintiffs' Exhibit 41.

3    MR. LUCAS:  Nothing further, Your Honor.

4    THE COURT:  Okay.  Mr. Getty, cross-examination, sir?

5                        CROSS-EXAMINATION

6  BY MR. GETTY:

7  Q.   Let's just sort of go in reverse order.  Isn't it a fact

8  that you introduced Mr. Williams to Kentucky Fuel?

9  A.   Mr. Williams actually made a deal --

10 Q.   I prefer a yes or no and then you can explain, please.

11 A.   I think I did introduce him back in probably 2005 or '6,

12 somewhere in there.

13 Q.   Okay.  And you understood at the time that you introduced

14 Mr. Williams that he was interested in the possibility of

15 acquiring the Fivemile leases and permits, plus even more in

16 terms of permits, right?

17 A.   I didn't know about the even more part.  But in 2005 or

18 '6, whenever I first introduced him, that's what he said he was

19 interested in.

20 Q.   You knew from the outset he was very keenly interested in

21 the Fivemile permits and leases?

22 A.   He told me those were the two permits he was interested

23 in, because he paid Mr. Wolford $2 million for them after

24 Mr. Wolford no longer owned them.  And he was trying to figure

25 out some way to get his money back.

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM        174

1   Q.   So you go as far back as 2005 with Mr. Williams?

2   A.   No.

3   Q.   You said 2005?

4   A.   Well, what I said was that he told me that's what he had

5   done in that time period.

6   Q.   Okay.  And isn't it a fact, Mr. Brownlow, you and

7   Mr. Schmid actually helped Mr. Williams obtain certain leases,

8   didn't you?

9   A.   I don't have a recollection of that.

10  Q.   You don't have a recollection that you assisted him in

11  acquiring some of the leases in that general area?

12  A.   I don't know what leases he has, so I'm having a hard time

13  figuring out what you're talking about.

14  Q.   When Mr. Wolford defaulted, did you ask him why he didn't

15  mine the coal?

16  A.   Did I ask Mr. Wolford?  I never met Mr. Wolford.

17  Q.   But you granted him -- you transferred certain Fivemile

18  permit leases to him, right?

19  A.   To Mr. Wolford?  No, I never did.

20  Q.   Well, what was Mr. Wolford mining or what did he purport

21  to mine?

22  A.   Mr. Wolford bought the Deep Wood leases and the Deep Wood

23  permit and the Fivemile leases and the Fivemile permit

24  application from Doug Terry --

25  Q.   Okay.

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM          175

1   A.    -- in January of 2005.

2   Q.    And you loaned him the money to do that?

3          MR. LUCAS:  Let him finish.

4          THE COURT:  He does need to be able to finish the

5   answer.

6       Go ahead, Mr. Brownlow.

7   A.    And I helped provide the financing in January of 2005 to

8   Mr. Wolford for him to buy those from Mr. Terry.

9   Q.    Okay.

10  A.    And when he did not pay me in -- six months later when the

11  notes were due, I began collection and ultimately foreclosed on

12  them, which resulted in --

13  Q.    Go ahead.

14  A.    -- which resulted in foreclosure, I mentioned, on, I

15  think, September 25 --

16  Q.    Okay.

17  A.    -- 2005.

18  Q.    And the Deep Wood and the Fivemile leases and permits were

19  held by Mr. Terry, and you financed Mr. Wolford to purportedly

20  buy them, right?

21  A.    That was -- that was my understanding of the transaction.

22  Q.    And you took security interest in the leases and permits?

23  A.    Well, I actually took -- my actual security interest was

24  in the ownership of the corporations that owned those leases

25  and permits.

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM     176

1   Q.    That owned them.  Okay.  Are you saying that he basically

2   bought the stock of the corporation that held title to the

3   Deepwood and Fivemile leases permits?

4   A.    I think one was a corporation and one was an LLC.

5   Q.    And you took a security interest in -- a membership

6   interest or the stock, which you foreclosed on?

7   A.    Correct.

8   Q.    And you did that within how many months?  Six months or

9   less of his default in paying you?

10  A.    The note was a six month note.

11  Q.    Okay.  So six months came due and he didn't pay you, and

12  you sued him and foreclosed, correct?

13  A.    Ultimately, I foreclosed.

14  Q.    So you didn't wait two years to enforce that obligation

15  against Mr. Wolford, did you?

16  A.    Well, his note was really quite clear with regard to for

17  when it was due.

18  Q.    My question was:  You didn't wait two years to take action

19  against him, did you?

20  A.    I took action after six months.

21  Q.    All right.  Not two years?

22  A.    Six months is not two years, that's correct.

23  Q.    And with respect to this clause that you are trying to

24  enforce here, paragraph 10 in the fourth amendment -- fourth

25  assignment, you waited almost two years to try and invoke it

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM          177

1    against Kentucky Fuel, didn't you?

2    A.   I think the calendar speaks for itself.

3    Q.   If you executed it in November of 2010 and you filed the

4    lawsuit in May of 2012, so that would be one month in 2010, all

5    the months in 2011, and then another five months, so that's --

6    how many months?  16, 17 months?

7           MR. LUCAS:  Objection.  Relevance.

8           THE COURT:  I'll overrule the objection.  Go ahead,

9    Mr. Brownlow.

10   BY MR. GETTY:

11   Q.   Isn't that correct, that's 16 -- I'm terrible with math.

12   I'll just tell you that right up front.  But that would be

13   November and December of 2010, so two months there, 12 months

14   in 2011, so that's 14 months.  And then you got another 5

15   months into May.  That's really actually 19 months, almost two

16   years, isn't it?

17   A.   Well, I think it's 18 months, if you actually add it up.

18   Q.   Did you ask Kentucky Fuel to give up the Deep Wood leases

19   and permits so you could flip it to Mr. Hoops?

20   A.   Actually, they said that they had no interest --

21          MR. LUCAS:  Your Honor, objection.  It's beyond the

22   scope of the direct.

23          THE COURT:  I do think it was, Mr. Getty.  Do you

24   think that was a matter covered on direct examination?

25          MR. GETTY:  I believe that he opened up the door when

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM         178

1   he talked about what the discussions were with, you know, our

2   transaction.

3           THE COURT:  Mr. Lucas?

4           MR. LUCAS:  I'm not sure what that means when he says

5   what the discussions were with our transaction, how that opens

6   the door to something about Mr. Hoops with respect to property

7   that is not the subject of this lawsuit.

8           THE COURT:  Okay.  I'm going to overrule the

9   objection.  I understand.

10      Mr. Getty, do try to tailor your questioning to the

11  subject matters that were covered on direct examination.  The

12  question was:  "Did you ask Kentucky Fuel to give up the Deep

13  Wood leases and permits so you could flip it to Mr. Hoops?"

14  BY MR. GETTY:

15  Q.   Answer.

16  A.   Actually, they asked me to take them back.  They wanted

17  rid of them.  They didn't want them and said the reason they

18  didn't want them is that they did not have any of the mineral

19  leased in that permitted area any longer.

20  Q.   Uh-huh.

21  A.   And so they wanted to get rid of that and asked me to find

22  somebody else who would be interested.

23  Q.   And then you transferred them to Mr. Hoops and --

24  according to your earlier testimony, you transferred them to

25  Mr. Hoops, and I think you said and made a lot of money.

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM     179

1  A.    I don't think that's what I said.  What I said was I got

2  rid of them.

3  Q.    And then with respect to Kentucky Fuel, do you know how

4  much they paid you from day one up until now in minimum

5  royalties?

6           MR. LUCAS:  Objection, Your Honor.  This really is

7  beyond the scope.

8           THE COURT:  It is.  I'll sustain that.

9       Your next question, Mr. Getty.

10 BY MR. GETTY:

11 Q.    And Exhibit 8 in the information, you said, you never had

12 any core data.  Did you give this information that was

13 generated by Doug Terry to my clients?

14 A.    I don't recall giving it to them, no.

15 Q.    If they said -- they said earlier in the testimony;

16 Mr. Justice said that that was the case, that you gave it to

17 him.  If he says that, are you disputing his testimony or are

18 you just saying you may have and you just don't recall?

19 A.    My recollection is Mr. Terry was more than willing to

20 share his data with anybody who asked for it.  So I don't

21 recall whether he shared it with them or not.

22 Q.    Okay.  Is it your testimony here today, sir, that under

23 this paragraph 10 of the covenant to mine, that it was your

24 understanding at all times that my client was obligated to

25 start mining that coal whether they lost money or made money?

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM          180

1   A.   Well, here's -- here's the lead-up to --

2   Q.   Can I get an answer?  Yes or no, is that your position as

3   you understand it?

4   A.   My position is is that that paragraph is quite clear that

5   this coal is to be mined, and that they made a promise to mine

6   it.  Now, in order to understand how you get to that point, you

7   have to understand the history of this and how it has been

8   brought forward.  And the way it's been brought forward --

9        MR. GETTY:  Your Honor, can I get an answer as to,

10  you know, whether it's his position we have to mine the coal

11  even if we lose money?

12       THE COURT:  You did.  Your question was, yes or no,

13  is that your position as you understand, I believe.  And I may

14  have the phrasing a little mixed up.  And he stated what his

15  position was.  He's explaining now.  I think it's a fair

16  response.

17  A.   The history of what happened was Kentucky Fuel had

18  obtained these properties through the original assignments in

19  2005.  That went along for a few years, and then finally, in

20  2009, I started getting calls from landowners who said, we're

21  not getting paid our annual minimum royalties.  And so I tried

22  to get in touch with the folks at Kentucky Fuel, and they're

23  difficult to get through to and seldom either answer the phone

24  or return phone calls.

25       So I decided, well, I don't want this thing to get broken

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM   181

1  up and lost, so I need to go ahead and renew these leases.

2  Many of the leases had expired on their own terms.  And many of

3  them just simply had not been paid the annual minimum

4  royalties.  So I formed --

5           THE COURT:  Okay.  I am going to interrupt you.

6  Mr. Getty, this is nearly verbatim of what was described at the

7  outset of his initial testimony on direct examination days ago.

8  Is there another topic --

9           MR. GETTY:  Maybe I can sort of crystallize it and

10 get it --

11          THE COURT:  Be more specific.

12          MR. GETTY:  Yeah.

13 BY MR. GETTY:

14 Q.   Isn't it a fact that you've taken the position in this

15 litigation that my client was obligated -- is obligated to mine

16 that coal whether or not they can make money in mining it?  Yes

17 or no?

18 A.   Yes, they're obligated to mine the coal.

19 Q.   And from the time that you executed that covenant in

20 November of 2010, isn't it true that there is not one letter,

21 not one note, not one communication in writing of any sort

22 directing them to commence mining?

23 A.   There is much conversation and many emails with regard to

24 that.

25 Q.   Uh-huh.  Do you think this was an important matter, that

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM          182

1  they had to mine this coal?

2  A.    Absolutely.

3  Q.    And you never reduced any demand on that important matter

4  to writing, did you?

5  A.    I think Mr. Schmid's letters indicate that they defaulted

6  under the agreement.

7  Q.    Have you ever heard the phrase "Where's Waldo?"  Where's

8  Mr. Schmid?  He's not here, is he?

9              THE COURT:  Mr. Getty, questions.

10  BY MR. GETTY:

11  Q.    Is Mr. Schmid here?

12  A.    No.

13  Q.    Did you call him as a witness?

14  A.    No.

15  Q.    Okay.  I just have one other point.  There was a schedule

16  of cases put into the record.  Do you know whether that was

17  accurate or not, Exhibit 15, Plaintiffs'?

18  A.    I didn't prepare that schedule.

19  Q.    Okay.  Did you check or make any attempt to verify whether

20  it was current in any respect?

21  A.    None whatsoever.

22  Q.    Did you make any effort to -- to determine that virtually

23  every case on that list, except for maybe three or four, had

24  long ago been settled or dismissed?  Did you make any effort to

25  do that?

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM          183

1   A.    I did not.

2   Q.    Do you know whether your lawyers did?

3   A.    That's privileged.

4   Q.    Would you assume that your lawyers would be diligent

5   enough --

6             THE COURT:  The relevance of that, Mr. Getty?

7             MR. LUCAS:  Your Honor, I object.  I'm going to

8   object to the relevance.

9             MR. GETTY:  It's --

10            MR. LUCAS:  Let me finish, please.

11            MR. GETTY:  I'll withdraw the question.

12            THE COURT:  Actually, I started -- I asked the

13  question.  So I want to hear Mr. Getty's response.  And then

14  I'll certainly hear from you as well, Mr. Lucas.

15            MR. LUCAS:  I'm sorry, I didn't mean to interrupt.  I

16  didn't hear your question.

17            THE COURT:  My question was:  What's the relevance?

18            MR. GETTY:  I think the relevance is, you know, this

19  case has been nothing but sort of implication and innuendo.

20  And, you know, to come into this Court and to present a witness

21  with a list of cases that were long ago dismissed to create the

22  impression -- to poison this Court or to create the impression

23  we're bad guys and we still have these cases out there.  Most

24  of those cases have been dismissed.  I have a schedule that

25  would tell you that.

WILLIAM G. BROWNLOW - FURTHER CROSS-EXAM          184

1      So I just think the way it's been practiced on that --

2   that point, of coming to this Court, you know, borders on --

3   well, it's just wrong, and I have a right to clear it up and

4   clarify it.  He's testified that he didn't check, and to his

5   knowledge, obviously, his lawyers didn't check either.

6            THE COURT:  Okay.

7            MR. GETTY:  You know, I think we have an obligation

8   and candor with this Court and opposing counsel.  You don't

9   come into this Court, Your Honor, and you don't hold up a

10  schedule, you know, and create the impression that the client

11  that's involved -- or clients that are involved have all these

12  cases pending against them.  And they don't.  I'll represent to

13  you they don't.

14           THE COURT:  Okay.  Mr. Getty --

15           MR. GETTY:  They're all gone, settled, dismissed,

16  resolved except one or two.

17           THE COURT:  Are you finished questioning the witness,

18  Mr. Getty?

19           MR. GETTY:  Yes.

20           THE COURT:  Okay.  Mr. Lucas, you are welcome to add

21  a comment if you choose.  Or you have additional -- you have

22  redirect?

23           MR. LUCAS:  I just want to respond to that and very

24  briefly on redirect.  Mr. Getty misunderstands the relevance of

25  the list.  It's not and it's never been --

WILLIAM G. BROWNLOW - REDIRECT EXAM                185

1        MR. GETTY:  Is that a question or is that a
2   statement?
3        THE COURT:  Mr. Getty, he didn't interrupt you.
4        MR. GETTY:  I agree, and I apologize.
5        THE COURT:  Go ahead, Mr. Lucas.
6        MR. LUCAS:  They were not offered for, and neither I
7   nor anyone else ever represented that all of those cases were
8   still pending.  Their relevance was that there was an
9   interrogatory asking about all litigation that they had been
10  involved in and that they provided a list that is woefully
11  incomplete, and like every other -- that's an exaggeration --
12  but like so much other of the discovery in this case was never
13  supplemented so that we got a complete list.  And as we sit
14  here today, we still don't even know a full answer to that
15  interrogatory.  That's the relevance.
16        THE COURT:  After the evidence is concluded, we'll
17  discuss the schedule going forward and how the argument will be
18  presented.  Your redirect, Mr. Lucas.
19                     REDIRECT EXAMINATION
20  BY MR. LUCAS:
21  Q.   Mr. Brownlow, you were questioned by Mr. Getty just now
22  about the question of whether or not you thought the agreement
23  required them to mine regardless of their arguments about
24  economic conditions or profitability.  So that's what I want to
25  focus you on now.  And you were trying to give some context for

WILLIAM G. BROWNLOW - REDIRECT EXAM          186

1   that, for why you thought that was a reasonable interpretation

2   in view of the history of the parties.  Can you just give the

3   Court the Reader's Digest view of why you believe that's a

4   reasonable interpretation?

5   A.    There were several different dynamics in play in October

6   and November leading up to the fourth amendment.  One dynamic

7   was that some adverse parties had signed some leases within the

8   Deep Wood and Fivemile area and had filed a complaint with the

9   Department of Natural Resources seeking to have the permits on

10  those two properties taken away.

11       Part of the problem was that Kentucky Fuel had never

12  applied to have the permits issued in their name.  And so on

13  the 25th of October of that year, I received a letter from the

14  Kentucky Department of Natural Resources in which they said

15  they were going to have a hearing and a determination on the

16  25th of November, one month later, in which they were going to

17  decide to either revoke those permits or if they got some

18  substantiation that the leases and the permits were together

19  and not separated, then they might consider allowing the

20  permits to stay with the property.  And so --

21  Q.    And these were for the --

22  A.    This is for both Fivemile and Deep Wood.

23            MR. GETTY:  Excuse me.  This is hearsay.  There's not

24  been a document to support this put into the record.  You know,

25  it's more, you know, innuendo or implication without proof.

WILLIAM G. BROWNLOW - REDIRECT EXAM          187

1    THE COURT:  What was the last question, Madam Court

2  Reporter?

3      (The record was read as follows:

4      QUESTION:  "Mr. Brownlow, you were questioned by

5  Mr. Getty just now about the question of whether or not you

6  thought the agreement required them to mine regardless of their

7  arguments about economic conditions or profitability.  So

8  that's what I want to focus you on now.  And you were trying to

9  give some context for that, for why you thought that was a

10  reasonable interpretation in view of the history of the

11  parties.  Can you just give the Court the Reader's Digest view

12  of why you believe that's a reasonable interpretation?")

13    THE COURT:  Did you you start a question after that?

14    MR. LUCAS:  I don't think so.  During his answer, I

15  was asking him were these for the Fivemile leases and he said

16  it was for both Fivemile and Deep Wood.

17    THE COURT:  All right.  Can you refocus the witness

18  to try to avoid potential hearsay, Mr. Lucas?

19    MR. LUCAS:  Yes, Your Honor.  And let me say, it's

20  not the hearsay because it's not offered for the truth of

21  whether the Kentucky DNR or anyone else was going to hold a

22  hearing or whether the violations were meritorious or not.

23  It's offered to show that's what he understood and what led --

24  it was the context leading up to the fourth amendment, so it's

25  not hearsay.

WILLIAM G. BROWNLOW - REDIRECT EXAM          188

1          MR. GETTY:  It is hearsay.  And how do I know that it

2    never occurred, that he simply comes into this Court and makes

3    it up out of whole cloth, just like a couple of other issues in

4    this case have been made up out of whole cloth.  It's hearsay.

5    If -- he's saying what he was told by the Department of Natural

6    Resources, and that is pure hearsay.

7          MR. LUCAS:  It is only hearsay if it's offered for

8    the truth of the matter.  He can question him about whether or

9    not he's being truthful when he says, I was told this.

10          MR. GETTY:  Well, you know --

11          THE COURT:  Wait a second.  Wait a second.

12          MR. GETTY:  Of course he's going to say he's

13    truthful.

14          THE COURT:  Well, Mr. Getty we don't know that.  None

15    of us have a crystal ball.  We don't know what the answers to

16    the questions are going to be.

17          MR. GETTY:  Your Honor, I wasn't purporting to be

18    like Karnak --

19          THE COURT:  No, no.

20          MR. GETTY:  -- that I could hold a paper up to my

21    temple and know what was going to be said.  I'm just trying to

22    be funny.

23          THE COURT:  I'll allow it for the purpose Mr. Lucas

24    has described.  Go ahead with your questioning.

25

WILLIAM G. BROWNLOW - REDIRECT EXAM                189

1   BY MR. LUCAS:

2   Q.    Go ahead, sir.

3   A.    I actually received a letter from the Department of

4   Natural Resources, said there would be a hearing and a

5   determination on the 25th of November.  I also, at the same

6   time, had a large number of leases within the Fivemile area

7   that Kentucky Fuel had let slip away, which I had signed new

8   leases on.  And so there was a certain amount of pressure on

9   everybody concerned, that being myself and Kentucky Fuel, to

10  find some resolution so that we could respond to the Department

11  of Natural Resources prior to the 25th of November.

12        And so it was with that in mind that Mr. Schmid and I

13  began pushing for some sort of new agreement or some sort of

14  resolution in the latter part of October and the first part of

15  November.  And from that we evolved into the meetings at The

16  Greenbrier and ultimately into the documents that are the

17  fourth amendment.

18  Q.    And it's been well established that during this time

19  Kentucky Fuel had not mined the property?

20  A.    Correct.

21  Q.    And I believe you testified on direct that was one of your

22  principle objectives going into the meeting, that the property

23  must be mined; is that correct?

24  A.    Yes.  And as a matter of fact, at the meeting on the

25  evening of the 11th of November, at dinner at The Greenbrier,

WILLIAM G. BROWNLOW - RECROSS-EXAM          190

1   attended by Mr. Merritt and Mr. Ball and myself and Mr. Schmid,

2   and I think there was another party from Kentucky Fuel, maybe

3   Terry Miller, but I'm not sure about that -- but in any event,

4   I asked the question at least ten times, how can I be sure that

5   this promise to mine the coal is going to be different from all

6   the other promises when you haven't done anything?  And they

7   repeatedly said, don't worry, we're going to mine it this time.

8              MR. LUCAS:  That's all I have, Your Honor.

9              THE COURT:  Recross, Mr. Getty?

10                         RECROSS-EXAMINATION

11  BY MR. GETTY:

12  Q.   So would it be accurate to say when you got communication

13  from the Department of Natural Resources about the permits that

14  that was a danger sign?  As I understand your testimony, I

15  understand it was a danger.

16  A.   It was a case that had been ongoing at the Department of

17  Natural Resources for some time.  And they finally set a

18  settlement conference or a final adjudication of it.  And the

19  attorneys I had at Sites and Harbison said, you need to get

20  this thing resolved before the 25th of November so it's not a

21  problem for you.

22             MR. GETTY:  Move to strike any reference to Stites

23  attorneys or what they said.

24  BY MR. GETTY:

25  Q.   Mr. Brownlow, what you described is a situation which put

1  these permits in jeopardy, right?

2  A.    Yes.

3  Q.    Yes.  That was a real danger to you, wasn't it?

4  A.    Certainly.

5  Q.    And did you ever put in writing, either before or after

6  the November agreement was entered into, you must mine this

7  coal regardless, period, end of story?  You never did, did you?

8  A.    I don't recall a letter like that.

9  Q.    I'd asked you about this exhibit, the core drills.  You

10 don't deny that prior -- well in advance of the November 2010

11 meeting you received this core drill information from

12 Mr. Terry, didn't you?

13 A.    That's possible.

14 Q.    Okay.  Did you read it and understand it and realize how

15 terrible this coal is?

16 A.    I've actually answered that before.

17 Q.    Please answer it again.  Will you indulge me?

18 A.    Could you repeat the question?

19 Q.    You said you answered it before as to whether you received

20 this information from Mr. Terry and understood that this coal

21 was of this bad quality --

22          MR. LUCAS:  Your Honor, I think this is beyond the

23 scope of my last redirect.

24          THE COURT:  This is beyond the scope of the redirect,

25 Mr. Getty.

WILLIAM G. BROWNLOW - EXAM BY THE COURT          192

1   BY MR. GETTY:

2   Q.    If you knew the coal was of bad quality, why would you

3   ever ask my client to mine it?

4   A.    I don't agree with your assumption, sir.

5            MR. GETTY:  That's all I have.

6            THE COURT:  Mr. Brownlow, you can return to counsel

7   table.

8                        EXAM BY THE COURT

9            THE COURT:  Well, actually, I have a question for

10  you, Mr. Brownlow.  Your reference a few moments ago to

11  Stites & Harbison.  Has any attorney with Stites & Harbison

12  ever represented you in this piece of litigation?

13           THE WITNESS:  No, sir.

14           THE COURT:  Have you ever called upon them for advice

15  concerning this litigation?

16           THE WITNESS:  No, sir.

17           THE COURT:  Has anyone attorney from Stites &

18  Harbison ever acted as a lawyer in this proceeding in any way?

19           THE WITNESS:  No, sir.

20           THE COURT:  Okay.  Thank you.  You all are welcome to

21  ask follow-up questions because I have a conflict if Stites &

22  Harbison is acting as a lawyer in the proceeding, so I wanted

23  to make that clear.  That's the first time I've ever heard of

24  their involvement.

25       Questions, Mr. Lucas?

193

1          MR. LUCAS:  They have not been involved in this
2     litigation in any way, shape, or form.
3          THE COURT:  Certainly never been counsel of record.
4     Mr. Getty?
5          MR. GETTY:  No.  No questions.
6          THE COURT:  You can step down, sir.
7          THE CLERK:  The exhibits?
8          THE COURT:  Yes.  Did we have a new exhibit?
9          THE CLERK:  We do.
10          THE COURT:  Do you intend for Exhibit 41 to be
11     admitted into evidence, Mr. Lucas?
12          MR. LUCAS:  That was the Brian Rice affidavit?
13          THE CLERK:  Yes.
14          MR. LUCAS:  Yes, please, Your Honor.
15          THE COURT:  Objection to that, Mr. Getty?
16          MR. GETTY:  No.
17          THE COURT:  Okay.  Further proof of the plaintiffs,
18     Mr. Lucas?
19          MR. LUCAS:  Your Honor, the only further proof are
20     depositions which we have marked and shared with the other
21     side, the designations, and they are depositions of
22     Mr. Williams, deposition of Mr. Ball, and a deposition of
23     Kentucky Fuel 30(b)(6), with Mr. Ball as the representative.
24          THE COURT:  Is this the entirety of these
25     depositions?

194

1          MR. LUCAS:  No, Your Honor.  What I have done is --
2    thank you -- is we've -- we thought this would be the easiest
3    way.  And I can actually mark -- well, I can call out, for the
4    record, the pages that they're on so you don't have to flip
5    through them.  But we basically marked them in red in the
6    margin, the portions that we wanted to designate so flipping
7    through them it would be easier for Your Honor to see.
8          THE COURT:  Okay.  And, Mr. Getty, is there any
9    objection to those being made a part of the record and not read
10   into evidence, sir?
11         MR. GETTY:  No.  We have some additional designations
12   we'd like to --
13         THE COURT:  Cross designations?
14         MR. GETTY:  Cross designations.  And I have a list of
15   those.  I can read those into the record.  And what I would
16   suggest is that if they mark their -- you know, their portions,
17   then if he can provide that to us before we give them to the
18   Court, we'll go ahead and highlight where we want to add to it.
19         THE COURT:  How about --
20         MR. GETTY:  I also have a list that we can -- I
21   actually put a title, handwritten, Defendants designations of
22   depositions.
23         THE COURT:  Why don't we do this?  Could you provide
24   the transcripts, Mr. Lucas, and I could set a period of time
25   for you to put in writing your list of designations and then

195

1   the defense cross designations --

2             MR. LUCAS:  Certainly.

3             THE COURT:  -- and just hold the evidence open for

4   that limited purpose?

5             MR. LUCAS:  Certainly.  Most of them, with one or two

6   minor exceptions, were identified on our exhibit list.  But I

7   said there's one or two.  I'm sure we can get together and just

8   send it, if it pleases you, in whatever form you want it in,

9   just a letter saying, these are the designations by each of us.

10            THE COURT:  File it in the record.  File a notice

11  with the designations.  Is that fair enough?

12            MR. LUCAS:  Yes, sir.

13            MR. GETTY:  And we'll do likewise.

14            THE COURT:  Is a week enough time to do that,

15  Mr. Lucas?  You want ten days?

16            MR. LUCAS:  Yeah.

17            THE COURT:  Actually, we're getting right up on

18  Christmas.  How much time would you need?

19            MR. LUCAS:  I think we can have that done by the end

20  of next week.  I think we ought to have it.  He's got his

21  designated.  I've got mine designated.  We ought to be meeting

22  when we break up here right now to do it.

23            THE COURT:  Okay.  So that will be on or about before

24  the 21st.  Is that fair enough, Mr. Getty?

25            MR. GETTY:  Yeah.  That'd be fine.

196

1          THE COURT:  File those notices with plaintiffs'
2     deposition designations and defendants' cross designations on
3     or before --
4          MR. GETTY:  What day is the 21st?
5          THE COURT:  It's Friday, next week.
6          MR. GETTY:  Can we just go to the next Monday?
7          THE COURT:  Yes.  We're closed.  You can file them
8     electronically, but that's Christmas Eve.
9          MR. GETTY:  Oh, no, no.  We'll do it by the 20th, I'm
10    sorry.
11         THE COURT:  Okay.
12         MR. GETTY:  I'm sorry.
13         THE COURT:  Sure.
14         MR. LUCAS:  Let me ask just --
15         MR. GETTY:  Yes.
16         MR. LUCAS:  -- Your Honor's preference on that.  The
17    ones that I've got here -- and just for the record, I misspoke.
18    We didn't have them.  They're not in red.  They're in yellow.
19         THE COURT:  Okay.
20         MR. LUCAS:  Would you prefer that large format like
21    this where it is one page per piece of paper, or does Your
22    Honor prefer the mini script where we've got four?
23         THE COURT:  You don't need to put together a
24    different format for me.  That's fine.
25         MR. LUCAS:  We've got it both ways.  Whichever you

197

1  prefer.

2            THE COURT:  The large format is fine.

3            MR. LUCAS:  Okay.

4            THE COURT:  Further proof then from the plaintiffs,

5  Mr. Lucas?

6            MR. LUCAS:  Yes, Your Honor.  Do you want me then

7  to --

8            THE COURT:  Maybe you didn't hear my question.  Is

9  there further proof from the plaintiffs?

10            MR. LUCAS:  Oh, I'm sorry.  No.

11            THE COURT:  Okay.  All right.  Finish your question,

12  sir.

13            MR. LUCAS:  I was just going to ask if you want me

14  to -- if you want to use these copies with what we're going to

15  file, if you want me to pass these up.

16            THE COURT:  That's fine.  Those can be provided to

17  the clerk to be made a part of the record, please.

18       Go ahead, Roger.  You can grab those.

19            THE CLERK:  You want them as exhibits or --

20            THE COURT:  No, they'll just be designated as a part

21  of the record provided at the hearings.  Is that okay, Sheila?

22            THE CLERK:  Yes.

23            THE COURT:  All right.  So that concludes the

24  plaintiffs' presentation of evidence; is that correct?

25  Mr. Lucas?

198

1           MR. LUCAS:  Yes, Your Honor.

2           THE COURT:  Okay.  You mentioned the possibility of

3     surrebuttal, Mr. Getty.

4           MR. GETTY:  I just want to put Mr. Justice on for two

5     minor real quick points.  And one is to -- since we touched

6     upon this with Mr. Brownlow, put this -- make sure that you

7     have the actual, real accurate information in the record.

8           MR. LUCAS:  That's redundant.  It's already --

9     Mr. Justice already testified to that.  Ours was rebuttal.

10          MR. GETTY:  He never testified to this.

11          MR. LUCAS:  Oh, I'm sorry.

12          THE COURT:  Yes.

13          MR. LUCAS:  I misunderstood.  I thought you were

14    referring to other documents.  I apologize.  Go ahead.

15          MR. GETTY:  I think it'll take less than 10 minutes.

16          THE COURT:  That's fine.  I'm just thinking through.

17    One moment.  I mean, it's not surrebuttal evidence.  That list

18    came in through Mr. Lucas' examination of Mr. Ball, correct?

19          MR. GETTY:  Yeah, but Mr. Ball had no knowledge of

20    this.  Mr. Justice has the knowledge to refute the implication

21    that was false.

22          THE COURT:  Okay.  We're going to take a 5-minute

23    break.  I'll allow this.  But surrebuttal is rare.  It has to

24    strictly be limited to the scope that you have just described,

25    Mr. Getty.

199

1        And I do want to take a five-minute break.  Sheila, is

2   that okay for you to make your call?

3              THE CLERK:  That's fine.

4              THE COURT:  Anything before the break, Mr. Lucas?

5              MR. LUCAS:  No, Your Honor.

6              THE COURT:  Okay.  Mr. Getty?

7              MR. GETTY:  No, sir.

8              THE COURT:  We'll be in recess for five minutes.

9         (A recess was taken from 4:56 to 5:03 p.m.)

10             THE COURT:  Thank you.  We're back on the record.

11  Mr. Lucas, you've got something on your mind.

12             MR. LUCAS:  Yes.  Mr. Harlan and I were discussing.

13  She's got some exhibits she wants to offer, and I neglected to

14  add that there's one, Plaintiffs' Exhibit 5, to which there was

15  no objection, and I would offer that.

16             THE COURT:  I preserved a ruling on 5.  There was a

17  list of those discussed.  There was a -- sort of a group, 4, 5,

18  9, and 55.  Is that the right list, Sheila?

19             MR. LUCAS:  5 is not one of the ones that I offered

20  initially, but it was designated as an exhibit and there's been

21  no objection.

22             THE COURT:  Okay.  Is there an objection to that

23  being entered into evidence, Mr. Getty?

24             MR. GETTY:  No, there is not.

25             THE COURT:  Plaintiffs' Exhibit 5 will be admitted,

200

1    too.  Other exhibit issues, Mr. Lucas?

2              MR. LUCAS:  No, Your Honor.  That's it from us.

3              THE CLERK:  Those that were sealed initially, are

4    they staying sealed?

5              THE COURT:  I'm going to address that in a moment.

6    Thank you.

7         Okay.  Yes.  Ms. Harlan, correct?

8              MS. HARLAN:  Yes.  Yes, Your Honor.  Thank you.

9              THE COURT:  You're welcome.

10             MS. HARLAN:  These are just the exhibits -- and I'll

11   be glad to provide the Court with this list.  I've given a --

12   offered a copy to Mr. Lucas and gave them a screen shot of it.

13             THE COURT:  You're moving to have --

14             MS. HARLAN:  These are exhibits we have utilized

15   throughout the proceedings that we're moving to have entered,

16   but I think I need to do them individually simply because there

17   are any objections.

18             THE COURT:  That's fine.

19             MS. HARLAN:  I asked if we could do it subject to

20   objection, and I didn't get a response.

21             THE COURT:  Just one moment.  Let me get your books.

22             MS. HARLAN:  Sure.

23             THE COURT:  Go ahead, ma'am.

24             MS. HARLAN:  All right.  The first one was

25   Defendants' Exhibit 1, which was the Fivemile mining and

1   reclamation map which came from permit application 813-0354.

2           THE COURT:  Yes.  There was an objection initially to

3   that.

4           MS. HARLAN:  There was an objection, Your Honor.  I

5   didn't mean to interrupt.  I'm sorry.  And we had addressed

6   that in our responses to --

7           THE COURT:  Right.

8           MS. HARLAN:  -- the objections.

9           THE COURT:  Mr. Lucas?

10          MR. LUCAS:  Wait.  I'm trying to find my objections,

11  Your Honor.

12      You say your Exhibit 1?

13          MS. HARLAN:  Our Exhibit 1.

14          THE COURT:  Yes.

15          MR. LUCAS:  That's the Fivemile mining and

16  reclamation.  Okay.  Yes.

17      Your Honor, a lot of these I have objections to relevance

18  on, and I don't want to waive those.  I've raised that

19  relevance objection earlier and you've allowed the evidence in.

20  So I may just say I object to relevance to preserve it, but I

21  understand, based on Your Honor's rulings, it would come in.

22  But I just want to preserve that.

23          THE COURT:  You can preserve that.  That's fine.

24          MR. LUCAS:  So I object to that one on relevance

25  grounds.

202

1          THE COURT:  Okay.  That will be admitted, Defendants'
2     Exhibit 1.
3          MS. HARLAN:  Number 2, the Deep Wood Mining
4     reclamation map from the permit 813-0264.
5          THE COURT:  Mr. Lucas, same objection?
6          MR. LUCAS:  I object to that, both on grounds of
7     relevance and it had not been previously identified or
8     produced.
9          THE COURT:  Okay.  Was it produced in discovery?  Do
10    you know, Ms. Harlan?
11         MS. HARLAN:  Your Honor, if I could -- and I'm sorry.
12    I should have had this in front of me.  I could look at our
13    response.  Our response to each of their objections was
14    included in a response on that chart, and I should have printed
15    it over the break and I didn't.  It will take me two minutes to
16    pull it up.
17         THE COURT:  No.  I mean -- okay.  If not -- it wasn't
18    produced or provided, that is a problem, but I don't believe
19    the testimony concerning it was so prejudicial that it needs to
20    be excluded.  I'll admit --
21         MS. HARLAN:  And I would --
22         THE COURT:  I'll admit number 2.
23         MS. HARLAN:  Exhibit Number 3, this was the 10-mile
24    radius aerial photo of the Fivemile mine that was from Google
25    Earth.

203

1          THE COURT:  Mr. Lucas?

2          MR. LUCAS:  Same objections.  Relevance and not

3   previously produced.

4          THE COURT:  Okay.

5          MS. HARLAN:  And that's accurate.  It was not

6   produced.  It was something that --

7          THE COURT:  I'll admit Defendants' Exhibit 3.

8          MS. HARLAN:  4 you have excluded.  5 you have

9   excluded.  The next one, 9, you have excluded.  The next one

10  that we utilized was Defendants' Exhibit 11, which was a Doug

11  Terry email to Steve Sarver regarding the permit transfer GSI:

12  Mining LLC, permit number 813-0415 transfer.  And it was all

13  part of a permit time application --

14         THE COURT:  Yes.

15         MS. HARLAN:  -- from -- to GSI coal mining.

16         THE COURT:  Yes, I have it here.  Mr. Lucas?

17         MR. LUCAS:  Your Honor, again, I object on -- let's

18  see what we preserved.  I objected to -- same grounds, Your

19  Honor, relevance and not previously produced.

20         MS. HARLAN:  Your Honor, I believe that these were

21  included in the subsequently overruled motion for ruling on

22  measure of damages as an exhibit as part of the explanation of

23  the Kentucky-Fuel-GSI transaction.

24         THE COURT:  You think this was filed in the record as

25  a part of your filing on that motion?

204

1          MR. GETTY:  It was.  It was.

2          MS. HARLAN:  I believe it was -- I believe that --

3          THE COURT:  Okay.

4          MS. HARLAN:  -- it was one of the exhibits to that

5   motion, yes, Your Honor.

6          THE COURT:  There still -- of course, it's prejudice.

7   I mean, it's not as if to prepare for the hearing the

8   plaintiffs have to sift through every single thing that was

9   filed and throw darts at a board and try to figure out what is

10  going to be in an exhibit and what is not.

11      That's the point of the process, to assert -- for

12  disclosure and to assert objections.  Is that the prejudice

13  you're claiming, Mr. Lucas?

14         MR. LUCAS:  Yes, Your Honor.

15         MS. HARLAN:  Your Honor, it wouldn't -- I'm sorry.

16         THE COURT:  Go ahead.

17         MS. HARLAN:  My understanding is also it would not

18  have been produced previously other than, I suppose, through a

19  very late supplement, because I believe that the -- and I'd

20  have to ask my client because I don't have it off the top of my

21  head -- that the GSI-Kentucky Fuel agreement was a relatively

22  recent agreement.

23         THE COURT:  Well, but the duty to supplement is the

24  converse of that.  I'll exclude 11.

25         MS. HARLAN:  And the same will be -- the same

205

1    situations with number 12.  That's the bond that was put in

2    place for Fivemile.

3              THE COURT:  Okay.  Objection to that one, Mr. Lucas?

4              MR. LUCAS:  Same objections, Your Honor.

5              THE COURT:  I'll admit Exhibit 12.

6              MS. HARLAN:  Number 14, Your Honor, was the costs for

7    rehabilitating the Haddix loadout facility.

8              THE COURT:  Mr. Lucas?

9              MR. LUCAS:  Your Honor, I objected to that both on

10   lack of foundation and that it had not been previously

11   identified or produced.  I mean, that's a classic one that, you

12   know, I hadn't had a chance -- and just for the record, when

13   you're talking about when we got these, I know I said this

14   before, but I want to make sure it's clear that part of the

15   prejudice is I didn't get these until just recently in

16   December, after having requested them the first time I saw them

17   on their list.

18       And I never had time, given everything else we had to do

19   in this case, to go through all these and look at these

20   numbers, for example.  So I object to this one for those

21   reasons and not previously produced.

22             THE COURT:  I understand.  And I don't remember the

23   testimony about this exhibit.  That's why I'm struggling a bit.

24             MS. HARLAN:  I believe Mr. Getty laid the foundation

25   of it and utilized it with Mr. Justice.

206

1          MR. GETTY:  What was it?

2          MS. HARLAN:  The Haddix loadout facility

3     rehabilitation clause.

4          MR. JUSTICE:  Yes, yes.  I testified about that.

5          MR. GETTY:  It's relevant.

6          THE COURT:  Okay.  One at a time.  I mean,

7     Ms. Harlan's handling this.  I'll admit Plaintiffs' Exhibit 14

8     subject to Mr. Lucas' preserving all of these objections.

9        The next exhibit, Ms. Harlan.

10          MS. HARLAN:  Is Defendants' Exhibit 15, which was the

11    Kentucky Fuel accounting records of the Fivemile minimum

12    royalties that were paid in 2010, 2011, and 2012.  And again, I

13    believe that these were utilized with Mr. Justice.

14          MR. LUCAS:  Your Honor, on Exhibit 15, I certainly

15    object to that for lack of foundation.  There was -- the

16    testimony Mr. Justice attempted -- I believe it was Mr. Justice

17    who attempted to put that in, and some of the figures didn't

18    total and he couldn't explain how this was prepared, why some

19    of the figures were like this, or why there were these errors.

20    So there's no foundation laid that it's an accurate, reliable

21    business record.

22          MS. HARLAN:  And if it was --

23          THE COURT:  You're objecting to an exhibit that you

24    proved had inaccuracies, that -- the substance of which that

25    defendants are relying on to show that this is what should be

207

1   included in the measure of damages.  And I guess my point is,

2   doesn't the exhibit help you, given -- I understand you're

3   preserving the objections, Mr. Lucas.  I'll admit 15.

4       The next exhibit, Ms. Harlan.

5           MS. HARLAN:  Defendants' Exhibit 16 was Kentucky Fuel

6   accounting record costs for Fivemile and Deep Wood mines.

7   Again, I believe this was used with Mr. Justice in order to

8   demonstrate the expenditures and investments that Kentucky Fuel

9   had made in trying to prepare the Fivemile and Deep Wood sites.

10          THE COURT:  Yes.  Mr. Lucas?

11          MR. LUCAS:  I'll just stand on my cross-examination

12  on this one, Your Honor.

13          THE COURT:  Yeah.  That needs to be admitted because

14  it provides context to those questions which were important.

15      Go ahead, Ms. Harlan.

16          MS. HARLAN:  Number 17, I don't believe this was

17  admitted.  This was the asset purchase agreement between

18  Williams Industries and Kentucky Fuel with its exhibits, and I

19  believe that Mr. Lucas has utilized it.

20          MR. LUCAS:  We didn't object to that one.

21          MS. HARLAN:  Okay.  Thank you.  I wasn't clear on

22  that one.

23          MR. LUCAS:  May I sit down, Your Honor?

24          THE COURT:  Of course.

25          MS. HARLAN:  I believe that 18 through 42 were

208

1    admitted, some subject to objections.

2         THE COURT:  Now, I'll need the clerk to verify that.

3         THE CLERK:  40 has not been admitted.

4         MS. HARLAN:  I beg your pardon.  40 was the fifth

5    amendment to the asset purchase agreement between Williams

6    Industries and Kentucky Fuel, again, one that Mr. Lucas also

7    utilized, I think with plaintiffs' exhibits.

8         MR. LUCAS:  No objection to 40.

9         THE COURT:  That will be admitted.

10        MS. HARLAN:  Is there any other one, Madam Clerk?

11   I'm sorry.

12        THE CLERK:  There are some more above this, but 43

13   and 44 were not.

14        MS. HARLAN:  But through that, 42, is that all

15   correct?

16        THE CLERK:  Above higher numbers.  Numbers --

17        MS. HARLAN:  18 through 42.

18        THE CLERK:  6, 7, 8, 9 --

19        MS. HARLAN:  No, ma'am, I'm --

20        THE CLERK:  You're still at the bottom?

21        MS. HARLAN:  -- just asking.

22        THE CLERK:  Okay.

23        MS. HARLAN:  From my --

24        THE CLERK:  You're -- that's right.

25        MS. HARLAN:  My notes reflected 18 --

209

1          THE CLERK:  That's right.

2          MS. HARLAN:  -- through 42 --

3          THE CLERK:  That's right.

4          MS. HARLAN:  -- have --

5          THE COURT REPORTER:  I'm sorry.  Can you repeat that?

6          THE COURT:  Just so everybody is clear, I'm not in a

7    hurry.  And as I said yesterday, late in the day, whenever

8    everyone wants to get home, this is where mistakes are made.

9    So take your time.  Let's get it correctly.

10        Restate the list, please.

11         MS. HARLAN:  I have, according to my records,

12   Defendants' Exhibit 18 through 42, now including 40, as having

13   been admitted.

14         THE CLERK:  That's correct.

15         MS. HARLAN:  Defendants' Exhibit 43 was the

16   September 23rd, 2013 notice of default letter that was signed

17   by Roger Hunter.

18         MR. LUCAS:  And on that one and 44, our only

19   objections have been to relevance.

20         THE COURT:  Yes, those will be admitted.

21         MS. HARLAN:  Thank you.  Exhibit 45, Defendants'

22   Exhibit 45, was the sixth amendment to the asset purchase

23   agreement between Williams Industries and Kentucky Fuel.

24         MR. LUCAS:  No objection.

25         THE COURT:  Admitted.

210

1          MS. HARLAN:   Number 46 was the permit transfer and

2    operating agreement between Kentucky Fuel and GSI Coal Mining.

3          MR. LUCAS:   No objection.

4          THE COURT:   Admitted.

5          MS. HARLAN:   47 were 2017 and 2018 emails between

6    Doug Terry and Justice representatives.

7          MR. LUCAS:   I'm not sure that they've been the

8    subject of testimony.

9          THE COURT:   I don't think there was any discussion of

10   those.

11         MS. HARLAN:   I beg your pardon.   Then I must have

12   marked it incorrectly.   I'm sorry.

13         THE COURT:   That I can recall.

14         MS. HARLAN:   47, Doug Terry emails.

15         MR. JUSTICE:   Yes, I read one into the record.

16         MS. HARLAN:   Okay.   Mr. Justice is indicating to me

17   he read one into the record.

18         THE COURT:   Well, then, it's in the record.

19         MR. JUSTICE:   It was the one about --

20         MR. LUCAS:   Your Honor --

21         MR. JUSTICE:   -- the coal was 5 percent sulfur.

22         MR. LUCAS:   47 is a whole series --

23         THE COURT:   Yes.

24         MR. LUCAS:   -- of emails.   I'm not prepared to

25   contradict the witness.   I don't recall any of them being read.

211

1   But if there was one read, it's somewhere lost in this stack.

2          THE COURT:  Well, if it was read, its substance is in

3   the record.  And independently admitting the email is probably

4   not going to add anything; is that correct, Ms. Harlan?

5          MS. HARLAN:  That's correct.  The one that was read

6   into the record, which apparently was deemed the one to be

7   important, was the one that talked about there being 5 percent

8   ash content in the coal.

9          THE COURT:  So admitting the email is not going to

10  add anything, correct?

11         MS. HARLAN:  That's correct.

12         THE COURT:  Okay.  Well, 47 will not be admitted.

13         MS. HARLAN:  The next one that we utilized was

14  Defendants' Exhibit 52, which was the flight logs and notes

15  regarding Mr. Justice's trip to Chicago.

16         MR. LUCAS:  Relevance. not previously produced.

17         THE COURT:  Okay.  I think the -- I think for the

18  limited purpose of assessing damages, they're -- those records

19  are admissible.  I'll let the 52 in.

20         MS. HARLAN:  And just for clarification, we did not

21  utilize Defendants' 48 through 51.

22         THE COURT:  Okay.

23         MS. HARLAN:  Defendants' Exhibit 53 were a list of

24  Fivemile coal leases and payments.  No, they were just the

25  leases.  I beg your pardon.  These were the leases that were

212

1 utilized with Mr. Justice to demonstrate in part that Mr. Terry

2 had been the president of Fivemile when the leases were entered

3 into.

4         THE COURT:  Yes.

5         MR. LUCAS:  Your Honor, it's a different Fivemile.

6 These have no relevance

7         MS. HARLAN:  I think that -- I beg your pardon.  I

8 thought we had determined, well, if it was just a relevance

9 objection, that they could be entered over.

10         THE COURT:  53, the objection -- yeah, I think what

11 he's saying, Ms. Harlan, is it's a different relevance.  It's

12 relevance but in a different way, or he's articulating it more

13 specifically.

14         MS. HARLAN:  And we believe -- oh, I'm sorry.

15         THE COURT:  Well, is it a different Fivemile is the

16 question.

17         MS. HARLAN:  I mean, I think that's been established

18 that it was a different Fivemile, Your Honor.  But it also

19 establishes Mr. Terry's involvement with this particular

20 property and these leases from the outset, including what he is

21 doing now on the property.

22         THE COURT:  I think that was established through the

23 testimony.  53 will be excluded.

24         MS. HARLAN:  Plaintiff -- or, excuse me, Defendants'

25 Exhibit 54 was a list of payments made to Mr. Brownlow for

213

1  consulting services.

2        THE COURT:  Mr. Lucas?

3        MR. LUCAS:  Just one moment, Your Honor.

4        THE COURT:  Sure.

5        MR. LUCAS:  Your Honor, I am going to stand on my

6  relevance objection to this for this reason.  Any money that

7  they ever paid to Mr. Brownlow for any other reason is not

8  relevant to this damages problem.  This is about the payments

9  due pursuant to Fivemile.  The testimony is that there are

10 payments on here that related to other things, and so -- so

11 this document is -- is not accurate to the extent that it

12 purports to be payments in connection with Fivemile.  So it's a

13 combination of inaccurate and lack of foundation and not

14 relevant.

15       THE COURT:  Okay.  Well, I'm going to admit it

16 because I -- I don't think I'd be able to understand the

17 testimony without it.  Now, the testimony established what you

18 just argued, or at least established it for me to evaluate it.

19       MR. LUCAS:  I understand.

20       THE COURT:  I'll admit 54.

21       MS. HARLAN:  And then the final one is Defendants'

22 Exhibit 56, which was the Brownlow-Justice financial model

23 regarding projected future payments.

24       MR. LUCAS:  I don't think anyone ever discussed this

25 one either.

214

1          THE COURT:  I don't remember any testimony about 56.

2          MS. HARLAN:  I may have written that one down

3    incorrectly, Your Honor.  I apologize.

4          MR. GETTY:  There was not, Your Honor.

5          THE COURT:  Okay.

6          MS. HARLAN:  I apologize.  I should have checked.

7          THE COURT:  So 56 will not be admitted.

8          MS. HARLAN:  And then Mr. Getty has just indicated to

9    me that he would like to add -- this is the partial list.  This

10   was Plaintiffs' Exhibit 15, the partial list of the Kentucky

11   Fuels, Justice Company litigation which we have gone through

12   and marked as to which ones are settled.

13         MR. GETTY:  That's the document I put in real quickly

14   with Mr. Justice.

15         THE COURT:  Well, that's --

16         MR. GETTY:  I just want it to be a part of the

17   record.

18         MR. LUCAS:  Is that ones that have been -- you're

19   saying have been resolved?

20         MS. HARLAN:  We have just handwritten on there which

21   ones are resolved.

22         MR. LUCAS:  Okay.  I object to that on relevancy

23   grounds.

24         THE COURT:  Well, okay.  But let's think about it for

25   a moment.  The way that issue arose, I think, was initially

1   from my questioning of Mr. Justice with respect to just the

2   number of lawsuits that were pending.  And that then developed

3   into questions of Mr. Ball about the accuracy of the

4   interrogatory response.  I never intended to put at issue

5   whether these are litigious defendants or not.  It doesn't

6   matter to me how many are pending or have been resolved.

7   That's not a fact that I would rely on for anything in

8   connection with what's been referred to me.

9        My questioning to Mr. Justice was to get a sense of the

10  scope of the litigation to assess if there were reported

11  sanctions, how those figure into that scope.  Whether there are

12  a lot of lawsuits out there involving these parties does not

13  matter to me.  So, Mr. Getty, I don't know if that makes you

14  feel better about your surrebuttal --

15           MR. GETTY:  Well --

16           THE COURT:  But that's not -- it's just not --

17           MR. GETTY:  It's offered to show --

18           THE COURT:  The only thing it was -- the only thing

19  that Mr. Lucas tried to establish was that the interrogatory

20  response was not correct, to go to Mr. Ball's credibility.

21  Now, to me, it doesn't matter if there are a lot of lawsuits or

22  not.  There could be one.  There could be a thousand.  It

23  doesn't matter with the damages.

24           MR. GETTY:  It verifies or supports because, as you

25  go through the list, after you check them, his testimony was

216

1   there's five or six pending, active cases.  And that list, once

2   you go through it -- and some of those --

3          THE COURT:  Okay.

4          MR. GETTY:  -- cases were 2010.  There's only about

5   five or six --

6          THE COURT:  I'll allow you to question him without

7   the use of the exhibit.  Is that fair enough, Mr. Getty?  I

8   mean, you can use the exhibit, but we don't need to have the

9   exhibit admitted into evidence.

10         MR. GETTY:  That's fine.

11         THE COURT:  Is that fair enough, Mr. Lucas?

12         MR. LUCAS:  Well, it is, Your Honor.  To make clear,

13  I'm not trying to prove, as Your Honor said, that they're a

14  litigious corporation.  It's that the interrogatory -- not just

15  Mr. Ball's correct on the stand, but that the interrogatory

16  answer was incomplete and never supplemented.

17      And so the fact that some of them have been resolved -- if

18  all of them had been resolved, if they had prevailed on every

19  lawsuit is immaterial.  I was looking for lawsuits so I could

20  look for things that might be relevant to this case.  We saw

21  one.  That was the sole purpose of it.  So we're wasting time

22  if we argue about, did you win this case, is it still pending.

23         THE COURT:  It does not seem to be a damages issue,

24  was the point that I was attempting to make.

25      But, Mr. Getty, your thoughts on the matter?

1        MR. GETTY:  I would, you know, respectfully beg to

2   differ.

3        THE COURT:  How does it go to damages whether these

4   suits were resolved or not?

5        MR. GETTY:  Well, it goes to whether or not there are

6   lawsuits out there that would hinge upon the Justice Companies

7   or Kentucky Fuel.  I mean, if they've been dismissed, then

8   they've been dismissed.  I mean, I frankly -- honestly, I feel

9   compelled to say that I think that list was offered to create

10  an impression that there are all these lawsuits out there, and

11  that's not true.

12        THE COURT:  Okay.

13        MR. GETTY:   Most of them are long since gone.  If

14  you look at the dates of filings, some of them were like 2010

15  and '11.  They've been gone for a long time.

16        THE COURT:  Okay.  The relevance that you just

17  described is not convincing to me.  In fact, I think it would

18  be totally inappropriate if I were to take into consideration

19  that there might be huge liabilities from these to affect the

20  calculation of damages.  No, I don't think we're talking about

21  a relevant subject matter for the presentation of surrebuttal

22  proof, Mr. Getty.  And so no, we don't -- I'm going to -- I'm

23  not going to allow the exhibit.  We haven't had testimony about

24  it yet.

25        And what I said is true.  The damages determination is not

218

1   going to be in any way, even with respect to the punitive

2   damages calculation, a function of whether there are other

3   lawsuits pending or not, Mr. Getty.  So I hope that gives you

4   some comfort.  It's not going to be a basis of the decision.  I

5   don't think there's a need to --

6               MR. GETTY:  It does.

7               THE COURT:  -- present the surrebuttal proof.

8               MR. GETTY:  And I think we can do it very quickly and

9   wrap things up.

10              THE COURT:  Well, I don't think you need to put the

11  evidence on.  It doesn't go to anything that is a fact at

12  issue.

13              MR. GETTY:  I would like it to be part of the record,

14  though.  I would like it to be on the record.

15              THE COURT:  Okay.  We can put it on the record so

16  that Judge Van Tatenhove doesn't have to consider it if he

17  disagrees with my ruling.  We'll do that.  It's essentially a

18  proffer because I'm not going to rely on it.

19              MS. HARLAN:  Your Honor, I have one thing.

20              THE COURT:  Yes.

21              MS. HARLAN:  I know we shouldn't tag team, but

22  sitting back here, as I listened to Your Honor's questions and

23  then saw this list come in, my concern about not including this

24  list included the fact that the introduction of the list

25  perhaps gave the impression or attempted to give the impression

219

1   that Mr. Justice or Mr. Ball had misspoken or misled when they

2   indicated the existence of five or six current cases.

3              THE COURT:  I understand.  I made my ruling --

4              MS. HARLAN:  Thank you.

5              THE COURT:  -- on that issue.  I understand the

6   point.  This is a proffer.  This evidence that I am about to

7   hear is presented just as a preservation technique in the

8   event -- when I issue my R&R, the evidentiary is raised, Judge

9   Van Tatenhove disagrees with me and wants to consider the

10  evidence instead of referring it back to me for an additional

11  evidentiary hearing.

12      Is that clear enough, Mr. Lucas?

13             MR. LUCAS:  I think you're telling me I don't

14  cross-examine him on it?

15             THE COURT:  Well, no.  I want to wrap it up in one

16  neat package and we're going to talk about how to do that

17  later.  We'll just see what the evidence is.

18             MR. LUCAS:  It's clear.

19             THE COURT:  Mr. Getty, are you comfortable preserving

20  it in that fashion?

21             MR. GETTY:  Yes.

22             THE COURT:  Call your witness, please.

23             MR. GETTY:  Absolutely.

24             THE COURT:  Come on forward and be sworn in, please.

25             MR. GETTY:  We have extra copies.  Pass them on up to

220

1   the Court, please.

2           THE COURT:  You can be sworn again, please.

3                   JAMES C. JUSTICE - SWORN

4                      SURREBUTTAL EXAM

5   BY MR. GETTY:

6   Q.   Just real quickly --

7           THE COURT:  I'm sorry.  Does the witness have it?

8           THE WITNESS:  No, sir, I don't.

9           THE COURT:  This is his copy.  Mr. Getty, you don't

10  need to approach.  He's got it.

11          MR. GETTY:  That has the colors on it, so it would

12  probably be better for him to have that.

13          COURT SECURITY OFFICER:  Here you go, sir.

14  BY MR. GETTY:

15  Q.   Mr. Justice, just real quickly, can you -- you see here

16  what was marked as Plaintiffs' Exhibit 15.  Have you checked

17  the status of all of these cases and noted which cases are

18  pending as of this day?

19  A.   Yes, sir, I have.  My previous testimony said that I

20  thought there were around five cases pending.  There are

21  actually six cases in total pending.  One is a workers' comp

22  case.  Two are insurances cases associated with the flood at

23  The Greenbrier in 2016.  One is the case -- it's in Harlan

24  County, that the default judgment was set aside.  And the other

25  two; one is a property tax issue in Magoffin County that Billy

221

1   Shelton is working on.

2   Q.   Property tax or unmined minerals?

3   A.   Unmined minerals on coal.

4   Q.   Okay.

5   A.   I misspoke.  And the last one is a case that we're denying

6   liability, but our attorneys told me that maximum exposure

7   would be $50,000.

8   Q.   Okay.

9   A.   All the rest -- all the rest of them have been settled or

10  set aside.

11  Q.   For example, there's some in 2010, '11, '12.  Have those

12  long since disappeared and gone?

13  A.   Yes, sir, they have.

14  Q.   And do you believe if those records had been checked, that

15  it would readily have been known that they were settled and

16  gone?

17  A.   It was very easy for -- for our attorneys to check those

18  today and find out very quickly that they have been long since

19  gone.

20  Q.   Okay.  And apparently that wasn't done before the list was

21  presented?

22  A.   Obviously not.

23          MR. GETTY:  Okay.  That's all I have.  Thank you.

24          THE COURT:  Okay.  Mr. Lucas?

25          MR. LUCAS:  No questions, Your Honor.

222

1          THE COURT:  Okay.  You can step down, Mr. Justice.

2     Thank you.

3        So that concludes the presentation of evidence from both

4     sides, correct, Mr. Lucas?

5          MR. LUCAS:  Yes, Your Honor.

6          THE COURT:  And Mr. Getty?

7          MR. GETTY:  Yes, sir.

8          THE COURT:  And to be clear, the last witness that

9     was offered, that was just a preservation in the form of a

10    proffer.

11       I want to talk how to proceed going forward.  The parties

12    will need to obtain a transcript and I want it briefed.  I want

13    it briefed in such a way that there are specific record

14    citations to every factual assertion made in the briefs,

15    period.

16       There have been developments in the law that need to be

17    addressed as well.  The one that was raised in the defendants'

18    prehearing motion for ruling that I denied without prejudice

19    was the concept of the defendants' argument that the economic

20    loss rule has been adopted and precludes recovery on the fraud

21    theory.  I denied that motion without prejudice, Mr. Getty, but

22    all those matters, if you intend to reraise them, can be raised

23    in the form of objections to my R&R.  So that is why I denied

24    them without prejudice.

25          MR. GETTY:  I understand that.

1        THE COURT:  Okay.  So there are things that need to

2   be briefed and they need to be briefed in detail.  And here's

3   my goal, and I want everyone to be as clear as we can on this.

4        This case jumps out off of my docket because of two

5   numbers.  One.  Two.  The case is six years old.  It has to be

6   resolved on the merits.  It's narrowed to the point now where

7   there is one job for me to do and then there will be one job

8   for Judge Van Tatenhove to do.  The job is you all are to brief

9   it to provide me with your arguments, I'll make my recommended

10  disposition.  The statute -- that's another form of a report

11  and recommendation.

12       The statute has a 14-day period for objections.

13  Judge Van Tatenhove will entertain the objections, make his

14  ruling, and enter a final judgment.  In order to facilitate

15  that process, given the proliferation of filings in the case,

16  I'm going to order that no motion can be filed by either party

17  without leave first.

18       Is there an objection to that, Mr. Lucas?

19            MR. LUCAS:  No, Your Honor.

20            THE COURT:  Mr. Getty?

21            MR. GETTY:  No.  I think that's a good suggestion.

22            THE COURT:  So then there is one filing I need from

23  the plaintiffs, I think.  But what I'm talking about now is how

24  long you all need after you obtain the transcript to prepare

25  your briefs.  And again, specific record citations are

1   absolutely necessary for me to thread together the evidence

2   that has been presented.

3       In thinking about it, it seems to me that 40 pages is

4   enough to brief from both sides, and then perhaps a 25-page

5   reply from the plaintiff.  They get the first and last word.

6   It's their burden of proof.

7       Mr. Lucas, do you think a 40-page memorandum will suffice,

8   sir?

9           MR. LUCAS:  I believe so, Your Honor.

10          THE COURT:  Okay.  Do you think a 40-page memorandum

11  in response will suffice, Mr. Getty?

12          MR. GETTY:  I'm not sure, given the extent of this

13  record.  I would -- I would suggest maybe we consider

14  increasing that maybe from 40 to 50.

15          THE COURT:  I won't go any higher than that.  50

16  pages for plaintiffs' initial memorandum, 50 pages for

17  defendants' response memorandum.  30 pages for the reply

18  memorandum.  Mr. Lucas, is that fair enough?

19          MR. LUCAS:  Yes, Your Honor.

20          THE COURT:  I don't know how long it'll take to

21  obtain the transcript once it's ordered, but Mr. Lucas, how

22  long do you think you need to put your brief together once you

23  have the transcript, sir?

24          MR. LUCAS:  Your Honor, I had asked the court

25  reporter earlier what normal turnaround time was, and she told

225

1   me 30 days.  Is the Christmas -- if I may inquire, is the

2   Christmas schedule, Christmas and New Year's holidays apt to

3   impact that?

4               THE COURT:  I can get it to you within 30 days.

5               MR. LUCAS:  May I have just a moment?

6               THE COURT:  Sure.  Yes, sir.

7          (Off the record.)

8          MR. LUCAS:  Your Honor, my normal default would be to

9   request 30 days.  Due to other scheduling issues that affect my

10  own schedule, I would ask for 45 days.

11              THE COURT:  I want to pick a date.  Does that give

12  you more comfort?  I mean, I know you don't know when you're

13  going to get the transcript, but if it's roughly 30 days from

14  today --

15              MR. LUCAS:  If it's roughly 30 days from today, that

16  would be January 14.  So if I had -- hold on a minute.

17              THE COURT:  That would be roughly March 1st, you're

18  looking at it for 45 days, right?

19              MR. LUCAS:  Yes, sir.  And I could do that.

20              THE COURT:  That's Friday, March 1st.  Okay.  You

21  sure?  Assuming you get the transcript by within 30 days?

22              MR. LUCAS:  Yes, sir.

23              THE COURT:  Okay.  Mr. Getty, how long do you think

24  you nee to respond?

25              MR. GETTY:  Same period would be fine with us.

226

1          THE COURT:  30 day from March 1st?

2          MR. GETTY:  About -- 45 days.

3          THE COURT:  45 from March 1st?

4          MR. GETTY:  Yes, sir.

5          THE COURT:  Okay.

6          MR. LUCAS:  And, Your Honor --

7          THE COURT:  Yes.

8          MR. LUCAS:  Excuse me.  I didn't mean to interrupt.

9          THE COURT:  Go ahead.

10         MR. LUCAS:  If I can do it earlier, I will.  And can

11   we just have it that it's -- assuming we get it within 30 days,

12   March 1st, but if I file it earlier, that that would then start

13   their 45-day clock?

14         THE COURT:  Is there an objection to that, Mr. Getty?

15         MR. GETTY:  I'm sorry?

16         THE COURT:  He's saying if he files his before

17   March 1st.

18       Okay.  Let's just do this.  Defendants' response brief 45

19   days from the date plaintiffs' brief is filed.  And then how

20   long do you need for a reply, Mr. Lucas?  We're scrapping the

21   March 1st certain date -- well, we are going to keep the

22   March 1st date.

23         MR. LUCAS:  Right.

24         THE COURT:  Plaintiffs' brief no later than

25   March 1st.  If it's filed prior to that or on that day, the

227

1  defendants' response brief is due 45 days from the date of the

2  plaintiffs' filed.

3          MR. GETTY:  I would rather just keep it March 1st and

4  then 45 days, and then whatever you give me because -- the

5  reason I'm saying that --

6          THE COURT:  Okay.

7          MR. GETTY:  -- is in March, I've got like two Fourth

8  Circuit briefs and a Sixth Circuit brief.

9          THE COURT:  Okay.  March 1st for plaintiffs,

10 April 15th for defendants.  How long do you need to respond in

11 terms of the reply, Mr. Lucas?

12         MR. LUCAS:  May I consult a minute?

13         THE COURT:  Sure.

14         MR. GETTY:  That is tax day.  We can handle it,

15 though.

16         THE COURT:  Okay.

17         MR. LUCAS:  21 days, Your Honor.

18         THE COURT:  Okay.  So then that would put you at

19 May 6th.

20         MR. LUCAS:  May which?

21         THE COURT:  May 6th.

22         MR. LUCAS:  May 6.

23         THE COURT:  It's a Monday.  That's plaintiffs' reply

24 memorandum.  So I need one more filing from the plaintiffs,

25 Mr. Lucas.  Finish your note.  Do you need to finish your

228

1    note-taking?

2            MR. LUCAS:   I have finished.

3            THE COURT:   Okay.   The tax returns that are the tax

4    documents that were returned that were provisionally sealed, my

5    basic question is are those the same as the documents that were

6    previously filed and subject to the motions to seal or to

7    unseal?   I don't think Judge Van Tatenhove has ruled on that.

8    I ruled they should be unsealed, but will remain provisionally

9    sealed until he rules on it, any objections, and objections

10   were asserted.   Do you know?

11           MR. LUCAS:   They are the same documents, Your Honor.

12           THE COURT:   Okay.   What I would like for you to file

13   for me is a notice describing which of those exhibits match up

14   with those that are addressed by way of my order on that motion

15   to unseal.   So the record's clear, if -- I'm not going to

16   revisit it.   It's the same analysis.   If Judge Van Tatenhove

17   thinks they should remain sealed, he'll consider it.   Already

18   it's teed up for him now.   If he unseals them, then the

19   exhibits will be unsealed.   If he keeps them sealed, then these

20   exhibits would remain sealed.   Is there an objection to that?

21           MR. LUCAS:   I'm not sure I understand.

22           THE COURT:   Okay.   Well, let me make it clear.

23           MR. LUCAS:   Okay.

24           THE COURT:   Here's my memory of the posture and my

25   clerk can correct me if I'm wrong.   There were exhibits --

229

1   there were the tax returns that are still sealed in the Court

2   record.  I ruled they should be unsealed.  But to allow for

3   objections to that ruling, I kept them sealed.  Objections were

4   lodged, so they remain sealed.

5       I don't think Judge Van Tatenhove has ruled on that.  So

6   they're only sealed at this point because of the objections

7   raised to my ruling.  The exhibits that you tendered in this

8   hearing should just be dealt with in the same fashion as those

9   that Judge Van Tatenhove is going to decide on, if they mirror.

10  If they mirror the ones that are sealed, Judge Van Tatenhove is

11  going to decide whether to keep them sealed or not.  Does that

12  help you?

13           MR. LUCAS:  I understand.  Can I say it in my own

14  words to make sure I understand it?

15           THE COURT:  Yes.

16           MR. LUCAS:  What you're looking for us is to look

17  back at the document numbers that were the subject of that

18  motion to seal then that were addressed in your order

19  recommending that they be unsealed, and just if these exhibits

20  are identical to them, just say our Exhibit 27c or whatever

21  matches document number such and so?

22           THE COURT:  Yes.  You could set forth a chart that

23  says these -- plaintiffs' exhibit number blank matches record

24  entry number that is provisionally sealed.  If they're not, you

25  can put in your notice they're not already subject to an order

230

1    of the Court.

2          MR. LUCAS:  Here's the only thing that I raise and

3    partly as a reflection of my own, probably, lack of

4    understanding about some of the sealed documents.  We had

5    found, and Mr. Webster's also been involved in this, so I'll

6    ask him to ad lib here, too, if necessary.

7          THE COURT:  Okay.

8          MR. LUCAS:  But we have found on many of these

9    documents that are sealed, getting the exhibit numbers to them

10   has proved to be somewhat of a challenge.  And I -- maybe I'm

11   going to let Scott address that, if I may.

12         THE COURT:  That's fine.

13         MR. LUCAS:  Because I just don't want that to present

14   a practical problem where we're trying to cope with Your

15   Honor's order.

16         THE COURT:  Yes.

17         MR. WEBSTER:  The problem, and we ran into it trying

18   to find some documents in the 150 range for today, is that

19   there's never -- once a document is filed under seal, there's

20   never a chance -- especially with exhibits that have sort of

21   general descriptions like tax returns -- to determine precisely

22   what sealed docket entry number may correspond with a

23   particular tax return.  I try to keep very, very good notes,

24   but sometimes it's just -- and the clerk's office, because I

25   think the law requires it, won't tell you.

231

1          THE COURT:  What's that, Sheila?

2          THE CLERK:  Pardon?

3          THE COURT:  You're shaking your head.

4          THE CLERK:  No, we won't tell them.

5          THE COURT:  Yes.

6          THE CLERK:  If it's sealed, we don't even know about

7    it.

8          MR. WEBSTER:  There seems there ought to be a way

9    that --

10          THE COURT:  All right.  Okay.  We'll do it.  My clerk

11   will do it.  Scratch it.  I don't need a motion from the

12   plaintiffs.  We'll compare the exhibit numbers that are

13   provisionally sealed to the ones that are subject to my order.

14   I don't know exactly when we'll do that.  But we'll come up

15   with the analysis and I'll put on an order.

16          MR. LUCAS:  And, Your Honor, I'll commit to do this.

17   I just didn't want to get in a situation where because of the

18   technologies I could find myself in violation of your order.

19          THE COURT:  I understand.

20          MR. LUCAS:  But I will go back and look at our

21   records of what we filed at the time, and if I can construct a

22   chart like that to help you, I will.

23          THE COURT:  Okay.  If you can do that, can you file

24   it, say, what -- in three weeks?

25          MR. LUCAS:  Okay.  Between us, we'll make every

232

1   effort to do that.

2           THE COURT:  Okay.  And that is just so that there's

3   not duplication of effort.  There's already been a ruling.

4   There's going to be another ruling.  If they're the same

5   documents, there's no need for me to revisit those issues, or

6   Judge Van Tatenhove, frankly.

7           MR. LUCAS:  There's one other issue on that, let me

8   raise.

9           THE COURT:  Yes.

10          MR. LUCAS:  Because, Sheila, if I may, raised it with

11  us.

12          THE COURT:  Yes.

13          MR. LUCAS:  Which was the redaction of the taxpayer

14  information number.  And when she raised that, we looked at the

15  exhibits and the -- the exhibits that we had introduced as

16  the -- I think the way they were described was the alleged

17  first tax returns for both companies.

18      We went through, and I think the ones that we tendered,

19  the taxpayer ID number was redacted from those; is that

20  correct?

21          MR. HASKINS:  From the witness copy.

22          MR. LUCAS:  On the witness copy.

23          MR. HASKINS:  And --

24          THE COURT REPORTER:  I'm sorry.  He's speaking and

25  I'm not getting it in the record.

233

1           THE COURT:  She can't hear your colleague.

2           MR. LUCAS:  I apologize.  It's my understanding that

3    the taxpayer identification number for the individual first

4    alleged tax returns was redacted because it only appeared on

5    the first page.

6        On the consolidated returns, which I think were the 28

7    series, that was the consolidated returns, the ones that

8    apparently were actually filed for James C. Justice Companies

9    for all -- for them and all of their subsidiaries.  And so on

10   many, many pages there are taxpayer ID numbers.  And we have

11   not gotten all of those redacted.  So I don't know how that

12   affects what -- what you want to do under the sealing.

13          THE COURT:  Well, okay.  So am I understanding

14   correctly there are exhibits that have been admitted into

15   evidence that you need to review pursuant to Rule 542 to see if

16   anything needs to be redacted?

17          MR. LUCAS:  That's correct.

18          THE COURT:  Okay.  It shouldn't affect what I'm

19   telling you about.

20       The provisionally sealed exhibits from this hearing,

21   Sheila, can counsel see those if they come into the clerk's

22   office?

23          THE CLERK:  If you direct us to let them see them, we

24   will let them.

25          THE COURT:  I'm directing the clerk's office to allow

234

1   counsel for both sides to see the provisionally sealed exhibits

2   from this hearing.

3           MR. LUCAS:  Well, in that case, do you want us -- I

4   mean, we want to do it the way the Court needs it done.  Do you

5   want us to come up to the clerk's office, look at those, and

6   physically redact where all the taxpayer identification numbers

7   are?

8           THE COURT:  Is there an objection to that, Mr. Getty?

9   I mean, it's counsel's obligation to review these for the

10  privacy protection.  Is there -- so the question, Mr. Getty, is

11  they would go to -- they would come to the clerk's office, have

12  the exhibits and review them again for redaction requirement.

13          MR. GETTY:  That would be fine.  We would just want

14  the opportunity to --

15          THE COURT:  See what they redacted?

16          MR. GETTY:  Yeah, see what they redacted.

17          THE COURT:  Can you keep a record of what you redact

18  and provide it to Mr. Getty?

19          MR. LUCAS:  Well, it'd be only the taxpayer

20  identification number.  I mean, we tendered them this way, Your

21  Honor, because that's the way they were produced to us,

22  unredacted.

23          THE COURT:  That's fine.  It's only going to be the

24  taxpayer identification.

25          MR. LUCAS:  That's all we're going to redact.

235

1          THE COURT:  Then send them a letter that says that.
2     Is that fair enough?
3          MR. GETTY:  That's fair.
4          THE COURT:  You make a record of what you redact, and
5     send it to Mr. Getty.
6          MR. LUCAS:  Okay.
7          THE COURT:  But that's distinctly not the clerk's
8     obligation nor the Court's obligation.  If there are exhibits
9     that have financial account numbers, personal identification,
10    taxpayer identification information, it's not the Court or the
11    clerk's obligation to review those for redaction requirements.
12    Is that clear, Mr. Lucas?
13         MR. LUCAS:  No, I understand.  And that's why I
14    raised it, because the Court personnel, you know, advised us of
15    that.  And when they were under seal, I thought, well, they're
16    protected, but if there was a chance they were going to be
17    unsealed, I wanted to make that disclosure, that it needs to be
18    fixed.
19         THE COURT:  All right.  Do you know if the ones that
20    are in the record and they're subject to my provisional seal
21    from the previous motion, do you know if those contain the
22    taxpayer identification?
23         MR. LUCAS:  I don't know, Your Honor.
24         THE COURT:  All right.  I'm not laughing at your
25    answer.  I'm laughing at how circular the analysis is.  Well, I

236

1   don't know how to solve that.  But you can have access to these

2   sealed exhibits from the clerk to fulfill your redaction

3   obligations.  If you think you need to access other sealed

4   filings for that same obligation, file a motion for leave to

5   file a motion to do that.

6           MR. LUCAS:  And I have permission to do that?

7           THE COURT:  Either side has permission to file a

8   motion for leave.  I'm not prejudicing you from filing

9   anything.

10          MR. LUCAS:  I got it.

11          THE COURT:  But I need to approve motions that are

12  filed.  So just file a motion for leave with a description of

13  what you intend to file.  Is that fair enough?

14          MR. LUCAS:  Yes, sir.

15          THE COURT:  Did I confuse you or am I clear?

16          MR. LUCAS:  I think it does not.

17          THE COURT:  Bad question.  Okay.  So on this motion

18  for leave requirement, just if you think something needs to be

19  presented to the Court, just file motion for leave explaining

20  why, and I'll consider that.  So I'm not prejudicing anyone

21  from actually filing anything, I just think there needs to be a

22  threshold to determine if it's something that needs to be

23  raised at that time.  Is that clear enough, Mr. Lucas?

24          MR. LUCAS:  Yes, sir.

25          THE COURT:  Mr. Getty?

237

1          MR. GETTY:  Yes.  Yes, Your Honor, it is.

2          THE COURT:  Okay.  Sheila, you have other exhibits

3    with respect to defendants' exhibits; is that correct?

4          THE CLERK:  There were several that have not been

5    mentioned, not been admitted, not been excluded.  They probably

6    need to come out of the exhibits.

7          MS. HARLAN:  They will come out of the exhibit books.

8    We put them in, thinking we may use them, decided against using

9    them.  We'll take everything that was excluded or that was not

10   utilized.

11         THE COURT:  Does that need to be done for both sides,

12   Sheila?

13         THE CLERK:  No.  No, sir.  Plaintiffs have all been

14   admitted.

15         THE COURT:  Okay.  Okay.  You can get with the

16   clerk's office to do that, Ms. Harlan?

17         MS. HARLAN:  Yes, Your Honor.

18         THE COURT:  Okay.  Sheila, is that satisfactory?

19         THE CLERK:  Yes.  Sure.

20         THE COURT:  You've got something on your mind,

21   Mr. Lucas?

22         MR. LUCAS:  One last issue, Your Honor.

23         THE COURT:  Yes.

24         MR. LUCAS:  The Court had previously ruled, and

25   pursuant to the contract between the parties, that as the

238

1    prevailing party, the plaintiffs allowed to recover attorneys'

2    fees.  Judge Van Tatenhove and you both later recommend -- or

3    said that that would be dealt with at the end.  So we obviously

4    hadn't attempted to deal with that here and assumed it would be

5    resolved at the final -- final stage of this case.

6              THE COURT:  That makes sense to me.

7              MR. LUCAS:  And then in connection with that, though,

8    one of -- one of the related costs that will be incurred is

9    paying the court reporter for the transcript that she's going

10   to prepare of this hearing.  And in view of that order, that

11   the defendants are liable for those costs, I would expect that

12   the defendant should be taxed with that cost and have to pay

13   the court reporter when it comes time to pay her, so that the

14   transcript can be filed.

15             MR. GETTY:  I'm sure she wants to be paid up front

16   and not wait for -- the court reporter always needs to be paid.

17   I have no problems splitting it at the outset and then

18   reallocating it later.  She needs to be paid for her work.

19             MR. LUCAS:  Well, no, and I just said that because

20   my -- the practice in Knoxville was when the court reporter had

21   it prepared, before she filed it -- before he or she filed it,

22   they said, we've got to be paid before it's filed.  You know,

23   it should be paid whenever the local practice is, whether it's,

24   you know, next week or when it's filed.  But she won't know how

25   long it is next week.

239

1          THE COURT:  Yeah.  Ma'am Court Reporter, what's your
2     practice?  What's your expectation?
3          THE COURT REPORTER:  Normally we ask for a rather
4     large deposit of at least half.  And then once upon completion,
5     before it's actually sent, the remaining half.
6          THE COURT:  Okay.  Now, Mr. Getty says he is offering
7     to split that cost.
8          MR. GETTY:  I am.
9          THE COURT:  Mr. Lucas, is that satisfactory?  I can't
10    determine if it's taxable now because we don't know it's
11    taxable, who's prevailing.  Actually, the clerk would do that,
12    in the first instance.  It's not the Court.
13          MR. LUCAS:  Well, it's not a taxable cost, Your
14    Honor.  It's a matter of the contract.  And the Court has
15    previously ruled that they were liable for the attorneys' fees.
16    That's the law of the case, attorneys' fees and costs.  That's
17    the law of the case, so they should be charged with this
18    expense.  It's not a taxation cost.
19          MR. GETTY:  Can I make a suggestion?
20          THE COURT:  Let me make a suggestion.
21     And you're welcome to remain standing or not.  It's up to
22    you, Mr. Lucas.
23     I intended to cover this in any event.  On December 1st,
24    2015, the Federal Rules of Civil Procedure were amended.  And
25    Rule 1 was amended to add that the rules should be construed,

240

1   administered, and employed by the Court and the parties to

2   secure the just, speedy, and inexpensive determination of every

3   action and proceeding.

4       There was a great deal of study by the rules committee

5   conducted before that change was adopted, and, Mr. Getty, I

6   want you and your clients to listen because this is -- I'm

7   speaking directly to the parties --

8           MR. GETTY:  No, I am.

9           THE COURT:  -- now.  That is not aspirational.  It's

10  not a goal.  It's a requirement.  The parties are required, by

11  Rule 1, to cooperate to facilitate the just, efficient, and

12  speedy resolution of this matter.  That's what I expect, and

13  that is what is going to happen from here on out in the case,

14  period.  I'm bound by the rule, just as the parties are, and

15  that is what is going to happen to get this case finally

16  resolved.

17      And I hope I'm being clear.  I've not yet seen a sanction

18  imposed -- actually, I have seen a sanction imposed for

19  violation of that rule, not in this Court, but it's been

20  reported.  And that is the Court's expectation.  It's required

21  by the rule.  That is how this case is going to come to its

22  resolution.

23      The parties should be able to agree on something like this

24  issue of the cost of the transcript at this point.  I'm open to

25  an additional suggestion as long as it is in keeping with the

241

1   requirement of the rule that I just described.  Mr. Lucas?

2           MR. LUCAS:  I've got nothing further to say on it.  I

3   yield to the Court's discretion.

4           THE COURT:  Okay.

5           MR. GETTY:  May I make my suggestion?

6           THE COURT:  Yes.

7           MR. GETTY:  As I said before, I think the court

8   reporter needs to be paid.  I would suggest that perhaps she

9   tell us, here's what I estimate, what I believe it's going to

10  cost.  She gives us that number, and after she gives us that

11  number, within a certain manner of days or promptly, we pay her

12  half that, Mr. Lucas' clients pay half that.  Once the

13  transcript comes in, if it's more than that amount and her

14  estimate was short, then we're obligated to split the

15  additional amount which she will tell us what it is.  But she

16  needs to be paid up front.

17          THE COURT:  If that can be done and both parties

18  preserve the ability to seek reimbursement of that in the

19  future, is that fair enough, Mr. Lucas?

20          MR. LUCAS:  Yes, Your Honor.

21          THE COURT:  Okay.  Madam Court Reporter, will that

22  get you what you need?

23          THE COURT REPORTER:  I'm sorry?

24          THE COURT:  They're offering to ask for an estimate

25  and to split it and pay you that when you provide the estimate,

242

1   correct, Mr. Getty?

2           THE COURT REPORTER:   I can provide them an estimate.

3           THE COURT:   Okay.   And then is it true that once it's

4   fully paid for, it will be then be filed in the record?   Is

5   that right?

6           THE COURT REPORTER:   Right, it will be.

7           THE COURT:   Are we all on the same page?

8           MR. LUCAS:   Yes, Your Honor.

9           MR. GETTY:   And if you're short -- may I address her?

10          THE COURT:   Yes.

11          THE COURT REPORTER:   Can we go off the record?   I

12  can't write and converse with them, or --

13          THE COURT:   I think -- no, no.   Let's keep going

14  here.   If you have another matter to raise -- the Court's

15  blessed the proposal that's been made -- you can talk to the

16  court reporter after the hearing.   Is that fair enough?

17          MR. GETTY:   That would be fine.

18          THE COURT:   All right.   I do appreciate the

19  presentation of the evidence.   That concludes every -- well, we

20  have covered everything on my list in terms of how to proceed

21  going forward.   And I'm just underscoring my expectations again

22  with respect to what Rule 1 requires.

23      Is there anything else we need to take up at this time,

24  Mr. Lucas?

25          MR. LUCAS:   No, Your Honor.

243

1           THE COURT:  Okay.  Mr. Getty?

2           MR. GETTY:  No, Your Honor.  I just want to say it's

3   been a pleasure appearing in front of you.

4           THE COURT:  Okay.  I appreciate that.  And everyone

5   travel safely, please.  I do hope you feel better soon,

6   Mr. Getty.

7        And we will be adjourned for the day.  Thank you all.

8           (Proceedings concluded at 5:59 p.m.)

9                              - - -

10

11              C E R T I F I C A T E

12        I, S. Diane Farrell, RDR, CRR, do hereby certify that the

13   foregoing is a correct transcript from the record of

14   proceedings in the above-entitled case.

15

16   /s/S. Diane Farrell                    January 12, 2019
     S. Diane Farrell, RDR, CRR            Date of Certification

17

18                    I N D E X

19   JAMES C. JUSTICE III                        PAGE

20   Exam by the Court                             6

21   STEPHEN W. BALL                             PAGE

22   Direct Examination by Mr. Getty              14
     Cross-Examination by Mr. Lucas              64
23   Redirect Examination by Mr Getty           139
     Recross-Examination by Mr. Lucas           153
24   Exam by the Court                          155
     Further Cross-Examination by Mr. Lucas     161

25

244

```
1   WILLIAM G. BROWNLOW IV

2   Further Direct By Mr. Lucas                        164
    Further Cross-Examination by Mr. Getty            172
3

4                                       IDENTIFIED   ADMITTED
    Plaintiffs' Exhibit 10                  3           3
5   Plaintiffs' Exhibit 11a                 3           3
    Plaintiffs' Exhibit 11b                 3           3
6   Plaintiffs' Exhibit 11c                 3           3
    Plaintiffs' Exhibit 11d                 3           3
7   Plaintiffs' Exhibit 11e                 3           3
    Plaintiffs' Exhibit 11f                 3           3
8   Plaintiffs' Exhibit 11g                 3           3
    Plaintiffs' Exhibit 11h                 3           3
9   Plaintiffs' Exhibit 11i                 3           3
    Plaintiffs' Exhibit 11j                 3           3
10  Plaintiffs' Exhibit 11k                 3           3
    Plaintiffs' Exhibit 11m                 3           3
11  Plaintiffs' Exhibit 11n                 3           3
    Plaintiffs' Exhibit 11o                 3           3
12  Plaintiffs' Exhibit 11p                 3           3
    Plaintiffs' Exhibit 11q                 3           3
13  Plaintiffs' Exhibit 11r                 3           3
    Plaintiffs' Exhibit 11s                 3           3
14  Plaintiffs' Exhibit 11t                 3           3
    Plaintiffs' Exhibit 11u                 3           3
15  Plaintiffs' Exhibit 11v                 3           3
    Plaintiffs' Exhibit 15                 87          98
16  Plaintiffs' Exhibit 36                 98          98
    Plaintiffs' Exhibit 37                109         109
17  Plaintiffs' Exhibit 38                109         109
    Plaintiffs' Exhibit 39                114         114
18  Plaintiffs' Exhibit 40                123         123
    Plaintiffs' Exhibit 41                135           -
19  Defendants' Exhibit 1                 200         202
    Defendants' Exhibit 2                 202         202
20  Defendants' Exhibit 3                 202         203
    Defendants' Exhibit 4                 203           -
21  Defendants' Exhibit 5                 203         203
    Defendants' Exhibit 9                 203           -
22  Defendants' Exhibit 11                203           -
    Defendants' Exhibit 12                205         205
23  Defendants' Exhibit 14                205         206
    Defendants' Exhibit 15                206         207
24  Defendants' Exhibit 16                207         207
    Defendants' Exhibit 17                207         207
25  Defendants' Exhibit 18                208         208
    Defendants' Exhibit 19                208         208
```

245

| | | | |
|---|---|---|---|
| 1 | Defendants' Exhibit 20 | 208 | 208 |
| | Defendants' Exhibit 21 | 208 | 208 |
| 2 | Defendants' Exhibit 22 | 208 | 208 |
| | Defendants' Exhibit 23 | 208 | 208 |
| 3 | Defendants' Exhibit 24 | 208 | 208 |
| | Defendants' Exhibit 25 | 208 | 208 |
| 4 | Defendants' Exhibit 26 | 208 | 208 |
| | Defendants' Exhibit 27 | 208 | 208 |
| 5 | Defendants' Exhibit 28 | 208 | 208 |
| | Defendants' Exhibit 29 | 208 | 208 |
| 6 | Defendants' Exhibit 30 | 208 | 208 |
| | Defendants' Exhibit 31 | 208 | 208 |
| 7 | Defendants' Exhibit 32 | 208 | 208 |
| | Defendants' Exhibit 33 | 207 | 208 |
| 8 | Defendants' Exhibit 34 | 208 | 208 |
| | Defendants' Exhibit 35 | 206 | 206 |
| 9 | Defendants' Exhibit 36 | 208 | 208 |
| | Defendants' Exhibit 37 | 208 | 208 |
| 10 | Defendants' Exhibit 38 | 208 | 208 |
| | Defendants' Exhibit 39 | 208 | 208 |
| 11 | Defendants' Exhibit 40 | 208 | 208 |
| | Defendants' Exhibit 41 | 208 | 208 |
| 12 | Defendants' Exhibit 42 | 208 | 208 |
| | Defendants' Exhibit 43 | 209 | 209 |
| 13 | Defendants' Exhibit 44 | 209 | 209 |
| | Defendants' Exhibit 45 | 209 | 209 |
| 14 | Defendants' Exhibit 46 | 210 | 210 |
| | Defendants' Exhibit 47 | 211 | - |
| 15 | Defendants' Exhibit 48 | 211 | - |
| | Defendants' Exhibit 49 | 211 | - |
| 16 | Defendants' Exhibit 50 | 211 | - |
| | Defendants' Exhibit 51 | 211 | - |
| 17 | Defendants' Exhibit 53 | 212 | - |
| | Defendants' Exhibit 54 | 213 | 213 |
| 18 | Defendants' Exhibit 56 | 213 | - |

19

20

21

22

23

24

25