## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## LONDON

**NEW LONDON TOBACCO MARKET, INC.**　　)
**and FIVEMILE ENERGY, LLC**　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　**No. 6:12-CV-00091-GFVT-HAI**
　　　**Plaintiffs,**　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
**v.**　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
**KENTUCKY FUEL CORPORATION, and**　　)
**JAMES C. JUSTICE COMPANIES, INC.**　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　**Defendants.**　　　　　　　　　　　)

## PLAINTIFFS' POST-HEARING MEMORANDUM

**John A. Lucas\* (011198)**
**HOWARD & HOWARD, P.C.**
**4820 Old Kingston Pike**
**Knoxville, TN 37919**
**865.588-4091 (telephone)**
**865.588-4206 (facsimile)**
**jlucas@howardhowardlaw.com**
*\*admitted pro hac vice*

**Scott M. Webster**
**TOOMS, DUNAWAY & WEBSTER**
**1306 West Fifth Street, Suite 200**
**P.O. Box 905**
**London, Kentucky 40743-0905**
**606.864.4145 (telephone)**
**606.878.5547 (facsimile)**

*Counsel for New London Tobacco*
*Market, Inc., and Fivemile Energy, LLC*

# TABLE OF CONTENTS

**Page**

I.    BASIC FACTUAL BACKGROUND AND CREDIBILITY ISSUES    1

   A.    The Formation of the Original Assignment of Leases and Permits and the Alleged Misrepresentations    1

   B.    The Negotiation and the Construction of the Fourth Amendment    3

     1.    The Greenbrier Negotiations    4

     2.    The Covenant to Mine    5

       a.    The default judgment establishes that KFC was obligated to mine the Fivemile Property    5

       b.    Both the text and drafting history of the Covenant to Mine and Mr. Brownlow's testimony establish that KFC was obligated to mine the Fivemile Property    5

     3.    The negotiation of the remedy of an award by the Independent Arbiter    10

   C.    Mr. Brownlow's Continued Work Under the Retainer Agreement    11

   D.    The Williams/New Lead Transaction and the Mineable Coal    13

     1.    The transaction shows the value of the Fivemile Assets    13

       a.    The value of the leases and permits    13

       b.    The tipple    15

     2.    The transaction contradicts the argument that the coal was not mineable    17

   E.    Other Credibility Issues    18

     1.    The bogus allegation that the Plaintiffs surreptitiously added the Covenant to Mine to the Fourth Amendment    18

     2.    Mr. Justice's attempt at blame-shifting for his failure to appear for his deposition    19

     3.    Unmineable and unmerchantable coal?    22

     4.    The phony tax returns    23

     5.    Mr. Justice's testimony about Defendants' Spreadsheets showing alleged expenses    24

II.    DAMAGE AMOUNTS                                                          26

   A.    Breach of Contract Damages                                           26

      1.    Royalties as determined by the Independent Arbiter                26

         a.    The amount of the award is undisputed                         26

         b.    The Independent Arbiter's award also cannot be disputed as a matter of     27
               contract

         c.    The Defendants have not mitigated damages                     31

      2.    The amount of Retainer Fees owed is established by the default judgment     32

      3.    Minimum Royalties – The need for a declaratory judgment          33

         a.    The Defendants' payment history shows the need for a declaratory     33
               judgment

         b.    Defendants' statements during the hearing also show the need for a     34
               declaratory judgment

         c.    Sixth Circuit case law supports the entry of a declaratory judgment     35

   B.    Fraud Damages                                                       37

      1.    Fraudulent inducement and the economic loss rule                 37

      2.    The Strong Brothers lease payments are part of the fraud damages     39

      3.    The remaining fraud damages are properly measured by the value of the     39
            leases

         a.    The Court should allow this measure of damages based upon the     41
               Amended Complaint and the circumstances of this case

         b.    The Court should also allow this measure of damages as a Rule 37     44
               remedy

   C.    Punitive Damages                                                    46

      1.    KRS §411.186 Factors                                             46

      2.    United States Supreme Court and Constitutional considerations    47

III.    CONCLUSION                                                           49

# I.  BASIC FACTUAL BACKGROUND AND CREDIBILITY ISSUES

## A.  The Formation of the Original Assignment of Leases and Permits and the Alleged Misrepresentations

New London acquired the original Fivemile Leases and the pending application for a mining permit in September 2005, via a foreclosure.[1]  Tr. (1) at 41. It assigned them to Kentucky Fuel Corporation ("KFC") in the original Assignment of Leases and Permits (the "Original Assignment") on October 5, 2005.  Tr. (1) at 41.  The Defendants testified that Mr. Brownlow induced them to enter into the Original Assignment by misrepresentations about the quality of the coal and whether he had all the permits necessary to mine the properties.  *Id.* at 212 ("We were represented that the properties were permitted and you could fully mine the reserve."); *id.* at 211 ("Q…What, if anything, did Mr. Brownlow tell you about the availability of a 404 valley fill permit?  A. Well, we were represented that the 20 million tons was permitted."); *id.* at 217 ("I think without question the status of the permitting was misrepresented, and the status of the coal quality was misrepresented."). *See also id.* at 207; Tr. (2) at 113.  Supposedly these representations were made in 2005, when the parties were negotiating the Original Assignment.  *See* Tr. (1) at 205-08.

These contentions are not relevant to the present issue of damages.  The Defendants have no Counterclaim.  If there were some argument that they were somehow relevant to a defense, it would be superseded by the default judgment.  However, these contentions do show how the Defendants bend the truth and how they have a pattern of fabricating testimony that is refuted by the plain language of the agreements that they signed and prior affidavits they have made.

Mr. Justice's loose approach toward his sworn testimony is shown by his testimony that he had not read the Original Assignment before he took the witness stand and falsely accused Mr. Brownlow of misrepresentations.  Tr. (2) at 122.  He never even asked anyone what that agreement

---

[1] Capitalized terms not defined herein are used as defined in Plaintiffs' prior filings.  All emphasis herein is added. Transcripts for each day of trial are cited as "Tr. (1), (2) or (3)."

said about the quality of the coal.  *Id.* at 123.  In fact, Mr. Justice's charge that Mr. Brownlow misled the Defendants is refuted by the integration clause in the Original Assignment.

> 16.  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement concerning the subject matter and supersedes any prior or contemporaneous representations or agreements not contained herein concerning the subject matter of this Agreement.

Exh. 3 to Px. 1, ¶16.  It also contains a standard clause providing that it could only be amended by a written, signed agreement.  *Id.* ¶13. The language in those paragraphs obviously negates the Defendants' arguments that there were prior representations that KFC somehow relied upon.

Moreover, the substantive terms of the Original Assignment contradict Mr. Justice's testimony.  Nowhere in that agreement is there any representation by New London regarding the quality of the coal.  In fact, paragraph 8 expressly negates any such representation:

> 8. <u>Seller' Representations and Warranties</u>.  The Seller sells the Leases and Permits "AS IS" without any representations, covenants or warranties except as explicitly stated in this Agreement.  Kentucky Fuel agrees that it has had the opportunity to review the Leases and Permits and accepts the assignment of such assets "AS IS" subject to all the terms described therein….

Mr. Justice's hearsay allegation that Mr. Brownlow misrepresented that all necessary permits had been obtained also is refuted by the express terms of the Original Assignment.  On the very first page, the Recitals, (second paragraph) state that the Fivemile Permit "has been applied for."  That representation is buttressed by the last sentence of paragraph 8, which expressly refutes Mr. Justice's testimony about this so-called misrepresentation:

> Kentucky Fuel understands and accepts that the Fivemile Permit has not yet been issued but has been applied for and is in the process of being issued by the Commonwealth of Kentucky.

Exh. 3 to Px. 1, ¶8.

Mr. Justice's testimony on this topic presented one of the first of many examples of his lack of credibility:  It squarely contradicts his sworn testimony in one of his own affidavits, D.E. 204-4,

which Mr. Justice identified in his testimony. *See* Tr. (2) at 120. He first described how KFC had

learned that Mr. Brownlow was marketing the Fivemile and Deep Wood properties. Then, he said:

> I instructed Mr. Sarver to advise Mr. Brownlow that having a state mining
> permit only without an Army Corps of Engineers ("ACOE") §404 permit….
> a substantial majority of this property could not be mined. ***I further
> instructed Mr. Sarver to advise Mr. Brownlow that given the poor quality of
> the coal, specifically the high ash content and the extremely high sulfur,
> when combined with the lack of §404 permits*** made it extremely unlikely
> these properties could be mined anytime in the near future.

D.E. 204-4, ¶5.

There you have it: In his 2014 Affidavit Mr. Justice says he told Mr. Sarver to negotiate a

low payment (*see id.* at ¶6) using as negotiating points both the "poor quality of the coal" and the

"lack of §404 permits." Now, he thinks it is more favorable to him to say the opposite: that Mr.

Brownlow misled Kentucky Fuel by not disclosing the "poor quality of the coal" and the "lack of

§404 permits." As Plaintiffs have said before, "*These men will say anything.*" They present a nice

appearance and they are slick. But, they will say *anything.* This is something that must be

remembered when assessing any of their testimony.

Finally, Mr. Justice did not have any personal knowledge that Mr. Brownlow ever made a

misrepresentation. Mr. Justice admitted that these supposed representations were made to others

and that he did not "personally hear them or receive them." *Id.* at 114; Tr. (1) at 208. Mr. Justice's

first personal contact with Mr. Brownlow was years after the Original Assignment in 2005. He

testified that he gave an affidavit in this case in 2014, D.E. 204-4. In paragraph 10, he stated:

> A.   During the transactional negotiations, closing and post-closing taking place
> from 2005 ***through 2012***, **I personally had no interaction with Mr.
> Brownlow** as it relates to Fivemile and Deep Wood.

Tr. (2) at 121. It is undisputed that Mr. Justice's testimony about these supposed misrepresentations

was not based upon personal knowledge. It should not be given any weight.

**B.      The Negotiation and the Construction of the Fourth Amendment**

## 1. The Greenbrier Negotiations

By the Fall of 2010, KFC had not mined the Fivemile property. It also had lost many of the original Fivemile Leases due to non-payment or non-renewal. Tr. (1) at 55-59. It had not responded to Mr. Brownlow's efforts to maintain these leases so that the properties could be mined. *Id*. at 56. Mr. Brownlow therefore formed Fivemile Energy, LLC to re-acquire as many of the lapsed leases as possible. *Id*. KFC obviously still thought that the property presented a good mining opportunity because it wanted to re-acquire the leases. In October 2010, the Defendants began negotiating with Mr. Brownlow's attorney, Culver Schmid. Tr. (1) at 60; Tr. (2) at 68.

Those negotiations culminated in a meeting at Mr. Justice's Greenbrier resort on November 11 and 12, 2005. Tr. (1) at 60-61. Mr. Brownlow attended with Mr. Schmid. They met personally with Mark Merritt and Steve Ball. *Id*. Mr. Justice's now-admitted involvement illustrates another instance of the Defendants' lack of credibility. In August 2018, the Defendants filed a Memorandum in Support of Motion for a Ruling as to the Measure of Damages (the "Damages Memorandum"). D.E. 375-1. Mr. Justice read it. Tr. (2) at 157. The Defendants stated that Mr. Justice "was not involved in the meetings or negotiations [at the Greenbrier] *in any way*." D.E. 375-1 at 3. Three months later in their Prehearing Memorandum, the Defendants repeated this same representation, verbatim. D.E. 395 at 3. Mr. Justice read that, too. At the hearing, however, Mr. Justice admitted that he *was* present at the Greenbriar. Tr. (2) at 36. He was in "constant communication" with Ball and Merritt and "absolutely" was kept apprised and consulted about their negotiating position. Tr. (2) at 36-37; Tr. (1) at 63-64. Contrary to the exact language in the Defendants' prehearing filings, he admits that he *was* "involved in those negotiations." Tr. (2) at 158. With updates on an "hourly basis," he made decisions about the agreement. *Id*.

Because KFC had never mined the coal, Mr. Brownlow had two primary objectives in the negotiations: (1) to ensure that the coal would be mined and (2) a specific remedy if the Defendants

failed to mine the coal.  Tr. (1) at 61.  The first of these objectives was addressed in paragraph 10 (the Covenant to Mine).  The second objective was addressed in the remedies portion of paragraph 7 (Events of Default).  These are discussed immediately below.

### 2.  The Covenant to Mine.

The Defendants contend that the Independent Arbiter's award of $16,990,900 should not be affirmed because the Parties' intent as embodied in the Covenant to Mine was not to require the Defendants to mine the property unless they determined that it was economical to do so (which Defendants would decide unilaterally).  This position is without merit for a number of reasons:  (a) it is inconsistent with the finality of the Independent Arbiter's award and the default judgment in this case, (b) the language and the drafting history of paragraph 10 supports the Plaintiffs' interpretation, (c) it is inconsistent with the plain language of the Fourth Amendment and (d) the Defendants' demonstrated lack of credibility disfavors their version.

### a.  The default judgment establishes that KFC was obligated to mine the Fivemile Property.

In the Covenant to Mine, KFC promised "to use commercial and reasonable good faith and its best efforts to maximize within the constraints of industry standards the amount of coal extracted from these real properties."  Px. 1A, p. 6, ¶10.  As established by the default judgment, KFC has breached that contract.  *See* Px. 1 (A/Complt., ¶23h).  Because its breach is now established, the Defendants' arguments that KFC was not required to mine the Property are pretermitted by the default judgment.  They will be addressed below, however, to inform the Court's recommendation on this topic since the Court understandably allowed the Defendants to develop the record fully.

### b.  Both the text and drafting history of the Covenant to Mine and Mr. Brownlow's testimony establish that KFC was obligated to mine the Fivemile Property.

The text of the Covenant to Mine, its drafting history, Mr. Brownlow's testimony and its comparison with language in other standard KFC contracts all show that the Defendants were

required to mine the Property irrespective of their claims that it would be unprofitable to do so. The text of the Covenant to Mine is not standard language (Tr. (3) at 74), but it is straightforward: KFC "covenant[ed] to use commercial and reasonable good faith and best efforts to maximize within the constraints of industry standards the amount of coal extracted from these real properties." In construing this language, it is first important to note what it does *not* say: It does not limit KFC's obligation to extract only "mineable" or "merchantable" coal. As discussed below, this contrasts sharply with language in other standard contracts used by the Defendants. Second, the requirement to "maximize . . . the amount of coal extracted" is the same as a requirement to "maximize production." A promise to maximize production (or the amount of coal extracted) necessarily assumes that the coal will be mined. **Production** cannot be "maximized" unless there is mining. To maximize its production, KFC is required to mine. Hence, the heading of paragraph 10 evidences the obligation: "Covenant to Mine." The very title of the paragraph is a covenant or promise to mine. That plain language as well as the remaining text of paragraph 10 required KFC to mine the property. *See United Food & Commer. Workers Int'l Union, Local 38-D v. Buffalo Trace Distillery, Inc.*, 2011 U.S. Dist. LEXIS 149614, *10-11 (E.D. Ky. Dec. 30, 2011) ( considering both the heading and text when interpreting an article in a collective bargaining agreement: "The broad heading 'Contracting Out,' suggests that the article defines the particular circumstances under which the Company may contract out work."); *Guitar Ctr. Stores, Inc. v. 7250 S. Cicero Equities, LLC*, U.S. Dist. LEXIS 83764 (N.D. Ill. Nov. 8, 2007) (noting the absence of a "general provision in the contract that headings and titles of sections are for convenience only and not to be considered terms of the contract" and considering both the subject paragraph's title and content when interpreting a paragraph in a lease agreement).

The question then becomes whether the phrase "within the constraints of industry standards" gives KFC an excuse not to mine the property. It does not. "Industry standards" has been defined

as "Generally accepted requirements followed by the members of an industry."[2]  It necessarily must refer to some specific standard in a particular industry, in this case the coal mining industry.  That differentiates it from general considerations of "economic conditions" or "profitability" that could be present in any commercial dealings in any industry.  Every business' general desire to make a profit is not an "industry standard." Where KFC was obligated to maximize production, "industry standards" refers to using standard mining techniques to maximize production, recognizing that all the coal in the ground may not be extracted because of topography, spillage or similar physical – not economic -- limitations. Tr. (1) at 123-24.  There is no "industry standard" that allows any company to abandon its contractual commitments just because it later decides that it would be unprofitable to perform.

Any "industry standards" for the coal industry would have to be demonstrated by expert testimony.  *See Rich & Rich Partn. v. Poetman Records USA, Inc.*, 2010 WL 1978804, at *5 (E.D. Ky. May 17, 2010) ("Davis could have shown from her experience how these projections are generally accepted. Instead, she simply says her projections are the industry standard and based on accepted marketing principles. That does not make her opinion reliable.").  The only evidence of the industry standard is the expert report by Mr. Dexter Patton, which was admitted without objection as Px. 5.  Mr. Patton has been in the coal industry for over fifty years.  *See id.* at pp. 14-15 of 91.  The portion of his report that is relevant to the language in the Covenant to Mine and the industry standards is at Px. 5, ¶ 12 at pp. 10 and 11 of 91.  He notes the absence of any reference to "Mineable and Merchantable coal" and states that the "language in paragraph 10 of the Fourth Amendment requires KFC to mine the Five Mile property and maximize the amount of coal extracted . . . ." The last two paragraphs of that paragraph 12 then conclude:

---

[2] Web Finance, Inc., *Business Dictionary,* available at http://www.businessdictionary.com/definition/industry-standard.html.

This requirement to maximize the amount of coal extracted was limited by 'the constraint of industry standards,' not by whether the coal was merchantable. In my experience, based upon many years of reviewing and negotiating coal contracts and leases, this means that whether the coal is of the best quality or a lesser quality is not a factor that limits Kentucky Fuel's obligation to maximize production. The quality of the coal goes to its merchantability.

As opposed to the quality of the coal, the limiting constraints of good faith and industry standards could limit Kentucky Fuel's obligation to extract 100% of the coal reserves if the topography made that impracticable. But, Kentucky Fuel was obligated to maximize the amount of coal extracted regardless of its merchantability, which goes to whether it can be sold feasibly and is not a limiting factor in the Fourth Amendment.

The Defendants contend that the Covenant to Mine only obligates them to attempt to extract "mineable and merchantable coal." *See* Tr. (2) at 49-50. There are a number of flaws in that argument in addition to those discussed above. The first is that, as noted above, the words "mineable" or "merchantable" do not appear anywhere in that agreement. This contrasts sharply with the proposed mining agreement that Mr. Ball sent to New Lead, whereby KFC proposed to mine the Fivemile Property. That KFC-drafted agreement would have required KFC to mine and ship "mineable coal." See Px. 16 E (proposed Mining Agreement), ¶1. It then defined "mineable coal" as "coal which, when reached in the course of KFC's mining operations, ***can be removed economically*** . . . ." *Id.* The lack of any such language in the Fourth Amendment is telling.

The drafting history of the Fourth Amendment reinforces this conclusion. Prior to the negotiations, the parties had already gone "back and forth" exchanging "multiple" drafts of the Fourth Amendment. Tr. (1) at 60; Tr. (3) at 68. On November 12, 2010, after the previous day's negotiations, Mr. Schmid sent a black-lined version of the draft Fourth Amendment to Messrs. Ball and Merritt. *See* Px. 17. That draft shows that an earlier draft of the agreement had included language that would have excused the Defendants from any obligation to mine if there were adverse "economic circumstances." But, after the negotiations that language was stricken:

11. **10. Covenant to Mine.** In consideration of NLTM, Deep Wood, Fivemile and Fivemile Energy agreeing to the terms described herein, Kentucky Fuel covenants to

use commercial and reasonable good faith and best efforts to maximize within the constraints of industry standards the amount of coal extracted from these real properties ~~which shall include all currently permitted portions described in the Fivemile Permits and any expansions, extensions or increments thereto including but not limited to such expansions, extensions or increments evidenced by newly issued, renewed or amended permits.~~ ~~Industry standards shall include and consider the economic circumstances of the coal industry, future coal prices, current contracts of buyer and such other circumstances as a reasonably prudent coal producer would consider at the time of making such determinations~~. . . .

The deletion of this language shows that the parties negotiated just as Mr. Brownlow testified: KFC attempted to negotiate a provision that conditioned its covenant to mine on "economic circumstances" but that limitation was removed from the final agreement. *See Energy Mktg. Services, Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369, 376 (S.D. Ohio 1999), *aff'd* 229 F.3d 1151 (6th Cir. 2000) ("Court is not persuaded that the parties intended to include the . . . clause . . . when it had been excluded specifically from the contract. The absence of the . . . clause from the . . . amendment effectively removed the clause from the Agreement."). **[check cite] [other case?]**

Other Defendants' contracts show that when they wanted to condition their obligation to mine upon profitability or other economic factors, they knew how to do just that with plain language. Px. 32 is a contract pursuant to which the Justice Companies was obligated to mine "mineable and merchantable coal." *See id.*, p. 1 (preamble and §2.1) and p. 5 (§3.4). It then defined "Mineable and Merchantable" as coal that could be "mined at a profit." *Id.* at p. 8, §3.9. *See also* Px. 33 and 34 (giving KFC the right to abandon leases and not mine if "in its judgment, at any time, the mining of said coal shall be or become unprofitable."); Px. 36, <u>Schedule 2</u> to Coal Lease, ¶1.4(1).[3] (Assignment of coal leases assigned to KFC and signed by Gov. Justice, which required KFC to pay royalties only on "mineable and merchantable Coal mined and sold . . . ." The contrast between these examples of specific language and the obligatory language in the Covenant

---

[3] Px. 36 is a certified copy of pleadings from a Kentucky state court case. That case was never identified by the Defendants in response to Plaintiffs' Interrogatory No. 12. *See* Px. 7 and 15.

to Mine is striking. One excuses KFC from any obligation to mine if it is unprofitable or if the coal is not "mineable and merchantable;" the other does not.

KFC's obligation to mine also is clear from Mr. Brownlow's testimony. After the Original Assignment, he had "many, many" conversations with KFC, asking when they were going to start mining. Tr. (3) at 169-70. Most were with Mr. Merritt who said that he would "check with Jay, and as soon as Jay gives me an answer, I'll let you know." *Id*. at 170. They never said that they were not going to mine because the coal was poor quality; they just did not respond. *Id.* With that background, in the negotiations for the Fourth Amendment, Mr. Brownlow obviously wanted a commitment that KFC would mine the property this time. During the negotiations, he repeatedly asked for and received assurances from Messrs. Ball and Merritt (5-10 times) that the property would be mined: "And repeatedly they said, we're going to mine it this time." Tr. (1) at 63-64. Mr. Brownlow "wouldn't have done the deal" without that agreement. *Id.* at 107-08.

**3. The negotiation of the remedy of an award by the Independent Arbiter.**

Mr. Brownlow's second objective in the Greenbriar negotiations was to secure a specific remedy if the Defendants failed to mine the coal. That was accomplished by the inclusion of dual remedies in paragraph 7 of the Fourth Amendment: If KFC defaulted, the Plaintiffs had the option of either pursuing their remedies for the breach in court or they could estimate the lost royalties by appointing an Independent Arbiter to make that determination. This remedy is discussed in Section II A 1, beginning at p. 26, below. For now, we note that the remedy provided by the Independent Arbiter was intended to be expeditious and final, as opposed to having to "go to court, retain experts, lawyer up, [and] spend six years litigating back and forth." Tr. (1) at 63. That is why his estimated amount of lost royalties was "immediately due and payable." No witness refuted this testimony. Mr. Ball acknowledged that this provision remedy is "fairly unique language" and they had not entered into any other contracts like it. Tr. (3) at 74. Nevertheless, he agreed that language

of the Fourth Amendment accurately reflects what was agreed to in the Greenbriar negotiations. *Id.* at 65.

**C.      Mr. Brownlow's Continued Work Under the Retainer Fees Agreement**

As discussed in Section II A 2 at pp. 32-33 below, the Defendants' liability for the $10,000 monthly retainer fees is established by the default judgment in this case. Even if the liability for these fees had not been established by the default judgment, any termination of the contract for retainer fees would have been made by "thirty (30) days prior written notice." Px. 1A, ¶ 9. KFC was required to give any such notice by certified mail or overnight delivery. *Id.*, ¶ 16. It did not do that. Tr. (1) at 70; Tr. (2) at 204; 239. Because the default judgment has established that these fees continue to accrue, Plaintiffs will not add unduly to this Memorandum with a lengthy recitation of the services that Mr. Brownlow provided long after the Defendants contend that he abandoned the retainer agreement. A few examples will suffice.

Px. 10 is a Log of some of Mr. Brownlow's contacts and communications with KFC and Justice Companies relating to his services and efforts to assist that was prepared contemporaneously with the communications. Px. 11 is a summary of some of the emails evidencing his services. Pxs. 11A-V are copies of relevant emails referenced in this summary. All these exhibits evidence numerous efforts by Mr. Brownlow to assist the Defendants, including work at their request long after the time that they contend he abandoned the retainer agreement.

Mr. Justice's testimony about the retainer fees provides more examples of the lack of dependability of his testimony. He claimed to know more about the retainer fees than he did about the minimum royalties. Tr. (2) at 197. However, when asked if *any* of the payments due under the Fourth Amendment were ever paid on time, he attempted to evade, claiming, "I don't really know the answer. I think they have all been made. They may have been made late but I think they have

all been made." Tr. (2) at 188.[4]  His later testimony showed that he was fully aware that the first (and only) payment of retainer fees was made in May 2011.  It did not bring the fees current; it only paid those due through April 1, 2011.  Tr. (1) at 70.

Mr. Justice's loose testimony that Mr. Brownlow did not provide any services after April 2011, is just another example of him making up "facts" about which he had zero personal knowledge.  Like his testimony about Mr. Brownlow's supposed misrepresentations, it is another example of Mr. Justice's propensity to testify to things about which he knows nothing.  He repeatedly testified that Mr. Brownlow had not provided any services after April 2011.  Tr. (2) at 47, 214, 215, 216, 217, 230.  Yet, his testimony showed that he was totally ignorant about work Mr. Brownlow continued to do after then *at KFC's request*.  *See generally* Px. 11; 11A-V; Tr. (2) at 233-48.  Although the Plaintiffs' exhibits reflect numerous communications between Mr. Brownlow and KFC about the Strong Brothers leases, Mr. Justice knew nothing about those efforts, including that Mr. Brownlow was working at KFC's request to try to get those leases paid so that it could continue to access that property.  *See* Tr. (2) at 234-36; Px. 11B, 11C, 11E-11I, 11O, 11T.  Similarly, Mr. Justice had no idea that Marc Merritt had asked Mr. Brownlow to get a "Howell lease."  Tr. (2) at 236-37; Px. 10 (entry for 1/30/12 and 2/1/12) (instruction from both Merritt and Ball "to lease Howell property if possible"); and 4/17/12 (email to Merritt "regarding lease meeting with Howells.  No response.").

Mr. Justice also testified – or, rather, argued – that Mr. Brownlow sent them a notice stating that he was not working because he had not been paid.  He testified that he remembered what it said because he had read the letter within the past week.  Tr. (2) at 204.  He testified Mr. Brownlow said, "I'm not going to do anything" and that "he wasn't going to do any more work."  Tr. (2) at 201; 215.  The best that can be said about this testimony is that Mr. Justice embellished the facts.  He

---

[4] The transcript attributes this question to Mr. Getty, but it was by Mr. Lucas.

also testified that Mr. Brownlow never provided any services, so they stopped paying him. Tr. (2) at 47. The best that can be said about that testimony is that it is just incorrect. The letter was later introduced as Px. 35. It says no such thing. The letter shows on its face that it was prompted by a call from Mr. Ball to Mr. Brownlow in which Mr. Ball "asked for assistance with the Fivemile Leases." When the letter was written in May 2012, it had been a year since KFC had last made a payment under the Fourth Amendment. During that year, Mr. Brownlow had not been paid anything. No tonnage royalties, no minimums royalties, no consulting fees. Mr. Brownlow's letter was an obvious effort to prompt payment by KFC. Mr. Brownlow wrote that in view of KFC's failure to honor its agreements with both him and the various land owners, "I cannot see the merits of continuing to devote more of my time and energy to leases I have already resurrected for you at least once". He concluded with the observation that:

> I am confident that you would not work for Kentucky Fuel if it did not pay you, so I am sure that you understand that Kentucky Fuel cannot treat people this way and then expect them to keep doing business with it.

In fact, *for years* after sending this letter Mr. Brownlow continued to provide services to KFC, including both matters that he brought to its attention for its own protection and work that KFC expressly asked him to do. In addition to the summary and numerous emails introduced as Px. 11 and 11A-V, Mr. Brownlow's Log of communications with the KFC, Px. 10, makes this clear.

**D.      The Williams/New Lead Transaction and the Mineable Coal**

In the Williams/New Lead transaction the Defendants "flipped" the Fivemile Assets, reaping millions of dollars, none of which was paid to Plaintiffs. This transaction is relevant for two reasons: (1) it shows the value of the Fivemile Assets in an arms-length transaction and (2) it refutes the Defendants' contention that the coal was not mineable because it was "bad coal."

**1. The transaction shows the value of the Fivemile Assets.**

**a.      The value of the Leases and permits**

Plaintiffs respectfully submit that the proper measure of the damages for fraud should be the value of the Fivemile Assets (the Leases and permits), and the Strong Brothers lease payments. The multiple reasons why this should be the measure of fraud damages are discussed in Section II B, beginning at p. 36 below. The discussion in this section is limited to how the Williams/New Lead transaction shows the value of those Assets.

The Williams/New Lead transaction shows that the minimal value of the Fivemile Assets in an arms-length transaction was at least $12,327,876, based upon the price paid by New Lead. Of this amount, as shown below, KFC received at least $8,827,876 and the other parties (Williams Industries and RJLT/Cypress Camon) received at least $3.5 million. However, New Lead invested a total of $21,855,000, in the Fivemile Assets. *See* Px. 13 FF. Because New Lead was willing to invest $21,855,000 to acquire these assets, that is a fair, arms-length valuation of them.

The minimum value of the Fivemile Assets is the total amount paid to the sellers. KFC tries to artificially limit this amount to $7.5 million, which was the principal amount of the promissory note from New Lead to KFC. However, that calculation ignores two other major components. The first is that the total principal amount of the purchase price was $11 million, not $7.5 million. Williams Industries' share was $2.0 million and RJLT's was $1.5 million. Px. 40 at p. 5; Tr. (3) at 42. Second, those are just the original principal amounts. There were additional amounts paid pursuant to the various amendments to the APA, Px. 13A.

Like much of the Defendants' testimony, Mr. Ball's testimony about the amounts KFC received in the New Lead transaction is riddled with contradictions and inconsistencies. His first testimony on this subject began with a blatantly untrue statement: In December 2014, he filed an Affidavit in which he said that "Defendants received **only a total** of $7.5 million" from the New Lead transaction. *See* Px. 39, ¶9. Less than 18 months later, however, he filed a Declaration in which he stated that the total amount was $8,552,876. Px. 40, ¶12. All of the payments shown on

Px. 40 had been made before Mr. Ball's December 2014 Affidavit, in which he swore that the Defendants received more than a million dollars less. Even Mr. Ball's 2016 figure of $8,552,876 for the price allegedly received only by KFC is incorrect. Instead of candidly acknowledging the inaccuracy of his earlier, incorrect affidavit, Mr. Ball tried to justify it by claiming that the disclosure of the additional amounts paid "wasn't the purpose of that statement." Tr. (3) at 113-14. That statement highlights Mr. Ball's lack of credibility: Mr. Ball says that when he said that KFC had "received **only** a **total** of $7.5 million dollars, not $11 million," his purpose somehow was **not** to apprise the Court of the "total" amount KFC had received.

On March 18, 2013, the New Lead parties executed the Fifth Amendment to the APA. Px. 13T. All the payments on Mr. Ball's 2016 Declaration, Px. 40, were made after the March 18, 2013 execution of that Fifth Amendment to the APA. Prior to that Fifth Amendment, however, New Lead had made two payments that are not reflected on Mr. Ball's 2016 Declaration: a $100,000 non-refundable deposit required to obtain the first extension of the "Second Closing" (Px. 13T at 2), and the "immediate delivery" of $175,000 in New Lead stock (*id*. at 3) that had been required to obtain a second extension of that closing, which had been scheduled to occur no later than March 6, 2013. Neither of those payments is reflected on Px. 40. When they are added to it, the total received by KFC (or whomever got its money) was $8,827,876. Thus, the total received by the three sellers from New Lead was $12,327,876. That amount should be regarded as the minimum value of the Fivemile Assets.

### b.      The tipple

The Defendants contend that the New Lead purchase price was for both the leases and permits and the "Andy" tipple and that the value of the tipple should therefore be deducted from the purchase price to derive the value of the Leases and permits. Mr. Ball originally testified that the value of the tipple was a derived figure: He said that they valued the leases at $1/ton, thereby

estimating their total value at $2.5 million based upon the approximate tonnage in just the original permitted area.  Based upon that calculated value for the leases, they derived the tipple value by subtracting it from KFC's $7.5 million share of the original principal amount of the New Lead purchase price. Tr. (3) at 126.  Now, however, they employ the opposite methodology: they claim that the tipple was worth $5.0 million and from that they then derive a value for the leases of $2.5 million.  *Id*. at 41. There are several flaws in this argument.  The first is that even under the Defendants' changed methodology, their math is wrong.  The New Lead purchase price was not $7.5 million; the underlined(principal) amount was at least $11 million by the Defendants' own admission.  *Id*. at 42.  When the entire $11 million (principal amount only) purchase price is considered, a value of $5 million for the tipple still yields a minimum $6 million value for the leases.

Second, a review of the New Lead Asset Purchase Agreement ("APA") shows how the Defendants attempted to manipulate the numbers to contrive an inflated value for the tipple.  The original APA, Px. 13A, shows that the ***Buyer*** was to propose an allocation of the purchase price.[5] Px. 13A, Schedule 3.4 ("Allocation of Purchase Price [***Buyer*** to propos***e***]").  Five months later, however, that was changed in the Second Amendment to the APA, Px. 13B.  That Amendment recited the existence of this suit and provided that the Schedules to the APA had been "amended and restated ***by Seller*** . . . to reflect certain developments . . . ."  It then allocated $2.5 million to the leases and permits and $5.0 million to the tipple.  Px. 13B, pp, 1, 4 and Schl. 3.4.  This change from the original APA shows that because of this suit over the Leases and permit, the Defendants manipulated the APA in an effort to minimize the value of the Leases, by assigning a contrived value to the tipple.  Consistent with that, the Defendants did not introduce any testimony of actual expenditures on the tipple from which its value could be calculated.

---

[5] The original APA was executed on May 10, 2012.  This suit had just been filed two days earlier, but the Defendants were not yet aware of it.  *See* Px. 1A, Schedule 4.6 (no litigation disclosed).

Third, the methodology originally employed by Mr. Ball for valuing the tipple shows that the Fivemile Leases were worth far more than the $2.5 million claimed by Mr. Ball. That value was based upon his estimate of $1 per ton *for the initially permitted area only.* Tr. (3) at 125. The Covenant to Mine, however, required KFC to maximize production "from these real properties." Px. 1A, ¶10. That is a reference to all the Fivemile Leases, not just those within the original permitted area. As Mr. Justice admitted, coal properties normally are permitted in increments and the original permit was just the first step toward mining the entire property. Tr. (2) at 209. The Fivemile Leases had a total of 16,740,900 recoverable tons (Px. 1B), yielding a value of $16,740,900 for the Leases **using Mr. Ball's own methodology**. Px. 1B; Tr. (1) at 136-37.

**2. The transaction contradicts the argument that the coal was not mineable.**

As this Court has previously stated, "Obviously, because a purchaser presumably would not purchase a worthless asset, information concerning the sale of the Fivemile leases and permits is highly relevant to whether coal was mineable and, if so, its value." D.E. 189 at 19. To support that common-sense proposition, Px. 16 summarizes some of the negotiations with New Lead and Defendants' representations concerning the opportunity to mine the Fivemile coal. Further details are provided in Px. 16A-M. For example, Mr. Ball initially represented to New Lead's CEO, Mr. Zolotas, that "Williams Industries and Kentucky Fuel Corporation have a solution to the current cashflow issues at the Fivemile project that would allow for the taxes to be paid, landowners to be paid and *coal to be mined*." Px. 16A. The Defendants' "solution," was the agreement with New Lead pursuant to which KFC proposed to mine the Fivemile coal. Mr. Ball subsequently described the proposed contract as "a proposal that can work for both sides" (Px. 16B) and as a "win-win situation." Px. 16H. The Defendants' general counsel, Roger Hunter, described the proposed mining agreement "as a practical and mutually beneficial arrangement." *Id.* More than six months

after opening these negotiations, and after New Lead's alleged default, Mr. Ball was still telling Mr.

Justice, "if we want to control the process mining agreement is not a bad thing." Px. 16M.

Mr. Justice's contention that the coal was not mineable is refuted by these facts. The Court

therefore should find that KFC's excuse that the coal was not mineable is factually deficient.

## E.     Other Credibility Issues

During their testimony, Mr. Justice and Mr. Ball either refused to admit, denied or

contradicted matters that were apparent from the face of the Defendants' own documents or other

objective evidence. Examples follow:

### 1.     The bogus allegation that the Plaintiffs surreptitiously added the Covenant to Mine to the Fourth Amendment

In addition to the false statement that Mr. Justice did not participate in the Greenbriar

negotiations "in any way," Defendants' Damages Memorandum made another misrepresentation

about the drafting of the Covenant to Mine. In it, Defendants stated:

> Although never discussed by Mr. Brownlow, and unbeknownst to Messrs. Ball
> and Merritt, the amended agreement for the first time included a Covenant to
> Mine, essentially a diligent mining provision. In hindsight, the Justice entities
> believe Mr. Brownlow was "setting them up" for litigation, given his
> knowledge of the terrible quality of coal covered by the leases, and in light of
> the fact that not long after the amendment was executed the Plaintiffs filed this
> action.

D.E. 375-1 at 4-5.

If this allegation were true, it would have been powerful evidence to support the Defendants'

theory that they were under no obligation to mine the Fivemile property if they claimed it was

uneconomical, as well as a grave charge of serious professional misconduct by Mr. Schmid. When

confronted about this specious charge, however, Mr. Justice attempted to equivocate. He first tried

to claim that all it meant was that the parties' agreement had not previously included a covenant to

mine. Tr. (2) at 164. However, if that were the case, it would not have been "unbeknownst to

Messrs. Ball and Merritt." *Id.* Mr. Justice was then asked, "So it wasn't unknown to Mr. Ball and

Mr. Merritt? It wasn't snuck in, was it?" For once, he was at a loss for words: "I just – I just don't know how to respond to it, Mr. Lucas." *Id.*

The defamatory claim that the Covenant to Mine was "never discussed" and was inserted "unbeknownst to Messrs. Ball and Merritt" is a clear charge that Messrs. Schmid and Brownlow somehow slipped the language into a draft Fourth Amendment subsequent to the initial draft, and that Mr. Ball signed the document without realizing that it had been surreptitiously altered to include the Covenant to Mine. However, the draft of the Fourth Amendment that is included in Px. 17 was sent to both Mr. Ball and Mr. Merritt. (Tr. (3) at 69). Not only did the black-lining highlight the change, but Mr. Schmid pointed it out in the accompanying email. *See* Px. 17.

The Defendants cannot blame this allegation on imprecise drafting by their attorney. Mr. Justice testified that because of Mr. Getty's recent involvement, he had a "high hill to climb to get up to speed." Tr. (2) at 156. He and Mr. Ball therefore met numerous times with Mr. Getty to educate him about the case and to give him their versions of what had happened. *Id.* at 156-57. Mr. Justice reviewed the Damages Memorandum. *Id*. at 157. They then made this same grave charge in their Prehearing Memorandum [D.E. 395] three months later, which Mr. Justice also reviewed (*id.*), so he and Mr. Ball had ample time to review and correct this calumny. They did not.

### 2. Mr. Justice's attempt at blame-shifting for his failure to appear for his deposition

Mr. Justice again attempted to throw Mr. Dudley under the bus, this time blaming him because Mr. Justice "treated his deposition as optional." D.E. 189 at 27. This should be rejected for many reasons. The first is that Mr. Dudley was not present to defend himself. Second, the testimony is not relevant. The sanctions were against the Defendants, not Mr. Justice. As the U. S. Supreme Court has held, the attorney is the agent for his client and his acts or omissions are attributable to his principal, the client. *Pioneer Investment Services Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 397 (1993). Thus, even if Mr. Dudley were at fault (and based on their

interaction with him in this case, Plaintiffs believe that Mr. Dudley is an honorable lawyer who was not at fault), the sanctions (and consideration of this as a factor for punitive damages) would be equally appropriate because both he and Mr. Justice were agents for the Defendants.

Third, once again, Mr. Justice gave his sworn testimony based upon hearsay and without knowing the facts. He testified that his non-appearance was caused by Plaintiffs' counsel, Mr. Lucas, because he allegedly was not "professional," did not extend routine courtesies when he supposedly failed to respond to Mr. Dudley's request to postpone his deposition and "refused to even communicate." Tr. (2) at 61, 65-66; 96-98. On cross-examination Mr. Justice tried to claim "personal knowledge" of all this, but he admitted that it was all based on what he says the absent Mr. Dudley supposedly told him. *Id.* at 96. On cross examination, however, Mr. Justice admitted that he had not seen any of the letters and emails that Mr. Lucas sent to Mr. Dudley concerning the deposition. *Id.* at 98-100; 108-09. He was not aware that Mr. Lucas had offered to take the depositions in Roanoke, Virginia, where the Defendants' offices are located. *Id.* at 100; D. E. 150-1, ¶2 and Ex. 1 thereto. He was not aware that the Defendants did not respond to that offer. Tr. (2) at 100-02. He was not aware that Mr. Lucas agreed to postpone all the depositions by one day, to accommodate their schedule. *Id.* at 107-09. He had never seen Mr. Lucas' letter of November 4, 2013, confirming that agreement to depose Mr. Justice on November 7, instead of Nov. 6. Tr. (2) at 108-09, 112; D.E. 150-1, ¶4 and Ex. 4 thereto. He was not aware that Mr. Lucas was not told that he would not appear until after 6:00 p.m. the day before his deposition was to begin. Tr. (2) at 109. He was not aware that no one told Mr. Lucas why he was not appearing. *Id.* at 109-10.

Mr. Justice's failure to appear obviously was a key issue upon which he prepared to testify. Before he took the stand, he "did review some documents" and "discussed those … issues" with his attorney. *Id.* at 99. The above facts upon which he was cross-examined are all in the record. *See* D.E. 150 and 150-1; Tr. (2) at 112. It is inconceivable that he prepared his testimony with his

attorney without reference to these documents, since cross-examination on them would be assured. It is simply inexcusable – but consistent with these Defendants' casual approach toward their sworn testimony – that he gave this false testimony attempting to blame opposing counsel after he had reviewed the record and prepared with his own attorney who, along with Mr. Ball, surely knew what was in the record on this key issue.

Finally, the testimony by Mr. Ball and Mr. Justice about his non-appearance is simply not credible. Mr. Justice claims that he does not even remember where he was on the day he was to be deposed. Tr. (2) at 94. Given the sanctions and his professed desire to apologize to the Court, it simply is not credible that he did not even come prepared to tell the Court what he did that day that was more important than being deposed. They denied that they ever talked about the depositions in the days leading up to them. That testimony also is not credible. It is not the way businessmen act in the real world. Consider the context and situation at the time: Mr. Ball was going to testify both individually and as a corporate Rule 30(b)(6) representative. Tr. (2) at 109. In that role, he had to prepare to testify for the corporations even on issues upon which he might not have personal knowledge but was designated to speak for the defendant corporations. Given Mr. Justice's key role in making decisions, as evidenced by the testimony throughout the hearing, it is inconceivable that an experienced lawyer, who was in-house counsel to both Defendants, would not have talked to Mr. Justice about the depositions, especially his Rule 30(b)(6) deposition. Yet, that is their story. Tr. (3) at 158-61. Similarly, even though both men obviously would have flown from Roanoke to Knoxville on the same company plane, and even though they flew back together from Chicago to Roanoke the day before the depositions, Mr. Ball claimed that he did not even know that Mr. Justice was not going to show up. *Id.* at 160-61.

Mr. Justice's attempt to shift the blame for his non-appearance is consistent with the Defendants' approach to this case: their problems are always someone else's fault. *See, e.g.,* Tr. (2)

at 95-98.  His failure to appear was central to the sanctions that resulted in the default judgment.  Even though that obviously was a grave matter, he made his blame-shifting allegations while claiming that he could not even remember reviewing the filings on this key issue that show that his claimed "personal knowledge" is incorrect.  Tr. (2) at 98-100.  This loose approach toward testimony on what Defendants and Mr. Justice obviously considered a important issue that they needed to "clean up," is good reason to give no credibility to their testimony on any disputed matter.

### 3.  Unmineable and unmerchantable coal?

Although the Defendants now deny that Fivemile presented a good mining opportunity, their denials are inconsistent with their prior representations and actions. Mr. Justice says that he learned in 2005 or 2006 that the Fivemile property supposedly was "unmineable or had bad coal." Tr. (2) at 121.  He claimed that the "Fivemile situation has cost us many, many, many millions of dollars and . . . . *it's just been a debacle from day one*." Tr. (1) at 215.  Nevertheless, in November 2010, over four years later, Mr. Justice and Mr. Ball negotiated and signed the Fourth Amendment, committing themselves to millions of dollars in expenses, to renew their right to mine Fivemile.[6]  It simply is not believable that the Defendants learned in 2005 or 2006 that the coal was "unmineable," but then entered into the Fourth Amendment four or five years later with its commitment to pay the Plaintiffs a minimum of $480,000 in the first year alone.

Defendants' present denials also are inconsistent with their "win-win" representations to New Lead when they were negotiating with it for KFC to mine the coal, which are discussed above at pp. 17-18.[7]  In addition, Doug Terry (whom Mr. Justice claims is *the* most knowledgeable person

---

[6] The Defendants claim that they spent "upwards of $10 million" on the properties.  Tr. (2) at 50.  In the first 13 months after the Fourth Amendment the Defendants were required to pay $150,000 at closing, monthly minimum royalties totaling $125,000, a $75,000 minimum royalty on December 1, 2011, and retainer fees of $10,000 per month.  *See* Px. 1 A, ¶¶ 4(b), 5(f), and 9; Tr. (1) at 64-65.

[7] Notwithstanding their representations to New Lead, as is his wont Mr. Justice tried to blame others by arguing that Mr. Williams inflated tonnage to try to fool New Lead.  Tr. (2) at 211.

about Fivemile (Tr. (2) at 77) and Mr. Williams wanted to mine the Fivemile properties. Tr. (2) at 84-86. Mr. Williams has been involved in the coal business for the past 18 years. He has been involved with Fivemile since 2007. *See* D.E. 419, incorporating D.E. 162 (Williams Dep. Tr.) at 6-12. Based upon his cost estimates and potential contracts, he "could profitably mine the Fivemile property." *Id*. at 18-20. *See also* Px. 5 (Patton, "Expert Report on Mineability, Conclusions," ¶2 ("The coal on the Five Mile property is mineable and the Five Mile property represents a good, viable mining opportunity.").

Although his testimony on this subject – like much of his other testimony – was contradictory, when asked whether the company currently mining Fivemile (GSI) would generate enough royalties to pay the full amount of Plaintiffs' damages, Mr. Justice responded, "That's my position, yes sir." Tr. (2) at 207. If true, that would show that the Fivemile coal is mineable.

The only reasonable conclusion that the Court can draw from these objective facts is that after owning the Fivemile Leases for 4-5 years and knowing the quality of the coal and the opportunity it presented, the Defendants thought that the coal was mineable and presented a "win-win" (as Mr. Ball said in Px. 16H) economic opportunity for them.

### 4. The phony tax returns

This Court ordered the Defendants to produce their tax returns on October 8, 2113. D.E. 128. They did not comply with that Order. After their objections were overruled by Judge Van Tatenhove, he ordered them again to produce the returns. D.E. 156. Again, they refused. At the January 10, 2014 hearing, Mr. Dudley acknowledged that they had the returns and could produce them "promptly, very immediately." D.E. 191 at 97. It did not happen. The Defendants persisted in their contumacious conduct.

The sequence of this episode is described in D.E. 265 at 1-6 and D.E. 271 (sealed) at 26-29 and will not be repeated here. Below Plaintiffs will rebut the excuses that the Defendants used at

the hearing to attempt to justify their misrepresentations about the phony tax returns. They did not

deny that the first, phony "returns" were not genuine. Instead they tried to justify what they did by

arguing that holding companies and their subsidiaries often prepare "dummy returns" (as they called

them),[8] (*see, e.g.,* Tr. (1) at 52, 93, 97), to use in preparing a final consolidated return. *See Id*. at 93-

97. Consider just these points in response:

- On March 10, 2016 the Defendants produced what they represented were the tax returns for both KFC and the Justice Companies. Px. 22A-I; Px. 23 A-I. The letter from Defendants' counsel transmitting them stated unambiguously that they were the "tax returns" for both companies. Px. 21. A short time later they represented that these "tax returns" had been prepared by internal accountants and "reviewed by internal management including Jay Justice." Px. 25. ***None of that was true.***

- The phony returns that they first produced ***did not even exist*** in the years in question. Tr. (1) at 170.They were prepared by an outside accountant in January 2016. Px. 41, ¶7.

- That was inconsistent with Defendants prior representations to Plaintiffs, when they said that they had been prepared by in-house accountants and reviewed in the years in question by Mr. Justice. Px. 25.

- The Court ordered Defendants to produce their tax returns, not "dummy returns."

- The "dummy returns" did not even comply with the spirit of the Court Order – they were prepared according to GAAP, not tax accounting. Px. 41, ¶8.

- The Defendants 'March 10, 2016 production did not disclose that they were producing so-called "dummy returns." They represented that they were producing the Defendants' "tax returns."

- One of Defendants' prior filings confirms that they prepared these "dummy returns," which they then called "alone returns," "in order to preserve the confidentiality of the return." D.E. 269-1 at 3. In other words, they were presenting phony documents precisely because they wanted to keep the real returns secret even though the Court had ordered otherwise.

**5. Mr. Justice's testimony about Defendants' Spreadsheets showing alleged expenses**

Mr. Justice's eagerness to testify to things about which he knows little or nothing also is

---

[8] Mr. Getty even had Mr. Justice identify the first, phony returns as "the tax returns," as if they were genuine tax returns. Tr. (2) at 68.

illustrated by his testimony about the data on various Defendants' exhibits, including Dx. 15, 16 and 54. On cross examination, however, it became apparent that he did not have the faintest idea about what much of the data on these exhibits represented or if it is accurate. When cross-examined about these exhibits, Mr. Justice could not verify or explain the figures or the contradictions on them. Here are just some examples:

**Dx. 54:**

Dx. 54 is a spreadsheet entitled "amounts that have been paid to Mr. Brownlow personally for him to use with respect to lessors." Tr. (2) at 78. Mr. Justice next testified that it allegedly depicted amounts paid in connection with both Fivemile and Deep Wood, but could not distinguish between them. *Id.* Deep Wood costs, of course, have no relevance to the present issues. He did not know if there were any errors on it. Tr. (2) at 131.

- When asked about the two entries dated 8/22/2013, he had to "guess" what they were for. *Id.* at 132.

- He does not know what the $50,000 allegedly paid on 3/23/2010 was for or if it had any relation to Fivemile.

- He does not know what the $49,000 entry for 10/7/2010 was for. *Id.* at 135.

- He claimed that the 8/27/2013 entry for $4311.67 was an interest payment. *Id.* In fact, it was payment of attorneys' fees as the first sanction imposed by this Court. *Id.* at 136-37; Px. 30.

**Dx. 16:**

- Mr. Justice did not attempt to verify any of the figures. Tr. (2) at 141-42.

- The exhibit includes alleged costs for both Fivemile and Deep Wood. Mr. Justice does not know how much of the alleged costs relate to either one. *Id.* at 140.

- Mr. Justice did not know if it included payments for Strong Brothers. *Id.* at 140-41.

- This exhibit, which purports to be "Five Mile and Deep Wood Costs," lists alleged compliance costs totaling $147,493 from 2005 through 2018. But, KFC had no interest in Deep Wood after November 2010. And, it never mined Fivemile so it would have had minimal, if any, compliance costs for it. These unexplained figures obviously are unreliable.

- The dates for several of the entries do not match the dates for the same payments shown on Dx. 54. Some are off by as much as two years. Mr. Justice had no explanation. *Id.* at 142-44.

- When shown payments totaling $99,000 that were counted twice, he had no explanation. *Id.* at 144-47.

**Dx. 15:**

- He could not explain why some of the totals on the bottom line for payments made to various landowners did not match the data in the columns that supposedly comprised the totals. Tr. (2) at 147-49.

Mr. Justice's testimony about these exhibits demonstrates in a nutshell his loose approach toward his testimony in this case.

## II. DAMAGE AMOUNTS

**A. Breach of Contract**

**1. Royalties as determined by the Independent Arbiter**

**a. The amount of the award is undisputed.**

Because of the Defendants' default under the Fourth Amendment (Px. 1A), pursuant to Section 7 of the Fourth Amendment, New London retained an independent arbiter, Mr. Conway, to determine the amount of royalties that would have been paid by KFC under the terms of the Fourth Amendment. His report (Px. 1B) was attached as Exhibit 6 to the Amended Complaint. D.E. 40-6. It is undisputed he determined that the lost royalties that would have been paid by KFC, but for its default, are $16,990,900.00. Pursuant to the default judgment, as this Court has noted, this "assessment of damages is immediately due and payable." Px. 1, ¶32; D.E. 302 at 13. Given the contractual role of the Independent Arbitrator (discussed immediately below), because the contract between the parties provides that his estimate of lost royalties is conclusive and binding, that $16,990,900 award is a liquidated sum. It is well-established that where damages are liquidated, a default judgment is conclusive as to the amount of damages as well as liability issues.

26

*See Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6ᵗʰ Cir. 1995) ("***Where damages are unliquidated*** a default admits only defendant's liability and the amount of damages must be proved."); *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012) ("Damages must be proved ***unless they are liquidated or capable of calculation***.") (quoting *Merrill Lynch Mortg. Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir. 1990)); *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof ***unless the amount is liquidated or susceptible of mathematical computation***.").  Because the lost royalties estimated by the Independent Arbiter are a liquidated sum, since that estimation is binding on the Defendants, that amount is established by the default judgment and the Report and Recommendation to the District Judge should so state.

### b. The Independent Arbiter's award also cannot be disputed as a matter of contract.

As can be seen from Paragraph 7 of the Fourth Amendment (Px. 1A at 6), the Independent Arbiter is a "creature of contract."  Paragraph 7 provides in pertinent part:

> Upon the occurrence of an Event of Default, NLTM and Fivemile Energy may exercise any and all rights and remedies available to NLTM at law or in equity by reason of such Event of Default including but not limited to recovery of all fees and expenses incurred by NLTM or Fivemile Energy in their enforcement of the terms of this Agreement and specific performance of the obligations of Kentucky Fuel described herein.  In the alternative, NLTM and Fivemile Energy may determine the estimated lost royalties that it would have received but for the Event of Default by Kentucky Fuel and such amount shall be immediately due and payable by Kentucky Fuel under the terms of this Agreement.  Such royalties shall be determined by an independent arbiter selected by NLTM for the purpose of determining the amount of royalties that would have been paid by Kentucky Fuel to NLTM under the terms of this Agreement. . . .

Px. 1A at p. 5.

In his role as Independent Arbiter, Mr. Conway was not a retained testifying expert.  He was not required to submit a lengthy report.  Mr. Brownlow selected Mr. Conway because he had completed the voluminous and detailed Fivemile Mining Permit Application and therefore he appeared to be the person most knowledgeable about the Property. Px. 2; Tr. (1) at 75.  Even though

his Arbiter's Report (Px. 1B) is short, his permit application (Px. 2) shows that Mr. Conway did a great deal of detailed work on and was familiar with the Property. That application is approximately 1800 pages long. Mr. Conway's engineering stamp and/or signature appear approximately 340 times on different parts of the application.[9] Mr. Conway died prior to the hearing, on May 20, 2017. Px. 3A.

The opening sentence of paragraph 7 of the Fourth Amendment begins by making it clear that it is the Plaintiffs, not KFC, who are permitted to determine the estimated lost royalties: "***NLTM and Fivemile Energy may determine the estimated lost royalties*** that it would have received but for the Event of Default by Kentucky Fuel . . . ." This determination will then be made "by an independent arbiter ***selected by NLTM***." Thus, the Fourth Amendment clearly anticipates a unilateral determination ***by the Plaintiffs*** of lost royalties, through the mechanism of an independent arbiter selected by them.

Paragraph 7 also makes clear that the Independent Arbiter's determination of the "estimated lost royalties" is conclusive. That is because his estimation of the lost royalties is "***immediately*** due and payable by Kentucky Fuel." *See* Px. 1, ¶32. The defenses raised by Defendants, such as the quality of the coal, economic conditions and the like, are irrelevant because they are inconsistent with the Defendants' agreement that the amount determined by the Independent Arbiter would be payable ***immediately***, not after rebuttal evidence, contrary arguments or a six-year delay. Even absent a default judgment, pursuant to their contract the Defendants could not dispute this calculation, because they specifically agreed that the Independent Arbiter would determine the amount due and that they would pay it "immediately." Thus, the Independent Arbiter's award, is conclusive and binding.

---

[9] Those pages are indicated by small red tabs on Px. 2. Tr. (1) at 77-78.

The finality of the Independent Arbiter's award is no different than an award by an arbitrator, whose award is conclusive, absent fraud or any of the other narrow bases for appealing an arbitration award. Mr. Conway was independent: Mr. Brownlow had no prior relationship with him. Tr. (1) at 75. It has long been established that where a contract appoints an arbiter to determine disputes, the arbiter's award is "final and will be enforced." In *Atlantic Painting v. Nashville Bridge Co.,* 670 S.W.2d 841, 843 (Ky. 1984) (A court reviewing an arbitration award is not permitted to "evaluate the evidence for either party and substitute our judgment for that of the arbitrator *if the award is within the scope of the submission* and not fraudulent." (italics in original). *Accord 3D Enterprises Contracting Corp. v. Lexington-Fayette Urban Cnty. Gov't*, 134 S.W.3d 558, 561 (Ky. 2004) ("In reviewing whether an arbitrator exceeded his powers, a court should not review the merits of the award, only whether the issues were submitted and covered by the contract."); *Conagra Poultry Co. v. Grissom Transp., Inc*., 186 S.W.3d 243, 245 (Ky. App. 2006) ("An arbitrator's resolution of factual disputes and his application of the law are not subject to review by the courts."); *Cincinnati S.R. Co. v. Cummings,* 1884 Ky. LEXIS 162, *9 (Ky. Ct. App. 1884) ("It is, we think well settled that a contract made by which a chief engineer is to act as an arbiter between the contractor and the company and his award made final will be enforced.").

With this language Kentucky courts have made clear that the Defendants' efforts to attack the Independent Arbiter's report would be misplaced if Defendants were appealing an award by an arbitrator. If the merits of a properly submitted arbitration award cannot be re-litigated in court, then *a fortiori* a determination by the Independent Arbiter, whose award is supposed to be paid "immediately" should not be subject to second-guessing and 6+ years of additional delay. The binding effect of his award, however, did not preclude the Defendants from putting on evidence of any efforts to mitigate damages. That is what was anticipated by Judge Van Tatenhove's Order, as discussed below.

The unique contractual role of the Independent Arbiter is also highlighted by the fact that Paragraph 7 of the Fourth Amendment provides for two alternative remedies. The first sentence preserves the right of the Plaintiffs to file a lawsuit. The estimate by an independent arbiter is then specified as an alternative remedy. There are both benefits and detriments to each alternative. On the one hand, the Plaintiffs could have relied upon the right to sue instead of retaining an independent arbiter to estimate the lost royalties. With this alternative, they could have retained expert witnesses to prepare and testify about damage models that would have resulted in higher damages. Expert witnesses, however, presumably would be subject to discovery, cross-examination, *Daubert* motions, etc., with the resulting increase in time and money.

Alternatively, if the Plaintiffs elected to use an independent arbiter, his determination would be binding (unlike a report by retained experts in the normal litigation process), and the amount of lost royalties he "estimated" would be due "immediately." This obviously offered what should have been a less expensive alternative than extended litigation, with the additional benefit that the amount determined was due and payable immediately instead of after years of protracted litigation. The tradeoff against this benefit was that the lost royalties determined by the independent arbiter might well be less than those in a damage model prepared by a testifying expert witness. Of course, what Plaintiffs did not know at the time was that they would be saddled with the detriment of a lower award but without the benefit of "immediate" payment, due to the Defendants' bad-faith refusal to honor their contractual obligations.

By electing to pursue the alternative remedy, the Plaintiffs in fact have given up a real potential for a greater recovery. For example, based upon production anticipated in New Lead's mining plan, the provision in the Fourth Amendment for royalties of 2% of the average selling price of coal could have resulted in damages of over $26 million (exclusive of interest) instead of the $16.9 million estimated by the Independent Arbiter. *See* Px. 4C; Tr. (1) at 43; 80; *see also id.* and

Px. 4B. But, the tradeoff for the potentially higher damages was that electing to proceed with litigation was thought to be more time-consuming and expensive than a summary determination by an independent arbiter.

By continuing to dispute the Independent Arbiter's award, the Defendants seek to take advantage of the Independent Arbiter's lower estimate, but still retain the benefit of being able to dispute his award. They were entitled to that additional benefit, however, only if Plaintiffs had foregone the alternative remedy of an expedited award by an independent arbiter in favor of the potential higher reward of using retained litigation experts. That was the bargain that the parties struck in the Fourth Amendment. The Court should enforce it.

The Defendants' conduct in this litigation, in which they continue to insist that they are entitled to attack the Independent Arbiter's award, is a continuing breach of the Fourth Amendment. It is now established that KFC never intended to honor this promise of "immediate" payment (Px. 1, ¶22) and that this failure "was intentional and was part of its business plan and strategy." *Id.*, ¶ 24. To allow the Defendants to contest this award would be to facilitate a continuing breach of the Fourth Amendment. It should not be permitted.

**c. The Defendants have not mitigated damages.**

The Court's order permitting an evidentiary hearing (D.E. 321) stated that the Defendants could "present any evidence regarding mitigation of damages or any other analysis they think is important for this Court to consider." *Id.* at 5. However, the Court emphasized the purpose of the evidentiary hearing: "Allowing Defendants an evidentiary hearing does not condone their past behavior, but ***gives them some process to present evidence of mitigation of damages***." *Id.* at 6. At the beginning of the hearing, this Court emphasized the need to focus on mitigation of damages. Tr. (1) at 22. An example of mitigation of damages could have been the sale of the Fivemile assets to New Lead, ***if*** the Defendants had done what they should have done. After selling the Fivemile

Assets, the Defendants (or their affiliates and Mr. Justice) pocketed at least $8,827,876. *See* discussion above at pp 14-15. If they had remitted that amount to Plaintiffs, it could properly be regarded as a mitigation of damages. It could also be a mitigating factor in connection with punitive damages. But, they did not. The Defendants have not accounted to Plaintiffs for the proceeds, much less remitted it to Plaintiff. They tried to claim that some of the annual minimum royalties were paid from the New Lead proceeds. Tr. (3) at100-01. However, the funds received from New Lead were not put in a separate account or otherwise set aside or held for payments to the Plaintiffs; they were just put into Mr. Justice's personal brokerage account at Goldman Sachs and in an account in the name of "Justice Management Services":

| Date | Amount | Recipient |
|------|--------|-----------|
| 12/23/13 | $508,575 | James C. Justice, III Brokerage Acct. |
| 1/6/14 | $500,000 | James C. Justice, III Brokerage Acct. |
| 1/17/14 | $500,000 | James C. Justice, III Brokerage Acct. |
| 2/19/14 | $339,050 | James C. Justice, III Brokerage Acct. |
| 2/26/14 | $339,050 | Justice Management Services |
| 3/31/14 | $1,084,960 | Justice Management Services |
| 4/30/14 | $1,084,960 | Justice Management Services |
| 6/2/14 | $1,084,960 | Justice Management Services |
| 6/16/14 | $2,068,205 | Justice Management Services |

*See* Px. 13BB, 13CC, 13 DD, 13 EE and 13HH; Tr. (3) at 101-02). The Defendants did not mitigate damages by remitting *any* of these payments to Plaintiffs.

### 2. The amount of Retainer Fees owed is established by the default judgment.

The Defendants' argue that Mr. Brownlow supposedly terminated or abandoned the retainer contract. That argument is pretermitted by the default judgment. As this Court has previously acknowledged, the default judgment established that, "such Monthly Retainer Fees continue to accrue at the rate of $10,000 per month." D.E. 40 (Amended Complaint), ¶23d. In addition, it is established that the Defendants are "obligated to pay all such future fees that accrue from and after

the filing of this Amended Complaint." D.E. 40, ¶28; D.E. 302 at 8-9. This "abandonment" argument also is factually unsupported, as discussed in Section I C, at pp. 11-13, above.

The monthly retainer fees accrue at the rate of $10,000 per month. The only payment ever made was $50,000 paid on May 20, 2011. Tr. (1) at 65. Although Mr. Justice claimed that at some point these fees were "caught up" (*Id.*) at 45), that payment only paid them through April 1, 2011. *Id.* at 65-66. That was just another example of loose testimony by Mr. Justice, who apparently thinks that if he is only 50 days late, he is "caught up." As of December 1, 2018, the principal amount due is $920,000 with accrued interest of $327,333.45. *See* Px. 12.

### 3. Minimum Royalties – The need for a declaratory judgment

The minimum royalties continue to accrue at the rate of $75,000 each year. There is no expiration date for these payments and they are not offset by any production tonnage royalties, if any are ever paid. Even though they are now current, Mr. Brownlow has proven concerns that the Defendants will not pay these amounts in the future, but will force him to file suit for subsequent payments. The evidence supports his concerns.

This Court's initial Report & Recommendation on Damages (D.E. 302) denied Plaintiffs' request for declaratory judgment on the grounds that "[the] Amended Complaint did not seek any declaratory judgment …." and because at that time there were no damages currently owed for these payments. Respectfully, the Court's first ground, i.e., that no declaratory judgment had been sought, apparently overlooked paragraph (3) of Plaintiffs' prayer for relief in which Plaintiffs requested declaratory relief for future minimum royalties and monthly retainer fees. D.E. 40 at 16. In addition, as discussed immediately below, both the Defendants' payment history and their statements during the hearing show the necessity of a declaratory judgment on this issue.

### a. The Defendants' payment history shows the need for a declaratory judgment.

The Fourth Amendment required payments of minimum royalties of $10,000 per month, beginning December 1, 2011, for eleven months, followed by a $15,000 payment on November 1, 2011. Thereafter, the annual minimum royalty was a $75,000, due on December 1 of each year. Px. 1A at p. 4, ¶ 5(f). When Plaintiffs' Amended Complaint was tendered, the unpaid amount was $225,000. KFC had only made one $50,000 payment toward these minimum royalties in May 2011, which paid the minimum royalties only through April 1, 2011. Tr. (1) at 65; Px. 1, ¶¶23 D and C. Even after the Amended Complaint was filed, the Defendant did not take any immediate steps to pay these royalties. However, as a result of this litigation, they finally caught up the minimum royalties in August 2013. Tr. (1) at 72. They then reverted to their former practice. The $75,000 due on December 1, 2013, was not paid for almost a year. *Id*. at 72-73. Of twenty minimum royalty payments, only three have been paid on time. And, the timely payments did not begin until 4 ½ years into this litigation. This pattern of late payments combined with Defendants' business plan and strategy of not paying their debts shows the need for a declaratory judgment.

b. **Defendants' statements during the hearing also show the need for a declaratory judgment.**

Both Mr. Justice's testimony and statements by Defendants' counsel at the hearing show the need for a declaratory judgment. At first, Mr. Justice testified that "we intend to keep making them the minimum payments under the lease." He then was specifically asked:

> So you are representing to the Court then that you are going to continue to make those minimum royalty payments on December 1 of every year?

*Id.*

Mr. Getty then attempted to coach the witness:

> MR. GETTY: If I can interpose, now that I'm counsel in the case, we may actually seek -- we haven't fully discussed but we may file a motion to pay the Court.
>
> THE COURT: A motion to -- all right. Mr. Getty, the witness needs to answer the questions.

After having just said that they intended to keep making the payments, Mr. Justice then reneged:

> Q. …. Are you committing to the Court that you will pay those minimum royalties payments on December 1 of every year to Mr. Brownlow or New London?
>
> A. I'm a little confused about how long those payments should last and given that there is no ability to mine the coal. And I don't think there ever will be, given the quality. We would most definitely surrender the property, surrender the permits to Mr. Brownlow, do that immediately if he would so desire.
>
> Q. I take it in view of your confusion that you just described, you are not prepared to make the commitment to the Court that I just asked you about.
>
> A. I would -- I would like to reserve our right to deal with that at a later date.

Tr. (2) at 194.

That exchange tells us a lot: After Mr. Justice first said they intend to keep making the payments, his counsel interposed a comment. Mr. Justice understood the coaching and began to back-peddle. When pressed, he refused to commit to the future payments that he had committed to make less than one minute earlier. That captures the Defendants' business approach in a nutshell: After promising to make these payments at the bottom of page 193 of the transcript, Mr. Justice reneged on that commitment on the very next page.

Mr. Getty's statement that they may file a motion to interplead the minimum royalties also illustrates the need for a declaratory judgment. There is no point in re-litigating this issue every December when the Defendants file such a motion. Avoiding such unnecessary litigation is the intended purpose of a declaratory judgment. In short, both Mr. Justice's equivocation and refusal to commit to making these payments and Mr. Getty's statement that they may interplead future minimum royalties instead of paying them illustrates the need for declaratory judgment.

### c. Sixth Circuit case law supports the entry of a declaratory judgment.

The decision in *Kelley v. E.I. DuPont De Nemours & Co.,* 17 F.3d 836 (6th Cir. 1994) shows the propriety of a declaratory judgment in this case. *Kelley* was a CERCLA case. The Sixth Circuit

affirmed the district court's grant of declaratory relief awarding future cleanup costs. The court's language is worth quoting because it illustrates the propriety of declaratory relief in this case.

> Declaratory judgment actions present a unique challenge to the case or controversy requirement. In such a case,
>
> > 'the question . . . is whether the facts alleged, under all circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'
>
> . . . . Accordingly, it is not essential that the threatened injury be absolutely 'immediate' and 'real.' The potential for injury need only be 'sufficiently immediate and real[].' As another court has explained, ***a party seeking declaratory relief must allege facts to support a likelihood that his opponent's injurious 'conduct has continued or will be repeated in the future.'***

17 F.3d at 844-45.

The testimony by Mr. Justice and statements by counsel establish that there is a likelihood that Defendants' conduct will "continue or will be repeated in the future." Plaintiffs specifically alleged that Defendants were "further obligated to pay all such future fees that accrue from and after the filing of this Amended Complaint." Px. 1, ¶28. In their Answer, the Defendants expressly denied this liability for future fees. D.E. 152 at 3, ¶16. They have never amended that denial. The Defendants' denial of any liability for future contractual obligations, coupled with their history of nonpayment, combined with Mr. Justice's hedging about whether they will make future payments and Mr. Getty's statements, all establish "facts to support a likelihood that [Defendants'] injurious conduct has continued or will be repeated in the future." *Kelley, supra*, 17 F.3d at 845.

A declaratory judgment regarding the Defendants' obligations to pay these annual minimum royalties in future years will nip future litigation over these same issues. To prevent the Plaintiffs from having to re-litigate this issue every year, the Court should enter a declaratory judgment that the Defendants are obligated to make these payments on December 1 of each year until tonnage royalties totaling $16,990,900 have been paid.

### B.    Fraud Damages

#### 1.    Fraudulent inducement and the economic loss rule

The Kentucky Supreme Court's recent recognition that the economic loss rule can apply to a narrow range of fraud claims does not bar the recovery of the type of fraud damages at issue in this case.  In *Nami Res. Co., L.L.C. v. Asher Land & Mineral, L.T.D.*, 554 S.W.3d 323 (Ky. 2018), the Court vacated an award of punitive damages as improper because they were awarded "for what is essentially a breach of contract."  *Id.* at 328.  Unlike this case, however, *Nami*, was not a fraudulent inducement case.  In *Nami* the plaintiff claimed that the defendant breached a contract for the payment of natural gas royalties.  The similarity of that case to this one stops there.  The fraudulent activity in *Nami* was identical to the breach of contract.  That is not the case here.

The *Nami* plaintiff accused the defendant of "fraudulently underpaying royalties owed under the leases." *Id*.  The claimed fraud was that the defendant had underpaid by misrepresenting the quantity of gas extracted, its sales price and related costs.  *Id.*  That was the same as the breach of contract.  That would be analogous to this case only if the Plaintiffs alleged as both a breach of contract and fraud that KFC underpaid royalties by misrepresenting the tonnage of coal extracted.  In this case, the tort was the fraudulent inducement to Mr. Brownlow to sign the Fourth Amendment, when the Defendants never intended to honor that contract.  D.E. 40 at 14 (Amended Complaint, ¶46).   As a result, the Plaintiffs were damaged because they conveyed the Leases to KFC.  *Id., ¶*47.  The Plaintiffs' loss was of the Leases themselves, which is separate from the loss of the royalty income from the Leases.  This is addressed more fully in Section II B 1 at pp. 36-39, below.

In *Nami* the fraud was concurrent with the breach of contract.  In this case, the fraud came **before** the breach, when the Defendants fraudulently persuaded Mr. Brownlow to sign the contract.

D.E. 40 at 14 (Amended Complaint, ¶45). The *Nami* court expressly recognized that just because a party has a contract does not mean that it cannot also be the victim of fraud:

> However, a party who has been aggrieved by fraudulent or malicious conduct which results in damages that differ from the damages sustained by reason of the breach of contract, may assert an independent claim for such fraudulent or malicious conduct seeking whatever damages are appropriate for the independent claim, including punitive damages if otherwise authorized by law.

*Id.* at 336.

The *Nami* court's concluding words in that part of its decision also highlight its difference from this case. It stated that, the plaintiff "asserts no compensable injury beyond its claim for unpaid royalties, and it alleges no misconduct by Nami other than the conduct of breaching the contract by underpaying the royalties due." *Id.* In contrast to that, in this case, the breach of contract damages are the lost royalties. The fraud damages, as discussed below, are the Strong Brothers lease payments and the value of the Fivemile Assets.

In fact, the *Nami* court's limited application of the economic loss rule was consistent with prior Kentucky law. In *Thomas v. Brooks,* 2007 WL 1378510, at *2 (Ky. Ct. App. May 11, 2007) (citations omitted), the court held:

> [T]ort damages, including punitives, are sometimes recoverable in the context of a contract breach, . . . but this is so ***only when the breach involved independently tortious conduct***. Kentucky law has not recognized a fraudulent misrepresentation claim where a contract is involved ***unless the fraud induced the contract***. This is consistent with the law of other jurisdictions, which have disallowed misrepresentation claims where a contract is involved ***unless the misrepresentation occurred before the contract was formed***, ***it satisfied all the elements of that tort, and it involved either a matter extraneous to the contract's terms or a risk not contemplated to be a part of the contract.***

As the *Thomas* court held, even where there is a contract, a plaintiff can bring a fraud claim where the "fraud induced the contract" and the "misrepresentation occurred before the contract was formed." *Id.* at *2. That ruling was not changed by *Nami*; it is consistent with it and therefore remains the law in Kentucky. That is the case in the fraud established in this case. *See also*

*Biszantz v. Stephens Thoroughbreds*, 620 Fed. Appx. 535, 542 (6th Cir. 2015) (not recommended for full-text publication), where the Sixth Circuit predicted that Kentucky would not employ the economic loss doctrine "to bar claims seeking recession." The damages sought for the value of the Fivemile Assets are, of course, recessionary type damages. *See also Davis v. Siemens Medical Solutions USA, Inc*., 399 F. Supp. 2d 785 (W.D, Ky. 2005) (refusing to apply the economic loss rule to a claim for fraudulent inducement).

2. **The Strong Brothers lease payments are part of the fraud damages.**

The Defendants conceded this category of damages. Tr. (2) at 195-96. The judgment therefore should include this undisputed $20,000 as one element of Plaintiffs' damages for fraud.

The Defendants' responsibility for the Strong Brothers' payments also is relevant to the punitive damages award: The Defendants have forced litigation over this claim for almost seven years, even though they have no defense to it. Not only did they concede at the hearing that they had no defense to this claim; they did not even object to the recommended $20,000 award in their Objections to the Court's Initial Report and Recommendation on Damages. *See* D.E. 305. This illustrates the Defendants' willful misconduct and fraud. The reason that the Defendants did not make these payments is that they never intended to honor this commitment in the Fourth Amendment. *See* D.E. 40 at 3 (Amended Complaint), ¶14. In the context of this case, these four $5,000 obligations were insignificant, at least to these Defendants and to the Justice family. However, they are not insignificant to the landowners of these small Breathitt County properties. Yet, for ***absolutely no reason they refused to make these payments.*** The Court should consider this in connection with the failure to mitigate and the amount of the punitive damages award.

3. **The remaining fraud damages are properly measured by the value of the leases and Permit.**

The damages caused by the Defendants' fraud are the value of the Fivemile assets that the Plaintiffs conveyed to KFC in reliance upon its false representations. The Defendants fraudulently

induced Plaintiffs to enter into the Fourth Amendment by falsely representing that they would keep the promises and make the payments required by that agreement. In reliance upon those misrepresentations, the Plaintiffs transferred the Fivemile Assets to KFC. Instead of paying the Plaintiffs as it was required to do, KFC "flipped" the Assets, selling them to New Lead Holdings, LLC ("New Lead"). But although Mr. Justice and "Justice Management Services" pocketed millions of dollars from this transaction, they never delivered the Assets to New Lead. Under these undisputed facts, the damages caused by the Defendants' fraud are the value of the assets that they fraudulently induced Plaintiffs to transfer to them.

As discussed in Section I D 1 at pp. 13-15, above, the value of the Fivemile Assets as evidenced by the New Lead transaction is at least $12,327,876, which was the amount received by Mr. Justice, "Justice Management Services" and the other sellers. A second way to measure their value is by Mr. Ball's formula of $1/ton for the reserves. As discussed at p. 17 above, Mr. Ball's methodology of valuing the leases at $1 per ton yields a value of $16,740,900. Third, the value also can be measured by the amount that an arms-length purchaser was willing to pay to acquire these assets, which was the $21,855,000 that New Lead spent to acquire them. *See* Px. 13FF. That figure is consistent with Mr. Justice's suggestion that it could be worth $20,000,000. *See* Tr. (2) at 35.

In its initial Report and Recommendation on Damages, this Court recommended against this measure of damages based upon a narrow reading of the Amended Complaint in this case. The Plaintiffs respectfully request that the Court take a fresh look at this issue for the reasons discussed below. The "big picture" in this case is that the Defendants fraudulently induced the Plaintiffs to transfer these assets to them, they then sold the assets for millions of dollars, kept all the proceeds, and still retained possession of the assets. ***None of this was known as of the deadline for Plaintiffs to amend their Complaint.*** Equally important, there is no prejudice to the Defendants by allowing

40

this measure of damages, ***because all the relevant damages information and data has been within the control of the Defendants***.  They affirmatively concealed it from the Plaintiffs.

      **a.**    **The Court should allow this measure of damages based upon the Amended Complaint and the circumstances of this case.**

As shown below, allowing this measure of damages is supported by the facts of this case, by the language in the Amended Complaint, by relevant case law and by Rule 15, Fed. R. Civ. P.

The Amended Complaint was tendered to the Court on January 2, 2013, which was the deadline for amending the pleadings.  D.E. 16 at 3.  At that time Mr. Brownlow and the Plaintiffs had no idea that the Defendants had already entered into an agreement – actually *five* agreements – to transfer the Fivemile Assets to New Lead.  The Defendants' first disclosure to the Plaintiffs about anything relating to New Lead was on March 19, 2013, when Mr. Justice told Mr. Brownlow and his son that he was thinking of doing a deal for the Fivemile Assets with New Lead.  Tr. (1) at 185.  By this time, however, KFC had already entered into the *Fifth* Amendment to the Fivemile APA.  *See* Px. 13T.  It had already been paid $350,000 towards the purchase price.  In fact, almost two months before the deadline for amending the Complaint, both Defendants and New Lead had entered into the ***Third*** Amendment to the Fivemile APA, which provided that a $7,500,000 portion of the purchase price payable to KFC would be made by a secured promissory note from New Lead.  Px. 13C, p. 2. The Defendants concealed all this from Mr. Brownlow.  It was not just passively concealed; it was affirmatively misrepresented.  Tr. (1) at 185.

None of this was known at the time of the January 2013 deadline for amending the complaint.  Plaintiffs only began to piece together the story much later when information began to trickle out (or was pried out).  Defendants produced a small number of documents relating to this transaction and Plaintiffs had to resort to a Motion to Compel.  Even when Plaintiffs filed their initial Rule 55 Motion, they did not know all the details of the transactions and were still trying to reconstruct what had happened.  In fact, as described in Plaintiffs' Renewed Motion for Sanctions

(D.E. 378), Defendants continued to dribble out information until September 2017.  The production is still incomplete, in violation of the Court's production orders and the duty to supplement.

The initial Report & Recommendation on Damages (D.E. 302) recommended against damages based upon the value of these assets because they had not been specifically pleaded in the Amended Complaint.  But these damages could not have been alleged before the deadline for amending pleadings, because the Defendants had affirmatively concealed them.  The Amended Complaint should be read broadly to permit the recovery of these damages for fraud under these unique circumstances, especially since it did allege that Plaintiffs "have been damaged in that [they] conveyed the new Fivemile Energy leases to Kentucky Fuel, in reliance upon Kentucky Fuel's representations that it was entering into the Fourth Amendment in good faith and would perform its obligations thereunder in good faith." Px. 1 at 14, ¶47.  Although the same paragraph does allege lost royalties, *it does not limit the damages to lost royalties* and those were the only damages known at the time due to the Defendants' concealment of the New Lead transaction.  Not to do so would effectively permit the Defendants to steal Plaintiffs' assets, "flip" them to a third party, pocket over $8 million, and still retain control of the same assets.

Moreover, in addition to lost royalties, paragraph (5) of the prayer for relief requests "the recovery of [s]uch other and further relief as may be necessary and proper."  This can also be regarded as a simple matter of restitution.  Given the fact that the Defendants fraudulently deprived Plaintiffs of the Fivemile Assets, reaped enormous profits from them and kept the assets, restitution in the form of the monetary value of these assets is an appropriate remedy.  It certainly falls within the broad relief requested in paragraph (5) of the Amended Complaint's Prayer for Relief.

A reading of the Amended Complaint to allow recovery of the value of the Leases is supported by case law.  A case remarkably similar to this one addresses this exact situation. In *Sarlie v. E.L. Bruce Co.*, 265 F. Supp. 371 (S.D. N.Y. 1967), a stockholder (Sarlie) sued for

securities fraud. The Defendants counterclaimed and alleged that Sarlie manipulated stock and engaged in other unlawful activities. Sarlie failed to appear for his deposition. The company was awarded a default judgment based upon his failure to obey a court order to attend his deposition. The parallels with this case are obvious. The court held a hearing on damages, including damages caused by Sarlie's stock manipulation. Sarlie tried to limit the company's ability to prove damages based on the formula it had pleaded. *Id.* at 375. At trial the company sought to recover based upon a simpler model of damages. *Id.* at 376. As in this case, the company argued that Sarlie's default in discovery had prevented it from developing the theory of damages pleaded in its complaint. The court allowed the company to recover based upon the unpleaded theory. Its reasons resonate here:

> This court is unimpressed by the arguments advanced by Sarlie's able counsel, when they are considered in light of the fact that it was Sarlie's own conduct which prevented the application of the pleaded theory of damages. To permit Sarlie to prevail on the theory it has advanced would be to give to him a windfall to which in business morals and good conscience, he is not entitled.

*Id.* at 376.

The similarities between these two cases are striking. In this case, exactly as in *Sarlie*, the Plaintiffs seek to recover based upon a damages model that is not specifically pleaded in their complaint. In this case, too, the omission is due to the Defendants hiding the relevant evidence. As in *Sarlie*, this Court should allow a recovery based upon the alternate measure of damages to prevent "a windfall to which in business morals and good conscience, [the defendants are] not entitled." *Id.* at 376.

If the Court has any doubt about the propriety of construing the Amended Complaint to allow recovery of the value of the Fivemile assets transferred, then the Court can and should construe the Complaint as amended to make this specific allegation. In *Sarlie,* the court allowed the counterclaimant/company to move to increase the amount of damages sought ***at the damages hearing.*** *Id.* at 377. *See also Peitzman v. Illmo,* 141 F.2d 956, 960-62 (8th Cir. 1944) (allowing a

plaintiff to amend its pleadings during the course of a hearing on damages to increase the amount prayed for after default had been entered against defendants for their failure to appear at properly-noticed depositions). Such an amendment is expressly permitted, even after trial. *See* Fed. R. Civ. P. 15 (b)(2).[10] *See also* Fed. R. Civ. P. 15 (b)(1) ("The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits.").

This is only fair under the circumstances of this case. There is no prejudice to the Defendants in amending the Complaint to claim this category of damages. ***All of the information has been within the control of the Defendants, not the Plaintiffs. The Plaintiffs are not relying upon a single document from the Plaintiffs' own file to prove the amount of these damages***. The Defendants hid this information and now oppose damages based upon the transaction and the Plaintiffs' inability to plead the facts that the Defendants concealed from them. Fundamental fairness requires that the Plaintiffs be allowed to recover damages measured by the value of the Fivemile assets. Under these circumstances, and especially because these facts were not known by the Plaintiffs in time to file a timely motion for leave to amend, the Court should, if necessary, construe the Complaint as having been amended to claim this category of fraud damages.

> **b.** **The Court should also allow this measure of damages as a Rule 37 remedy.**

The Court should also award the value of the Fivemile assets as evidenced by the New Lead transaction, pursuant Rule 37, as a remedy for Defendants' discovery violations. This is set forth in detail in Plaintiffs' Renewed Motion for Sanctions (D.E. 378) and supporting Memorandum (D.E. 378-1), which will not be repeated here.

---

[10] "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue."

There were, however, other issues raised during the hearing that are relevant to the Rule 37 Motion because they relate to the Defendants' failure to provide or supplement discovery responses, which was the central issue in the Renewed Motion for Sanctions. The first is the Defendants' failure to identify litigation to which they were parties. In response to Plaintiffs' Interrogatory requesting the identification of litigation in which either had been involved "from January 1, 2005 to the present," Defendants identified 22 suits, all in Kentucky state courts. No federal litigation was identified. Px. 7, Answer to Interrogatory No.12. They never supplemented that answer. Tr. (3) at 83-84. Px. 15 is a partial list of litigation responsive to that same Interrogatory that was not disclosed. Seven of the suits on Px. 15 were filed before and should have been disclosed in the Answers that are now Px. 7. Of the remaining 31 suits on Px. 7, at least 30 should have been identified in a supplemental response,[11] but never were.

This lackadaisical approach has permeated this litigation. The obvious purpose of the Interrogatory was to discover information that could lead to the discovery of other evidence, such as mining contracts where the Defendants had used specific language that required them only to mine "mineable and merchantable" coal.[12] *See, e.g.,* Tr. (2) at 176; Px. 32. Thus, the Interrogatory did not ask for just current or pending suits; it sought the identification of ***all*** suits. Even if a suit had been resolved, it was required to be disclosed. And that is what Mr. Ball's sworn Answer purports to provide with no limitation. It was just another of his incorrect sworn statements. The Defendants, as is their custom, attempted to shift the blame to someone else: It is never *their* fault. This time they argued that Plaintiffs' counsel could have learned the irrelevant "fact" that many of the suits had been resolved by the time of the hearing. *See* Tr. (3) at 181; 213. That argument, however,

---

[11] Mr. Ball contended that one of the suits was a worker's compensation suit, which was not required to be disclosed. Tr. (3) at 217.

[12] In fact, one of the undisclosed suits that Plaintiffs were able to discover on their own yielded exactly that. *See* Px. 36 and discussion at p. 9, above.

ignores the plain language and the purpose of the Interrogatory as well as the duty to supplement. The Defendants also attempted to excuse themselves by suggesting that if a suit involved an insured claim, they did not have to identify it. *See* Tr. (3) at 13; 217. That limitation, however, obviously was not in the Interrogatory (or the Answer to it) and given the purpose of such Interrogatories, it is not justification for an incomplete response or failure to supplement.

Another example of the Defendants' failure to supplement responses was their failure to ever supplement their document production by producing the emails and drafts of the Fourth Amendment. *See* Tr. (3) at 155. As discussed at pp. 8-9 and 18-19 above, the November 12, 2005 draft of the Fourth Amendment was critical because it showed that the kind of language that the Defendants now seek to add to the contract was expressly deleted during the negotiating process. Their failure to supplement their document production by producing the drafts of the Fourth Amendment and related emails supported their pre-hearing strategy of claiming that the covenant to mine was somehow inserted "unbeknownst to Messrs. Ball and Merritt." *See, e.g.,* D.E. 375-1 at 4-5.

**C.      Punitive Damages**

The punitive damages issue was briefed in Plaintiffs' Memorandum in Support of Renewed Motion Under Rule 55 (D.E. 270-1) at pp. 21-35. Plaintiffs will not repeat that discussion but encourage the Court to review that briefing. The discussion below will highlight come of the additional evidence from the hearing that relate to some of the KRS §411.186 factors.

**1.      KRS § 411.186 Factors**

**a.      The profitability of the misconduct to the Defendants**

The Court should consider the fact that the Defendants funneled $8,827,876 from the New Lead purchase price to Mr. Justice and "Justice Management Services" when they flipped the Fivemile Assets to New Lead and then never delivered them. *See* pp. 13-15 and 31-32, above.

**b.      The duration of the misconduct and any concealment of it by the Defendants**

In considering the duration of the misconduct, the Court should also consider that the misconduct and the Defendants' failure to take responsibility for it continues. The Defendants still show no remorse over their actions. Instead of accepting responsibility, they consistently try to shift the blame to others. They constantly blame other people for their misconduct. They blame Mr. Brownlow for supposedly misleading them about the coal; they make false statements to blame Mr. Lucas for Mr. Justice's no-show; they blame Mr. Schmid for supposedly sneaking the Covenant to Mine into the Fourth Amendment without their knowledge. They blame everybody but themselves. If it is not Mr. Brownlow, it is Mr. Lucas; if not Mr. Lucas, it is Mr. Dudley; if not Mr. Dudley, it is the Magistrate Judge (D.E. 305 at 3,4 and 32); or the Independent Arbiter (*id.* at 10-11); or prior counsel (*id.* at 4); or even the District Judge (*id.* at 19 & 32-33). It is ***anybody*** but themselves. It is even New Lead -- One of Mr. Justice's emails provides additional insight into that strategy. Writing to one of his in-house lawyers about their dispute with New Lead, Mr. Justice asked, "Anyway to lay the Brownloe [sic] deal on them? Let's all gameplan." Px. 13GG. After Mr. Deane responded, "Maybe", Mr. Justice suggested: "Here is what I'm thinking. ˜ we tell New Lead that they have cost us a fortune. + we now have Brownlow because of them." *Id.* Only a good dose of punitive damages is likely to have any deterrent effect.

The Court should also consider that Defendants tried to conceal the amount of the New Lead payments from New London. Tr. (3) at 104-09.

    **c.**        **Any actions by Defendants to remedy the misconduct once it was discovered.**

After representing to the Court that one of the reasons for flipping the Fivemile Assets to New Lead was to mitigate damages (*see* D. E. 394 at 16), Defendants did nothing to mitigate the harm by remitting those proceeds to Plaintiffs. See pp. 31-32, above.

    **2.**   **United States Supreme Court and Constitutional considerations.**

    **a.**       **Degree of reprehensibility**

The Defendants' business strategy of intentionally not paying their debts is relevant to this factor. Mr. Brownlow's Contact Log (Px. 10) sheds light on this. In a conversation with Mr. Merritt on 1/9/12, when Mr. Brownlow asked about the status of one of the past due Strong Brothers' leases (the Combs lease), Mr. Merritt told him that he would "try to pry it loose." Px. 10 at 4. Mr. Merritt had to try to "pry it loose" as opposed to KFC simply honoring its financial commitments, because, as Mr. Merritt said, Jay Justice "just doesn't want to pay." Id. at 7. This care free attitude toward paying their legitimate debts also was reflected in Mr. Justice's testimony about the Strong Brothers leases. Mr. Justice testified that he did not know if the Strong Brothers lessors were paid (they undisputedly were not) because they had finished mining, the site was reclaimed and there was no need for KFC to keep the lease. However, he paid no attention to whether KFC still had a lease obligation he did not know the term of the lease; he did not know whether KFC took any action to terminate the lease or if it just stopped paying; he was then asked:

> Q.     Isn't it a fact that you just stopped paying? You didn't terminate it. The term hadn't expired. You just stopped paying?
>
> A.     Well, I told you I just don't know.

Tr. (2) at 248.

That answer is revealing. Mr. Justice's view is that once KFC has reaped all *its* benefits, it can simply walk away from its payment obligations, without regard to the term of its contracts. That is exactly what the Defendants did to Plaintiffs: They got Plaintiffs' Fivemile Assets, made millions of dollars by selling them to New Lead, kept possession of the Assets, and paid nothing to the Plaintiffs because they already had what they needed from the Plaintiffs. What a scam.

In addition, in *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996) the Supreme Court held that the Court can consider "acts of affirmative misconduct [and] concealment of evidence." *Id*. at 579. In that regard, the award of punitive damages should take into account the following:

48

- The Defendants' refusal to pay the Strong Brothers lease payments for as long as *seven* years (see Px. 8) when they have no defense and concede this claim.

- The Defendants' repeated and continuing failure to supplement their discovery responses even after they previously had been sanctioned for such conduct. *See* pp. 44-46 above.

- The Defendants' lies about Mr. Lucas' alleged failure to communicate with them about the deposition schedule, without the slightest attempt to verify their false testimony by reviewing the record in this case. *See* pp. 19-22, above. Recall that Mr. Lucas initially objected to this testimony, but it was admitted in response to Plaintiffs' argument that it was relevant to punitive damages, as it indeed proved to be. Tr. (2) at 58.

- Habitual false testimony and representations throughout the hearing, including that Mr. Brownlow misled Defendants about the coal when that conflicted with Mr. Justice's own prior declaration (*see* pp. 2-3, above); that Mr. Justice was deeply involved in the Greenbriar negotiations when his prior affidavit denied that (*see* p. 4, above); that Mr. Brownlow had done nothing under his consulting agreement after the last payment of a retainer fee (*see* pp. 11-13, above); that Mr. Schmid secretly slipped the Covenant to Mine into the Fourth Amendment without their knowledge (*see* pp. 18-19, above). This list could go on.

- The Defendants' tender of phony tax returns. *See* pp. 23-24, above.

## III. CONCLUSION

Damages should be awarded as follows:

(1) Breach of contract: $17,910,900 ($16,990,900 for Independent Arbiter's Report and $920,000 retainer fees (as of December 1, 2018));

(2) Fraud: Minimum of $12,327,876 (price paid to sellers); maximum of $21,855,000 (amount invested by New Lead); and

(3) Punitive damages: An amount equal to a 1:1 ratio of the compensatory damages for fraud.

(4) Interest should be awarded consistent with the original Recommendation on Damages, D.E. 302. The award of attorneys' fees should be reserved until the District Judge has ruled on any objections to the current Report and Recommendation.

_/s/ Scott M. Webster_                          _/s/ John A. Lucas_
Scott M. Webster                             *John A. Lucas (011198)
**TOOMS, DUNAWAY & WEBSTER**       **HOWARD & HOWARD, P.C.**
1306 West Fifth Street, Suite 200           4820 Old Kingston Pike
P.O. Box 905                                 Knoxville, TN 37919
London, Kentucky 40743-0905          865.588.4091 (telephone)
606.864.4145 (telephone)               865.588.4206 (facsimile)
606.878.5547 (facsimile)                jlucas@howardhowardlaw.com
swebster@toomsdunaway.com           ***admitted pro hac vice***

***Counsel for New London Tobacco***       ***Counsel for New London Tobacco***
***Market, Inc., and Fivemile Energy, LLC***    ***Market, Inc., and Fivemile Energy, LLC***

<u>**CERTIFICATE OF SERVICE**</u>

       I hereby certify that a true copy of the foregoing has been served electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt of this 27th day of February, 2019.

                               /s/ John A. Lucas