UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| NEW LONDON TOBACCO MARKET, INC., and FIVEMILE ENERGY, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | No. 6:12-CV-91-GFVT-HAI |
| v. | ) ) | REPORT & RECOMMENDATION |
| KENTUCKY FUEL CORPORATION and JAMES C. JUSTICE COMPANIES, INC., | ) ) ) | & ORDER |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Following a three-day hearing in December 2018 (D.E. 415, 416, 418) and post-hearing briefing (D.E. 428, 432, 433), the Court offers recommendations on the damages to be awarded after entry of default judgment (D.E. 206) against Defendants on Counts I, II, and V of the Amended Complaint (D.E. 40).  Also pending is Plaintiffs' renewed motion for sanctions (D.E. 378, 394, 410) and Defendants' motion for leave to file a sur-reply to their post-hearing brief (D.E. 434, 435, 436).[1]  This Report & Recommendation ("R&R") completely supersedes the R&R on damages filed in January 2017 (D.E. 302).  All page number references are to the page numbers generated by ECF.

## I.  Introductory Remarks

Through litigation misconduct, Defendants earned the heavy sanction of default judgment against them.  The undersigned's previous recommendation as to the damages due to Plaintiffs (D.E. 302) was rejected by Judge Van Tatenhove, who referred that issue back to the

---

[1] Also unresolved are Defendants' August 1, 2017 objections (D.E. 346) to the undersigned's July 19, 2017 order (D.E. 343) concerning the sealing of certain documents.  Of course, Judge Van Tatenhove will resolve those objections.

undersigned for an evidentiary hearing and renewed recommendation. D.E. 321. After significant pre-hearing planning and preparation, the hearing was held over three days and post-hearing briefs have been submitted. Although illuminating, the evidence does not change much of the undersigned's previous analysis, particularly the appropriate interpretation of the contract at issue.

The hearing underscored what has been obvious from the outset—the parties are highly sophisticated and they knew the business risks they assumed. The parties entered into a detailed series of contractual arrangements, but their relationship soured and this lawsuit resulted. Defendants are essentially stuck with the impact of the risks they assumed through a negotiated contractual provision giving Plaintiffs the power to define the lost royalties in the event of a default. Escaping those risks at this point would require reformation of the contract. Reforming the contract is not the undersigned's function. The undersigned again recommends that the contractual remedy at issue be enforced as written. Plaintiffs also continue to be entitled to damages for their fraudulent inducement claims, including punitive damages. While the total damages are significant, in the tens of millions of dollars, this outcome is the appropriate result given the business risks assumed by Defendants and their demonstrated misconduct to avoid those risks.

Defendants' misconduct throughout this litigation was designed to forestall the inevitable—paying Plaintiffs what is owed. During the hearing, the defense witnesses professed their remorse for how this case has been litigated, assuming responsibility at times while also placing blame elsewhere. The undersigned is quite familiar with sincere expressions of remorse having seen hundreds upon hundreds in criminal cases. That sincerity here is lacking.

Remarkably, the misconduct continued even after the evidentiary hearing.  Defendants'
post-hearing brief attempted to include a sworn statement and 79-page expert report obtained
from Kent Gross, whom they described as having been first revealed in March 2019, months
after the hearing.  The evidence from Gross was purportedly "critical" and "highly relevant"
concerning mineability, and the defense claimed it "had no way" to know of its existence before
the hearing.  The undersigned denied the attempt to rely upon this after-acquired evidence.  D.E.
431.  Then, Plaintiffs pointed out that Gross was in fact on Defendants' pre-hearing witness list
and had even been identified by Defendants in other filings of record.  D.E. 433 at 3-6.

This means that even the entry of default judgment and potential damages in the tens of
millions of dollars have not prevented continued misrepresentations from Defendants.
Hopefully, the recommendations made herein will prompt a speedy resolution of the case, at
least in this Court.  But, if the misconduct continues, the District Judge should consider pursuing
additional sanctions as an exercise of inherent authority under *Chambers v. NASCO, Inc.*, 501
U.S. 32 (1991).  At a minimum, their continuing misconduct means the undersigned, and the
District Judge, must view Defendants' testimony and arguments with skepticism.

## II.  Procedural and Factual Background

This is a highly contentious lawsuit involving leases to mine coal.  Plaintiffs are New
London Tobacco Market ("NLTM") of London, Kentucky, and its agent Fivemile Energy, LLC,
of Tennessee.[2]   In 2012, Plaintiffs sued Defendants Kentucky Fuel Corporation and James C.
Justice Companies, Inc., for breach of contract and fraudulent inducement related to an
agreement to mine coal (the Fourth Amendment to the original asset purchase agreement).
Plaintiffs claim they entered into the Fourth Amendment because Defendants had delayed

---

[2] A companion lawsuit involving the same parties, 6:17-CV-245-GFVT, is currently stayed pending resolution of
this matter.

mining the coal.  According to Plaintiffs, the purpose of the Fourth Amendment was to obtain a firm promise to begin mining.  The lawsuit is based on Defendants' failure to mine, failure to pay required fees, and their false promise to mine whereby they induced the contract.

On September 30, 2014, District Judge Van Tatenhove granted Plaintiffs' request for a default judgment against Defendants as to liability on Counts I, II, and V of the Amended Complaint as a sanction against Defendants under Federal Rule of Civil Procedure 37(b)(2) for their deliberate noncompliance with multiple discovery orders.  D.E. 206.

Count I alleges that Defendants breached section 9 of the Fourth Amendment by (1) failing to pay required minimum royalty payments and (2) failing to pay monthly retainer fees. D.E. 40 at 10.  Count II alleges that, as a result of the breach, Defendants owe lost tonnage royalties, which Plaintiffs calculated using an independent arbiter as authorized under section 7 of the Fourth Amendment.  *Id*. at 11.  Count V alleges that Defendants committed fraud to induce assent to the Fourth Amendment because they "did not intend to honor their obligations or to make the payments due when they were required."  *Id*. at 14-16.

During this litigation, details of the "NewLead" (or "New Lead" or "Newlead") transactions relating to the coal at issue also came to light.  This case was filed on May 8, 2012. D.E. 1.  Also in 2012, Defendants and other entities entered into a series of transactions that included conveying the Fivemile leases and permits (the same leases and permits that were the subject of the Fourth Amendment) to a Bermuda company, NewLead Holdings, Ltd.  These transactions will be described in Section V.B.3.ii.

In a September 15, 2015 Order, Judge Van Tatenhove referred to the undersigned "as he deems necessary, [to establish] a briefing schedule, and hold[] proceedings to make appropriate findings and issue a recommendation regarding damages on Counts I, II, and V (although the

4

Court anticipates that such recommendations will not be made until after Counts III and IV are resolved)." D.E. 227 at 7.

On January 4, 2016, Plaintiffs sought voluntary dismissal of Counts III and IV. D.E. 245. That motion was granted on February 2, 2016. D.E. 251. The same order directed the undersigned to "(l) hold any proceedings necessary to make appropriate findings of law and fact regarding damages as to Counts I, II, and V of the Plaintiffs' Amended Complaint and (2) issue a report and recommendation regarding these damages." *Id*. at 6.

Two rounds of briefing followed, and the undersigned issued the R&R on damages on January 17, 2017. D.E. 302. The undersigned determined that the record relating to damages was unusually robust and no hearing was necessary. *Id*. at 3-7. The undersigned recommended an assessment of damages and prejudgment interest, and Defendants objected (D.E. 305).

Judge Van Tatenhove ultimately rejected the January 2017 R&R and ordered an evidentiary hearing. D.E. 321. Judge Van Tatenhove found it unwise to proceed without a hearing absent clear guidance from the Sixth Circuit on the necessity of a hearing. *Id*. at 1. He found that "an evidentiary hearing is warranted in this matter because of the complicated nature of damages and the need to promote judicial efficiency by reducing the chance of appeal." *Id*. at 4. Judge Van Tatenhove was also "hesitant to rely primarily on the very short independent arbiter's report to award damages of such a magnitude." *Id*. at 5. He described the report as "a mere two pages that did not consider the market or the ability for Defendants to remove coal." *Id*. at 6.

Judge Van Tatenhove explained:

Defendants should still have the opportunity to speak meaningfully towards the damages calculation this Court will award and present any evidence regarding mitigation of damages or any other analysis they think is important for this Court to consider. After analyzing the record in this case, though some damages can be

> mathematically calculated, the logistics of mining coal necessarily complicate the analysis of damages. To be clear, an evidentiary hearing into damages does not mean that Judge Ingram's conclusions as to damages will change. $60 million in damages may be an accurate assessment, but it is in the interest of justice to allow Defendants a final time to be heard before such damages are imposed.

D.E. 321 at 5. He further explained:

> Allowing Defendants an evidentiary hearing does not condone their past behavior, but gives them some process to present evidence of mitigation of damages. Further, this Court is hopeful that, with new counsel, Defendants will take their responsibilities more seriously moving forward. [*See* R. 289.] This Court is mindful of judicial efficiency and the desire to reduce appellate work. In granting an evidentiary hearing, this Court hopes to reduce the chance of appeal and increase the chance of a timely resolution to this lengthy case.

*Id*. at 6.

The evidentiary hearing was conducted December 11-13, 2018. D.E. 415, 416, 418. William Brownlow IV, president of New London Tobacco Market and Fivemile Energy, testified for Plaintiffs. James C. "Jay" Justice III, current president and CEO of James C. Justice Companies and Kentucky Fuel, and Stephen W. Ball, vice president and general counsel for James C. Justice Companies and Kentucky Fuel, testified for the defense. The transcripts are in the record. D.E. 423, 424, 426. Thousands of pages of exhibits were submitted. D.E. 417. The Court has carefully considered all the evidence in the record.

In line with Judge Van Tatenhove's order, this R&R will focus on the facts from the evidentiary hearing that Defendants rely on in their post-hearing briefing. The Court will consider the issues flagged by Judge Van Tatenhove—mitigation of damages, the logistics of mining coal, the coal market, and Defendants' ability to remove coal. D.E. 321 at 5-6.

### III. Damages Under Count I
### (Minimum Royalty Payments and Monthly Retainer Fees)

In Count I, Plaintiffs allege that Defendants failed to pay the minimum royalty payments and monthly retainer fees required under the Fourth Amendment. D.E. 40 at 10.

## A.  Monthly Retainer Fees

The monthly retainer fees pertain to the "Strong Brothers" property.  The fees are described in section 9 of the Fourth Amendment.  That section begins by noting that

> The Strong Brothers Property is one of the properties leased by Fivemile Energy. Kentucky Fuel previously requested that NLTM assist Kentucky Fuel in completing documentation of the permitting and leasing of . . . the "Strong Brothers Property".  Such permitting and leasing has been partially completed to the satisfaction of Kentucky Fuel but remains ongoing.  Additionally, Kentucky Fuel has requested that NLTM, from time to time, provide additional services to Kentucky Fuel in connection with multiple properties and assignments, including but not limited to the Strong Brothers Property.

D.E. 40-5 at 6-7.  Against this historical backdrop, section 9 describes the retainer fee payments and how the retainer agreement can be terminated:

> In consideration of the previously performed services, and the anticipated future services to be provided by NLTM, Kentucky Fuel agrees to pay NLTM a monthly retainer fee in the amount of $10,000 paid in arrears beginning December 1, 2010, and on the first day of each month thereafter and continuing until terminated by mutual agreement of the parties; provided, however, Kentucky Fuel or NLTM shall have the right to terminate such payment upon providing thirty (30) days prior written notice and, thereafter, neither Kentucky Fuel nor NLTM shall have no [sic] further obligation to provide services to Kentucky Fuel.

*Id*. at 7.  The Amended Complaint alleges that Kentucky fuel paid $50,000 in retainer fees on May 2011 but has not paid any since then.  D.E. 40 at 7-8.  This appears to still be the case.  D.E. 428 at 36.

Defendants argue that any of Plaintiffs' consulting services secured by the retainer agreement ended at the latest when this suit was filed in May 2012.  D.E. 432 at 34.  Mr. Brownlow, they say, breached the contract himself—by the time this suit was filed, he had "stopped his work for Defendants and Defendants' obligation to continue to pay him likewise

logically ceased."[3]  *Id.*  Accordingly, Defendants ask that damages for retainer fees be cut off at the date the lawsuit was filed in May 2012.[4]  *Id.*  Plaintiffs have argued that Mr. Brownlow did continue to provide consulting services.  D.E. 428 at 14-16.

In a previous filing, Defendants argued for a finding of abandonment.  D.E. 262 at 20-22. Defendants might have a valid claim of abandonment if not for the fact that this case is controlled by the award of default.  Liability is established and the facts pleaded in the complaint must be taken as true.  *United States v. Conces*, 507 F.3d 1028, 1038 (6th Cir. 2007).  Count I of the Amended Complaint states:

> Justice has failed to pay the Monthly Retainer Fee and minimum royalty payments as required by Section 9 of the Fourth Amendment.  Pursuant to its guaranty, Justice presently is liable to NLTM in the amount of $435,000 for the unpaid Minimum Royalty Payments and the Monthly Retainer Fees, and is *further obligated to pay all such future fees that accrue from and after the filing of this Amended Complaint.*

D.E. 40 at 10 (emphasis added).[5]

Regardless of Defendants' arguments regarding abandonment or rescission, the effect of the default awarded to Plaintiffs is a finding that retainer fees have continued to accrue after the filing of the Amended Complaint.  By provoking the Court to sanction them by way of a default

---

[3] William G. Brownlow is president of NLTM.  D.E. 40 at 1.  He and his wife constitute the members of Fivemile. *Id.*  As such, he was responsible for performing the occasional "additional services" contemplated by section 9 of the Fourth Amendment.

[4] In an earlier filing (April 1, 2016), Defendants state that they "now provide clear notice that Mr. Brownlow's services were and have been terminated."  D.E. 262 at 22.  This is apparently a reference to section 9 of the Fourth Amendment, quoted above, which provides the right to terminate the consulting services agreement "upon providing thirty (30) days prior written notice."  D.E. 40-5 at 7.  However, section 16 of the Fourth Amendment describes how notices are to be made—"delivered in writing by certified mail, postage prepaid, or delivered by overnight delivery addressed to the party for whom intended at the address specified below."  D.E. 40-5 at 7.  Plaintiffs argue this procedure was not followed, so the April 2016 notice was ineffective.  D.E. 428 at 14.

[5] Defendants have argued that the italicized language is a legal conclusion, not a factual assertion.  D.E. 305 at 32. Even so, the Court cannot determine based on the record whether or when the retainer fee/consulting services obligations may have terminated.  Clearly, Mr. Brownlow continued to provide services beyond the filing of the complaint.  *See* D.E. 428 at 14-16.  Without an adequate factual basis to establish a cutoff date, the Court recommends the award of fees through the date of judgment.

judgment, Defendants are liable as defined by the Amended Complaint and therefore must pay these fees regardless of whether they feel Mr. Brownlow has continued to provide meaningful consulting services. Moreover, the retainer fees were designed not solely for ongoing services, but also as compensation for services already rendered regarding the Strong Brothers property. D.E. 40-5 at 6-7.

The undersigned recommends that damages under the retainer fee provision be assessed as of the date of final judgment. Although the fees may continue to accrue until judgment is rendered, currently 102 months have passed since December 1, 2010, when the first monthly payment was due. D.E. 40-5 at 7. Defendants have already paid $50,000. D.E. 40 at 7-8. Subtracting $50,000 from $1,020,000 yields a result that Defendants currently owe $970,000 in unpaid retainer fees.[6]

### B.  Annual Minimum Royalty Payments—Declaratory Judgment

The next issue under Count I is the minimum royalty payments. Under section 5(f) of the Fourth Amendment, Kentucky Fuel promised to pay NLTM $10,000 monthly for ten months, beginning December 1, 2010, followed by a lump payment of $15,000 on November 1, 2011, and $75,000 annually beginning on December 1, 2011. D.E. 40-5 at 5. After December 1, 2013, these minimum royalty payments are no longer credited against future tonnage and royalty payments.[7] *Id*. The parties agree that the principal and back-interest have been paid.[8] D.E. 428

---

[6] In an earlier brief, Plaintiffs asked the Court to enter a declaratory judgment that Defendants are liable for future retainer fees, effectively asking for a permanent injunction. D.E. 271 at 16. The Amended Complaint also requests a "declaration that [Defendants] are liable for future . . . Monthly Retainer Fees each month." D.E. 40 at 16. In their post-hearing briefing, despite asking for a declaratory judgment concerning minimum royalties, Plaintiffs do not request a declaratory judgment concerning retainer fees. *See* D.E. 428 at 36-39 (arguing for a declaratory judgment on minimum royalties); D.E. 433 at 18 (discussing retainer fees without requesting a declaration); *id*. at 24 (arguing for a declaratory judgment on minimum royalties). The Court construes the current posture as Plaintiffs having abandoned their earlier request for a declaratory judgment that *retainer fees* will continue to accrue post-judgment.

[7] Defendants argued in their objections to the prior damages R&R that the minimum royalty payments should be credited against the damages on Count II. D.E. 305 at 31-32. Plaintiffs argued in opposition. D.E. 310 at 37-38. Defendants have not raised this argument again, and the Court considers it abandoned.

at 36.  Defendants therefore currently owe no damages for failure to make the annual minimum royalty payments under section 5(f) of the Fourth Amendment.

The issue now is that Plaintiffs seek a declaratory judgment holding that they remain entitled to continue receiving the annual $75,000 minimum royalty.  D.E. 428 at 36; 28 U.S.C. § 2201.  Such payments should continue to be made, they argue, until all tonnage royalties have been fully paid.  D.E. 433 at 24.

However, a recommendation on Plaintiffs' request for a declaratory judgment (*see* D.E. 40 at 16) is outside the scope of the referral.  This matter was referred to the undersigned for a recommendation on the calculation of damages.  *See* D.E. 227 at 7; D.E. 251 at 6.

In the alternative, if Judge Van Tatenhove desires a recommendation on Plaintiffs' request for a declaratory judgment, the Court offers the following analysis.  Section 2201 states that a court "may declare the rights and other legal relations of any interested party" that seeks a declaratory judgment if there is "a case of actual controversy within its jurisdiction."  Thus, an "actual controversy" is a jurisdictional prerequisite that confers upon the Court discretion to issue a declaratory judgment.

## 1.  Actual Controversy

Plaintiffs argue that Defendants remain "obligated to make [the annual $75,000 minimum royalty payment] on December 1 of each year until tonnage royalties totaling $16,990,900 have been paid."  D.E. 428 at 39.  They argue that "both the Defendants' payment history and their statements during the hearing show the necessity of a declaratory judgment on this issue."  *Id*. at 36.  In other words, they claim a live controversy exists.  A declaratory judgment, they argue, will "prevent the Plaintiffs from having to re-litigate this issue every year."  *Id*. at 39.

---

[8] Plaintiffs are careful to note that, of the twenty minimum royalty payments made, "only three have been paid on time" and "the timely payments did not begin until 4 ½ years into this litigation."  D.E. 428 at 27.

The inquiry into whether there is an actual controversy focuses on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

To establish that an actual controversy exists, Plaintiffs rely on the Sixth Circuit's *Kelley* case. D.E. 428 at 35-36. The *Kelley* court noted:

> Declaratory judgment actions present a unique challenge to the case or controversy requirement. In such a case,
>
> > "[t]he question . . . is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."
>
> *Detroit, Toledo & Ironton R.R. Co. v. Consolidated Rail Corp.*, 767 F.2d 274, 279 (6th Cir. 1985) (citation omitted). Accordingly, it is not essential that the threatened injury be absolutely "immediate" and "real." The potential for injury need only be "sufficient[ly] immedia[te] and real [ ]." *Id.* As another court has explained, a party seeking declaratory relief must allege facts to support a likelihood that his opponent's injurious "conduct has continued or will be repeated in the future." *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985).

*Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844-45 (6th Cir. 1994).

Plaintiffs argue under *Kelley* that, although the minimum royalties are current, the history of this case demonstrates that Defendants are likely to fail to make the annual payments in the future. In fact, at the evidentiary hearing, Mr. Justice declined to commit to continue making the payments. D.E. 424 at 194. He testified he "would like to reserve our right to deal with that at a later date." *Id.* Defense counsel also interjected he might "file a motion to pay the Court." *Id.*

The issue of whether an actual controversy exists as to future minimum royalty payments is a close call. On one hand, it is undisputed that Defendants are current on those payments, although most of the payments were not timely made. The Court previously noted it would be

"difficult for the Court to find that Defendants' injurious conduct will be repeated in the future when they are currently up-to-date on these payments." D.E. 302 at 10. They have continued to make the payments despite their position that Plaintiffs' filing of this lawsuit "effectively terminated" the agreement.[9] D.E. 432 at 45.

On the other hand, at the hearing, Mr. Justice was reluctant to commit to making the payments in the future. At first he said, "we intend to keep making . . . the minimum payments under the lease." D.E. 424 at 193. After counsel interposed that a "motion to pay the Court" might be filed, Mr. Justice expressed confusion "about how long those payments should last," given their position that the coal cannot be profitably mined. *Id*. at 194. And Defendants' conduct during this litigation cuts both ways—they have continued to make the annual minimum royalty payments while contesting whether they are required to do so and often paying them late.

Ultimately, the Court assumes (without deciding) that an actual controversy exists sufficient to confer jurisdiction to enter a declaratory judgment under section 2201. Nevertheless, even in the face of a live controversy, a declaration is not automatic. The undersigned recommends declining to issue a declaratory judgment in the exercise of judicial discretion.

## 2. Discretion to Issue a Declaratory Judgment

Even when a "case of actual controversy" exists, the Court retains absolute discretion under § 2201(a) to decide whether a declaratory judgment is appropriate.[10]

---

[9] The Court rejects Defendants' theory that the contract obligations were terminated in 2012 because it is inconsistent with the default judgment and the facts alleged in the complaint. Defendants also argue that paying royalties in the future would be an "unfair windfall" for Plaintiffs. *Id*. But again, this argument is inconsistent with the default judgment. The purpose of this R&R is to calculate damages, not to rewrite the contract or revisit the default judgment.

[10] As Plaintiffs recognize, *Kelley* is a CERCLA case. D.E. 428 at 38. In *Kelley*, a declaratory judgment was mandatory under 42 U.S.C. §§ 9607 and 9613(g)(2)(B) if certain standards were met. *Kelley* does not address the discretionary aspects of declaratory judgment under 28 U.S.C. § 2201.

> The Federal Declaratory Judgment Act by its express language makes it clear that a court has certain discretion to grant or withhold declaratory relief.  It provides, in pertinent part, that in "a case of actual controversy within its jurisdiction, . . . any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201 (emphasis added).  Decisions of the Supreme Court have established the discretionary nature of this remedy.

*Banas v. Dempsey*, 742 F.2d 277, 283 n.9 (6th Cir. 1984) (collecting cases), *aff'd sub nom. Green v. Mansour*, 474 U.S. 64 (1985).  "The Declaratory Judgment Act has always been 'understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'"  *Bituminous Cas. Corp. v. Combs Contracting Inc.*, 236 F. Supp. 2d 737, 742 (E.D. Ky. 2002) (quoting *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 969 (6th Cir. 2000)); *see also Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 526 (6th Cir. 2001).

Courts often rely on two criteria to determine whether to render a discretionary declaratory judgment:  (1) whether the judgment will serve a useful purpose in clarifying the legal relations in issue or (2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980) (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941).

The primary subject of this lawsuit is whether Defendants breached the terms of the Fourth Amendment and fraudulently induced the contract.  All counts of the Amended Complaint have been either dismissed or resolved in Plaintiffs' favor via default judgment.  Thus, the controversy giving rise to this proceeding has been settled.

The only forward-looking issue is whether future royalty payments are owed.  Defendants contend that their obligations under the Fourth Amendment were terminated at the

latest upon the filing of this lawsuit.  D.E. 432 at 45.  But the issues of *how* the agreement could be terminated and *whether* or *when* the agreement was terminated have not been fully argued before the Court.  No party has pointed to language in the agreements themselves concerning how the obligation to pay minimum annual royalties might be terminated.  Without a more detailed record based on the parties' positions of how their  series of agreements provide for termination, the Court is not in a position to impose prospective relief.  Thus, the Court cannot find that issuing a declaratory judgment now would appropriately clarify the legal relations at issue.

Therefore, if the request for a declaratory judgment is not outside the scope of the referral, then the undersigned recommends that Judge Van Tatenhove exercise his discretion and deny Plaintiffs' request for prospective relief.

### IV.  Damages Under Count II
### (Lost Tonnage Royalties for Failure to Mine)

Count II of the Amended Complaint alleges that Defendants breached the Fourth Amendment, particularly by failing to extract any coal.  D.E. 40 at 11.  As alleged in the Amended Complaint:

> Notwithstanding its covenant to mine as set forth in Section 10 of the Fourth Amendment, Kentucky Fuel has not attempted to mine any of the coal subject to the Original Fivemile Leases or the New Fivemile Leases or the Fivemile Permit. It has not used commercial and reasonable good faith nor its best efforts to maximize the amount of coal extracted from those properties.

D.E. 40 at 9.

Defendants continue to attempt to relitigate their liability on Count II.  *See, e.g.*, D.E. 432 at 22-30.  But their liability is established by the default judgment.  Defendants failed to mine as required by the Covenant to Mine in the Fourth Amendment, thereby creating an event of default.  *See* D.E. 40-5 at 6 ¶ 7.

Plaintiffs, relying on section 7 of the Fourth Amendment, elected to employ an independent arbiter, Bob Conway, to calculate the lost royalties in an amount that would be immediately due and payable.  D.E. 40 at 11.  The Amended Complaint seeks $16,990,000 in damages based on the arbiter's report.  *Id*.  The analysis in the previous damages R&R hinged on this report because the independent arbiter and his report are creatures created by the contract.

Section 7 of the Fourth Amendment provides as follows, with the independent arbiter provision in italics:

> **7. Events of Default.**  If Kentucky Fuel fails to perform under the terms of this Agreement, the occurrence of any of the following events shall constitute an "Event of Default" under the terms of this Agreement:
>
> (a) If Kentucky Fuel fails to perform under the terms of the Prior Agreement or this Agreement; or
>
> (b) If Kentucky Fuel or any successor and assigns fails to perform under the terms of any of the Leases or the Permits.
>
> Upon the occurrence of an Event of Default, NLTM and Fivemile Energy may exercise any and all rights and remedies available to NLTM at law or in equity by reason of such Event of Default including but not limited to recovery of all fees and expenses incurred by NLTM or Fivemile Energy in their enforcement of the terms of this Agreement and specific performance of the obligations of Kentucky Fuel described herein.  *In the alternative, NLTM and Fivemile Energy may determine the estimated lost royalties that it would have received but for the Event of Default by Kentucky Fuel and such amount shall be immediately due and payable by Kentucky Fuel under the terms of this Agreement.  Such royalties shall be determined by an independent arbiter selected by NLTM for the purpose of determining the amount of royalties that would have been paid by Kentucky Fuel to NLTM under the terms of this Agreement.*  As an additional remedy, NLTM may choose to exercise its rights against the Guarantor pursuant to the terms of the Guaranty Agreement in the form attached hereto as **Exhibit F.**

D.E. 40-5 at 6.

None of the evidence presented at the December 2018 hearing alters this Court's prior determination that the independent arbiter's report establishes the appropriate measure of damages on Count II.  The default judgment established that Defendants "fail[ed] to perform" as

described in section 7.  *See* D.E. 40 at 7, 11.  And Plaintiffs then elected to pursue one of the remedies described in section 7—having an independent arbiter determine the royalties in an amount that would be immediately due and payable.

The entirety of the Independent Arbiter Report issued by Bob Conway is reproduced below:

> **RE: Lost Royalty Estimate of the Five Mile Energy Permit in Breathitt County, KY**
>
> Dear Mr. Brownlow:
>
> Pursuant to your request, I am responding to provide my best professional judgment on the Fivemile Energy permitted areas of Breathitt County, Kentucky. It is my professional opinion that the estimated coal reserves underlying the subject properties, at **18,601,000 tons** of in situ reserves, more or less, underlying the Five Mile Energy permitted areas.  This estimate was formulated from the best available information at the time, circa 2003.  No new information is known to this writer at this time.  This estimate includes multiple seams at multiple elevations.
>
> In the formulation of the subject permits the mining method was area surface mining and was approved by the regulators, state and federal.  The standard 10:1 ratio of overburden to tons of coal was for the most part adhered to except for one area.  It is reasonable to assume recovering 90% of the estimated reserves.  Those numbers are: For Five Mile Energy: **16,740,000 tons** at 90% recovery.
>
> Based upon the above amounts of recoverable coal, I estimate the lost royalty that NLTM would have received but for the default of Kentucky Fuel (and the $1.00 per ton royalty rate in the Fourth Amendment) the total royalties on Fivemile on **16,740,900** tons of coal are **$16,990,900.**
>
> **Disclaimer:** This report is made in my role as independent arbiter pursuant to Article 7 of the Fourth Amendment of the Assignment of Leases and Permits from New London Tobacco Market to Kentucky Fuel.  This report is to be used for that purpose only and for no other purpose without my express approval.

D.E. 40-6.  Mr. Conway unfortunately passed away on May 20, 2017.  D.E. 428 at 31.

Defendants have lodged several arguments against using the arbiter's figure as a measure of damages in this case, but they have not offered any legitimate construction of the remedies provision that alters its clear effect.  Plaintiffs were expressly granted the power to "determine the estimated lost royalties" through selecting an independent arbiter, and Defendants agreed that the arbiter's estimate "shall be immediately due and payable."  There is no provision giving Defendants the ability to challenge the estimate based upon issues such as mining difficulties or market constraints.

Because the remedies provision is clear and was followed by Plaintiffs, Defendants turn to weak arguments to escape its effect.  First, they make a contract-interpretation argument that there was never an "event of default" to trigger the remedies described in section 7 of the Fourth Amendment.  D.E. 432 at 28-30.  They argue that they could not have mined the coal within the constraints of industry standards (as required by the Fourth Amendment) because the coal could not be mined profitably.  *Id*.

Defendants' argument that there was no event of default is a transparent attempt to relitigate the default judgment.  Defendants are subject to liability premised on accepting as true the well-pleaded facts in the Amended Complaint.  This includes the fact that "Kentucky Fuel never intended to mine the properties" at issue.  D.E. 40 at 3.  This includes Plaintiffs' assertion that, "[n]otwithstanding its covenant to mine as set forth in Section 10 of the Fourth Amendment, Kentucky Fuel has not attempted to mine any of the coal."  *Id*. at 9.  The Amended Complaint also includes the accusation that Defendants intentionally breached the contract and had "a pattern and practice of disregarding and refusing to pay its contractual obligations."  *Id*. at 10.  Accepting these accusations as true, Defendants defaulted as defined in section 7.  *See also id*. at

11 ¶ 31 (establishing breach under section 7).  To find that there was never an event of default would be incompatible with the sanction imposed by Judge Van Tatenhove.[11]

Defendants also argue that "Plaintiffs never declared a default."  D.E. 432 at 28.  While that may be true, Defendants point to no contract provision requiring that default be declared prior to seeking a remedy under section 7.

Defendants have long argued that the covenant to mine did not require them to mine coal if doing so would be unprofitable.  The undersigned has rejected this argument as being inconsistent with the default judgment.  D.E. 302 at 12-13.

As Plaintiffs explain, following the evidentiary hearing, this mineability and merchantability argument loses much of its force now that we know a previous draft of the Fourth Amendment contained stricken language that referenced economic circumstances of the coal industry.  D.E. 428 at 11-12.[12]  As made clear in recently disclosed emails, although the earliest form of the Fourth Amendment contained a marketability requirement, this language was deleted from the contract with the full knowledge of the parties.  *Id*.  Further, although Kentucky Fuel entered into other contracts that depended on the coal being mineable or merchantable, the Fourth Amendment contained no such language.  *Id*. at 8-13.  Mr. Brownlow has consistently maintained that his intention in entering the Fourth Amendment was to guarantee that the Fivemile coal would get mined no matter what.  *See, e.g.*, D.E. 426 at 168-171, 180, 189-90. Prior to these mid-negotiation emails coming to light, Defendants misrepresented to the Court that the covenant to mine had been surreptitiously inserted into the Fourth Amendment "unbeknownst" to Defendants' lawyers who were negotiating the deal.  D.E. 375-1 at 4; D.E.

---

[11] Plaintiffs argue that relying on the arbiter's report is analogous to enforcing an arbitration award.  D.E. 428 at 32; D.E. 433 at 23.  Although this R&R does not rely on this analysis, Judge Van Tatenhove may find it useful.

[12] Part of the stricken language stated: "Industry standards shall include and consider the economic circumstances of the coal industry, future coal prices, current contracts of buyer and such other circumstances as a reasonably prudent coal producer would consider at the time of making such determinations.[.]"  D.E. 428 at 12.

395 at 3. The emails show there was nothing surreptitious about the negotiation of the covenant to mine.

Defendants also point to cases concerning an "implied" obligation to mine in mineral leases. D.E. 432 at 22-24. These cases are not on point or persuasive because the contract here includes an express covenant to mine that is now fully enforced through entry of default judgment. Defendants' efforts to relitigate liability fail.

Defendants argue the arbiter's findings are inconsistent with the language of section 7. That section commissions the independent arbiter to estimate the "lost royalties [Plaintiffs] would have received but for the Event of Default" (D.E. 40-5 at 6). D.E. 432 at 30. Defendants argue Plaintiffs "would have received" zero royalties because none of the coal could have been profitably mined. *Id.* They also argue the Conway report "made no effort to determine the amount of coal that may have been mined between the date of the Fourth Amendment, November 22, 2010, and the date of his report, May 1, 2012." *Id.* Had Mr. Conway conducted "a proper analysis," Defendants argue, he would have

> tested and analyzed market conditions during the November 2010 – May 2012 time frame to determine if Kentucky Fuel should have mined tonnage above and beyond an amount that would satisfy the annual minimum tonnage, and then added the difference (if any) between what should have been mined during that time frame to the $75,000.00 annual minimum.

*Id.* at 30-31. Defendants ask the Court to ignore the Conway report and limit the damages to "those actually incurred by Plaintiffs as the direct result of any default." *Id.* at 34. Of course, their overarching argument is that there was no default and the only royalties owed to Plaintiffs are the minimum annual royalties discussed in Part II. They are wrong for all the reasons discussed above, primarily the plain language of the Fourth Amendment. But, consistent with Judge Van Tatenhove's referral, the undersigned evaluates the evidence presented at the hearing.

### A.  Evidence on Mineability and Marketability

The Court now considers the evidence at the hearing related to the issues flagged by Judge Van Tatenhove—mitigation of damages, the logistics of mining coal, the coal market, and Defendants' ability to remove coal.  D.E. 321 at 5-6.  Defendants have argued that, in light of such factors, Conway's report must be rejected as a measure of damages.  They claim there is "overwhelming evidence that the Fivemile coal is of minimal mineable tonnage and could not be mined by Defendants at a profit."  D.E. 432 at 22.  "[T]he coal at issue could not be mined without staggering losses for Kentucky Fuel."  *Id.* at 27.

Before delving into Defendants' evidence, it bears noting that some of the evidence at the hearing bolstered the Conway report.  First, it became apparent that the late Mr. Conway may have been the person most knowledgeable about the Fivemile properties and their coal.  Plaintiffs' Exhibit 2 is the detailed permit application prepared by Mr. Conway and signed or stamped by him in about 340 places.  This lengthy collection of studies provides contextual background for Mr. Conway's basis of knowledge that he brought to the damages calculation.

Other documents support Conway's estimate of the amount of coal at the site.  For example, NewLead (which purchased the Fivemile leases from Defendants) issued a press release stating they had acquired rights to "18.6 million tons of estimated coal reserves."  D.E. 264-2 at 1.  This is strikingly similar to Mr. Conway's estimate of 18,601,000 tons of coal beneath the properties.  D.E. 40-6.  There is also a reserve study by Summit Engineering from November 2011 that estimated 19,794,240 "in place tons."  This one-page study was emailed by Lloyd Williams to Mr. Ball in June 2014.  D.E. 358-12 at 2-3.  The same tonnage estimate was also quoted in a two-page study that Summit Engineering sent to NewLead in February 2013.  Plaintiffs' Exhibit 13Q.  That 2013 report states that mining the Fivemile coal could "potentially

be very profitable." *Id*.  These studies were apparently used to entice NewLead into the deal. *See* D.E. 378-1 at 18; D.E. 394 at 14; D.E. 424 at 217-19.  And the documents all lend some credence to the figures in Conway's report.  Defendants (and Williams) apparently marketed the transaction to NewLead with estimates of 18.6 or 19 million tons, in stark contrast to their argument before this Court that the coal at the Fivemile properties "simply did not exist in the quantities suggested by Mr. Conway."  D.E. 432 at 22.

No evidence presented at the December 2018 hearing suggested there was an effort to mitigate damages by either party.  In fact, Defendants' behavior concerning the NewLead transactions is the opposite of mitigating damages.  Defendants entered into contracts with other entities and pocketed millions of dollars as part of an agreement to mine the very coal at the heart of this dispute.  Although Judge Van Tatenhove expressly invited Defendants to "present any evidence regarding mitigation of damages" (D.E. 321 at 5) and "present evidence of mitigation of damages" (*id*. at 6), no evidence of mitigation was offered.  Defendants do not claim the damages were reduced—they claim there are no damages beyond the minimum royalties.  There is no reason to adjust the damages calculation to account for mitigation of damages.

The parties presented evidence on the logistics of mining the Fivemile coal.  Defendants summarize that "no significant amounts of coal have been mined under the Deep Wood permit or the Fivemile permit for three primary reasons—poor quality of coal, unfavorable market conditions and inadequate permitting."  D.E. 432 at 8.

Concerning permitting, Defendants explain that, soon after entering the first agreement with Plaintiffs, they discovered that "Mr. Brownlow had never obtained the necessary 404 Army Corps of Engineer valley fill permits, which meant there was nowhere to put the cast-off dirt that results from strip mining."  D.E. 432 at 7-8.  Mr. Justice testified that such permits are necessary

for mining coal in Kentucky and that, during the Obama administration, the federal government simply quit issuing valley fill permits.  D.E. 423 at 210-11.  One small area of the properties had been previously mined, and, for valley-fill-permitting purposes, Kentucky Fuel would only be able to mine "approximately 50,000 tons" there.  *Id*. at 215.

There was also testimony on the market and coal prices.[13]  Mr. Justice testified that the market was good in 2005.  Quality coal could sell for around $65 a ton.  D.E. 423 at 209.  Then, the market tanked.  "In 2015, twelve five BTU steam coal, 1 percent sulfur, sold for $35 a ton." *Id*. at 226-27.   In contrast, the market "is pretty good today," double what it was in 2015.  The same coal sells for about $74 a ton.  *Id*.

Defendants also argue "the coal was of a very low quality."  D.E. 432 at 8.  Mr. Justice testified that "the standard [for steam coal] is 12,500 BTU, 1 percent sulfur, and 12 [percent] ash."  D.E. 423 at 218.  Falling below this standard, such as with higher sulfur or ash content, "has a tremendous adverse effect on price."  *Id*. at 219.   Mr. Justice testified that after his company purchased the properties from Mr. Brownlow, they found:  "The ash was, you know, anywhere from probably 15 percent on the best seam to 35 percent on the worst seam.  Sulfurs were 1 1/2 percent on the best seams and as high as 7 percent on the worst seams."  *Id*. at 209.

For their part, Plaintiffs point to evidence that Defendants knew about the permitting issues and the high ash and sulfur content of the coal *prior to the original transaction*.  D.E. 428 at 5-6.  Mr. Justice declared in a September 2014 affidavit that, when he was first negotiating with Mr. Brownlow, he knew of the "high ash content and the extremely high sulfur" of the coal and "the lack of § 404 permits."  D.E. 204-4 at 2.

---

[13] By virtue of their own failure to participate in discovery, Judge Van Tatenhove ordered that Defendants were not allowed to present any expert testimony at the evidentiary hearing.  D.E. 368.

Other evidence suggests Defendants believed the coal could be profitably mined. Some comes from emails related to the NewLead transactions. As Plaintiffs explain:

> For example, Mr. Ball initially represented to New Lead's CEO, Mr. Zolotas, that "Williams Industries and Kentucky Fuel Corporation have a solution to the current cashflow issues at the Fivemile project that would allow for the taxes to be paid, landowners to be paid and **coal to be mined**." Px. 16A. The Defendants' "solution," was the agreement with New Lead pursuant to which KFC proposed to mine the Fivemile coal. Mr. Ball subsequently described the proposed contract as "a proposal that can work for both sides" (Px. 16B) and as a "win-win situation." Px. 16H. The Defendants' general counsel, Roger Hunter, described the proposed mining agreement "as a practical and mutually beneficial arrangement." *Id.*

D.E. 428 at 20. For their part, Defendants argue these communications are being misinterpreted and that, in part, they were trying to secure income to make payments to Plaintiffs. D.E. 394 at 16-18.

Also, Defendants have indicated they have entered into a new agreement to mine the Fivemile properties that will generate enough revenue to pay the damages in this case. D.E. 375. Defendants have entered an agreement with GSI "pursuant to which GSI intends to mine all of the mineable and merchantable coal at the Five Mile property at issue and to pay an override to Kentucky Fuel, from which Kentucky Fuel will make the override payments to Plaintiff New London Tobacco Market, Inc." *Id.* at 1. Mr. Justice testified that his "position" is that "the full amount of the damages is going to be paid by royalties generated by . . . the GSI mining." D.E. 424 at 207. Along these lines, Defendants filed a prehearing motion to limit damages. D.E. 375. Their argument was that, because GSI is now going to mine the property, Plaintiffs' damages should be limited to the time value of the lost money. D.E. 375-1 at 5-10. "[T]he mining is expected to be at the rate of 5,000 to 10,000 tons per month," which will result in "significant" reduction in damages. *Id.* at 9; *see also* D.E. 423 at 22 (denying the motion on the record); D.E. 424 at 206-07 (Mr. Justice's testimony concerning GSI); D.E. 427 (Judge Van Tatenhove

denying the motion as moot).  This is not a mitigation argument because Defendants are arguing the damages should be limited based upon future, expected mining, not completed efforts to reduce Plaintiffs' damages.

Thus, although Defendants have argued vigorously for years before this Court that the coal could not be profitably mined, they were simultaneously assuring the other parties in the NewLead transactions that the coal could be profitably mined.  They have also represented that, under their current agreement with GSI, they will generate enough royalties to pay the damages in this case.  D.E. 375-1.  Plaintiffs accordingly argue that "the best evidence of the fact that the coal was mineable is the fact that both the Defendants and others have paid substantial amounts of money for the opportunity to mine it."  D.E. 433 at 23.

To summarize, Defendants presented evidence that much of the coal would be difficult to extract due to permitting issues.  They presented evidence the coal would be difficult to sell profitably because of quality issues.  Mr. Justice and Mr. Ball were not terribly credible witnesses.  And some evidence suggests that at least some of the coal can be, and will be, mined.  Defendants attempted to sell the properties for millions of dollars in the NewLead transactions and are now working with GSI to mine the coal.

Thus, Defendants' own calculations of in-place tonnage, the NewLead transaction as a whole, and their expectation relayed to GSI that the coal can be mined so as to generate revenue support the arbiter's damages calculation.  The Court finds the defense's evidence on "mitigation," mineability, and marketability is not sufficiently reliable to discount the arbiter's calculation.  But, in the undersigned's view, it does not matter because the evidence related to mineability and marketability does not change the nature of the default judgment and the remedies that flow based upon the parties' contractual choices.  The remedies described in

section 7 of the Fourth Amendment are not ambiguous.  They were drafted and accepted by sophisticated businesspeople.  Plaintiffs chose to employ a highly knowledgeable independent arbiter, and his assessment of damages is immediately due and payable.  The undersigned recommends assessing $16,990,900 in damages under Count II.[14]

## V.  Count V (Fraud in the Inducement)

Plaintiffs alleged, and have now established, that Defendants entered into the Fourth Amendment with no intention of performing or making payments.  *See* D.E. 40 at 3, 7, 10, 14. Count V accordingly makes a claim of fraudulent inducement:   "[Defendants] falsely and fraudulently represented to NLTM and Fivemile that they would make the payments required by the Fourth Amendment and perform their obligations thereunder in order to induce NLTM to execute the Fourth Amendment."  *Id*. at 14.  The undersigned previously addressed this claim as a general fraud claim, but recent developments in Kentucky law and the parties' resulting arguments require more specific focus on the nature of the claim.  That focus reveals it to be a fraudulent inducement claim.

Kentucky law posits six elements for a fraudulent inducement claim that must be proven by clear and convincing evidence:  a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury.  Also, the misrepresentation must be about a present or past fact.  *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010).  Concerning the present or past fact limitation, courts have noted that one may commit fraud in the inducement "by making representations as to his future intentions when in fact he knew at the time the representations were made he had no intention of carrying them out."  *Id*.; *see also Duracore Pty Ltd. v. Applied*

---

[14] The Amended Complaint's references in Count II to damages of "$16,990,000" may be typographical errors.  The arbiter's report includes an additional $900 to the "the lost royalty that NLTM would have received but for the default of Kentucky Fuel," for a total of 16,990,900.  D.E. 40-6.

*Concrete Tech., Inc.*, No. 5:13-CV-184-TBR, 2016 WL 3620793, at *6 (W.D. Ky. June 28, 2016).  Because the facts alleged in the Amended Complaint must be taken as true, the above elements have been met.   As established by the Amended Complaint, Defendants' representations that they would execute their mining and payment obligations under the Fourth Amendment were knowingly false pre-contractual intentional misrepresentations designed to induce Plaintiffs to act and caused injury.  This leaves to be determined the amount of damages due.

### A.  Economic Loss Rule and Double Recovery

Defendants argue that the economic loss rule precludes any compensatory or punitive damages on Plaintiffs' fraudulent inducement claim.  D.E. 432 at 40-41.  The prior damages R&R rejected this argument on the basis that Kentucky courts had not yet adopted the economic loss rule.  D.E. 302 at 16.  The law in Kentucky has evolved since January 2017, but it does not affect the outcome in this case.  Although the Kentucky Supreme Court in *Nami* adopted the economic loss rule for fraud claims associated with breach-of-contract actions, *Nami* did not address *fraudulent inducement* claims like this one.  *See Nami Res. Co., L.L.C. v. Asher Land & Mineral, Ltd.*, 554 S.W.3d 323, 335-36 (Ky. 2018).  Both compensatory and punitive damages remain available on Plaintiffs' fraudulent inducement claim.

There is no question that, prior to *Nami*, Kentucky courts awarded both compensatory and punitive damages on fraudulent inducement claims.   For example, *Raleigh* is an unreported 2014 Kentucky appellate case upholding a jury award of punitive damages on a claim of fraud in the inducement with a sales contract for a mobile home.  *Raleigh v. Edgewood Mobile Homes, Inc.*, No. 2012-CA-764-MR, 2014 WL 505579, at *1 (Ky. Ct. App. Feb. 7, 2014).  The court noted, "our Supreme Court has recognized that punitive damages are permissible 'where a party

has been induced by fraud to enter a contract.'" *Id.* at *5 (quoting *Wiley v. Adkins,* 48 S.W.3d 20, 23 (Ky. 2001)).   In *Wiley*, the Supreme Court upheld a jury award of punitive damages because "[p]unitive damages are allowed where a party has been induced by fraud to enter a contract." *Wiley*, 48 S.W.3d at 23 (citing *Hanson v. American National Bank & Trust Co.,* Ky., 865 S.W.2d 302 (1993)); *see also Thomas v. Brooks*, No. 2005-CA-1983-MR, 2007 WL 1378510, at *2 (Ky. Ct. App. May 11, 2007).

The Court in *Hanson* likewise upheld a jury award of punitive damages on a fraudulent inducement claim. *Hanson*, 865 S.W.2d at 308.  Citing *Hanson*, Judge Heyburn once wrote that "To expand the [economic loss] rule so as to bar a fraudulent inducement claim in an employment contract without further guidance from the Kentucky courts would eviscerate the claim of fraudulent inducement and would contravene contrary Kentucky case law." *Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005), *aff'd*, 279 F. App'x 378 (6th Cir. 2008); *see also Faulkner Drilling Co. v. Gross*, 943 S.W.2d 634, 638-39 (Ky. Ct. App. 1997) (reversing the trial court's denial of punitive damages on a fraudulent inducement claim).

In the 2018 *Nami* case, the Kentucky Supreme Court for the first time invoked the economic loss rule to vacate an award of punitive damages for fraud in the execution of a contract. *Nami*, 554 S.W.3d at 335.  To explain the rule's application "in the present context," the Court quoted at length from a federal case out of California:

> The economic loss doctrine requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise.  To that end, the economic loss rule prohibits the recovery of tort damages in a breach of contract case.  Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving one into the other.  Courts have applied the economic loss rule to bar fraud claims where the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract.  In such cases, permitting a fraud

claim to proceed would open the door to tort claims in virtually every case in which a party promised to make payments under a contract but failed to do so.

*Id.* at 335-36 (quoting *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 991-92 (E.D. Cal. 2012)) (internal citations and quotation marks omitted).

The *Nami* Court explained that:

when a plaintiff may obtain complete relief for his contractual losses by means of compensatory damages under a breach of contract claim, even when the breach is motivated by malice and accomplished through fraud, he may not simultaneously recover punitive damages after being made whole on his contractual damages. However, a party who has been aggrieved by fraudulent or malicious conduct which results in damages that differ from the damages sustained by reason of the breach of contract, may assert an independent claim for such fraudulent or malicious conduct seeking whatever damages are appropriate for the independent claim, including punitive damages if otherwise authorized by law.

*Id.* at 336.  The *Nami* Court then explained that "the conduct" undergirding the fraud claim at issue was "indistinguishable" from the breach of contract claim.  *Id.*  Because the claim alleged "no misconduct . . . other than the conduct of breaching the contract," and because the non-breaching party was made whole through contract damages, punitive damages were unavailable.  *Id.*

The *Nami* Court, citing a case from 2017, further explained that "[a] breach of duty which arises under the provisions of a contract between the parties must be addressed under contract, and a tort action will not lie."  However, "[a]breach of a duty *arising independently* of any contract duties between the parties" may support a tort action.  *Nami*, 554 S.W.3d at 336 (quoting *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 792 (Ky. 2017), *reh'g denied* (Mar. 22, 2018)).

Such is the case here.  A fraudulent inducement claim involves a breach of a duty that existed prior to and independent from the contract duties.  That is why most jurisdictions that

employ the economic loss rule recognize an exception for fraudulent inducement claims.[15]   There is no reason to anticipate Kentucky will vary from this majority approach.

Indeed, the existence of this exception in Kentucky seems noncontroversial.   In an unpublished opinion issued post-*Nami*, the Court of Appeals of Kentucky upheld an award of punitive damages on a fraudulent inducement claim.   *See Stavens v. Buridi*, No. 2016-CA-1301-MR, 2018 WL 6601879, at *3 (Ky. Ct. App. Dec. 14, 2018), *review denied* (Apr. 11, 2019).   Granted, *Nami* is not discussed in *Stavens*, but this would be an odd omission if it was understood that *Nami* applied to fraudulent inducement.

By virtue of the default judgment, Count V of the Amended Complaint defines the *duties* that were breached and Defendants' conduct in breaching those duties.   The breached duties predated the Fourth Amendment and did not arise from the parties' contractual obligations.   Defendants' tortious *conduct* also predated the Fourth Amendment and did not arise from their performance under the contract.   This is not a case like *Nami* where the claimed tort is also a breach of *contractual duties* "motivated by malice and accomplished by fraud."   *Nami*, 554 S.W.3d at 336.

*Nami* did not address fraudulent inducement.   Kentucky courts (even post-*Nami*) have allowed compensatory and punitive damages on fraudulent inducement claims associated with breach-of-contract cases.   Most states that apply the economic loss rule carve out an exception for fraudulent inducement.   For these reasons, *Nami* does not affect this case.   The economic loss

---

[15] "Most states have adopted the broad fraud in the inducement exception to the economic loss doctrine.   The broad exception provides that the fraud is an intentional tort, and as such, the intentional misrepresentation is actionable as a tort, notwithstanding that the contract losses are solely economic."   Ralph C. Anzivino, The Fraud in the Inducement Exception to the Economic Loss Doctrine, 90 Marq. L. Rev. 921, 922-23, 931-33 (2007); *see also* Vincent R. Johnson, The Boundary-Line Function of the Economic Loss Rule, 66 Wash. & Lee L. Rev. 523, 568 (2009) ("Fraud in the inducement is generally actionable because pre-contractual misrepresentation violates obligations arising from tort principles that are independent of the terms of the agreement the parties ultimately reach"); Steven W. Feldman, The Economic Loss Doctrine: Rescuing Contract from Drowning in A "Sea of Tort", Tenn. B.J., April 2008, at 24, 28 ("[A]llowing full recovery for fraudulent inducement . . . is the majority rule"); Restatement (Second) of Torts § 525, 549 (1977).

rule does not bar recovery on Count V.   In the alternative, if Judge Van Tatenhove believes *Nami*'s reasoning could encompass fraudulent inducement claims, it is recommended that he consider certifying the question of the existence of fraudulent inducement as an exception to the economic loss rule to the Kentucky Supreme Court. *See* Ky. R. Civ. P. 76.37.

In their objections to the prior damages R&R, Defendants invoked a rule against "double recovery."  D.E. 305 at 20-23; *see also* D.E. 277 at 18-20.  Defendants do not raise this argument in their post-hearing brief (D.E. 432) or their brief on Plaintiffs' motion for sanctions (D.E. 394). The Court considers the argument abandoned but addresses it in case it is raised again.

There exists in torts a general rule that a party "is not entitled to recover twice for the same loss, even if the party would otherwise be able to recover for that loss under separate theories of liability."  *Johnson v. Howard*, 24 F. App'x 480, 484 (6th Cir. 2001); *see also E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[T]he courts can and should preclude double recovery by an individual.").  When a plaintiff seeks "to recover separate damages for each cause of action," this can lead to impermissible "multiple recoveries for the same injury." *Wolgast v. Richards*, No. 05-10278-BC, 2011 WL 3426187, at *5 (E.D. Mich. Aug. 5, 2011). The impact of this rule is that damages may be apportioned among the different tort causes of action, or alternatively the plaintiff may make an election of remedies.  *See, e.g.*, *Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 566-67 (6th Cir. 2001) (discussing election of remedies); *Johnson*, 24 F. App'x at 485 (upholding damages on an apportionment theory).

Defendants point to two Kentucky cases in which there was an impermissible double recovery under a contract claim and a related fraud claim.  D.E. 277 at 19-20 (quoting *Gulf Coast Farms, LLC v. Fifth Third Bank*, No. 2011-CA-000965-MR, 2013 WL 1688458, at *5 (Ky. Ct. App. Apr. 19, 2013); *Thomas v. Brooks*, No. 2005-CA-1983-MR, 2007 WL 1378510, at *2 (Ky.

Ct. App. May 11, 2007)).  However, as explained previously in this section, an action for fraud *in the inducement* is different than an action for fraud in the execution of a contract.  The Court, Plaintiffs, and Defendants agree that "a recovery for any allege fraudulent conduct must stem from a matter that is not encompassed within the contract itself."  *Id.*; *cf.* D.E. 310 at 26.  Such is the case with fraudulent inducement.  As discussed above, Kentucky courts have awarded compensatory and punitive damages on fraudulent inducement claims that were asserted alongside contract claims.  The "double recovery" rule did not bar damages for both fraudulent inducement and contract breach in these cases.  Nor should it do so here.  *See* D.E. 302 at 15-16 (discussing *Thomas*, 2007 WL 1378510, at *2).

### B. Compensatory Damages on Count V

Under Count V, Plaintiffs seek compensatory damages "in the amount of $17,000,000, or such other amount that the evidence may show is due and owing."  D.E. 40 at 15.

### 1.  Compensatory Damages Include $20,000 for Strong Brothers Lease Payments

Count V's compensatory damages should include $20,000 for unreimbursed lease payments for the Strong Brothers Property under section 9 of the Fourth Amendment.  *See* D.E. 428 at 42.  Count V alleges that, because of Defendants' fraud in the inducement, Plaintiffs "have not been reimbursed for the lease payments for the Strong Brothers Property Lease."  D.E. 40 at 14 ¶ 47.  Plaintiffs later calculated these payments as totaling $20,000.  D.E. 271 at 19; D.E. 271-1 at 17-18 ¶ 36.

Plaintiffs argue that Defendants have now "conceded this category of damages."  D.E. 428 at 42.  Mr. Justice testified that Defendants were "okay" with the $20,000 liability and had no objection to its inclusion in the damages calculation.  D.E. 424 at 195-96.  Defendants did not object to the $20,000 liability following the prior damages R&R.  D.E. 305.  This amount

therefore appears undisputed. This $20,000 should be added to the other damages, as calculated below.

## 2. Compensatory Damages as Derived from the Language of the Controlling Documents

Although the Amended Complaint sought a particular dollar amount as compensatory damages on Count V, Plaintiffs and Defendants both now argue for a different method of calculating those damages. The Court is not convinced to change course.

Plaintiffs state in Count V that, due to the fraudulent inducement, they "have lost the value of the royalties payable in connection with the New Fivemile Energy leases." D.E. 40 at 14 ¶ 47. In their prayer for relief, Plaintiffs request compensatory damages "in the amount of $17,000,000, or such other amount that the evidence may show is due and owing, pursuant to Count V." *Id.* at 15. Under the language of Count V chosen by Plaintiffs to describe their claim, the proper measure of damages is lost royalties plus the money owed under the Strong Brothers leases. When the Amended Complaint was filed, the unreimbursed Strong Brothers lease payments (discussed above) totaled $10,000. D.E. 271 at 19; D.E. 271-1 at 17-18 ¶ 36. So it appears Plaintiffs added this $10,000 to the $16,990,000 derived from the Conway report to arrive at the $17 million figure. *See* D.E. 40 at 11, 15.

The prior damages R&R adopted the Amended Complaint's prayer for relief on Count V. The Court found, "This measure is consistent with Plaintiffs' anticipated benefit of their bargain." D.E. 302 at 14. The Court continues to believe the compensatory damages on Count V should be restitutionary in nature. What benefit did Defendants wrongfully obtain that should have been a benefit to Plaintiffs? As defined by the default judgment, the Amended Complaint, and the arbiter's report, the best measure remains the coal royalties that Plaintiffs expected to receive by entering into the contract, but which were wrongfully obtained by Defendants.

The arbiter's report is a creature of the contract, defined by section 7 of the Fourth Amendment. And the default judgment establishes as true all facts pleaded in the Amended Complaint. The Amended Complaint states that "the lost royalties that would have been paid by Kentucky Fuel, but for its default are $16,990,000.00 [sic]." D.E. 40 at 11 ¶ 31. This figure corresponds to the "lost . . . value of the royalties payable in connection with the New Fivemile Energy leases," which Plaintiffs describe as their damages (plus the Strong Brothers lease payments) under Count V. *Id*. at 14. Plaintiffs' $17,000,000 prayer for relief under Count V corresponds to this figure. *Id*. at 15. The default judgment, the Amended Complaint, the Fourth Amendment, and the arbiter's report work in concert to establish as a matter of law that Plaintiffs' compensatory damages or restitution damages under Count V (excluding the Strong Brothers lease payments) total $16,990,900. Using the contract's language, this figure is the "estimated lost royalties that [Plaintiffs] would have received but for the Event of Default." D.E. 40-5 at 6 ¶ 7. Using the arbiter report's language, this figure is "the lost royalty that NLTM would have received but for the default." D.E. 40-6. The default judgment therefore establishes compensatory damages of $16,990,900 (plus $20,000) for Defendants' fraudulent inducement. This figure is dictated by the language of the Amended Complaint, the Fourth Amendment, and the arbiter's report acting in concert.

The Court is also constrained by Rule 54, which states: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54.

No evidence presented at the December 2018 hearing has altered the Court's interpretation of the Fourth Amendment. The Court thus continues to recommend compensatory damages on Count V in the amount of $17,010,900.

Defendants argue that relying on the Conway report is unfair and absurd because the Conway report failed to address how much coal was actually mineable. "To date no significant amounts of coal have been mined under the Deep Wood permit or the Fivemile permit for three primary reasons—poor quality of coal, unfavorable market conditions and inadequate permitting." D.E. 432 at 8. But this does not matter. Defendants assented to the choice-of-remedies provision in the Fourth Amendment and its expedited process for determining the amounts "immediately due and payable." They now seek to escape the consequences of having agreed to that provision. Defendants are essentially asking the Court to reform the contract to include considerations of mineability and merchantability and redline those concepts into the Fourth Amendment nearly a decade after the language was negotiated. It is not the Court's role at this juncture to reform the contract.

Interestingly, both Plaintiffs and Defendants are now arguing for a different measure of damages.[16] Both sides point to figures associated with the NewLead transactions, whereby Defendants sold the Fivemile leases and permits to another party. The specifics of the NewLead figures will be discussed below in section V.B.3.ii.

Plaintiffs argue that damages based on the NewLead transactions could not have been pleaded in the Amended Complaint because they were withheld by Defendants from production. Because Defendants concealed this information, these damages could not have been alleged prior to the deadline for amending pleadings. D.E. 428 at 45. Plaintiffs argue that although paragraph 47 of the Amended Complaint "does allege lost royalties, *it does not limit the damages to lost royalties* and those were the only damages known at the time due to the Defendants'

---

[16] Plaintiffs' position may be driven by a concern that the $16.99 million figure could be affected if the economic loss rule is found to apply because this damage figure is identical to their breach-of-contract damages under Count II. Plaintiffs noted in their motion for sanctions that they were pushing the NewLead numbers to avoid the "duplication" of damages issue that Defendants raised in their objections to the prior damages R&R. D.E. 378-1 at 25-26.

concealment of the New Lead transaction." *Id*.  Alternatively, Plaintiffs seek to amend their complaint to plead damages based on the NewLead transactions.  *Id*. at 46.

In making this argument, Plaintiffs rely on a 1967 case out of New York, *Sarlie v. E. L. Bruce Co.*, 265 F. Supp. 371 (S.D.N.Y. 1967).  D.E. 428 at 45-46.  Like this case, *Sarlie* dealt with calculating damages following a default judgment.  *Sarlie*, 265 F. Supp. at 374.  The *Sarlie* court acknowledged Rule 54(c)'s guidance that a default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  *Id*. at 375 & n.16.  The court cited case law which held that the theory for computation of damages cannot be changed after a default.  *Id*. at 375 & n.16.  However, there was a "practical problem" in that certain portions of the statute at issue lacked any provision that would guide the calculation of damages.  *Id*. at 376.  And, similar to this case, Plaintiffs argue, the defaulting party's conduct had "prevented the application of the pleaded theory of damages."  *Id*.  The court accepted the prevailing party's invitation to "relax the application of Rule 54(c) and in its place apply an alternative measure of damages."  *Id*. at 375-76.  The court therefore applied the common law formula for tort damages. *Id*. at 376.

The Court is not persuaded to follow *Sarlie*.  The case is both old and from another District.  It is not this Court's regular practice to "relax the application" of the Rules of Civil Procedure.  Unlike *Sarlie*, in this case, Plaintiffs pleaded a clear theory of damages in Count V, going so far as to request a specific dollar amount in damages.  That request was not a lowball figure.  Nothing in this case compels the application of a theory of damages inconsistent with Rule 54(c).

"We give the Federal Rules of Civil Procedure their plain meaning.  As with a statute, our inquiry is complete if we find the text of the Rule to be clear and unambiguous."  *Bus.*

*Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 540-41 (1991).   The

purpose and language of Rule 54(c) are clear.   *Silge v. Merz*, 510 F.3d 157, 159 (2d Cir. 2007).

The theory underlying Rule 54(c) is that

> the defending party should be able to decide on the basis of the relief requested in
> the original pleading whether to expend the time, effort, and money necessary to
> defend the action.  It would be fundamentally unfair to have the complaint lead
> defendant to believe that only a certain type and dimension of relief was being
> sought and then, should defendant attempt to limit the scope and size of the
> potential judgment by not appearing or otherwise defaulting, allow the court to
> give a different type of relief or a larger damage award.

*Id.* at 159 (quoting 10 Charles Alan Wright, et. al., Federal Practice and Procedure § 2663 3d ed.

1998).

A 2012 case from South Carolina declined to follow *Sarlie*.   *CT & T EV Sales, Inc. v.

2AM Grp., LLC*, No. 7:11-CV-1532-TMC, 2012 WL 1576761, at *4 (D.S.C. May 2, 2012).

Citing the above passage from Wright & Miller, the *CT&T* court observed that Rule 54(c) "is

intended to apply to all cases of default" and that "fundamental fairness, required by due process

of law, limits the scope of relief."  *Id.* at *4-5 (quoting *Enter. Bank & Tr. v. Vintage Ranch Inv.,

LLC*, No. 11-CV-1797-PHX-LOA, 2012 WL 1267988, at *2 (D. Ariz. Apr. 16, 2012)).   This

fairness principle is "undoubtedly" why Rule 54(c) "proscribes that a default judgment must not

differ in kind from, or exceed in amount, what is demanded in the pleadings."  *Id.*; *see also

Enter. Bank & Tr.*, 2012 WL 1267988, at *2-3 (relying on Rule 54(c) and awarding the exact

damages requested in the complaint without a hearing).

For these reasons, the Court recommends applying Rule 54(c) and hewing to Plaintiffs'

pleaded theory of damages.  The award of default judgment as a sanction entitles Plaintiffs to

what they asked for—lost royalties (as calculated by the arbiter) and Strong Brothers lease

reimbursements.  Although the Fivemile-related damages are the same as Count II's damages,

they derive from separate conduct and the violation of separate duties. The undersigned therefore recommends awarding $16,990,900 (the amount of lost royalties established in the record) plus $20,000, for a total of **$17,010,900** in compensatory damages under Count V. Plaintiffs' request to amend the complaint (which was never asserted as a separate motion) should be denied as inconsistent with the fairness principles embodied in Rule 54(c).

### 3. Alternative Recommendation – Defendants' Enrichment Through the NewLead Deals

Should Judge Van Tatenhove disagree with the foregoing analysis, the Court offers an alternative recommendation—a restitutionary amount derived from the NewLead figures. This alternative recommendation would be appropriate if Judge Van Tatenhove decides to grant Plaintiff's renewed motion for sanctions. D.E. 378. The Court now describes that motion.

#### i. Plaintiffs' Renewed Motion for Sanctions

In October 2017, Plaintiffs filed a motion under Rule 37 "for sanctions and for final judgment for damages based upon changed circumstances and new facts." D.E. 356. They complained that Defendants had provided a late supplemental document production concerning the NewLead transactions on September 14, 2017. *Id*. at 1. They argued that the new documents revealed that some of Defendants' prior representations to the Court (including statements made in objection to the prior damages R&R) were false. *Id*. at 1-2. Plaintiffs asked the Court to not hold an evidentiary hearing and to instead, as a sanction, enter judgment utilizing the recommendations in the prior damages R&R (with the exception that they requested fraud damages based on the NewLead transactions rather than the arbiter's report). *Id*. at 2-3. The motion was briefed. D.E. 357, 361, 364. In July 2018, Judge Van Tatenhove denied the motion for sanctions without prejudice. D.E. 368 at 6. He said the motion "is best suited to be taken up in the course of the evidentiary hearing." *Id*.

On November 6, 2018, Plaintiffs filed their now-pending "Renewed Motion for Sanctions." D.E. 378. As before, they complain that over 5,000 pages of documents related to NewLead were not disclosed until September 2017, over four years after the Court ordered disclosure. D.E. 378-1 at 1-2; *see also* D.E. 99, 122 (ordering prompt disclosure in 2013). Judge Van Tatenhove referred the renewed motion to the undersigned. D.E. 384. Because the earlier version of the motion had been fully briefed, the Court ordered expedited briefing. D.E. 386. Briefing was finished prior to the evidentiary hearing. D.E. 394 (response), 410 (reply). At the hearing, the Court allowed the parties to fully explore the NewLead transactions, partially due to this referral. D.E. 423 at 50.

Afterward, Plaintiffs pointed to "issues raised during the hearing that are relevant to the Rule 37 Motion because they relate to the Defendants' failure to provide or supplement discovery responses." D.E. 428 at 48. First, Plaintiffs argue, Defendants failed to fully disclose other litigation to which they were parties. *Id*. Plaintiffs argue this information was particularly important because, in researching other cases, they found other examples of contracts in which Defendants limited their mining obligations to marketable coal. *Id*. at 48-49. Second, Defendants also failed to timely disclose emails that concerned the drafting of the Fourth Amendment. *Id*. at 49. Plaintiffs argue this information was important because the emails show that language related to marketability and mineability of the coal was actually removed from draft versions of the Fourth Amendment with the awareness of all parties. *Id*. at 21-22, 49.

As a sanction, Plaintiffs ask the Court to measure fraud damages under Count V as "the value that a willing purchaser would place on the Fivemile leases in connection with an arms-length transaction." D.E. 378-1 at 27. They explain:

> This remedy—as a sanction under Rule 37—addresses and cures the prejudice caused by Defendants' concealment of the New Lead transaction and

> the documents relating to it.  As noted above, Defendants' strategy prevented the [Plaintiffs] from knowing enough about the New Lead transaction to seek to amend their Complaint to specifically allege fraud damages based upon that transaction.

*Id*.  They propose four alternative measurements of these market-value damages:  (1) the $21,855,000 specified in NewLead's SEC filing; (2) "other evidence of New Lead's expenditures;" (3) the amounts Kentucky Fuel was entitled to receive in connection with the NewLead transactions; or (4) the amounts Kentucky Fuel did receive in connection with the NewLead transactions.  *Id*. at 25.

This is an unusual motion.  Plaintiffs are not seeking an *additional* damages award on top of the damages flowing from the default judgment.  Instead, the remedy they seek is for the Court to adopt their preferred method for calculating compensatory (and by extension punitive) damages under Count V.  D.E. 378-1 at 25.  They frame this as the Court directing that designated facts are taken as established under Rule 37(b)(2)(A)(ii).  *Id*. at 24.  "Such an award as a sanction under Rule 37 is entirely different from an award of damages pursuant to the default judgment, which the Court has held should be preceded by an evidentiary hearing."  *Id*.

Defendants argue they did nothing wrong.  D.E. 394.  Their protestations of innocence are unpersuasive.  Defendants did produce 41 relevant files on September 24, 2013, and supplemented on October 25, 2013.  D.E. 394 at 3-4.  They argue that the September 2017 supplementation was not required, but was only done in the abundance of caution to avoid accusations that they were hiding documents.  *Id*. at 6.  Defendants argue:

> As the Newlead transaction was not pled in the Amended Complaint, Defendants did not believe that the Newlead transaction would be at issue in the default damages determination; thus, Defendants reasonably believed and understood a supplemental production of Newlead transaction documents generated after October 25, 2013 was unnecessary.

*Id*. at 4.  In a seven-year old case in which Defendants' misconduct has persisted as a series of obstructive tactics, this argument stands out as perhaps the most absurd presented.  The Court's orders in July 2013 specifically required production of all documents and emails "related to" the NewLead transactions (D.E. 99 at 3), and Rule 26(e)'s duty to supplement applies.  Plaintiffs indicated as early as March 11, 2016, that Defendants' sale of the leases and permits could be relevant to damages.  D.E. 258 at 10-11, 17.  Plaintiffs have been beating this drum ever since. *See* D.E. 410 at 4-5.  Defendants' argument that the September 2017 documents did not appear to them to be relevant is just another example of Defendants' failure to respect the integrity of the Rules and their process to ensure the efficient administration of justice.

Defendants' discovery violations have continued unabated even after the entry of default judgment.  Their untimely production of the NewLead documents in 2017 violated the plain duty to supplement under Rule 26(e).  When the documents were produced, their contents called into question some of Defendants' earlier representations to the Court.  D.E. 410 at 5-7.  This includes Defendants' sustained argument that the Fivemile coal was worthless. *Id*. at 8.

Even after the hearing, Defendants made misrepresentations to the Court.  In April 2019, Defendants moved to supplement the record with "the April 2, 2019 sworn statement of Kent Gross and the May 31, [2013] Summit Engineering Report."  D.E. 430.  These exhibits and the post-hearing brief that relied on them were stricken from the record.  D.E. 431.  Defendants argued that they had "learned of Kent Gross" in "late March 2019."  D.E. 430-1 at 1.  And they did not have "the information" included in his statement "until well after the evidentiary hearing." *Id*.  Despite months of preparation and planning, and a three-day evidentiary hearing solely limited to damages, Defendants waited until after Plaintiffs had filed their post-hearing brief and then contended that the evidence from Gross and the Report were "critical to the

Court's analysis of the amount of recoverable coal located at the subject Fivemile property, and the quality of that coal." D.E. 430-1 at 1. Injecting such evidence so late in the game would have severely prejudiced Plaintiffs.

The record flatly contradicts the assertion that defense counsel "first learned of Kent Gross" in March 2019, which was the factual basis for their motion to supplement. The Summit Engineering Report dated to May 31, 2013. *Id*. at 3. Defendants' stricken motion (an excerpt of which is at Docket Entry 433-1) also stated defense counsel "first learned of Kent Gross" in "late March 2019"—three months after the evidentiary hearing. In truth, Defendants themselves filed several documents in the record referencing Mr. Gross in August 2018. D.E. 375-3, -4, -5. Mr. Gross was also identified as a potential defense witness in November 2018: "Kent Gross is partners with Doug Terry in GSI, and will testify as to the Kentucky Fuel/GSI Agreement and GSI's current and future mining plans for the Fivemile property, as well as to the quality, mineability and merchantability of the coal." D.E. 397 at 2. Plaintiffs objected to Mr. Gross testifying, and Defendants argued he was an "appropriate and relevant" witness. D.E. 407 at 3.

Evidence brought forward at the hearing also demonstrated Defendants have been untruthful about the negotiations underlying the Fourth Amendment. They told the Court in their prehearing memorandum that "Jay Justice was not involved in the meetings or negotiations in any way." D.E. 395 at 3. Yet Mr. Justice testified he was present at the Greenbrier and received hourly updates from his lawyers about the negotiations. D.E. 424 at 158. Defendants told the Court the covenant to mine was inserted into the Fourth Amendment "unbeknownst" to their lawyers. D.E. 375-1 at 4-5; D.E. 395 at 3. But emails were produced that show the drafting history of this contract and belie this accusation. *See* D.E. 428 at 22.

This continuing litigation misconduct supports Plaintiffs' renewed motion for sanctions and that motion could be granted by Judge Van Tatenhove to allow him to adopt an alternative basis for computing damages on the fraud claim, as described in the next section. Alternatively, Judge Van Tatenhove may consider pursuing additional sanctions as an exercise of the Court's inherent authority under *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

### ii. The NewLead Transactions

Here is the background on the NewLead transactions, with key money figures rendered in bold type. On May 10, 2012 (two days after this lawsuit was filed, but before Defendants were aware of it), Defendant Kentucky Fuel entered an asset purchase agreement ("APA") to transfer the Fivemile assets to Williams Industries. D.E. 270-3 to 270-6. The "purchase price" in the original APA was $8,500,000, "reduced by usual, reasonable and ordinary expense prorations." D.E. 270-3at 11 ¶ 3.3(a). Included among the transferred assets was an "Andy Tipple," a facility for loading coal. *Id*. at 6-7 ¶ 2.1(a), (c).[17] As the transactions progressed, Cypress Camon Energy and then ultimately NewLead became final purchasers of the Fivemile assets. D.E. 433 at 11.

By December 28, 2012, the final purchase price was $11,000,000. *See* D.E. 270-18 at 5 (the March 18, 2013 Fifth Amendment to the APA).[18] NewLead touted this purchase in a January 17, 2013 press release: "Newlead Holdings Ltd. (NASDAQ: NEWL) ('Newlead') today announced that the Company has entered into an agreement to acquire title and excavation rights in properties containing 18.6 million tons of estimated coal reserves for $11.0 million." D.E. 264-2 at 1. NewLead entered another agreement for another set of coal properties at the same time. *Id*. Part of that $11 million purchase price was paid directly to Kentucky Fuel in the form

---

[17] Defendant's evidentiary hearing exhibit 13 is an artistic aerial video of the Tipple facility.

[18] The figures payable to "Seller," added together, total eleven million dollars and four cents.

of a **$7,500,000** promissory note.  The additional $3,500,000 went to other companies.  D.E. 433 at 12.  Through a series of amendments, the closing was delayed.  The Fifth Amendment contains a purchase price of **$11,000,000**, payable to "Seller" (D.E. 270-18 at 5), which is defined as Kentucky Fuel Corporation (*id*. at 1).  Kentucky Fuel's counsel Stephen Ball testified that not all of this $11 million actually went to them; as specified in the earlier documents, $3.5 million went to other companies.  D.E. 426 at 42.

Plaintiffs allege that Defendants and the other two sellers received at least **$12,327,876**, including interest and forbearance payments to defer the closing.  D.E. 428 at 18.  Plaintiffs now argue that this figure is the "minimal value of the Fivemile Assets in an arms-length transaction." *Id*. at 17.  Based on Plaintiffs' calculations, of this $12.383 million, Kentucky Fuel received at least **$8,827,876** and the other parties received at least $3.5 million.  *Id*.

It is undisputed that Defendants received over $8 million through the NewLead transactions.  But, Plaintiffs argue, NewLead invested a total of **$21,855,000**.  D.E. 428 at 17.  This figure comes from an SEC filing in which NewLead recited paying a total of $21,855,000 for the Fivemile Assets.  D.E. 270-20.  Plaintiffs have acknowledged "that price cannot be reconciled with the documents [obtained through discovery]."  D.E. 271 at 9 n.2.  But they argue this figure is "a fair, arms-length valuation" of the assets.  D.E. 428 at 17.

On Count V, Plaintiffs now ask for compensatory damages at a "[m]inimum of $12,327,876 (price paid to sellers) [and a] maximum of $21,855,000 (amount invested by New Lead)."  D.E. 428 at 52.  Kentucky Fuel is currently the only approved operator on the Fivemile permit; the assets have not been transferred to NewLead.  As Mr. Ball testified, NewLead defaulted.  D.E. 426 at 33, 42-43.  And Kentucky Fuel has now contracted with another company to mine the Fivemile coal.  D.E. 375.

The Court believes that, as compensatory damages, Defendants should have to pay Plaintiffs the funds they actually received through the NewLead transactions. In other words, they should make restitution and give back their unjust benefit. The starting high point for this figure is the undisputed **$8,827,876** that was paid to Kentucky Fuel, as evidenced in the NewLead documents. This includes the original $7.5 million note and the subsequent forbearance payments. Although the March 18, 2013 Fifth Amendment to the APA contains a purchase price of $11 million to the "Seller," the evidence does not otherwise indicate that NewLead made $11 million in payments to Defendants.[19] Although the amounts above the $7.5 million note were forbearance payments from NewLead to secure a delayed closing, these funds are benefits that Kentucky Fuel received as part of the sale.

What complicates this assessment is the presence of the Andy Tipple. Plaintiffs had nothing to do with the tipple, and funds spent on purchasing and repairing it should not be credited to them. Defendants maintain that the value of the tipple and its renovations was $5 million. D.E. 432 at 14. Plaintiffs argue Defendants inflated this figure during negotiations with NewLead. D.E. 428 at 19. Plaintiffs argue Defendants set the tipple's value at $5 million, knowing that the NewLead documents could be used in the future for assessing damages in this lawsuit. D.E. 433 at 10. Neither side has produced any documentation of the money expended on purchasing and renovating the tipple. What we have is the testimony of Mr. Justice and Mr. Ball.

Mr. Justice testified his company bought the tipple or "loadout facility" from Lexington Coal, which was going bankrupt, for about $450,000. D.E. 424 at 80. They invested "greater

---

[19] Mr. Justice's testimony was consistent with this analysis. When asked how much money his company received through the NewLead transactions, he responded, "Approximately $8 million." D.E. 424 at 90. Plaintiffs also state "it is clear that the principal amount of the purchase price for the Fivemile assets was $11 million dollars, which was payable to all three sellers – Kentucky Fuel, Williams Industries and Cypress Camon." D.E. 433 at 12.

than $4 million" (*id*. at 81) or "between 4 and $5 million" (*id*. at 86) or "about $5 million in the purchase and refurbishment of the facility" (*id*. at 53).

Mr. Ball testified that Kentucky Fuel acquired the Tipple at auction in 2005, and immediately began "refurbishing and updating" the facility.  D.E. 426 at 23.  He agreed with Mr. Justice's testimony that $4.5 to $5 million was invested in this process.  *Id*.  Mr. Ball later explained that the $5 million figure in the NewLead contracts was determined "by mutual agreement with Lloyd Williams . . . well before we ever signed an agreement with him."  *Id*. at 126.  But Mr. Ball relied on Mr. Justice's testimony that Kentucky Fuel invested at least $5 million into the tipple.  *Id*. at 132.

The relevant documents and the hearing testimony are fairly consistent in ascribing approximately $5 million to the loadout facility.[20]  Pointing out, as Plaintiffs correctly do, that Defendants lack credibility does not provide a sufficient basis for rejecting or altering this figure.  Because there is no evidentiary basis to assign a different value to the tipple, the Court will deduct $5 million from the recommended alternative compensatory damages.  As an alternative to the $17,010,900 described above, the Court recommends damages of $3,827,876 associated with the Fivemile leases, based on Defendants' apparent net receipt through the NewLead transactions.  Adding $20,000 for the Strong Brothers properties (as discussed in Part IV.A), the Court alternatively recommends **$3,847,876** as compensatory damages under Count V.  This is the amount Defendants owe if Plaintiffs' renewed motion for sanctions (D.E. 378) is granted by Judge Van Tatenhove.  This figure is less than what Plaintiffs asked for and much less than

---

[20] Mr. Ball testified that the parties allocated the $7.5 million note such that $5 million was for the tipple, and $2.5 million was based on the "estimated tonnage located on the Fivemile permit, i.e., 2.5 million tons valued at $1 per ton or $2.5 million."  D.E. 426 at 126.  Plaintiffs argue this 2.5 million tons referred only to the initially permitted area, and that it was intended to be "just the first step toward mining the entire property."  D.E. 428 at 20.  Mr. Justice explained in his testimony that only part of the property is currently permitted, and that industry practice is to "get it permitted in different increments."  D.E. 424 at 209-10.  At this point, it does not matter what Defendants expected to receive from NewLead in the future—the Court's focus is on the amount Kentucky Fuel did receive from the ill-fated NewLead transactions.

damages based on the arbiter's report.   But making Plaintiffs whole absent Defendants' fraudulent inducement means granting Plaintiffs the money Defendants have actually acquired through their control of the properties.   The Court therefore recommends this restitutionary figure.

### C.  Punitive Damages on Count V

It is settled that Defendants owe punitive damages.   As Judge Van Tatenhove explained: "Accepting the pleaded facts as true, the Plaintiffs have shown by clear and convincing evidence that the Justice Companies acted fraudulently and, hence, owe punitive damages pursuant to KRS § 411.184.  The amount of punitive damages will be determined at a later date."  D.E. 227 at 6.[21]   The purpose of punitive damages is "to punish what has occurred and to deter its repetition."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 587 (1996) ("*Gore*") (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21 (1991)).   The Court acknowledges that the award of default was itself a sanction, a punishment.   But embedded in that sanction was a finding that punitive damages are also appropriate in this case.   Nevertheless, the Court will discuss why punitive damages are legally warranted.

### 1.  An Award of Punitive Damages is Appropriate.

The operative Kentucky statute lists five factors to guide the Court's assessment of the amount of punitive damages to award:

> (a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;

> (b) The degree of the defendant's awareness of that likelihood;

---

[21] An award of punitive damages requires proof by clear and convincing evidence that defendant acted toward the plaintiff with oppression, fraud, or malice.  *Raleigh v. Edgewood Mobile Homes, Inc.*, No. 2012-CA-764-MR, 2014 WL 505579, at *5 (Ky. Ct. App. Feb. 7, 2014) (quoting KRS § 411.184(2)).   There must be evidence that a defendant's failure to exercise reasonable care was accompanied by wanton or reckless disregard for the lives, safety, or property of others.  *Id.*  These standards are satisfied by virtue of the default judgment and the well-pleaded charges in the Amended Complaint.

(c) The profitability of the misconduct to the defendant;

(d) The duration of the misconduct and any concealment of it by the defendant; and

(e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.

Ky. Rev. Stat. Ann. § 411.186(2).

Plaintiffs rely on an earlier brief (D.E. 270-1 at 21-35) to argue that punitive damages are appropriate.  D.E. 428 at 49.  Plaintiffs point both to pre-litigation conduct by Defendants and Defendants' conduct during this litigation, including their delayed disclosure of the NewLead documents.

Defendants no longer appear to argue that § 411.186(2)'s elements for punitive damages cannot be satisfied.  *See* D.E. 432.  Their post-hearing argument is that the Amended Complaint fails to state a viable fraud claim.  *Id*. at 40.  As discussed at the beginning of Section V, *supra*, the Amended Complaint does state a valid claim of fraud in the inducement.  In the alternative, Defendants argue that the economic loss rule precludes punitive damages.  *Id*. at 42.  As discussed in Section V.A, the economic loss rule does not apply in this case because there is an exception for fraudulent inducement claims.

Regarding the first § 411.186 factor, Plaintiffs argue the harm resulting from the fraud "was entirely foreseeable and certain" when Defendants had "an intentional business plan and strategy" of avoiding their contractual obligations.  D.E. 271 at 22.  Indeed, the Amended Complaint alleges that Defendants made intentional fraudulent statements and planned to avoid their contractual obligations.  D.E. 40 at 14; *see also* D.E. 227 at 4.  Those allegations have now been established as true.  The Court agrees that this factor supports a significant punitive damages award.

Regarding the second factor, Plaintiffs focus on Defendants' litigation conduct.[22]  They argue that Defendants' discovery violations and Mr. Justice's attempt to hide the NewLead transactions are evidence of their awareness of the likelihood of harm.  *Id.* at 22-23.  Even without considering the NewLead transactions, Defendants' well-established discovery violations (D.E. 206) support the second factor.  Defendants have manifested "a consistent pattern of obfuscation" (*id.* at 21), which supports a finding that they were aware that what they were doing was causing "serious harm" to Plaintiffs.  KRS § 411.186(2)(b).  Even if Defendants possessed defenses to liability that they could have pursued in good faith, their consistent obfuscation and sabotage of the orderly progress of this case stymied Plaintiffs' pursuit of the claims.  Defendants knew that their conduct would likely interfere with any recovery for Plaintiffs' business injuries.  The misconduct continued even after the award of default judgment as a sanction and the evidentiary hearing concerning the potential award of tens of millions of dollars in damages.  It seems only an enforceable judgment will counter Defendants' strategy.  Such intentional conduct should be deterred through a substantial punitive damages award.

The third factor considers the profitability of the misconduct.  Here, Plaintiffs ask the Court to award "some multiple" of the amount of money Defendants made through the NewLead transactions.[23]  D.E. 271 at 24.  Initially, Plaintiffs suggested $34 million.  *Id.*  Certainly the fraud

---

[22] In an abundance of caution, the Court notes that Defendants previously objected to any reliance on "'litigation conduct' (i.e., discovery violations)" in calculating punitive damages—an argument that now appears abandoned. They proposed that "one's conduct during litigation cannot be used to establish their bad faith regarding the alleged conduct that gave rise to the lawsuit." D.E. 277 at 23-24.  They provided one case citation, but that case concerned the interpretation of a statute under Kentucky's insurance code.  *Id.* at 23 (citing *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 522-23 (Ky. 2006)).  Plaintiffs point to cases in which courts took into account litigation conduct in assessing punitive damages.  D.E. 284 at 12-13.  This Court has no hesitation in considering both pre-litigation and litigation conduct in calculating punitive damages against Defendants.  *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1216 (6th Cir. 1988) ("[T]he court may award punitive damages when a party's conduct during the course of litigation is either frivolous or in bad faith.").  Defendants' behavior in this case sets an unfortunate new low in the undersigned's experience.

[23] As discussed in section V.B.3.ii, the amount of money Defendants themselves received from the NewLead transactions appears to be $8,827,876.

was profitable for Defendants because they have avoided paying millions of dollars in royalties and fees and sold the property for millions of dollars with the coal reserves intact.  Like the other factors, this one supports a robust punitive damages award.

The fourth factor concerns the duration and concealment of Defendants' misconduct. Plaintiffs argue that Defendants' fraudulent failure to comply with the Fourth Amendment began immediately and has continued for years.  D.E. 271 at 24.  Relevant conduct includes not paying retainer fees since May 2011, concealing the NewLead transactions, and providing phony tax returns.[24]  *Id.* at 25-26.  Defendants' reprehensible litigation conduct, including prolonged concealment of relevant discovery, is well-supported in the record.  Because Defendants have spent years defying the Court's discovery orders, factor four supports a copious punitive damages award.

Concerning the fifth factor, Plaintiffs argue that Defendants have taken no action to remedy the misconduct once it became known.  D.E. 271 at 29.  Instead, Defendants have "doubled down" on their misconduct.  Plaintiffs argue that Defendants continue to fail to pay the minimum royalties to the Fivemile landowners, some of whose leases have now been terminated or expired.  By causing these landowners to suffer, Defendants have also "tarred" Plaintiffs' reputations.  *Id.* at 29-30.  The Court observes that, although Defendants have caught up on their

---

[24] The Court ordered Defendants to produce their tax returns in 2013.  DE. 128, 156.  Defendants did not timely comply with that order.  *See* D.E. 206 at 11-13 (describing how Defendants had not fully complied with these orders in September 2014).  In March 2016, Plaintiffs received what was purported to be the tax returns.  *See* D.E. 265-1 at 2.  But these documents were not actually "copies of tax returns," even though the accompanying letter indicated they were.  Instead, Defendants later clarified that they were internally prepared accounting documents.  *See* D.E. 265-21 at 1.  Defendants then sent another set of accounting documents that Plaintiffs characterize as inconsistent with the first set.  *See* D.E. 265-22 at 1; D.E. 265 at 5-6.  Plaintiffs claim that both sets of documents are hoaxes. D.E. 265 at 5-6.  In April 2016, Defendants finally produced their actual tax returns along with a signed authorization allowing Plaintiffs to obtain copies directly from the IRS.  *See* D.E. 269 at 2.  Defendants' defiance of the Court's orders, stretching even beyond the award of default judgment as a sanction, constitutes relevant litigation conduct that supports the imposition of prodigious punitive damages.

Defendants now argue that the earlier-provided documents were legitimate "dummy" returns.  D.E. 432 at 39-40.  But the fact remains that they did not produce their actual IRS tax returns until 2016.

49

minimum royalty payments, they have not taken any other meaningful steps to remedy their misconduct.  Instead, their continuing misconduct has frustrated the prompt administration of justice.  This factor does not help them.

## 2.  Amount of Punitive Damages

Even though KRS § 411.186 supports a hefty punitive damages award, the Court must also consider Constitutional limitations.  In *Gore*, the Court laid out the following factors to ensure that a punitive damages award satisfies the need for fundamental fairness:  the degree of reprehensibility, the ratio of punitive damages to actual damages, and any disparity between the punitive damages award and other civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575.

Plaintiffs argue Defendants' conduct is reprehensible because it is repetitious.  D.E. 271 at 31.  It is "now established by the default judgment [that] not paying their debts was their business plan and strategy." *Id*.  They continue to "stiff" the "small Fivemile landowners," *id*. at 32, and their "bad-faith actions throughout this case are also relevant to the reprehensibility of their conduct." *Id*.  Plaintiffs point to a mineral royalties case, *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 (1993), in which the Court upheld punitive damages of a 52:1 ratio when the failure to pay royalties was "part of a larger pattern of fraud, trickery, and deceit." *Id*. Plaintiffs also urge the Court to consider the concealment of evidence and the false tax returns. *Id*. at 33.

The Court agrees that the degree of reprehensibility supports a large punitive damages award.  As the Amended Complaint alleges, Defendants' "business plan and strategy" included willfully ignoring their contractual obligations.  D.E. 40 at 3, 7.  Additionally, Defendants' litigation conduct that led to this entry of default was "contumacious," "perverse in resisting

authority and stubbornly disobedient." D.E. 206 at 5. And, as noted, the misconduct has extended beyond the entry of default and even the evidentiary hearing on damages.

The second *Gore* factor focuses on the ratio between the punitive damages and the amount of compensatory damages awarded on the fraud count. The recommended compensatory damages are $17,010,900 (or $3,847,876 in the alternative). There is no strict constitutional formula for setting this ratio; no "categorical approach" to the ratio question. *Gore*, 517 U.S. at 582-83. However, the Court in *Gore* explained that

> low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

*Id*. at 582. Here, the compensatory damages are not exactly "low." And this is not a case in which the injury is difficult to detect or its noneconomic harm difficult to determine. Accordingly, the Court will hew to a low ratio, specifically a ratio of 1:1. As the Supreme Court stated in *Campbell*, "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Of course, the award must be assessed case-by-case "upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id*. Here, assessing an additional $17,010,900 (or even $3,847,876, should Judge Van Tatenhove adopt the alternative calculation) suffices, in the Court's view, to punish Defendants for their fraud and deter them from future fraud without threatening to violate due process under *Gore*. A ratio of 1:1 is appropriate and should apply to either of the alternative fraud damages formulations discussed above.

Regarding the third *Gore* factor, Plaintiffs point to Kentucky statutory sanctions and conclude that their request is reasonable because state law allows for treble damages in certain contexts.  D.E. 271 at 34.  Defendants argue that the statutes Plaintiffs cite (such as ones for tree piracy and tax evasion) are not comparable to a breach of contract action and cannot guide the Court.  D.E. 277 at 24.  The Court believes that applying a punitive damages ratio of 1:1 avoids any problem regarding the third *Gore* factor while still fulfilling the purpose of punitive damages.

In their post-hearing brief, Plaintiffs agree that a 1:1 ratio is appropriate.  D.E. 428 at 52. In their reply brief, they changed course slightly, asking for a 1:1 ratio on the Fivemile assets and a 5:1 ratio on the $20,000 related to the Strong Brothers leases.  D.E. 433 at 27.  Plaintiffs provide no argument in support of the 5:1 ratio, so the Court will not consider it.  The undersigned recommends punitive damages in the amount of **$17,010,900** (or, alternatively, should Judge Van Tatenhove grant Plaintiffs' motion for sanctions and base lost royalties on the NewLead transactions, **$3,827,876**).

## VI.  Attorneys' Fees

Because the sun has not yet on this litigation, the Court is not equipped to recommend a precise award of attorneys' fees and expenses.  Plaintiffs' Rule 55 motion that preceded the prior damages R&R is accompanied by declarations documenting the fees and expenses.  These total $696,888.16 including interest through June 1, 2016, plus $46,983.75 in "additional out-of-pocket costs."  D.E. 271 at 34-35.  According to their motion, Plaintiffs plan to file an additional supplemental statement of fees after any related proceedings occur.  They ask for prejudgment interest to apply from the date of each invoice.  *Id*. at 35.

Defendants present no argument on attorneys' fees in their post-hearing brief.  D.E. 432.
Nor did they lodge any objections to the previous damages R&R's assessment of attorneys' fees.
D.E. 305.  Prior to that R&R, they objected to any award of fees incurred by R. Culver Schmid,
"who is not counsel of record in this matter, yet apparently was a 'ghost writer' of the
complaint."  D.E. 277 at 28.  They argued that if Schmid is indeed corporate counsel, then he
should be salaried and his fees not compensable.  *Id*.  However, Schmid's declaration and
invoices make clear he was a member of two outside law firms when he billed the time in this
case.  D.E. 270-32.  Schmid did not appear in previous fee applications because he was not
involved in the sanctions motions.  The undersigned continues to recommend awarding fees for
Schmid's work.

Schmid's invoices contain references to unidentified persons named "GPS" and "JMS,"
who billed $200 an hour without details of their qualifications provided.  GPS billed 1.8 hours.
D.E. 270-32 at 16-17.  JMS billed 3.2 hours.  *Id* at 16-19.  Defendants challenged these
individuals' hours.  D.E. 277 at 28.  Plaintiffs responded that NLTM has "validated" the work of
GPS and JMS by paying all of Schmid's invoices.  Despite the fact that "no details regarding
their qualifications have been provided," their roles were "minor" and the issue is "not material."
D.E. 282-1 at 16.  "Plaintiffs defer to the Court's discretion on this point."  *Id*.  The Court takes
this as a concession that the billing for GPS and JMS is not adequately supported by the record.
As before, the Court recommends that their billed hours—totaling five hours—not be included in
the Court's award of attorneys' fees and expenses.

A full account of Plaintiffs' attorneys' fees and expenses must be deferred until the
issuance of final judgment.

## VII.  Prejudgment Interest

In their post-hearing brief, Plaintiffs agreed with the Court's prior recommendation on prejudgment interest. D.E. 428 at 52. Defendants, in their post-hearing brief, made no mention of prejudgment interest. D.E. 432. But they did object to the prior R&R's assessment of prejudgment interest, arguing that it was inequitable and unjustly punitive. D.E. 305 at 28. The Court's opinion has not changed.

"In diversity cases in this Circuit, federal law controls postjudgment interest but state law governs awards of prejudgment interest." *F.D.I.C. v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000). A determination of prejudgment interest is "a matter of substantive state law." *Diggs v. Pepsi-Cola Metro. Bottling Co.*, 861 F.2d 914, 924 (6th Cir. 1988). Under Kentucky law, "The legal rate of interest is eight percent (8%) per annum." Ky. Rev. Stat. Ann. § 360.010. "Absent a contractually agreed upon rate, the appropriate rate of interest is governed by [KRS § 360.010]." *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 857 (Ky. Ct. App. 2003).

When damages are "liquidated," prejudgment interest "follows as a matter of course." *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991). Thus, when damages are liquidated, a successful plaintiff in Kentucky is "entitled to interest at the legal rate of eight percent (8%) per annum." *Poundstone v. Patriot Coal Co.*, 485 F.3d 891, 903 (6th Cir. 2007) (quoting *Pursley v. Pursley,* 144 S.W.3d 820, 828 (Ky. 2004). Stated a bit more precisely, "if damages are both undisputed and liquidated, prejudgment interest is payable as a matter of law. However, if the damages are either disputed or unliquidated, or both, then the decision as to whether prejudgment interest is due is left to the sound discretion of the trial court." *Barnett v. Hamilton Mut. Ins. Co. of Cincinnati, Ohio*, No. 2009-CA-2234-MR, 2011 WL 43307, at *4 (Ky. Ct. App. Jan. 7, 2011); *see also Denzik v. Denzik*, No. 2004-CA-944-MR, 2006 WL

3107110, at *3 (Ky. Ct. App. Nov. 3, 2006) (using identical language).  "Interest should not be *required* except for a claim which is for a liquidated amount, and which is not disputed in good faith."  *Wittmer v. Jones*, 864 S.W.2d 885, 891 (Ky. 1993) (emphasis added).

Whether damages are liquidated "is not always clear, but in general 'liquidated' means '[m]ade certain or fixed by agreement of parties or by operation of law.'"  *Nucor*, 812 S.W.2d at 141 (quoting *Black's Law Dictionary* 930 (6th ed.1990)).[25]  In contrast, "unliquidated" damages are damages "which have not yet been determined or calculated" or are "not yet reduced to certainty in respect to amount."  *Id*. (quoting *Black's* at 1537).  "[T]he key issue is whether the amount is fixed as between the parties to the litigation either by agreement or operation of law."  *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 276 (6th Cir. 2010).  "[I]n determining if a claim is liquidated or unliquidated, one must look at the nature of the underlying *claim*, not the final award."  *3D Enterprises Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).

Plaintiffs cite a Sixth Circuit case from Michigan (D.E. 258 at 19) for a definition of liquidated damages:  "Liquidated damages are those damages which are reasonably ascertainable at the time of the breach, measurable by a fixed or established external standard, or by a standard apparent from the documents upon which plaintiffs based their claim."  *Ramada Dev. Co. v. U.*

---

[25] As one authority defines them:

> "Liquidated damages" are a set amount of money, or a certain formula, expressly stipulated in a contract as the amount of damages to be paid by a party that breaches the agreement.  Liquidated damages can also be defined as the amount which has been ascertained by judgment or by specific agreement of the parties or which are susceptible of being made certain by mathematical calculation from known factors.  The amount must be stipulated and agreed upon by the parties at the time the contract is entered and compensate for injuries in the event of contract breach.

> Damages are "liquidated" when the proper amount to be awarded can be determined with exactness from the cause of action as pleaded, i.e., from a pleaded agreement between the parties, by an arithmetical calculation, or by application of definite rules of law.

22 Am. Jur. 2d Damages § 504.

*S. Fid. & Guar. Co.*, 626 F.2d 517, 525 n.11 (6th Cir. 1980); *see also G.D. Deal Holdings, Inc. v. Cincinnati Ins. Co.*, No. 1:05-CV-3-TBR, 2007 WL 3306109, at *2 (W.D. Ky. Nov. 6, 2007) (applying this definition in a federal case in Kentucky).

For any unliquidated damages, awarding prejudgment interest lies at the discretion of the Court. *Nucor*, 812 S.W.2d at 143.  In such cases,

> "Interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness; it is denied when its exaction would be inequitable . . . . the tendency of the courts is to charge and allow interest in accordance with the principles of equity, to accomplish justice in each particular case."

*Id*. (quoting 47 C.J.S., "Interest and Usury" § 6 (1982)).

Further,

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

*Id*. (quoting Restatement (Second) of Contracts § 354 (1981)).

"Kentucky courts rarely award prejudgment interest on unliquidated claims on equitable grounds." *Kentucky Commercial Mobile Radio Serv. Emergency Telecommunications Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905, 917 (6th Cir. 2013).  But such interest is available in any case when equitably appropriate. *Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444, 461-62 (6th Cir. 2016).  Imposing prejudgment interest often turns on whether the defendant disputed its liability in good faith, or whether there were allegations of bad faith. *Kentucky Commercial*, 712 F.3d at 917 (citing *Meridian Citizens Mut. Ins. Co. v. Horton*, No. 5:08-CV-302-KKC, 2010 WL 1253084, at *9 (E.D. Ky. Mar. 25, 2010)); *Owensboro Mercy Health Sys. v.*

*Payne*, 24 S.W.3d 675, 679 (Ky. Ct. App. 1999)).  For each damages award, the Court must determine whether the award amount is liquidated and unchallenged.  If not, the Court must determine in its discretion whether prejudgment interest is just and equitable.

### A. Count I

First, the monthly retainer fees under Count I are liquidated.  The value of the fees is clearly set out in section 9 of the Fourth Amendment.  D.E. 40-5 at 7.  Prejudgment interest of 8% is therefore automatic.  Regarding the minimum royalty payments under Count I, although these payments may have been tardy, the payments have been made, including interest (D.E. 271 at 17; D.E. 428 at 36), so there is no need to consider interest at this juncture.

### B. Count II

Second, the arbiter-determined award for lost tonnage royalties under Count II is unliquidated.  Although the amount of lost royalties determined by the arbiter is "immediately due and payable" (D.E. 40-5 at 6), the amount had to be calculated through a factual investigation outside the terms of the contract.  The amount was not "ascertainable at the time of the breach" by use of a fixed standard.  *Ramada*, 626 F.2d at 525 n.11.  Additionally, despite obstructing the progress of this case, Defendants have contested the applicability and validity of the arbiter's findings.

Although this damage award is technically unliquidated, equity tips in favor of assessing prejudgment interest.  Interest is particularly appropriate here because (1) the breach in Count II was made possible by Defendants' fraud-in-the-inducement (Count V), and (2) in light of Defendants' obstructive discovery tactics.  *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 496-97 (6th Cir. 2013) (upholding 8% interest in a RICO case in light of Defendants' fraud and "unfair obstruction of the pretrial proceedings"); *S.E.C. v. Antar*, 44 F. App'x 548, 553 (3d

Cir. 2002) (upholding a District Court's award of prejudgment interest based on the fact that Defendants committed fraud); *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1257 (10th Cir. 1988) ("In particular, where a defendant's behavior has involved dishonest or fraudulent conduct, the equities favor an award of prejudgment interest as compensatory damages."). Under the contract, this amount was "immediately due and payable" (D.E. 40-5 at 6), but no royalties have been forthcoming over the past seven years.

Defendants contend that prejudgment interest should not be awarded because they have disputed liability in good faith. But merely asserting a defense to such liability in their Answer does not paint the whole picture regarding their conduct. Instead, that assertion was a necessary procedural step to defend the case and set up a posture in which they could drag everything out through litigation misconduct. They may have reasonably disputed liability for the lost tonnage royalties at the onset of the case, but raising that dispute was one small step taken to further their "appalling" pattern of conduct. D.E. 206 at 21. Defendants converted this Court's processes into a tool for obstruction and delay. The totality of the circumstances supports an award of prejudgment interest. *Journey Acquisition–II*, 830 F.3d at 461-62.

To be clear, prejudment interest is not being imposed to punish Defendants for any litigation misconduct. Rather, its purpose is to compensate Plaintiffs for the denial of access to money they could have received years ago if Defendants had not obstructed justice.

The undersigned recommends that Judge Van Tatenhove assess 8% interest on damages under Count II. Interest should be calculated from the date of the independent arbiter's report, May 1, 2012. D.E. 40-6 at 2.

### C.  Count V—Compensatory Damages

Third, the $20,000 for the Strong Brothers leases under Count V is unliquidated.  Under section 9, Defendants agreed to reimburse Plaintiffs for "all payments of rent or any other payments due" under the Strong Brothers leases within seven days of a repayment request by Plaintiffs.  D.E. 40-5 at 7.  The "payments of rent or any other payments due" had to be assessed in light of facts beyond the bounds of the contract.  Although the payments amounted to $5,000 a year, the amount and regularity of the payments is not apparent from the Fourth Amendment itself.  However, the amount owed is not disputed.  Assessing interest is equitable in this case because Defendants had no good faith basis to avoid making these reimbursements.  The undersigned recommends assessing 8% interest to the unpaid Strong Brothers reimbursements, with the interest beginning to accrue seven days after each repayment request.

Mr. Brownlow describes the payments made on the Strong Brothers leases in his Supplemental Declaration of April 28, 2016 (D.E. 271-1 at 17-18 ¶ 36), and provides an account statement (D.E. 270-28).  The account statement provides as follows:

| Lease Payment Due Date | Principal Balance Due |
|---|---|
| 10/1/2011 | $5,000 |
| 10/1/2012 | $5,000 |
| 10/1/2013 | $5,000 |
| 10/1/2014 | $5,000 |
| | $20,000 |

Mr. Brownlow also provides a collective exhibit containing his requests for reimbursement from Kentucky Fuel.  D.E. 270-29.  The requests were sent on October 7, 2011, September 27, 2012, November 15, 2013, and April 21, 2016.  *Id.*  Defendants do not dispute that these requests were sent.  The undersigned recommends assessing prejudgment interest at a rate of 8% beginning

October 14, 2011, for the first $5,000 payment, beginning October 4, 2012, for the second, beginning November 22, 2013, for the third, and beginning April 28, 2016, for the fourth $5,000 payment.

The fourth question concerning interest also relates to Count V.  Because the remaining fraud damages under Count V consist of "the lost value of the royalties" (D.E. 40 at 14), they are similar to the arbiter-determined award under Count II.  But it does not necessarily follow that interest is warranted.  As previously discussed, these damages are unliquidated and contested. Furthermore, in contrast to Count II, Plaintiffs proffered alternative methods for calculating these damages.  D.E. 271 at 20-21.  Additionally, Count V is a tort claim, not a contract claim. Kentucky allows prejudgment interest in a tort claim.  *Nucor*, 812 S.W.2d at 143-45 (relying on Restatement (Second) of Torts § 913 (1979)).  Under the Restatement, a prevailing Plaintiff is entitled to interest "from the time of the accrual of the cause of action to the time of judgment, if the payment of interest is required to avoid an injustice."  Restatement (Second) of Torts § 913(1)(b).  In this case, the Court cannot say that prejudgment interest on Count V is *required* to avoid an injustice, especially when interest is already awarded for Counts I and II.  The undersigned does not recommend interest on the compensatory damages related to lost royalties under Count V.

### D.  Count V—Punitive Damages

What about prejudgment interest on the punitive damages?  "Punitive damages are clearly not liquidated[.]"  *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974).  "The majority of courts . . . deny the collection of prejudgment interest on punitive damages, finding that such interest is not recoverable on punitive damages because prejudgment interest has a compensatory purpose while punitive damages are essentially meant to punish."  *Ortiz v. Bright*, No. 2:98-CV-

1031, 2006 WL 1133296, at *3 (S.D. Ohio Apr. 26, 2006) (collecting cases); *see also McCoy v. Alfrey*, No. 7:08-CV-112-ART, 2010 WL 4366120, at *8 (E.D. Ky. Oct. 28, 2010) (amending a judgment to remove prejudgment interest on punitive damages).  The Court is loathe to depart from the majority view.  The undersigned does not recommend prejudgment interest for the punitive damages.

### E.  Attorneys' Fees and Expenses

The remaining category of damages is attorneys' fees and expenses.  Clearly these damages are unliquidated.  *See Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275-76 (6th Cir. 2010) (finding that attorney's fees were not liquidated when the parties could not have calculated them in advance of litigation).  The total amount of these fees and expenses is yet to be determined.  No compelling equitable considerations exist that would warrant an assessment of prejudgment interest on these fees.

### F.  Whether Interest Should Be Compound

Plaintiffs requested that interest be compounded annually.  D.E. 258 at 16, 20; D.E. 271 at 35.  "Kentucky law typically awards simple interest, but compound interest is also allowed in the court's discretion."  *Travelers*, 598 F.3d at 265 (citing *Reliable Mechanical, Inc. v. Naylor Indus. Services, Inc.*, 125 S.W.3d 856, 858 (Ky. Ct. App. 2003).  "[C]ompound interest may be awarded to accomplish justice in accordance with the principles of equity and the circumstances of each particular case."  *Leasure v. Coleman Am. Companies, Inc.*, No. 2006-CA-1673-MR, 2008 WL 2065235, at *3 (Ky. Ct. App. May 16, 2008) (citing *Reliable Mech.*, 125 S.W.3d at 857).

District Judge Van Tatenhove has previously analyzed the compound interest question under Kentucky law:

The Kentucky Court of Appeals explained its reasoning for allowing compound interest in *Reliable Mechanical* because the defendant had deprived the plaintiff "of the use of the money rightfully due and owed to it for nearly eight (8) years" when the defendant arguably "would have been capable of earning compound interest on its money during this lengthy time period." *Reliable Mech.*, 125 S.W.3d at 858. The court in that case went on to explain that the award of compound prejudgment interest there "[did] not constitute a punitive reprisal as to Reliable. Rather, it is an equitable means of recognizing the economic reality that Reliable has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from Naylor." *Id.* Awarding compound interest can be a means of "adjust[ing]" the inequitable result of providing the prevailing party with money that it might have earned itself but for the wrongful actions of the opposing party. *Id.*; *see also Prima Int'l Trading v. Wyant*, 2009 WL 722609, at *3 (E.D. Ky. Mar. 17, 2009) (quoting the reasoning in *Reliable Mech.*, 125 S.W.3d at 858, as basis for awarding compound prejudgment interest).

*Journey Acquisition-II, L.P. v. EQT Prod. Co.*, No. 6:12-CV-108-GFVT, 2015 WL 3916353, at *18 (E.D. Ky. June 25, 2015); *see also Groupwell Int'l (HK) Ltd. v. Gourmet Exp., LLC*, No. 4:09-CV-94-M, 2014 WL 2618601, at *20 (W.D. Ky. June 12, 2014) (awarding compound interest and noting that "[a]t any time during the pendency of this litigation [Defendant] could have stopped the running of this interest by paying [Plaintiff] what it admittedly owed. Instead, it kept the money and used it to fund its own operations"); *Prima Int'l Trading v. Wyant*, No. 6:07-CV-338-REW, 2009 WL 722609, at *3 (E.D. Ky. Mar. 17, 2009) (awarding compound interest under *Reliable Mechanical*); *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 596 F. Supp. 2d 1020, 1026 (W.D. Ky. 2008) (awarding simple interest when the defendant had "not unreasonably withheld payment from [Plaintiff] for such a lengthy period of time that would require compound interest"), *aff'd*, 598 F.3d 257 (6th Cir. 2010).

This is a case where equity tips in favor of awarding compound interest. The scenario is similar to that found in *Reliable Mechanical*, where the defendant deprived the plaintiff "of the use of the money rightfully due and owed to it for [multiple] years." *Reliable Mech.*, 125 S.W.3d at 858. Plaintiffs "[a]rguably . . . would have been capable of earning compound

interest on its money during this lengthy time period." *Id.* Awarding compound interest recognizes "the economic reality that [Defendants have] enjoyed a long opportunity to earn interest on the money that [they] wrongfully withheld from [Plaintiffs]." *Id.* Here, Defendants clearly owed the retainer fees and the reimbursements on the Strong Brothers Leases. And the arbiter's award was designed to be "immediately due and payable." Defendants should have made these payments. By refusing to do so, they have deprived Plaintiffs of the compound interest they could have otherwise earned on this money. *See Journey Acquisition-II*, 2015 WL 3916353, at *18 (awarding compound interest under *Reliable Mechanical*); *Groupwell*, 2014 WL 2618601, at *20 (same). In this case, equity demands that interest be compounded.

## VIII. Conclusion

For the reasons explained, the undersigned **RECOMMENDS** an award of damages to Plaintiffs as follows:

(1)     For Count I, as of the date of this Report, Defendants owe **$970,000** in unpaid *retainer fees*. That amount continues to increase by $10,000 on the first day of each month. Judge Van Tatenhove should assess 8% interest on these fees, compounded annually. No amount for unpaid *minimum royalties* should be awarded because Defendants are current on these payments. Plaintiffs' request for a declaratory judgment is outside the scope of the referral. In the alternative, it should be denied as an exercise of Judge Van Tatenhove's discretion.

(2)     For Count II, Defendants owe **$16,990,900**, as determined by the independent arbiter, with 8% prejudgment interest compounded annually beginning May 1, 2012.

(3)     As compensatory damages under Count V, Defendants owe **$20,000** for the Strong Brothers lease reimbursements, plus 8% compound interest beginning October 14, 2011, for the first $5,000 payment; October 4, 2012, for the second; November 22, 2013, for the third; and April 28, 2016, for the fourth $5,000 payment.  In addition to the foregoing, Defendants also owe **$16,990,900**, without interest, for lost royalties.  If this calculation is rejected by Judge Van Tatenhove, in the alternative to the $16,990,900, he should grant Plaintiffs' motion for sanctions and base lost royalties on the NewLead transactions, meaning Defendants owe **$3,827,876**, without prejudgment interest.

(4)     As punitive damages under Count V, Defendants owe **$17,010,900**, without interest.  In the alternative, should Judge Van Tatenhove base lost royalties on the NewLead transactions, Defendants owe **$3,847,876** in punitive damages, without prejudgment interest.

(5)     Under section 14 of the Fourth Amendment, Defendants owe "all attorney fees and expenses" in connection with this lawsuit (D.E. 40-5 at 7).  But the total amount cannot yet be assessed.   After Judge Van Tatenhove acts on this Recommendation and all motions are resolved, the undersigned recommends that Plaintiffs be allowed to file an affidavit of fees and costs with an opportunity for a response from Defendants.  *See* Fed. R. Civ. P. 54(d)(2)(C).  Interest should not be applied to the award of attorneys' fees and expenses.

    **IT IS HEREBY ORDERED** that Defendants' motion for leave to file a sur-reply (D.E. 434) is **DENIED.**  The sur-reply relates to matters that were already stricken from the record by prior order (D.E. 431).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Report and Recommendation, issued under subsection (B) of the statute. *See also* Rule 72(b). Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

This the 26th day of June, 2019.

**Signed By:**

**_Hanly A. Ingram_**

**United States Magistrate Judge**