UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

| | |
|---|---|
| **NEW LONDON TOBACCO MARKET, INC. and FIVEMILE ENERGY, LLC**<br><br>        Plaintiffs,<br><br>V.<br><br>**KENTUCKY FUEL CORPORATION and JAMES C. JUSTICE COMPANIES, INC.,**<br><br>        Defendants. | Civil Action No. 6:12-cv-91-GFVT-HAI<br><br>Judge Gregory F. Van Tatenhove<br><br>**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS TO ALTER OR AMEND OR TO RECONSIDER SEPTEMBER 23, 2019 MEMORANDUM OPINION AND ORDER** |

Defendants, Kentucky Fuel Corporation ("Kentucky Fuel") and James C. Justice Companies, Inc. (collectively, "Kentucky Fuel" or "Defendants"), through counsel, submit this Memorandum in support of their Motion pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure to alter or amend or to reconsider the Memorandum Opinion and Order (the "Opinion and Order") entered September 23, 2019 [Doc. 445]. The grounds supporting Defendants' Motion are addressed below.

**I.      INTRODUCTION.**

This matter has been pending for over seven years, and as would be expected over the course of the years has taken many procedural turns and involves extensive facts and factual allegations.[1] As the Court is well aware, the matter is now one of damages, a default judgment having previously been entered in Plaintiffs' favor against Defendants. That default judgment resulted from alleged discovery violations on the part of Kentucky Fuel, and in particular the

---

[1]     The Court is well aware of the facts in evidence and the procedural machinations. Defendants therefore do not include a factual summary or procedural history. Relevant factual and procedural points are included where necessary.

inadvertent failure of Jay Justice to appear for his scheduled deposition. Although then-counsel for Defendants attempted to reschedule the deposition with counsel for Plaintiffs, those efforts went unheeded. Plaintiffs' counsel instead went silent until hitting Defendants with a Motion for Default Judgment. Defendants recognize that on this issue the Court has remained firm, but nevertheless respectfully submit that there was never any bad faith on their part and that this matter could and should have been addressed through lesser sanctions and allowed to proceed to a decision on the merits.

Because that did not happen, the question of what damages are to be awarded based on the imputed liability was addressed at a three-day hearing before the Magistrate Judge. Many of the recommendations set forth in the June 26, 2019 Report and Recommendation and Order (the "Report and Recommendation") [Doc. 437] were adopted in the Opinion and Order. Without relinquishing the right to contest other aspects of the Opinion and Order in an Appeal, if necessary, Defendants request, first, that the Court review whether the entry of default judgment and the hearing on damages denied Defendants their due process rights and, second, that the Court reconsider three of the findings in the Opinion and Order: the award of monthly retainer fees to Mr. Brownlow through the entry of final judgment; the award of lost tonnage royalties based on the disputed report of Plaintiffs' "independent" arbiter; and, finally, the 1:1 ratio adopted for punitive damages in light of the already harsh sanction of default judgment.

II.     **LEGAL STANDARD.**

Rule 59 of the Federal Rules of Civil Procedure provides that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). Rule 60 provides for reconsideration of a "final judgment, order, or proceeding." Fed. R. Civ. P. 60(b). Defendants recognize that a Judgment has not yet been entered, and that the

Opinion and Order is nowhere designated as a "final" Order, however out of an abundance of caution Defendants file this Motion now.

Motions to alter or amend judgment may be granted if there is a "clear error of law, newly discovered evidence, an intervening changing [sic] in controlling law, or to prevent manifest injustice." *Curry v. Eaton Corp.*, 2010 U.S. App. LEXIS 19704, *59 (6th Cir. 2010) (emphasis added) (quoting *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (other citations omitted)).[2]  The Sixth Circuit "has interpreted the term 'judgment' to refer to a judgment or a final order." *Keith v. Bobby*, 618 F.3d 594, 597-98 (6th Cir. 2010) (citing *CGH Transp., Inc. v. Quebecor World, Inc.*, 261 F. App'x 817, 823 n. 10 (6th Cir. 2008); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 617 (6th Cir. 2002)).  In this case, the aspect of the Opinion and Order discussed *infra* were based upon certain errors of fact and law and is therefore appropriate for review and reconsideration.

### III.  LEGAL ARGUMENTS.

#### A.  The Denial Of Due Process.

The Fifth Amendment to the United States Constitution provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. CONST. AMEND. 5, §1.

The Due Process Clause applies to civil cases, just as it does to criminal ones. *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. V. Rogers*, 357 U.S. 197, 209 (1958).  The fundamental requirement of due process is the opportunity to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970).  "Being heard" means more than being permitted to file documents in the record.  It means the Court gives the litigant an opportunity for a hearing "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552

---

[2]  Pursuant to Sixth Circuit Rule 28, a copy of the *Curry* opinion is attached as ***Exhibit A***.

(1965). Where the issues in the case require proof, due process requires that the litigants be afforded an opportunity to present it, and where proof is presented by their opponents, they have a right to dispute it by cross-examination. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg*, 397 U.S. at 267.

Due process considerations apply even when the Court has entered a default judgment on liability. While a Court may enter such an order where its principled discretion demands it, such an order remains subject to the limits of due process. "The provisions of Rule 37 which are here involved must be read in light of the provisions of the Fifth Amendment that no person shall be deprived of property without due process of law…." *Societe Internationale*, 357 U.S. at 209.

The imposition of default judgment as a sanction for discovery violations "is a drastic step which should be resorted to only in the most extreme cases." *Prime Rate Premium Fin. Corp. v. Larson*, 930 F.3d 759, 769 (6th Cir. 2019) (quoting *United Coin Meter Co. v. Seaboard Coastline R.R.*, 705 F.2d 839, 845 (6th Cir. 1983)). The factors to be considered by the reviewing Court are whether the party acted in bad faith, whether the opposing party was prejudiced, whether the Court gave adequate warning and if a less drastic sanction could have ensured compliance by the "offending" party going forward. *See Larson, supra*, 930 F.3d at 769 (citing *Grange Mut. Cas. Co. v. Mack*, 270 F. App'x 372, 376 (6th Cir. 2008). Here, Defendants have denied any bad faith in their actions with respect to the Jay Justice deposition, a sentiment that Mr. Justice reiterated during his testimony at the evidentiary hearing. Jay Justice Testimony, Trans. (2), 65:19-66:13; 66:23-67:7. *See also Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990) (citations and internal quotations omitted) ("Just as dismissal of an action for failure to cooperate in discovery is a sanction of last resort that may be imposed only if

4

the court concludes that a party's failure to cooperate in discovery is due to willfulness, bad faith, or fault, so, too, is entry of default judgment.").

Any prejudice to Plaintiffs occasioned by Mr. Justice's failure to appear at his deposition could have been addressed through monetary sanctions, especially in light of the efforts of Defendants' then-counsel to have the deposition rescheduled. Finally, a much less drastic sanction could certainly have ensured that Defendants would comply with their discovery obligations going forward. Defendants therefore submit that the entry of default judgment was an unnecessarily harsh response to Defendants' actions and omissions.

But even if the Court's decision to enter a default judgment were correct, it applied only to liability. This Court itself wrote:

> A party who has been found liable by default judgment "still has the opportunity to respond to the issue of damages." *Antoine*, 66 F.3d at 110, and a finding of default "is not considered an admission of damages." *Greyhound*, 973 F.2d at 158.
>
> Plaintiff's reliance on the Independent Arbiter's report, a mere two pages that did not consider the market or the ability for Defendants to remove coal from the ground, is inadequate.
>
> Memorandum Opinion and Order [Doc. 321], pp. 4, 6 (quoting *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105 (6th Cir. 1995), and *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155 (2d Cir. 1992), *cert. denied*, 506 U.S. 1080 (1993)).

Yet the Magistrate Judge's consideration of the evidence at the damages hearing, and the Court's adoption of it, deprived defendant of a meaningful opportunity to be heard. The Court's reliance on the "independent" arbiter's report of Robert Conway – a report whose sources, methodology, and underlying assumptions could not be challenged by Defendants because of the untimely death of its author – inappropriately deprived Defendants of their property rights without due process of law.

5

The use of the Conway report to calculate the damages for "lost tonnage royalties" was likewise improper. Mr. Conway's death precluded Defendants the opportunity to cross-examine him about his report. Coupled with Defendants' inability to put on their own damages expert and to challenge the assumptions relied upon by Mr. Conway (for example, the assumption that the coal at issue could have ever been mined for a profit), Defendants were provided with no meaningful opportunity to demonstrate the myriad reasons that the Conway report was unreliable and unsuitable as a measure of damages. The Supreme Court has stated that due process means "notice and opportunity for [a] hearing appropriate to the nature of the case." *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). In this case, Defendants were precluded from challenging the Conway report in the only ways possible to do so – either by cross-examining Mr. Conway, or by presenting evidence as to why the assumptions of methodologies of his report were erroneous.

Obviously there was no way to cure the inability to cross-examine Mr. Conway, and his report should not have been permitted into evidence for that reason alone. However, because the Court determined that Plaintiffs could use the Conway report, the failure to consider Defendants' evidence regarding the mineability and merchantability of the coal, the poor quality of the coal, the failures by other entities to successfully mine the coal, and the regulatory obstacles to mining the coal, effectively deprived Defendants of a fair hearing "appropriate to the nature of the case," *i.e.*, the correct measure of damages.[3] In other words, the Court has deprived Defendants of a

---

[3] Plaintiffs did retain another expert witness who appeared at the hearing and was going to testify, but when Plaintiffs learned that Defendants intended to call the expert themselves if Plaintiffs did not, Plaintiffs sent him away. This precluded Defendants from bringing out the flaws in his report and questioning him regarding the flaws in the Conway report. Defendants were precluded from calling any experts of their own. *See* Trans. (1), 199:1-202:6.

property right – to the tune of over $35 million – without the procedural due process to which they are constitutionally entitled.

### B.  The Monthly Retainer Payments.

In the Opinion and Order, the Court cited to the Report and Recommendation that "the effect of default judgment is a finding for Plaintiffs that retainer fees have continued to accrue to the date of final judgment." Opinion and Order [Doc. 445], p. 3. The Court adopted this portion of the Report and Recommendation – as to Count I of the Amended Complaint – and found that Defendants "currently owe **$1,000,000** [in unpaid retainer fees], compounded annually at 8% interest." *See id.*, p. 15 (emphasis in original). Defendants respectfully submit that the law cited by them in response to the Report and Recommendation amply demonstrates that the obligation to pay retainer fees ceased at least as early as the filing of the original Complaint in this matter on May 8, 2012, Mr. Brownlow stopped his work for Defendants and Defendants' obligation to continue to pay him likewise ceased.

The Court suggests in its Opinion and Order that no evidence was presented as to "how the agreement to pay minimum royalties may be terminated, or whether it was terminated." *See id.*, p. 4. Respectfully, this statement is not entirely accurate. In their April 1, 2016 Response (Prehearing Memorandum) [Doc. 262, pp. 22-23/Page ID# 3246-3247], Defendants put Plaintiffs on notice that any continuing relationship between Defendants and Mr. Brownlow was terminated in accordance with the Fourth Amendment. Defendants subsequently also presented evidence that Mr. Brownlow's work for them had ceased when Plaintiffs filed their Complaint. Specifically, at the evidentiary hearing, Plaintiffs introduced a list of contacts Mr. Brownlow made, allegedly on behalf of Defendants, over the years. *See* P. Hg. Ex. 10. After the Complaint was filed on May 8, 2012, through November 2017, Mr. Brownlow reported some 102 contacts

with or related to Kentucky Fuel – however, a number of those entries on their face relate to the litigation.  Surely Kentucky Fuel should not be required to pay Mr. Brownlow for his contact with them related to his claims *against* Kentucky Fuel?

Other numerous contacts consisted of nothing more than forwarding e-mails.  Finally, and as explained previously, after Plaintiffs filed suit and through the end of 2012, Mr. Brownlow claimed 12 contacts (with no contacts in 4 of those months); in 2013 he claimed 37 contacts – one month with no contacts, and two contacts consisting of forwarding e-mails; 36 contacts in 2014, 22 of which were forwarding e-mails; 12 contacts in 2015 (4 months with zero contact); only 4 contacts in 2016, and only 4 contacts through November 2017.  In other words, Mr. Brownlow himself has demonstrated that he performed almost no work for Kentucky Fuel after his entities filed suit, making an award of fees for his services post-Complaint nothing more than a windfall.

In the end, however, the contract language and the evidence are of no real relevance in light of the case law.  When one party breaches a contract, the other party's obligation to continue performance is excused.  *See Metro Louisville/Jefferson County Government v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (to succeed on a breach of contract claim in Kentucky, the complaining party must prove a valid contract existed, a breach of that contract, and damages flowing from the breach) and *Dalton v. Mullins*, 293 S.W.2d 470 (Ky. 1956) (a material breach by one contracting party excuses the other party from performing his contractual obligations). Likewise, when the non-breaching party is no longer required to perform, the obligation to pay for that performance also ends.  Stated more simply, Mr. Brownlow stopped working for Kentucky Fuel and sued Kentucky Fuel and, Plaintiffs' damages for the monthly retainer fees should have been cut off as of May 8, 2012.

C. **The Award Of Lost Tonnage Royalties.**

The Court also awarded $16,990,900 in lost tonnage royalties, based on the report of the "independent" arbiter, the late Bob Conway. *See* Opinion and Order, pp. 9-11, 16. Defendants respectfully submit that the Court's statement that Defendants' arguments about the mineability and merchantability of the coal at issue and the unreliability of the Conway report were "mooted with the entry of default," is erroneous. *Id.*, p. 10. By accepting the Conway report as "gospel," without allowing for any consideration of its (many) failings, the Court has removed from Plaintiffs any burden to actually *prove* their damages.

Defendants understand and accept that their liability was cemented with the entry of Default Judgment, but submit that this judgment should not obviate Plaintiffs' burden to prove its damages. It was for that reason that the Court overruled the first Report and Recommendation and required an evidentiary hearing. Indeed, as stated by this Court in ordering that an evidentiary hearing on damages take place:

> The independent arbiter's report [R. 40-6] is barely over one page and estimates that the lost royalties on the Fivemile lease are $16,990,990.00. … this Court is hesitant to rely primarily on the very short independent arbiter's report to award damages of such a magnitude. Though this Court has entered default judgment against Defendants and will not consider the scope of liability, *Defendants should still have the opportunity to speak meaningfully towards the damages calculation this Court will award* and present any evidence regarding mitigation of damages or any other analysis they think is important for this Court to consider.

Memorandum Opinion and Order [Doc. 321], pp. 2, 5 (emphasis added).

It is for this reason that Defendants have attempted to convince the Court to consider their arguments about the unreliability of the Conway report and about the implied covenant of mineability and merchantability that should be read into the parties' agreement.

While it is certainly true that, upon entry of default, the well-pleaded allegations of the subject Complaint are accepted as valid, this does not mean that the Court can completely wash

9

its hands of its duty to enter a judgment that conforms with the applicable law. *See* Wright & Miller, 10A *Federal Practice & Procedure Civ*. §2688 (4th ed.) (emphasis added) ("Even after default, however, *it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action*, since a party in default does not admit conclusions of law."). Of particular importance as to this issue is the Kentucky Court of Appeals' statement in *Deskins v. Estep*, 314 S.W.3d 300, 304 (Ky. Ct. App. 2010) (emphasis added), that "[n]otwithstanding that a default judgment has been entered, *the law still requires a legal basis to support a damages claim*." *See also Dirs. Of the Ohio Conf. of Plasterers & Cement Masons Combined Funds, Inc. v. Akron Insulation & Supply, Inc.*, 2018 U.S. Dist. LEXIS 77549, at *13 (N.D. Ohio, May 8, 2018) (citing *Ford Motor Co. v. Cross*, 441 F.Supp.2d 837, 848 (E.D. Mich. 2006)) ("the well-pleaded allegations in a complaint are taken as true as to liability when a defendant is in default, *but not as to damages*").

Without reiterating the arguments set forth by Defendants in their objections to the Report and Recommendation, Defendants would emphasize a few key points. First, Mr. Conway made no effort to determine the amount of coal that could have been mined between the date of the Fourth Amendment, November 22, 2010, and the date of his report, May 1, 2012. A proper analysis would have tested and analyzed both the coal at issue – its quality, quantity, and mineability – and the market conditions during the November 2010 – May 2012 time frame to determine the amount of coal, if any, that Kentucky Fuel would have had the ability to profitably mine. "Lost tonnage royalties," as characterized by the Court, would then be the minimum royalties and/or the royalties payable for the coal that could be mined under the prevailing conditions.

Instead, Mr. Conway concerned himself solely with the amount of tons *in situ* along with an estimated recovery rate. He then calculated the supposed damages based upon a multiple of $2.00 per ton for the first 250,000 tons of coal that supposedly could be mined and a $1.00 per ton for coal that could be extracted afterward [Doc. 1-8]. If this were the true measure for damages intended by the parties, the total amount of coal reserves could have been calculated at the time the Fourth Amendment was drafted. The parties would then have been able to negotiate that figure or take into consideration the various realities associated within the "constraints of industry standards."

A more logical explanation is found in Paragraph 5(f) of the Fourth Amendment. It sets out the *minimum* royalty clauses which were an actual part of the negotiations between these Parties. In setting the minimum, the Parties would have taken into consideration the realities of the coal market as it then existed and the factors affecting future mining. The minimum royalties clause would have ensured Plaintiffs at least some compensation for the use of their grant of the leases even where the industry was depressed. This interpretation is also consistent with the Parties' previous transactions. The first contract between New London and Kentucky Fuel relevant to the subject properties was an Assignment of Leases and Permits dated October 5, 2005. [Doc. 1-5] An amendment was then made to the original assignment on October 31, 2005, which was quickly followed by a Second Amendment to the Assignment of Leases and Permits on November 23, 2005. *Id.* A Third Amendment was entered about June 1, 2006. *Id.* None of these amendments included provisions for "minimum royalties", "covenant to mine" or "event of default" clauses. Whether it be because of changes in the industry or changes in the parties' relationship over the years, the addition of the "minimum royalties" clause is evidence of an intent to provide a standard for measuring compensable damages. Under such circumstances, it

11

is logical to conclude that the arbiter would not be an engineer, but an accountant who determines the amount of royalties that were paid or due as well as the interest on amounts that were unpaid and owing.

In addition, the covenant to mine included in the Fourth Amendment to the Parties' Agreement includes critical qualifiers: that Kentucky Fuel must use "commercial and reasonable good faith efforts" to mine and that Kentucky Fuel must use those efforts to maximize recovery "within the constraints of industry standard." It is those qualifiers which limit a proper damage award. Several factors combined to make it impossible for Kentucky Fuel to extract significant amounts of coal from the property at issue, the testimony regarding which was *unrefuted*. For example, Jay Justice testified that the lack of §404 Permits for valley or hollow fill areas in which to put earth and rock displaced in the coal extraction process were virtually impossible to obtain, and that even if they could be obtained, the cost was prohibitive:

> (A)ny of the mining required a lot of valley fills.…In recent years…the federal government has taken over the permitting of the valley fills….It (would take) four or five or six years and millions and millions of dollars to get one….(I)f you need a valley fill permit, you are just out of luck. That's just what happened.

Jay Justice Testimony, Trans. (2), 210:1-3; 210:18-211:11.

Another obstacle to significant mining activity at Fivemile was the poor quality of the coal. Mr. Justice testified that the standard makeup of steam coal was 12.5 BTU, 12% ash, and 1% sulfur. In contrast, the ash content of coal at Fivemile was "anywhere from probably 15 percent on the best seam to 35 percent on the worst seam. Sulfurs were 1 1/2 percent on the best seams and as high as 7 percent on the worst seams. And so...it's coal you just can't mine. It's just not marketable." *See* Jay Justice Testimony, Trans. (1), 209:2-8, 13-23. Defendants demonstrated through this testimony that the coal at issue was not marketable – and non-marketable coal would never have been mined by Kentucky Fuel, no royalties beyond the

minimum royalties would have been due, and Plaintiffs cannot support their claim for $16.9+ million in damages.

The understanding of Defendants regarding the finished project was made clear with the – again, unrefuted – testimony of Steve Ball:

> Q. And the [mineable and merchantable] language that was excised, the interlineated language, how did you view its excision or deletion, I guess is what I would say?
>
> A. To me, it didn't change the intent of the agreement or what the agreement says. It was just more specificity to the language above. So I didn't feel like it materially changed the agreement in any way….In my experience, these provisions, as long as they have the elements of commercial reasonableness and within the – as this one puts it, the constraints of industry standards, I'm comfortable with that.

Steve Ball Testimony, Trans. (3), 141:21-142:16; 139:15-141:8.

Defendants' unrefuted testimony about the proper interpretation of this language should have been considered in the determination of damages because, again at the risk of repetition, *it demonstrates that, assuming that understanding was correct, there would have been no damage to Plaintiffs* beyond the minimum royalties.

Finally, and even accepting Plaintiffs' argument that Defendants were required to mine even unprofitable coal and that future damages could still be awarded under the Agreement, the testimony of Jay Justice is that no more than 50,000 tons of coal could have been produced, and that it is unlikely *any* mining would have occurred – an assertion borne out by the fact that none of the prior or subsequent entities who attempted to mine the Fivemile property were able to do so successfully. *See* Jay Justice Testimony, Trans. (2), 6:14-21; 209:2-14. Therefore, rather than applying a compounded prejudgment interest rate to $16,990,900 from May 2012, the proper damages calculation would need to reduce that amount by a reasonable present value discount interest rate over thirty years. Any other methodology would result in the assessment of an

unlawful penalty. *See Paducah Area Public Library v. Terry*, 655 S.W.2d 19, 24-25 (Ky. App. 1983) (adopting the "universal rule [requiring] that awards for lost future earnings be in present worth … [a]ny other rule may tend to overcompensate … and turn injury into profit, a result forbidden under our sense of justice.").

Applying this rule, the Kentucky Court of Appeals in *Moore v. Ford Motor Credit Co.*, 778 S.W.2d 657, 659 (Ky. App. 1989) instructed the trial judge to reduce the amount owed on the balance of the term of a lease to its present value to avoid imposing an unlawful penalty, explaining:

> …we hold that the failure of the default provision to discount the accelerated rent to its present value constitutes an unlawful penalty. Under Kentucky law, only those liquidated damages provisions which bear a reasonable relationship to the anticipated damages are enforceable. Accelerated rentals that are not discounted do not bear a "reasonable relationship" to actual damages suffered. Further, since the penalty clause allows the lessor both the car *and* the rental payments (with one year's less depreciation than bargained for), failure to discount the accelerated rents to present value obviously results in the lessor being unjustly enriched.

*Moore, supra*, 778 S.W.2d at 659 (citations omitted) (emphasis in original).

The same principles apply in this case. The lost tonnage royalties awarded constitute an award of damages to Plaintiffs as if the Fourth Amendment required Defendants to mine every ounce of coal underlying the property within eighteen months, by May 2012. However, even if the Lease required Defendants to mine all of the coal regardless of its profitability, mining 17 million tons under the "constraints of industry standards" would have taken far more than eighteen months. Discounting the damages based on a realistic assessment of how many tons of coal per year could have been mined (if any) and over a realistic amount of time would significantly reduce the amount awarded to Plaintiffs for royalties. Even in the default context, the Court must decline to award damages that constitute an unlawful penalty. *See Borek, Stockel & Co. v. Slevira*, 609 N.Y.S.2d 679, 679-80 (N.Y. Super. 1994)).

14

The fact of default does not mandate that Plaintiffs' chosen method of calculating damages is also to be taken as fact. The case law cited *supra* is clear that even in a default setting, Plaintiff must prove its damages. By failing to refute Defendants' testimony about their ability to mine and sell the subject coal for a profit, and their (reasonable and legally supported) understanding of their obligations under the agreement, Plaintiffs have not demonstrated that they are entitled to their chosen arbiter's (minimal and highly disputed) calculation – a calculation that the Court was "hesitant to rely primarily on" – of the value of the coal in place at the Fivemile property. Defendants' evidence and arguments about the correct interpretation of the Parties' agreement, and their evidence and arguments about the abysmal quality of the subject coal and the near impossibility of obtaining necessary permits, or even effectively mining much more than a maximum of 50,000 tons, were not presented to refute the finding of default judgment and liability. They instead were presented to demonstrate to the Court that the Conway report is not a valid analysis of the amounts Plaintiffs would have received *but for the default* and is therefore not a valid calculation of Plaintiffs damages.

### D.  **The Punitive Damage Award Was Excessive.**

The third award Defendants ask the Court to reconsider is the 1:1 ratio of punitive damages assessed. The punitive damages arise from the allegations of Count V of the Complaint alleging fraud as follows:

> At the time they executed the Fourth Amendment, Justice and Kentucky Fuel did not intend to honor their obligations or to make the payments due when they were required by the Fourth Amendment. Instead, they falsely represented…that they would make the payments required under the Fourth Amendment and perform their obligations thereunder in order to induce (the Plaintiff) to execute the Fourth Amendment.

Amended Complaint [Doc. 40], p. 14.

15

As litigation on the action ensued, and accepting without agreeing with the Court's finding of repeated egregious discovery errors on the part of Defendants (a different version involving New London's counsel refusing to cooperate on resetting Jay Justice's deposition and then pouncing on Kentucky Fuel with a sanctions motion was offered by Kentucky Fuel), the Court penalized Kentucky Fuel with the most dramatic of remedies – default judgment against them and in favor of Plaintiffs. In denying the Defendants' Motion to Alter or Amend [Doc. 212], which attempted to contest entry of the Default Judgment as it pertained to certain aspects of the allegation of fraud and request for punitive damages, the Court stated:

> When a default judgment is entered, liability is established and the facts pleaded in the Complaint must be taken as true. ***Accepting the pleaded facts as true***, the Plaintiffs have shown by clear and convincing evidence that the Justice Companies acted fraudulently and, hence, owe punitive damages pursuant to KRS Section 411.184.
>
> Order [Doc. 227] (citations omitted) (emphasis added).

By its plain meaning, then, it is clear that the imposition of punitive damages is, itself, born of a separate punishment imposed by the Court: the default judgment predicated on discovery violations deemed so outrageous that an extreme remedy was required. Although it was deemed by the Court to serve the interests of justice, the imposition of the default judgment was a distinctly punitive measure which enabled New London to avoid scrutiny of the legitimacy of its claims and denied Kentucky Fuel any further opportunity to contest liability – including liability for punitive damages. With this in mind as a mitigating factor, the Defendants ask the Court to reconsider the 1:1 ratio of punishment to damages.

The traditional manner to establish a reasonable punitive damage award is to focus on the reprehensibility of the defendant's conduct. *See State Farm Mutual Auto Ins. Co. v. Campbell*,

538 U.S. 408, 419 (2002) (citing *BMW of North America v. Gore*, 517 U.S. 559, at 575, 116 S.Ct. 1589 (1996)).[4] The factors for determining reprehensibility are whether:

- The harm caused was physical as opposed to economic;
- The tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;
- The target of the conduct had financial vulnerability;
- The conduct involved repeated actions or was an isolated incident; and
- The harm was the result of intentional malice, trickery, or deceit, or a mere accident.

*See State Farm, supra*, 538 U.S. at 419.

Application of the factors to the actions of Defendants in this case demonstrates that punitive damages should be reduced, if not eliminated. Even with the allegations of Plaintiff taken as true, the harm to them was purely economic – no one's health or safety was compromised, there was no hint of financial vulnerability on the part of Plaintiffs (the entities and Mr. Brownlow are well-heeled and financially successful), the fraud alleged to have been occasioned by Defendants was confined to the events surrounding the adoption of the Fourth Amendment, and the harm was alleged to have resulted from false representations as to an intention to mine coal, not intentional malice, trickery or deceit.

In pointing out that there are no benchmarks for setting a punitive damage award, the Supreme Court in *State Farm* noted that "(w)hen compensatory damages are substantial…a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the

---

[4] In *Campbell*, the Supreme Court confirmed that the Due Process clause of the 14th Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *See Campbell, supra,* 538 U.S. at 417 (citing *Cooper Industries, Inc. v. Leatherman Pool Group, Inc.*, 532 U.S. 424, 433 (2001)).

due process guarantee." *State Farm, supra,* 538 U.S. at 425. In this case, compensatory damages are multiple millions of dollars. If a 1:1 ratio reaches the outermost limits of an award when compensatory damages are substantial, then surely the 1:1 ratio is excessive in a case in which Plaintiffs have been awarded damages exceeding $17 million and in which, without a default judgment of liability, Plaintiffs might never have been awarded a judgment at all. The question also arises whether, when compensatory damages are not awarded for breach of contract, should punitive damages even be assessed.

In any case, it is clear that Defendant's actions, resulting in a punishment in the form of a default judgment, did not rise to such a high level of reprehensibility as to justify the devastating imposition of $17,010,900 in punitive damages. Defendants respectfully submit that, at most, ten percent of the amount computed as compensatory damages, or $1,701,090, is a more than adequate punishment. The current award not only constitutes a hardship, but it will also unduly enrich Plaintiffs, who already will take home nearly $20 million.

### IV. CONCLUSION.

For all these reasons, Defendants respectfully request that the Court reconsider the Opinion and Order and alter or amend it and the eventual Judgment as requested herein.

Respectfully submitted,

/s/ Richard A. Getty
RICHARD A. GETTY
DANIELLE HARLAN
    and
MARCEL RADOMILE

THE GETTY LAW GROUP, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507
Telephone: (859) 259-1900
Facsimile: (859) 259-1909

E-Mail:  rgetty@gettylawgroup.com
E-Mail:  dharlan@gettylawgroup.com
E-Mail:  mradomile@gettylawgroup.com

And

KENT WICKER

DRESSMAN BENZINGER LAVELLE PSC
321 West Main Street
Suite 2100
Louisville, Kentucky 40202
Telephone:  (502) 572-2500
Facsimile:   (502) 572-2503
E-Mail:  kwicker@dbllaw.com

COUNSEL FOR DEFENDANTS,
KENTUCKY FUEL CORPORATION AND
JAMES C. JUSTICE COMPANIES, INC.

## CERTIFICATE OF SERVICE

A copy of the foregoing Memorandum in Support of Motion of Defendants to Alter or Amend or to Reconsider September 23, 2019 Memorandum Opinion and Order was served on the 21st day of October 2019, electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures and Standing Order upon all parties in the electronic filing system in this case.

/s/ Richard A. Getty
COUNSEL FOR DEFENDANTS

dhbpld2212