**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON**

| | | |
|---|---|---|
| **NEW LONDON TOBACCO MARKET, INC.** | ) | |
| **and FIVEMILE ENERGY, LLC,** | ) | |
| | ) | |
| **Judgment Creditors,** | ) | |
| | ) | **Docket No. 6:12-cv-0091-GFVT** |
| **v.** | ) | |
| | ) | |
| **KENTUCKY FUEL CORPORATION, and** | ) | |
| **JAMES C. JUSTICE COMPANIES, INC.** | ) | |
| | ) | |
| **Judgment Debtors.** | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO COMPEL FULL RESPONSES TO
POST-JUDGMENT WRITTEN DISCOVERY**

Judgment Creditor, Fivemile Energy, LLC, submits this Memorandum in Support of its

Motion to Compel.

**A.  General Background**

This Court recalls the abusive discovery history of the Judgment Debtors in this case so

the Plaintiffs will refrain from "wast[ing] any further time detailing the Defendants' startling

history of obstruction and delay," and instead focus only on the *current* obstruction and delay.

Mem. Op. & Order, R. 285 at 1. One might think that this history of the Judgment Debtors'

"alarming strategies designed to frustrate and delay the discovery process," Order, R. 251 at 1,

which resulted in default judgment, an award of tens of millions of dollars, two previous awards

of attorneys' fees, *see* Order, R. 99; Order, R. 116; and Mem. Op. & Order, R. 285, and

sanctions, might persuade the Judgment Debtors to act with the utmost level of cooperation in

post-judgment discovery. However, one would be wrong.

To begin collection efforts, Fivemile propounded post-judgment discovery consisting of

ten Interrogatories and eighteen Requests for Production to the Judgment Debtors *over eight*

*months ago* on May 27, 2020. The Judgment Debtors responded on June 26, 2020. As part of those responses, the Judgment Debtors raised yet another "morass of conclusory objections" as this Court previously characterized the Judgment Debtors' discovery actions. *Id.* The Judgment Debtors objected to 25 of the 28 requests. They objected to nine interrogatories and 14 requests for production as being "overly broad, unduly burdensome, and seeking information which is neither relevant nor reasonably proportionate to the needs of this case." They objected to one request for production as "overly broad" and "neither relevant nor reasonably proportionate to the needs of the case." Lastly, they objected to one interrogatory as merely "seeking information which is neither relevant nor reasonably proportionate to the needs of the case."  These requests speak for themselves.

Where the Judgment Debtors did provide responses, they were woefully inadequate.[1] With respect to interrogatories, the Judgment Debtors provided a narrative response only to Interrogatory No. 9 and otherwise responded by producing documents pursuant to Rule 33(d) of the Federal Rules of Civil Procedure. The problem, however, is that the Judgment Debtors' production of documents did not fully answer the interrogatories, as Rule 33(d) requires, and were grossly deficient in scope. As for the requests for production, much of what the Judgment Debtors produced consisted of summary documents—such as asset disposal reports, cash receipts reports, tax returns, and balance sheets—many of which are simply printouts from accounting software with hardly any of the underlying documentation. For example, the Judgment Debtors' 2019 federal tax returns show they maintained almost $426 million in assets

---

[1] The Judgment Debtors also produced a jumbled collection of documents on June 26, 2020, oftentimes labeling multiple documents with the same bates numbers. Filemile devoted time and resources to reviewing this production using the erroneous bates numbering. In their good faith letter, Fivemile requested that the Judgment Debtors correct this. The Judgment Debtors subsequently re-produced their documents and corrected the bates numbering, but this poor production and subsequent correction increased the time required for Filemile to evaluate the sufficiency of the Judgment Debtors' production and resulted in unnecessary confusion.

at the end of 2019. Exhibit A. However, the Judgment Debtors' production makes it impossible for Fivemile to collect on any of these vast assets. Without that information, collection is impossible, as the Judgment Debtors no doubt intend.

Fivemile began addressing the deficiencies in these responses with the Judgment Debtors on July 20, 2020, by emailing a narrow request for a supplemental response to Interrogatory No. 5, asking for further response as to accounts receivables. The Judgment Debtors' initial responses included the James C. Justice Companies' ("Justice Companies") federal tax return for 2019. This tax return revealed accounts receivable of $284,000,000, many of which were owed by related companies or individuals. Exhibit B. Fivemile's email asked for all underlying documents for these accounts receivable. On August 18, 2020, and in response to the July 20 request, the Judgment Debtors trickled out nine additional pages of documents by e-mail. Together with the initial production, these nine pages memorialize only $789,000 of the accounts receivable assets—less than 1% of the $284,000,000 in accounts receivable James C. Justice Companies, Inc.'s federal tax return balance sheets showed.

On September 11, 2020, after having no success at obtaining a meaningful supplement to a targeted request, Fivemile sent a comprehensive good faith letter identifying all the deficiencies in the Judgment Debtors' responses to post-judgment discovery and seeking full responses to this discovery. Exhibit C. By subsequent e-mails, the parties sought to work together on a fair deadline for response. At the Judgment Debtor's request, the deadline was set and reset. Ultimately, the Judgment Debtors responded to the Fivemile's letter on October 5, 2020, but did not supplement their responses until October 26, 2020. When the Judgment Debtors produced some additional documents, their supplemental responses barely advanced the ball. Most, if not all, of their responses remained far from complete.

Fearing that the Judgment Debtors were not acting in good faith yet again, counsel for Fivemile arranged a phone call with the Judgment Debtors' new counsel, Mr. Schroeck (who had taken the sole responsibility on discovery responses), on December 22, 2020. On this call, Mr. Schroeck, insisted that the Judgment Debtors considered their responses "full responses" to the post-judgment discovery, despite obvious deficiencies. This confirmation made it clear to Fivemile that Court intervention would be required to obtain full responses to the outstanding discovery.

**B.  Law on the broad scope of post-judgment discovery**

Post-judgment discovery is broader than the scope of discovery the Federal Rules of Civil Procedure allow during litigation. *E.g., Heartland Materials, Inc. v. Warren Paving, Inc.*, No. 516CV00146TBRLLK, 2019 WL 7290472, at *2 (W.D. Ky. Dec. 30, 2019) ("Compared to discovery during litigation, post-judgment discovery is 'very broad.'") (quoting *United States v. Conces*, 507 F.3d 1028, 1040 (6th Cir. 2007)). The scope of post-judgment discovery is so broad, in fact, that parties may take discovery on assets a judgment debtor fraudulently transferred. Judge Wier expressed this unequivocally in a recent decision:

> A judgment creditor is entitled to utilize the full panoply of federal discovery measures provided for under federal and state law to obtain information from parties and non-parties alike, including information about assets on which execution can issue or about assets that have been fraudulently transferred.

*In re ClassicStar Mare Lease Litig.*, No. 5:06-CV-243-JMH, 2017 WL 27455, at *3 (E.D. Ky. Jan. 3, 2017) (internal citations and quotation marks omitted).

This broad scope for post-judgment reflects that the Court has already determined liability and therefore all discovery aimed at collection is relevant to collecting damages for that liability. "The scope of examination is very broad, as it must be if the procedure is to be of any

value." 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3014 (3d.ed, West 2020).

## C.  The scope of Fivemile's post-judgment written discovery

Fivemile propounded written discovery requests meant to uncover the Judgment Debtors' current assets, the documents creating and "relating to" those assets, and potential fraudulent transfers of assets to affiliated companies and insiders. These requests did not need to be complicated and they were not. Fivemile propounded ten interrogatories and 18 requests for production. Those discovery requests are attached as <u>Exhibits D and E</u>. But the Court may find this brief summary to be useful.

<u>Summary of Interrogatories</u>: Fivemile asked the Judgment Debtors to identify and describe for the Judgment Debtors and their parents, subsidiaries and affiliates:

1.  All subsidiaries of the Judgment Debtors (which by definition includes their parents, subsidiaries, and affiliates),

2.  All sources of revenue and expenses,

3.  All bank or financial accounts,

4.  All assets with a value greater than $500 from 2010 through the present,

5.  All accounts receivable,

6.  All transfers of an interest in assets with a value over $500 from 2010 through the present,

7.  All liabilities from 2010 through the present,

8.  All sources of funds provided to the Judgment Debtors,

9.  The ownership of the Judgment Debtors (which by definition includes their parents, subsidiaries, and affiliates) for each year from 2010 through the present, and

10. Whether any person or entity holds assets on behalf of the Judgment Debtors or their parents, subsidiaries and affiliates from 2010 through the present.

Exhibit D.

Summary of Requests for Production: Then, to require production of the documents memorializing this information, Fivemile took two routes. First, Fivemile propounded Request for Production No. 1, which required the Judgment Debtors to produce all documents "relating to the Interrogatories … or referenced in the answers to those Interrogatories." Second, Fivemile propounded additional requests for production asking the Judgment Debtors to produce the underlying documents showing assets and asset transfers. These requests are attached (Exhibit E), but a select few are illustrative:

5. All notes, guarantees, financing or credit agreements to which any of the Judgment Debtors, including its parents, subsidiaries and affiliates are a party.

8. The complete transaction files for all transactions involving transfer of any assets of the Judgment Debtors, including its parents, subsidiaries and affiliates for the period from 2010 to the present.

9. The complete transaction files for all mergers, acquisitions, or other similar transactions involving the Judgment Debtors, including its parents, subsidiaries and affiliates for the period from 2010 to the present.

10. All agreements between the Judgment Debtors, including its parents, subsidiaries and affiliates, and any affiliates, subsidiaries, officers, directors or insiders.

12. All financing or loan agreements which of any of the Judgment Debtors, including its parents, subsidiaries and affiliates, are parties.

15. Documents sufficient to show all assets of any nature, including contract rights, worth over $500 held between 2010 and the present.

Exhibit E.

As a whole, these discovery requests should provide a comprehensive picture of the current assets of the Judgment Debtors, how they were created, and any transfers of assets that the Judgment Creditors could use for collection purposes.

**D. The insufficiency of the Judgment Debtors' responses and inappropriate attempt to shift responsibility away from themselves onto Fivemile**

In response to these post-judgment discovery requests, the Judgment Debtors produced summary documents, such as tax returns, balance sheets, etc., but their responses are grossly insufficient.

In their initial response on June 26, 2020, the Judgment Debtors declined to respond narratively to the interrogatories and, instead, produced documents. *See* Exhibits F & G. But the documents produced respond to the interrogatories incompletely, as the Judgment Debtors' supplements have laid bare. Unfortunately, the only way to fully understand this insufficiency is to analyze each response in depth and compare the documents identified with information learned through the other documents produced (but not identified as responsive) and independent research. But one example is illustrative: Interrogatory No. 3 asks the Judgment Debtors to describe certain information about bank accounts, a basic source of information for purposes of garnishment. In response, the Judgment Debtors seem to have created a new document produced as JCJCPOST 000902-903 that lists 14 bank accounts and then produced it as a native document. Exhibit H. Of course, such a response is not proper because it was created to respond to discovery and should have been made into a narrative interrogatory response. But the Judgment Debtors exacerbate their deficiency yet again in their document production in responding to

7

Request No. 7 to produce statements of all bank accounts (and Request No. 1 asking for all documents referenced or relating to Interrogatory responses). The Interrogatory response lists the open and closing dates of the 14 bank accounts, which shows that the Judgment Debtors should have produced around 346 monthly bank statements if they had fully responded to the discovery. But in this initial production, the Judgment Debtors held back all the statements for 12 of the 14 bank accounts identified. Notably, the two accounts for which they did produce bank statements were relatively new accounts created *after* this Court conducted its December 11-13, 2018 evidentiary hearing on damages so this production provides no insight into funds used or transferred previously (for example, the Judgment Debtors provided no bank statements that would reveal whether they made any transfers of funds during the time between the Magistrate Judge's first multi-million dollar damages report and recommendation and the evidentiary hearing). The Judgment Debtors unilaterally chose not to divulge their banking details prior to this late stage in the litigation.

After receiving Fivemile's good faith letter, the Judgment Debtors supplemented on October 2020, but their supplement did not resolve the deficiencies in any meaningful way. Exhibit I & J. Instead, they produced bank statements at random and with three fundamental problems.

First, the Judgment Debtors still held back bank statements for 9 of 14 of the initial originally disclosed accounts. The supplement only added random monthly statements of three more (of the 14) bank accounts.

Second, of the bank statements supplemented, the Judgment Debtors produced only random bank statements for three of the originally identified accounts: Premier Bank Account No. XXXX-4723 (only two statements produced for February and March 2018), City National

Bank Account No. XXXX-8146 (five statements produced for June and July 2017, February through May 2018), and JP Morgan Chase Bank Account No. XXXX-5907 (three statements produced for August through October 2016). Simple arithmetic reveals the Judgment Debtors' deficient production even after they supplemented: of the accounts identified (which we know to be incomplete as explained below), and based upon the opening and closing dates that the Judgment Debtors identified, there should be approximately 346 monthly bank statement. But, to date, the Judgment Debtors have only produced **23 of 346 bank statements, leaving at least 323 unproduced**.

Third, the Judgment Debtors produced some bank statements for at least ***seven new*** accounts not listed as an account in their initial production, meaning that they had more than the fourteen accounts they originally swore to having and that the 323 unproduced statements actually understates the Judgment Debtors' failure. Because we do not know when these newly disclosed accounts were opened and closed (since the Judgment Debtors chose not to supplement their interrogatory answer with these accounts), we cannot determine how many statements are missing but it is obvious many are. Those new accounts are Goldman Sachs Account No. XXXX-2153 (two statements produced for February and May 2018), Goldman Sachs Account No. XXXX-6508 (one statement produced for February 2018), First United Bank & Trust Account No. XXXX-2049 (two statements produced for March and May 2018), J.P. Morgan Account No. XXXX-0009 (two statements produced for February and May 2018), Merrill Lynch Account No. XXXX-2237 (one statement produced for March 2018), Carter Bank & Trust Account No. XXXX-4488 (one statement produced for June 2020), BB&T Account No. XXXX-6815 (twenty-one statements produced for January 2019-September 2020), and Premier Bank Account No. XXXX-2448 (eighteen statements produced for April 2019-September 2020). The

Judgment Debtors failed to produce a significant number of bank statements for these supplemented accounts, swelling the number of undisclosed bank accounts far above the 323 number above.

The problems with this single example do not end here. Buried within their document production, the Judgment Debtors reveal they have *still other bank accounts* that they have never identified and for which they have produced *zero* bank statements.  The Judgment Debtors can offer no explanation for this exclusion.

Again, this focus on bank statements is meant to illustrate the gross deficiencies in the Judgment Debtors' obvious obligations, and it is far from comprehensive as to the deficiencies with other discovery requests. The length of the discussion necessary to make just these deficiencies clear shows why this illustrative approach is necessary at this point. A similar detailed discussion of every one of the many deficiencies would cause this Memorandum to be unduly lengthy.

Rather than do a detailed review of the production themselves, the Judgment Debtors seek to excuse their failure in a way that enables them to string out their discovery abuse: claiming no knowledge of deficiencies and seeking to force Fivemile to detail what documents are missing from the production. This excuse is merely a continuation of the Judgment Debtor's prior discovery abuses whereby they supplement by filling in only the gaps they know we are aware of.

First, as explained in the telephonic conference preceding this Motion, the Judgment Debtors are engaging in willful ignorance about their own assets and multi-million-dollar transactions. The summary documents they produced include balance sheets and tax returns. These documents show assets worth almost **$426 million**. Exhibit A is attached as an example.

Of those assets, **$240 million** of the assets are accounts receivable. *See* <u>Exhibit B.</u> But the Judgment Debtors failed to produce underlying documents that create these massive assets. During the telephonic conference, undersigned counsel gave one example to illustrate the Judgment Debtors' failure: the approximately $30 million account receivable owed by Jay Justice (55% owner of the Judgment Debtors). It defies belief that a company owned by Jay Justice disclosed this asset to the IRS but is unable to determine what is missing when responding to discovery requests that ask for the documents creating this asset (and others). This feigned ignorance is willful.

Second, the Judgment Debtors' position seeks to impermissibly shift their discovery obligations onto Fivemile, and thereby withhold information unknown to Fivemile. According to the Judgment Debtors' position, Fivemile must specify those specific assets and transactions (which presumes that Fivemile already *knows* about each asset and transaction), and then, *only then*, will the Judgment Debtors produce documents that Fivemile has described. This willful evasion would eviscerate the ability of many plaintiffs to collect a judgment. Contrary to the purpose of post-judgment discovery, the Judgment Debtors' proposed process enables them to conceal transactions that Fivemile does not know about, to withhold documents about those unknown transactions, and stretch this discovery process from the 30-day period set by Rules 33 and 34 into this seven-plus months logjam.

**E. Inappropriate Objections**

The Judgment Debtors exacerbated their failures to respond to discovery by unilaterally limiting the scope of the requests in two ways: (1) by refusing to respond as to "affiliates" of the Judgment Debtors and (2) by stopping their search and production in 2015 rather than back to

2010 as requested. As explained below, both of these objections should be overruled, and the Judgment Debtors required to respond in full.

## 1. Fivemile has a right to seek information about the Judgment Debtors' affiliates.

The broad scope of post-judgment discovery (*see* Section B, *supra*) allows the Plaintiffs to discover information from the Judgment Debtors not simply about the Judgment Debtors, but also about related entities and affiliates. In fact, this Court specifically recognizes the right of a party to acquire information through discovery about non-parties to determine whether a judgment debtor has shuffled assets to thwart collection efforts. *See e.g., In re ClassicStar Mare Lease Litig.*, No. 5:06-CV-243-JMH, 2017 WL 27455, at *3 (E.D. Ky. Jan. 3, 2017). Black's law dictionary defines "affiliate" as "1. A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation. 2. Securities. Someone who controls, is controlled by, or is under common control with an issuer of a security." AFFILIATE, Black's Law Dictionary (11th ed. 2019).

Relevant Kentucky statutes also defines "affiliate" at several places. *E.g.*, KRS § 45A.067, KRS § 271B.12-200, KRS § 154.22-010, KRS § 132.099, KRS § 154.20-254. A consistent theme across all these examples from the Kentucky Revised Statutes is that affiliate includes both ownership and control. Kentucky's Uniform Voidable Transactions Act also contains a definition of "affiliate" for purposes of voiding transfers to avoid creditors:

(1) "Affiliate" means:

(a) A person that directly or indirectly owns, controls, or holds with power to vote, twenty percent (20%) or more of the outstanding voting securities of the debtor, other than a person that holds the securities:

1. As a fiduciary or agent without sole discretionary power to vote the securities; or

2. Solely to secure a debt, if the person has not in fact exercised the power to vote;

(b) A corporation twenty percent (20%) or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or a person that directly or indirectly owns, controls, or holds, with power to vote, twenty percent (20%) or more of the outstanding voting securities of the debtor, other than a person that holds the securities:

1. As a fiduciary or agent without sole discretionary power to vote the securities; or

2. Solely to secure a debt, if the person has not in fact exercised the power to vote;

(c) A person whose business is operated by the debtor under a lease or other agreement, or a person substantially all of whose assets are controlled by the debtor; or

(d) A person that operates the debtor's business under a lease or other agreement or controls substantially all of the debtor's assets;

KRS 378A.010.

Fivemile has a right to seek information about affiliates and did so. Fivemile requested information about entities related to the Judgment Debtors by defining "Judgment Debtors" to include "Kentucky Fuel Corporation, James C. Justice, Inc., and the parents, subsidiaries and affiliates of each." As it currently stands, the Judgment Debtors have produced information with respect to the Justice Companies and some, but not all, of its subsidiaries; Kentucky Fuel Corporation, but none of its subsidiaries; and no affiliates for either company.

Initially, the Judgment Debtors refused to provide any information about any parents, subsidiaries, or affiliates from 2010 through the present. When the Plaintiffs pressed, the Judgment Debtors' counsel, Mr. Schroeck, claimed that neither "KFC nor JCJC has any parent companies," "KFC has no subsidiaries," and "JCJC has several subsidiaries whose documents, to the extent they exist, will be produced." Exhibit K at 2. We know this to be false both due to the

Judgment Debtors' previous sworn statements to this Court and due to some of their produced documents.

Contrary to Mr. Schroeck's statement, according to an affidavit of Stephen W. Ball, his clients' Vice President, filed on March 10, 2017, "Kentucky Fuel was a wholly owned subsidiary of [James C.] Justice Companies[, Inc.,] from 2004 (year of inception) through 2012. In 2013 Kentucky Fuel became a wholly owned subsidiary of Southern Coal Corporation." Aff. of Stephen W. Ball, R. 317-2 at 3. And in a document produced by Kentucky Fuel Corporation, it revealed that it does have subsidiaries. In its 2019 federal tax return, Kentucky Fuel Corporation informed the IRS that it is the one-hundred percent owner of Greenthorn, LLC; Southern Minerals, LLC; Consolidated Fuel Corp.; Kopperston Trucking, Inc.; SC Underground Mining, Inc.; Southern Surface Mining, Inc.; Justice Coal Corporation; and Alabama Fuel Corporation. Exhibit L.

The Judgment Debtors attempted to negotiate down the scope of these "affiliate" requests but their proposal is really an attempt to shield critical affiliate information from Fivemile. The Judgment Debtors offered to "expand" their initial response by defining "affiliates" as entities which are owned or partially own Kentucky Fuel Corporation and James C. Justice, Inc. *See id.* This limitation would carve out a huge amount of relevant material and the Judgment Debtors know it. For example, several agreements in the production contain the signatures of Governor Justice, Jay Justice, Jillean Justice, and Steve Ball as officers of companies not identified by Mr. Schroeck or the Judgment Debtors' discovery responses.

The Judgment Debtors' attempt to avoid responding to discovery as to "affiliates" is another act of willful ignorance to avoid their discovery obligations.

## 2. Fivemile has a right to seek discovery on matters taking place between 2010-2015.

The Judgment Creditors filed this case on May 8, 2012. The Judgment Creditors became present creditors as of the date the judgment in this case became final but established their rights as future creditors by May 8, 2012 at the latest. As future creditors, the Kentucky Uniform Voidable Transactions Act ("KUVTA") (and its predecessor Act) affords the Judgment Creditors protection from an empty judgment to the extent the Judgment Debtors shifted assets with the intent to hinder, delay, or defraud. *See* KRS § 378A.040. The KUVTA has a four-year lookback period. KRS § 378A.090. So, Fivemile could have justifiably requested information and documents from the Judgment Debtors dating as far back as early 2008. Fivemail chose to limit its discovery requests to the start of 2010, just over two years prior to when this lawsuit began and established their rights as future creditors.

The Judgment Debtors nevertheless objected to the scope of Fivemile's discovery requests. One of the main reasons this case has continued for almost nine years, as the Court well knows, is because the Judgment Debtors' conduct has caused needless delay. *See* R. 206 at 25, Mem. Op. & Order ("In sum, Defendants' entire strategy in this case has been to delay, object and not-comply."). Now, the Judgment Debtors seek to gain an advantage from their strategy by unilaterally limiting their discovery response obligations to 2015 forward. Not only is this date well after the scope of KUVTA's protection, **but it is after the date the Court granted default judgment, September 30, 2014**. Mem. Op. & Order, R. 206. In effect, the Judgment Debtors decline to divulge documents that could show efforts during this three-month period (or prior) to purge assets and render themselves judgment-proof. Fivemile reasonably requested discovery responses to catch any such transactions. Given the breadth of the Judgment Debtors' misconduct in this lawsuit and the broadly permissive scope of post-judgment discovery, the

Court should require the Judgment Debtors to provide documents and information dating back to 2010, as the Plaintiffs requested.

## F.  Relief Requested

Fivemile acknowledges and is making a good faith effort to obey the Magistrate Judge's direction in the January 8 teleconference preceding this Motion to specify the relief we sought in this motion. Fivemile requests the following relief:

1. That the Court overrule the Judgment Debtors' objections regarding producing documents relating to affiliates of Kentucky Fuel Corporation and James C. Justice, Inc.

2. That the Court overrule the Judgment Debtors' objections regarding producing documents from 2010 through 2015.

3. That the Court order complete narrative, sworn responses to all ten interrogatories.

4. That the court compel production of documents memorializing the creation of and documents relating to all assets shown on the Judgment Debtors' balance sheets, including but not limited to:

    a.  copies of all notes, guarantees, financing or credit agreements to which the Judgment Debtors are parties (Request No. 5),

    b.  copies of all bank account statements for all accounts owned or held by the Judgment Debtors (Request No. 7),

    c.  copies of the complete transaction files for all transactions involving any transfer of assets by Judgment Debtors (Request No. 8),

    d.  copies of all agreements between the Judgment Debtors and any affiliates, subsidiaries, officers, directors or insiders from January 1, 2010 through the present (Request No. 10).

5.   That the Court compel production of documents reflecting any modifications, payments, disbursements, or any other business actions taken with regard to the transactions shown in response to #2 above. (Request No. 1, documents "relating" to or "referenced" in the Interrogatory Responses, see also Requests No. 8 and 10).

## G. Attorneys' Fees.

As the Court stated in the telephonic conference preceding this Motion, it is "very difficult to believe" that the Judgment Debtors have made sufficient discovery responses in the seven-month period since Fivemile propounded its discovery. This delay and failure necessitated this motion and resulted in Fivemile incurring additional fees that would have been unnecessary but for the Judgment Debtor's continued tactics.

Rule 37(a)(5) makes an award of attorneys' fees mandatory if the Court grants a Motion to Compel, unless the Court finds that an award of fees is not appropriate for one of the reasons specified in the Rule.  There is no reason in this case for the Court to depart from the mandatory language of Rule 37(a)(5).

Further, due to the specific circumstances in this case, the award of attorneys' fees should be against both the Judgment Debtors <u>and</u> their counsel, Mr. Schroeck, for this discovery dispute for three reasons (although the Judgment Debtors should be allowed to pay any award against Mr. Schroeck). First, the rule permits it and the policy behind such fees encourages an award that gives effect to the Court's power. Rule 37(a)(5)(A) states that "the court must, after giving an opportunity to be heard, require … the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Under Rule 37 "**any party or person** who seeks to evade or thwart full and candid discovery incurs the risk of serious consequences[.]" 8B Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 2281 (3d.ed, West 2020) (emphasis added). This policy recognizes that "[w]ithout adequate sanctions the procedure for discovery would often be ineffectual[.]" *Id.*

To assure that courts have adequate power to sanction discovery in a meaningful way Rule 37 provides "broad discretion" to courts when imposing and crafting sanctions. 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2284 (3d.ed, West 2020). "The court is directed to make such orders as are 'just' and is not limited in any case of disregard of the discovery rules or court orders under them to a stereotyped response." *Id.* Accordingly. "[t]he district court may, within reason, use as many and as varied sanctions as are necessary to hold the scales of justice even." *Id; see also* (*Robison v. Transamerica Ins. Co.*, 368 F.2d 37, 39 (10th Cir. 1966) ("The administration of the rules lies necessarily within the province of the trial court with power to fashion such orders as may be deemed proper to vouchsafe full discovery for the just, speedy and inexpensive determination of the lawsuit."). Here, only an award against Ms. Schroeck will have a meaningful effect.

Second, the Judgment Debtors have signaled that they will not voluntarily pay anything ordered by this Court but will use the assets of related companies to fund their own defense. Recently, this Court entered a Memorandum Opinion & Order dated April 24, 2020 [Doc. # 466] on various motions, including a Motion for Sanctions under Rule 11 against Mr. Getty and Plaintiffs' Statement of Attorneys' Fees, Expenses, and Costs. That Order awarded the Judgment Creditors $10,000 in fees against Mr. Getty and his firm, and over $1 million in fees against the Judgment Debtors. To date, Mr. Getty paid his $10,000 into Court; the Judgment Debtors paid nothing. Although the judgment (including the fee award) is on appeal, the Judgment Debtors declined to post a supersedeas bond during the pendency of appeal. Despite hiring one of the most expensive law firms in the country, Gibson Dunn & Crutcher, LLP, to represent them on

appeal, the Judgment Debtors continue to claim (as recently as the telephonic discovery conference conducted on January 7, 2021) that they have no assets, "there's nothing there." But their actions in hiring Gibson Dunn and directing Mr. Schroeck to appear and fight about this discovery undercut this claim.

Third, the Judgment Debtors' use of an in-house attorney for this discovery dispute makes it likely that an award of fees against Mr. Schroeck will reach assets of the Judgment Debtors or related companies paying for this defense, giving effect to this Court's power. Current counsel in this discovery dispute, Mr. Schroeck, identifies himself as an employee of Bluestone Coal Corporation (e-mail address listed as chris.schroeck@bluestone-coal.com). The Judgment Debtors' introduction of in-house counsel for another company carries with it a deep level of irony. As part of the post-judgment discovery at issue, Fivemile sought information about all "parents, subsidiaries and affiliates" of the Judgment Debtors. The Judgment Debtors objected to the discovery about "affiliates" and purported to limit their responses to only subsidiaries. Their responses did not identify Bluestone Coal Corporation. Now, Bluestone has assigned an employee to represent the Judgment Debtors in this post-judgment discovery.

The interrelationship of these companies is exemplified by the path this post-judgment discovery must have taken to reach Mr. Schroeck at Bluestone Coal. Fivemile served the written discovery on counsel of record for the Judgment Debtors—Mr. Getty, Mr. Kent Wicker, and Ms. Kendra Samson. Somehow, these discovery requests were transmitted from counsel of record to the Judgment Debtors, who then sent the discovery to Bluestone Coal, who appears to have directed Mr. Schroeck to appear and take responsibility for representing its affiliates, the Judgment Debtors, in this discovery process. Put another way, someone with authority at Bluestone Coal apparently directed Mr. Schroeck to appear in this case on behalf of its affiliates,

19

to communicate with representatives of those affiliates, the Judgment Debtors, and to respond to the discovery. This is not mere corporate beneficence; as an affiliate of the Judgment Debtors, Bluestone apparently is sufficiently interested in the outcome to devote its financial resources to help stave off collection.[2]

Further, it appears that Mr. Schroeck has picked up the baton from his predecessors in channeling his employer's lack of respect for the processes of the federal court. Just four days after the January 7, 2020 discovery teleconference, United States Magistrate Judge Omar J. Aboulhosn of the Southern District of West Virginia issued an order granting a plaintiff an award of attorneys' fees against Mr. Schroeck's employer for a discovery dispute in *Gautier v. Tams Management, Inc.*, Case No. 5:20-CV-00165, 2021 WL 97712 (Jan. 11, 2021). Mr. Schroeck represents his employer, Bluestone Coal, along with other affiliated companies, Pay Car Mining, Inc., Bluestone Industries, Inc., Bluestone Resources, Inc. and Tams Management, Inc.[3], in that litigation. The Magistrate Judge's comments about Mr. Schroeck and his clients is reminiscent of some of this Court's comments about these Judgment Debtors' strategy, discovery abuse, and inconsistent positions:

> [T]his Court previously granted Plaintiff's Motion to Compel (ECF No. 28) as a result of Defendant's failure to properly and timely respond to discovery requests. The undersigned is stunned that Defendants maintain not only that Plaintiff has supposed not been prejudiced by the "short delay" in its production, but bizarrely contends that instead of conferring, Plaintiff "chose motion practice, which is of course more time-consuming than a phone call" (ECR No. 36 at 2) while at the same time ignores Defendant's ***own*** motion practice instead of simply responding to reasonable discovery requests! … These events simply do not reflect favorably upon Defendants. … Given this procedural history, the Court "must" order Defendants to pay Plaintiff's attorneys' fees under Rule 37(a)(5)(A). Even when

---

[2] The affiliation between Bluestone Coal and the Judgment Debtors further exemplifies the frivolous and abusive nature of the Judgment Debtors' objection to and refusal to respond to discovery as to affiliates. When it benefits the Judgment Debtors to do so, the affiliates become involved, but the Judgment Debtors object to discovery aimed at those affiliates.

[3] Yet again, the Judgment Debtors did not identify any of these other entities as affiliates in response to the discovery despite the joint defense offered by Mr. Schroeck in that case to those different companies.

examining these particular circumstances under Rule 37(b)(2)(A) … the undersigned is hard-pressed **NOT** to find Defendants acted in bad faith when it did not respond to Plaintiff's discovery requests in a timely manner.

*Id.* at *3 (emphases in original). Of note, that Court awarded such fees against Mr. Schroeck's employer due to a discovery delay of only "several months" rather than the seven-month delay at issue here. *Id.* Although Mr. Schroeck claims that the Judgment Debtors are taking their discovery obligations seriously, his behavior on behalf of his employer in other federal court litigation belie his words.

The appropriate period of time for an award of fees to Fivemile should be from the date of the Judgment Debtors' initial responses to discovery, June 26, 2020, through the resolution of this Motion. Through its failure to respond to this post-judgment discovery in good faith (as evidenced by an inevitable supplementation), the Judgment Debtors have effectively self-imposed a moratorium on collection during the pendency of the appeal without posting a supersedeas bond. These failures needlessly increased the expense to Fivemile and greatly benefited the Judgment Debtors. The Judgment Debtors should not benefit financially from their self-created delay to the detriment (and significant additional cost and delay) of the Judgment Creditors who have been defrauded.

Fivemile requests leave to submit an affidavit of fees within fourteen days of the Court's ruling on this Motion and that such fees be charged to both the Judgment Debtors and their current counsel.

**CONCLUSION**

For the above reasons, Fivemile requests that the Court grant its Motion and grant leave to file a fee application.

Fivemile certifies, by signature of counsel below, that counsel have conferred and are unable to resolve their differences.  The details of counsel's attempts to resolve the dispute are detailed above.

Respectfully submitted,

/s/  W. Edward Shipe
*John A. Lucas (011198)
*W. Edward Shipe (023887)
**BROCK SHIPE KLENK, PLC**
265 Brookview Centre Way,
Suite 604
Knoxville, Tennessee 37919
865-338-9700
*jlucas@bskplc.com*
*eshipe@bskplc.com*
***admitted pro hac vice***

Scott M. Webster
**TOOMS, DUNAWAY & WEBSTER, PLLC**
1306 West Fifth Street, Suite 200
P.O. Box 905
London, Kentucky 40743
606-864-4145
*swebster@toomsdunaway.com*
***Counsel for New London Tobacco***
***Market, Inc., and Fivemile Energy, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt on this 29th day of January, 2021.

/s/ W. Edward Shipe