IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION AT LONDON

Docket No. 6:12-CV-00091-GFVT-HAI

NEW LONDON TOBACCO MARKET, INC., )
and FIVEMILE ENERGY, LLC, )
)
                Plaintiffs, )
v. )
)
KENTUCKY FUEL CORPORATION and )
JAMES C. JUSTICE COMPANIES, INC., )
)
                Defendants. )
_____ )

DEPOSITION OF STEPHEN W. BALL

MAY 19, 2022

_____

LORA R. BOATMAN, LCR, CCR

GATEWAY COURT REPORTING & VIDEO, LLC
606 West Main Street, Suite 270
P.O. Box 950
Knoxville, Tennessee  37901
(865)804-2500

---

**Page 2**

APPEARANCES:

        FOR THE PLAINTIFFS:

        John A. Lucas
        W. Edward Shipe
        R. Cuyler Haskins
        BROCK, SHIPE, KLENK, PLC
        265 Brookview Centre Way, Suite 6
        Knoxville, Tennessee  37919
        (865)338-9700

        FOR THE DEFENDANTS:

        Steven R. Ruby
        CAREY, DOUGLAS, KESSLER & RUBY, PLLC
        707 Virginia Street, East
        901 Chase Tower
        Charleston, West Virginia  25301
        (304)345-1234

        ALSO PRESENT:

        Will Brownlow

---

**Page 3**

INDEX OF EXAMINATIONS

                                                Page No.
By Mr. Lucas                                          5


INDEX OF EXHIBITS

Exhibit                                          Page No.

16    JCJC's Real Property Transfers            14
      for No Consideration - Exhibit U

17    3/31/2022 Email from Linda Byrd           69

18    Requests for Production of                71
      Documents

19    2014 - 2019 Tax Form 1120S -             95
      Exhibit P

20    2020 Tax Form 1120-S                      95

21    Asset Purchase Agreement                 129

22    Assignment of Leases                     129

---

**Page 4**

S T I P U L A T I O N S

        The deposition of Stephen W. Ball, herein, called at the instance of the Plaintiffs, taken pursuant to all rules applicable to the Tennessee Rules of Civil Procedure, and taken by notice on the 19th day of May, 2022, beginning at approximately 10:23 a.m., at the law offices of Brock, Shipe & Klenk, PLC, 265 Brookview Centre Way, Suite 604, Knoxville, Tennessee, before LORA R. BOATMAN, Licensed Court Reporter, pursuant to stipulation of counsel.

        It being agreed that LORA R. BOATMAN, Licensed Court Reporter, may report the deposition in machine shorthand, afterwards reducing the same to typewritten form.

        All objections except as to the form of the questions are reserved to on or before the hearing.

        It being further agreed that all formalities as to notice, caption, certificate, transmission, et cetera, excluding the reading of the completed deposition by the witness and the signature of the witness, are expressly waived.

Page 5

1   STEPHEN W. BALL,
2   having been duly sworn, testified as follows:
3   EXAMINATION
4   BY MR. LUCAS:
5   Q.       Sir, would you go ahead and for the
6   record state your full name and residential address?
7   A.       Stephen Wayne Ball, 1050 Hawthorne
8   Hall Road, Fincastle, Virginia.
9   Q.       Is Fincastle right near Roanoke?
10  A.       It's 20 miles north of Roanoke.
11  Q.       Okay.  How far off the interstate?
12  A.       Probably -- it's where Route 220 and
13  I-81 intersect.  So probably ten miles off of 81.
14  Q.       Okay.  Where are you employed, sir?
15  A.       I have offices in Roanoke, Virginia,
16  and White Sulfer Springs, West Virginia.
17  Q.       Okay.  And who is your employer?
18  A.       Encore Leasing, LLC.
19  Q.       Okay.  And they -- how would you
20  describe Encore's business?
21  A.       Really, Encore serves two functions.
22  It owns at least an aircraft, maybe two, but I'm not
23  for sure on that.  And then it provides the payroll
24  services to what I would call the corporate
25  functions of the coal and farming business of the

Page 6

1   Justice organization.  And by "corporate," I mean
2   its accountants, lawyers, engineers, things like
3   that.
4   Q.       Jay -- and we were in the habit
5   yesterday of using first names for a lot of things.
6   Are you comfortable if I just refer to Jay and Jill
7   instead of by their last names?
8   A.       Yes.
9   Q.       Okay.  Jay yesterday testified at
10  some length about how that worked with Encore doing
11  payroll and just the whole process.  And my question
12  is, is the process that Encore follows for the
13  payroll and where it gets the money to meet payroll
14  for the various companies -- is that process and
15  your procedures the same as it was before Encore
16  filled that particular role?
17  A.       The process -- what I would describe
18  as the process of, I guess, collecting time and
19  processing the payroll for the employees that are on
20  that payroll, that part is the same.  Prior to, the
21  employees were directly on what I would describe as
22  an operating entity's payroll.  So like Blackstone
23  Energy is where several of the corporate employees
24  were technically employed.  There was a time where
25  Bluestone Industries, Inc. served that function.

Page 7

1   But the process is the same.
2   Q.       The way as I understood it that Jay
3   described it -- and I'm going to give you my
4   understanding of what he said.  Obviously, I'm
5   paraphrasing, and correct me if I'm wrong.  That if
6   a -- if an employee works exclusively for a
7   particular company, then all of the costs for that
8   employee will be charged to and absorbed by that
9   company.  Am I right so far?
10  A.       Yes.
11  Q.       Okay.  And that if an employee
12  actually performs services for multiple companies,
13  such as the lawyers and I'm assuming other people in
14  the corporate office, that in that case, that Encore
15  basically eats the cost and doesn't attempt to
16  allocate out 5 percent to Company A, 20 percent to
17  Company B, and so forth.
18  Is that a correct understanding?
19  A.       Just so I'm clear, you're saying in
20  some instances there's no allocation of that?
21  Q.       My understanding of Jay's testimony
22  was that in some instances for an employee that
23  works for multiple companies, that the cost of that
24  employee -- salary, benefits, whatever -- are not
25  allocated to the multiple companies that he or she

Page 8

1   works for, but they are just absorbed by Encore.
2   Do you agree with that?
3   A.       Um, I don't know.  I -- I don't
4   think of Encore as absorbing anything.  Jay may look
5   at it differently than I do, but I look at Encore
6   as -- essentially just as a passthrough.  And my
7   understanding is to, you know, to as accurately as
8   we can, capture overhead costs on income statements
9   that we do allocate.
10  But if Jay thinks there's instances
11  where they're not allocated, I'm -- I'm not sure
12  what he -- I just don't know what that situation
13  would be.  Because I think that the situations I'm
14  aware of, they do get allocated.
15  Q.       Okay.  So let me kind of rephrase
16  it, then.  Is it your understanding that if an
17  employee works for, let's say, just hypothetically,
18  five different companies but he's being paid by
19  Encore, will that -- will the cost of that employee
20  then be charged proportionately to each company that
21  he or she works for?
22  A.       No.  No, I do not think it's that
23  specific.
24  Q.       Okay.  How does it work, then?
25  A.       I guess what I'm thinking of is, is

Page 9

1  like today, for example, you know, I do work for all
2  of the companies.  But my understanding is, I would
3  be allocated to Bluestone's books because Bluestone
4  is the primary operating company today, and that's
5  where those overhead costs would be...
6       Q.       Okay.
7       A.       That's where they would be
8  reflected.  So like on nonoperating entities, I
9  don't think we are attempting to capture like what
10 I'm calling overhead costs, these corporate overhead
11 costs.  I don't think we're attempting to capture
12 those on any idle companies or nonoperating
13 companies.
14      Q.       Okay.  Well, for companies that are
15 not idle, that are operating companies, do you
16 attempt to allocate overhead costs that are paid by
17 Encore to each company for which a particular
18 employee may provide services?
19      A.       Not that I'm aware of.  My general
20 understanding is, I think today it is all being
21 captured on Bluestone's books.
22      Q.       Okay.  And is that true for
23 everybody that is paid by Encore?
24      A.       I don't know.
25      Q.       Why Bluestone?

Page 10

1       A.       Bluestone -- today, Bluestone and
2  its subsidiaries are the majority of the coal
3  operations within the organization.
4       Q.       Well, what -- are there employees
5  who provide services for, say, the farming or timber
6  operations?
7       A.       Yes.
8       Q.       How are their costs allocated?
9       A.       I don't know.
10      Q.       Does Encore handle the payroll and
11 other costs for the Justice Family Group, the
12 hospitality group?
13      A.       No.
14      Q.       Who does?
15      A.       The Greenbrier Hotel handles their
16 own payroll.
17      Q.       Okay.  Thank you.
18               Is the procedures that you
19 understand are now in place concerning the
20 allocation of costs -- strike that.
21               My understanding also from Jay's
22 testimony was that prior to Encore fulfilling this
23 role, it was performed in prior years by James C.
24 Justice Companies and for some period of time by
25 Justice Management Services.  Is that correct?

Page 11

1       A.       Generally.  But like I said, there's
2  also been times where corporate employees have been
3  directly on one of the operating entity's payrolls.
4  We've not always had a separate entity like Encore
5  or Justice Management Service processing payroll.
6  But I would agree that at certain times those two
7  entities have done it as well.
8       Q.       Let me ask you something I intended
9  to ask you at the top.  Share with me, then, without
10 obviously revealing any specific discussions that
11 you've had with counsel, what have you done to
12 prepare to give your testimony today?
13      A.       I -- I met with Mr. Ruby yesterday.
14 Spent some time on the phone with Mr. Ruby the day
15 before.  We had at different times discussed the
16 deposition in prior weeks, just different parts of
17 it.
18               As far as documents, I reviewed the
19 orders that are referenced in your discovery -- your
20 recent discovery requests to us.  I reviewed not the
21 tax returns but the -- like the org charts that we
22 submitted as part of those discovery responses, I
23 reviewed those.
24      Q.       Are you talking about these org
25 charts that have been marked as Exhibit 5?

Page 12

1       A.       Yes.
2       Q.       Okay.
3       A.       I reviewed the -- I think it was
4  Exhibit O from the Haskins declaration, if that's
5  what it was called.
6       Q.       (Displaying document.)
7       A.       Yes.
8       Q.       Referring to Exhibit 1?
9       A.       Yes.
10      Q.       And I'm going to set these exhibits
11 in front of you -- they're not necessarily in
12 order -- in case you need to refer to any of the
13 exhibits that we've used so far.
14      A.       Okay.
15               MR. LUCAS:  We'll just -- all right
16      with you if we just continue to use
17      consecutive numbering?
18               MR. RUBY:  Sure.
19 BY MR. LUCAS:
20      Q.       Okay.
21      A.       All of these are -- I'm going to
22 give you the exhibit number or letter from the
23 Haskins declaration because that's what I had fresh
24 in my mind.
25      Q.       Sure.

Page 13

1    A.    I reviewed R, S, T, and U from that
2 declaration.
3    Q.    R is a disposal report, right?
4    A.    Yes.
5    Q.    And then S -- by S, do you mean the
6 series of exhibits of S1 through 16?
7    A.    Correct.
8    Q.    And T is a deed of South Carolina
9 property to Jay?
10    A.    Correct.
11    Q.    And I don't recall off the top of my
12 head what Exhibit U was.  Do you?
13    A.    I was thinking it was a summary of
14 the real property disposals.  And if I got that
15 exhibit letter wrong --
16    Q.    Are you looking at Exhibit 14?
17    A.    Yeah.  The copy I had was landscaped
18 format, so it looked a little different.  But I
19 think that was Exhibit U.  But this is -- this is
20 generally -- no, it was actually -- Mr. Lucas, it
21 was a little different now that I think about it.
22    Q.    Okay.
23    A.    But I think it was U.  It was a
24 similar document, but it's a little bit different.
25    Q.    Did you review any documents other

Page 14

1 than what you've described?
2    A.    I can't -- I can't think of any off
3 the top of my head.
4    MR. LUCAS:  Can we mark this?
5    I'll substitute it, if you have no
6    objection, a copy later that's not three-hole
7    punched.  But if we can mark this as the next
8    exhibit, which will be, what, 16?
9    THE STENOGRAPHER:  Sixteen.
10    (Exhibit 16, JCJC's Real Property
11    Transfers for No Consideration -
12    Exhibit U, marked for
13    identification.)
14 BY MR. LUCAS:
15    Q.    I'm handing you what the court
16 reporter has marked as Exhibit 16, which was
17 Exhibit U to the Haskins declaration.
18    Is that what you reviewed?
19    A.    Yes.
20    Q.    Compare it, if you would, to
21 Exhibit 14, and maybe we can just get it down to
22 where we're looking at one document.
23    May I look at U again for a minute?
24    Other than the footnotes that are on
25 Exhibit 16, does it appear to be the same data that

Page 15

1 is on Exhibit 14 for the Items 17 through 31 at the
2 bottom, and 12 through 14 in the top portion?
3    (Witness reviewing document.)
4    THE WITNESS:  I think so.  They're
5    in a little bit different order, but I think
6    they're generally the same.
7 BY MR. LUCAS:
8    Q.    Okay.  Thank you.
9    As you reviewed those, did you see
10 anything on any of those exhibits that you thought
11 was inaccurate?
12    A.    I didn't really -- I didn't really
13 review it for accuracy.  I was really just reviewing
14 it for familiarizing myself with what was on it.  So
15 I -- and I don't know how to answer it because it
16 has the "unknown" under transferee.  So I don't know
17 how -- I don't know how to describe that as accurate
18 or inaccurate.  I mean, I don't think it's
19 inaccurate for what you all presented, but...
20    Q.    All right.  For those transferees
21 that are unknown, and it's on Exhibit 14, it would
22 be Item 17 through 31, do you know who the
23 transferees are in each case?
24    A.    Um, no.  There's a couple of them I
25 can't tell.

Page 16

1    Q.    Well, which ones -- which ones can
2 you tell?
3    A.    Like No. 30, for example, I believe
4 that's the same as No. 14.
5    Q.    All right.  Why do you think that?
6    A.    It was just -- and maybe it's just
7 -- when I was looking at what is now Exhibit 16,
8 maybe it's just the acreage.  But given they were
9 the exact acreage, I thought they were the same.
10    Q.    They do have different dates,
11 two years apart.
12    A.    Okay.
13    Q.    Does that change -- had you noticed
14 that?
15    A.    I had not noticed that.  So that
16 would change my view on that.
17    Q.    Okay.
18    A.    But just generally when I went down
19 the list, like No. 18 -- I can't tell what No. 17 is
20 on Exhibit 14.  Number 18, my understanding is the
21 Ayash Farms, which is located in Greenbrier County,
22 West Virginia, is owned by Justice Farms of
23 North Carolina.
24    Q.    Okay.  Are you saying that the
25 transferee was Justice Farms of North Carolina or

Page 17

1  that it's now owned by them or both?
2      A.      It's -- I know for sure it's now
3  owned by them.  I'm not aware of any intermediate
4  transfer.
5      Q.      Let me ask you also to take
6  Exhibit 12, because the ones we're looking at there
7  that have "unknown" on Exhibit 14 were all taken
8  from that property disposal report, which is
9  Exhibit 12.
10     A.      Okay.
11     Q.      And I will represent to you, and you
12 can see on the bottom it has a Bates number for
13 JCJPost starting with 909.  And this was a document
14 that you all produced to us in discovery.  And so if
15 you look, for example, on 1231 for Item No. 17, if
16 you go to the page that's numbered 5, Bates No. 912,
17 you'll see that $800,000 transaction there.
18         Do you see that?
19     A.      Yes.
20     Q.      Okay.  And then -- but it doesn't
21 identify the transferee.  So do you know who that
22 land was transferred to in 2015?
23     A.      No.
24     Q.      How would -- what would we have to
25 look at to know that?

Page 18

1      A.      I don't know.
2      Q.      Well, can you think of anything that
3  would give the answer to that?  Any documents?
4      A.      No.
5      Q.      Okay.
6          Let's look at the next one,
7  Land-Ayash Farms.  See if we can find that.  It's
8  three million three.  And it's on the last page of
9  Exhibit 12.  You probably see it highlighted there.
10         In two thousand -- in 2015, who was
11 it transferred to?
12     A.      That's -- that's the property that
13 we were -- or I mentioned a second ago.  I know
14 today it's owned by Justice Farms of North Carolina.
15 I'm not aware of any intermediary or intermediate
16 transfers.  I can't say for sure by looking at this
17 document, but I believe that Justice Farms of
18 North Carolina was the transferee.
19     Q.      Okay.  Next one is Land-Black River,
20 and I think you will find that on the first page of
21 Exhibit 12, a million one.  Who was the transferee
22 of that in 2016?
23     A.      I don't know.
24     Q.      Do you know where we could -- what
25 we would look at to find that out?

Page 19

1      A.      No.
2      Q.      All right.  The next one is
3  Land-Westvaco for a million two.  And that is at the
4  top of the second page of the exhibit.  Do you know
5  who the transferee was on that?
6          I'm sorry.  Cuyler pointed out to me
7  I said the next one was Westvaco.  I misspoke.  The
8  next one is Huber.  So Huber is just above Westvaco
9  on Exhibit 12.  So for the Huber land, do you know
10 who the transferee was?
11     A.      On Huber and Westvaco, I believe the
12 transferee is Bellwood Corporation.
13     Q.      When you say -- when you say "I
14 believe," you know that forces me to ask what's your
15 level of certainty in that?
16     A.      Well, I know that's who it's owned
17 by today.  And similar to the Ayash Farm we just
18 discussed, I'm not aware of any intermediate
19 transfers.
20         I'll just be transparent with you.
21 The only reason I keep giving you that qualification
22 is, for example, when we had the hearing in
23 Frankfort, when you pointed out to me the day on
24 that Black River deed, I was unaware of the
25 intermediate deed that was the same day that you

Page 20

1  pointed out between Black River to JCJ, then to
2  James C. Justice, III.  That's the only reason I'm
3  giving you those qualifications.  But my
4  understanding is, it went to Bellwood and Bellwood
5  still owns it today.
6      Q.      I understand.  And I thank you for
7  the clarification.
8          MR. RUBY:  He thinks you're going to
9      pull out a document and say "gotcha."
10         MR. LUCAS:  No.
11 BY MR. LUCAS:
12     Q.      Both Westvaco and Huber you think
13 went to Bellwood?
14     A.      Yes.
15     Q.      What was the reason for that?
16     A.      It was part of refinancing that was
17 being done with Carter Bank.
18     Q.      How many refinancings have there
19 been with Carter Bank?
20     A.      I don't know the specific number but
21 there have been several.
22     Q.      Were there multiple refinancings in
23 the same year at any time?
24     A.      Possibly.  I can't -- I can't recall
25 the specific dates right off the top of my head, but

Page 21

1 there was -- obviously, there's the one that
2 involved Justice Farms of North Carolina that we
3 talked about before.  There was one that involved
4 Bellwood Corporation.
5         Going all the way back to 2014 when
6 Kentucky Fuel and Virginia fuel were spun off from
7 Southern Coal, that was a Carter Bank refinancing.
8 So I'm sure some of these overlapped as far as being
9 in the same year.  There was a refinancing that
10 involved Oakhurst Club.  So there's been a few of
11 them.
12     Q.        All right.  Were there multiple
13 refinancings in 2016?
14     A.        I don't recall.
15     Q.        All right.  Tell me why these two
16 properties -- or were there any other properties
17 besides those two, Huber and Westvaco, that were
18 transferred to Bellwood Corporation?
19     A.        I believe so.  Those two properties
20 are located in Monroe County, West Virginia.  The
21 Bellwood properties that are pledged to Carter Bank
22 include some smaller tracts that were acquired over
23 time.  And my recollection is, they were not
24 originally acquired in Bellwood's name.  So I
25 believe they would have been transferred as well.

Page 22

1     Q.        Well, there's one here, it's
2 Item 26, Land in Monroe County.  Was that
3 transferred to Bellwood, or do you know?
4     A.        I don't know.  I can't tell from
5 that description.
6     Q.        Okay.  Well, the other smaller
7 parcels that you described went to Bellwood, they
8 went from JCJ -- can we call James C. Companies Inc.
9 JCJ?
10     A.        Yes, that's fine with me.
11     Q.        Did they go from JCJ to Bellwood?
12     A.        My -- my recollection is they did.
13 I guess the only thing I don't know is were maybe
14 those properties being carried accounting-wise as
15 part of what they described as Huber and Westvaco.
16     I mean, I know technically speaking,
17 like in my mind, Huber and Westvaco were two
18 distinct properties.  Those just reference the names
19 of the buyers when the Justice organization
20 originally acquired them.  And then over -- like I
21 said over time, smaller tracts that were adjacent to
22 those were acquired.
23         So I think if you looked at the
24 deed, it's going to have multiple tracts on it.  I
25 don't -- I just can't say for certain from an

Page 23

1 accounting standpoint where they may be aggregating
2 all of those into the Huber and Westvaco
3 description.
4     Q.        And I'm not asking you necessarily
5 from an accounting point of view.  But from a
6 transactional point of view, were there other deeds
7 of other parcels to Bellwood that you know of other
8 than Items 20 and 21 to the Huber and Westvaco
9 tracts on Exhibit 14?
10     A.        My recollection is the property in
11 Monroe County was conveyed to Bellwood.  I -- my
12 recollection is it was a single deed.  I don't
13 remember multiple deeds.
14     Q.        When you say "a single deed,"
15 there's Huber and the Westvaco.  Was that in one
16 deed?
17     A.        That's my recollection, yes.
18     Q.        Okay.  And Item 26, a moment ago
19 when I asked you about it, land in Monroe County,
20 you said you didn't know who the transferee was.  Do
21 you now think that that was Bellwood too?
22     A.        I can't tell for certain with that
23 description, but my belief is if it was in Monroe
24 County, West Virginia, and JCJ transferred it, it
25 would have -- unless there was some third-party sale

Page 24

1 that I'm not recalling, I believe it would have been
2 transferred to Bellwood.
3     Q.        Okay.  Why was property transferred
4 from JCJ to Bellwood in order to facilitate a
5 refinancing?
6     A.        Most of the refinancings were the
7 result of Carter Bank had lending limits.  They
8 increased over time.  But as part of being able to
9 borrow more money to try to help with liquidity in
10 the organization, Carter Bank over the years would
11 come up with these suggestions of if there was a
12 separate entity, they could loan -- that entity
13 could have its own lending limit.
14     Q.        What were the lending limits you
15 recall?
16         I think you -- I don't want to put
17 words in your mouth, but I thought you testified in
18 April that it was 60 million.  Is that right?
19     A.        I think very early on in the
20 relationship it was less than that.  But I think by
21 2015, it was in the high 50s or -- it did eventually
22 get to 60, and actually went above 60.
23         As it was explained to me by Carter
24 Bank, it had something to do with their equity.  And
25 so as their equity in the bank increased, their

Page 25

1  lending limits would crease some.

2      Q.      And was it your understanding that

3  that was -- those lending limits were -- keyed, as

4  you said, to the bank's equity or capital that they

5  were a function of federal regulations as opposed to

6  just the bank's own internal policy?

7      A.      Yes.

8      Q.      Okay.  And who told you that?

9      A.      When Worth Carter was alive, I dealt

10  directly with Mr. Carter a decent amount.  And then

11  my primary other contact was Phyllis Karavatakis.

12  But all of my communications were with them.

13              MR. LUCAS:  Do you need that

14      spelled, Lora?

15              THE STENOGRAPHER:  Yes, please.

16              THE WITNESS:  Every other letter is

17      an A, it seems like.  K-A-R-A-V-A-T-A-K-I-S.

18  BY MR. LUCAS:

19      Q.      What was the first name?

20      A.      Phyllis.

21      Q.      Did you have any questions in your

22  mind about the proprietary of setting up another

23  lender when all of the companies were -- came under

24  the Justice Family umbrella with common ownership

25  -- strike that.  Let me ask you this.

Page 26

1              These other companies that were set

2  up as a separate borrower, am I correct that all of

3  them were under common ownership of the Justice

4  Family?

5      A.      Yes.

6      Q.      And did you have any questions about

7  the proprietary of that plan, to basically evade the

8  lending limits by lending to a new company even

9  though it was under common management with the prior

10  borrower?

11      A.      No.

12              MR. RUBY:  Object to evade.

13  BY MR. LUCAS:

14      Q.      Did you seek any legal opinions on

15  that issue?

16      A.      No.

17      Q.      Do you know if Carter Bank did?

18      A.      I don't know.  It was always their

19  idea.  They are the ones that proposed it to us.

20  And so, I mean, I don't think it ever occurred to us

21  that they were doing something that would violate

22  their rules and regulations.

23      Q.      Has it occurred to you since then

24  that that could be the case?

25      A.      Um, yes and no.  On the one hand, we

Page 27

1  still have an ongoing relationship with them.  They

2  seem to be more apt to just combine everything into

3  a single lending relationship today.  And so that --

4  that makes me think they're not worried about that

5  structure.  But then at the same time, you know, as

6  part of the disputes and you look back at it, I

7  mean, sure, you question it, but -- but I'm not

8  aware of them having a legal opinion.  We never had

9  one.  And they seem to just obliterate that today.

10      Q.      I understand.

11              Well, you said, sure, you questioned

12  it.  Who did you discuss that questioning with?

13      A.      No one.  I'm just meaning in my

14  mind.  When you think about it today, in some

15  conversations -- in some conversations that I had

16  when they first retained Troutman Sanders to start

17  representing them in all matters that relate to our

18  relationship, there was a lawyer at Troutman, his

19  name was Jonathan Houser.  He made a couple of

20  comments to me -- that's probably the first time,

21  actually, I ever thought about it is he made some

22  comments to me that the way that Mr. Carter was

23  structuring those probably wasn't the best way.  But

24  then right on the heels of that, he would come in

25  with a request about wanting to cross-collateralize

Page 28

1  and demanding cross-collateralize.  And I would

2  question him about, "Well, look, if you have

3  concerns about what Mr. Carter was doing by creating

4  these separate entities, it seems like to me you're

5  blurring the lines even worse today by wanting to

6  treat it as a single enterprise."  And that -- his

7  -- he never really gave me an answer to that,

8  frankly.  But since Troutman's involvement, they've

9  actually been very aggressive about

10  cross-collateralizing/cross-defaulting, treating it

11  as a single relationship.

12      Q.      Okay.  The next item that we haven't

13  discussed yet was Item 22, Beckley Office Building.

14              Who was the transferee of that?

15      A.      I believe it was James C. Justice,

16  III.

17      Q.      And what was the purpose of that

18  transaction?

19      A.      It was -- it was also related to

20  Carter Bank refinancing.

21      Q.      So was James C. Justice, III, was he

22  a borrower so that some of these loans were put in

23  his name and then he put the money back into the

24  companies?

25      A.      Yes.

Page 29

Q.      So just like Bellwood Corporation
would be a new borrower, then Jay would be a new
borrower.  Is that fair to say?

A.      Yes.  His -- as I recall, his loan
was never nearly as large as the entity loans.  But
the Beckley office building and the land that it was
on, the Black River Farm we've talked about before,
those all became collateral for a loan he had with
Carter Bank.

Q.      Okay.  And was that a personal -- a
loan for personal use or a loan for business
purposes?

A.      It was certainly used for business
purposes.

Q.      Who did it go to?

A.      I don't have a specific
understanding of that.  But generally, it just went
back into the business.  It was used for business
purposes.

Q.      Do you know which business it went
into?

A.      Not specifically.

Q.      The next entry, Item 23 is
Land-Beckley Office.  Is that just the real estate
that the office building sat on?

Page 30

A.      Yeah.  And I think more, there was
an adjacent lot that was a part of that office
building.  I think some of the parking lot was on
it.  So there were two different tracts.

Q.      Well, it shows that the value of
that land was something over $2 million in Beckley.
What conclusions would you draw about the size of
the property from that and your knowledge of where
it was located?

A.      It's definitely a good location in
Beckley.  It's on Eisenhower Drive, which is one of
the busier roads in Beckley.  My recollection is it
was three or four acres.  It actually was part of --
I think some of that value -- the office building
and the lot, I mean, they're seamless if you were to
look at them in person.  But part of the lot was --
there was a drainage project that came through, and
it was a large -- a really large culvert was put in
and then covered.  And you could use the lot for
anything, but you could never build on that part of
it.  But I think it was somewhere in the three and a
half to four acre range.

Q.      Okay.  Number -- or correction.
Number 24, the Land-Custom Wildlife, who was the
transferee of that?

Page 31

A.      My recollection is that was part of
one of the transactions that was done with Farmland
Partners.

Q.      Well, look at Exhibit 12.  And
Farmland Partners was a transferee in the normal
course of business to a non-related party, correct?

A.      Correct.

Q.      All right.  And they typically paid
what everybody would agree on was fair market value
for the property, right?

A.      Yes.

Q.      Okay.  Look at the Land-Custom
Wildlife on the second page of Exhibit 12, and it
indicates that there's no net proceeds.

Do you see that?

A.      Yes.

Q.      Does that change your answer?

A.      I still believe that property was
transferred to Farmland Partners.  But as it relates
to Exhibit 12 and Exhibit 14, I guess it's possible
maybe there was an intermediate transfer.  So I
can't say specifically that I know, based on looking
at Exhibit 12, who the transferee was for the
transaction described on Exhibit 12 and summarized
on Exhibit 14 as No. 24.

Page 32

Q.      All right.  So is it your
understanding that that land described as Custom
Wildlife would have been transferred to some
intermediate transferee, as shown on Exhibits 14 and
12, and then that transferee transferred it to
Farmland Partners?

A.      I don't have an understanding of
that.

Q.      Well, what is your understanding?

A.      Well, my understanding is my initial
answer, which is it was transferred to Farmland
Partners.  You directed me to Exhibit 12 and asked
me if that changes my answer.  It doesn't
necessarily change my answer, but it -- it certainly
makes me question whether there could have been an
intermediate transfer.  But I'm not aware of one.

Q.      All right.  Well, let me try to come
at it this way.  The transferee that's shown on
12/31/16 on Exhibit 12, Land-Custom Wildlife
worth -- or with an acquired value of $476,000 with
no net proceeds.  Who did JCJ transfer that property
to?

I'm not asking who ultimately wound
up holding it, whether it was Farmland Partners or
anyone else.  But who did JCJ transfer it to on

**Stephen W. Ball**                                                    **9 (33 - 36)**

Page 33

1  December 31, '16?

2      A.      I don't know.

3      Q.      Do you believe that it is now owned

4  by Farmland Partners?

5      A.      Yes.

6      Q.      And what is the basis for your

7  belief?

8      A.      That a transaction was entered into

9  with Farmland Partners.  And that property -- my

10 understanding is that property also goes by the name

11 of Dials Bay, and I believe Dials Bay was part of

12 the Farmland Partners transaction.

13     Q.      What documents have you seen that

14 give you that understanding?

15     A.      That's just a general understanding

16 of mine.

17     Q.      What documents would we need to look

18 at to answer that?

19     A.      I guess ultimately we would need to

20 look at the document with Farmland Partners.

21     Q.      Is that -- are you referring to a

22 contract?

23     A.      I don't know what it was.

24     Q.      Okay.

25     A.      At a minimum, it would have been a

Page 34

1  deed.  But I don't know if there was a contract

2  associated with it or not.

3      Q.      The next entry is Eagle Rock Land,

4  $55,000.  And that -- you can refer to the third

5  page of Exhibit 12, and you will see also there were

6  no proceeds for that.  So who received that land

7  from JCJC?

8      A.      I don't know.

9      Q.      The next one we've already talked

10 about.

11             So Number 27, the Budget Inn Motel,

12 238,000.  Who was that transferred to by JCJ?  And

13 if you need it, it's on the page numbered 7 of

14 Exhibit 12, Bates No. 914.

15     A.      My understanding is that was

16 transferred to Oakhurst Club.

17     Q.      What's the basis of that

18 understanding?

19     A.      There was a Carter Bank refinancing

20 that involved Oakhurst Club.  It involved properties

21 located in Greenbrier County, West Virginia, and I

22 believe this is one of the properties.

23     Q.      When was that refinancing?

24     A.      Um, I believe it was in 2016.

25     Q.      Do you know when in 2016?

Page 35

1      A.      My years are running together.  Can

2  I ask him something?  I mean, I'll do it on the

3  record.

4              THE WITNESS:  Do you remember when

5          the flood -- what year was the flood?

6              MR. RUBY:  '16.

7              THE WITNESS:  I think it was in the

8          March/April time frame of 2016.

9  BY MR. LUCAS:

10     Q.      Okay.  Well, this indicates that the

11 date this property was disposed of was roughly eight

12 or nine months later, on December 31, 2016.  So what

13 was the purpose of this transfer of the Budget Inn

14 Motel?

15     A.      It was part of the Carter Bank

16 refinancing.

17     Q.      The refinancing that occurred seven

18 or eight months earlier or eight or nine months

19 earlier?

20     A.      Yes.

21     Q.      Okay.  Can you explain that to me?

22     A.      I believe -- let me just -- this is

23 just a guess, but I believe these disposals were

24 probably done at yearend in the accounting system

25 just based on how many of them are 12/31.  Part of

Page 36

1  yearend cleanup, things that weren't captured in

2  realtime throughout the year.

3      Q.      Okay.  The next entry, Item 28,

4  881 acres of land, who was the -- who did JCJ

5  transfer that property to?

6      A.      I don't know.  I can't tell what

7  that property is based on that description.

8      Q.      All right.  The next one is

9  Crestwood Estates, Item 29.  Who was that

10 transferred by JCJ to?

11     A.      I believe that was part of the Jay

12 Justice/Carter Bank restructuring.

13     Q.      And which was that?

14     A.      Crestwood Estates.  I believe that's

15 a property in Raleigh County, just outside of

16 Beckley.

17     Q.      So you think that went to Jay

18 Justice?

19     A.      Yes, as part of the Carter Bank loan

20 we described in conjunction with the Beckley Office

21 above.

22     Q.      Okay.  The next one is Item 30,

23 710 acres in -- it doesn't say where it is in.

24 These are all on the same page, page 914 Bates

25 number of Exhibit 12.  Do you know who the

Page 37

1  transferee of that $2 1/2 million piece of property
2  was to?
3       A.       No.
4       Q.       How about the next one, Item 31,
5  2,100 acres for 11 1/2 million?
6       A.       I believe based off of the -- what's
7  in the serial number column of Exhibit 12, the
8  reference to Brandon, I believe that's the Upper
9  Brandon Farm that was transferred to Upper Brandon,
10 LLC.
11      Q.       What's Upper Brandon, LLC?
12      A.       It is -- it's an entity wholly owned
13 by Jim Justice.
14      Q.       All right.  And what was the purpose
15 of that transfer?
16      A.       It was -- I don't remember the
17 specific reference or purpose.  It was related to
18 Carter Bank once again, because it remained pledged
19 to Carter Bank.  But I don't recall Upper Brandon
20 ever having a separate loan with Carter Bank.  So I
21 -- I know it was something done with Carter Bank,
22 but I just don't know the specific purpose.
23      Q.       Who would we need to talk to find
24 that out?
25      A.       Jay would be the best person to know

Page 38

1  that, I think.
2       Q.       What about Jim?
3       A.       In my dealings, Jay has done most of
4  the dealings with Carter Bank.  So I still think Jay
5  would be the -- even though it was a Jim-owned
6  entity, I still think Jay would be the best person.
7       Q.       But Jim was the sole shareholder of
8  Brandon, LLC?
9       A.       Upper Brandon, LLC.
10      Q.       Upper Brandon.  I'm sorry.
11      A.       Yes.
12      Q.       And what you just described for the
13 2,100 acres, does that apply also to the 710 acres,
14 Item 30, there on Exhibit 14?
15      A.       Until you pointed out to me the
16 discrepancy earlier, I thought that it would have,
17 but I don't -- I don't know now.  And the reason I
18 say that is -- I mean, I'm aware of 710 acres in
19 Prince George County.  And I would have thought it
20 would have been part of or related to Upper Brandon,
21 but I -- after that discrepancy you pointed out to
22 me earlier, I just can't say for certain.
23      Q.       I take it from your explanation you
24 gave a moment ago that these 12/31/16 might be
25 accounting cleanup dates.  Am I correct, then, to

Page 39

1  infer from your answer that in looking at all of
2  these transactions, Items 17 through 31, you can't
3  tell from the disposal report, Exhibit 12, the
4  actual dates of any of those transfers, correct?
5       A.       Correct.
6       Q.       And, in fact, can we even know for
7  sure that the ones -- all the ones listed for
8  12/31/16, and there's a bunch of them, do we even
9  know that all of those occurred in 2016?
10      A.       I don't know.
11      Q.       All of these, regardless of who the
12 -- who the transferees were, all of them did involve
13 JCJ, correct?  They were the transferor in each
14 case?
15      A.       Yes.
16      Q.       Okay.  Can you share with me why
17 none of these transactions were disclosed in your
18 discovery responses other than the ones that are --
19 you know, some information is provided on
20 Exhibit 12.
21      A.       I -- I don't know.
22      Q.       We went down that long rabbit trail
23 after you identified some of the documents you did
24 in connection with my preliminary question, "What
25 did you do to prep for today?"  So let me go back to

Page 40

1  that.
2       A.       Okay.
3       Q.       As part of your preparation, did you
4  review any transcripts of your prior testimony,
5  either depositions or your testimony on April 18?
6       A.       Only -- yeah.  I missed that.  Only
7  the April 18th.
8       Q.       Okay.
9       A.       I didn't review any prior deposition
10 or the evidentiary hearing.
11      Q.       Okay.  Did you see anything in that
12 April 18 testimony that you think was incorrect or a
13 mistake that you need to correct?
14      A.       I -- I don't recall anything jumping
15 out at me that was a mistake.
16      Q.       Okay.  Let me ask you just generally
17 about the businesses.  Would it be accurate to say
18 in terms of just the family businesses generally,
19 that the businesses are thriving?
20      A.       No.  Certainly not the ones I'm
21 involved in.
22      Q.       Is that just the coal businesses?
23      A.       I mean, I work on things for The
24 Greenbrier, but I'm not in the day-to-day at The
25 Greenbrier.

Page 41

Q.      Well, when you were referring to the ones that you're involved in, were you referring to everything other than The Greenbrier with the understanding you do a little bit of work for them?

A.      Predominantly, yes, sir.

Q.      Okay.  So the rest of the businesses are not thriving?

A.      No.

Q.      Okay.  In terms of the fundamentals of the business, do you think the fundamentals of your family businesses, the ones that you're involved in, are strong?

A.      Give me an idea of what you mean by fundamentals.

Q.      Just the common ordinary English use of it.

A.      Okay.  Well, so like Bluestone, for example, is a metallurgical coal company.  I think being in the metallurgical coal business today is -- that's a good place to be.  So I think there.  And Bluestone controls a significant amount of coal reserves.  You know, long enough that you could have a long-term mine plan.

So, you know, when you look at the fundamentals of that business, in theory, it should

Page 42

be really good.  The reality is, Bluestone is really suffering from the Greensill bankruptcy.  It's just really strapped for cash.  So if everything doesn't fall into line perfectly, it has a hard time overcoming that.  Like when equipment breaks down and things like that, there's just not enough cash to keep it operating.

The farming business has been significantly scaled back compared to what it was 15 years ago.  I think the small element of what's being farmed today, I mean, I think that has a potential of being a good business.  But, you know, unfortunately, you do have some companies that have significant legacy liabilities associated with them, like mining reclamation and things like that.  So there's a lot of diversity in there where it's kind of hard to broadbrush it.  You know, the whole thing is being fundamentally strong, but there certainly are some pieces of it that have the ability to be strong based on how they're positioned.

Q.      Okay.  Well, let me -- I'm just trying to get a feel for the overall picture, the macro picture.

A.      Yeah.

Q.      As you might imagine, Jay and I

Page 43

discussed some of the details at length.  But in terms of if you were just going to describe to someone -- and I'll limit it -- I started to say I would limit it to the businesses that transact with Carter Bank or that have a relationship with them.  Would that be all the coal businesses, coal and timber?

A.      It would not directly include Bluestone because Bluestone's debt with Carter Bank was refinanced by Greensill.  So Bluestone is caught up in Greensill instead of Carter Bank.

Q.      Okay.  Does it have any relationship with Carter Bank in terms of collateral it's given that bank or anything else?

A.      At one time all of Bluestone's assets were pledged to Carter Bank.  But since it refinanced with Greensill, and it was a series of refinancing in 2018 and '19, none of Bluestone's assets are currently pledged to Carter Bank.

Q.      Okay.  Well, in terms of the businesses that deal with Carter Bank and Bluestone combined, if I suggested to you that the fundamentals of the businesses were the strongest that they've been in years, would I be correct?

MR. RUBY:  Just object to the form

Page 44

on "fundamentals."

THE WITNESS:  Not -- not in -- they don't -- they don't feel like they're the strongest ever to me.

BY MR. LUCAS:

Q.      Okay.  Let me ask you a little bit about the role of the various shareholders and directors.  Is Governor Justice involved in any way since he became governor -- since 2017 until the present, is he involved any way in either the management or the control of JCJ or Kentucky Fuel?

A.      He's not involved in the management in any way.  He has retained his ownership as a shareholder.

Q.      Yeah, and that -- let me kind of explain the context of that because Jay and I had the same discussion.  I said I know he's a shareholder, and shareholders are certainly entitled to express their opinion.  I can express my opinion to the CEO of IBM, and he can either choose to ignore it or not.

A.      Yeah.

Q.      And so I understand shareholders are entitled to talk and entitled to express their opinions.  So my questions really go to whether the

**Stephen W. Ball**                                                    **12 (45 - 48)**

Page 45

1  governor is involved in any way in the management or
2  control, which is a little bit different than just
3  making your views known or offering advice, and I
4  had said initially of either Kentucky Fuel or JCJ.
5  I'll broaden that to any of the companies in the
6  family umbrella.
7        A.        Not -- not to my knowledge.  Not
8  with anything I deal with.  You know, I do still
9  have to deal with the governor some just from the
10 standpoint he has personally guaranteed the Carter
11 Bank debt, and he's also personally guaranteed the
12 Greensill debt.  And so anytime we're working
13 through those issues, you know, he can be involved
14 in those conversations.  But I've -- since he's been
15 in office, I've not had any conversations with him
16 about the day-to-day business.
17        Q.        Were you involved in the preparation
18 of the disclosures statement of his holdings that he
19 had to file with the West Virginia Ethics
20 Commission?
21        A.        Not directly.  Terry -- I believe
22 Terry Miller did that because Terry asked me a few
23 questions, but they were specific questions about
24 entities.  But I wasn't involved in the actual
25 preparation of it.

Page 46

1        Q.        I know he's no longer a director or
2  an officer of either of our defendants, Kentucky
3  Fuel or JCJ.  Is he a director or officer of any of
4  the family companies?
5        A.        Not that I'm aware of.
6        Q.        Could you tell me why -- when he
7  became governor, why did he step down from his
8  positions as officer and director of the many
9  companies that he was either an officer or director
10 of?
11       A.        I never had a specific conversation
12 with the governor about that.  My conversation was
13 with Jay Justice.  It was just advising me that when
14 he took office he was going to step down in those
15 positions, and for me to work with, you know, our
16 people to make sure we reflected that in change of
17 status-type reports with the Secretary of State's
18 Office, and then internally do new shareholder
19 resolutions nominating the new board and board
20 resolutions reflecting that.
21       Q.        As a practical matter, did you have
22 an understanding that that was just to try to reduce
23 any potential for a conflict of interest with --
24 between his role as a manager of any of the
25 companies and his role as governor of the state?

Page 47

1        A.        Yeah, as a practical matter that was
2  my understanding.  I never spoke to the governor
3  directly about it, but that was certainly my
4  understanding that that was the purpose of that.
5        Q.        And so it's your understanding
6  that's the reason he's no longer involved -- in a
7  nutshell, that's the reason he's no longer involved
8  in the management or control of the companies; is
9  that fair?
10       A.        Yes.
11       Q.        Okay.  Who runs the mining companies
12 on a daily basis?
13       A.        Jay.
14       Q.        I know that Jill is a director but
15 not an officer.  What does she do?
16       A.        Jill does not do anything on a daily
17 basis with any of the coal companies.
18       Q.        As a practical matter, does she do
19 -- I know she signs resolutions in lieu of meetings
20 and board minutes and the like.  My understanding is
21 those meetings don't actually take place.  They are
22 basically papering the file.  Is that fair?
23       A.        Yeah.  We do not do -- given how
24 many times, pretty much every day, that the family
25 talks to one another, we do not do formal board

Page 48

1  meetings, and so we do those agreements in lieu of
2  meetings.
3        Q.        Does Jay talk to Jill regularly
4  about the business of either Kentucky Fuel or JCJ?
5        A.        I don't know.  I know he talks to
6  Jill regularly, but I don't know the -- I don't know
7  the extent of those conversations.
8        Q.        Do you know any decisions on behalf
9  of either defendant, Kentucky Fuel or JCJ, that Jill
10 has offered input in connection with making any
11 significant decision?
12       A.        No.
13       Q.        Do you think that she doesn't or do
14 you think, well, she probably does but I'm just not
15 aware of it?
16       A.        I -- I just don't know the extent of
17 her and Jay's conversations.
18       Q.        Okay.  Jay -- I take it you would
19 agree with this, he describes himself as a pretty
20 hands-on guy.
21       A.        Yes.
22       Q.        Involved in operations a lot.
23       A.        Yes.
24       Q.        How often does he visit the mines?
25       A.        Multiple times a week.  I don't know

Page 49

1  that you could say every single day, but it's
2  certainly multiple times a week.
3        Q.      You've got now, what, seven or eight
4  active operating mines?
5        A.      Um...
6        Q.      I know a couple of them go idle for
7  short periods of time and then resume again.  But
8  counting those as operating, how many operating
9  mines do you have?
10       A.      I think seven's right.
11       Q.      Okay.  And does Jay visit -- even
12 the ones that may be idle, does he visit those
13 regularly also?
14       A.      Not nearly as regularly, but yes.
15 If we have something going on from a reclamation
16 standpoint, like in Southwest Virginia there's only
17 one mine currently running in that area, but I know
18 he has gone down there to meet with the Virginia
19 Department of Mines and Minerals director.  They've
20 met down there.  So he does things like that too.
21       Q.      Well, when he goes out to mines that
22 are operating, just as a practical matter, he's
23 president and CEO, what does he do when he goes out
24 there?
25       A.      You know, I -- I can only base it on

Page 50

1  the times I've been with him, which is not so much
2  recently.  But when I'm with him, he will meet with
3  the foremen on site.  Ask them, you know, how things
4  are going.  He'll check with them on, "Do you have
5  any equipment running?" and things like that.  He
6  always checks with them to see if they've had any
7  safety issues or safety complaints.  And then
8  normally we'll ride around the job with the foremen
9  to look at the next areas of work, to kind of ask
10 them, "What's your game plan for when you move over
11 there?" and things like that.
12              If he sees something that's not
13 consistent with his prior visit, you know, he'll ask
14 them, "Why is this different than what we had
15 discussed last time?"  Those kind of conversations.
16       Q.      And you said he does -- he visits
17 typically the operating mines multiple times a week?
18       A.      Yes.
19       Q.      Is he pretty much doing these visits
20 five or six days a week?
21       A.      Um, I'd say four or five days for
22 sure, I would say.
23       Q.      And the mines are, what, in both
24 West Virginia and Virginia?
25       A.      (Witness moves head up and down.)

Page 51

1        Q.      Any in Kentucky?
2        A.      There's one in Kentucky.
3        Q.      So they're spread out over three
4  states.  How does he get there?  Does he use a
5  helicopter?
6        A.      Occasionally.  I do know he uses
7  that some.  The mines in West Virginia, he will
8  drive to those sometimes because five of the seven
9  mines are in West Virginia and they're all very
10 close in proximity.  So he'll occasionally drive to
11 those.  I think he typically does use the helicopter
12 for the Virginia and Kentucky mine.
13       Q.      Does he ever use it for the
14 West Virginia mines, or does he always drive?
15       A.      Oh, no, he definitely uses it some
16 for West Virginia.  But there are times -- you know,
17 the helicopter is very weather dependent.  There's
18 time if weather won't allow it and he wants to go to
19 West Virginia, he'll drive.
20       Q.      When he's making these visits,
21 what -- in terms of hours, what does the day look
22 like?  Is this a leave in the morning, come back
23 late in the afternoon?  Generally, what's the
24 timetable?
25       A.      More late in the morning or

Page 52

1  midafternoon, or early afternoon to late in the
2  evening.
3        Q.      Okay.
4              MR. LUCAS:  I'm going to go into an
5         entirely different subject area.  Would this
6         be a good time for a short break?
7              MR. RUBY:  Yes, it would.
8              (Whereupon, a recess took place
9              from 11:24 a.m. until 11:36 a.m.)
10 BY MR. LUCAS:
11       Q.      You wear two hats.  One is general
12 counsel for multiple companies, and another one is
13 as an officer, correct?
14       A.      Yes.
15       Q.      And for -- let's take Kentucky Fuel
16 and JCJ.  What officer position do you hold with
17 those companies?
18       A.      Vice president.
19       Q.      Jay at one time I think was the
20 executive vice president.  Are you the executive
21 vice president?
22       A.      I'm sorry.  I didn't mean to jump in
23 there.  Yes, I am.
24       Q.      Okay.  Are there other vice
25 presidents?

Stephen W. Ball                                                        14 (53 - 56)

Page 53

1   A.   Not officers.  We have a few people
2   that have like a "vice president of" title, but
3   they're not officers of the company or companies.
4   Q.   Okay.  So it's just a title?
5   A.   Yeah.
6   Q.   Who are the officers of the company
7   besides -- of Kentucky Fuel besides you and Jill?
8   A.   The officers are me and Jay.
9   Q.   I'm sorry.  I misspoke.  I didn't
10  mean to do that.  You and Jay.  Anybody else?
11  A.   And Terry Miller is the secretary.
12  Q.   What about for JCJ?
13  A.   Yes, the same thing for JCJ:
14  Myself, Jay, and Terry Miller.
15  Q.   All right.  What role does Terry
16  Miller have in connection with any litigation?
17  A.   None.  And he has no role with
18  either of the companies.  He's a longtime Justice
19  Family employee.  Just being honest with you today,
20  I do the secretary role.  I was formally the
21  secretary, and it ties in with the general
22  counsel-type role anyways.  So Terry Miller does
23  have that title, but I do all the secretarial
24  functions.
25  Q.   Does he do anything?

Page 54

1   A.   He works day-to-day at The
2   Greenbrier, but he does not do anything on the coal
3   or ag businesses.
4   Q.   What does he do at The Greenbrier?
5   A.   He's had different roles over time.
6   I believe today he is -- it's -- I want to say his
7   title is vice president of operations.  But his
8   primary responsibilities are, he looks over the
9   warehouse at The Greenbrier and the security
10  function.
11  Q.   Okay.  How do you, just in your own
12  mind, distinguish between what you do as general
13  counsel and what you do as vice president or
14  executive VP?
15  A.   I mean, there are certain things
16  that are easier to distinguish than others.  In the
17  executive vice president role, you know, sometimes
18  I'll work on projects that clearly aren't legal in
19  nature.  And then there are things like, you know,
20  when you're involved in litigation and things like
21  that, that's clearly legal in nature.  So it's not
22  always a bright line.  So I don't know that I really
23  think about things that way in my head as I'm
24  working on them.
25  It's a long-winded answer.  There

Page 55

1   are some things that are clearer to me than others
2   when I'm doing that.
3   Q.   Was Roger Hunter previously the
4   general counsel?
5   A.   Yes.
6   Q.   And do you fill the role that Roger
7   used to fill?
8   A.   Yes.
9   Q.   Okay.  You hesitated a little bit
10  when you said that.  Is there any qualifications to
11  that?
12  A.   Roger, where he was solely focused
13  on legal, you know, there's probably some legal
14  things that -- Roger reported to me.  But like
15  Mr. Hatfield, for example, he does some things that
16  Roger used to do.  So I don't do -- my only
17  hesitation was I don't do everything that Roger did.
18  But when he left, I took the general counsel title
19  back.  But as far as filling his job duties, that's
20  been more Pat's work.
21  Q.   Okay.  Who does -- what is it that
22  Roger Hunter did that you don't do?
23  A.   So like the -- some of the direct
24  litigation, like what Mr. Hatfield does today, I
25  don't do any of that.  Roger was physically based at

Page 56

1   The Greenbrier Hotel, and so he did more day-to-day
2   legal things at the hotel than what I do today.  He
3   was way more involved with human resources and
4   advising them on things that they were dealing with.
5   I do that only when it rises to the level of like a
6   grievance or an arbitration.  But as far as meeting
7   with HR on a weekly basis, I don't do anything like
8   that, and he did stuff like that.
9   Q.   Okay.  You said that you don't do
10  direct litigation like Mr. Hatfield.  What did you
11  mean by that, "I don't do direct litigation"?
12  A.   I really don't make appearances in
13  court cases.
14  Q.   Oh, okay.
15  A.   I mean, I have on occasion, like if
16  we have a really small -- especially prior to
17  Mr. Hatfield starting.  If we had a really small
18  matter in West Virginia that we just needed to get
19  an answer filed or something like that, I would
20  occasionally do that.  So it's not like I've never
21  made an appearance.  But if it's something that's
22  going to be protracted litigation, I don't make
23  appearance in that.
24  Q.   Do you ever -- in either small
25  matters or bigger matters, do you ever prepare

Page 57

1  pleadings or motions or anything that's going to be
2  filed with the Court?
3       A.       No.
4       Q.       Now, who else is in the legal
5  department besides you and Mr. Hatfield?
6                Dustin Dean?
7       A.       No longer.  He was in the legal
8  department from, uh, the end of 2012 through the
9  beginning of 2018.
10      Q.       Okay.  And what was his role?
11      A.       He was associate general counsel.
12 And, I mean, basically, was kind of a catchall for
13 things that Roger needed help on, or at the time
14 H.A. Dudley was there.  If they needed help, he
15 would assist with that.  He did make -- he is a
16 Virginia-licensed lawyer.  He would make appearances
17 in some matters in Virginia.  And on occasion he
18 would help me if I was working on a commercial
19 matter and just needed an extra set of hands.  But
20 he was more -- he was more involved with litigation
21 matters than commercial matters.
22      Q.       All right.  And how many lawyers do
23 you have now in your legal department?
24      A.       Myself.  Ron Hatfield.  And then
25 there is one lawyer that's based in Birmingham,

Page 58

1  Alabama.  His name is James Seal, S-E-A-L.
2       Q.       What does he do?
3       A.       He just -- he's a younger lawyer.
4  And for the most part, he just handles the smaller
5  litigation that we have in Alabama.
6       Q.       Only in Alabama?
7       A.       Only in Alabama.
8       Q.       Okay.  And does Ron Hatfield report
9  to you?
10      A.       Yes.
11      Q.       And what's his role?
12      A.       Ron is in charge of all litigation
13 in West Virginia and Kentucky.
14      Q.       Who are his clients?
15      A.       He's -- he's handled a handful of
16 Greenbrier matters.  Obviously, Kentucky Fuel and
17 James C. Justice Companies.  He's made appearance in
18 some Bluestone cases and a case involving Tams
19 Management.  So, basically, the Justice
20 organization.
21                Ron started with the -- with the --
22 what I'll just generically call the Justice
23 Companies in September of '21.  In his private
24 practice prior to that, he was doing some criminal
25 work.  And so he's had a couple of those criminal

Page 59

1  matters he continues to do outside of the Justice
2  organization.  But the intent is, once those wrap
3  up, he would exclusively be in-house to the Justice
4  organization.
5       Q.       Does Ron have experience in
6  commercial litigation in what you or I might call
7  complex litigation?
8       A.       I believe so, yes.
9       Q.       Okay.  What kind of complex
10 litigation has he ever been involved in?
11      A.       When he was in private practice, he
12 was involved in several asbestos cases.  He
13 predominantly did insurance defense work.  And so I
14 know he handled several asbestos cases.  And he also
15 handled some commercial matters involving coal
16 companies, things like that.  But, I mean, that's
17 just what I learned from interviewing him.
18      Q.       What kind of commercial matters
19 involving coal companies has he had experience in?
20      A.       The ones that he mentioned to me,
21 they were -- as I best recall, they involved like
22 land disputes.  Like, um, I guess, a mineral --
23 mineral dispute.  And I think -- I'm trying to think
24 now.  I think another one was an employment dispute.
25 I called it commercial, but he -- it was for a coal

Page 60

1  company, but I think it was an employment dispute.
2       Q.       All right.  Do you know if he ever
3  handled any commercial cases -- I'm carving out the
4  "asbestos" word.  Any commercial cases where the
5  amount in controversy was over, say, $5 million?
6       A.       No.  I've heard him talk about a
7  couple of med-mal cases he had that had large
8  exposure, but I don't recall him specifically
9  discussing a commercial case that had that type of
10 exposure.
11      Q.       Any over, say, a million dollars?
12 Commercial cases; not med-mal or personal injury or
13 the like.
14      A.       I don't know.
15      Q.       Okay.  Do you know if he was ever
16 involved in any cases that required significant
17 document management involving the production of more
18 than, say, 5,000 pages of documents?
19      A.       Not specifically, no.
20      Q.       Do you have that kind of experience?
21      A.       Not as a direct litigator, but we
22 certainly have involved -- been involved in a couple
23 of cases that had significant discovery.
24      Q.       And when you say "significant
25 discovery," what do you -- how do you define that?

Page 61

1    A.       Just, um, I guess substantial
2  production is what I was thinking of.
3    Q.       Well, in "substantial production,"
4  some people think -- some lawyers may think 500
5  documents is substantial production.  Some may not
6  think it's substantial until you hit 50,000.  What's
7  your --
8    A.       Well, I'm not thinking of 50,000,
9  but I'm thinking of, you know, more than 5,000.
10   Q.       Okay.  Well, tell me how you manage
11 your document production in big document production
12 cases.
13   A.       Typically, it's handled through the
14 lawyers.  I mean, we're asked to collect certain
15 documents, and we collect those and give them to the
16 lawyers.
17   Q.       You're referring to outside counsel?
18   A.       Yes --
19   Q.       Okay.
20   A.       -- predominantly.
21   Q.       How do you go about -- hang on.
22 I'll withdraw that.  I'll come back to that in a
23 minute.
24            You said earlier Ron Hatfield
25 reports to you.  Does he also -- is he authorized

Page 62

1  and does he communicate directly with the principals
2  of the companies as his clients, or does he always
3  have to go through you?
4    A.       No.  He -- I mean, he -- he
5  typically does go through me.  But, I mean, there
6  are times I will ask him to reach out directly to
7  Jay, you know, especially if that's -- if I'm going
8  to be unavailable and something is
9  time sensitive, I'll have him reach out directly to
10 Jay on things like that.  I'm not aware of him ever
11 -- I don't think he's ever communicated with the
12 governor, and I don't know if he has ever directly
13 communicated with Jill.
14   Q.       When he's been authorized or when he
15 has talked to Jay, is that -- is your approval
16 always required for that, or just as a practical
17 matter, does he have the authority to pick up the
18 phone or walk into the office and talk to Jay about
19 any particular -- if it's a significant issue in a
20 case?
21   A.       I don't think the channels are that
22 formulized.  I mean, I've certainly never told him,
23 "Don't you ever talk to Jay without me."  I think
24 given his newness, he tries to always go through me
25 first.  But I've never told him, "You can't go

Page 63

1  directly to Jay."
2    Q.       Okay.
3    A.       And I will tell you, I think he
4  always tries to go to me first.  And so far -- I
5  mean, he's, you know, he's been here less than a
6  year.  So far, it's only been when I've told him he
7  needs to go directly to him just because I'm tied
8  up.  That's the only times I'm aware of him going
9  directly to him.
10   Q.       I'm not asking the substance of any
11 communication between him and Jay, but do you know
12 whether or not he has communicated directly with Jay
13 about any of the matters in this lawsuit?
14   A.       Not to my knowledge.
15   Q.       Okay.  Has he been forbidden from
16 doing that in any way?
17   A.       No.
18   Q.       In your view, knowing everything you
19 know about the case -- and I'm not suggesting an
20 answer on this.  I just want to know.  In your view,
21 has he in any way dropped the ball?
22   A.       No.
23   Q.       Has anyone else dropped the ball?
24   A.       I guess the best way I could answer
25 that is, I certainly have a different view today of

Page 64

1  the April 2021 order than I did at that time.
2    Q.       Okay.  Can you explain that to me?
3    A.       Um...
4    Q.       Do you need to refer to the order to
5  answer that?
6    A.       No, no.  So here's all that I would
7  say about that is --
8            MR. RUBY:  Without going into
9        specific conversations between counsel.
10           THE WITNESS:  Yeah, without going
11       into specific conversations.  After that April
12       order, I understood that we needed to provide
13       additional information.  I did not personally
14       read the order at that time.  The only thing I
15       read was -- I don't even know what you call
16       it.  When the Court sends out one of their
17       electronic communications and sometimes
18       there's like a summary in the body of the
19       email.
20 BY MR. LUCAS:
21   Q.       The ECF notice?
22   A.       Yeah, whatever was in the body of
23 that email from -- on that ECF notice, I read that.
24 And then I worked with Chris Schroeck to collect the
25 documents.

Page 65

Q.      Okay.  Well, you said your -- well, strike that.

You read the ECF notice that basically sent out that April discovery order?

A.      Yes.

Q.      Okay.

A.      It was -- I believe it was either cut-and-pasted in an email to me or forwarded to me.

Q.      Okay.  And you understood from that that the Court had granted our motion to compel and compel the production of additional documents.  Is that fair?

A.      Yes.

Q.      Okay.  Is there any particular reason why you didn't read the order itself?

A.      No particular reason other than I -- it's just not something I typically do.  It's not my primary focus.  It's not something I typically do.

Q.      Okay.  You said you have a different understanding now than you had then.  What's your -- what's your understanding now and how is it different?

A.      My understanding after -- so that understanding has changed, I guess, gradually over time after your all's motion to compel was filed

Page 66

last fall.  And then -- or motion for sanctions, I'm sorry.  And then reading Judge Ingram's March of this year order, the one that basically ordered these depositions, I did read that order.  And...

I don't know how to answer it any further than that without getting into further conversations.

Q.      I don't want you to characterize any conversation that your lawyer had with you.  Obviously, I'm not entitled to that at this point.  All I want to know is how you now understand that original, I'll call it the discovery order, from April of 2021.

A.      I guess the best way I can characterize that is how insufficient the Court has deemed our May and June supplementation to have been.

Q.      All right.  Take a look at Exhibit 7.

A.      Okay.

Q.      Look back -- and this is one you said you had read, correct?

A.      Correct.

Q.      Okay.  Flip back to page 10.  In the middle -- or above the middle of the page, after

Page 67

that quotation and the cite to D.E. 505, it reads, "Clearly, the Court ordered discovery of information related to the hundred-plus business entities the Justice Family claimed to own."

Were you aware of that before you read this order?

A.      No.

Q.      Okay.  At the risk of stating the obvious, you were aware of it after you read the order, correct?

A.      Yes.

Q.      And what -- what follow-up procedures were taken after you read this order?

Phrased another way, what did you do as a result of it?

A.      So shortly after we received this order, we received your discovery requests, I guess in advance of these depositions.  And so the fact of the matter is, we're very, very thinly staffed from a resource standpoint.  It's very difficult to keep up with our -- what I'll call our day-to-day normal activities, you know, in addition to when you get something in like this for discovery.  And so it's just hard to -- from a resource standpoint, it's hard to get to all of it.  And so we initially

Page 68

focused on the discovery requests and supplementing the information that we have previously provided.  And so that's what we've been able to do so far.

Q.      Well, this order was entered in May -- excuse me, in April of this year.  What supplements have you provided since then?

A.      I believe this was in March.

Q.      I'm sorry.  I misspoke.  You're correct.

A.      So in addition to what I'm calling the discovery responses that you -- I forget exactly when you issued them, but like a week or two after this.  So we did that.  And then --

Q.      Wait a minute.  I didn't understand that.  You said the discovery responses that we issued.

A.      Or the discovery requests that you issued.

Q.      Okay.

A.      Like, shortly after this order came out, we received discovery requests, which I think they were only requests for production of documents.  And so what I'm saying is, from a resource standpoint, we focused on those first.  And then after we provided those responses -- after we

**Stephen W. Ball**                                                      **18 (69 - 72)**

Page 69

1  provided those responses, my understanding is we
2  provided some additional tax returns and bank
3  statements and things like that, which were intended
4  to be supplements to our May and June of '21
5  supplemental disclosures.
6          Q.      You did give us some supplements,
7  and you did it on the 29th day of April --
8          A.      Okay.
9          Q.      -- of this year.  And that was a --
10  you gave us a supplemental response to the document
11  request.
12                 MR. LUCAS:  Can I get a sticker from
13      you there, please?
14                 (Exhibit 17, 3/31/2022 Email from
15                 Linda Byrd, marked for
16                 identification.)
17  BY MR. LUCAS:
18          Q.      I'm going to show you what's been
19  marked as Exhibit 17.  And you'll see the first page
20  is an email from Linda Byrd to Mr. Hatfield, which
21  actually transmitted the discovery requests.  The
22  second page is a letter that she mailed to him doing
23  the same thing.  The actual discovery request begins
24  on the third page.  And you will see that it is --
25  and take a minute and read it to the extent you need

Page 70

1  to.
2                 You can see from the title and then
3  reading the body on the first page, that it is a
4  request for supplementation both of your prior
5  interrogatories and the document requests.  And the
6  period for which supplementation is requested is
7  between -- if you look in the middle of the texts
8  there, between May 17 as well as June 7, which was
9  the date of your third supplemental response, and
10  the date that the supplementation is provided.  So
11  it was roughly a -- roughly, a one-year period that
12  we were requesting supplementation both of your
13  prior interrogatory response and prior document
14  requests.  Do you see that?
15          A.      Yes.
16          Q.      All right.  And you are correct, you
17  did provide a supplement to the document requests.
18                 There's been nothing provided in
19  connection with the requests for supplementation of
20  the interrogatories.  No answer, no objections, no
21  nothing.  Can you tell me why that is?
22          A.      No.
23          Q.      Now, that was all what you did in
24  response to this discovery request, Exhibit 17.  My
25  question originally was, what did you do -- let me

Page 71

1  ask you this.  I'm going to rephrase it slightly.
2                 After we filed the sanctions motion
3  that you referred to, which was filed in August of
4  last year.  As a result -- did you read that motion?
5          A.      Yes.  But can I clarify one thing?
6          Q.      Sure.
7          A.      This isn't actually the request I
8  was referring to.  I mean, I understand why you went
9  through this with me.  But in my prior answer, there
10  was -- I think there was like an eight or nine item
11  request for production of documents.  And that's the
12  one I -- when I said we got to work on that first,
13  that's the one I was referring to.  And then after
14  we finished -- then after we finished that, we
15  started working on supplementing prior responses.  I
16  just wanted to make that clear.
17          Q.      And thank you for that
18  clarification.  All right.
19                 (Exhibit 18, Requests for Production
20                 of Documents, marked for
21                 identification.)
22  BY MR. LUCAS:
23          Q.      I'm going to hand you a copy of what
24  has been marked as Exhibit 18.  And that one is just
25  a request for production of documents; not an

Page 72

1  interrogatory.  And so if my earlier question misled
2  you by mixing the two together, I apologize for
3  that.
4                 Your response was a response to --
5  when I said "what did you do as a result," I was
6  asking you as a result of the March sanctions order.
7  And you referred to that supplementation.  But that
8  was actually in response to this discovery that's
9  been marked as Exhibit 18, correct?
10          A.      Yeah, that's what we got to work on
11  first was this Exhibit 18.  We got to work on that
12  first, and then -- and then we worked on
13  supplemental document production.
14          Q.      Okay.
15          A.      At least I don't think they were
16  produced at the same time.  I wasn't involved in the
17  physical production of them.  I think there was a
18  later production of documents that was not in
19  response to Exhibit 18.
20                 I think -- I don't recall really
21  seeing Exhibit 17 before.  I don't think I've seen
22  that.  But I -- but I knew that a request had been
23  received.
24          Q.      Okay.  You knew that a request had
25  been received, referring to Exhibit 17, even though

Page 73

1  you hadn't actually seen it?
2      A.      Correct.
3      Q.      Did you ask to see it when you
4  learned it had been received?
5      A.      No.
6      Q.      Any particular reason why not?
7              I mean, was there some thought
8  process where you made a conscious decision not to
9  look at it?
10     A.      No.  No.
11     Q.      Okay.  When we filed the sanctions
12 motion last August, did you read that motion?
13     A.      Yes.
14     Q.      And as a result of reading that
15 motion and seeing the complaints that we had raised
16 about the sufficiency of your compliance with the
17 Court's April of 2021 discovery order, did you take
18 any follow-up action to provide the additional
19 discovery about which we were complaining?
20     A.      Yes.
21     Q.      What?
22     A.      I think the -- I think the majority
23 of that all related to bank statements.
24     Q.      Anything else other than providing
25 some additional bank statements?

Page 74

1      A.      I know as part of putting our
2  responses together, there were certain transactional
3  documents that we included in some of those
4  responses.  I don't recall any other information
5  specifically off the top of my head.  But I think as
6  part of our responses, we did provide some
7  information to address those points that you all had
8  made.
9      Q.      Are you able to be any more specific
10 than that?
11     A.      I recall collecting the Mechel
12 transaction document.  I recall getting some
13 additional information on the 2018 Blackstone
14 transaction document with Kentucky Fuel and several
15 other entities.  That's all that I specifically
16 recall.
17     Q.      And that information you actually
18 put in a -- you put some of the -- you attached some
19 of those documents to your affidavit that you filed
20 actually in response to our sanctions motion.  Is
21 that correct?  Is that your recollection?
22     A.      I believe that's correct, yes.
23     Q.      And after the Court entered the
24 order on our motion for sanctions, which it did this
25 past March, March 23, and it's Exhibit 7.  I think

Page 75

1  you've got it in front of you.
2      A.      Yes.
3      Q.      Did you do anything else to provide
4  additional discovery in response to that order?
5      A.      The supplemental information or
6  supplementation information I was talking about
7  earlier, I guess you could -- in your mind, you may
8  have been looking at it as being a response to
9  Exhibit 17.  But in my mind, it was -- I guess it is
10 in response to Exhibit 17, but it's also in response
11 to additional information.
12     Q.      Okay.
13             Did there come a time in this
14 process where you realized that the companies had a
15 significant problem on their hands?
16     A.      Yes.
17     Q.      When?
18     A.      After, um, Exhibit 7.
19     Q.      Exhibit 7 being the order that was
20 entered roughly two months ago?
21     A.      Yes.
22     Q.      What did you do -- did you brief Jay
23 or give him a copy of that order once you realized
24 that the companies had a significant problem on
25 their hands?

Page 76

1      A.      I did not give him a copy of the
2  order.
3      Q.      Without telling me anything that
4  might be attorney-client privilege, did you brief
5  him on it?
6      A.      I briefed him on what the order
7  says.
8      Q.      Okay.  Did he give you any
9  instructions as to what to do as a result of it?
10     A.      No.
11     Q.      Prior to this, had you briefed or
12 otherwise made Jay aware either of our motion to
13 compel or the April 16, 2021, discovery order which
14 granted, in part, that motion to compel, or -- let
15 me just stop with those two.
16             Had you made him aware of either of
17 those?
18     A.      Generally, the April order, um, at
19 that time I wasn't aware -- I hadn't read the order
20 myself.  But he was aware that we had to provide
21 additional information.
22     Q.      Okay.  How was he made aware of
23 that?
24     A.      I told him that.
25     Q.      Okay.  Did he ask to see a copy of

Page 77

1  the order or to know any details about it?
2     A.      No.  He actually -- he told Chris
3  Schroeck not to mess around with it because -- well,
4  because it's something that your all's side would
5  take advantage of.
6     Q.      Other than saying don't mess around
7  with it, did he ask for any details just about what
8  the order said?
9     A.      No.
10             And I'll share with you.  I mean,
11  the reason he was -- I know I discussed it with him
12  is we were actually at --
13             MR. RUBY:  Let me stop you there.
14        Is this something we should talk about?
15             I just don't want you to get into
16        details of conversations that you had with
17        Jay.
18             THE WITNESS:  Um...
19             MR. LUCAS:  If it's confidential.
20             MR. RUBY:  Sure.
21             THE WITNESS:  This is more about why
22        I remember the conversation.
23             MR. RUBY:  Okay.  Go ahead.
24             THE WITNESS:  We were at an
25        arbitration hearing in Jacksonville, Florida,

Page 78

1        on a coal matter.  And myself and Chris
2        Schroeck and Hunter Naff were all there.  In
3        the evenings, we were -- Jay was only there
4        for one evening.  We were there for three
5        days.  But while he was there in the evenings,
6        we were working on the responses that we
7        submitted in May.  And he just asked us what
8        we were working on, and that's what led to the
9        conversation about it.
10             MR. LUCAS:  Okay.
11             Let me -- let's go off the record
12        for a minute.
13             (Whereupon, an off-the-record
14             discussion took place.)
15  BY MR. LUCAS:
16     Q.      In January, and I believe it was
17  January 7 of last year, there was a telephonic
18  conference with the magistrate judge that preceded
19  the motion to compel.  Under this Court's
20  procedures, you have to have that kind of conference
21  and get permission to file a motion to compel.
22  During that conference the magistrate ordered the
23  parties to obtain the audio recording of the
24  conference, and then to make their clients aware of
25  it.  Mr. Schroeck submitted an order to obtain the

Page 79

1  audio of the conference.
2             Did he make you or anyone else aware
3  of what transpired at that conference and what the
4  magistrate said?
5     A.      Not -- I know that a motion to
6  compel ultimately issued, but I don't -- I don't
7  have any recollection about that particular
8  telephone conference other than I do know -- like I
9  said, I know that the Court ultimately allowed the
10  motion to compel.
11     Q.      Well, the magistrate had ordered him
12  to obtain a copy of the audio.  Did you ever listen
13  to the audio?
14     A.      No.
15     Q.      Subsequently, there was a transcript
16  ordered and filed.  Did you ever read the
17  transcript?
18     A.      No.
19     Q.      Are you aware that the magistrate
20  asked that the lawyers each advise their clients of
21  what transpired at that conference?
22     A.      I am now.  I didn't know that at the
23  time.
24     Q.      When you say you are now, you mean
25  as a result of my questioning, or have you learned

Page 80

1  that before today?
2     A.      I learned that before today as part
3  of the -- and I can't remember if it was in one of
4  the orders or not.  But I know as part of the
5  discovery, the recent request for production of
6  documents, the discovery requests, we searched
7  through Chris's files to try to obtain that audio
8  recording.  Because we could see -- my understanding
9  from Ron is we could see that he had ordered it, but
10  we have -- we can't find a copy of it in our office.
11  And I'm not aware of him playing it for anyone at
12  the time.  So I just don't know if he received it
13  and didn't do anything with it.  I just don't know
14  how that played out.
15     Q.      All right.  I'm going to -- I've got
16  the transcript here, and I'm going to read you some
17  portions and just ask you if you were made aware of
18  these requirements.  I'm not trying to argue with
19  you about any of them.  I just want to know if you
20  were made aware of what the magistrate was saying he
21  wanted.
22             MR. RUBY:  John, just for the
23        record, this is the transcript of the
24        January 2021 telephone conference with the
25        magistrate judge?

Page 81

1                    MR. LUCAS:  Yes, sir.  It's
2      January 7, 2021.  And I'll call out the -- you
3      all probably have the transcript.  I'm sure
4      you do somewhere.  I'll call out just for the
5      record the pages I'm looking at on the
6      transcript.
7  BY MR. LUCAS:
8      Q.       On page 18, he's talking about --
9  this was all in the context of us saying that
10 discovery, your, the company's discovery responses
11 were insufficient, and we wanted to file a motion to
12 compel.  And the magistrate said, talking to
13 Mr. Schroeck:
14                "So what you're responsible for
15      creating, Mr. Schroeck, is a record, a record
16      of how every single request was reviewed,
17      every single person that your clients -- that
18      you spoke to about them, every single person
19      that was asked to gather information, every
20      single item of information that was provided
21      to you by your client."
22                And so my question is, was that
23 done?
24      A.       I don't know.  I wasn't aware of
25 that.

Page 82

1      Q.       I'll read you one more.  And I'm not
2  going to read this whole thing.  It kind of
3  permeates the whole transcript.  But he said, kind
4  of building on that:
5                "I'm not going to invade any
6      attorney-client privilege or work product
7      domain, but eventually I will need to see a
8      narrative of what happened, how your clients
9      responded to these discovery requests."
10                Was that type of narrative of what
11 happened and how the clients were responding, was
12 that ever done?
13     A.       Not to my knowledge.
14     Q.       He said:
15                "So the clerk's office will provide
16      you, Mr. Schroeck," this is on page 26, "with
17      a copy of the audio file of this call so that
18      you will have that record as you formulate
19      your response, and can make it available to
20      your clients so that they understand the
21      Court's expectations."
22                Was that ever done?
23                I take it from your answer it was
24 not.  By that I mean was the audio file made
25 available to your clients so that they could

Page 83

1  understand the Court's expectations?
2      A.       Not that I'm aware of.
3      Q.       When you -- when you go about
4  collecting documents for production, you said
5  earlier -- you used the phrase "we collected the
6  documents."  Tell me what your procedures and
7  protocols are for identifying the documents, doing
8  the search, and making sure that you're providing
9  all of the documents that have been requested or
10 ordered.
11     A.       Typically, I will -- it can either
12 be in person or sometimes by email, but the lawyer,
13 whether it's Mr. Schroeck or it's an outside lawyer,
14 will tell me the information that we need to
15 collect.  And then based on the type of information,
16 you know, I'll start I guess distributing those
17 requests to the people I think are best suited to
18 answer them.
19     Q.       Okay.  And in this case, I'm going
20 to limit it to our case, who were these requests and
21 whatever instructions you gave with it, who were
22 they distributed to?
23     A.       Predominantly Summer Dean for bank
24 accounts and also for accounting records.  Sometimes
25 I would go -- or I can't say in this case, but

Page 84

1  sometimes I will go directly to some of the
2  accountants if Summer's not available.  Will Morset
3  helped with that in this case.  John Prekker helped
4  with that.
5      Q.       How do you spell his name?
6      A.       P-R-E-K-K-E-R.
7      Q.       Thank you.
8      A.       And then Valerie Hamlet helped with
9  the tax returns.
10     Q.       Okay.  Did you send -- did you send
11 the requests or instructions about collecting
12 documents to anyone other than those three plus
13 Summer Dean?
14     A.       On some of the organizational
15 documents, I think I primarily collected those
16 myself.  But Hunter Naff assisted with that as well.
17 And Polly Hanson, who is a paralegal, she has
18 assisted with some of the -- some of the corporate
19 documents.
20     Q.       Was all of this oral or did you send
21 -- are there emails in existence that embody these
22 instructions?
23     A.       A little bit of both.
24     Q.       Okay.  Where are the emails?
25     A.       The emails that we have were

Page 85

1   provided as part of our recent document production.
2        Q.        Were there any instructions given
3   about how to collect the documents that were
4   required other than the redacted emails that were
5   produced to us late last month?
6        A.        No.  And I typically don't provide
7   them instructions anyways.  It's more need the
8   income statement for this entity for this time
9   period.
10       Q.        Well, if you want to get, say, the
11  documents -- all the documents pertaining to the
12  Mechel transaction, who do you ask for and what do
13  you tell them to collect?
14       A.        I would -- I would just handle that
15  one myself.
16       Q.        And how would you go about getting
17  all those documents?
18       A.        I most likely would have that
19  document saved to my folder on our server, or I also
20  use Dropbox.
21       Q.        When you say "that document," what
22  are you referring to?
23       A.        The Mechel transactional document
24  that you referenced.
25       Q.        Well, my question, though, was

Page 86

1   broader than that.  It was all documents related to
2   the Mechel transaction.
3        A.        Um, I'm just trying to think what
4   else that would entail.  Can you give me an example?
5        Q.        Sure.  Emails.
6        A.        I would search emails between --
7   like Paul Sullivan and Jeff Hallos at Frost Brown
8   Todd handled that transaction.  So I would search
9   emails with them to see what documents were
10  included.
11       Q.        How would you search their emails?
12       A.        I would search our system for
13  incoming emails from the Frost Brown Todd email
14  address.
15       Q.        Okay.  How -- just tell me how you
16  would search your system.  What would you do and
17  what would you look at?
18       A.        I would -- so we do not have a
19  record of emails prior to 2012.  But since 2012,
20  emails are stored on an archiver.  It's called
21  Barracuda.  And within Barracuda you can do these
22  search terms that you kind of think of when you
23  think of search terms.  And so I would go in there
24  and look for all emails to and from Paul Sullivan,
25  Jeff Hallos.  I would probably expand that to all,

Page 87

1   you know, @FBTlaw.com email addresses and look for
2   anything that has that keyword or search word in it.
3        Q.        All right.  Keep in mind -- and I
4   appreciate your trying to help with what you might
5   do, but tell me what you remember that you did in
6   this case.  That's what I'm focusing on, or trying
7   to.
8        A.        In this case, all I remember doing
9   is collecting the actual transaction document.
10       Q.        Okay.  In addition to, for example,
11  emails with Frost Brown Todd or other outside
12  counsel, did you search on any of the
13  transactions -- on any transactions that either
14  Kentucky Fuel or JCJ have been involved in since
15  2012, did you search for intracompany emails, for
16  example, between Jay and somebody else in accounting
17  or Summer Dean or anyone?
18       A.        The only email searches that I have
19  done in this case were for the most recent document
20  production.  And I searched both external and
21  internal emails as part of that production.
22       Q.        What keywords did you use to -- or
23  what search terms did you use?
24       A.        New London.  I'm trying to think.  I
25  think New London and Brownlow were the two primary

Page 88

1   search terms that I used.  And I used a date
2   parameter of the January 7th hearing date to
3   whatever the day of the production was.
4        Q.        Have you ever done a search for
5   emails, either external or internal, to the
6   companies for any emails in response to any document
7   production other than the one you just described?
8        A.        No.
9        Q.        Has anyone else ever done that for
10  the company?
11       A.        Not that I'm aware of.
12       Q.        Okay.
13       MR. LUCAS:  Why don't we break for
14       lunch?  Does that suit you all?
15       MR. RUBY:  Uh-huh.
16       MR. LUCAS:  Okay.
17       (Whereupon, a lunch recess took
18       place from 12:38 p.m. to 1:22 p.m.)
19  BY MR. LUCAS:
20       Q.        I want to ask you about some
21  documents that we didn't get in terms of -- I think
22  these are just JCJ subsidiaries at different times.
23  And I'm not sure, some of these may be newer
24  companies.  But we had requested financial
25  statements, income statements, and balance sheets.

Page 89

1  I'm not going to bore you with all this detail.  We
2  got them for some years but not for others.
3          So, for example, for Black River
4  Coal, LLC, we got -- we didn't get balance sheets or
5  financial statements -- by that I'm including income
6  statements -- until 2013.
7          Do you know any reason why those
8  weren't produced?
9      A.      Black River Coal is a single site
10 underground mine.  We did not operate it very long.
11 I don't know the specific reason why you didn't get
12 those.  I also don't know that it had financial
13 statements for the other periods.
14     Q.      Okay.  How about Bluestone
15 Resources, Inc.?  It had them, did it not, prior to
16 2016?
17     A.      The Justices reacquired -- well,
18 Bluestone Resources wasn't formed until 2015.  And
19 it was formed -- it's possible it was formed in
20 December of '14.  But it was formed for the purpose
21 of reacquiring the Bluestone assets.  So there would
22 not have been anything prior to 2015.  I don't know
23 why you don't have anything for 2015.
24     Q.      Okay.  What about Dynamic Energy,
25 Inc.?

Page 90

1      A.      It's part of the Bluestone group, so
2  it would have that same time period.
3      Q.      Okay.  Did it have financial
4  statements and balance sheets before 2015?
5      A.      Yes.
6      Q.      Okay.  Justice Highwall Mining,
7  Inc., when was it formed?
8      A.      It's also part of the Bluestone
9  group.  It's a fairly old company, though.  I'm
10 going to say it was formed in the early 2000s.
11     Q.      Okay.  Do you know why we didn't get
12 any financial statements or balance sheets for it
13 prior to 2016?
14     A.      Just the same answer as Bluestone
15 and Dynamic for prior to 2015.
16     Q.      But you said it had been in
17 existence.
18     A.      Yeah, but it was -- it was part of
19 the reacquisition in 2015.
20     Q.      Okay.  But did it have financial
21 statements for the period 2010 through '14?
22     A.      Not that we have.
23     Q.      Okay.  Justice Low Seam Mining.  Do
24 you know why we don't have -- we had statements that
25 are starting 2012, but not for '10 and '11.  Do you

Page 91

1  know why that is?
2      A.      I think it's one of the entities
3  that we ran into a problem with the accounting
4  software.  Some of the entities -- we were able to
5  overcome that.  But for whatever reason, I don't
6  think we could get '10 and '11 to generate out of
7  the system.
8      Q.      Do they exist in electronic form but
9  you just can't print them?
10     A.      I don't know the answer to that.
11     Q.      What about Kentucky Fuel?
12     A.      What time period?
13     Q.      Prior to 2016 -- oh, I'm sorry.  I
14 misspoke.  For '10 and '11.
15     A.      I think it would -- it's the same
16 issue.
17     Q.      National Resources, Inc., we don't
18 have anything prior to 2016.
19     A.      It's part of the Bluestone group.
20 So we don't have anything prior to 2015.  I don't
21 know why '15 wasn't included.
22     Q.      Okay.  Is the same true of Nine Mile
23 Mining, Inc.?
24     A.      No.  Nine Mile Mining, Inc. is a
25 subsidiary of Virginia Fuel Corporation.  So it

Page 92

1  would not -- it wouldn't have the same issues as the
2  Bluestone companies.
3      Q.      Do you know why we didn't get
4  balance sheets and financials statements for Nine
5  Mile Mining, Inc. prior to 2016?
6      A.      No.
7      Q.      Okay.  Do they exist?
8      A.      I don't know.  I don't have any
9  reason to believe they don't, but I -- I've not
10 specifically seen them before.
11     Q.      Okay.  What about Nufac Mining,
12 Inc.?  The same period of time, prior to 2016, we
13 don't have anything.
14     A.      It's part of the Bluestone group.
15 We don't have any records prior to 2015.  I don't
16 know why '15 wasn't included.
17     Q.      Okay.  What about Pay Car Mining,
18 Inc.?  It's also part of Bluestone, right?
19     A.      Correct.
20     Q.      The same answer?
21     A.      The same answer.
22     Q.      Okay.  Second Sterling Corp?
23     A.      The same answer:  Part of Bluestone.
24     Q.      Okay.  Nothing prior to '15.  And
25 don't know why we don't have '15?

**Stephen W. Ball**                                                           **24 (93 - 96)**

Page 93

1    A.    Correct.

2    Q.    Okay.  There's several others here.

3 Sequoia Energy, Southern Coal Corp, and Virginia

4 Fuel Coal Corp.  And again, we don't have anything

5 for those for '10 and '11.  Same answer about the

6 computer issues?

7    A.    Yes.

8    Q.    But we do have them for that period

9 of time for JCJ.  So why do we have them for JCJ but

10 not for the others?

11    A.    I -- I don't know the technical

12 answer there.  I don't know why JCJ -- because

13 they're all in -- my understanding is they're all in

14 the same mass/Sage accounting software.  So I don't

15 know why JCJ was able to generate and the others

16 weren't.

17    Q.    Who would know that?

18    A.    Summer Dean.

19    Q.    Going back briefly on a couple of

20 things we've talked about.  Do you all have any

21 in-house IT people?

22    A.    No.

23    Q.    Do you have an external IT firm you

24 use?

25    A.    Yes.

Page 94

1    Q.    Have you ever used them or sought

2 their assistance in connection with searching for

3 documents to respond to discovery?

4    A.    We have.  We've attempted to use

5 them a time or two, but they don't specialize in

6 that type of thing.  They're more of network-type

7 people, setting up computers and things like that,

8 and it just didn't -- they tried, but it's just not

9 what they do.

10    Q.    Okay.  Did you ever consider

11 retaining some other of these specialty firms that

12 does specialize in assisting companies in electronic

13 discoveries?

14    A.    I don't know.  I've never been asked

15 to do that, but I don't know if anyone else

16 considered it or not.

17    Q.    Well, who would ask you?

18    A.    The lawyers.

19    Q.    The outside lawyers?

20    A.    The outside lawyers, or Mr. Hatfield

21 or Mr. Schroeck.

22    Q.    Okay.

23       MR. LUCAS:  Let me see the

24    exhibit -- we've got some already.  We're off

25    the record.

Page 95

1       (Whereupon, an off-the-record

2       discussion took place.)

3       (Exhibit 19, 2014 - 2019 Tax Form

4       1120S - Exhibit P, marked for

5       identification.)

6 BY MR. LUCAS:

7    Q.    I'm going to hand you what has been

8 marked as Exhibit 19.  It's excerpts of JCJ's tax

9 returns from 2014 through '19.

10       MR. LUCAS:  I need '20 also.

11       We're going to add 2020 to this.

12       I'll make 20 a separate exhibit.

13       (Exhibit 20, 2020 Tax Form 1120-S,

14       marked for identification.)

15       (Whereupon, an off-the-record

16       discussion took place.)

17 BY MR. RUBY:

18    Q.    Okay.  What I wanted to ask you

19 about is on Exhibit -- if we start with Exhibit 19.

20       All right.  Exhibit 19 is a

21 collection of the first page of the tax return for

22 JCJ, together, with the page that comprises a

23 Schedule L.  It's for each of those years, 2014 to

24 '19.  Do you see that?

25    A.    Yes.

Page 96

1    Q.    I want to start on each of them on

2 Schedule L.  Loans to shareholders for 2014 is zero,

3 correct?

4    A.    Correct.

5    Q.    And similarly in 2015, there are no

6 loans to shareholders, are there?

7    A.    No.

8    Q.    All right.  And in 2016, if you go

9 to the same line on Schedule L, it shows at the

10 beginning of the year there's no loans to

11 shareholders.  And at the end of the year, there are

12 in round numbers 22 million.  Do you see that?

13    A.    Yes.

14    Q.    And let's just keep paging through

15 it to get us oriented.

16       In 2017 -- and I have a question on

17 this.  It was shown on 2016 that the loans to

18 shareholders were at the end of the year, which

19 would be December 31, $22,266.  Do you see that?

20    A.    Yes.  22 million?

21    Q.    I'm sorry.  22 million, yeah.  And

22 then 266,735.  And then, yeah, I see that's picked

23 up at the beginning of the next year.  I thought for

24 a minute there was an inconsistency, but they look

25 the same.

Page 97

1            And then by the end of 2017, the
2 loans to shareholders had increased to 29 million.
3 Right?
4        A.      Yes.
5        Q.      And then in 2018, the loans to
6 shareholders started at that 29.9 million, and were
7 $31,740,101 at the end of 2018. Right?
8        A.      Yes.
9        Q.      And then in 2019, it stayed constant
10 at that figure. Do you see that?
11       A.      Yes.
12       Q.      And then look on Exhibit 20, for
13 right now just the second page of the exhibit, and
14 it's still at $31,740 -- $31,740,101, right?
15       A.      Yes.
16       Q.      Okay. Can we just for ease of
17 discussion just refer to that as a round of
18 $32 million?
19       A.      Sure.
20       Q.      All right. Who were the
21 shareholders who were liable for what's shown there
22 as loans to shareholders?
23       A.      Based on the document we went
24 through during the April 18th hearing that
25 summarized that, I think those are James C. Justice,

Page 98

1 III.
2        Q.      Okay. And let's just refer to that
3 so we're all on the same wave length. I don't think
4 it's an exhibit yet, so let's make it an exhibit.
5                MR. RUBY: I thought it was two.
6                Are you looking for the Schedule L
7      detail?
8                MR. LUCAS: Oh, wait, wait, yes,
9      Schedule L. I think it is Exhibit 2. Let's
10     see.
11               Yeah. Yeah, it is. Thank you.
12 BY MR. RUBY:
13       Q.      Okay. Look at Deposition Exhibit 2.
14 You got it there?
15       A.      Yes.
16       Q.      Is that what you were referring to?
17       A.      Yes.
18       Q.      Okay. As far as you know, are there
19 any loans to any of the shareholders by JCJ other
20 than the loans to Jay Justice?
21       A.      I mean, I think the shareholder loan
22 account goes up and down, like we discussed at the
23 hearing that day. So, I mean, I'm sure there have
24 been adjustments. And I'll say this, I don't know
25 as we sit here whether Jill Justice has ever loaned

Page 99

1 money. I can't say that for sure.
2        Q.      I'm not asking loans by
3 shareholders.
4        A.      Yeah.
5        Q.      I'm only asking about loans made to
6 shareholders.
7        A.      Right.
8        Q.      Because the Line 7 on Schedule L is,
9 quote, "loans to shareholders." So that would be
10 from JCJC's point of view a receivable from the
11 shareholder, right?
12       A.      Right. And the only point -- and
13 maybe I'm splitting a hair here, but the only point
14 I'm making is let's take Jim Justice's shareholder
15 loan account. In my experience, there usually are
16 debits and credits to that account. So while it may
17 not be showing on this tax return as a loan to Jim
18 Justice, I mean, there are certainly times that
19 those accounts go both ways. That's the only point
20 I'm making. But on these -- on that tax return, the
21 only loan to a shareholder is Jay Justice.
22       Q.      Okay. Well, I'm -- forgive me. I'm
23 confused by your answer, because you said for Jim
24 Justice they could go back and forth.
25               Let me limit it to the most recent

Page 100

1 information we have, which in documents is at the
2 end of 2020. On what's shown as loans from
3 shareholders, were any of those loans due from Jim
4 Justice?
5        A.      No. None of -- not that 31 -- or
6 what we're generally calling the 32 million.
7        Q.      Okay. Was any of that 32 million
8 loans to Jill Justice?
9        A.      No.
10       Q.      Okay.
11               And I know you and I had a dialogue
12 the other day, or in April, about whether they were
13 loans or something else. I'm calling them loans for
14 right now only because that's the way they're
15 characterized here.
16               If I change that terminology to say
17 receivables from shareholders, would your answers be
18 any different?
19       A.      No. It's the same account on the
20 books.
21       Q.      Okay. So whether you call it a loan
22 or receivable, that rounded 32 million is all owed
23 by Jay, correct?
24       A.      Yes.
25       Q.      Now, are there other loans or loans

Page 101

1 to or receivables from Jill Justice at any time,
2 from 2010 until the present, that are not shown?
3 Because we know they're not shown on Line 7 of
4 Schedule L.
5     A.     Not that I'm aware of.
6     Q.     Okay.  Did the companies ever make
7 loans or advance moneys so that they had a
8 receivable owed by Jim Justice?
9     A.     No.
10    Q.     Okay.  I thought you said a moment
11 ago -- and maybe I misunderstood you, so correct me.
12 I thought you said that his shareholder loan account
13 had both debits and credits.
14    A.     It wouldn't be uncommon for it to go
15 up and down.  And I guess I was just trying to --
16 and maybe this goes back to what Mr. Ruby said
17 earlier about making sure there's not a "gotcha"
18 moment.  I think technically those would be a
19 repayment of a loan previously made.  But I'm just
20 saying it's possible that any of these shareholder
21 loan accounts could fluctuate up and down.  And I
22 guess it's how you look at that payment from the
23 company to the shareholder when -- I mean, I would
24 just look at it as a repayment of a loan that was
25 made.  But I was just trying to make the point that

Page 102

1 there are instances that maybe aren't captured here,
2 because at the end of the year, maybe the accounts
3 ended up in a net loan to the company.  But you
4 would have some fluctuation in the shareholder loan
5 account.
6     Q.     Okay.  Well, let me ask you this.  I
7 may have -- I may be guilty of having asked a bad
8 question when I asked about debits and credits in
9 the account, because that could result from payments
10 as well as advances.
11           My question is did -- other than as
12 repayment for a loan made by the shareholder to the
13 company that the company is repaying, did the
14 company ever make distributions to Jim Justice where
15 it was loaning money or advancing money to him?
16    A.     No.
17    Q.     Okay.  The same question for Jill.
18    A.     No.
19    Q.     So the only one that's taken out
20 really any loans from the company is Jay; is that
21 correct?
22    A.     And I don't think -- I don't think
23 that -- I mean, when we got into this in the
24 hearing, I've never known any of the Justices to
25 just take a loan from the company.  I mean, these

Page 103

1 records are what they are.  I'm not saying they
2 don't say what they say.  But just in my experience,
3 I've never known the companies -- I've never known
4 any of the Justices to be in a net position where
5 they owed the companies money, because they're
6 constantly putting money back into the companies.
7     Q.     Then why is it -- since the books
8 and tax returns are on a net basis, why is it shown
9 as a rounded $32 million receivable from Jay
10 Justice?
11    A.     I can't answer that.
12    Q.     Since that's a net.
13           Would you agree with me that because
14 you keep your books on a net basis, that that -- on
15 its face, that would indicate that he owes the
16 company $32 million, correct?
17    A.     On its face.
18    Q.     If the tax returns are correct.
19    A.     Yes.
20    Q.     Okay.  Do you have any reason to
21 believe that the tax returns for these years that
22 we've looked at are not correct?
23    A.     Yes.  I've not been involved in it
24 directly.  But I know after the hearing in April and
25 then in preparation for Jay's deposition, that

Page 104

1 number has been looked into more.  And I know Jay
2 believes that it's in error.  But I have not been
3 involved in the analysis of it.
4     Q.     Who has?
5     A.     I don't -- I don't know who Jay is
6 working with on that.
7     Q.     Okay.  If I ask you any other
8 questions about the details of that, would you know
9 them?
10    A.     No.  I just know that it was a
11 surprise when it was pointed out to me.  And I
12 advised Jay of it as part of preparing for his
13 deposition, or maybe I advised Mr. Ruby.  But either
14 way, Jay became aware of it, and I know he's had
15 someone looking into it.
16    Q.     Let me ask you this.  This was
17 raised as early as August of last year in our motion
18 for sanctions about undisclosed transactions, and we
19 mentioned receivables from or loans to shareholders.
20           Do you recall that being in that
21 motion for sanctions?
22    A.     Not specifically.
23    Q.     Do you want to see it?
24    A.     I can look at it if you want.  I
25 just don't have a specific recollection of it.

Page 105

Q.     Well, here's my question -- if you need to look at it, I'll certainly let you look at it.  My question is, if these tax returns were incorrect, why wasn't that looked at then and then responded to when you filed -- when you, the companies, filed their responses to our motion for sanctions?

A.     I don't know.

Q.     Do you need to see it to elaborate on that at all?

A.     No.  I don't know why it wasn't addressed at that time.  I have no reason to doubt that it was included in the motion.  I just don't specifically recall it.

Q.     Did you look at a draft of your response to that motion?  And your response would have been filed in September of last year.  Did you look at it in order to approve it before it was filed?

A.     Not that I recall.  I typically only do that if I'm asked to do it.  And even then, it usually is just a specific section.  But I've -- I don't do that in the ordinary course.

Q.     In the -- pardon me.

In the April 18 hearing, you

Page 106

testified -- I'm paraphrasing, but you testified that you believe the $32 million was an account receivable, as I understood your testimony, not from a cash advance but from a real estate transaction where property was transferred to Jay and that he owed that.  Do you recall that?

A.     Yeah.

Q.     Was that your belief at the time?

A.     Yeah.

Q.     Is it your belief today?

A.     I think that property transfer is definitely reflected in his shareholder loan balance.  I mean, as we determined in the hearing, it's not the total amount.  But I do know that the intention of the Black River transfer was to be a reduction in his shareholder loan account.

Q.     Okay.  I'll come back to the Black River transfer.  But my question then is, was that -- strike that.

Based on what you just said, what I'm hearing is that he got the Black River property, what you're describing as the Black River property, and instead of paying cash for that, that the consideration was a reduction in -- was it a reduction in what the companies owed him, will we

Page 107

see that on the books, or was it the generation of an account receivable from Jay?

A.     No, my understanding is that at time the company owed him more than $13 1/2 million, and it was a reduction in that amount that the company owed him.

Q.     Okay.

Well, your testimony on -- in the 18th was that this was related to the $32 million -- or, excuse me, yeah, to the $32 million receivable.  That it was part of that.  And, you know, through our dialogue together then, you acknowledged that it was 13 1/2 million and it wasn't the whole thing, right?

A.     Right.

Q.     But as I recall, you didn't know where the balance came from.

A.     Right.

Q.     Okay.  But you were saying it was part of the 32 million that was shown as a receivable.  So is that correct?

A.     Yeah, there's only one shareholder loan account.  So any transaction up or down would be part of that.  I mean, the entire history of money he's loaned to the company and anything that

Page 108

the company has given back to him in reduction of that, or an outright loan, it's all part of that 32.

Q.     Well, did he pay any cash in exchange for that $13 1/2 million South Carolina property?

A.     Not that I'm aware of.

Q.     If you are looking at what -- were you calling it the shareholder loan account?  Is that what you called it?

A.     That's just what I generally call it.

Q.     Okay.  If you're looking at the shareholder loan account -- and in this case, we see that the shareholder loan account, according to the tax returns, is showing that Jay owes the company rounded 32 million, correct?

A.     Correct.

Q.     How do you know -- in looking at that account, since you're only seeing that number, how do you know how much of that is comprised of advances to Jay as opposed to how much of the account is -- how much of the net effect is a result of payments by Jay?

A.     I don't.  All I know is all activity between Jay individually and the company is

Page 109

1 reflected in that account.  And what you're seeing
2 there is the balance on the books and records as of
3 the 12th -- whatever the first year was it went to
4 31.  But that's -- as of that date, that's the
5 balance of all activity.
6          Q.        Well, is that -- and I think my
7 question was a bad question.  But is that account,
8 the shareholder loan account that you're
9 describing -- on JCJ's records, are all of the
10 debits and credits reflected on that where you can
11 look at one or two or however many sheets of paper
12 and see everything that's happened in that account?
13          A.        In theory, yes.  But in reality,
14 there are times where there's a -- similar to what
15 we saw on a disposal sheet, sometimes there are
16 yearend true-ups that are done in bulk.  But in
17 theory, yes.  But I'm just telling you in my
18 experience.  I know in reality there are also
19 sometimes bulk entries at the end of the year.
20          Q.        Well, during the year as any event
21 occurs or any transaction occurs that would be
22 reflected in the shareholder loan account, is it
23 input into the system contemporaneously with the
24 transaction itself?
25          A.        It should be.

Page 110

1          Q.        Well, is it though?
2          A.        It doesn't always happen.
3          Q.        And sometimes it doesn't happen
4 until the end of the year?
5          A.        Yes.  That's what I'm referring to
6 when I say the bulk transfers.
7          Q.        Okay.
8          A.        But if everyone is doing their job,
9 and sometimes it's just a matter of being
10 shorthanded, but the accountants should do that in
11 the month that it happens.
12          Q.        Well, if they're trueing it up at
13 the end of the year, what documents are they looking
14 at in order to know what's the net number that
15 should go in there at the end of the year?
16          A.        Typically, that would lead to that
17 is part of their yearend closing process.  If
18 there's something that's an outlier, like they have
19 a deposit that they haven't identified and they just
20 put it in a certain account, or a piece of property
21 was disposed of and they don't find that it was
22 inputted in the month it happened.  It's usually
23 part of the yearend process.  That's why it happens
24 there instead of -- we don't really do quarterly
25 type like you would -- like a public company does

Page 111

1 quarterly reporting.  We don't really do that.  So
2 it all gets caught at the end of the year, if at
3 all.
4          Q.        Well, if money was advanced to Jay
5 or money was distributed to Jay in the form of
6 either a repayment of what the company owed Jay or
7 as a loan to Jay, what record is going to be created
8 at the same time that the accountants can look at it
9 at the end of the year to true it up?
10          A.        For cash, it would be a bank
11 statement.  They would look at a bank statement to
12 see either a deposit or outgoing.
13          Q.        What about for noncash?
14          A.        For property, um, usually where
15 property gets caught if it wasn't caught at the time
16 is Valerie, who does the tax returns, she also does
17 the property taxes.  When the assessments are coming
18 out for the following year, she does a doublecheck
19 to make sure we still own all the properties that we
20 get tax tickets for.  So sometimes that would get
21 caught there.  The equipment, I don't really know
22 what other document you would have on a piece of
23 equipment.
24          Q.        I want to make sure I understand
25 this because I may misunderstand you.  Is it your

Page 112

1 belief and understanding that the $32 million shown
2 as a loan to Jay is actually a result somehow of
3 transfer of property to Jay?
4          A.        I think that that shareholder
5 account captures property transfers to Jay, which we
6 know has happened.  And so I think a part of that
7 32 million includes any property transfers to Jay.
8          Q.        Okay.  When you say it includes
9 property transfers, explain that.  If they transfer
10 property to Jay, is the purchase price of that
11 property then going to show up as a receivable owed
12 by Jay?
13          A.        It -- it should just be either -- it
14 should be a plus or a minus in his shareholder loan
15 account.  It's not a specific receivable per se.
16 It's just an adjustment to his shareholder loan
17 account for that amount.
18          Q.        Well, if property -- I'm trying to
19 understand what you mean by the property transfers
20 would be reflected in this account.  So let's say
21 there's $13.5 million worth of property transferred
22 to Jay.  How will that transaction show up in the
23 shareholder's loan account?
24          A.        Just to make an example.  If
25 yesterday the company owed Jay $13,500,000 and then

Page 113

1 today the company transferred to Jay a piece of
2 property valued at $13,500,000, today his
3 shareholder loan account would be zero. That's what
4 I mean by its -- that number captures that
5 transaction. And maybe I'm not saying it correctly,
6 but that's what I mean when I'm saying that.
7        Q.       I understand that. But in the real
8 world, what we've got is that the account is not
9 zero. It's 31,740,000. So how did it get to that?
10       A.       By -- I don't know how many
11 transactions, but by all of the transactions between
12 Jay and JMC Justice Companies.
13       Q.       Well, can you tell me what any of
14 the transactions are that have generated this
15 $32 million receivable from Jay?
16       A.       Not -- other than the Black River
17 property, not specifically.
18       Q.       Okay.
19       A.       And I -- because my understanding is
20 that was -- the consideration for that was intended
21 to be a reduction in the loan that he made to the
22 company. But I don't know specifically what else
23 makes up that.
24       Q.       But if that was to reduce the loan
25 that he made to the company, that wouldn't result in

Page 114

1 a payable by Jay. So my question is, how did this
2 Black River property transaction result in a payable
3 by Jay?
4        A.       I agree with the -- I agree with
5 what you're saying. I mean, I agree with the first
6 part of what you said exactly. I guess I don't know
7 how else to say it. But I agree with what you're
8 saying. The way that we looked at that, there was a
9 loan payable to JCJ, to Jay at the time of the Black
10 River transfer. That's my understanding.
11              I've never known the Justices -- if
12 it were zero, if his shareholder loan account was
13 zero, I've never known the company to transfer
14 something to one of the shareholders for a
15 receivable. I've just never known that.
16              Now, how the account got all the way
17 up to $32 million, I don't know specifically what
18 caused that.
19       Q.       Well, I don't want to beat this to
20 death, but I'm just trying to understand what
21 happened.
22       A.       Sure.
23       Q.       And I understand what you're saying.
24 If the company owes Jay -- let's say they owe him
25 $13 1/2 million, and they say we're going to pay

Page 115

1 that debt off by transferring to him $13
2 1/2 million, that results in the company's account
3 payable going from 13 1/2 down to zero, right?
4        A.       Correct.
5        Q.       In this case, though, what we have
6 -- what we're seeing on this entry, this $32 million
7 entry is not money owed by the company. We're
8 seeing money owed by Jay to the company. So how is
9 the Black River transaction, $13 1/2 million
10 transaction, how does it result in this number other
11 than the fact that it's just part of the whole net
12 mix that somehow comes out in the wash as a
13 $32 million receivable?
14       A.       It doesn't. That's the only way
15 that it contributes to that.
16       Q.       Okay. So it contributes to it in
17 the same way, then, that every other transaction
18 involving Jay contributes to it. Is that fair?
19       A.       No, that is exactly what I've been
20 trying to say.
21       Q.       Okay.
22              THE WITNESS:  Are you at an okay
23        spot for a bathroom break?
24              MR. LUCAS:  Sure.
25              THE WITNESS:  Thank you.

Page 116

1              (Whereupon, a recess took place from
2              2:08 p.m. until 2:21 p.m.)
3 BY MR. LUCAS:
4        Q.       Are you ready?
5        A.       Yes.
6        Q.       All right. Going back to our old
7 friend the New Lead transaction. Jay said you were
8 kind of the point guy for that. Is that right?
9        A.       Generally. Myself and Roger Hunter.
10       Q.       Okay. Am I correct that whether in
11 the original agreement or in any of the amendments
12 to it, that the consideration flowing from New Lead
13 to Kentucky Fuel was intended to include both cash
14 and later, pursuant to an amendment, a certain
15 amount of New Lead stock, correct?
16       A.       Yes.
17       Q.       And that amendment or the New Lead
18 stock was not in the original agreement. That was
19 in a later amendment. Do you recall that?
20       A.       Yes.
21       Q.       And do you recall the amount of the
22 New Lead stock?
23       A.       I don't.
24       Q.       Does $175,000 sound about right to
25 you?

Page 117

1    A.        Yes, I think it does.

2    Q.        Okay.  Do you need to see the
3  documents?

4    A.        No.

5    I was just thinking for a second,
6  but I think that's right.

7    Q.        Okay.  Was that stock actually
8  transferred?

9    A.        I believe so, yes.

10   Q.        Okay.  And was it then immediately
11 sold?

12   A.        I don't know about the timing, but
13 I'm sure it was sold.

14   Q.        Okay.  What was done with the
15 proceeds?

16   A.        I don't know.

17   Q.        Who would know that?

18   A.        I don't -- I don't know.

19   Q.        In addition to that $175,000 of
20 stock, do you recall that there was also payments of
21 cash or cash equivalents owed by New Lead to
22 Kentucky Fuel in the principal amount of
23 $8 1/2 million?  Or, excuse me, in the principal
24 amount of $7 1/2 million.

25   A.        I think that's right, yes.

Page 118

1    Q.        And with interest and various other
2  charges they totaled, I think you testified
3  previously somewhere, in the approximate $8 1/2
4  million range.  Do you recall that?

5    A.        Yeah, I think that's right.

6    Q.        Did any of those payments -- I'm not
7  talking the stock.  Did any of those payments go to
8  Jay Justice?

9    A.        I don't know.

10   Q.        Have you ever looked at that?

11   A.        I -- I know this issue has come up,
12 and I know some money flowed to Jay and Justice
13 Management from prior conversations.  And I feel
14 like we have looked at this at some point, but I
15 just don't recall the specifics of how much went to
16 Kentucky Fuel, how much went to Jay, how much went
17 to Justice Management.  I don't recall the exact
18 details of that.

19   Q.        All right.  You gave two answers
20 that, forgive me, are slightly inconsistent.  When I
21 asked if any money went to Jay, you said, "I don't
22 know."  I wasn't asking the amounts, but just if any
23 money.  But that's not really what you meant, was
24 it?

25   A.        Well, I just couldn't tell by the

Page 119

1  sequencing of your questions if one was -- I don't
2  know if what went to Jay was the stock or cash.
3  That's why I said I don't know.

4    Q.        Okay.

5    A.        I know I've been asked about money
6  that went to Jay.  I think money.  But I don't -- as
7  we sit here, I don't know whether it was cash or it
8  was stock that went to Jay.

9    Q.        Okay.  So you, as we sit here today,
10 don't have any idea whether Jay received any cash in
11 connection with that?

12   A.        No.

13   Q.        In connection with the discovery
14 responses in this case, have you looked at any of
15 the recent, meaning postjudgment, have you looked at
16 any of the documents relating to that transaction?

17   A.        No.

18   Q.        In order to find out if any money in
19 fact did go to Jay that was owed to Kentucky Fuel?

20   A.        I haven't, no.

21   Q.        Has anyone else from the company
22 looked at that?

23   A.        Not that I'm aware of.

24   Q.        Okay.  Any reason why that could not
25 have been done?

Page 120

1    A.        Not that I'm aware of.  I think we
2  did it as part of, um, either getting ready for or
3  part of the evidentiary hearing, I think it was
4  done.  So I can't think of any reason why it
5  couldn't have been done again.

6    Q.        Okay.  No reason why that couldn't
7  have been provided in a discovery response as a
8  transaction that you would identify, right?

9    A.        Not that I can think of, no.

10   Q.        Are you -- I'm sure you are.  You're
11 familiar with a suit brought in the Western District
12 of Virginia by the United States of America versus a
13 whole bunch of companies, starting with Southern
14 Coal and A&G and on down in Kentucky Fuel, seeking
15 to compel enforcement of a consent judgment.  This
16 is actually a motion in the case to comply -- to
17 compel compliance with a consent judgment.

18   Do you recall that suit and the
19 consent judgment?

20   A.        Um, does that relate to the
21 Department of Labor MSHA violations?

22   Q.        It does.

23   A.        Yes, I'm familiar with it.

24   Q.        I'm not trying to ask you a "gotcha"
25 question.  You can look at these if you want.

Page 121

1  They've got some highlighting on them, but it's not
2  a big deal.
3          This recites that the -- pursuant to
4  the consent judgment, the defendants had to make an
5  initial payment of, rounded numbers, $213,000 by
6  April 15 of '20, and thereafter monthly payments of
7  $102,442 by the first of each subsequent month.
8          Do you see that?
9      A.      Yes.
10     Q.      And my -- you can --
11     A.      No, I'm good.  I'm familiar with it.
12     Q.      My very, very rough math on this
13 indicates this was about a four-year payout.  Is
14 that consistent with your recollection?
15     A.      That seems right, yes.
16     Q.      All right.  How much is still owed
17 on this?  Do you know?
18     A.      I don't know off the top of my head,
19 but we're a month or two behind on the payment
20 schedule.
21     Q.      Okay.  Well, you were a month or two
22 behind, which was why on March 31 they filed this
23 motion to compel you to comply by making the
24 payments you were behind on.  My understanding from
25 looking at the docket and your responses, the

Page 122

1  response recites that the defendants have now paid
2  the March 2022 installment.  I assume you have no
3  reason to disagree with that?
4      A.      No.  And they immediately filed
5  something similar for being late for April.
6      Q.      Okay.  Have you paid April?
7      A.      Not to my knowledge.
8      Q.      Okay.
9      A.      Possibly.  And I think they've
10 already put us on notice for May as well.  That's
11 what I mean by a couple months.
12     Q.      Okay.
13     A.      One or two.  But, yeah, we made the
14 March payment.
15     Q.      The total here is roughly
16 5.1 million.  Without getting to a precise figure,
17 have you paid roughly half of that?  We're two years
18 into the deal now.
19     A.      Um, based on the math, yeah, I think
20 that's probably right.
21     Q.      Okay.  Which of the companies has
22 actually been making these payments on behalf of all
23 of them?
24     A.      Either Bluestone or Blackstone.
25 They're the only two with any even potential

Page 123

1  revenue.
2      Q.      Why is Bluestone paying the
3  penalties levied against Kentucky Fuel?
4      A.      MSHA has the ability to shut your
5  mines down for past due -- lack of payment of past
6  due penalties.  And all of those mines are linked --
7  if you go into MSHA's data retrieval website, they
8  link mines by controllers.  And Jay and Jill are
9  listed as the controllers for all of those entities.
10     Q.      I gotcha.  So it wouldn't be just
11 Kentucky Fuel's mines being shut down, but it could
12 be any controlled by Jay or Jill?
13     A.      Correct.
14     Q.      Okay.
15     A.      Because they link all of them by
16 what they call the controller.
17     Q.      Okay.  I understand.
18          Am I right that you recently settled
19 a claim for other fines or penalties that had kind
20 of a screwy and excessive interest rate in them?
21     A.      Yes.
22     Q.      And that was thanks to the good
23 offices of your counsel, Mr. Ruby, you were able to
24 work that out, right?
25     A.      Correct.

Page 124

1      Q.      And when you settled that, was there
2  an upfront payment that you had to make in
3  connection with the settlement?
4      A.      No.
5      Q.      How much did you -- when did you
6  settle it?
7      A.      The original settlement or what
8  Mr. Ruby worked on?
9      Q.      The latter.
10     A.      I think the -- well, I -- I don't
11 know.  I don't know.
12     Q.      Are there installments, payments
13 being made now on that liability?
14     A.      Not that I'm aware of.
15     Q.      Okay.
16     A.      It doesn't mean it hasn't happened.
17 I've not worked very closely with Mr. Ruby on that
18 case.  But my last involvement was what he had won
19 was the screwy interest charge that you referred to.
20 And I know he's been talking directly to the state
21 about settling the remaining penalty.  But as we sit
22 here, I can't tell you whether that's actually been
23 resolved or not.
24          MR. RUBY:  We didn't settle it.  I
25     just beat them.

Page 125

1  MR. LUCAS:  That was on the interest
2  rate, right?
3          All credit to you for that because
4  you were looking at a pretty stiff interest
5  rate, weren't you?
6          THE WITNESS:  Very stiff interest
7  rate.  So the amount that's left is -- had we
8  fully performed, there was a discount in the
9  penalties that should have been or would have
10  been charged.  But where we did not timely
11  perform under the consent decree, they are
12  arguing that it triggered the balance,
13  basically the discount that we would have
14  gotten.
15          And my understanding is that that
16  amount is still sitting out there, although I
17  know we're in conversations to try to resolve
18  that.  Because the other piece of that that's
19  really probably a bigger issue for us today is
20  they're trying to revoke all the permits and
21  reclamation bonds for the permits that we
22  didn't timely perform on.
23  BY MR. LUCAS:
24      Q.      What court is that in?
25      A.      Franklin County Circuit Court.  I

Page 126

1  don't know the -- I don't know the designations in
2  Kentucky, but it's in state court.  I think it's
3  Franklin County.
4      Q.      And who are the parties?
5      A.      Commonwealth of Kentucky and
6  Kentucky Fuel Corporation.  It's several entities in
7  addition to Kentucky Fuel.  But I think it's
8  Kentucky Fuel Corporation, A&G Coal Corporation,
9  Virginia Fuel, Sequoia Energy, Infinity Energy, and
10  then Jim and Jay personally.
11      Q.      Okay.
12      A.      There probably are a few more
13  entities in there.  There's a handful of them.
14      Q.      Something I was intending to ask you
15  about after April 18, talking about New Lead and the
16  UCC1.  You said it wasn't a violation of the UCC1 to
17  take the proceeds because that was a sublease and
18  not an assignment.  Did I understand you correctly
19  on that?
20      A.      Yes.
21      Q.      My understanding -- and I want you
22  to correct me if I'm wrong; and if you need to look
23  at the documents, we've got them here -- is that in
24  the New Lead transactional documents, it was both an
25  assignment and a sublease, sort of belt and

Page 127

1  suspenders.  Am I right on that?
2      A.      That's not my recollection.  I think
3  there was an assignment of the mining permits, but I
4  don't recall the lease being assigned.
5      Q.      Okay.  Let me see.  You may be
6  right.  Let me just see.
7          I'm looking here -- and you're
8  welcome to look with me.  And we can make this as an
9  exhibit if we need to.  This is the original Asset
10  Purchase Agreement, which of course originally was
11  with Williams Industries.  And that's the one that
12  ultimately was assigned to New Lead, right?
13      A.      Correct.
14      Q.      And this original Asset Purchase
15  Agreement is dated May 10, 2012.  And if I turn over
16  to page 6, under Article 2 for the Purchase and Sale
17  of Assets, it says:
18          "Upon the terms and subject to the
19          conditions contained in this agreement,
20          seller," which is Kentucky Fuel, "shall or
21          shall cause its affiliate to sell, assign,
22          transfer and convey to buyer, and buyer shall
23          purchase, acquire, and accept from seller,
24          accept from seller or its affiliate, all of
25          seller's or its affiliate's, right, title, and

Page 128

1          interest in and to the following assets."
2          Did I read that right?
3      A.      Yes.
4      Q.      Okay.  And those assets include the
5  leased real property.  This is in subparagraph C on
6  page 7:
7          "The leased real property related to
8          the Fivemile Permit and identified on Schedule
9          2.1(c)," so forth and so on, "and including
10          the Andy Tipple and the Strong Bothers Leased
11          Property."
12          That's the subject property that's
13  the subject of this lawsuit today, correct?
14      A.      Yes.
15      Q.      Okay.  And so that property,
16  pursuant to this agreement, was sold and assigned to
17  New Lead pursuant to this contract, right?
18      A.      Yeah.  But I view that language up
19  there as just catchall language to make sure the
20  interest is being adequately conveyed.  Like I see
21  that -- and maybe it's too overbroad, but I see that
22  in contracts all the time.  My understanding is the
23  actual conveying document itself ended up being a
24  sublease.
25          MR. RUBY:  John, can I see what you

Page 129

1  were reading from there just to make sure I
2  have it in my notes?
3              MR. LUCAS:  Sure.
4              Let's go ahead and make what I was
5  just reading from a -- we'll mark this as
6  Exhibit 21.
7              (Exhibit 21, Asset Purchase
8              Agreement, marked for
9              identification.)
10 BY MR. LUCAS:
11     Q.      I'm going to show you a second
12 document, which I'll mark as Exhibit 22.
13             (Exhibit 22, Assignment of Leases,
14             marked for identification.)
15 BY MR. LUCAS:
16     Q.      We can look at it together.  It's an
17 Assignment of Leases dated December 28, 2012,
18 between Kentucky Fuel and Williams Industries.  And
19 again, this is part of what became the New Lead
20 transaction, right?
21     A.      Correct.
22     Q.      And it provides that after the
23 whereases:  "Now, therefore, it's hereby agreed as
24 follows, that the assignor --" and the assignor is
25 Kentucky Fuel, right?

Page 130

1      A.      Correct.
2      Q.      "That Kentucky Fuel hereby transfers
3  and assigned to assignee," which would be Williams
4  Industries, "all of the assignor's right, title and
5  interest to and under the leases."  And that's the
6  leases that are on Exhibit A.  And if you look at
7  Exhibit A, that's our old friends all of the
8  Fivemile leases, right?
9      A.      Correct.
10     Q.      That are subject to this lawsuit
11 today, or the subject of this lawsuit today?
12     A.      Yes.
13     Q.      Okay.  And so aside from whether
14 there was also a sublease, can we agree that those
15 leases were assigned by Kentucky Fuel to Williams
16 Industries and later to New Lead?
17     A.      Can I see that?
18     Q.      Sure.
19             (Witness reviewing document.)
20             THE WITNESS:  It's not clear to me
21 that this is Exhibit A.  Now, I know it's
22 attached to this document, but I don't recall
23 -- I mean, my recollection is the Fivemile
24 leases were transferred by sublease, because
25 we had made the purchasers aware that it

Page 131

1  required Mr. Brownlow's consent and we were
2  never able to get his consent.
3              I guess it could have played out
4  differently, but that's my recollection is
5  that because we were unable to provide consent
6  to a full assignment, we had to do a sublease.
7              And these Fivemile leases are titled
8  "Amended and Restated Schedule 2.1(c)."  So
9  it's not clear to me whether this Exhibit A is
10 just these three leases, which we were able to
11 get in Kentucky Fuel Corporation's name and
12 that's why we were able to assign them.  So I
13 -- it's not clear to me that that document is
14 an assignment of those leases on the Amended
15 and Restated Schedule 2.1(c).
16 BY MR. LUCAS:
17     Q.      Say that last part again.
18     A.      That title of that page that says
19 "Amended and Restated Schedule 2.1(c)," that's not
20 clear to me that's intended to be an Exhibit A to
21 that assignment.
22     Q.      You're not saying it's not.  You're
23 just saying you don't know.  Is that fair?
24     A.      Yeah.
25     Q.      There it is.  You can further read

Page 132

1  it if you want to.
2              Whether or not it's part of this
3  particular Exhibit A, or Exhibit 22, that Schedule
4  2.1(c) is the property described in the Asset
5  Purchase Agreement as being sold, assigned,
6  transferred, and conveyed to the buyer, correct?
7      A.      Yes.
8      Q.      I had another question about -- are
9  you familiar with the subpoenas that were recently
10 issued to or directed to the three shareholders,
11 Jim, Jay, and Jill Justice?
12     A.      Yes.
13     Q.      And I believe Mr. Houchens was
14 retained to handle the objection to those.  Do you
15 recall that?
16     A.      Yes.
17     Q.      Who retained him?
18     A.      As I said in the hearing,
19 Mr. Houchens does a lot of work for the Justice
20 organization.  He basically handles all of our
21 Virginia cases.  And so when the subpoenas -- when
22 we first got notice of the subpoenas, I can't recall
23 how that happened, but either -- I guess we found
24 out through Mr. Hatfield.  And I told Mr. Hatfield
25 to send them to Mr. Houchens.

Page 133

1      Q.      Okay.  Did you ever talk to
2  Mr. Houchens?
3      A.      Yes.
4      Q.      What instructions did you give him
5  pertaining to the subpoenas?
6              MR. RUBY:  Let me think about that
7      for a second, John.
8              MR. LUCAS:  I'm not asking him about
9      advice.  I'm just asking him about what
10     instructions.
11             MR. RUBY:  That's fine.  Go ahead.
12             THE WITNESS:  When I sent them to --
13     I think Ron actually sent them to him.  But I
14     just asked him to look at them and give me his
15     thoughts.
16 BY MR. LUCAS:
17     Q.      Okay.  Did you give him any
18 instructions about who to talk to or what he should
19 do?
20     A.      No, not directly.
21     Q.      Did you do that indirectly?
22     A.      No.  But Aaron -- like I said, he
23 does a lot of work for us, and he deals directly
24 with Jay a lot.  And so I don't -- I don't really
25 direct him per se.  As outside counsel, I forward

Page 134

1  stuff to Aaron and he handles it.
2      Q.      Who made the decision to object to
3  those subpoenas?
4      A.      From my perspective, Mr. Houchens.
5      Q.      Okay.  Did he seek your approval to
6  object to them?
7      A.      I mean, he and I discussed it.  I
8  certainly believe they were objectionable, if that's
9  the right phrase for them.  So he -- basically, he
10 just told me he was working on objections to them.
11     Q.      Okay.
12             I know I'm paraphrasing, so I
13 don't -- don't let me put words in your mouth that
14 you're not comfortable with.  Was it basically he
15 said, "I've got them, I'm working on the
16 objections," and you said in so many words, "It
17 sounds okay to me"?
18     A.      Yeah.  That's fair.
19     Q.      Did anyone ever discuss them with
20 any of the shareholders?
21     A.      I don't know what conversations
22 Aaron had.  I told Jay that we had received them and
23 we are objecting to them.
24     Q.      Okay.  Did Jay have any questions
25 about them?

Page 135

1      A.      No.
2      Q.      Did anyone ever discuss them with
3  the governor?
4      A.      Not that I'm aware of.
5      Q.      I had asked you earlier about what
6  sort of complex commercial litigation experience
7  Mr. Hatfield had.  The same question about
8  Mr. Schroeck.
9      A.      Mr. Schroeck, before he came to work
10 for us, he was also predominantly an insurance
11 defense lawyer.  He was with a firm in Nashville and
12 they -- they did a lot of auto manufacturer work,
13 and a lot of, oh, like 18-wheeler, like truck
14 accident-type work.  But he did mostly insurance
15 defense work.
16     Q.      Okay.
17             MR. LUCAS:  I am about done.  I've
18     got one other sort of subject area that could
19     be very short or a little longer.  But if you
20     all will give me a few minutes here, I'll
21     consult with my handlers and make a decision
22     on that.  In any event, we'll be done today.
23             MR. RUBY:  Wonderful.
24             (Whereupon, a recess took place from
25     2:55 p.m. until 3:02 p.m.)

Page 136

1  BY MR. LUCAS:
2      Q.      Are you ready?
3      A.      Yes.
4      Q.      I want to talk to you a little bit
5  about the transition between Mr. Schroeck and
6  Mr. Hatfield.  When did Schroeck leave?
7      A.      I believe it was July of 2021.
8      Q.      Okay.  Why did he leave?
9      A.      He took another in-house job.  He
10 stayed in Roanoke, but he went to work for a life
11 insurance company.
12     Q.      Doing -- do you know what he's
13 doing?
14     A.      It's still a general counsel role,
15 but I don't know specifically what he's doing.
16     Q.      Did he move to Roanoke?  You
17 mentioned he worked for a Nashville firm.  Did he
18 move there from Nashville?
19     A.      Yes.
20     Q.      Okay.  When he left, did he leave on
21 good terms?
22     A.      Um, yeah.
23     Q.      Was he asked to leave or was this
24 his own idea?
25     A.      It was his own idea.

Page 137

Q.      Okay.  Did he give you a reason as to why he was leaving?

A.          The pace was quicker than he was expecting in an in-house role, and thought that the new position would be better suited for what he -- he had three little kids.  And he was thinking that an in-house role would allow him a little bit more time in that capacity, and it wasn't quite what he was expecting.

Q.      Did you tell him, by any chance, that he was lucky he wasn't working for Williams & Connolly?

A.      I -- I didn't tell him that.

Q.          That falls in the previous category of my wife's comments on my sense of humor, which, Steve, you weren't here, which is that nobody appreciates it.

       He left in July.  When did Hatfield join?

A.      September.

Q.      Who was managing this litigation between those -- in that gap period?

A.      No one.  Chris's emails were getting forwarded to me.  And so -- well, I shouldn't say no one.  I would have to say during that period I was.

Page 138

And I had told Jay that if anything was filed and it would have came to Chris's email, I would be aware of it.  And actually, shortly thereafter you all filed the motion for sanctions.

Q.      When in September did he arrive?

A.      I don't remember the specific date.

Q.      Early September?  Late September?

A.      Well, I can help you answer that.  Hatfield's electronic signature is on your response to our motion for sanctions, which was filed on September 7.

A.      Okay.

Q.      So at that point he had been working for you for less than a week?

A.      I guess maybe he started in August, but I was thinking it was September.  I do know his first filing in this case, he had not been there very long at all.  So I do remember that.

Q.      As the guy -- as the general counsel, and you had been in charge during the interim period, including when the motion was filed in August, how did you get Hatfield up to speed in a case like this in time to, you know, prepare and file something on September 7?

A.      When I initially received the motion

Page 139

for sanctions, I actually sent it to Mr. Houchens initially.  And my intention was Mr. Houchens was going to handle that, but then Mr. Hatfield ended up handling it.  He worked on it more with Mr. Houchens than he did with me.

Q.      Okay.  During the interim phase, after it was filed but before Hatfield got there, did anyone either in the company, you, Houchens, anybody else, try to evaluate the discovery that had been provided in response to the motion to compel?

A.      I did not, but I do believe Mr. Houchens did.

Q.      Okay.  How much background did he have in the case at that point?

A.      He had some familiarity because he worked a lot with Mr. Schroeck on other matters, and they had discussed this case before.  But I don't know the full extent of his background at that point.

Q.      On Exhibit 5, which was the organizational chart for the Justice Family and various of their entities, turn to the second page of that, if you please.

A.      Okay.

Q.      There's a certification on the

Page 140

bottom, do you see there, for you to sign?  It's blank with no signature.  Do you know why this particular set of org charts was prepared and why they have this certification on them?

A.      This one was prepared for -- or at the request of Greensill Capital, and they required that certification on it.

Q.      Okay.  When you say "this one," this Exhibit 5 obviously is a collection of I think seven or so different pages.  Were all of these prepared at the same time for Greensill?

A.      No.  No.  Only page 2 was prepared for Greensill.

Q.      Okay.  They were provided to us in this order, as you can see from the Bates numbers.  When and why were the other pages prepared?

A.      Almost all of these were prepared as part of financing or potential refinancing.  The top page, I had prepared.  Because at the time -- the top page and page 4 were prepared at the same time, which is the Justice Family Group page.  About a year or so ago, we were working on refinancing for The Greenbrier.  And as part of that refinancing, a lot of banks are somewhat anti-coal these days.  And so they like to see where your non-coal assets fit

Page 141

1  within the organization as related to coal assets.
2  And so the top chart was intended just to give a
3  picture of the overall organization.  And then the
4  Justice Family Group chart was intended to show them
5  the structure of The Greenbrier assets.
6          Q.      All right.  And so that's all that
7  was given to -- who was the lender that asked for
8  that?
9                  THE WITNESS:  Can I ask you about
10     that real quick?
11                 MR. RUBY:  Can we step out?
12                 MR. LUCAS:  Uh-huh.
13                 (Whereupon, off the record.)
14                 MR. RUBY:  That's under an NDA.  Do
15     you...
16                 MR. LUCAS:  The identity of the
17     lender is under an NDA?
18                 MR. RUBY:  My understanding is that
19     there was an NDA that was signed -- the loan
20     was never consummated.  So there was a NDA for
21     the discussions with the lender about the
22     possible transaction.
23                 MR. LUCAS:  I gotcha.
24                 MR. RUBY:  But it was never actually
25     done.

Page 142

1                  MR. LUCAS:  Okay.
2  BY MR. LUCAS:
3          Q.      Let me try this.  It wasn't
4  Greensill?
5          A.      No.
6          Q.      It wasn't Carter Bank?
7          A.      No.
8                  MR. LUCAS:  I'm not sure I care
9      which bank it was.
10                 MR. RUBY:  All right.
11 BY MR. LUCAS:
12         Q.      Was this a bank you didn't have a
13 prior relationship with?
14         A.      Um, yes.  And I don't know that they
15 would technically be called a bank.
16         Q.      Okay.  And did they decline to make
17 the loan?
18         A.      Um, you know, I don't really know.
19 I just know it didn't happen.  I don't know how it
20 reached that result, though.
21         Q.      All right.  Well, you have accounted
22 for a couple of the pages.  How about the other
23 pages, like the third page, which is the
24 non-Bluestone Coal assets.  When and why was that
25 prepared?

Page 143

1          A.      I created it.  I created all of
2  these.  I honestly do not recall why I made this
3  chart.  But when I was going through organizational
4  charts that I have, I have this one.  But I don't
5  have a recollection of why I created this one.
6          Q.      Do you know roughly when it was
7  created?
8          A.      Um, I don't.
9          Q.      How about the next to the last page,
10 Bates No. 1149, that's JCJ and its subs.  Do you
11 recall when that was created?
12         A.      No.
13         Q.      Do you know why it was?
14         A.      I don't.
15         Q.      Are these org charts something that
16 are created for various purposes from time to time
17 but not on a regular basis?
18         A.      Yeah, not on a regular basis.
19 Typically only upon request.  And every instance I
20 can think of has been related to either financing or
21 potential financing.
22         Q.      Do you generally keep copies of them
23 like these?
24         A.      I do, yeah.
25         Q.      Are there more?

Page 144

1          A.      No.  These were the only ones that I
2  found.
3          Q.      Okay.
4                  MR. LUCAS:  That's all I've got.
5                  MR. RUBY:  Okay.  I don't have
6      anything.
7                  MR. LUCAS:  Are you sure?
8                  MR. RUBY:  Positive.
9                  MR. LUCAS:  Go ahead.
10                 MR. RUBY:  He'll read and sign.
11                 (Whereupon, the deposition concluded
12     at 3:14 p.m.)

Stephen W. Ball                                                    37 (145 - 148)

<table>
<tr><td>

Page 145

1            C E R T I F I C A T E

2 STATE OF TENNESSEE:

3 COUNTY OF KNOX:

4       I, LORA R. BOATMAN, Licensed Court

5 Reporter, in and for the State of Tennessee, do

6 hereby certify that the above deposition was

7 reported by me and that the foregoing pages of the

8 transcript is a true and accurate record to the best

9 of my knowledge, skills, and ability.

10       I further certify that I am not related to

11 nor an employee of counsel or any of the parties to

12 the action, nor am I in any way financially

13 interested in the outcome of this case.

14       I further certify that I am duly licensed

15 by the State of Tennessee Board of Court Reporting

16 as a Licensed Court Reporter as evidenced by the LCR

17 number and expiration date following my name below.

18       IN WITNESS WHEREOF, I have hereunto set my

19 hand this the 30th day of May, 2022.

20

21        *Lora R. Boatman*

22     _____

23     LORA R. BOATMAN, LCR No. 106.

      Expiration Date: 6/30/2022.

24

25

</td><td>

Page 147

            DEPOSITION ERRATA SHEET

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change: _____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change: _____

Page No.____ Line No. ____ Change to:_____

Reason for change: _____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change: _____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

SIGNATURE:_____ Date:_____

PRINT WITNESS NAME:_____

</td></tr>
<tr><td>

Page 146

            DEPOSITION ERRATA SHEET

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change: _____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change: _____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

Page No.____ Line No. ____ Change to:_____

Reason for change: _____

Page No.____ Line No. ____ Change to:_____

Reason for change:_____

SIGNATURE:_____ Date:_____

PRINT WITNESS NAME:_____

</td><td>

Page 148

      _____

       SIGNATURE OF WITNESS

STATE OF:

COUNTY OF:

Sworn and subscribed to before me this _____

day of _____, 2022.

      _____

       Notary Public

       My commission expires:_____

</td></tr>
</table>