**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**LONDON**

**NEW LONDON TOBACCO MARKET, INC.,**
and **FIVEMILE ENERGY, LLC**,

  *Plaintiffs*,

v.                  Case No. 6:12-CV-91-GFVT-HAI

**KENTUCKY FUEL CORPORATION**, and
**JAMES C. JUSTICE COMPANIES, INC.**,

  *Defendants*.

**DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S**
**RECOMMENDED DISPOSITION AND ORDER**

  Defendants Kentucky Fuel Corporation and James C. Justice Companies, Inc. ("JCJ") state

their objections to the magistrate judge's Recommended Disposition & Order ("Order") of March

28, 2023 [D.E. 697], as follows.

**1.  The magistrate judge lacked authority to order conclusive factual findings.**

  The Order addressed the Renewed Motion for Contempt and Sanctions [D.E. 673], filed

on December 13, 2022, by Plaintiffs and judgment creditors New London Tobacco Market, Inc.,

and Fivemile Energy, LLC.  The Renewed Motion derived from Plaintiffs' initial Motion for

Sanctions submitted August 16, 2021 [D.E. 512].  On March 23, 2022, the magistrate directed that

Defendants' representatives Jay Justice, Stephen Ball, Jill Justice, and Summer Deane sit for

depositions in order to clarify lingering unknowns and ambiguities concerning the Justice

companies' identities, interrelationships, finances, and operations [D.E. 565].  The representatives

dutifully appeared as directed, and Plaintiffs deposed them thoroughly in May and June 2022.

As will be detailed below, the representatives' sworn testimony affirmed and reaffirmed that barely a dozen of the hundred-odd Justice coal and farming companies have continued to actively operate; that the companies are only beginning to emerge from a decade of economic disaster; that operating cash is chronically scarce and transferred among companies on a just-in-time basis; and that company transactions with shareholders were and are for sound business reasons.  It is apparent from the testimony that Defendants are legitimately without assets to pay the default judgments entered against them.  Nonetheless, the Order purported to "enter[] a binding finding of fact" — invoking the authority reserved exclusively to the district judge to impose dispositive sanctions in redress of discovery violations — "that the companies owned and controlled by members of the Justice family [identified in the deposition exhibits] are the alter egos of the Defendants' shareholders."  Order 37.

The "binding finding" declaration was manifest legal error.  With respect to referred proceedings not tried by the parties' consent, Federal Rule of Civil Procedure 72(a) provides that a magistrate judge may "issue a written order stating the decision" solely regarding a "matter not dispositive of a party's claim or defense."  Conversely, as to a "matter dispositive of a claim or defense," the magistrate judge can do no more than "enter a recommended disposition," FED. R. CIV. P. 72(b)(1), which, if properly objected to, "[t]he district judge must determine de novo," *id.* 72(b)(3).  On de novo review, the "judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  *Id.*

Rule 72 reflects the allocation of responsibility set forth in 28 U.S.C. § 636(b), withholding from magistrate judges the authority to determine with finality eight specific matters, all of which are case-dispositive or have a high likelihood of being so (for example, motions to dismiss, for

summary judgment, or to suppress evidence in a criminal proceeding).  *See id.* § 636(b)(1)(A); *Callier v. Gray*, 167 F.3d 977, 981 (6th Cir. 1999) (recognizing that "the list of dispositive matters in 28 U.S.C. § 636(b)(1)(A) is nonexhaustive, and thus can include motions that are similar to those listed" (citations omitted)); *see also Vogel v. U.S. Office Prods. Co.*, 258 F.3d 509, 515 (6th Cir. 2001) (noting that "unlisted motions that are functionally equivalent to those listed in § 636(b)(1)(A) are also dispositive" (citations omitted)).  On referral, a magistrate judge may conduct hearings and obtain evidence bearing on the excepted motions, but is constrained to submitting "proposed findings of fact and recommendations for the disposition, by a judge of the court" of those particular motions and their dispositive analogs.  *Id.* § 636(b)(1)(B).

Pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(i), the district court may sanction a party for a discovery violation by directing that "designated facts be taken as established for purposes of the action, as the prevailing party claims."  The federal courts are generally in accord that the seven specified Rule 37(b)(2)(A) sanctions for disobeying a discovery order — including treating designated facts as established — are dispositive for purposes of Rule 72 and therefore may not be imposed by a magistrate judge.

In *Holtsinger v. Briddle*, No. CIV S-03-0732, 2009 WL 3157510, at *1 (E.D. Calif. Sept. 25, 2009), the magistrate judge directed the defendant "to appear and make herself available for a deposition," cautioning that her "failure to appear and cooperate . . . would result in the imposition of sanctions, pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(i), resulting in the facts alleged in the second amended complaint as to [her] liability being taken as established."  When the defendant failed to comply as directed, the magistrate judge recognized that "[i]mposition of fact establishing sanctions under Rule 37(b)(2)(A)(i) are dispositive of her defense to liability.

Such dispositive matters require a magistrate judge to enter a finding of fact and recommended disposition."

Similarly, the magistrate judge in *Harry v. Arizona*, No. CV-19-2234, slip op., 2020 WL 9597781, at *1 (D. Ariz. Nov. 9, 2020), being of the view that the plaintiff's discovery violations merited Rule 37(b)(2)(A)(v) dismissal with prejudice of the complaint, explained his supporting reasoning in an report and recommendation to the presiding district judge.  The process followed by the magistrate judge in *Harry* is in fact codified in the applicable Local Rules of Civil Procedure:

> In any motion in which the parties are seeking the sanctions provided for in Rule 37(b)(2)(A), (B), or (c) [sic], Federal Rules of Civil Procedure, ***if the Magistrate Judge is inclined to grant such requests the Magistrate Judge shall be limited to filing a report and recommendation with the District Court***; a Magistrate Judge may enter an order denying any such request.

L. R. Civ. P. 72.2(a)(1) (D. Ariz. Dec. 1, 2021) (emphasis added); *accord In re Regions Morgan Keegan Sec. Derivative & ERISA Litig.*, No. 2:09-md-02009, 2017 WL 3537597, at *1 (W.D. Tenn. Aug. 17, 2017) (district judge adopting magistrate judge's report and recommendation that plaintiff's complaint be dismissed under Rule 37(b)(2)(A)(v) as discovery sanction); *Baumgartner v. Life Care Ctrs. of Ariz.*, No. 1:12-CV-393, 2013 WL 1800195, at *1  (N.D. Ind. Apr. 4, 2013) (report and recommendation of magistrate judge that district court dismiss plaintiff's case in accordance with Rules 16(f)(1)(A) and 37(b)(2)(A)(v) for absence from scheduling conference and for failure to prosecute); *Ballard v. Williams*, No. 3:10-CV-1456, 2012 WL 2389845, at *5 (M.D. Pa. Apr. 3, 2012) (magistrate judge concluding that circumstances surrounding plaintiff's failure to appear at court-ordered deposition "prevents us from recommending that the court impose a sanction that determines the outcome of this litigation," *i.e.*, dismissal); *Mitchell Co., Inc. v. Campus*, No. 07-0177, 2009 WL 3110367, at *2 (S.D. Ala. Sept. 24, 2009) (recounting

district judge's adoption of magistrate judge's report and recommendation that defendant's motion for dismissal as sanction for discovery violation be denied).

*Holtsinger* and other decisions make clear that Rule 37(b)(2) fact-establishing sanctions under subparagraph (A)(i) are treated no differently from outright dismissals pursuant to subparagraph (A)(v). Both are dispositive for Rule 72 purposes and cannot be ordered by a magistrate judge. The court of appeals in *United States for Use and Benefit of Wiltec Guam, Inc. v. Kahaluu Construction Co., Inc.*, 857 F.2d 600 (9th Cir. 1988), observed that "[d]ismissal and default judgment are authorized only in extreme circumstances. So, too, are orders taking the plaintiff's allegations as established and awarding judgment to the plaintiff on that basis." *Id.* at 603. The Ninth Circuit in *Wiltec Guam* reversed the district court's imposition of fact-establishing discovery sanctions, which the court deemed "comparable" to those involving dismissal, "in that they represent the most severe penalty that can be imposed on each party." *Id.* at 603 n.5 (citation omitted).

To illustrate further the respective roles of the district and magistrate judges with respect to Rule 37(b)(2)(A) sanctions, in *FDIC v. Lewis*, No. 2:10-CV-439, 2015 WL 4579323, at *7 (D. Nev. July 29, 2015), the defendant homebuilder allowed judgment to be taken against him and his various companies for more than $66 million, emanating from his personal guarantee of five commercial loans. The homebuilder resisted post-judgment discovery into his assets, with the result that the magistrate judge recommended that his personal residence be subject to execution pursuant to Rule 37(b)(2)(A)(i)-(ii). *Id.* at *18. The district court reviewed the magistrate judge's recommendation de novo and overruled the defendant's objections, clearing the way for execution on the residence. *Id.* at *5-6; *see also Sheng Int'l Co. LTD v. Prince Americas, LLC*, No. 8:20-CV-124, slip. op., 2022 WL 1734492, at *10 (D. Neb. Apr. 26, 2022) (informing that district judge

would impose Rule 37(b)(2)(A) sanctions deeming defendants' alter ego status to have been established for non-compliance with magistrate judge's order directing discovery of the subject).

Contrary to the well-reasoned host of authorities referenced above, the magistrate judge here opined, "Common sense suggests that Rule 37 orders are not dispositive," Order 36, adverting to *Cage v. Harper*, No. 17-cv-7621, 2020 WL 1248685, at *18 (N.D. Ill. Mar. 16, 2020). The magistrate judge cited *Cage* for the general proposition that, other than in the realm of contempt, an Article I judge possesses the authority to "order nondispositive discovery sanctions under Rule 37." Order 35. The self-evident proposition is correct as far as it goes, but it ignores that *Cage* itself dealt solely with Rule 37(a), addressing the allocation of costs and attorney fees in the context of threshold ***motions*** to compel, which are mandatory, obviously nondispositive, and within the power of a magistrate judge to direct, subject to review for clear error. There is no mention whatsoever in *Cage* of the more severe sanctions set forth in Rule 37(b) governing disobedience of discovery ***orders***.

Indeed, in complement to *Cage*, the Order could only "point[] to several cases wherein magistrate judges ordered attorney fees as Rule 37 sanctions." Order 36. In addition, the magistrate judge cited *Compaq Computer Corp. v. Ergonome, Inc.*, 387 F.3d 403, 413-14 (5th Cir. 2004), which was declared "on-point," *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 582 (3d Cir. 2018), and *Flame S.A. v. Industrial Carriers, Inc.*, 39 F. Supp. 3d 752, 766-67 (E.D. Va. 2014), said to be "similar" to *Compaq*. Order 32-33. *Compaq*, though, involved a fee award against the corporate defendant for which the ***district judge*** rendered the codefendant principals individually liable as an alter ego discovery sanction.

Likewise, in *Clientron*, the court of appeals reviewed the imposition of fact-establishing, alter ego discovery sanctions by the district judge — not the magistrate judge. In *Flame*, the

6

magistrate judge made alter ego findings supporting the imposition of Rule 37(b)(2)(A)(i)

sanctions, styling the submission a "Memorandum Opinion and Order." *See* 39 F. Supp. 3d at 756.

Notwithstanding that counsel for the affected party argued that the magistrate judge's ruling only

amounted to clear error, *id.*, the district judge reviewed the sanctions and underlying findings de

novo, *id.* at 757, 766.  That the magistrate judge in *Flame* may have similarly misapprehended the

scope of his authority to direct the entry of Rule 37(b)(2)(A) sanctions in no way supports the

magistrate judge's actions here.

The magistrate judge's decision to sanction Defendants through the "binding finding" that

the Justice companies and their shareholders are alter egos is demonstrably contrary to law and

cannot stand.

**2.      The conduct of Defendants' representatives before the magistrate judge did not constitute civil contempt as a matter of law.**

The Order embraced two predicate orders entered by the magistrate judge:  (1) the April

16, 2021 order [D.E. 505] granting in part Plaintiffs' motion to compel (the "Discovery Order");

and (2) the March 23, 2022 order [D.E. 565] granting in part Plaintiffs' motion for sanctions (the

"Sanctions Order"), the latter premised on the finding that Defendants failed to obey the Discovery

Order.  The magistrate judge recommended that Defendants' officer, director, and shareholder Jay

Justice, together with Stephen Ball — general counsel for the Justice companies and an officer of

Defendants — be directed to appear before the court "to show cause why they should not be held

in civil contempt for failing to comply with the Discovery Order." Order 37.  The magistrate judge

recommended further that, in the event that Defendants' representatives be found in contempt, they

be assessed a penalty commensurate with the eventual final judgment on remand from the Sixth

Circuit, a sum that Plaintiffs assert is on the cusp of $40 million [D.E. 646-1].

A.      The Magistrate Judge has already sanctioned Mr. Justice and Mr. Ball for violations of the Discovery Order by directing them to appear for depositions.

In the Sanctions Order, the magistrate judge found that the corporate Defendants violated the Discovery Order by:  (1) not authoring narrative responses to Plaintiffs' ten interrogatories; (2) not identifying each of the one hundred fifty-odd entities comprising the Justice companies; (3) not providing detailed records from 2010 through 2015; and (4) not producing a complete set of written agreements among the Justice companies [D.E. 565 at 9-11].  The magistrate judge ordered, *as a sanction*, Mr. Justice, Mr. Ball, and two other representatives of Defendants (Jill Justice and Summer Deane) to submit depositions of up to two days each.  [D.E. 565 at 18].  It now seems that the magistrate judge always had in mind the idea that the representatives' testimony would facilitate the imposition of alter ego liability for the underlying judgment, and the judge certainly reserved his rights in that regard.  *See* D.E. 565 at 2 (declaring that "this order is intended to help set the stage so that such a certification [of contempt] can be made in the future").  However, the depositions ordered by the magistrate judge were also, without question, intended to cure past discovery transgressions.  *See* D.E. 565 at 17 ("The depositions will hopefully shed light on these transfers [among the companies, their shareholders, and potentially others].").  In that latter regard, the depositions worked as intended.

B.      The depositions cured most discovery deficiencies by solving persistent mysteries regarding the Justice companies' finances.

All of Defendants' representatives appeared as ordered for their depositions, doing so (it bears noting) willingly, cooperatively, and without a hint of contumaciousness.  The testimony painted a consistent portrait of a somewhat disorganized organization whose resources are stretched to the limit with respect to both finances and personnel.  The cash that comes in is almost immediately transferred from those entities that have it to those that need it.

8

JUSTICE:  You know, we've got a very lean management team, and sometimes perhaps too lean.  But, you know, we don't have the big bureaucracy, you know, 17 levels of managers and all that.  We just don't have that.  I spend the great majority of my time on the operations, you know, on mining the coal and selling the coal. [D.E. 638 at 103-04]

*  *  *  *

Q.        Would it be accurate to say in terms of just the family businesses generally, that the businesses are thriving?

BALL:     No.  Certainly not the ones I'm involved in

Q.        Is that just the coal businesses?

A.        I mean, I work on things for The Greenbrier, but I'm not in the day-to-day at The Greenbrier.

Q.        Well, when you were referring to the ones that you're involved in, were you referring to everything other than The Greenbrier with the understanding that you do a little bit of work for them?

A.        Predominantly, yes sir.

Q.        So the rest of the businesses are not thriving?

A.        No.  [D.E. 659 at 40-41]

*  *  *  *

Q:        I'll use your number, $200,000 and so we can use that to pay bills.. . . .  Then let's say that – who then makes the decision as to where that money – which companies contribute to that $200,000 that's going to get paid?

DEANE:    It's – me I suppose but at the end of the day it's whoever has the funds I move them up to the parent and I – I move them up to the Bluestone Coal Sales or whoever got the revenue in and I disperse it to whoever owes the debt. . . .  So it's not so much a technical thought out process of saying well, Justice Energy's money so we're going to pay it out of Justice Energy – it's not like an intentional type thing so much of it let's survive the moment and get something paid so we can get the part to the job and go forward.

*  *  *  *

Q.        Would you agree or disagree . . . is it not accurate then to say that what you got here is basically one big economic unit and that big economic unit pays the debts for all of its constituent parts and then you sort that out later with accounting entries?

A.        Yes, that is correct.  [D.E. 639-1 at 110-19]

*  *  *  *

Q.        I've seen a number of accounts and bank statements at the beginning of the month it will be a very small balance, and I'll define that to say under $1,000, and then a lot of money in the millions flows through the accounts but comes in and goes right out so that at the end of the month it's still a very small balance; is that a pattern in a lot of your accounts?

9

A.        That's not by design or anything.  We don't have a whole lot of money so there's not a lot of money to be left in accounts.  So I believe it's just one of those things where you start the month out with not much money, you have all these transactions and – money is gone as soon as we get it type thing so I don't know that it's an intentional thing.  I guess you could say it's a pattern in that we're spending whatever we get because we're just surviving.  [D.E. 639-1 at 137-38]

Plaintiffs assembled a list of some 160 business entities thought to comprise the Justice

companies [D.E. 662-1].  But the deposition testimony revealed that, beyond the several entities

associated with The Greenbrier, there are only thirteen farming and coal companies actively

operating.  *See* D.E. 639-1 at 14-19.  The sprawling operations that characterized the Justice

companies a decade ago contracted severely with the worsening economy.

JUSTICE:  Well, let me back up to say that the coal business started getting pretty bad in 2012 and really just continued to get worse and worse and worse.  So '12, '13, '14, '15, '16 we lost hundreds of millions dollars.  And tried to hang on and hang on and hang on.  And to fund those losses, we mortgaged everything we had to fund those losses.  So we had this gigantic, gigantic bank debt.  You know, the only way really to pay off the bank or reduce the bank debt is to sell those assets.  And so that's what we've done, or tried to do.  [D.E. 638-1 at 60]

* * * *

JUSTICE:  We spent a bunch of money in those assets, and then thermal coal went from 70 or $80 a ton to $30 a ton and stayed at $30 a ton, and we were stuck.  We lost hundreds and hundreds and hundreds of millions of dollars, and then when we burned through all the money that we had, cash that we had – and I say "we," the whole family – had one of two choices, either bankrupt or borrow money against those assets. . . .   And those assets were spun out of JCJC . . . . so that they could individually borrow money. . . .  [Carter Bank] lent 50 or 60 million to Kentucky Fuel, 50 or 60 million to Virginia Fuel, 50 or 60 million to Alabama Carbon, aggregating to 800 million by 2017.  The 800 million didn't all come from JCJC spinoffs.  It came from Greenbrier and anything we could mortgage, we did.

Q.        Did you say 800 million?

A.        800 million.  [D.E. 638-1 at 71-72]

The deposition testimony clarifies that insofar as any of the Justice companies —

specifically including the two Defendants — transferred or sold assets, it was for a legitimate

business purpose:  first to redistribute collateral among the companies to allow them to borrow

more money in the aggregate, and then to service the debt thereby incurred.  Kentucky Fuel, which

ceased operations in 2017, sold off the entirety of its encumbered coal properties the following year to retire its debt to Carter Bank, as part of a larger refinancing transaction. *See* D.E. 638-1 at 61-64, 107. To this day, JCJ remains in heavy debt to members of the Justice family, and in particular Governor Justice, who, over time, lent the company $200 million from his personal fortune. *See* D.E. 638-1 at 170-71, 181-82. JCJ is also yet indebted to Carter Bank in excess of $30 million. *See* D.E. 638-1 at 59; *see also* D.E. 638-2 at 70-71 (testimony that all assets transferred by JCJ between 2015 and 2022 have been sold to curtail debt).

The witnesses were thoroughly interrogated concerning two specific circumstances that Plaintiffs believed indicated an availability of funds to pay a portion of the judgment entered against Defendants. The first involved the Kentucky Fuel asset sale to Newlead Shipping for roughly $8.5 million, mostly in cash but including about $175,000 in stock. *See* D.E. 638-2 at 5; D.E. 659 at 17-18. The stock was transferred directly to Mr. Justice's brokerage account for processing purposes, then resold almost immediately. *See* D.E. 638-2 at 76-77; D.E. 639-1 at 184; D.E. 659 at 117. However, Mr. Justice plowed the proceeds back into the Justice companies. *See* D.E. 638-2 at 7-8.

The second concerned an entry on the companies' recent tax returns evidencing a net $32 million receivable to JCJ from Mr. Justice, characterized as a shareholder loan. *See* D.E. 659 at 96-98. Mr. Justice, however, could not recall that he or any member of his family had ever received a cash loan from either Defendant. *See* D.E. 638-2 at 73; *see also* D.E. 659 at 102 (Mr. Ball's testimony that "I have never known any of the Justices to just take a loan from the company."), 114 ("I've never known the company to transfer something to one of the shareholders for a receivable."). The entry appears to stem from a mistake in accounting:

Q:           Okay.  Are there any accounting entries that show that these figures are incorrect?

DEANE:   I think yes.

Q:           What?

A.           I think that the entries show where the accountants for whatever reason rolled debts to Jay personally versus just leaving them on the company level you see those entries.  I think that those are incorrect and that would show that it's incorrect.  I think that it's an accounting error [D.E. 639-1 at 168-69].

* * * *

JUSTICE:   I'm saying that [the loans] were classified to me personally, and they should have been classified to companies that I own.  So we'll have to give you that back-up, but we will.

Q.           Who told you that?

A.           Summer Dean.

Q.           When?

A.           Six o'clock last night.

Q.           How did – did she show you any documents that back that up?

A.           She did not, but she was looking at something on the computer.  So I feel like she can back that up.

Q.           Are you aware of any documents that say or would show that this was not a loan to you?

A.           I am totally stunned.  I think there's a big mistake, because I can assure you that I've never gotten any dollars from these companies [D.E. 638-1 at 146-47].

* * * *

Q.           When you talked to Summer Dean, this was last night?

A.           Uh-huh.

Q.           Were you personally with her or on the phone?

A.           On the phone.

Q.           Did you ask her what documentation she had to show that?

A.           My conversation with Summer was as follows:  "Summer, there's a document in the Brownlow deposition I'm doing to do tomorrow that indicates I owe JCJ Companies $32 million."  Her response, "No way." . . . .  She called me back in probably 20 minutes, and she said, "Preliminarily what I found is that they have tagged money that JCJ sent to other companies to you personally, and that's in error."  [D.E. 638-1 at 148-49].

Ms. Deane testified that in-house accountant Will Morrissette, with no outside assistance,

"make[s] sure to tick and tie every single dollar in and out of the account and what it's going to –

and how it should be recorded."  [D.E. 639-1 at 12]; *see also* D.E. 639-1 at 159 ("I would have an idea if Jay got $22 million in his bank accounts.").  Although the Sanctions Order permitted Plaintiffs "to move for permission to depose . . . other individuals revealed to have relevant knowledge," D.E. 565 at 18, they never sought to depose Mr. Morrissette.  Moreover, Plaintiffs have never attempted in this proceeding to pierce Defendants' corporate veil to prove that they are mere alter egos of any of the Justices, established and operated for the personal benefit of the family members.  That *is*, however, the essence of the parallel litigation — stayed pending final resolution of the instant matter — in *New London Tobacco Market, Inc., et al. v. James C. Justice Companies, Inc., et al.*, No. 6:17-cv-00245, also assigned to this Court.  Fairness demands that Plaintiffs should be put to their proof in the companion case without being afforded a procedural windfall in this one.

The deposition witnesses attempted to explain why the complete financial picture of the Justice entities had not been adequately disclosed as a result of Defendants' prior discovery responses.  Mr. Justice does not monitor litigation details and relies on counsel to comply with discovery, *see* D.E. 638-1 at 28-29, 85; *see also* D.E. 638-2 at 68, and he could not answer why narrative responses to interrogatories were not provided, but there was "no part of an intent to hide the ball at all," *see id.* at 87-88.  Mr. Justice was never asked to listen to the audiotape of the discovery status conference with the magistrate judge in January 2021, and he had no prior knowledge of the recording's existence.  *See* D.E. 638-1 at 97-98.

Mr. Ball understood only generally from the docket entry associated with the Discovery Order that "we needed to provide additional information," assigning his subordinate, Chris Schroeck, to gather the required documents.  D.E. 659 at 64.  Mr. Ball did not realize that there was a "significant problem" relating to discovery until he read the Sanctions Order.  D.E. 659 at

75.  According to Mr. Ball, he never received the recording of the status conference from Mr.

Schroeck or read the transcript of the proceedings.  *See* D.E. 659 at 79-80.

Ms. Deane recalled a ransomware attack in May 2021 that hindered compliance, *see* D.E.

639-1 at 63.  Ms. Deane vaguely recalled the motion to compel leading up to the Discovery Order,

but she knew nothing of the sanctions proceedings or the district court order of March 11, 2022,

directing the immediate payment of over $1 million in attorney fees, except that neither Mr. Justice

nor the companies had the liquidity to pay it.  *See* D.E. 639-1 at 201-04.

C.      There is no evidence of contumacious conduct.

It is impossible to reconcile the magistrate judge's recommendation of civil contempt with

the deposition testimony, which establishes that Defendants' failure to comply with the Discovery

Order was simply the result of institutional dysfunction and negligence.  Importantly, there is no

suggestion that Mr. Justice and Mr. Ball, having now been personally conscripted into the

proceedings, have done anything but strictly comply with the subsequent Sanctions Order.  At this

stage, the aim should be to seek and secure compliance with whatever additional documentation

may presently be deemed necessary to satisfy the Court that Defendants cannot satisfy the

judgment against them, and that no other person or entity may be held liable in their stead.  To the

contrary, acceptance of the magistrate judge's recommendation would potentially hold Messrs.

Justice and Ball liable for the entire judgment as the result of Defendants' violation of a ***single***

Discovery Order.

As the magistrate judge noted, civil contempt sanctions are designed "to compel obedience

to a court order and compensate for injuries caused by noncompliance." *Redkin Labs. Inc. Levin*,

843 F.2d 226, 229 (6th Cir. 1988).  A company's officers may be held individually liable for

contempt sanctions "only when (1) they are intended to compensate for actual losses, and (2) the

actual losses compensated for were caused by the officer's contumacious conduct." *Gascho v. Global Fitness Holdings, LLC*, 875 F.2d 795, 803 (6th Cir. 2017).

The magistrate judge's essential finding that Mr. Justice and Mr. Ball personally conducted themselves with contempt and disrespect for the judicial process that — against the clear weight of the evidence — somehow caused the damages embodied in the judgment order in excess of $30 million is, to put it plainly, a massive overreach. There is no indication in the record whatsoever to support the magistrate judge's twenty-first certified finding that Defendants' "noncompliance with the Discovery Order was a strategic litigation decision" on the part of Mr. Justice or Mr. Ball, such that either lacks "clean hands" in the matter. Order 40.

The magistrate judge's reliance on *Electrical Workers Pension Trust Fund of Local Union #58, IBEW v. Gary's Electric Service Co.*, 340 F.3d 373 (6th Cir. 2003), is to no avail. The sole owner and officer of the small defendant company in *Electrical Workers* indisputably took it upon himself to divert funds earmarked by an arbitrator for remittance to the plaintiff's employee-benefit fund. The Justice organization, by contrast, is a large, diversified corporate enterprise with diffuse decisionmakers and, in particular, a substantial group of in-house and outside counsel to handle the companies' legal matters.

More helpful for the Court's consideration is the situation in *Lewis*, *supra*, where the district court declined to hold the judgment debtor in contempt notwithstanding a finding of contumaciousness stemming from the debtor's "feigned ignorance" concerning the disposition of his assets. 2015 WL 4579323 at *20. The court instead granted the debtor "one last chance to provide full and complete discovery responses," ordering "the parties to meet and confer and identify outstanding discovery requests" and directing submission of a status report within 30 days. *Id.* at *21. A remedy similar to that fashioned in *Lewis* is just and appropriate here.

15

**3.    The magistrate judge's derivative award of costs and attorney fees was likewise in error.**

In the event that this Court confirms that the magistrate judge was without authority to order Rule 37(b)(2)(A) sanctions and declines to accept the show-cause recommendation set forth in the Order, then Defendants should not be directed to pay Plaintiffs' costs and attorney fees incurred in the preparation and presentation of their Renewed Motion.

**4.    Conclusion.**

For all the foregoing reasons, Defendants respectfully request that this Court sustain their objections to the March 18, 2023 Order.


Respectfully submitted,


By Counsel:

_/s/ Steven R. Ruby_
Steven R. Ruby (WVSB #10752)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone:    (304) 345-1234
Facsimile:    (304) 342-1105
sruby@cdkrlaw.com
***Counsel for Defendants***