**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION AT LONDON**

| | | |
|---|---|---|
| **NEW LONDON TOBACCO MARKET,** | ) | |
| **INC. and FIVEMILE ENERGY, LLC** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **No. 6:12-CV-00091-GFVT-HAI** |
| **KENTUCKY FUEL CORPORATION,** | ) | |
| **and JAMES C. JUSTICE COMPANIES,** | ) | |
| **INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO
MAGISTRATE JUDGE'S RECOMMENDED DISPOSITION**

## I.    SUMMARY

After the briefing, the *only* remaining issue is the appropriate remedy and damages. This is because the Defendants' Objections continue the same fundamental flaw pointed out by the Magistrate Judge in his Recommended Disposition and Order when he said that "crucially, Defendants fail to meaningfully engage with the elements of a civil-sanctions request in light of the facts of this case."  D.E. 697 at 13. They totally fail to provide any analysis within the relevant legal framework but persist in analyzing irrelevant issues. As a result, an objective analysis makes clear that the record is undisputed that Plaintiffs have established a *prima facie* case against the Defendants and Messrs. Ball and Justice[1] for civil contempt and that they have failed to establish any legally or factually sufficient defenses. Thus, the *only* remaining issue for this Court to decide is the appropriate remedy for their contempt. The remedies and damages recommended by the

---

[1]The Magistrate Judge did not recommend a show cause hearing for Dr. Jillean Justice. The Plaintiffs have objected to that part of his Recommendation. D.E. 705.

Magistrate Judge are appropriate. Plaintiffs will demonstrate all this below.

## II.     PRELIMINARY STATEMENT

The Defendants' "Objections to Magistrate Judge's Recommended Disposition and Order," D.E. 708 ("Objections"), make two objections:  The first, in Section 1 at pages 1-7, is an objection to the Magistrate Judge's Fed. R. Civ. Proc. Rule 37(b) sanction of finding of an alter ego relationship between (i) the two shareholders (Mr. James C. Justice, III and Dr. Jillean Justice), and (ii) the various companies that comprise the Justice family enterprise.  The second, in Section 2 at pages 7-15, is an objection to the recommendations for a show cause hearing and a potential contempt finding and contempt penalties.

In their first objection, the Defendants make one argument in support of their opposition to the finding of the alter ego relationship:  Their only argument in Section 1 of the Objections is that the Magistrate Judge exceeded his authority because his finding of an alter ego relationship supposedly is a dispositive ruling that he lacks the power to make. Pursuant to  Local Rule 72.2, Plaintiffs ordinarily are not permitted to file a Response to the arguments in Section 1, unless requested to do so by the Court, because they address a non-dispositive issue that will be reviewed pursuant to a "clearly erroneous" standard, rather than the *de novo* review accorded dispositive rulings. However, the Defendants' "no authority" argument creates a contradiction and a conundrum:  They contend that the alter ego finding is dispositive and therefore subject to *de novo* review by this Court. If they were correct, Plaintiffs would be entitled to respond to an objection to a dispositive issue. Not to be able to respond would create an especially unfair situation, since the "no authority" issue and the accompanying argument about the supposedly dispositive nature of a factual alter ego finding **were never raised below**, even though such a finding was specifically requested in the Renewed Motion for Contempt, D.E. 673 at 34-35. Because Defendants did not raise the issue before the Magistrate Judge, Plaintiffs have never had an opportunity to address

their arguments or point out contravening authority.

Nevertheless, out of an abundance of caution, Plaintiffs will eschew any argument in response to Defendants' "lack of authority" legal argument in Section 1 (unless the Court invites a response), even though they do believe that the Magistrate Judge was correct in his conclusion that his Rule 37(b) sanction was a proper non-dispositive ruling, and do not wish to waive that issue.  Plaintiffs do note that even if the Defendants' legal argument about the supposedly dispositive nature of the finding were correct, the only result would be a de novo review by this court and Plaintiffs would clearly be entitled to respond fully at that point.

However, all discussion of the alter ego relationship is not foreclosed. That is because the alter ego relationship also is relevant to the contempt issue, which is the subject of Section 2. Defendants discuss "alter ego" specifically at pages 8 and 13, and many of the transactions discussed throughout Section 2 also implicate the alter ego relationship. Because of that overlap, this Response will address in that context some of the facts that relate to the alter ego relationship.

### III.   DISCUSSION

It is important to focus on the issue before the Court because the Defendants do not. Although the facts that are recited in the Recommended Disposition support a contempt citation, the recommendations were simply (1) that Messrs. Justice and Ball be ordered to appear before the District Judge to show cause why they should not be held in contempt, (2) that if they could not "satisfactorily show cause as to why they have not fully complied with the discovery order" they be held in contempt, and (3) that if held in contempt, they be "ordered to pay Plaintiffs contempt penalties up to the amount of the final judgment . . . ." D.E. 697 at 37-38. The Magistrate Judge did not find them to be in contempt. That is up to the District Judge.

The recommendations simply would require Messrs. Justice and Ball to appear and show

cause why they should not be held in contempt. They will only be held in contempt if they are unable to make such a showing. These recommendations are plainly based upon the **uncontested** *prima facie* case of contempt and the Magistrate Judge's findings that they had failed to establish the required *Rylander* defenses. The Opposition, however, jumps the gun by devoting its argument to why they should not be held in contempt, which would be the subject of the future show cause hearing. It does not attempt even to argue that the Court should not conduct a show cause hearing for both Mr. Justice and Mr. Ball (and the Defendants). As its title shows, the arguments in Section 2 do not oppose the recommendation that Messrs. Ball and Justice appear to show cause. Rather, all arguments are against the later imposition of a contempt finding and sanction, not against the show cause hearing. Thus, that recommendation is unopposed. The discussion below will therefore focus on the deficiencies in the Opposition's arguments against a contempt finding and sanction.

## A.  The Applicable Legal Standard

To frame the discussion below in a proper legal context, it is helpful to outline briefly the legal principles governing civil contempt proceedings. This is particularly important because the Defendants do not discuss the controlling law. They do not even mention the leading Sixth Circuit case relied upon by the Magistrate Judge, *Elec. Workers Pension Tr. Fund of Loc. Union 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378-79 (6th Cir. 2003), until the next-to-last page of the Objections. Even then they provide only a superficial, one-paragraph discussion. So, we begin with the applicable legal principles, all of which the Magistrate Judge found in favor of the Plaintiffs, and virtually all of which the Defendants ignore.

Plaintiffs' *prima facia* case for contempt was established by the showing that there was a clear and unambiguous Court order, that the order was not obeyed, and that the Defendants (and their officers and directors) had actual or constructive knowledge of the order. D.E. 697 at 9 (*citing*

*Elec. Workers,* 340 F.3d at 379). The burden then shifted to the contemnors to establish the "*Rylander* defenses."[2] This required them to show the following "categorically and in detail,"

- Why they were unable to comply with the order;

- That they "made in good faith all reasonable steps to comply;"

- That they are not responsible for the inability to obey, i.e., that the alleged inability to comply was not self-induced; **and**

- The "essential" showing of clean hands.

*Elec. Workers, 340 F.3d at 379, 381-84.* The Defendants have failed to carry their burden to show ***any*** of these elements. We will show below how the record supports the Magistrate Judge's recommendations based upon this controlling legal authority.

The Defendants have waived many of the issues that they now seek to address and issues that they have failed to address that should have been a central part of their analysis. Even for recommendations that are reviewed *de novo* a waiver can first occur when a party fails to raise an issue before the magistrate judge, even if the party later files an objection before the district judge. *AES-Apex Employer Servs., Inc. v. Rotondo,* 924 F.3d 857, 867–68 (6th Cir. 2019); *see also Murr v. United States,* 200 F.3d 895, 902 n.1 (6th Cir. 2000) ("Courts have held that while the Magistrate Judge Act, 28 U.S.C. § 631 et seq., permits de novo review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate." (citations omitted)); *United States v. Micro Cap KY Insurance Co., Inc.,* 246 F. Supp. 3d 1194, 1197 (E.D. Ky. 2017). A waiver can also occur if the party fails to include the issue in an objection to the district court. As the Advisory Committee Notes to Rule 72(b) say, "Failure to make timely objection to the magistrate's report

---

[2] *United State v. Rylander*, 460 U.S. 752 (1983), cited and relied upon in *Elec. Workers*, 340 F.3d at 379-84.

prior to its adoption by the district judge may constitute a waiver of appellate review of the district judge's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).”; *accord Deters v. Hammer*, 568 F. Supp. 3d 883 (S.D. Ohio 2021) (The district court's review of a magistrate judge's report and recommendation applies only to the portion to which proper objection was made. Objecting litigants must identify each issue to which they object with sufficient clarity that the court can identify it, or else the issue is waived.). Both kinds of waiver occurred here – failures to raise issues before the Magistrate Judge and before the District Judge.

**B.  The Plaintiffs' *Prima Facie* Case for Contempt and the Lack of Defenses**

    **1.  The Objections do not rebut Plaintiffs' *prima facie* case.**

The Plaintiffs' *prima facie* case for contempt is undisputed. Plaintiff's burden was to show by clear and convincing evidence that the Defendants violated a “definite and specific Order of the Court” and that the Defendants and their responsible officers knew of the Order.

In his Recommended Disposition, the Magistrate Judge expressly certified “the fact that Defendants violated the Court's Discovery Order in … four respects.” D.E. 697 at 15. “Each of these findings of noncompliance is supported by clear and convincing evidence.” *Id*. at 39 (Certified Fact No. 11). The Court also certified that clear and convincing evidence established that “Mr. Ball and Jay Justice possessed actual or constructive knowledge of the Discovery Order.” *Id*. at 24 and 39 (Certified Facts Nos. 12 & 13). The Magistrate Judge also noted that the Defendants' response brief did not address the knowledge element and that the Plaintiffs' arguments regarding knowledge of the Discovery Order were “unopposed, unrebutted, and effectively conceded.” *Id*. at 20. **The contemnors do not object to these findings and certified facts**. Absent any objections to these findings, they are undisputed and established.

The lack of objections is not an oversight. The Defendants also waived any objections to

these issues previously. On March 23, 2022, the Court granted Plaintiffs' original Motion for Sanctions in part (D.E. 565). In that Order the Magistrate Judge also found that the Defendants violated the April 2021 Discovery Order (D.E. 505). The Defendants also did not object to that finding.[3] The same is true now – the Objections do not attempt to dispute either that the Discovery Order was disobeyed or that Messrs. Ball and Justice knew of that Order.

> 2. **The Objections make no effort to establish the *Rylander* defenses.**

The Recommended Disposition also found and certified that the Defendants had not carried their burden to establish the *Rylander* factors. Specifically, they failed to show that they were unable to comply, that they took "in good faith all reasonable steps" to try to comply, and that they had clean hands. D.E. 697 at 26 and 40 (Certified Fact No. 21). The Objections do not even attempt to show how the Defendants have established all the required elements of a *Rylander* defense. *See* D.E. 708. They never even identify the relevant factors, **all** of which they must establish "categorically and in detail." *Elec. Workers*, 340 F.3d at 379. They make a weak attempt to argue that they had "clean hands" (because they claim that their disobedience was not a "strategic litigation decision"), but they do not even attempt to address the first two factors found by the Magistrate Judge – that (i) they were able to comply and (ii) they took "in good faith all reasonable steps" to try to comply. Because **all** the *Rylander* factors must be established to constitute a defense to civil contempt (*Id. at* 381), their failure to object to the findings on these two issues **waived** the issues. These failures, coupled with the unrebutted *prima facie* case, show that civil

---

[3] Although the Defendants objected to this March 23, 2022 Order, that pending Objection goes *only* to the *scope* of the discovery that the Court ordered a year earlier in the 2021 Discovery Order, D.E. 505. They did not object to the finding that they had violated the Order. *See* D.E. 586. However, because the Defendants had never objected to the 2021 Discovery Order, that tardy objection to the scope of that Discovery Order is of no consequence because the scope of the discovery ordered was established as the law of the case.

contempt by the Defendants and by Messrs. Ball and Justice is established as a matter of law.

Instead of addressing the facts withing the requisite legal framework, including the *Rylander* factors, the Defendants devote most of Section 2 to their alleged financial condition (D.E. 708 at 8-10), and to attempting to justify two of the asset transfers as being for "a legitimate business purpose." *Id*. at 10-13. This is a continuation of their strategy of 'divert and ignore' before the Magistrate Judge who observed, "[C]rucially, Defendants fail to meaningfully engage with the elements of a civil-sanctions request in light of the facts of this case. It is not the Court's role to manufacture those arguments for them." D. E. 697 at 13.

Despite these failures and waiver, we will address the individual *Rylander* elements below, including some of the unchallenged facts pertaining to the *Rylander* defenses. There is considerable overlap between the *Rylander* factors. For example, many of the facts that explain *why* the Discovery Order was violated also show that the Defendants were able to comply with that Order, that they did not take all reasonable steps to comply, and that they have unclean hands.

First, in considering *why* the Defendants did not comply with the Discovery Order, we dispose of their efforts to throw Mr. Schroeck under the bus. They claim they relied on Mr. Schroeck because Mr. Justice – he who approves "every dollar out the door" and "likes to have his thumb on everything"[4] – "does not monitor litigation details" (D.E. 708 at 13), and Mr. Ball was only vaguely aware of what was going on (*Id*. at 13-14). That purported defense is legally insufficient. The Court has rejected this blame-the-lawyer defense previously. *See, e.g*., D.E. 206 at 8, n.6 (rejecting efforts to blame prior counsel and noting that Defendants' "continuing pattern of contempt for the Court's orders and their obstruction of discovery show that their non-compliance is not lawyer-driven."). The Magistrate Judge reiterated that "even as the attorneys

---

[4] D.E. 639-1 (Deane Dep.) at 121-23.

8

changed, the discovery problems never abated" and "it has long been clear to the Court that the misbehavior in this case has been client-driven."  D.E. 697 at 12-13. The Court's reasoning is impeccable – this attempted defense "side-steps the legal standards the Court must apply" and the relevant case law holds that represented clients can be held responsible for violations of court orders. D.E. 697 at 13; *see also Pioneer Inv. Servs. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 396-97 (1993) (acts or omissions of an attorney are attributable to his client). As the Court held, this defense is "frivolous" and "absurd."  D.E. 697 at 11 & 12.

The Defendants also argue that that their failure to obey the Discovery Order "was simply the result of institutional dysfunction and negligence," D.E. 708 at 14, and they are "a somewhat disorganized organization," *Id*. at 8. This is another frivolous argument. The Objections do not provide any support for the proposition that unintentional violations of a court order resulting from negligence do not constitute contempt. They cite no authority because it is well-established that intent is **_not_** a required element for a finding of civil contempt. *See* Recommended Disposition at 9, ("Civil contempt does not require willfulness; the intent of the party to disobey the order is irrelevant to finding contempt. *Rolex Watch U.S.A. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996)". And even if one credits the Defendants' claim that they were "negligent" and "disorganized," the question arises, "What did they do to fix it?" The record provides the answer:  "Nothing."  The Defendants have not attempted to show otherwise. To take just one example, Mr. Justice testified that he put in place no "management tools or safeguards" to ensure that he was informed about significant events in this litigation. D.E. 638-1 at 102-03. Even after the default judgment and multiple sanctions in this case, he still gets no daily, weekly, or even monthly reports. *Id*. When asked if he could answer *any* questions about why *any* required discovery responses and documents were not provided, he said that he could not. *Id*. at 154.

For his part, Mr. Ball's feigned ignorance of what they had to do was self-induced because he admits that he was aware of the Discovery Order and knew that the Motion to Compel had been granted but claims that he only read the summary that accompanied the ECF notice, not the text of the Discovery Order itself. *See* D.E. 659 at 64-65.

The Opposition also mentions an alleged 2021 "ransomware attack."  We say that they only "mention" it because Defendants do not claim that this alleged event prevented them from complying with the Discovery Order. Instead, they now say that it "hindered compliance" without explaining how it "hindered" them. D.E. 708 at 14. They have produced exactly *zero* documents to verify such an attack or its effects. This claim also is an excuse that was not offered to the Magistrate Judge and therefore is **waived**. *See* D.E. 686. There is a good reason why it was not argued to the Magistrate Judge: Mr. Ball has sworn under oath that "all information collected in response to Plaintiff's discovery request was backed up on a cloud-based server and **<u>not</u>** affected by the  ransomware attack."  D.E. 585 (Depo. Exh. 24) (emphasis added). When confronted with this evidence, Ms. Deane backtracked on her testimony and testified that she had no reason to disagree with Mr. Ball. D.E. 639-1 at 65-66.

The Magistrate Judge also found that the violations of the Discovery Order were driven by the Defendants' "strategic litigation strategy." That finding is relevant to two factors: The violations were self-induced, and the lack of "clean hands." First, Defendants have **waived** any argument about the "clean hands" issue because they did not raise that defense before the Magistrate Judge. Second, although the Defendants dispute that finding, the entire record refutes their conclusory contention that there no evidence "whatsoever" that their violations were part of a "strategic litigation decision."  In fact, that strategy has already been established numerous times. As early as 2014 this Court found that "Defendants' entire strategy in this case has been to delay,

object and not-comply." D.E. 206 at 21. Again in 2017: "Defendants have a long history of contumacious practice in this case that began in 2012." Those and similar findings of bad faith throughout the history of this litigation[5] are sufficient proof of unclean hands. It would add unduly to the length of this Response to discuss all instances of the Defendants' bad faith and unclean hands, but other examples discussed in the Renewed Motion for Contempt and the Recommended Disposition include repeated examples of false testimony, their insistence upon making "frivolous" and "absurd" arguments, deliberate withholding of documents, failure to search for responsive emails, their failure to produce hundreds and even thousands of text messages, unkept promises during the depositions to provide missing documents . . . . The list could go on for pages.

The finding about the "strategic litigation decision," also is supported by the fact that the contemnors could not identify "any external circumstance (past or present) that made compliance *impossible*." D.E. 697 at 25. Rather, they merely complained that it was *difficult*. *See, e.g.*, D.E. 638-1 at 87-88 (Mr. Justice justifying the failure to obey the order to provide narrative interrogatory responses because "it's just so doggone complicated"). The contemnors have not shown otherwise in their Objections. We will not belabor the point but refer to D.E. 673 at 5, 11, 13, 15, 16, 2, and 24-30, for further detail.

Finally, one other point about the Defendants' unclean hands merits mention: The unprecedented (in the experience of undersigned counsel) role of attorney Aaron Houchens in obstructing discovery. This disturbing affair, approved by Mr. Ball and the Defendants, shows that their stonewalling strategy in responses to the Discovery Order plainly was a "strategic litigation

---

[5] *See, e.g.*, D.E. 189 at 16-20 (finding Defendants' bad faith in refusing to provide discovery prejudiced Plaintiffs); D.E. 206 ("[T]he Court is left to believe that they could have complied [with discovery orders] but elected not to do so. This is, by definition, contumacious, and enough to conclude they acted in bad faith.").

decision." After the Magistrate Judge ordered the depositions, plaintiffs served subpoenas *duces tecum* on Mr. Justice and Dr. Justice. Mr. Houchens, who represents numerous Justice companies in other matters, claimed that he represented Dr. Justice and Mr. Justice and accepted service of the subpoenas for them. He objected to the subpoenas (*see, e.g.,* D.E. 601-2). He then appeared before the Magistrate Judge and took the position that a hearing on that objection could be conducted only in Virginia. *See* D.E. 603. The Magistrate Judge held that the Federal Rules of Civil Procedure required the objections to be heard in Virginia, rather than by this Court. D.E. 603. But he also made clear that he believed that the objections were part of the Defendants' obstructionist strategy and that they were "a continuation of the litigation misconduct and abuse **that has marked Defendants' strategy in this case at nearly every turn** – the most egregious example of such misconduct in the undersigned's twelve years' of service as a Magistrate Judge." *Id.* at 2 (emphasis added).

But it is worse: Dr. Justice testified that (i) she was unaware of her subpoena, (ii) Mr. Houchens objected to it without her authority or knowledge, or even (iii) who Mr. Houchens was or what he did, (iv) she had never met or talked with Mr. Houchens, and (v) he had never represented her. D.E. 660 at 15-16 [ECF page 5];  D.E. 627 at 6-7.[6]  Mr. Justice also testified that he did not know of his subpoena and was unaware of Mr. Houchens' role. D.E. 638-1 at 44-50.

Given the potential conflicts of interest between Dr. Justice and other contemnors in this case Mr. Houchens could only properly represent Dr. Justice if she gave her informed consent to the dual representation. *Boggs v. Kentucky B. Ass'n,* 349 S.W.3d 302, 305 (Ky. 2011). That did not

---

[6] Despite this unethical conduct, the Defendants continue to reward Mr. Houchens' loyalty and willingness to cut corners, by his continued representation of defendant Kentucky Fuel and numerous other Justice family companies, including in a recent case, *U.S. v. S. Coal Corp.,* 22-1110, 2023 WL 2763671 (4th Cir. Apr. 4, 2023).

happen, since she was unaware that he represented her. He was acting on behalf of the defendant corporations, not the witnesses, when he stonewalled the production of the witnesses' documents and files. The record shows that it was Mr. Ball who asked Mr. Houchens to do this, as Mr. Houchens was working with Mr. Ball on the objections. Mr. Ball told Mr. Justice that they had the subpoenas and "we are objecting to them." D.E. 659 at 134. For his part, Mr. Justice wasn't much interested: He did not ask any questions about the subpoenas or the objections. *Id.* at 134-35.

Mr. Houchens also stonewalled Plaintiffs' efforts to learn whether Defendants had taken "all reasonable steps" to comply with the Discovery Order. For example, Mr. Schroeck was asked, *"What steps, if any, did you take or did you ask others to take to provide all of the information and documentation relevant to the loans to shareholders?"* Mr. Houchens instructed him not to answer. Mr. Schroeck complied. D.E. 661 at 57-58. A question asking how Mr. Shroeck instructed others to *"to gather information to respond to those discovery requests about the transfer of real property"* was met with a similar instruction and refusal. *Id.* at 58-59; *see also id.* at 50. These improper instructions foreclosed legitimate inquiry into whether Defendants took "all reasonable steps" to comply with the Discovery Order. Defendants should now be estopped from contending that they "took all reasonable steps."

Plaintiffs will not add to the length of this Response by discussing all the other facts in the record that show that the Defendants could not establish the *Rylander* factors. If the Court needs further detail, we incorporate by reference the discussion in Plaintiffs' Renewed Motion for Contempt, D.E. 673, at 24-30 and their Reply Memorandum, D.E. 690, at 5-6.

## C.  The Recommended Damages Are Appropriate and It is Undisputed that They Are Causally Linked to the Violations.

The Magistrate Judge recommended multiple contempt remedies. As to Messrs. Ball and Justice, he recommended contempt damages up to the amount of the final judgment. This was

based upon his findings that the Defendants had not provided full discovery for six categories of asset transfers that collectively total hundreds of millions of dollars. These are identified below. Alternatively, he recommended judgment against Mr. Justice for two specific categories of transfers whereby Mr. Justice diverted money from the Defendants to himself personally.

The Magistrate Judge also found an alter ego relationship between (i) Mr. Ball (D.E. 697 at 34) together with Dr. Justice and Mr. Justice, and (ii) all the known Justice-owned companies. He made this finding as a Rule 37(b)(2)(A)(**i**) discovery sanction. However, he did ***not*** expressly exclude an alter ego finding as a contempt remedy. Contempt is also a Rule 37(b)(2)(A)(**vii**) sanction and the alter ego finding is just as appropriate as a contempt remedy pursuant to subsection (b)(2)(A)(**vii**), as it is as non-contempt sanction pursuant to subsection (b)(2)(A)(**i**). And the Magistrate Judge's rationale for an alter ego finding applies equally to the recommended contempt remedies. The same paragraph that finds that Mr. Ball is the alter ego of the Defendants, states that the alter ego finding is "meant to disempower Defendants from avoiding judgment by transferring their assets to the corporate **officers** and/or affiliate companies." D.E. 697 at 34 (emphasis added). Obviously, that includes Vice President Ball.

We discuss these categories of remedies below.[7] The Defendants have **waived** any objection to most of them.

The Magistrate Judge made findings about six categories of fraudulent asset transfers by the Defendants. The Objections ignore most of them. The Recommended Disposition describes these six categories of transfers on pages 28-30. They are:

1. Approximately $32 million in loans to Mr. Justice that he has never repaid;
2. The payments owed to Kentucky Fuel by New Lead that Mr. Justice diverted;

---

[7] The Magistrate Judge also awarded Plaintiffs their attorneys' fees and expenses. We will not include further discussion of that issue but defer to the Recommended Disposition at 34.

The Objections discuss only these first two categories. The failure to raise the remaining four before this Court therefore **waives** any objection of the findings that relate to them. Those remaining four are:

3. Transfers to shareholders for undocumented loans (for which no documentation has been produced) of over $159 million;
4. Intercompany receivables of almost $180 million, that are owed to Defendants by other family companies for transfers between the affiliates;
5. At least 31 transfers of real estate by James C. Justice Companies, Inc. ("JCJC"), for zero consideration and for which no documentation has been produced, plus an additional transfer to Mr. Justice of farm property for $13.5 million that has not been paid; and
6. The diversion of a $31+ million payment owed to JCJC by a Russian company, Mechel.

The Magistrate Judge also found that these transactions show:

- "[T]he Justice family treats their companies as a single financial entity – they move money around the various companies as needed." *Id*. at 30.

The Defendants did not object to this latter finding either. Any objection to it therefore is **waived**. It obviously supports the finding of the alter ego relationship. The same is true of Ms. Deane's testimony where she testified that the all the Justice family companies commingle their money into "one big bucket" and that they comprise "one big economic unit [that] pays the debts for all of its constituent parts . . . ."  D.E. 639-1 at 119-20.

Any rebuttal of the merits of the finding of alter ego status was required to be included in the Objections. But the Defendants do not attempt to show that the Magistrate Judge was incorrect in finding the alter ego status; they limited their objection to the "lack of authority" argument in Section 1. Thus, even if they were correct on that point (which Plaintiffs dispute but do not argue here) and if the Court were to conclude that a review *de novo* is appropriate, then the Defendants

15

**waived** the issue by not contending that the alter ego finding was an inappropriate remedy.[8]

Defendants also claim that there are only thirteen "actively operating" coal and farming companies. D.E. 708 at 10. That is both irrelevant and misleading. It is misleading because it omits one of their most profitable business segments – the twelve entities comprising the Greenbrier Hotel segment. D.E. 662-5 (Depo. Exh. 5, p. 4). It also ignores the fact that many of the allegedly non-operating entities have been used as "straw men" to facilitate the fraudulent transfers. *See, e.g.*, D.E. 662-14 (Depo. Exh. 12), which details properties transferred to companies that are not "actively operating entities."[9]

The Defendants' contention that all their asset transfers were for "a legitimate business purpose," D.E. 708 at 10, is an argument that could only be plausible if the alter ego relationship were acknowledged such that the individuals and all the companies are treated as one entity. Some of these transactions are discussed in the Renewed Motion for Contempt, D.E. 673 at 4-15. One aspect not described there merits attention. The testimony about JCJC's thirty-one known transfers of real property for no consideration disclosed that some of these zero-consideration transfers were to shareholders and affiliated companies so that ***those companies***, not JCJC, could use the property to collateralize loans to themselves, not to JCJC. *See* D.E. 638-1 (Justice Depo.) at 84, 168-72; 209-10; D.E. 659 (Ball Depo.) at 14-39. How those loan proceeds were distributed is unknown, due to the Defendants' failure to provide discovery about these transfers and they did not answer that in the depositions. *See id.*

The Recommended Disposition also found a causal link between the above categories of

---

[8] Defendants, of course, are not entitled to advance such an argument (or the other omitted ones) for the first time in a reply brief. *See Zamari v. Carnes*, 491 F.3d 990, 997 (9th Cir.) 2007.

[9] *Compare* Exh. 12 *with* companies referred to by Defendants in D.E. 708 at 10.  Although one recipient of such transfers, Justice Farms of North Carolina, is on Ms. Deane's spreadsheet, it is engaged in "no activity" according to Ms. Deane.

asset transfers and the damages recommended:

- These transactions were made "to drain the Defendant companies of assets to avoid paying the Judgment and fees;"

- The "Defendants have withheld documentation and narrative descriptions" of these transactions; and

- This "misconduct . . . was intended to delay discovery" into their efforts to drain the companies of assets to avoid paying.

- "Defendants' disobedience of the Discovery Order impeded Plaintiffs' attempt to track down Defendants' money and assets. This is the injury. The violation of the Discovery Order thwarted Plaintiffs' ability to collect the judgment."

D.E. 697 at 27; 30. The Defendants have not addressed or objected to any of these causation findings. Any objections are **waived**.

The Defendants' proposed remedy? Their want to reopen the discovery can of worms created by their contempt. Twelve years of case history proves the unreasonableness of their suggested approach. Their reaction to Ms. Deane's disclosure of unproduced text messages illustrates the folly of their proposed remedy. Her testimony about the text messages is described in D.E. 673 at 28. It suggests there are "thousands" just between her and Mr. Justice. ***It has been a year*** since she disclosed that these unproduced text messages exist. In that year, however, the Defendants have done *nothing* to cure the violation, even though these texts about the Defendants' finances doubtlessly are responsive to multiple discovery requests. Now, they wish to treat this and other failures to produce as just another dispute that they can drag out for months or years. They would argue about whether they even exist and whether they are discoverable. They would require more letters, meetings between counsel, conferences with the Magistrate Judge, motions to compel, court orders, testing compliance with the resulting orders, and on and on . . . . *See* D.E. 686 at 9; D.E. 708 (suggesting "one last chance," a meet and confer to "identify outstanding discovery requests," and a new "status report," followed, no doubt, by another motion and

briefing). In short, Defendants want to continue their delay strategy so they can keep transferring assets and frustrating collection efforts, ***which are ongoing as this Response is being written***. *See* D.E. 699 and 709. Nothing about these Defendants and their principals suggests such new efforts would be treated differently than past efforts to require compliance with existing Court orders.

Due to the contemnors' serial violations of Court orders, the **only** way the Plaintiffs will ever be able to collect what is owed to them is if the Court grants the relief requested against the Defendants' individual officers and directors.

**D.  The Defendants' Other Defense Arguments are Factually and Legally Insufficient.**

**1.  The depositions of Messrs. Justice and Ball do not immunize either them or the Defendants from a contempt citation.**

The contemnors' leading argument is that "the Magistrate Judge has already sanctioned Mr. Justice and Mr. Ball for violations of the Discovery Order by directing them to appear for depositions." D. E. 708 at 8. Nowhere do the contemnors attempt to explain why this should immunized them from a finding of contempt or further sanctions. Nor do they cite ***any*** authority supporting such a proposition. Frankly, it is just another frivolous argument that is noteworthy only because it illustrates (again) their twin tactics of delay and run-up-the-cost.

In the absence of any authority for such a novel proposition, Plaintiffs are loath to occupy the Court's time and patience with a lengthy response. Plaintiffs shall, therefore, respond briefly only to point out the relevant context that shows why the procedures and sequencing by the Magistrate Judge make sense. This is not a situation remotely resembling cases where the doctrine of *res judicata* bars additional sanctions as the Opposition would seem to suggest.

When the Plaintiffs filed their original Motion for Sanctions, D.E. 512, it was the Defendants who suggested the depositions. *See* D.E. 603 at 1. When the Magistrate Judge ruled on that original motion, he granted it <u>in part</u> and ordered "[p]reliminary (non-contempt) sanctions."

D.E. 565 at 18. Those "preliminary" sanctions were awarded only under Rule 37(b)(2)(A), not under the Court's contempt powers. One of those preliminary sanctions was the depositions of the designated officers and directors. So, although the Defendants emphasize that the depositions were ordered "**as a sanction**," D.E. 708 at 8 (emphasis in original), there were no ***contempt*** sanctions entered against Messrs. Ball and Justice or anyone else.

The Magistrate Judge's Order on the Motion for Sanctions denied without prejudice two categories of relief sought by the Plaintiffs – findings of fact and repayment or disgorgement of property and sums transferred and paid to the Justices and their affiliates. D.E. 565 at 16-17. The Court made clear that the depositions were ordered to develop the record so that the Motion for Contempt could be renewed, and the Court could decide on the proper sanctions, as it now has.

This context makes clear that the depositions ordered at the Defendants' suggestion as a Rule 37 sanction were part of a comprehensive effort by the Magistrate Judge to supplement the record and answer questions that the Court might have, to fashion an appropriate remedy. The Court has now done so. But nothing in that earlier interim Order stands as a defense to the now renewed sanctions that were denied at that time ***without prejudice***.

### 2. The depositions were not a substitute for the discovery ordered and did not purge the contempt.

The Defendants' present position is that the "explanations" in the depositions cured "most" discovery deficiencies (D.E. 708 at 8) and excuse them from complying with the Discovery Order. They claim they have now cleared up the "persistent mysteries regarding the Justice Companies' finances." D.E. 708 at 8. But depositions – particularly *these* depositions – are no substitute for full narrative answers to interrogatories and complete document production, for many reasons. Such written discovery necessarily precedes depositions because useful responses are necessary to meaningful depositions, particularly in cases involving complex business transactions such as this

19

case. In addition, as discussed throughout the Renewed Motion for Contempt, these depositions were marked by contradictions in the witnesses' testimony, contradictions between their testimony and documents, repeated instances of inability to answer questions that were ordered to be answered in narrative interrogatory responses, and promises to supplement the discovery responses where the witnesses could not provide an answer, **not a single one of which has been fulfilled**.

While it is true that there have been – and are – "persistent mysteries" regarding the Justice companies' finances, the "mysteries" have been caused by the Defendants hiding and failing to disclose assets and by transferring hundreds of millions of dollars of assets without either identifying the transactions or producing the documents that would prove how these are fraudulent transfers. The depositions have yielded little of substance to clear up the "mysteries," but they have yielded numerous false and conflicting stories that only further compound the "mysteries." The Objections do not show otherwise.

In evaluating the deposition testimony, the lack of credibility of Messrs. Ball and Justice also must be considered. The Magistrate Judge has had ample experience in evaluating their credibility by reviewing extensive deposition testimony, by comparing their prior testimony with their sworn affidavits, and by observing them in person when they testified at the damages hearing. He has repeatedly found that they are not credible. *See, e.g*., D.E. 437 at 24. That finding of no credibility, which was reiterated in the Recommended Disposition (D.E. 697 at 19), is particularly important because the Defendants represent as established facts testimony by both men that is contradicted – even conclusively rebutted – by other testimony and documents. Thus, the Objections' arguments and extensive quotations from their testimony need not be accepted as true because the Magistrate Judge found them to be "evasive and not credible." *Id. Falsus in uno, falsus in omnibus*.

3. **The Defendants' discussion of the two fraudulent transfers does not provide a defense.**

As noted above, the Recommended Disposition made findings about six categories of fraudulent transfers of the Defendants' assets. The Objections ignore all but two of these: the New Lead transfers and the ~ $32 million in loans to Mr. Justice that remain unpaid. Both are discussed separately below. The other four remain unaddressed.

First it is important to note that the Objections' limited discussions of both the New Lead payments and of the ~ $32 million in loans to Mr. Justice, do not provide a defense, or impeach the contempt recommendation pending before this Court. Defendants claim their discussion is intended to show that they cannot pay the judgment. D.E. 708 at 11. That is another attempted diversion – the availability of funds is not the issue in this proceeding. This Renewed Motion for Contempt involves the refusal to provide full discovery in violation of the Discovery Order, ***not*** a violation of an order to pay. Nevertheless, Plaintiffs discuss both transactions below, both to ensure that the record before this Court is not infected by an inaccurate version of the facts, and because the transactions are relevant to the recommended relief.

a. **The New Lead payments Mr. Justice diverted to himself.**

For a background description of these diversions of money, *see* the original Motion for Sanctions, D.E. 512, at 14-15, and the Renewed Motion, D.E. 673, at 8-10. In the Objections, the contemnors devote three sentences to Mr. Justice's theft of the payments that New Lead owed to Kentucky Fuel Corp. That brief discussion addresses an irrelevant issue and is misleading. The only aspect of the transaction they describe is an alleged transfer of stock to Mr. Justice as part of the New Lead purchase price for the Fivemile assets. Part of the ~ $8.5 million purchase price paid by New Lead for the Fivemile assets was a transfer of $175,000 of New Lead stock. Defendants claim that this stock went to Mr. Justice's personal brokerage account, but only for "processing

purposes" (whatever that means – They do not explain it because the explanation Mr. Justice gave in his deposition is not credible. *See* D.E. 673 at 8-10). They say that he resold the stock and put the money back into **unidentified** companies. D.E. 708 at 11. Even this story is highly suspect and contradicted by Ms. Deane. *See* D.E. 673 at 9 & 10. However, it has nothing to do with the cash payment that Mr. Justice diverted.

What the Defendants do **not** disclose is that Mr. Justice personally directed his employees to deposit $1,847,625 of these New Lead payments into his personal brokerage account. Both testimony and the Defendants' own documents establish this. *See* D.E. 595 (Trans. of Show Cause hearing) at 111-12; (Trial Exhibit 13BB from December 2018 damages hearing); D.E. 512 at 14-15, D.E. 639-1 at 186-87; D.E. 673 at 9. A close reading of his deposition shows that Mr. Justice did not deny this but claimed that he was only "aware" that he got the stock and "was not aware" that he had received any of the New Lead cash payments. D.E. 638-2 at 12, 18-19. So, Mr. Justice stopped short of denying that he diverted the cash to himself, and the record leaves no doubt that he personally received at least $1,847,625 of Kentucky Fuel's money, and that another $5,662,135 was diverted to Justice Management Services. *See* D.E. 512 at 14-15. But the Objections' discussion of New Lead omits that undisputed evidence, leaving the impression, as did Mr. Justice in his deposition, that he got no cash but "only" $175,000 in stock.

For present purposes, Mr. Justice's deposition did not any "mysteries" about these transfers of cash to him. His testimony did not explain anything about the transfers or explain what he did with the money, since he claimed he did not remember that he got the money.

Notably, **the Defendants did not dispute the nature of that transaction before the Magistrate Judge**. Instead, in their Response to the Renewed Motion for Contempt, their **only** argument about these transactions was that they occurred before the Discovery Order and therefore

could not support a contempt citation. D.E. 686 at 2-3. The Magistrate Judge correctly dismissed this argument as "frivolous" because the contempt is based upon the failure to provide full discovery about these transfers, not for the transfers themselves. D.E, 697 at 11-12. Similarly, the Defendants do not object to this ruling in their current Objections. Nor do the Objections contend – much less make a showing – that the Defendants provided full discovery about these transfers, as the Discovery Order required. This is another example of Defendants ignoring the relevant legal framework and issue in this contempt proceeding.

The Magistrate Judge found that these transfers resulted in "millions of dollars received [being] deposited in the brokerage accounts of Jay Justice and his company Justice Management Services, rather than in the accounts held by Defendants."  D.E. 697 at 28. The Defendants have not shown otherwise. That is an appropriate measure of the remedy recommended by the Magistrate Judge, as discussed in the Recommended Disposition, D.E. 697 at 27-32.

### b.  The loans Mr. Justice owes to the Defendants.

The transactions relevant to these contempt proceedings include the loans by JCJC to Mr. Justice totaling $31,740,101. They are relevant for two reasons: (i) They show violations of the Discovery Order because the Defendants did not describe them in their interrogatory answers or produce the documents pertaining to them, and (ii) the amount of these unpaid loans can be one of the measures of the contempt sanctions.

The facts about these loans and Mr. Justice's unsupported and incredible testimony about them was described in detail in Plaintiffs' Renewed Motion for Contempt. D.E. 673 at 4-8. The Defendants knew that they could not dispute these facts or support Mr. Justice's deposition testimony in their Response, so they did not try. Rather, their only argument about these loans was their frivolous defense that the failure to disclose the loans in discovery could not support a

contempt finding because they were made before the judgment in this case. D.E. 686 at 3. By not then raising it, they **waived** any argument that Mr. Justice did not receive these loans.

In the Objections, the Defendants now deny that Mr. Justice received these loans. They claim that they are a mere "mistake in accounting. We will not repeat the entire discussion from Plaintiffs' Renewed Motion. Instead, here is a condensed summary of the key points:

- Defendants' federal tax returns have shown loans to Mr. Justice since 2016. Since 2018 and through 2020 (the last return produced) these loans have totaled $31,740,101. D.E. 662-9 and 662-19 (Depo. Exhs. 9 and 19).

- Mr. Justice denied that he ever received *any* loans from the companies. D.E. 638-1 at 138-46.

- His denial is contradicted by his Vice President for Treasury, Ms. Deane, who testified that he *did* receive loans. D.E. 639-1 at 134; 166.

- His testimony also was contradicted by Mr. Ball who testified that Mr. Justice had received loans and that part of this ~ $32 million receivable was the $13.5 million purchase price for a South Carolina farm property that JCJC sold to him. D.E. 595 at 90; 659 at 99, 100.

- The tax returns are prepared from the companies' accounting software and internal financial records. D.E. 639-1 at 144. Those financial records confirm that this amount was loaned to Mr. Justice and that he still owes it. D.E. 639-1 at 142-43, 156, 161; 162.

- Those internal records include "Shareholder's Accounts," which show all loans to and from all shareholders and the dates and amounts of all payments. These records are kept on a "net" basis so that the figure shown as owed by or to each shareholder is net of all other similar transactions. D.E. 639-1 at 148; 169-70.

  o These Shareholder Accounts have never been produced. D.E. 673 at 18-19.

  o At his deposition almost a year ago, Mr. Justice repeatedly promised to produce his Shareholder Account, but has never done so. D.E. 638-1 at 146, 147; 149.

- These shareholder accounts are part of the companies' general ledger, which has never been produced. D.E. 639-1 at 155-56. In the Objections, the Defendants confirm the accuracy of the shareholder accounts by stating that an in-house accountant, Will Morrissette, oversees them and that he "make[s] sure to tick and tie every single dollar in and out of the account and what it's going to – and how it should be recorded." D.E. 708 at 12-13.

In short, the evidence is overwhelming that Mr. Justice *did* receive these loans. Both for

24

that reason and because they violated the Discovery Order by not identifying them in a narrative interrogatory response or producing Mr. Justice's Shareholder Account documents, the Court should use the $31,740,101 amount as a measure of a contempt sanction against Mr. Justice.

## IV.    CONCLUSION

For these reasons, the Court should adopt the recommendation to hold a hearing and require the Defendants and Mr. Ball, Mr. Justice, and Dr. Justice to show cause why they should not be held in contempt. At that hearing the Court should hold that based upon the existing record there is a prima facie case for contempt and that the contemnors have failed to establish a defense. The Court should then enter sanctions as follows:

- A factual finding that the companies identified in the Recommended Disposition are the alter egos of Mr. Justice and Dr. Justice and Mr. Ball;
- A contempt fine and an order to pay, up to the amount of the final judgment against Mr. Ball, Mr. Justice, and Dr. Justice, for the reasons stated above and in the Recommended Disposition;
- A contempt fine measured by the amounts diverted by Mr. Justice in connection with the transfer to him of the $13.5 million South Carolina farm property, the total diverted New Lead payments ($7,509,760), and the unpaid "loans" to him ($31,740,101), with the total amount capped at the amount of the final judgment, together with an order directing Mr. Justice to pay that fine to the Plaintiffs within a specified time; and
- An order to pay the Plaintiffs' attorneys' fees and expenses.

/s/ Scott M. Webster
Scott M. Webster
**TOOMS, DUNAWAY & WEBSTER**
1306 West Fifth Street, Suite 200
P.O. Box 905
London, Kentucky 40743
606-864-4145
swebster@toomsdunaway.com
**Counsel for Plaintiffs**

/s/ John A. Lucas
*John A. Lucas (011198)
*W. Edward Shipe (023887)
**BROCK SHIPE KLENK PLC**
265 Brookview Centre Way, Suite 604
Knoxville, Tennessee 37919
865-338-9700
jlucas@bskplc.com
eshipe@bskplc.com
***Admitted pro hac vice***