UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| NEW LONDON TOBACCO MARKET INC., *et al.*, | ) ) | |
| | ) | Civil No. 6:12-cv-00091-GFVT-HAI |
| Plaintiffs, | ) ) | |
| v. | ) ) | **OPINION** |
| | ) | **&** |
| KENTUCKY FUEL CORPORATION, *et al.*, | ) ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on the submission of additional briefing, pursuant to Judge Hanly A. Ingram's November 12, 2025, Order. [R. 830.]  The history of this dispute is long and storied; the post-judgment discovery dispute at the core of this opinion has itself remained ongoing for more than a decade.  Reams of paper and drums of ink have been expended on addressing the unfortunately ongoing struggles in obtaining necessary documentation to permit the Plaintiffs' recovery in this matter.  This Court has long cautioned the Defendants that continued intransigence could result in the ultimate disposition imposed by this Order.  This caution having gone unheeded, those "some-day" warnings ripen today.  The avoidance of accountability through blatant disregard of Court orders, premised on inexplicable and irresponsible business practices, and bolstered by paper-thin declarations, betrays the very concept of our American system of justice.  Accordingly, and for the reasons that follow, the Defendants' Motion to Vacate Sanctions **[R. 781]** is **DENIED**, and, instead, additional sanctions are imposed upon the Defendants.

**I**

The Court need not overly belabor much of the case's factual history, which has been recounted effectively time and time again.  As relevant here, the Court entered a default judgment against the Defendants as a sanction for their failure to comply with discovery. [R. 206.]  Subsequently, Magistrate Judge Hanly A. Ingram conducted a hearing on damages, and the Court subsequently adopted a modified version of his recommended disposition and entered final judgment. [R. 445; R. 446.]  While this was argued on appeal, post-judgment discovery commenced. [R. 471; R. 473.]  Naturally, the Plaintiffs' focus in post-judgment discovery was toward collection, and they sought information pertinent to potentially fraudulent transfers of assets, as well as evidence that the Defendant entities are merely alter-egos of members of the Justice family. [R. 512 at 1-2.]  Almost immediately, the Parties became deadlocked over post-judgment discovery disputes, which continues largely unabated to this day. [*See* R. 489; R. 565 at 3.]

For purposes of this opinion, it is worthwhile to recount, in detail, the gradual progression of post-judgment discovery disputes, and the resulting sanctions.   At an initial hearing regarding discovery, Judge Ingram advised the Defendant entities of their duty to comply with discovery requests, instructed them to document their efforts to comply, directed them to provide audio of the hearing to their clients, and to preserve all documents related to the discovery at issue, regardless of whether they had deigned to produce them yet. [R. 491.]  Judge Ingram also permitted the Plaintiffs to file a motion to compel. [*Id.*]

Unsatisfied with the initial progression of post-judgment discovery, the Plaintiffs moved to compel the Defendants to respond fully to ten interrogatories and eighteen requests for production. [R. 495.]  Although the Defendants objected to certain aspects of this motion, Judge

Ingram disagreed and determined that New London and Fivemile were entitled to full discovery as to the relationship between the Defendant entities because of the complexity of their ownership and interrelationship. [R. 505 at 2.] This culminated in the Discovery Order, entered by Judge Ingram on April 16, 2021, the compliance with which remains in issue. [*Id*.] The Discovery Order also required the Plaintiffs to file a status report "describing the extent of Defendants' compliance with this order." [*Id*.]

The Plaintiffs filed a timely status report, and opined that the Defendants failed to comply with the Discovery Order. [R. 507.] Shortly thereafter, Plaintiffs also moved for sanctions and specifically requested a finding of contempt against the officers of the Defendant entities. [R. 510; R. 512.] Judge Ingram addressed Plaintiffs' motion in a March 23, 2022, Order. [R. 565.] Specifically, Judge Ingram required that Stephen Ball, Jay Justice, Summer Deane, and Jill Justice submit to a deposition by the Plaintiffs, required that the Defendants file a notice that includes any and all privilege logs from the case's outset, and required the Defendants to file a notice of compliance with the Court's prior directive regarding the preservation of documents in this matter. [*Id*. at 18.] Judge Ingram did not, however, hold Jay and Jill Justice personally in contempt, and denied Plaintiffs' request for conclusive factual findings as a form of sanction. [*Id*.] Judge Ingram denied these requests without prejudice, and explicitly provided that they "can be renewed by motion following the depositions." [*Id*.]

Following the depositions, Plaintiffs did, in fact, renew those requests, arguing that, based on the depositions and related discovery, further sanctions and a finding of contempt against three officers/directors were warranted. [R. 673 at 2.] Again, Judge Ingram prepared a recommended disposition and order which recommended an increased regimen of sanctions. [R. 697 at 37.] The undersigned adopted several of Judge Ingram's recommendations, and rejected

3

others in his July 26, 2024, opinion and order. [R. 744.]  For the first time, the Court held Jay

Justice and Stephen Ball in civil contempt for failing to direct the Defendant entities to cooperate

with the Discovery Order, pursuant to Rule 37(b)(2)(A)(vii) and 28 U.S.C. § 636(e)(6). [*Id*. at

25-26.]  At this juncture, Ball and Jay Justice were ordered to pay sanctions in the amount of

$250.00 per day to the Court until such time as the Defendant entities were in full compliance

with the Discovery Order. [*Id*.]  The Court stopped short, however, of adopting Judge Ingram's

recommendation that Defendants be sanctioned under Rule 37(b)(2)(A)(i), by holding that the

Justice companies and their shareholders are alter egos. [*Id*. at 9.]  Further, while the Court

determined that the magistrate judge lacked the jurisdiction to directly order sanctions under

37(b)(2)(A)(i), it still found that his "recommendation provides an accurate rendition of the

record." [*Id*. at 5-9.]  Although the Court did not adopt this highly consequential factual finding

as a sanction at that time, the Court provided:

> The purpose of the post-judgment discovery was to discover facts that would
> support a finding of alter ego.  The Defendants then engaged in abusive practices
> for the sole purpose of frustrating the Plaintiffs' ability to extract the discovery.
> Despite these facts, the Court will abstain from sanctioning the Defendants under
> Rule 37(b)(2)(A)(i).  Although the Defendants' conduct is egregious, declaring a
> factual finding of alter ego at this particular juncture is premature.  That does not
> mean, however, that alter ego will never be found.  It may very well be the case
> that, down the road, the Court will make a finding of alter ego.  The Court will
> welcome a future motion by the Plaintiffs for an alter ego finding if the
> Defendants continue to evade discovery after the entry of this Order.  The
> Defendants are hereby *warned* that if they fail to cooperate, the Court may deem
> it appropriate to enter a finding of alter ego as a discovery sanction.

[R. 744 at 9.]

Unfortunately, the post-judgment discovery abuses did not abate after the imposition of

sanctions.  Several months later, the Plaintiffs filed a second renewed motion for contempt and

sanctions, arguing that the Defendants still failed to comply with the Discovery Order. [R. 770.]

The Court addressed these renewed motions in its February 10, 2025, memorandum opinion and order. [R. 778.]  The Court agreed with Plaintiffs' characterization, finding the Defendants' efforts a "relatively *de minimis* compliance which appears to have taken the Defendants less than ten minutes to procure and provide." [*Id*. at 3.]   The Court again stopped short, however, of levying a contempt fine in the amount of the judgment against Mr. Justice or Mr. Ball.  Instead, the Court substantially increased the daily sanctions of Ball and Justice to $1,000 per day; ordered Justice and Ball to pay, as part of their contempt sanction, the $194,528.95 in attorney fees and expenses previously awarded to compensate Plaintiffs in their pursuit of post-judgment discovery[1]; and established a hard deadline for full compliance with the Discovery Order. [*Id*. at 5-6.]  Specifically, the Court stated that "Defendants SHALL comply with the April 16, 2021, discovery order from Judge Ingram, [R. 505], within thirty (30) days of this order or they will face such other and further relief as may be appropriate." [*Id*. at 6.]  Within twenty-one days thereafter, Plaintiffs were ordered to file briefing on the question of whether the Defendants were in full compliance with the Discovery Order and were further ordered to provide consideration to further remedies, if not.  The Court stated explicitly, "[s]hould these increased penalties remain insufficient the Court will consider more drastic measures." [*Id*. at 5.]  Further, "[a]s to the Defendants' request that the Court instruct the Plaintiffs to cease filing motions in connection with the sanctions order, no such instruction will be forthcoming." [*Id*.]

On March 12, 2025, the Defendants filed a Motion to Vacate Sanctions, requesting that the Court vacate all sanctions against Jay Justice and Stephen Ball for the period after October 25, 2024. [R. 781.]  In essence, the Defendants argue that they have been in full compliance with

---

[1] The amount of fees and expenses was later modified by the Court's February 10, 2025, Order [R. 779] to total $648,366.19.  Additionally, as stated in the Court's order, this amount, as part of the Amended Judgment, is subject to applicable post-judgment interest under 28 U.S.C. § 1961 beginning April 24, 2020, the date of the original Judgment.

the Discovery Order since October 25, 2024, and, having paid their sanctions penalties up until that date, owe no additional sanctions fines to the Court.  The brief contains an itemized explanation of their response to each of Plaintiffs' discovery requests. [*Id*.]  In further support of their contention, Defendants filed a declaration of Ronald H. Hatfield, who serves as the current in-house counsel for the Defendant entities. [R. 781-1.]  The merits of the arguments set forth by the Defendants in this motion are discussed in greater detail later.

Pursuant to the Court's Order, Plaintiffs filed their brief regarding Defendants' compliance with the Discovery Order on April 2, 2025. [R. 783.]  In it they state that "Defendants printed and produced two ledger reports – one for each Defendant for the time period from October 31, 2019 through October 3, 2024." [*Id*. at 3.]  The Plaintiffs opined that the ledgers "prove that the Defendants have withheld obviously responsive documents about previously undisclosed asset transfers structured by Mr. Justice and Mr. Ball to deplete the Defendants' assets." [*Id*. at 12.]  They further claim that, by their estimation, approximately $302,489,686 in assets remain concealed by the Defendants in post-judgment discovery. [*Id*. at 18.]  Plaintiffs also provided that they deemed the March 12, 2025, supplemental interrogatory responses inadequate, because they merely cite to the record instead of providing full narrative responses, as requested. [*Id*. at 6.]  Consequently, the Plaintiffs request additional sanctions, including specifically those which the Court has threatened in the past but stopped short of imposing. [*Id*. at 19.]  Plaintiffs also, separately, filed a Motion to Strike the Defendants' Motion to Vacate, arguing that it was a disguised, untimely motion for reconsideration. [R. 787; R. 788.]

The Defendants filed a further brief on April 23, 2025, which attempted to recharacterize their Motion to Vacate and oppose the Plaintiffs' Motion to Strike. [R. 792.]  In this briefing, the Defendants provide that they intended the motion to actually represent a comprehensive "brief

explaining, in considerable detail, that Defendants have complied with their discovery obligations." [*Id*. at 1-2.]  Insofar as the motion requests relief from the Court, the Defendants provide that they seek "to vacate *ongoing* sanctions that are subjective Defendants' officers to massive financial penalties," which they characterize as "manifest injustice[.]" [*Id*. at 2.] (emphasis in original).  The following month, the Defendants filed tens of thousands of pages of documents in the record, and requested that the Court review the documents in camera to reach its own conclusions regarding compliance. [R. 796-R. 824.]

Concluding that "the parties have radically divergent views" of whether Defendants have satisfied their post-judgment discovery obligations at this point, Judge Ingram correctly stated that the "key question now is whether Defendant's item-by-item explanation of their discovery compliance is accurate." [R. 830 at 8-9.]  In lieu of a hearing, Judge Ingram ordered Mr. Hatfield to submit to a deposition regarding the contents of his declaration at [R. 781-1]. [*Id*. at 9.]  Judge Ingram further ordered that within fourteen days of receiving the transcript of Hatfield's deposition, the Plaintiffs shall file a supplemental brief regarding the post-judgment discovery compliance. [*Id*. at 10.]  The Defendants, in turn, were also ordered to file a response brief.  This additional briefing having been received, the Court rescinded the referral to Judge Ingram on May 14, 2026. [R. 847.]  Consequently, and in view of the foregoing, these motions and briefs are now ripe for judicial review. [R. 838; R. 845; R. 846.]

**II**

**A**

Beginning with their Motion to Vacate Sanctions, the Defendants have taken the position that they are in full compliance with their post-judgment discovery obligations.  In their own words, "Defendants have fulfilled their duty to act in good faith and make a reasonable effort to

comply with Plaintiffs' discovery requests." [R. 845 at 3.]  Plaintiffs reach the opposite conclusion regarding the Defendants' compliance.  In an extensive brief, Plaintiffs recount in detail eight exemplars of relevant information they seek, to which the Defendants have responded inadequately. [R. 838-1 at 9-20.]  Defendants seek to bolster their purported compliance upon the Hatfield Declaration, in which the Defendants' in-house counsel avers that Defendants have disclosed the full extent of available documents and information. [R. 781 at 9-13; R. 781-1.]  In light of the evidence before it, the Court concludes that the Defendants remain non-compliant with their post-judgment discovery obligations and the prior orders of this Court related thereto.

The Defendants' contention essentially amounts to an argument that they are unable to comply any further with their post-judgment discovery obligations, and, relatedly, present this as a defense to civil contempt.  The Sixth Circuit has provided that the present inability to comply suffices as a defense to civil contempt where the party can show "(1) that they were unable to comply, explaining why categorically and in detail; (2) that their inability to comply was not self-induced; and (3) that they made in good faith all reasonable efforts to comply." *Elec. Workers Pension Tr. Fund of Local Union #58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 381 (6th Cir. 2003) (quoting *Chicago Truck Drivers Union Pension Fund v. Brotherhood Labor Leasing*, 207 F.3d 500, 506 (8th Cir. 2000)).  "When evaluating a defendant's failure to comply with a court order, we also consider whether the defendant 'took all reasonable steps within [its] power to comply with the court's order." *Id.* at 379 (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989)).  Courts addressing such arguments have observed that contemnors face an "'especially high' burden of proving inability." *Chicago Truck Drivers*, 207 F.3d at 506 (citing *Federal Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999)).

Even presuming that the Defendants' proffered explanation of their failure to comply is sufficiently detailed as a matter of procedure, the Defendants still fall well short of meeting their burden.  Although the Plaintiffs provide numerous examples of the Defendants' ongoing deficiencies, the Court need not recount each one here.  For each example provided, the Plaintiffs provide a specific transaction, discuss the Defendants' response, or lack thereof, to the corresponding request for production or interrogatory, and conclude with a list of documentation which should be present, but is not.  It is also worth noting that the transactions are nothing new; the Plaintiffs have repeatedly briefed the Court over many years on these transactions and the corresponding discovery issues with each.  Here, several examples are sufficient to demonstrate the inconsistencies between the Parties' positions.

The first batch of documentation the Plaintiffs seek relates to an unknown number of loans between JCJC and its shareholders, the handling of which could provide critical information relevant to their alter ego claim. [R. 838-1 at 11-12.]  The Defendant entities' tax returns and ledger sheets reveal a number of loan transactions between the Defendant entities and its shareholders.  Prior briefing on these transactions provides greater clarity.  The Plaintiffs provide that the tax records indicate cash transfers from JCJC to its shareholders totaling more than $159 million between 2014 and 2019. [R. 512 at 16.]  Defendants have attempted to explain these transactions in several, apparently inconsistent, ways.  As a whole, the Defendants provide that the transfers represent repayment of prior loans from the shareholders to JCJC but fail to provide any documentation about the underlying loans or these repayment transactions. [*Id.*]  Regardless, Defendants contend that documentations are merely "hypothetical" and claims that the documents do not exist and never have existed. [R. 845 at 4.]  Further, the Plaintiffs provide that prior depositions from Defendants' officers indicate that "these loans were negotiated orally

and repaid in bushels of corn or other untraceable barter, because there are not even any accounting records of the payments." [R. 512 at 16.]  Plaintiffs therefore contend that these loans amount to phantom transactions and were used to conceal fraudulent transfers under the guise of legitimate, yet undocumented, loans worth tens of millions of dollars.

Plaintiffs also seek another set of documents related to the sale of the Mt. Pleasant property in 2022.  The JCJC ledger contained a May 31, 2022, entry altering a prior journal entry attributing $1,046,400.76 from a prior sale of the Mt. Pleasant property to a Jay Justice loan. [R. 838-1 at 12-13.]  To date, the Defendants produced three deeds which show transfers of the Mt. Pleasant property, in 2012, 2014, and 2022, respectively, but produced nothing further. [*Id*.]  The Defendants' interrogatory responses reveal an apparent contradiction between the deeds and the ledger entry. [*Id*.]  The Defendants state that JCJC purchased the Mt. Pleasant property in 2012 for $2.5 million, which matches the deed, and that the property was included in the Carter Bank refinancing. [*Id*.]  The Defendants provide that the property was then conveyed in 2014 to an affiliate, Justice Farms of North Carolina, which again pledged the property to Carter Bank as security for money loaned to Justice Farms. [*Id*.]  Plaintiffs provide that this creates a conflict because "the journal entry shows $1.046 million of consideration for the transfer while the deed itself shows no consideration." [*Id*.]  The Defendants finally provide that the property was again conveyed in 2022 to Tiger Hill Holdings IX, LLC, for $1.6 million, and that the proceeds were used to reduce the Carter Bank debt secured by the property. [*Id*.]

Plaintiffs contend that more documents must exist to show critical information about the 2014 and 2022 transactions, both of which occurred after this case commenced.  Specifically, the Plaintiffs seek documents that show "what series of agreements in 2014 resulted in a change to the Jay Justice loan account[,]" and "why JCJC made a ledger entry in 2022 following the sale of

10

another company's (Justice Farms) asset[.]" [*Id*.]  Given the nature of these real estate conveyances, Plaintiffs argue that these documents must exist, and even if they are not in the possession of the Defendant entities, they are within their control.  And, in the absence of these documents, Plaintiffs argue that "the Defendants are obligated to provide a complete narrative description under oath.  Either way, the Plaintiffs are entitled to trace and find these funds." [*Id*. at 14.]  Plaintiffs state, "[w]ithout these documents, it is entirely possible that the May 31, 2022, journal entry simply forgave over $1 million of debt owed by Jay Justice." [*Id*.]  The Defendants, for their part, simply state again that the documents Plaintiffs seek do not exist, and that Defendants are under no obligation to create new documentation. [R. 845 at 4.]

Similarly, Plaintiffs also seek documents related to some thirty-one real property transfers for no considerations made by the Defendant entities, including, notably, the transfer of farm property to Jay Justice. [R. 838-1 at 16-17.]  The Plaintiffs provide that after they independently discovered the 31 transactions, the Defendants belatedly produced deeds for 16 of the transfers, only one of which included additional deal documents. [*Id*.]  As to the farm transfer, the Defendants provided that Jay Justice gave $13.5 million in consideration for the farm, and then pledged the property to Carter Bank. [*Id*.]  The property remained pledged to Carter Bank until 2018, when Justice pledged the property to Rabo Agrifinance, then used that loan to pay down the Carter Bank debt. [*Id*.]  As to the remaining transactions, the Plaintiffs acknowledge that responses were provided for some of them, but key contextual details remain missing for all 31 transactions.  Plaintiffs contend that "[t]he transfer to Mr. Justice and the other no-consideration transfers were likely fraudulent and likely a source of collection, but the Defendants have not produced the documents or provided a complete narrative response to explain the who, what, when, and where of these transfers." [*Id*.]  Moreover, Plaintiffs contend that "the Defendants

11

have done nothing to show consideration changed hands, such as the $13.5 million for the farm transfer[,]" because the Defendants have chosen to conceal this information. [*Id*.]  Again, Defendants state simply that the documents Plaintiffs seek merely do not exist. [R. 845 at 4.]

Lastly, Plaintiffs seek additional information regarding the Defendants entities' intercompany and investment accounts, which were revealed on the JCJC ledger. [R. 838-1 at 19-20.]  Specifically, the JCJC ledger reveals some 36 accounts labeled as Intercompany Accounts (receivables) with a value totaling more than $143 million. [*Id*.]  Further, the ledger shows 18 accounts demonstrating investment in affiliates totaling more than $72 million. [*Id*.] Plaintiffs provide that the Defendants have provided neither documents nor narrative responses relating to these intercompany accounts and affiliate investments.  The Plaintiffs contend that "[t]he Defendants can acquire complete and detailed bank records for all 54 accounts, but they fail to provide any records showing these massive transfers." [*Id*.]  Plaintiffs further opine that "[t]hese accounts should be a source of collection for the Plaintiffs, but the Defendants have entirely refused to produce any documents, written explanation, history, aging, or status of these assets." [*Id*.]  As to these accounts, Defendants state that "Plaintiffs speculate that each of these ledger accounts should have had a corresponding bank account and attendant records, but their speculation is utterly unfounded." [R. 845 at 4.]

The foregoing demonstrates that the Defendants, at this juncture, rest their argument on a single response – the documents Plaintiffs now seek in post-judgment discovery simply do not exist.  Therefore, they provide that they have now fully complied with the Court's orders, and they are absolved of any future obligations.  In their view, Plaintiffs would be well-advised to walk away empty-handed, because the Defendant entities' have no ability to pay the judgment, and there are no further documents which could potentially lead them to recoverable assets.

12

Relatedly, they further argue that Justice and Ball scraped the bottom of the discovery barrel on October 25, 2025, and should not be required to pay the Court any contempt fines which accrued after that date.

This argument, however, fails to adequately demonstrate the Defendants' present inability to comply with the Court's orders under the standard articulated by the Sixth Circuit. First, and foremost, the Defendants have failed to demonstrate at all that their inability to provide the requested documents, and thus comply with the Court's discovery order, is not self-induced. If the Court were to adopt Defendants' argument wholecloth, future parties could shirk post-judgment responsibilities and ultimately avoid paying a judgment merely by avoiding a paper trail on any significant business transactions. In other words, the Defendants ask the Court to reward them for engaging in what amounts to an entirely inexplicable, and totally unreasonable, business practice.

As an additional matter, the Court has already rejected a similar argument raised by the Defendants, finding that the Defendants could not avoid the disclosure of electronic bank statements because they were required to disclose documents not only in their possession but also in their control. [R. 505 at 2-3.] The Court has also previously rejected the Defendants' argument that they do not normally maintain the kind of documents Plaintiffs seek, stating "Plaintiffs have produced adequate evidence to show that the Justice affiliates have engaged in transactions, for which records exist, that Defendants have failed to produce in defiance of the Court's order." [R. 565 at 11.] Put simply, documents of the sort that Plaintiffs seek should exist and, insofar as they are missing, such absence can be attributed only to intentional decisions undertaken by the Defendants.

Further, the inadequacy of Defendants' narrative responses cannot reasonably be

premised on a lack of available information. While the Defendants may not want to disclose detailed information regarding their transactions, for business reasons or otherwise, the bottom line is that the Court has ordered them to do so and they have refused. In other words, any inability the Defendants possess to comply with post-judgment discovery, and the Court's orders related thereto, can only be rationalized as self-induced.

Although the self-induced nature of their non-compliance alone renders their defense inapplicable, the Court further finds that the Defendants have likewise failed to demonstrate that they have made in good faith all reasonable efforts to comply with the Court's discovery order. One could argue that the mere fact that the Court now writes yet another opinion related to post-judgment discovery intransigence more than a decade after judgment was entered alone disproves a good faith effort to comply. More narrowly here, however, the Court finds that the Defendants have not demonstrated a good faith effort to reasonably comply with the Court's discovery order since the Court provided the Defendants with another opportunity to comply with the additional impetus of heightened sanctions on their officers. In fact, we are in no materially different position now, in terms of discovery compliance, as we were then. Although the Defendants provided additional documents and responses to the Plaintiffs, key information remains missing, and as discussed above, some of the disclosed information created more questions than answers. More concerning, it seems as though we have reached the last station on the line – Plaintiffs still seek documents and information while the Defendants now claim that all discoverable documents have been provided and that they are in full compliance. At any rate, Defendants have not made a good faith effort to comply with post-judgment discovery, now or ever, and indicate no intention to do so in the future.

Moreover, and perhaps even more fatal to Defendants' arguments, the Defendants' claim

14

that it took all reasonable steps within their power to comply with the Court's order relies exclusively on the Hatfield Declaration. The Plaintiffs' deposition of Hatfield, however, reveals that the foundation of this critically important declaration rests on mere quicksand. This further torpedoes Defendants' purported defense for failing to comply by further demonstrating that they have not made a good faith effort to do so. Given the length and broad scope of the Hatfield deposition, the Court will not recount it here verbatim. [*See* R. 839.] Several key deficiencies are sufficient to illustrate its frailty. In total, Plaintiffs summarized the Hatfield Declaration as follows, in light of his deposition, "Mr. Hatfield's deposition revealed that the purpose of his Declaration was not to show that the Defendants had complied with the Discovery Order, it was to show that *he* passed on everything that had been given to *him*." [R. 838-1 at 27] (emphasis in original).

First, Hatfield has minimal knowledge as to the Defendants' corporate record keeping practices and procedures. [R. 838-1 at 30-31.] Hatfield stated that he received no training on the Defendants' document storage system since he was hired in 2021, and was provided direct access only to the documents contained within the legal folder. [*See* R. 839-1 at 11-15.] In Plaintiffs words, "[h]e has a complete lack of personal knowledge on where and how the Defendants maintain their corporate records." [R. 838-1 at 30.] In the Plaintiffs' view, "[t]his completely removes Mr. Hatfield's ability to test the validity of his clients' claims or even ask the appropriate probing questions." [*Id.*] The Court agrees.

Second, Hatfield has minimal personal knowledge regarding the business transactions in which the Defendant entities, or their affiliates, are engaged in. [R. 838-1 at 31-32.] Hatfield provided that, as General Counsel of Litigation, he was not involved in the business transactions and was only made aware of them when they became the subject of litigation. [R. 839-1 at 8-9.]

15

Consequently, Hatfield stated that he was unaware of which people were involved in the various transactions, whether the Defendants possessed any non-documented information about the transactions, or who acted on the Defendants' behalf in the transactions. [*Id*.]  He also provided that he lacked personal knowledge on the topics at issue in post-judgment discovery, including the general ledgers [*Id*. at 27-29, 37]; balance sheets [*Id*. at 31.]; loan applications [*Id*. at 32.]; documented and undocumented assets [*Id*. at 41.]; tax returns [*Id*. at 42.]; and audits [*Id*. at 43.]. In other words, Hatfield's knowledge is derived almost exclusively from the information provided to him by Justice and Ball.  In the Plaintiffs' view, "[b]y walling him off from the Defendants' record keeping and transactions, the Defendants ensured that Mr. Hatfield is completely ignorant as to how these transactions were tracked and recorded.  But that does not mean these documents and information do not exist – it just means the Defendants and their officers decided not to tell Mr. Hatfield." [R. 838-1 at 32.]

Third, Hatfield engaged in minimal investigation into the foundation of his assertion before signing it and its filing with the Court. [R. 838-1 at 32-35.]  As to the existence of any relevant, discoverable emails, the Plaintiffs aver: "Mr. Hatfield neglected to investigate at all. He could not say whether he directed any searches for responsive emails, who performed the searches if they were done, whose emails were searched, or what search terms were used." [*Id*. at 33; R. 839-1 at 3-4.]  His investigation with respect to text messages was much the same. Plaintiffs provide "Mr. Hatfield did not know whether the Defendants had produced any text messages in this matter.  Without knowing what the Defendants have produced so far, Mr. Hatfield has no ability to know what has not been produced and cannot opine on the completeness of the Defendants' production." [R. 838-1 at 33; R. 839-2 at 2-3.]  Hatfield also could not say whether the Defendants had ever searched phones for the text messages at issue.

[*Id.*]  In other words, "[t]he only thing Mr. Hatfield knew is that *he* did not perform any searches for text messages." [*Id.*] (emphasis in original).

Fourth, Hatfield did not make a good faith effort to ascertain any information regarding the relationship between the Defendant entities and their affiliates.  The Plaintiffs opine that Hatfield's deficiency here is twofold. [R. 838-1 at 34.]  To begin, Hatfield stated that he does not know who the Justice affiliates are and made no effort to ascertain that information. [Id.; R. 839-1 at 48, 66.]  And, when confronted with the Plaintiffs' list of affiliates[2], as derived from their independent investigation into public records, Hatfield recognized only 45 of the 159 entities. [R. 838-1 at 34; R. 839-1 at 48-66.]  Further, Hatfield provided that he never asked the client representatives – including Jay Justice and Ball – about any transactions between the client and the affiliates. [R. 838-1 at 34; R. 839-1 at 44-45.]  This means, in Plaintiffs' view, that it is impossible to ascertain who the aforementioned loans should have been classified to, or the location or existence of documents related to those transactions.  In other words, without knowledge of who the affiliates are, or any attempt to learn about affiliate transactions, Hatfield was ill-equipped to attest that all discoverable documents were provided.

Fifth, and finally, Hatfield did not meaningfully investigate the specific business transactions for which there are missing documents discussed above, and thus his declaration is founded upon ignorance. [R. 838-1 at 35-38.]  Plaintiffs present numerous examples of specific transactions, for which they have long sought documentation and in reference to which Hatfield declared that no such documents exist.  The deposition, however, revealed that Hatfield lacked a foundation upon which he could reasonably base his declaration as to these specific subcategories of information.  For example, Hatfield stated that he did not personally investigate

---

[2] Plaintiffs' list of Justice affiliates is located in the record at [R. 514-2].

17

the $159 million JCJC shareholder loans, and could not recall whether he had even spoken to Justice about them. [R. 838-1 at 35; R. 839-2 at 4.]  Further, he did not investigate the Mt. Pleasant transaction, and admitted he had never used the general ledger documents and entries to form the basis of questions to his client, in an effort to locate documents or otherwise.  The same is true of the 31 no-consideration transfers of property, the intercompany accounts and investments, the Southeast Cotton property proceeds, the Fivemile asset sale, or the Mechel contingent payment, despite him having knowledge that these subjects were the core of the ongoing discovery dispute.  [R. 838-1 at 36-38; R. 839-2 at 4-10.]

When faced with this protracted discovery issue in his role as General Counsel of Litigation, a prudent individual would take even some minimal steps to inquire further before attesting to the fact that documents related to these topics do not exist.  To add insult to injury, the Defendants then utilized this declaration to seek vacation of their contempt sanctions by claiming full compliance.  With millions at stake in potential contempt sanctions, both real and threatened, the Defendant entities along with Justice and Ball took yet another attempt to hide behind a house of cards.  When this feeble declaration was put to the test, it unsurprisingly crumbled because Hatfield lacked a foundation for his assertions to an almost baffling degree.

In view of the foregoing, Hatfield's statement is essentially a trap for the unwary: "I make this Declaration from my personal knowledge gained from discussions with other personnel of Defendants, and after a review of Defendants' files made available to me." [R. 781-1 at 1.]  This is true on its face; yet the deposition unmasks a more accurate interpretation.  What value does such an assertion have when the declarant's personal knowledge is gained not from his own investigation, but merely by taking at face value the same dismissive assertions from Ball and Justice this Court has heard for more than a decade?  How can his "review of

Defendants' files made available to me" have any weight when the deposition reveals that he had access only to the legal folder, and had essentially no knowledge of the Defendants' document management system?  Thus, the Court is left with the inescapable conclusion that Hatfield truthfully lacks knowledge of discoverable documents because he has been told so by Ball and Justice and has taken no meaningful steps to determine otherwise.  However, such "see no evil, say no evil" arguments cannot pass muster before this Court.

The Defendants do not even dispute the Plaintiffs' recounting of the key aspects of the Hatfield deposition.  They state flatly, "Plaintiffs complain at length that Mr. Hatfield's knowledge of Defendants' discovery production was essentially derivative of Mr. Ball's.  But Mr. Hatfield never contended to the contrary.  Mr. Hatfield unambiguously stated under oath that 'I make this Declaration from my personal knowledge gained from discussions with other personnel of Defendants, and after a review of Defendants' files made available to me.'" [R. 845 at 5.]  The Defendants essentially ask Plaintiffs, and the Court, to reverse a decade of findings as to their noncompliance on the back of what they themselves acknowledge is a parroted declaration.   Defendants reiterate this by stating, "[p]erhaps Plaintiffs should confront the reality that those responses are, in fact, complete." [*Id*. at 6.]  Rather than even attempting to reinforce the credibility of Hatfield's declaration, Defendants essentially double down on their argument that no further documents exist and that they are fully compliant with the discovery order, and have been for some time.  But, as already discussed at length here, the record, now and over the last decade, strongly suggests otherwise.

The Defendants further claim that insofar as the documents Plaintiffs seek actually exist, they are in the possession of various non-parties to this suit and are discoverable only to the extent of the Court's subpoena powers.  Plaintiffs write that "in choosing to pursue the judgment

19

of record here against solely the two Defendants, Plaintiffs must accept that some of the evidence they seek through ordinary discovery requests are improperly directed at entities not parties to this case[.]" [R. 845 at 2.]  Moreover, they provide that, with respect to these affiliates, "[m]any or most are not subject to being subpoenaed in this district[,]" thus, "[t]he duty to produce affiliate discovery in response to Plaintiffs' requests can extend only to those materials in Defendants' possession or control that relate to those affiliates." [*Id.*]  In effect, the Defendants claim that even where these documents may exist, they are in the possession and control of non-party affiliates and are beyond the reach of this Court.

This argument misses the point, however.  The Defendants' failure to comply with post-judgment discovery, and the resulting sanctions, do not stem from the Defendants' failure to provide documents in the full custody of non-parties.  Rather, Plaintiffs' position is that either the Defendant entities are in possession of the documents and are refusing to cooperate, or they have acted intentionally to avoid creating and maintaining discovery documents.  Put differently, Plaintiffs argue that the Defendants are either intentionally non-compliant with discovery, or their inability to comply is self-induced through their conscious decision not to maintain basic documentation on multi-million-dollar business transactions.  Plaintiffs do not seek the affiliates' documents here, nor has the Court ordered affiliates to provide such documents.  Rather, the discovery order requires disclosure of basic documentation which the Defendants have, or should have, in their own possession.  Even more so, Judge Ingram and Plaintiffs' efforts to shed more light on this issue were ultimately inconsequential, since their assertions were premised upon the declaration of Mr. Hatfield, whose deposition revealed that he lacked a credible foundation for most, if not all, of his assertions.  Further, as the Court has stated already when faced with a similar argument from the Defendants, "the complexity of the ownership and relationship among

20

these business entities is the *reason* that further discovery is proper." [R. 505 at 2.]  While there may have come a day when the Court might more clearly differentiate which categories of information pertain to Defendants, rather than to their affiliates, the Court remains unable to do so where even basic information as to that relationship remains intentionally shrouded in a cloak of mystery.  Again, untangling the web to discover key information regarding the relationship between the dozens of Justice-owned entities is the key purpose of the post-judgment discovery. To that end, Defendants' argument regarding documents in the sole possession or control of nonparty affiliates seeks to divert the Court's attention from the core issue.

In other words, either way the cake is cut the Defendants' arguments are unavailing.  In a sense, they are inherently contradictory.  Suppose the Defendants are withholding the truth, and that the documents sought by the Plaintiffs do, in fact, exist.  This amounts to a bald refusal to comply with the Court's duplicative orders and sanctions are exceedingly appropriate.  On the other hand, suppose the Defendants are being truthful and that the documents sought by the Plaintiffs do not, and have never, existed.  This presents more questions than answers.  Take for example the $157 million balance sheet loan to the company's shareholders, namely, Jay Justice. The Defendant entities claim that there are no documents memorializing this transaction other than its identification on the ledger sheet.  What justification would a company have for failing to adequately document a loan worth tens of millions of dollars?  Defendants fail to provide an adequate explanation, and their attempt to hide behind the Hatfield deposition falls flat on its face.  At a minimum, however, the lack of documentation for such transactions bolsters Plaintiffs' long-held suspicions that the Defendant entities are mere alter egos of the Justice family.  If the parties had truly *loaned* the money, i.e., they sought eventual repayment, they would have taken some minimal step to document it.  On the other hand, if the "loans"

21

essentially amounted to Justice moving the money from one quasi-personal bank account to another, logic suggests that significantly less documentation would be needed.  So, supposing *arguendo* that the documents truly do not exist, this points strongly to the fact that the Defendant entities are merely an alter ego of the Justice family's own personal assets and accounts.  Thus, regardless of whether the document actually exist, the sanctions continued, and further imposed, today are warranted.  Either the discovery documents do exist, and Defendants are concealing them in violation of Court orders; or they do not exist, which can only conceivably be explained by the alter ego nature of the entities and the Justice family members.

To clarify, the Court's continued imposition of sanctions levied personally against Justice and Ball, does not rest upon this inferential basis.  Rather, these sanctions rest firmly upon the Defendants' well-demonstrated failure to comply with countless post-judgment discovery orders and their continued efforts to delay, distract, and subvert recovery.  This outcome has been forewarned for years and should come as little surprise.  Nonetheless, this logical exercise demonstrates that regardless of whether the Court buys the Defendants' averments as truthful as to the existence of the documents, the imposition of personal liability upon the Justice defendants is the appropriate next step at this juncture of the case.

To summarize, the Plaintiffs have demonstrated by clear and convincing evidence, as they have done several times before, that the Defendants did not comply with a Court order of which Jay Justice and Stephen Ball had knowledge.  To be more specific, this is the Discovery Order, and subsequent orders related thereto, requiring compliance with their post-judgment discovery obligations.  The Defendants, in turn, have not provided sufficient evidence to prove a present inability to comply with the Discovery Order.  Consequently, and pursuant to the precedent of the Sixth Circuit, the Court finds that Justice and Ball remain in contempt for their

continued failure to comply with Judge Ingram's Discovery Order. At bottom, the current sanctions regime has proven ineffective in fostering compliance. To tie the bow upon the lingering aspects of Defendants' Motion to Vacate Sanctions [R. 781], the motion must be denied, as Justice and Ball remain non-complaint with their discovery obligation and, thus, are also non-compliant with the Court's orders.

## B

Considering the foregoing, the Court again finds itself at an all too familiar crossroads. The Defendants, more than a decade from the entry of judgment, remain non-compliant with the post-judgment discovery process. Even more egregious, the Defendants remain non-compliant with several prior Court orders requiring their compliance. This, in turn, has resulted in the gradually escalating contempt sanctions levied against Justice and Ball personally, and which continue to accrue as of the date of this Order. Much remains unclear regarding the Defendants' assets, their alleged lack thereof, and the opaque interplay between the Defendant entities, other companies in the Justice family's business empire, and the Justice family personally. This much is clear, however: the sanctions regime currently in place has been ineffective. At this juncture, the Court is left with little choice but to impose the most drastic of sanctions, long forewarned but never implemented, to force compliance with post-judgment discovery.

As discussed in further detail below, the Court finds that two additional remedies are appropriate at this time. First, the Court will enter a conclusive finding of fact, to the effect that the Defendant entities and their shareholders are alter egos, as a further contempt sanction. Second, the Court will levy a contempt fine against Justice and Ball in the full amount of the outstanding judgment against the Defendant entities. The Court will address the foundation for each of these sanctions in turn.

**1**

The Court will first sanction the Defendants by entering a conclusive finding of fact that the Defendant entities and their shareholders are alter egos.  To reiterate, Judge Ingram sought to impose this non-contempt sanction in his March 28, 2023, recommended disposition and order. [R. 697.]  The Defendants objected and argued that the magistrate judge lacked the authority to impose such a sanction under Rule 37(b)(2)(A)(i) and could instead only recommend such sanctions to the district judge for adoption. [R. 708.]  Although the Court agreed with Defendants that the magistrate judge lacked the authority to impose the sanction, it agreed with Judge Ingram's underlying reasoning for imposing the sanction in view of the facts, and "concur[red] in his conclusion that a sanction under Federal Rule of Civil Procedure 37(b)(2)(B) is appropriate." [R. 744 at 7.]  Nonetheless, the Court stopped short of imposing the alter ego finding as a sanction at that time, effectively giving the Defendants an additional opportunity to comply with post-judgment discovery directives.  It specifically warned Defendants, however, that continued intransigence could result in revisiting it as a future sanction. [*Id*. at 9.]  Now, several years later and discovery in materially the same place, the time has come to revisit this well-trodden ground.

Rule 37(b)(2)(A) provides that where a party fails to obey a discovery order, the court may impose sanctions "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed. R. Civ. P. 37(b)(2)(A).  The Court has broad discretion to fasten an appropriate sanction under Rule 37(b).  See *Consumer Fin. Prot. Bureau v. Brown*, 69 F.4th 1321, 1329 (11th Cir. 2023) (citing *Marshall v. Segona*, 621 F.2d 763, 766 (5th Cir. 1980) ("The bandwidth of the District Court's power to impose Rule 37 sanctions is broad indeed.  We will not interfere unless … there has

24

been an abuse of discretion.")); see also *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 412 (5th Cir. 2004) (affirming the district court's finding of alter ego as a Rule 37(b)(2)(A) discovery sanction reviewed for abuse of discretion). This broad discretion is afforded to district courts because "[a] judge's decision as to whether a party or lawyer's actions merit imposition of sanctions is heavily dependent on the court's firsthand knowledge, experience, and observation." *Id*. (quoting *Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996)).

The Supreme Court has instructed that discretionary sanctions under Rule 37(b)(2) which a district court may invoke must be "just" and "specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982). The Fifth Circuit has noted that "deeming the establishment of certain facts is one of the least harsh sanctions available to courts under Rule 37(b). Indeed, it is only more severe than the granting of expenses and attorneys' fees." *Chilcutt v. United States*, 4 F.3d 1313, 1320 n. 17 (5th Cir. 1993). Multiple appellate courts have upheld a district court's establishment of alter ego as a Rule 37(b)(2)(A) discovery sanction. See e.g., *Global NAPs, Inc. v. Verizon New Eng. Inc.*, 603 F.3d 71, 93-94 (1st Cir. 2010) (affirming default judgment on alter ego claim that was entered as discovery sanction); *Compaq*, 387 F.3d at 412-14 (affirming in part district court's finding of alter ego as a discovery sanction under Rule 37(b)(2)(A)(i)).

The purpose of the post-judgment discovery was to discover facts that would support a finding of alter ego. The Plaintiffs sought such a finding to bolster their ability to recover the judgment from the Defendant entities, in view of the dense web of numerous other closely held corporations of which the Justice family are the shareholders. The Court has found, time and again, including within this order, that the Defendants have failed to cooperate with their post-

25

judgment discovery obligations.  Furthermore, the Defendants have been afforded additional opportunities to comply since the Court last warned of this potential sanction.  These warnings having gone unheeded, the time has arrived to place them into effect.  Consequently, the Court finds, under Rule 37(b)(2)(A)(i), that the companies owned and controlled by members of the Justice family, set forth at [R. 662-1] and [R. 662-5] are the alter egos of the Defendant entities' shareholders – namely Jay and Jill Justice.

**2**

The Court also finds that additional contempt sanctions are warranted as to the Defendant entities' officers which the Court has found chiefly responsible for the ongoing intransigence – namely Jay Justice and Stephen Ball.  It is prudent to recount briefly the evolution of the contempt sanctions against Justice in Ball over the history of this case.  On July 26, 2024, the Court adopted the recommendation of Judge Ingram to hold Jay Justice and Ball in contempt, as officers/directors of Defendant entities, for their failure to comply with Judge Ingram's discovery order. [R. 744 at 24-26.]  In fashioning the appropriate sanction, the Court concluded that a per diem civil penalty was appropriate to compel the Defendants' obedience. [*Id*. at 22.]  It therefore imposed an initial sanction of $250 per day until the Defendants were in full compliance.  Although Plaintiffs sought, and Judge Ingram recommended, a contempt sanction equal to the full amount of the judgment, the Court concluded that such a sanction was then "premature." [*Id*.]  The Court explicitly stated, however, that a future day may come where such a sanction is warranted.

The Court revisited the contempt sanctions regime on February 10, 2025, on renewed motion by the Plaintiffs and another recommended disposition and order from Judge Ingram.  After finding that the Defendants' were still not fully compliant with the discovery order, the

Court increased the per diem penalty to $1,000 per day, and also ordered Justice and Ball to pay, as part of the contempt sanction, the full amount of attorney fees and expenses awarded to compensate Plaintiffs in their pursuit of post-judgment discovery. [R. 778 at 5-7.]  The Court again, however, stopped short of levying a contempt fine in the amount of the judgment.  Instead, it "[took] note of Plaintiffs' alternative suggestion of ratcheting up the penalties and establishing a hard deadline for full compliance with the discovery order[.]" [*Id*. at 4.]  The Court again expressly stated, "[s]hould these increased penalties remain insufficient the Court will consider more drastic measures." [*Id*. at 5.]

While the Court has already considered the appropriateness of contempt and found that it was proper in this case – because Justice and Ball had knowledge of Judge Ingram's order and chose to ignore it – it will nonetheless briefly reiterate the legal standard for imposing contempt sanctions.  A sanction imposed upon a finding of civil contempt is "designed to compel future compliance with a court order" and is "considered to be coercive and avoidable through obedience." *Int'l Union United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).  To reflect the serious nature of contempt, "courts must exercise the contempt sanction with caution and use '[t]he least possible power adequate to the end proposed.'" *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 795, 799 (6th Cir. 2017) (quoting *United States v. Wilson*, 421 U.S. 309, 319 (1975)).  But "[t]he power to shape the appropriate remedy for a finding of contempt lies squarely within the discretion of the district court." *Paterek v. Vill. of Armada, Michigan*, 801 F.3d 630, 644-45 (6th Cir. 2015).  The Court will only be reversed if it "relied upon erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Gascho*, 875 F.3d at 800 (citing *Elec. Workers*, 340 F.3d at 378).

The continued failure of Justice and Ball to effectuate full compliance with the Court's

27

discovery order, despite having full knowledge of it, are well-documented including in this order. The egregiousness of this non-compliance is made all the more clear from their refusal to cooperate in the face of the gradually increasing per diem penalty.  In fact, after paying approximately one week's worth of sanctions penalty, Ball and Justice ceased payments to the Court.  To date, Ball and Justice owe more than one million dollars from the per diem contempt fines, exclusive of the additional amount owed in the form of costs and attorney fees associated with post-judgment discovery.  These sanctions have failed to accomplish the core objective of contempt sanctions – to force compliance with the Court's order.

Therefore, the Court is left with little alternative other than to increase the imposed sanction, lest the Defendants continue to shirk the Court's orders with impunity.  More specifically, a contempt sanction in the full amount of the judgment is warranted at this time, in view both of the continued disregard of the Court's discovery order and the continued ineffectiveness of the per diem sanctioning regime.  Furthermore, in view of the Defendants' failure to comply as of the date of this order, the Court will enforce the per diem sanction from the date of its imposition until the date of the entry of this Order.  Although this amount will no longer accrue upon entry of this Order, Justice and Ball will nonetheless be responsible for paying that amount, in full, to the Court.

**3**

Third, and finally, the Plaintiffs also request the Court to order the direct repayment of specific amounts and assets as an additional sanction.  While the Plaintiffs' briefing on the desired scope of this sanction is cursory, it cross-references prior briefing from when the sanction was first requested which provides greater insight. [R. 838-1 at 39.]  Here, the Plaintiffs moves the Court "to order Mr. Justice to pay to the Plaintiffs amounts improperly disbursed to

him and to pay the still-outstanding loans he received." [R. 673 at 34.]  In their view, this includes more than $47 million in improper disbursements, which he should be required to pay directly to the Plaintiffs, subject to a cap in the amount of the final Judgment.  Plaintiffs provide that "[a]nalytically, this relief is distinguished from the contempt fine discussed above, as it asks the Court to order Mr. Justice to pay to Plaintiffs the funds that he personally diverted to himself (the New Lead payments), the value of real estate that he caused JCJC to give to him without paying for it (the $13.5 million farm property), and debts owed to JCJC that he has not repaid ($31,740,101 in loans)." [*Id*.]  Plaintiffs acknowledge that they seek this as an alternative avenue of recovery, in the event that a contempt sanction in the amount of the judgment, or a factual finding of alter ego, is insufficient. [*Id*.]

Although the Court will not rule out such a sanction at a future juncture, it will decline to do so at this time.  While the Plaintiffs have made some efforts in the past to brief the Court on the specific transfers which they consider fraudulent and improper, more information is needed to impose such a sanction.  Furthermore, neither Plaintiffs nor Defendants have squarely briefed the legal foundation for such a sanction under the present circumstances.  The Court clarifies, however, that this should not be construed as a finding that it lacks jurisdiction to impose this sort of sanction.  The Court merely states that it declines to do so on the information presently before it.  Rather, the Court is confident that the significant increase in sanctions imposed today, long forewarned, will be adequate to foster greater compliance.  In the event these measures fall short, however, the Defendants are warned again that it may revisit this question as an additional sanction.

**III**

The sanctions the Court imposes today have been imposed only following years of intransigence, and only after numerous warnings have fallen upon deaf ears.  Although extensive in their scope and consequences, they are justified by the Defendants' continued misconduct and the Plaintiffs' failure to recover even one cent of the millions to which they are entitled more than a decade after the entry of judgment.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Defendants' Motion to Vacate Sanctions **[R. 781]** is **DENIED**;

2. The Plaintiffs' Motion for Leave to File Excess Pages **[R. 838]** is **GRANTED**;

3. The Plaintiffs' Motion for Leave to Seal a Document **[R. 840]** is **GRANTED**;

4. Plaintiffs' request for conclusive factual findings, as detailed at [R. 673-2] is **GRANTED**.  Per Rule 37(b)(2)(A)(i), the Court enters a binding finding of fact that the companies owned and controlled by members of the Justice family that are identified on Deposition Exhibits 1 [R. 662-1] and 5 [R. 662-5] are the alter egos of the Defendants' shareholders, James C. "Jay" Justice III and Jillean "Jill" Justice.

5. Mr. James C. "Jay" Justice III **SHALL** pay sanctions to the Clerk of the United States District Court for the Eastern District of Kentucky in the total amount of the following:

   a. The full amount of the Amended Judgment entered at [R. 740], which cross-references the amounts stated in the Court's August 30, 2023, Memorandum Opinion & Order [R. 714] and includes the following;

      i. For Count I, Defendants owe **$600,000** in unpaid retainer fees, with prejudgment interest compounded annually at 8% interest through

30

April 24, 2020, and with statutory post-judgment interest in accordance with 28 U.S.C. § 1961 thereafter;

    ii.  For Count II, Defendants owe **$16,990,900** in lost tonnage royalties, as determined by the independent arbiter, with prejudgment interest compounded annually at 8% beginning May 8, 2012, and with statutory post-judgment interest in accordance with 28 U.S.C. § 1961 beginning April 24, 2020;

    iii.  As restitution damages under Count V, Defendants owe **$20,000** for the Strong Brothers lease reimbursements, plus 8% interest beginning October 14, 2011, for the first $5,000; October 4, 2012, for the second $5,000 payment; November 22, 2013, for the third $5,000 payment; and April 28, 2016, for the fourth $5,000 payment

b.  Attorneys' fees and costs associated with post-judgment discovery.  As of February 10, 2025, this amount totaled $194,528.95, but this amount has doubtless increased since that time.  Accordingly, the Plaintiffs are **ORDERED** to file supplemental briefing within **twenty-one (21) days** of the entry of this Order as to the current amount of attorney fees and expenses associated with their pursuit of post-judgment discovery concerning the Justice entities.  Judge Ingram shall then prepare a report and recommendation regarding the present amount of attorney fees and expenses owed as a part of this sanction penalty.

c.  The per diem sanction total amount, in the amount of **$250.00 per day** beginning July 26, 2024, until February 9, 2025, and **$1,000.00 per day**

31

beginning February 10, 2025, until the date of the entry of this Order.  Per diem sanctions will cease to accrue after the date of the entry of this Order.

6. Mr. Stephen Ball **SHALL** pay sanctions to the Clerk of the United States District Court for the Eastern District of Kentucky in the total amount of the following:

    a. The full amount of the Amended Judgment entered at [R. 740], which cross-references the amounts stated in the Court's August 30, 2023, Memorandum Opinion & Order [R. 714] and includes the following;

        i. For Count I, Defendants owe **$600,000** in unpaid retainer fees, with prejudgment interest compounded annually at 8% interest through April 24, 2020, and with statutory post-judgment interest in accordance with 28 U.S.C. § 1961 thereafter;

        ii. For Count II, Defendants owe **$16,990,900** in lost tonnage royalties, as determined by the independent arbiter, with prejudgment interest compounded annually at 8% beginning May 8, 2012, and with statutory post-judgment interest in accordance with 28 U.S.C. § 1961 beginning April 24, 2020;

        iii. As restitution damages under Count V, Defendants owe **$20,000** for the Strong Brothers lease reimbursements, plus 8% interest beginning October 14, 2011, for the first $5,000; October 4, 2012, for the second $5,000 payment; November 22, 2013, for the third $5,000 payment; and April 28, 2016, for the fourth $5,000 payment.

    b. Attorneys' fees and costs associated with post-judgment discovery.  As of February 10, 2025, this amount totaled $194,528.95, but this amount has

doubtless increased since that time. Accordingly, the Plaintiffs are **ORDERED** to file supplemental briefing within **twenty-one (21) days** of the entry of this Order as to the current amount of attorney fees and expenses associated with their pursuit of post-judgment discovery concerning the Justice entities. Judge Ingram shall then prepare a report and recommendation regarding the present amount of attorney fees and expenses owed as a part of this sanction penalty.

c. The per diem sanction total amount, in the amount of **$250.00 per day** beginning July 26, 2024, until February 9, 2025, and **$1,000.00 per day** beginning February 10, 2025, until the date of the entry of this Order. Per diem sanctions will cease to accrue after the date of the entry of this Order.

This the 9th day of July 2026.

Gregory F. Van Tatenhove
United States District Judge